IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ASSOCIATION OF CLUB EXECUTIVES | § | |
| OF DALLAS, INC. et. al., | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:22-CV-00177-M |
| v. | § | |
| | § | |
| THE CITY OF DALLAS TEXAS, | § | |
| Defendant. | § | |

**DEFENDANT CITY OF DALLAS'S REPLY IN SUPPORT OF ITS
12(b)(6) MOTION TO DISMISS AND RESPONSE TO PLAINTIFFS' MOTIONS FOR
LEAVE TO FILE AMENDED COMPLAINT AND
PRELIMINARY INJUNCTION WITH BRIEF IN SUPPORT**

Defendant, City of Dallas ("the City") files its: (1) Reply to Plaintiffs' Response to the

City's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complaint (ECF No. 35); (2) Response to

Plaintiffs' Motion for Leave to File Their Amended Complaint (ECF No. 34); and (3) Response

to Plaintiffs' Motion for Preliminary Injunction (ECF No. 3) and Plaintiffs' Brief in Support (ECF

No. 4). The City asks the Court to deny leave to file Plaintiffs' Amended Complaint, grant the

City's Rule 12(b)(6) motion, dismiss the Complaint with prejudice, and/or deny plaintiffs' request

for preliminary injunction.

### INTRODUCTION

Chapter 41A of the Dallas City Code has regulated sexually oriented businesses "SOBs"

since 1986.  When the City first enacted Chapter 41A, it relied on studies and reports demonstrating

that sexually oriented businesses cause adverse secondary effects, including increased crime rates,

and it was upheld as constitutional, in part, on the basis that the City had justified its enactment by

relying on studies establishing that link. *See Baby Dolls Topless Saloons, Inc. v. City of Dallas*,

114 F. Supp. 2d 531, 545 (N.D. Tex. 2000), aff'd sub nom. *Baby Dolls Topless Saloons, Inc. v.*

1

*City of Dallas, Tex.*, 295 F.3d 471, 481-82 (5th Cir. 2002) (in upholding an amendment to Chapter 41A, the court pointed to a study on which the City relied that found "a correlation between SOBs—specifically, their 'hours of operation and the type of people which SOBs attract'—and higher crime rates."). The recent amendment to Chapter 41A adds a commonly utilized hours-of-operation restriction prohibiting adult businesses from operating between the hours of 2:00 a.m. and 6:00 a.m. Other businesses that operate in Dallas such as amusement parks, liquor stores, billiard halls, and pawn shops are subject to similar hours of operation restrictions.

Moreover, it is undisputed that when the City enacted the recent amendment to Chapter 41A, it did so, in part, due to a series of high-profile late-night shootings, four of which had occurred at or near SOBs, and in response to the Dallas Police Department's request for assistance with addressing crime during the late-night hours. It is likewise undisputed that the City also relied on studies and reports demonstrating a well-established and long-accepted link between higher crime rates and adult businesses and that adult businesses located in other Texas jurisdictions are subject to similar hours of operation restrictions. Finally, this information is summarized in the preamble on the face of the ordinance.

Notwithstanding the City's reliance on this crime-related information, Plaintiffs filed this lawsuit insisting that the new ordinance on its face and by its application targets only speech and should be held unconstitutional because it fails strict scrutiny. While ignoring all the other information on which the City relied, Plaintiffs' Complaint focuses solely on the voluminous and complex local crime data the Department gathered and analyzed to justify its request from the City Council for assistance with addressing crime emanating at or near adult establishments in the late-night hours. Consequently, without providing any competing data or referencing any conclusive alternative theory to explain the crime data, plaintiffs' theory of unconstitutionality as alleged in

the complaint rests entirely on the following legal and conclusory assertions: (1) "the ordinance was adopted without valid empirical information to support it;" and (2) "the data and information on which the City relied to support the Ordinance was invalid, flawed in several respects, and shoddy, and does not support or justify the Ordinance." [ECF No. 1 ¶¶48(e)(f) ]. In addition, plaintiffs fail to allege facts plausibly establishing the other elements on which their claim depends, namely that the ordinance (1) is not narrowly tailored to serve a significant government interest; and (2) leaves no open ample alternative channels for communication of the information.

The City's 12(b)(6) motion argued Plaintiffs' allegations with respect to the crime data were insufficient to state a claim for which Plaintiffs are entitled to relief in part because they do not plausibly establish the information on which the City relied was *irrelevant* to the late-night crime the City was seeking to address or provided *no reasonable* basis for City's determination that the ordinance would reduce crime and the concomitant demand on law enforcement. Moreover, whether the crime data is invalid, shoddy or failed to support the ordinance are all legal determinations, not factual allegations requiring assumption of truth.

In response to the City's 12(b)(6) motion, without addressing the defects in their pleading, Plaintiffs have sought to amend their complaint so they can attach several hundreds of pages of evidence. Instead of including a few concise factual allegations describing the extent and character of the alleged flaws in the data, or plausibly establishing a conclusive alternate theory that explains the local crime data, which if true, might render the City's interpretation of its own data plausibly unreasonable, Plaintiffs have opted to bury the City and this Court in superfluous information. Their refusal to comply with Rule 8 further highlights the inescapable conclusion that their claim is frivolous and should be dismissed. *See Bell Atlantic Corp. v Twombly,* 550 U.S. 544, 561-562 (2007) (rejecting pleading standard that allows for case to proceed in which "a wholly conclusory

statement of claim would survive a motion dismiss whenever the pleadings left open the possibility that a plaintiff might later establish 'some set of [undisclosed] facts to support recovery.')(citing in part *O'Brien v. DiGrazia*, 544 F.2d 543, 546, n. 3 (1st Cir. 1976)(observing that courts are not required to "to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional .. . . action into a substantial one.").  Finally, because their claim is frivolous and/or fails to plausibly establish they are entitled to the relief they seek, and their proposed amended complaint does not cure their pleading defects and therefore would be futile if filed, their complaint should be dismissed, their motion for leave should be denied, and their request for the extraordinary remedy of preliminary injunction should be denied.

## DISCUSSION

**I.    Reply to Plaintiffs' Response to the City's Rule 12(b)(6) Motion to Dismiss**

  **A.    Plaintiffs fail to allege facts plausibly establishing the challenged ordinance is subject to strict scrutiny.**

Plaintiffs re-urge the arguments made in their motion for temporary restraining order (TRO) and preliminary injunction (PI) in which they assert *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) requires the challenged ordinance be reviewed under strict scrutiny. [ECF No. 35 at 10-14 of 23]. The City has already responded to these arguments in its Rule 12(b)(6) motion to dismiss, [ECF No.17], response to the TRO, [ECF No. 10], and in its response to the PI motion contained below in part III of this pleading. The City hereby relies on those responsive arguments and incorporates them by reference as if fully set forth herein.

  **B.    Plaintiffs fail to allege facts plausibly establishing the challenged ordinance fails intermediate scrutiny on its face or as applied.**

To state a claim for relief, Rule 8 requires that the plaintiffs' complaint "contain a short and plain statement of the claim showing that [they are] entitled to relief." FED. R. CIV. P. 8(a)(2).

A claim may be dismissed for "failure to state a claim upon which relief can be granted." FED. R.
CIV. P. 12(b)(6). "To survive a Rule 12(b)(6) motion, a plaintiff must plead 'enough facts to state
a claim to relief that is plausible on its face." *In re Katrina Canal Breach Litig.*, 495 F.3d 191,
205 (5th Cir. 2007). A complaint is not required to provide "detailed factual allegations" but a
"plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than
labels and conclusions, and formulaic recitation of the elements of a cause of action *Twombly*, 550
U.S. at 555.

Courts are required to use a two-pronged approach when evaluating whether a complaint
satisfies Rule 8's pleading requirement. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009). First,
the court must begin by "identifying the allegations in the complaint that are not entitled to the
assumption of truth." *Id.* at 680. That is, the court must separate pleadings of fact from pleadings
of conclusion. Next, the court must evaluate the factual assertions to determine whether "they
plausibly suggest an entitlement to relief." *Id.* at 681. A claim has facial plausibility "when the
plaintiff pleads factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Id.* at 678. Determining whether well-pleaded facts
plausibly suggest an entitlement to relief is a "context-specific task" that calls upon a reviewing
court "to draw on its judicial experience and common sense." *Id.* at 679.

Here, before the City enacted the challenged ordinance which amended an ordinance that
was already regulating adult businesses, and which itself already contained historic findings that
adult businesses cause adverse secondary effects that the city was well within its authority to
regulate, the City held several public hearings during and after which it made available to the
public the evidence the City was reviewing when considering whether to impose an hours of
operation restriction on adult businesses. In addition to making the evidence publicly available,

after making findings based on this evidence, the City published its findings on the face of the newly enacted ordinance. The City's findings consisted of the following:

> WHEREAS, the Dallas Police Department created the northwest club taskforce in March 2021 due to multiple shootings and other violent crimes occurring at or near sexually oriented businesses; and
>
> WHEREAS, crime data shows a significant increase in violent crime and drug and gun arrests at or near sexually oriented businesses between the hours of 2:00 a.m. and 6:00 a.m.; and
>
> WHEREAS, Dallas Fire-Rescue Department data shows a significant increase in the number of calls for service at sexually oriented businesses between the hours of 2:00 a.m. and 6:00 a.m.; and
>
> WHEREAS, a 2012 research study by McCord and Tewksbery analyzing sexually oriented businesses in Louisville, Kentucky showed that there were higher rates of all types of criminal offenses in the immediate vicinity of sexually oriented businesses and that the effects of sexually oriented businesses significantly impact the local community; and
>
> WHEREAS, a 2008 study by McCleary showed that when a sexually oriented business opens on an interstate highway offramp in a rural community, total crime rises by 60 percent; and
>
> WHEREAS, a 2012 study by Weinstein and McCleary showed that sexually oriented businesses are associated with a higher incidence of crime regardless of the business's location; and
>
> WHEREAS, the cities of Beaumont, Texas and Amarillo, Texas produced a report showing that sexually oriented businesses: (1) promote prostitution, drug use, and other criminal activity, (2) have a deleterious effect on existing businesses and the surrounding residential areas adjacent to them, and (3) increase crime, and that there is a positive correlation between the hours of operation of a sexually oriented business and higher crime rates; and
>
> WHEREAS, based upon this data the Dallas City Council finds that the operation of sexually oriented businesses between the hours of 2:00 a.m. and 6:00 a.m. is detrimental to the public health, safety, and general welfare; and
>
> WHEREAS the city council wishes to reduce crime and conserve police and fire-rescue resources by requiring sexually oriented businesses to be closed for business between the hours of 2:00 a.m. and 6:00 a.m.

[ECF No. 19-1 at 2-3 of 121].

Thus, when evaluating the allegations contained within the complaint, the court is required to consider those allegations in the context of this public record. *Iqbal,* 556 U.S. at 679; *see also*, *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 114 F. Supp. 2d 531, 545 (N.D. Tex. 2000), aff'd sub nom. *Baby Dolls Topless Saloons, Inc. v. City of Dallas, Tex*., 295 F.3d 471 (5th Cir. 2002)(relying on the ordinance's preamble to find that "[u]nder *Renton*, the City has adequately justified that Ordinance No. 23137 is a content-neutral time, place, and manner regulation because it was enacted without reference to the content of Intervenors' expression. In enacting Ordinance 23137, the City's predominant concern was with addressing secondary effects associated with sexually oriented businesses.")

Moreover, as an initial matter, plaintiffs incorrectly state the burdens of the parties at the pleading stage. According to plaintiffs:

> A governmental entity seeking to regulate alleged adverse secondary effects of businesses engaged in the dissemination of expression must come forward with evidence or data that is, in the Court's parlance, not "shoddy" and that fairly supports the rationale of the law. If it meets that initial evidentiary burden, then the plaintiffs may challenge that evidence by demonstrating that the evidence proffered does not, in fact, support the ordinance's rationale and/or coming forward with contradictory evidence that disputes the government's factual findings regarding the purposed adverse secondary effects.

[ECF No. 35 at 17 of 23]. However, *before* a governmental entity is required to produce anything in a federal lawsuit, the plaintiff must first comply with the pleading requirements of Rule 8(a)(2) and survive dismissal under Rule 12(b)(6). Thus, the *first* step in this proceeding is for plaintiffs to allege facts plausibly establishing they are entitled to the relief they seek in the light of the public record, including the language of the ordinance itself.

Plaintiffs advance two arguments they assert support their conclusion, *not* that their complaint plausibly establishes they are entitled to relief, but instead that their complaint sufficiently "puts into issue the validity of the City's rationale for the ordinance.".[ECF No. 35 at

17 of 23]. Specifically, plaintiffs argue their complaint states a claim under both (1) the plurality

opinion, and (2) Justice Kennedy's concurring opinion in *City of Los Angeles v.  Alameda Books*,

535 U.S. 425 (2002). [ECF No. 35 at 14-23 of 23] The City addresses each of these arguments in

turn.

> 1.    **Plaintiffs fail to allege facts plausibly establishing the City's findings, justifying the facially expressed purpose of the ordinance of addressing adverse secondary effects, relied on evidence that is totally irrelevant or had no evidentiary value that would render the City's reliance on it unreasonable.**

Plaintiffs first argue they have stated a claim articulated by the plurality opinion in *Alameda*

*Books*. [ECF No. 35 at 15-18 of 23] Plaintiffs assert the plurality opinion stands for the proposition

that in all adult business regulation cases, plaintiffs need only file a lawsuit that places "into issue

the validity of the City's rationale" underlying the ordinance to automatically trigger the

government's "burden of producing evidence that adult uses cause the asserted adverse secondary

effects and that the proposed regulation is a reasonable measure to reduce that particular effect."

[ECF No. 35 at 12 of 23]. Thus, according to plaintiffs, the City has the initial burden of proving

it did not enact a content-based regulation. This, of course stands the pleading requirements on

their head and is unsupported by the plurality opinion for several reasons.

First *Alameda Books* did not arise from a 12(b)(6) context but was appealed from a motion

for summary judgment. Consequently, the plurality opinion did not examine the sufficiency of the

pleadings and instead discussed whether the evidence in that case was sufficient to entitle plaintiffs

to summary judgment.  In determining the evidence was insufficient to warrant summary judgment

against the City of Los Angeles, the court made a series of determinations that offer guidance about

what kinds of facts would and would not be sufficient to state a claim. Moreover, contrary to

plaintiffs' argument, the opinion certainly did not hold that merely filing a lawsuit containing a

conclusory allegation that evidence on which a municipality relies to support its ordinance is "shoddy" is sufficient to state a First Amendment claim.

Second, to the extent the plurality opinion hints at what allegations might satisfy the 12(b)(6) standard in the context of adult business regulation, *Alameda Books*, as well as other Supreme Court cases on which the plurality relied, suggest that when a city enacts an ordinance that on its face expressly aims at secondary effects rather than freedom of expression, as here, the City's findings justifying that non-speech purpose, which renders it content-neutral, are entitled to deference and that the plaintiffs must overcome that deference before it can be said they have stated a claim under the First Amendment. *See Alameda Books*, 535 U.S. at 440-41 ("Our deference to the evidence presented by the city . . . is the product of a careful balance between competing interests"); *see also id.* at 442 ("municipalities will in general have greater experience with and understanding of the secondary effects that follow certain protected speech than will the courts"); *see also City of  Erie v. Pap's A.M.*, 529 U.S. 277, 297-98 (2000)("The city council members, familiar with commercial downtown Erie, are the individuals who would likely have had firsthand knowledge of what took place at and around these adult establishments and can make particularized, expert judgments about the resulting harmful secondary effects").  In light of this deference, at the pleading stage, a plaintiff is required to overcome that deference by casting sufficient doubt on the validity of those findings by plausibly establishing the City's evidence is totally without relevance or having no evidentiary value that would make the City Council's reliance on them unreasonable. One way a plaintiff can show the City's findings are objectively unreasonable is by providing a *conclusive a*lternative theory explaining what the City's relied-upon data shows.

Third, the Supreme Court has already determined that certain factual allegations are insufficient to cast doubt on the City's findings in this context. For example, allegations establishing only that the City failed to conduct a new study or relied on the evidentiary foundations established by other jurisdictions are insufficient to state a violation of the First Amendment. *See e.g. Renton v. Playtime Theatres, Inc.* 475 U.S. 41, 51-52 (1986)("The First Amendment does not require a city before enacting an [adult business regulation] to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem the city addresses.") *see also Pap's A M*., 529 U.S. at 297 (municipalities can "reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theatres* to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood."); *see also Renton*, 475 U.S. at 51–52 (indicating reliance on judicial opinion describing evidentiary basis is sufficient. Accordingly, in order to ensure the plaintiff is not proceeding on a theory that would not entitle him to relief, he is required to assert the factual allegations on which he will rely, even when a reasonableness standard is at issue. *See eg., Taliaferro v. Lone Star Implementation & Elec. Corp*., 693 F. App'x 307, 311 (5th Cir. 2017) (affirming a 12(b)(6) dismissal in employment context because the plaintiff failed to plausibly establish her "reasonable belief" that text-messages she received constituted an unlawful practice under Title VII).

Here, plaintiffs submit conclusory assertion in its pleading that the City's evidentiary proof was, in its subjective determination, "flawed and shoddy" which does not come close to plausibly establishing the evidence on which the City relied was totally without relevance or having no evidentiary value whatsoever. *See Pap's A.M.,* 529 U.S. at 298 (reversing holding that adult

10

businesses restriction was unconstitutional in part because plaintiff has never "cast any specific doubt on the validity of [city council] findings. Instead, it has simply asserted that the council's evidentiary proof was lacking. In the absence of any reason to doubt it, the city's expert judgment should be credited.").  Indeed, plaintiffs' complaint focuses only on the police crime data while ignoring all other data and information on which the City relied, and without articulating the nature of the competing data on which plaintiffs rely or articulating a conclusive alternative theory that would suggest the City's interpretation of its crime data was unreasonable. *See Alameda Books* at 437 (reversing summary judgment against the City because plaintiffs provided no "reason to question the city's theory. In particular, they do not offer a competing theory, let alone data, that explains the elevated crime rates in neighborhoods with a concentration of adult establishments").

Moreover, plaintiffs' subjective and conclusory criticisms of the crime data analysis as alleged in their complaint amount to a mere disagreement with the conclusions drawn by a Department whose job it is to report and analyze crime so it can prevent crime. Even if there existed some mistakes or flaws in the data, which the City denies, the existence of flaws without more, does not plausibly establish the unreasonableness of the City's determination that the ordinance will reduce crime and thereby reduce demand on police and emergency services at these establishments during these hours. This is especially true when the complaint wholly ignores all the other findings, including that shootings were occurring during the late-night hours at or near adult establishments, that published research studies show adult businesses cause crime rates to increase, and that other jurisdictions have utilized similar restrictions to control crime during the late night hours.  Indeed, *Alameda Books*, and a vast majority of other circuit courts, including the Fifth Circuit teach that only "some evidence" of secondary effects need be offered, which is "not a heavy burden" and which plaintiffs have failed to plausibly establish the City did not meet.

11

For these reasons, Plaintiffs complaint is simply inadequate to state a claim for which they are entitled to relief as a matter of law.

### D.  Plaintiffs fail to allege facts plausibly establishing the challenged ordinance is not narrowly tailored to serve a significant government interest.

Next, Plaintiffs argue their complaint alleges facts plausibly establishing the regulation on its face, "shut[s] down and silenc[es] businesses that engage in the dissemination of constitutionally protected expression" and is therefore not narrowly tailored. [ECF 35 at 20 of 23]. This argument incorrectly assumes that *any* restriction on an adult businesses' hours of operation is unconstitutional. Plaintiffs primarily rely on Justice Kennedy's concurrence in *Alameda Books* to support their assumption.[1] [ECF 35 at 19-22 of 23]. However, Justice Kennedy's concurrence does not provide the support plaintiffs require because unlike the Los Angeles ordinance at issue there, plaintiffs' allegations do not plausibly establish the Dallas ordinance on its face or by its application will result in *permanent* closures of any adult businesses.

In *Alameda Books*, the adult businesses argued in part that compliance with a Los Angeles ordinance prohibiting the combination of two types of adult businesses – an adult bookstore and a adult video arcade -- would require adult video arcades to *permanently* close because they allegedly could not survive independent of adult bookstores. If true, Justice Kennedy surmised, such a requirement would in effect amount to a ban of adult arcades. *Id.* at 443. It was this argument that Justice Kennedy's concurrence addressed. *See id.*( referring to J. Kennedy's concurrence as a "reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is . .

---

[1]  Plaintiffs also rely on the rationale expressed in *Annex Books v. City of Indianapolis*, 740 F.3d 1136, 1138 (7th Cir. 2014)("[t]he secondary effects approach. . . permits governments to protect persons who want nothing to do with dirty books from harms created by adult businesses; the Supreme Court has not endorsed an approach under which governments can close bookstores in order to reduce crime directed against businesses that knowingly accept the risk of being robbed, or persons who voluntary frequent their premises. . ."). While the City disagrees with this reasoning, because this Court is not bound by Seventh Circuit precedent, the City does not address it.

. *not a ban*"); *see also id.* at 451 (J. Kennedy concurrence)(an ordinance requiring two adult businesses "to separate will have one of two results: One business will either move elsewhere or close. The city's premise cannot be the latter. . . The claim therefore must be that this ordinance will cause two businesses to split rather than one to close, that quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced. This must be the rationale of a dispersal statute"); *see also Illusions—Dallas Private Club, Inc.  v. Steen*, 482 F.3d 299, 311 (5th Cir. 2007) (interpreting *Alameda Books* to require courts to determine whether a time, place and manner restriction of adult entertainment, "bans SOBs altogether").

Here, however, the challenged ordinance on its face does not require, and plaintiffs do not allege its application will lead to, the *permanent* closure of *any of* the affected adult businesses. In the absence of such allegations, an ordinance requiring daily closure for only four hours a day does not result in a substantial diminishment of speech as a matter of law. *See Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079–80 (5th Cir. 1986)(affirming denial of preliminary injunction seeking to enjoin ordinance restricting hours of operation of adult bookstore); *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435 (6th Cir. 1998) (reversing preliminary injunction and upholding content-based statute limiting hours and days that adult entertainment establishments could be open); *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 827 (7th Cir. 1999)(upholding ordinance limiting the hours adult bookstores may open);  *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999)(upholding hours-of-operation regulation that "leaves open reasonable alternative avenues of expression" because "adult businesses may stay open fourteen hours a day, seven days a week."); *Center For Fair Public Policy v. Maricopa Cnty., Arizona*, 336

F.3d 1153, 1164–69 (9th Cir. 2003)(upholding state statute prohibiting sexually oriented businesses from operating during late night hours).

Because Plaintiffs fail to allege facts plausibly establishing the ordinance on its face or by its application will result in a substantial diminishment of speech, their claim fails.

## II.        Response to Plaintiffs' Motion For Leave to File Amended Complaint

The City objects to plaintiffs' proposed Amended Complaint because it violates Rule 8 of the Federal Rules of Civil Procedure and because it does not cure the defects identified in Defendant's 12(b)(6) Motion to Dismiss, rendering the amendment futile.

### A.        Rule 15

"Rule 15(a) requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014). However, "[l]eave to amend is in no way automatic." *Id.* "Denying a motion to amend is not an abuse of discretion if allowing an amendment would be futile." *Id.* An amendment is futile if it could not survive a Rule 12(b)(6) motion. *Id.*

### B.        Plaintiffs' amended complaint does not cure the defects identified in the original complaint.

Paragraph 47 in the proposed Amended Complaint attempts to "incorporate by reference" into the complaint whole deposition transcripts of (1) Dallas Police Department (DPD) Deputy Chief Rick Watson and (2) DPD Lt. Stephen Bishopp; (3) "testimony of Dr. Daniel Linz presented at the preliminary injunction hearing" for which there is no transcript currently available; and (4) Dr. Linz's expert report, which all together amounts to a 399-page amended complaint with attachments. [ ECF No. 34 at Ex. A ¶ 47].  This additional information does not cure the pleading problems with the original complaint for several reasons.

14

First, to the extent plaintiffs are attempting to utilize Dr. Linz's testimony and report to allege specific facts demonstrating the unreasonableness of City's findings, or for any other purpose, the City objects. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006)(holding district court did not abuse its discretion in refusing to consider expert affidavit attached to complaint when dismissing complaint under Rule 12(b)(6)). In advance of the preliminary injunction hearing, the City objected to the admissibility of Dr. Linz's opinions and testimony as irrelevant and unreliable, which the court denied without prejudice to its re-urging. [ECF No.26, 32]  The City re-urges those arguments here and relies on them as if fully set forth herein.  Relying on Dr. Linz's testimony and report to plead facts by attaching same to the complaint gets around that objection and the court's reliance on same at this stage risks a permanent ruling on the admissibility of Dr. Linz's opinions and regarding his qualifications. Moreover, even if the "non-opinion portions of an expert's affidavit constitute an instrument pursuant to Rule 10, opinions cannot substitute for facts . . ." *Id.*

Second, to the extent any relevant facts exist to *support* the plaintiffs' claim, the testimony of the police officers obviously offer facts that conclusively *negate* the plaintiffs' claim. Neither the City nor this court should be required to sift through a barrage of information to confirm plaintiffs have plead facts supporting and then negating their claim.  This scatter shot attempt to allege facts in support of their claim is not permitted by Rule 8. Moreover, for the reasons articulated above, to the extent plaintiffs are merely supplementing with evidence the original allegation that itself failed to state a claim, the Amended Complaint continues to suffer from the same defects as the original complaint.

Third, plaintiffs' proposed Amended Complaint also seeks to add an allegation that the studies on which the City relied to support its findings do not "deal with" or "examine" an hours

of operation of restriction.  Even if true, such an allegation does not plausibly establish the studies are totally irrelevant to the City's findings which "deal with" crime, nor plausibly establish that the City's findings are unsupported by the evidence as a whole. *Alameda Books* squarely holds that municipalities may draw reasonable inferences from studies to support the regulation, even if the study was not produced to support the specific regulation. Once again, it is an objectively reasonable test, not an empirically precise standard that controls. And a mere disagreement with the conclusions drawn from the relevant data, studies and other information, which is all that Plaintiffs have alleged in both the original and Amended Complaint, are insufficient to plausibly establish the City has violated the standards set forth in *Young*, *Renton* and *Alameda Books*.

For these reasons, the City requests that the Court deny plaintiffs' motion for leave to file their Amended Complaint as violative of Rule 8 and futile.

## III.   Response to Plaintiffs' Motion for Preliminary Injunction

### A.  Factual Background

By March 2021, the City of Dallas had experienced a series of shootings in the entertainment district which is located in the Northwest division of the City, where a majority of sexually oriented businesses operate. [PI DX 2 [2] at 9:1-25, 10:1-25, 11:1-16]. In response to these shootings, and as part of a citywide Violent Crime Reduction Plan, the Dallas Police Department ("the Department") formed the Northwest Club Task Force. [PI DX 2 at 11:23-25, 12:25, 13] The task force focused on addressing and reducing crime at or near clubs in the entertainment districts by deploying eight additional patrol officers in the areas where a substantial amount of late-night activity existed. *Id.*  Although this strategy offered some success in reducing crime in the northwest division over approximately an eight month period, [*id.* at 19:7-25, 20:1-10] the Department

---

[2]  ("PI DX" refers to preliminary injunction hearing defendant's exhibit, "PX" refers to plaintiff's exhibit)

determined it was unsustainable in the long term for several reasons including: (1) in order to canvass the entertainment districts with additional manpower, officers were being pulled from other shifts during which more crime typically occurs across the City; [PI DX 2 at 20:11-25, 21:1-14]  (2) other police units, like narcotics, fugitive apprehension, and gangs were temporarily deployed to focus on the adult establishments in the northwest division, where shootings had previously occurred, but could not be utilized to focus solely on these adult establishments indefinitely; [Maj. D. Palk Testimony] and (3) generally, fewer officers are willing to work in the late night hours, which presents a challenge when it comes to  staffing these late night shifts over the long term. [PI DX 1 at 23:14-25, 24:1-16 ]

Accordingly, to explore how best to manage its existing limited resources, the Department focused on crime data at or near adult establishments, where four of the six shootings in the northwest division had occurred. [PI DX 1 at 39:12-25,40:1-25, 41:1-17 ] To explore whether the late-night operation of the SOBs was producing a disproportionate demand on police and fire rescue resources, the Department gathered and analyzed crime data within 500 feet of the SOBs over a three-year period, between 2019 and 2020, between the hours of 10 p.m. and 6 a.m. [PI DX 1 at 46: 1-24, 48:2-25, 49:1-25, 50: 1-7] After analyzing the data, the Department determined that a substantial number of the violent crimes, such as murders and aggravated assaults, were occurring at or near these adult establishments after 2:00 am., when most other non-adult entertainment establishments begin to close. [*Id.*; PI PX 2]  In addition, the Department determined that a substantial number of "priority 1" and other calls for service were also emanating from or near these establishments after 2 a.m. [Id.; PI PX2; PI DX 18 (d)].  The Department was also aware that SOB hours of operation restrictions were already being utilized in other Texas cities including El Paso, Fort Worth, San Antonio, and Plano.  [PI PX 2 at COD 14 ]

In light of this data, the Department sought assistance from the City Council in the form of an amendment to the SOB ordinance that would restrict the hours of operation of SOBs between the hours of 2:00 a.m. and 6:00 a.m. [PI PX 2 at COD 35] The Department's determination that such an amendment would likely reduce crime during these hours was based on the following:  (1) the series of shootings occurring in the entertainment districts of the Northwest Patrol Division (where most of the adult businesses operate) during the late night hours,  four of which occurred at or near sexually oriented businesses; (2) the experience of the Northwest Club Task Force and determination that "high visibility" policing in the late night hours was unsustainable in the long term and was ultimately unsuccessful at preventing a shooting that occurred on January 5, 2022, in the parking lot of an adult establishment; (3) the Department determined that most of the adult establishments stay open past 2 a.m. at least three days a week and some stay open twenty-four hours a day; (4) Department crime data indicated a substantial amount of crime was occurring, as well as a substantial amount of 911 calls for service were emanating, at or near the adult establishments between the hours of 2 and 6 a.m; (5)  due to state TABC laws prohibiting the sale of alcohol after 2 a.m., most non-adult entertainment clubs close at or around 2 a.m.; (6) most of the adult establishments, some of which are BYOB, do not  close at or around 2 a.m. and draw large crowds after most of the other clubs have closed; (7) patrons visiting adult businesses after 2 a.m. typically have been drinking at other clubs before arriving at the adult businesses; (8)  some BYOB establishments do not, or are unable to, enforce state laws prohibiting the consumption of alcohol after 2 am.; (9) and the routine activities theory which is a well-established theory of criminology supports a determination that a link exists between crime and adult establishments, including adult bookstores because the typical patrons are attractive victims for perpetrators.

Accordingly, in the Department's view, such restriction would likely curb the amount of crime occurring during these hours and reduce the demand on law enforcement personnel. In support of its request, the Department presented the aforementioned evidence, including its crime data to two City Council committees on December 6 and 13, 2021, and to the City Council as a whole on January 5, 2022. In addition to the history of the shootings that prompted the creation of NW task force, the crime data, and the existence of hours of operation restrictions in other cities, the Department briefed City Council on the legal doctrine known as "secondary effects" as well as a criminology theory known "routine activities theory" discussed in research studies and articles that documented a well-established link between crime and sexually oriented businesses.

On January 26, 2022, after a public hearing during which community groups and citizens, including employees and representatives of the affected SOBs, expressed their support or opposition for the proposed restriction, the City Council voted unanimously to impose the SOB hours of operation restriction.

### B.    Legal Standard

"In order for a preliminary injunction to issue, the movant must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction will cause to the adverse party; and (4) that the injunction will not disserve the public interest." *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir.1991). "In order to obtain preliminary injunctive relief, the movant must carry the burden of persuasion on each of the elements of the four-prong test." *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984).

Finally, "[i]n considering whether to grant or deny preliminary injunctive relief, the district court must remember that a preliminary injunction is an extraordinary and drastic remedy, and that the movant has a heavy burden of persuading the district court that all four elements are satisfied." *Enterprise Intern. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir.1985) (internal quotations and citations omitted); *see also White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir.1989) (A preliminary injunction is "not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.").

C.      **Argument**

1.      **Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits because The Challenged Regulation Is a Time, Place & Manner Restriction, Invoking Intermediate Scrutiny.**

Plaintiffs allege the City's ordinance prohibiting them from operating their sexually oriented businesses between 2 a.m. and 6 a.m. violates their right to free expression under the First and Fourteenth Amendments.  In support of their assertion, they rely heavily on *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) and *Reagan National Advertising of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020) *cert. granted*, No. 20-1029 (June 28, 2021).  *Reed*, they argue, "clarified the [Supreme] Court's precedent concerning the level of scrutiny given facially content-based laws," which caused the Fifth Circuit to abrogate certain of its First Amendment cases. Plaintiffs' Br. at 10.

Plaintiffs' reliance on these cases is misplaced. Neither of these cases addressed government restrictions on sexually oriented businesses. Instead, both cases involved sign regulations and addressed only the level of scrutiny applicable to speech restrictions governed by the general rule requiring that governmental restraints on speech be neutral. *See Reed*, 576 U.S. at

20

159 (applying strict scrutiny to sign ordinance); *Reagan National Advertising of Austin, Inc*., 972 F.3d at 699 (applying strict scrutiny to sign ordinance).

With respect to zoning ordinances restricting sexually oriented businesses, it is well established that *despite* their content-based nature, they are *excepted* from the general neutrality rule because this type of regulation is typically "designed to combat the undesirable secondary effects of such businesses" and do not seek to restrain the dissemination of offensive speech. *City of Renton v. Playtime Theatres, Inc*., 475 U.S. 41, 49, (1986) (citing *Young v. American Mini Theatres, Inc*., 427 U.S. 50, 71, n. 34 (1976)(plurality). This line of cases expressly holds that "at least with respect to businesses that purvey sexually explicit materials," strict scrutiny is unnecessary because this category of restriction typically does not "contravene the fundamental principle that underlies [the Court's] concern about 'content-based' speech regulations [which is] that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" *City of Renton,* 475 U.S. at 48-49 (*quoting Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972)); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (erotic dancing as expressive conduct "falls only within the outer ambit of the First Amendment's protection" and is subject to restrictions); *Young*, 427 U.S. at 70 ("even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials. . . it is manifest that society's interest in protecting this type of expression is of wholly different, and lesser, magnitude than the interest in untrammeled political debate"). Accordingly, sexually oriented business restrictions are generally "to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations." *City of Renton,* 475 U.S at 49; *see also DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 827 (7th Cir. 1999), *cert denied*, 529 U.S. 1067 (April 17, 2000) (*citing Young*, 427 U.S. at 70–

21

71) ("The Supreme Court applies. . . a different kind of analysis to the category of speech at issue here: sexually explicit, non-obscene materials" which are "entitled to less First Amendment protection than non-sexually-explicit materials.").

Indeed, relying on this line of cases, several circuits, including the Fifth Circuit, have upheld the constitutionality of hours-of-operation restrictions on sexually oriented businesses similar to the restriction at issue here. None of these circuit cases were overruled by *Reed*, nor did *Reagan* overrule *Star Satellite*, even though it did abrogate several other First Amendment cases only to the extent that they relied on *Asgeirsson v. Abbott*, 696 F.3d 454, 459-60 (5th Cir. 2012), which did not address restrictions on sexually oriented businesses. *See Reagan National Advertising of Austin, Inc.*, 972 F.3d at 704 & n. 3.  Since *Reagan*, the Fifth Circuit has continued to rely on the standards established in *Renton* and *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (plurality opinion) rather than *Reed*, to determine the level of scrutiny that should be applied to sexually oriented business regulations.  *See Texas Entm't Ass'n Inc. v. Hegar*, 10 F.4th 495, 509-10 (5th Cir. 2021).

Here, the ordinance does not ban sexually oriented businesses and the purpose of the ordinance, on its face, is to address secondary effects associated with sexually oriented businesses, i.e. crime.  Therefore, it must be analyzed as a time, place, and manner restriction.  *Alameda Books*, 535 U.S. at 434. Dallas's hours of operation restriction at issue is constitutional so long as it (1) is narrowly tailored to serve a significant government interest; and (2) leaves open ample alternative channels for communication of the erotic speech. *Renton*, 475 U.S. at 48-50. The restriction meets this standard because it serves the significant government interests of ensuring public safety, reducing crime, and conserving limited police and fire prevention resources, and does not completely ban sexually-oriented businesses, but rather, permits them to remain open 20 hours a

day, seven days a week,  which amounts to 140 hours in a 168 hour week, which equates to approximately 7280 hours in a calendar year.

### 2.      Plaintiffs Cannot Demonstrate a Substantial Threat of Irreparable Injury.

Plaintiffs argue that "loss of First Amendment rights, for even minimal periods of time constitute Plaintiffs irreparable injury." Plaintiff's Br. at 22. However, as explained above, Plaintiffs' First Amendment rights are not violated by the ordinance because it merely imposes a reasonable restriction on the times during which they can freely express themselves.  Because the ordinance does not ban their businesses and allows them to remain open 140 hours in a 168-hour week, the restriction is more than reasonable. As Plaintiffs' First Amendment rights are not violated, they cannot demonstrate they will suffer *any* injury if the PI is denied, much less irreparable injury.

### 3.      Plaintiffs Cannot Show Their Threatened Injury Outweighs Damage that the PI will Cause to the City.

Next, Plaintiffs argue that the City "suffers no legally cognizable harm when it is prevented from enforcing an unconstitutional law."  Plaintiffs Br. at 22.  Plaintiffs also argue that "Plaintiff's employees and contractors will be deprived of their ability to earn their livelihoods." *Id.* However, as demonstrated above, the ordinance is not unconstitutional, and Plaintiffs cannot rely on injuries someone else might suffer to meet this element.  But even if they could, because the ordinance does not shut their businesses down, and only requires they hit pause for four out of 24 hours every day, the ability of their employees and contractors to earn a living is not substantially impacted.

Any time a governmental entity is enjoined by a court from effectuating the laws enacted by representatives of its people, the governmental entity suffers a form of irreparable injury.  *See Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (citing *Maryland v. King*, 567 U.S. 1301, (2012); *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984)).  Here, the

City's justification for passing the ordinance was to ensure public safety, reduce crime and conserve law enforcement and firefighter resources. (*See* ECF No. 1 at 21-22.) Granting the PI would prevent the City from achieving these goals and would prevent the City from engaging in the most important function of government—keeping its citizens safe. In addition, the City would continue to experience a drain on its already stretched thin law enforcement and fire resources. Thus, the City's harm flowing from the grant of the PI clearly outweighs any actual harm Plaintiffs might suffer by the ordinance if the PI is denied.

### 4. Granting the PI would disserve the public interest.

Finally, Plaintiffs once again rely on their assumption that the ordinance is unconstitutional to meet this element. Plaintiffs' Br. at 23. However, as demonstrated above, the restriction is reasonable and therefore valid. Accordingly, the public interest in preventing violent crime, conserving valuable and limited law enforcement and fire resources, and ensuring public safety are all furthered by the ordinance. Preventing it from going into effect only disserves this public interest.

### CONCLUSION

For these reasons, the Court should grant the City's Rule 12(b)(6) motion to dismiss for failure to state claim, deny as futile plaintiffs' motion for leave to file an amended complaint, and deny plaintiffs' request for preliminary injunction.

Respectfully submitted,

Christopher J. Caso
City Attorney
*/s/ Ana Marie Jordan*

ANN "ANA" MARIE JORDAN
Assistant City Attorney
Texas State Bar No. 00790748

24

Ann.jordan@dallascityhall.com

STACY JORDAN RODRIGUEZ
Executive Assistant City Attorney
Texas State Bar No. 11016750
stacy.rodriguez@dallascityhall.com

KATHLEEN M. FONES
Assistant City Attorney
Texas State Bar No. 24050611
kathleen.fones@dallascityhall.com


Dallas City Attorney's Office
1500 Marilla Street 7DN
Dallas, Texas 75201
Telephone: 214-670-3519
Facsimile: 214-670-0622
Attorney for Defendant


## CERTIFICATE OF SERVICE

I certify that on the April 5, 2022, the foregoing document was served on counsel of record

for Plaintiffs via the Court's electronic filing manager.


*/s/ Ana Marie Jordan*
Ana Marie Jordan