**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| ASSOCIATION OF CLUB EXECUTIVES | § | |
| OF DALLAS, INC., et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:22-cv-00177-M |
| v. | § | |
| | § | |
| CITY OF DALLAS, TEXAS, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Preliminary Injunction (ECF No. 3) and the Motion for Leave to Amend (ECF No. 34), filed by Plaintiffs the Association of Club Executives of Dallas, Inc.; AVM-AUS, Ltd. d/b/a New Fine Arts Shiloh; Nick's Mainstage, Inc.–Dallas PT's, d/b/a PT's Men's Club; Fine Dining Club, Inc., d/b/a Silver City; 11000 Reeder, LLC, d/b/a Bucks Wild; and TMCD Corporation, d/b/a The Dallas Men's Club (collectively, "Plaintiffs"). Also pending is the Motion to Dismiss for Failure to State a Claim (ECF No. 17), filed by Defendant the City of Dallas (the "City"). For the following reasons, the Motion for Preliminary Injunction is **GRANTED**, the Motion for Leave to Amend is **GRANTED**, and the Motion to Dismiss is **DENIED AS MOOT**.

**I.    BACKGROUND**

In Chapter 41A of the City of Dallas's Code of Ordinances, the City promulgates numerous regulatory obligations and restrictions on sexually oriented businesses ("SOBs")[1]

---

[1] The Code defines a SOB as "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, escort agency, nude model studio, or other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer." Dall. City Code § 41A-2(31).

operating within City limits.  On January 26, 2022, following a public hearing, the Dallas City Council unanimously voted to adopt Ordinance No. 32125 to amend Chapter 41A and add, *inter alia*, § 41A-14.3, a provision restricting SOBs from operating between the hours of 2 a.m. and 6 a.m.[2]  ECF No. 19-1 at 2–6 (the "Ordinance").

The Ordinance states the Council's finding that the operation of SOBs between 2 a.m. and 6 a.m. is "detrimental to public health, safety, and general welfare," citing various data in support, including crime data purporting to show an increase in violent crime and drug and gun arrests at or near SOBs between 2 a.m. and 6 a.m.; data from the Dallas Fire-Rescue Department showing an increase in the number of calls for service at SOBs between 2 a.m. and 6 a.m.; a 2012 research study by McCord and Tewksbery,[3] analyzing SOBs in Louisville, Kentucky; a 2008 study by McCleary, showing that crime increases when SOBs operate in rural communities; a 2012 study by Weinstein and McCleary, associating SOBs with a higher incidence of crime, regardless of location; and a report from the cities of Beaumont and Amarillo, showing that SOBs promote certain criminal activity, have a deleterious effect on adjacent areas, and increase crime.  Ordinance at 1–2.

The Ordinance also references a Dallas Police Department task force (the "Task Force") created in March 2021, at the Council's request, following shootings and other violent crimes that occurred at or near SOBs.  Ordinance at 2.  On January 5, 2022, the Police Department presented to the Council the Task Force's conclusions, and recommended that SOBs' hours of operation be reduced to decrease criminal activity, improve safety, and reduce demand on City

---

[2] Specifically, the Ordinance adopted by the City Council proposed amending §§ 41A-9, -16, -17, and -20 of the Code, and adding § 41A-14.3, the new section restricting SOBs' hours of operation.  ECF No. 19-1 at 2.

[3] The Ordinance references "a 2021 research study by McCord and *Tewksbery*," but the study attached to the City's Motion to Dismiss is authored by Richard Tewksbury.  *See* ECF No. 19-1, at 70.

services.  *See* ECF No. 19-1, at COD-35 ("SOB Briefing").[4]  On January 14, 2022, the Police Department submitted to the Council a "detailed analysis" of data relating to SOBs, including a list of licensed SOBs, graphs displaying data related to violent crime and associated arrests and emergency calls, and graphs displaying data related to all offenses, arrests, and calls for service. Resp. to Mot. for Preliminary Injunction, Ex. 2 (ECF No. 10 at 46) ("Task Force Report").[5]

On January 26, 2022, to advance its stated goal "to reduce crime and conserve police and fire-rescue resources by requiring [SOBs] to be closed for business between the hours of 2:00 a.m. and 6:00 a.m.," the City Council unanimously approved of the Ordinance.  Ordinance at 2; Item 36, Dall. City Council Meeting (January 26, 2022), https://dallastx.swagit.com/play /01262022-1031.  That same day, Plaintiffs filed a Complaint against the City, and moved for a temporary restraining order and preliminary injunction, asserting that the Ordinance violates Plaintiffs' First Amendment right to freedom of expression.  ECF Nos. 1 ("Compl."), 3 ("Mot."). Plaintiffs consist of four adult cabaret businesses and one adult bookstore that qualify as SOBs under the City Code, and a non-for-profit trade association whose members are SOBs and include adult bookstores, arcades, and cabarets located in the City of Dallas.  The Complaint alleges that the Ordinance is an unconstitutional content-based restriction of protected expression, does not withstand strict or intermediary scrutiny, and that the data and information relied on by the City in passing the Ordinance is invalid, flawed, and shoddy.  Compl. ¶ 48.

On January 28, 2022, the Court denied Plaintiffs' request for a temporary restraining order based on the City's representation that it would not enforce the Ordinance before the Motion for Preliminary Injunction was decided.  ECF No. 11.  On February 18, 2022, the City moved to dismiss under Rule 12(b)(6), attaching the Task Force Report, the Police Department's

---

[4] This presentation was admitted into evidence during the preliminary injunction hearing as Plaintiffs' Exhibit 2.
[5] This report was admitted into evidence during the preliminary injunction hearing as Plaintiffs' Exhibit 3.

SOB Briefing to the Council, and the research studies referenced in the Ordinance.  ECF

Nos. 17, 19.  On March 7, March 23, and April 6, 2022, the Court held evidentiary hearings in

connection with Plaintiffs' Motion for Preliminary Injunction.  On March 31, 2022, Plaintiffs

moved for leave to file an amended complaint.  ECF No. 34.  On April 28, 2022, the Court

received supplemental briefing on the recently decided case of *City of Austin, Texas v. Reagan*

*National Advertising of Austin, LLC*, 142 S. Ct. 1464 (2022).

## II.    DISCUSSION

The Court will first address the City's Motion to Dismiss and Plaintiffs' Motion for

Leave to File an Amended Complaint.  ECF Nos. 17, 34.  The Court will then address Plaintiffs'

Motion for Preliminary Injunction.

### A.  Motion to Dismiss and Motion for Leave to Amend

The City moves to dismiss under Rule 12(b)(6), arguing that the Complaint does not

contain facts plausibly alleging that the City's data was flawed, nor that the Ordinance was not

narrowly tailored to achieve a compelling government interest, as required to allege a First

Amendment violation.  *See* ECF No. 17 at 6–10.  In response, Plaintiffs seek leave to amend

their pleadings to include additional factual allegations to support their claim that the challenged

Ordinance is unconstitutional, in part incorporating evidence gathered in discovery and proffered

during the preliminary injunction hearing.  ECF No. 34.  The City opposes on the grounds that

Plaintiffs' amendments do not satisfy Rule 8 and are futile, and that the City objects to some of

the material attached to the proposed Amended Complaint, including the testimony and report of

Plaintiffs' expert, Dr. Daniel Linz.  ECF No. 37.

Under Federal Rule of Civil Procedure 15, the Court should "freely give leave" to amend

"when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Here, the Court determines that the

proposed amendments are not futile, and that justice requires granting Plaintiffs leave to amend the Complaint.  The Court has already ruled on most of the City's objections to materials attached to the Amended Complaint during the hearings, and to the extent other objections remain, they are hereby **OVERRULED**.  Accordingly, Plaintiffs' Motion for Leave to Amend is **GRANTED**, and the City's Motion to Dismiss is **DENIED AS MOOT.**

### B.  Motion for Preliminary Injunction

Plaintiffs move for a preliminary injunction enjoining the enforcement of the Ordinance's restriction of hours of operation of SOBs.  To be entitled to a preliminary injunction, the movant must demonstrate: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.  *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015).

As a preliminary matter, the Court need not analyze factors (2) and (4), threat of irreparable injury and whether an injunction would be in the public interest, respectively; because Plaintiffs allege a First Amendment violation, these factors are presumed and weigh in favor of an injunction.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("Injunctions protecting First Amendment freedoms are always in the public interest."). Accordingly, the Court addresses only whether Plaintiffs have shown a likelihood of success on the merits and the balance of hardships.  Based on the evidentiary record before the Court and for the reasons stated below, the Court concludes that Plaintiffs have established a reasonable

likelihood of success on the merits, and the balance of hardships weighs in favor of an injunction.

### 1. Likelihood of Success on the Merits

Plaintiffs contend that the Ordinance's restriction on the hours of operation of SOBs is a content-based law which regulates protected speech, and is unconstitutional under both strict and intermediate scrutiny.  The City responds that because the Ordinance regulates SOBs, it is evaluated under the standards established in *City of Renton v. Playtime Theatres, Inc*., 475 U.S. 41, 49 (1986), and *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (plurality opinion); under *Renton*, the City maintains, the Ordinance is content neutral, because it is aimed at addressing the secondary effects of SOBs, and survives intermediate scrutiny as a reasonable time, place, and manner restriction.  ECF No. 10 at 8.

In analyzing a First Amendment claim, the Court first determines whether the targeted speech is protected, and, if so, what level of scrutiny applies; and second, determines whether the Ordinance survives the appropriate level of scrutiny.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011).  Nude dancing is expressive conduct protected by the First Amendment.  *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (O'Connor, J., plurality) ("[N]ude dancing . . . is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection.").  Similarly, regulations targeting businesses that purvey sexually explicit materials are subject to scrutiny under the First Amendment.  *E.g.*, *Renton*, 475 U.S. at 49–50; *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 70 (1976).  Accordingly, the speech targeted by the Ordinance—nude dancing and materials sold at adult bookstores—is protected.

Here, the Court concludes that it need not determine as a final matter which level of scrutiny applies, because regardless of the standard under which the Ordinance is evaluated, it

does not pass muster, and therefore must be enjoined.  Accordingly, this factor weighs in favor

of an injunction.

###### a.   The governing law is unclear as to whether strict or intermediate scrutiny applies here.

Laws that regulate speech are presumptively unconstitutional because, under the First

Amendment, a government has "no power to restrict expression because of its message, its ideas,

its subject matter, or its content."  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting

*Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)).  Laws that target speech based on its

"communicative content"—*i.e.*, content-based laws—are subject to strict scrutiny, and may only

be justified by a showing that the law is narrowly tailored to serve a compelling state interest.

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  In contrast, time, place, and manner

restrictions that are content neutral and "designed to serve a substantial governmental interest

and not unreasonably limit alternative avenues of communication" are afforded intermediate

scrutiny.  *Renton*, 475 U.S. at 41.

Accordingly, whether a law is content based or content neutral determines the scrutiny

under which it is evaluated.  A law is content based if the regulation, on its face, "draws

distinctions based on the message a speaker conveys."  *Reed*, 576 U.S. at 163.  "Some facial

distinctions based on a message are obvious, defining regulated speech by particular subject

matter, and others are more subtle, defining regulated speech by its function or purpose."  *Id.* at

163–64.  For example, the Supreme Court in *Reed* considered an ordinance limiting the size,

duration, and location of temporary signs to be content based on its face, because the

communicative content of the signs had to be read and interpreted—specifically, to determine

whether the sign was directional, political, or ideological—to know whether certain restrictions

applied.  *Id.* at 164 ("The restrictions in the Sign Code that apply to any given sign thus depend

entirely on the communicative content of the sign.").  Here, because the Ordinance regulates SOBs, which are defined in the Dallas City Code by the content of the entertainment or services purveyed, the Ordinance is content based.  *See* Dall. City Code § 41A-2(31) (defining an SOB as a business providing services or items "intended to provide sexual stimulation or sexual gratification to the customer").

Here, the City acknowledges that the Ordinance restricting SOBs is content based, but argues that under *Renton*, regulations addressing SOBs fall into an exception to the normal content-based approach, and are not subject to strict scrutiny.  ECF No. 10 at 5 (arguing that, "*despite* their content-based nature," regulations restricting SOBs "are *excepted* from the general neutrality rule" because they address secondary effects, as opposed to the dissemination of speech).  In *Renton*, the Supreme Court applied what is often referred to as the "secondary effects doctrine" in the SOB context, which treats certain content-based regulations as content-neutral regulations subject to decreased scrutiny, in instances where it appears that the "predominate concerns" of the body enacting the regulation were to address the "secondary effects" of the speech, as opposed to its content.  475 U.S. at 47; *see also Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring) ("The purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech.").  Secondary effects can include an increased crime rate, diminution of property value, and the adverse impact on the quality of neighborhoods.  *Alameda Books*, 535 U.S. at 434 (O'Connor, J., plurality).  Here, because the Ordinance states it was approved by the City Council, at least in part to reduce crime, the City contends that the Ordinance is subject to intermediate scrutiny, by application of the secondary effects doctrine.

Plaintiffs contend that the secondary effects doctrine no longer applies, citing the Supreme Court's decision in *Reed* and the Fifth Circuit's subsequent abrogation of at least some secondary effects doctrine cases.  In *Reed*, the Supreme Court held a law that is content based on its face "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." 576 U.S. at 165.  Accordingly, a court must consider whether the challenged law is content based or content neutral "*before* turning to the law's justification or purpose."  *Id.* at 166.  As discussed, *Reed* concerned sign laws, and the majority did not expressly address the secondary effects doctrine, SOBs, or the implication of *Reed* on *Renton* or *Alameda Books*.[6]

In *Reagan National Advertising of Austin, Inc. v. City of Austin*, 972 F.3d 696, 702–04 (5th Cir. 2020), *reversed and remanded*, *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464 (2022),[7] the Fifth Circuit applied *Reed* to a regulatory sign provision concerning the digitalization of signs.  The Code at issue in *Reagan* regulated "on-premises" and "off-premises" signs.  An off-premises sign is one "advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site."  972 F.3d at 700.  The Code permitted on-premises sign owners to install digital signs, but off-premises sign owners could not.  *Id.* at 704.  Following *Reed*, the Fifth Circuit concluded that because determining whether the sign was "off-premises" under the Code required reading the sign—to determine whether it advertised something located elsewhere or directed someone to a different location—the Code was content based, and subject

---

[6] The only reference this Court found in *Reed* to the regulation of SOBs is in Justice Kagan's concurrence, in which she acknowledges that prior Supreme Court cases "have been far less rigid than the majority admits in applying strict scrutiny to facially content-based laws," citing *Renton* in her discussion.  *See Reed*, 576 U.S. at 183 (Kagan, J., concurring).

[7] This opinion uses "*Reagan*" to refer to the Fifth Circuit's decision in *Reagan National Advertising of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020), and "*City of Austin*," to refer to the Supreme Court's decision overturning the Fifth Circuit in *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464 (2022).

to strict scrutiny.  *Id.* at 707.  The Fifth Circuit in *Reagan* applied *Reed*'s reasoning that "a distinction can be facially content based if it defines regulated speech by its function or purpose," and concluded that because the regulation defined off-premises signs by their purpose of advertising a business elsewhere or directing attention to something at a different location, the regulation was content based.  *Id.* at 706.

In reaching its holding, the Fifth Circuit in *Reagan* acknowledged that *Reed* constituted a "sea change" in First Amendment jurisprudence, and that *Reed* abrogated the Fifth Circuit's prior holding that "[c]ontent-neutrality . . . [is] defined by the justification of the law or regulation." *Id.* at 703 (quoting *Asgeirsson v. Abbott*, 696 F.3d 454, 459–60 (5th Cir. 2012), *abrogated by Reagan*, 972 F.3d at 703).  In footnote 3 of *Reagan*, the Fifth Circuit specifically identified a number of cases it was abrogating based on *Reed*, including four cases that had upheld ordinances relating to SOBs under the secondary effects doctrine.  *Id.* at 703 n.3 (citing *Illusions–Dall. Priv. Club, Inc. v. Steen*, 482 F.3d 299, 303 (5th Cir. 2007) (prohibiting SOBs from serving alcohol); *Fantasy Ranch Inc. v. City of Arlington, Tex.*, 459 F.3d 546, 550 (5th Cir. 2006) (restricting proximity from the stage, requiring plexiglass barriers, and regulating tipping); *N.W. Enterprises Inc. v. City of Hous.*, 352 F.3d 162, 172 (5th Cir. 2003) (restricting SOB location, design, and employee licensing); *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 290 (5th Cir. 2003) (prohibiting SOBs within 1,000 feet of residential areas).  By abrogating these SOB cases in footnote 3 of its opinion in *Reagan*, the Fifth Circuit implicitly applied *Reed*'s holding that a content-based law is subject to strict scrutiny regardless of the government's content-neutral justification, so as to abrogate the secondary effects doctrine in the SOB context.  In doing so, however, the Fifth Circuit in *Reagan* did not name the secondary

effects doctrine, nor expressly discuss the impact of *Reed* on *Renton* or the Supreme Court's
more recent secondary effects case, *Alameda Books.*[8]

Plaintiffs contend that under the Fifth Circuit's decision in *Reagan*, the Council's stated
aim of reducing crime as a secondary effect of SOBs cannot be considered when determining if
strict scrutiny applies.  In response, the City maintains that the Fifth Circuit's decision in *Reagan*
did not disturb the applicability of the standards articulated in *Renton* and *Alameda Books* in the
SOB context, and accordingly, argues that this Court must consider whether the City enacted the
Ordinance to address secondary effects of SOBs in deciding the scrutiny level.  The City points
to the case of *Texas Entertainment Association, Inc. v. Hegar*, 10 F.4th 495 (5th Cir. 2021), as
establishing the continued viability of the secondary effects doctrine in the SOB context, post-
*Reagan*.  In *Hegar*, the Fifth Circuit applied the secondary effects doctrine articulated by the
Supreme Court in *Renton* and *Alameda Books* to assess whether a rule regulating nude dancing
in SOBs was subject to intermediate or strict scrutiny; the Fifth Circuit noted that to determine
whether the rule was content based or content neutral, it "must look to its purpose as
substantiated by the record."  *Id.* at 510.  The panel went on to apply strict scrutiny because the
record contained no evidence of secondary effects, and accordingly, did not apply the secondary
effects doctrine, and the rule was deemed content based.  *Id.* at 510–12.  Despite being fully

---

[8] Apart from the cases cited in footnote 3, the authorities relied on by the Fifth Circuit in *Reagan* either do not address
the secondary effects doctrine or the regulation of SOBs, do not reach the issue, or conclude that *Reed* did not impact
the secondary effects doctrine.  *See e.g.*, *Free Speech Coal., Inc. v. Att'y Gen. United States*, 825 F.3d 149, 161 (3d
Cir. 2016) ("We need not reach the issue of whether the secondary effects doctrine survives *Reed* because this is not
a secondary effects case."); *Free Speech Doctrine After Reed v. Town of Gilbert*, 129 Harv. L. Rev. 1981, 1996 &
n.11 (2016) ("Early evidence also suggests that the secondary effects doctrine—another categorical carveout from
unitary application of content analysis—also survived *Reed*. The secondary effects doctrine allows 'intermediate
rather than strict scrutiny' for zoning ordinances that are facially content based (especially so after *Reed*) but are
'designed to decrease secondary effects and not speech.'  The doctrine is a contested exception to content analysis that
has largely been limited to the context of sexually explicit speech." (citations omitted)).

11

briefed, argued, and decided after the Fifth Circuit decided *Reagan*, neither the briefs nor the opinion in *Hegar* cites to *Reagan*.

This Court acknowledges the apparent tension between the Fifth Circuit's decisions in *Reagan* and *Hegar*.  Despite *Reagan*'s seeming abrogation, in footnote 3, of its pre-*Reed* content-neutrality analysis of SOBs under the secondary effects doctrine, *Hegar* references and employs that same purportedly rejected framework, without providing guidance on how to read the two cases harmoniously.  Put differently, it is unclear whether, as the City argues, SOBs were implicitly carved out of the Fifth Circuit's acknowledgment of the "sea change" wrought in First Amendment jurisprudence by *Reed*.  Nor is it clear how this Court should apply *Reagan* and *Hegar* in light of the Fifth Circuit's rule of orderliness, which provides that when the Fifth Circuit issues a decision that resolves a legal question, absent an intervening change in law or en banc or Supreme Court decision, a subsequent panel "may not overrule a prior panel opinion and the earlier precedent controls."  *United States v. Walker*, 302 F.3d 322, 325 (5th Cir. 2002); *see also Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect.").

Further complicating matters is the fact that, on April 21, 2022, the Supreme Court issued its opinion in *City of Austin v. Reagan National Advertising of Austin, LLC*, reversing the Fifth Circuit's decision in *Reagan* and thereby perhaps calling into question the Fifth Circuit's abrogation of the secondary effects doctrine in SOB cases therein.[9]  142 S. Ct. at 1470–71.  Specifically, in *City of Austin*, the Supreme Court disagreed with the Fifth Circuit's conclusion that the regulation targeting off-premises signs was content based simply because the sign's

---

[9] This Court ordered the parties to submit briefing on the impact on this case of the Supreme Court's decision in *City of Austin*, and they did so.  ECF Nos. 38, 39, 40.

contents must be read to determine whether it qualified as off-premises. *Id.* at 1471–72. Instead, the Supreme Court concluded the Code was a content-neutral, location-based regulation, because "[a] given sign is treated differently based solely on whether it is located on the same premises as the thing being discussed or not," and "[t]he message on the sign matters only to the extent that it informs the sign's relative location." *Id.* at 1472–73. In so holding, the Supreme Court acknowledged "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral," and reversed the judgment of the Fifth Circuit and remanded for further proceedings.[10] *Id.* at 1473, 1476.

Thus, although it is clear that the Fifth Circuit erred in classifying the off-premises/on-premises regulation at issue as content based, the viability of the remainder of the Fifth Circuit's holdings in *Reagan* is unknown. The Supreme Court's decision in *City of Austin* does not address the Fifth Circuit's abrogation of its pre-*Reed* secondary effects cases, including those SOB cases discussed in footnote 3; given that the Fifth Circuit's reasoning there relied on *Reed*, and is arguably not implicated by the Supreme Court's *City of Austin* opinion, that portion of *Reagan* may have survived. On the other hand, the Supreme Court in *City of Austin* arguably pushes back against the Fifth Circuit's "broad" characterization of *Reed*, characterizing it as, at least in parts, an "extreme" interpretation. 142 S. Ct. at 1471 ("The Court of Appeals interpreted *Reed* to mean that if '[a] reader must ask: who is the speaker and what is the speaker saying' to apply a regulation, then the regulation is automatically content based. This rule . . . is too extreme an interpretation of this Court's precedent." (citation omitted)). The majority also clarified the scope of *Reed*'s holding, reigning in the scope of its potential impact on earlier

---

[10] Specifically, the Supreme Court remanded for the lower courts to determine whether the regulation survived intermediate scrutiny, and to consider whether there was evidence that an impermissible purpose or justification underpinned the off-premises regulation, such that the facially content-neutral restriction could be considered content based. *City of Austin*, 142 S. Ct. at 1476.

precedent.  *E.g.*, *id.* at 1474 ("That does not mean that any classification that considers function or purpose is always content based.  Such a reading . . . would contravene numerous precedents, . . . . *Reed* did not purport to cast doubt on these cases."); *id.* ("Nor did *Reed* cast doubt on the Nation's history of regulating off-premises signs."); *id.* at 1475 ("Nor do we cast doubt on any of our precedents recognizing examples of topic or subject-matter discrimination as content based."); *see also id.* at 1487 (Thomas, J., dissenting) ("The majority's holding that some rules based on content are not, as it turns out, content based nullifies *Reed*'s clear test.").  Admittedly, this commentary arises in the context of whether the off-premises sign regulation was facially content neutral, and not in determining whether an undisputedly content-based restriction can otherwise be subject to intermediate scrutiny under the secondary effects doctrine.  However, the salient point is that these cabining assessments of *Reed* by a majority of the Supreme Court at least cast doubt on the Fifth Circuit's expansive application of *Reed* so as to seemingly vitiate the secondary effects doctrine in SOB cases, as Plaintiffs purport is mandated by footnote 3 of *Reagan*.

In the absence of clear guidance that the Fifth Circuit's abrogation of secondary effects cases in footnote 3 remains good law, the silence of *Reed*, *Reagan*, and *City of Austin* regarding the secondary effects doctrine—not to mention SOB cases such as *Renton* and *Alameda Books*—renders Plaintiffs' position that the secondary effects doctrine has been abrogated harder to sustain.  In the Supreme Court's most recent secondary effects case, *Alameda Books*, a plurality held that a local zoning ordinance that applied only to adult establishments was content neutral under the secondary effects doctrine because its purpose was to reduce crime, not to suppress speech.  535 U.S. at 436.  No intervening Supreme Court case expressly overturned *Alameda Books*, and no Fifth Circuit case distinguished *Alameda Books*.  Without clear instruction from

the Supreme Court or the Fifth Circuit otherwise, this Court is reluctant to interpret *Reed*, a sign

case, as implicitly making sweeping changes to the law governing SOBs, particularly as the

Supreme Court has long characterized businesses that offer sexually explicit entertainment as

falling within the "outer ambit" of the First Amendment's protection.  *See City of Erie*, 529 U.S.

at 289; *Young*, 427 U.S. at 70 ("[I]t is manifest that society's interest in protecting this type of

[sexually explicit] expression is of a wholly different, and lesser, magnitude than the interest in

untrammeled political debate . . . ."); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 n.1

(7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of

businesses that offer sexually explicit entertainment, a category the Court has said occupies the

outer fringes of First Amendment protection.").

      In sum, the Court is confronted with two outstanding questions regarding the correct

scrutiny to apply to the Ordinance at issue here: first, the continued viability of *Reagan*'s

abrogation, in footnote 3, of pre-*Reed* Fifth Circuit SOB secondary effects cases in light of *City

of Austin*; and second, to the extent footnote 3 of *Reagan* remains good law, how it can be

reconciled with the seemingly contrary teachings of *Hegar*.  Fortunately, the Court concludes

that it need not resolve the question of the continued viability of the secondary effects doctrine in

the Fifth Circuit because, as discussed below, the Ordinance does not survive regardless of the

scrutiny applied.  Accordingly, the Court does not expressly decide whether the Ordinance is

subject to strict or intermediate scrutiny.

### b.  Regardless of the scrutiny applied, the Ordinance is unconstitutional.

      In light of its stated purpose and the evidence presented by the parties, the Court

concludes the Ordinance's restriction on Plaintiffs' protected expression does not survive strict

or intermediate scrutiny, and is thus unconstitutional.

Accordingly, having heard the evidence presented, the Court first considers whether the Ordinance passes strict scrutiny.  Laws analyzed under strict scrutiny must be narrowly tailored to serve a compelling state interest.  *Reagan*, 972 F.3d at 709.  Narrow tailoring requires that an ordinance must be the "least restrictive" means of achieving the compelling state interest. *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  The tailoring requirement does not permit the government to take efficiency into consideration.  *See id.* at 486.

The City states that it adopted the Ordinance to reduce crime and conserve police and fire rescue resources, by restricting SOBs from operating between the hours of 2 a.m. and 6 a.m.  *See* Ordinance at 2.  However, even assuming that the stated aim constitutes a compelling government interest, no evidence was presented that the City considered less restrictive means of achieving its stated interest of lowering crime, such as, for example, requiring heightened security, escorts of customers to their vehicles, or better lighting, before it decided to prohibit the operation of SOBs between the hours of 2 a.m. and 6 a.m.   Dallas Police Department Major Samuel Sarmiento testified that members of the Police Department met with certain SOBs to make recommendations for how to make their businesses safer, such as adding more lights and cameras for surveillance, but there is no evidence suggesting that the City considered making those recommendations mandatory prior to imposing the Ordinance.  *See* Tr. Vol. 1, at 245:20– 247:14 (Mar. 7, 2022).  Nor did the City consider whether any shorter or alternative time periods could achieve the City's interest, such as whether closing SOBs between 2 a.m. and 4 a.m., or only on weekends, could achieve the desired reduction in crime.[11]

---

[11] As will be discussed, the testimony presented in this case reveals that many of the SOBs affected by the Ordinance are not even open until 6 a.m. during the week, exposing the City's failure to consider a less restrictive means.  *E.g.*, Tr. Vol. 1, at 182:13–16.

In addition, Major Sarmiento testified that SOBs cannot hire off-duty members of the Dallas Police Department to work security, although officers are permitted to work off-duty security details for other types of businesses.  *Id.* at 241:18–25.  To the extent the Ordinance was intended to preserve police resources, permitting police officers to work security at SOBs while off-duty would be a less restrictive approach to achieving the City's stated interest of conserving resources.  Accordingly, because restricting protected speech is not the least restrictive means available to the City to combat crime and conserve resources, the Court concludes that the Ordinance does not pass strict scrutiny.

The Court also concludes that the Ordinance fails to pass intermediate scrutiny.  To survive intermediate scrutiny, a content-neutral law regulating expression must be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  If secondary effects are considered, "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact."  *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring).  To satisfy intermediate scrutiny, the City must show that the Ordinance targets the "noxious side effects" of SOBs, rather than the expressive activity, and "may not assert that it will reduce secondary effects by reducing speech in the same proportion."  *Id.* at 446–47, 449.

The City may rely on "any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest," but cannot "get away with shoddy data or reasoning."  *Id.* at 438 (O'Connor, plurality) (quoting *Renton*, 475 U.S. at 51–52).  The City's evidence must "fairly support" its rationale for the Ordinance.  *Id.*  Plaintiffs can cast doubt on this rationale, either by demonstrating that the City's

evidence does not support its rationale or by furnishing evidence that disputes the City's factual findings. *Id.* If Plaintiffs succeed in casting doubt on the City's rationale, the burden shifts back to the City to supplement the record "with evidence renewing support for a theory that justifies its [O]rdinance." *See id.*

As discussed, the Council approved the Ordinance which restricts protected speech at SOBs between the hours of 2:00 a.m. and 6:00 a.m. to advance its stated goal "to reduce crime and conserve police and fire-rescue resources." Ordinance at 2. Accordingly, the City must provide evidence demonstrating a connection between SOBs and its government interest of reducing crime and conserving police resources. In support of its Ordinance, the City submitted evidence including certain crime data; testimony from law enforcement officers, namely Lieutenant Stephen Bishopp, Deputy Chief Rick Watson, Major Devon Palk, and Major Samuel Sarmiento; and three research studies referenced in the Ordinance purportedly connecting SOBs with increased crime.[12]

The Court begins with the crime data presented. In passing the Ordinance, the City Council relied on the January 5, 2022, SOB Briefing to the City Council, and the January 14, 2022, Task Force Report, both of which contain crime data relating to SOBs from 2019 to 2021.[13] During the preliminary injunction hearing, the City also submitted Exhibit 18 and elicited testimony regarding Exhibit 18-D, which contains raw crime data for 2018 through 2021

---

[12] Richard McCleary, *Rural Hotspots: The Case of Adult Businesses*, 19 Crim. Just. Pol'y Rev. 153 (2008); Erin S. McCord & R. Tewksbury, *Does the Presence of Sexually Oriented Businesses Relate to Increased Levels of Crime? Examination Using Spatial Analyses*, 59 Crime & Delinquency 1108–25 (2012); Alan C. Weinstein & Richard McCleary, *The Association of Adult Businesses with Secondary Effects: Legal Doctrine Social Theory, and Empirical Evidence*, 29 Cardozo Arts & Ent. L.J. 565 (2011).

[13] The record also contains Defendant's Exhibit 5, a December 6, 2021, presentation to the City Council by Chief of Police Eddie Garcia, entitled "Sexually Oriented Businesses, Regulations and Public Hearing," and Defendant's Exhibit 6, a December 13, 2021, presentation to the Public Safety Committee by Chief Garcia entitled "Sexually Oriented Businesses (SOBs), Age Change and Hours of Operation." Testimony was provided during the hearing that Defendant's Exhibits 5 and 6 contain similar crime data information as in the January 5, 2022, SOB Briefing to the City Council. *See* Tr. Vol. 1, at 227:14–228:12.

regarding calls for service to SOBs or locations within 500 feet of SOBs.[14]  There is no indication that Exhibit 18 was available to or relied on by the City Council prior to passing the Ordinance.[15]

The materials that were before the City Council indicate that, as of January 14, 2022, there were 35 licensed SOBs in the City, consisting of 9 adult bookstores/arcades/theaters, 10 topless cabarets, 9 fully nude cabarets, and 7 "not operating" establishments.[16]  Task Force Report, at COD-040.  Lieutenant Stephen Bishopp, who collected and organized the Dallas police data that was presented to the City Council, testified that when assessing whether there was an increase in crime at SOBs, he collected data for three different metrics: arrests, crimes or offenses reported, and calls for service.  Tr. Vol. 2, at 105:22–107:7. He focused on two different timeframes, 10 p.m. to 2 a.m., and 2 a.m. to 6 a.m., and collected data from locations within a 500-foot radius of each of the licensed SOBs.  *Id.*

The SOB Briefing provided to the City Council summarized Lieutenant Bishopp's findings.  Regarding arrests, Lieutenant Bishopp focused on aggravated assaults, robberies, prostitution, and gun- and drug-related arrests from 2019 to 2021.  SOB Briefing, at COD-019. The data collected showed that during that three-year period, there were 2,082 total custodial arrests[17] at SOB locations,[18] including 831 arrests between 10 p.m. and 2 a.m., and 772 arrests

---

[14] No testimony or argument was given during the hearing regarding Exhibit 18-A, -B, -C-, or -E, each of which consist of lengthy spreadsheets containing data of unknown significance.

[15] The record also contains Plaintiffs' Exhibit 9, which appears to break out crime data occurring at SOBs by type of crime.  However, no testimony or argument was given regarding Exhibit 9, nor did the City Council appear to rely on Exhibit 9 in passing the Ordinance.

[16]  During his deposition, Lieutenant Bishopp testified that the businesses listed as "not operating" had a license to operate as an SOB, but were not operating as an SOB.  Tr. Vol. 1, at 70:6–12.  Lieutenant Bishopp testified that this could mean the business was closed or open, but was not operating as an SOB.  *Id.*

[17] A "custodial arrest" is any arrest for which someone is taken into custody, including, for example, violent crime, property crime, and arrests for driving while intoxicated.  Tr. Vol. 2, at 130:1–11.  It does not necessarily mean that the crime occurred at or near the arrest site.

[18] References to "at SOBs" or "at SOB locations" in this summary of the data includes data associated with locations within a 500-foot radius of each of the licensed SOBs.

between 2 a.m. and 6 a.m.  *Id.* at COD-025.  Gun- and drug-related arrests comprised 58% of all

arrests at SOBs between 10 p.m. and 2 a.m., and 63% of all arrests at SOBs between 2 a.m. and 6

a.m.  *Id.* at COD-019.  In 2021, more total arrests occurred at SOBs between 2 a.m. and 6 a.m.

than 10 p.m. and 2 a.m.—94 versus 83, respectively—but Lieutenant Bishopp did not look at

whether that difference was statistically significant.  SOB Briefing, at COD-019; Tr. Vol. 2, at

114:16–20 (Mar. 23, 2022).

  Regarding reported crime, for 2019 through 2021, less reported crime—both violent and

property—occurred at SOBs in the hours of operation from 2 a.m. to 6 a.m., compared to 10 p.m.

to 2 a.m.  SOB Briefing, at COD-022.  However, the data differs when violent crime is

segregated from property crime.  Nearly 67.16% of reported violent crime[19] in the data

collected[20] for SOBs occurred during the 2 a.m. to 6 a.m. period; for 2021, the 2 a.m. to 6 a.m.

period had 76 % of all reported violent crime at SOBs.  *Id.* at COD-020.  Across all three years,

violent crime at SOBs decreased by 29% during the 10 p.m. to 2 a.m. period, but increased by

80% during the 2 a.m. to 6 a.m. period.  *Id.*  In contrast, the data reflected that property crime[21]

occurred more frequently from 10 p.m. to 2 a.m. (59%), compared to 2 a.m. to 6 a.m. (41%).  *Id.*

at COD-021.

---

[19] Under the Uniform Crime Reports categorization system, "violent crimes" include aggravated assault, rape, robbery, and murder.  SOB Briefing, at COD-020; Tr. Vol. 1, at 34:5–10.

[20] The Court notes that because Lieutenant Bishopp only collected crime data covering the 10 p.m. to 6 a.m. time frame, the relative magnitude of the data is exaggerated when expressed as a percentage, as it is in the SOB Briefing to the City Council.  For example, the SOB Briefing states that the 2 a.m. to 6 a.m. time period comprises nearly 67.17% of "all" reported violent crime at SOBs, when in fact, the 2 a.m. to 6 a.m. period comprises 67.17% of violent crimes reported in the 10 p.m. to 6 a.m. window, not the entire 24-hour day.  *See* SOB Briefing, at COD-020; *see also* Tr. Vol. 2, at 117:17–20 (testimony of Lieutenant Bishopp) ("[W]hen I say 'all,' it's all that's within the data set, the SOB crime data sets.").  For violent crime offenses, the Task Force Report similarly indicates that from 2019 to 2021, there were a total of 200 violent crime offenses reported, with 65 occurring from 10 p.m. to 2 a.m., and 135 from 2 a.m. to 6 a.m.  Task Force Report, at COD-041.  The 6 a.m. to 10 p.m. time period was not analyzed.

[21] "Property crime" is defined as including burglary, theft, and motor vehicle theft.  SOB Briefing, at COD-021.

Regarding calls for service,[22] the data collected showed that between 2019 and 2021, 11,999 calls for service were generated at or within 500 feet of SOB locations, which included 2,171 calls between 10 p.m. and 2 a.m. (of which 165 were Priority 1), and 2,396 calls between 2 a.m. and 6 a.m. (of which 215 were Priority 1).[23]  *Id.* at COD-028.

The SOB Briefing also contained charts comparing SOBs and five entertainment districts in Dallas,[24] which were created by researchers at the University of Texas at San Antonio using data supplied by the Dallas Police Department.  *See id.* at COD-023, -024, -027, -030; Tr. Vol. 2, at 104:20–25, 120:9–22.  These materials were prompted by a request from the City Council to review crime in Deep Ellum in Dallas to see if the crime occurring there in those time periods could be compared to crime occurring at SOBs.  Tr. Vol. 2, at 120:13–22; Tr. Vol. 3, at 43:15–47:13 (Apr. 6, 2022).  Instead of providing information on Deep Ellum, data was gathered on five entertainment districts in Dallas, and analyzed collectively in a way that would not allow Deep Ellum, which reportedly has a problem with crimes of violence in the early morning hours,[25] to be studied separately.  Tr. Vol. 3, at 43:15–47:13.  The charts comparing SOBs and

---

[22] Calls for service refer to an individual dialing 911 for emergency assistance. They are ranked by priority, with "Priority 1" calls, also referred to as "Code 3" calls, considered the most urgent, requiring an emergency immediate response.  Tr. Vol. 2, at 133:1–21.  Priority 1 calls would involve shootings, stabbings, aggravated robberies in progress, disturbances, armed encounters, and major accidents on the freeway.  *Id.*  Priority 2 calls are disturbances that do not meet the criteria for Priority 1, and include domestic disturbances or suspicious persons, prowler calls, and burglar alarms.  *Id.*  Priority 3 calls, "General Service," refer to situations in which police service is needed but there is no urgent need or threat of injury.  *Id.*  For example, a Priority 3 call could consist of someone calling to report a burglary, criminal mischief, or damage to property.  *Id.*

[23] The SOB Briefing also includes a slide discussing "Calls for Service – Fire," which Lieutenant Bishopp testified was based on data collected from the Fire Department.  SOB Briefing, at COD-031; Tr. Vol. 2, at 139:23–140:8.  That data indicates that between 2019 and 2021, 1,317 calls for service for fire services were generated at SOB locations, and of those, there were 270 calls for service between 10 p.m. and 2 a.m., and 405 calls for service between 2 a.m. and 6 a.m.  SOB Briefing, at COD-031.  However, Lieutenant Bishopp conceded he did not know whether the data reflecting information collected by the Fire Department was based solely on the location of SOBs, or included data reflecting locations within a 500 foot radius of SOBs.  Tr. Vol. 2 at 139:23–140:8.

[24] The five entertainment districts considered as a single total were Lower Greenville, Uptown, Deep Ellum, Bishop Arts, and Trinity Groves.  Tr. Vol. 3, at 40:23–41:10.

[25] *See, e.g.,* Kelli Smith, *Man Arrested on Murder Charge in Deep Ellum Gunfire Exchange that Killed 2, Wounded 4, in September*, Dallas Morning News (Nov. 19, 2021) (describing a shooting in Deep Ellum occurring at 12:40 a.m.), *available at* https://www.dallasnews.com/news/crime/2021/11/19/man-arrested-on-murder-charge-in-deep-ellum-gunfire-that-killed-2-wounded-4-others-in-september/ .  In referencing Deep Ellum's reported association

entertainment districts differ from Lieutenant Bishopp's analysis, in that the researchers excluded all data from 2020 in their analysis, to avoid incorporating reduced crime rates attributable to the effect of COVID-related shutdowns and quarantining into the results. *See id.* at 123:6–125:5.

These charts compare SOBs and entertainment districts based on four different metrics: all offenses, violent offenses, total arrests, and total calls for service. SOB Briefing, at COD-023, -024, -027, -030. Taking the chart showing all offenses as an example, the researchers aggregated all crimes occurring in 2019 and 2021 between 10 p.m. and 6 a.m. for SOBs and entertainment districts, respectively, and then used percentages to show how much of the crime for each group (SOB or entertainment district) occurred between 10 p.m. and 2 a.m., and between 2 a.m. and 6 a.m. *Id.* at COD-023. Thus, as shown in the chart below included for illustrative purposes, of offenses occurring at SOBs between 10 p.m. and 6 a.m. in 2019 and 2021, 52% occurred between 10 p.m. and 2 a.m., and 48% occurred between 2 a.m. and 6 a.m.; for entertainment districts, 65% of offenses occurring between 10 p.m. and 6 a.m. occurred in the earlier 10 p.m. to 2 a.m. window, while 35% occurred from 2 a.m. to 6 a.m.:

---

with crime, the Court is not making any factual findings regarding the relative rate of crime in Deep Ellum, but instead cites a possible motivation for the City Council's request for crime data for Deep Ellum.



*Id.*

The chart comparing SOBs and the entertainment districts based on 2019 and 2021 violent crime show that, for SOBs, 67% of violent crime occurring between 10 p.m. and 6 a.m. occurred in the 2 a.m. to 6 a.m. window, whereas only 55% of violent crime occurred in that later window for the entertainment districts. *Id.* at COD-024. For arrests made in 2019 and 2021 between 10 p.m. and 6 a.m., the chart indicates that SOBs and entertainment districts had a similar proportion of arrests taking place during the relevant time period: 46% of arrests at SOBs and 47% of arrests at entertainment districts occurred between 2 a.m. and 6 a.m. *Id.* at COD-027. Finally, regarding calls for service, SOBs 52% of calls for service originating between 10 p.m. and 6 a.m. occurring within the 2 a.m. to 6 a.m. window, compared to only 39% for the entertainment districts. *Id.* at COD-030.

The Task Force Report, submitted to the City Council after the SOB Briefing, includes graphs showing the raw crime numbers supporting Lieutenant Bishopp's analysis, along with charts comparing the race of crime victims and arrested persons. The Task Force Report contains the raw data crime statistics for six different crime metrics—violent crime offenses,

violent crime arrests, Priority 1 calls, all offenses, all arrests, and all calls—for the three-year period of 2019 through 2021, broken down by the type of SOB, *i.e.*, bookstores/arcades/theaters, topless cabarets, fully nude cabarets, and not operational SOBs, and the time of the incident, either 10 p.m. to 2 a.m., or 2 a.m. to 6 a.m.  Task Force Report, at COD-040–046.  For example, for violent crime arrests, the Task Force Report shows that, for the three-year period of 2019–2021, at bookstores, there were 5 arrests for violent crimes between 10 p.m. and 2 a.m., and 2 arrests between 2 a.m. and 6 a.m.; for fully nude cabarets, 6 and 11 arrests, respectively; for topless cabarets, 6 and 2 arrests, respectively; and for non-operational SOBs, 1 arrest in each of the 10 p.m. to 2 a.m., and 2 a.m. to 6 a.m. time periods.  *Id.* at COD-042.  The Task Force Report also contains information for violent offenses, Priority 1 calls, and total offenses, arrests, and calls.

Based on its review of the admitted exhibits, the testimony provided at the hearing, and the arguments made by both sides, the Court concludes that the City's evidence does not fairly support its stated rationale for the Ordinance.  Because the City could not reasonably believe that the evidence shows the requisite connection between the protected speech and harmful secondary effects, the Ordinance is not narrowly tailored.  *See H & A Land Corp.*, 480 F.3d at 339.

The Court will first address crime data, starting with the quality of the data.  The Court notes that to carry its burden under the secondary effects doctrine, the City was not required to "conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relied upon is reasonably believed to be relevant to the problem that the city addresses."  *Renton*, 475 U.S. at 51–52; *see also Baby Dolls Topless Saloons, Inc. v. City of Dallas, Tex.*, 295 F.3d 471, 481 (5th Cir. 2002) ("We must determine whether, under this reasonable belief standard, the City's evidence demonstrates a link between

its interest in combating secondary effects and the Ordinance.").  Nor is there a requirement that the City conduct a rigorous statistical inquiry or use control groups, so as to quantitatively justify the Ordinance with any particular degree of reliability.  However, while the Court does not fault the City for not conducting a statistical study, the data it relies on is flawed such that it is not probative as to the secondary effects the City sought to address, so that the City could not have reasonably relied on it to justify the Ordinance.

The Court finds at least four issues relating to the crime data relied on by the City to justify the Ordinance.  First, the inclusion of data relating to closed or non-operational SOBs renders the City's reliance on it unreasonable.  Lieutenant Bishopp testified that the City's data includes crime statistics for locations which hold a license to operate as an SOB, but are not currently operating—or never operated—as an SOB.  Tr. Vol. 1, at 33:20–34:5.  Some of these locations are empty buildings or vacant parking lots, while others are operating in a non-SOB capacity, such as a poker house.  Tr. Vol. 2, at 22:2–24:16.  Thus, the City's data purports to identify adverse secondary effects associated with SOBs, but includes multiple locations where it concedes there are no SOBs operating.  As Plaintiffs' expert, Dr. Daniel Linz, testified, including non-operating businesses introduces "tremendous error" into the City's crime statistics.  Tr. Vol. 1, at 106:6.  The Court agrees; by commingling non-operational SOBs with operational cabarets and bookstores, it is impossible to tell whether any increased crime rate observed is a result of SOBs, or some other factor, such as, for example, the general potential for parking lots to attract criminal activity.  *E.g.*, Tr. Vol. 2, at 40:22–41:3 (testimony of Major Palk acknowledging no "material difference between crime in the parking lots of establishments in entertainment districts as compared to parking lots of [SOBs]").  Indeed, the City's data indicates that, from

2019 through 2021, non-operational SOBs accounted for more violent crime offenses occurring from 2 a.m. to 6 a.m. than SOBs operating as bookstores.  Task Force Report, at COD-041.

The inclusion of crime unrelated to SOBs is likewise problematic in the second observed issue with the City's crime data, namely that by including data from crimes occurring at locations within a 500-foot radius of SOBs, the data does not necessarily reflect crime resulting from activity at the SOBs.  Lieutenant Bishopp testified that, depending on the particular SOB, his data could include unrelated crime that happened to occur within 500 feet of the SOB's location.  Tr. Vol. 2, at 107:22–108:6; *see also* Tr. Vol. 1, at 56:8–17 (acknowledging that arrests would include arrests based on traffic stops, outstanding warrants, and misdemeanor offenses that happened to take place within 500 feet of an SOB).  For example, depending on the SOB's location vis-à-vis the parking lot, road, and neighboring businesses, the data could reflect crimes resulting from traffic stops, robberies or crimes at other businesses or locations, or unrelated calls for service.  Testimony was presented that, at least for SOBs on Northwest Highway, there are businesses within 500 feet of the SOB locations that are open during the relevant time periods and may have crime associated with them.  Tr. Vol. 1, at 176:22–177:9 (discussing a storage facility next to an SOB that has "homeless people breaking in"), 189:15–22 (owner of Plaintiff The Men's Club testifying that there are two 24/7 hotels, a gas station, and two late-night eateries nearby The Men's Club), 205:3–13.  One SOB is apparently surrounded by four motels that fall within 500 feet of the SOB's location.  *Id.* at 205:3–13.  No attempt was made to segregate crime that may have actually resulted from another business or arrest that happened to occur within 500 feet of an SOB.  *Id.* at 35:11–36:8; Tr. Vol. 3, 25:10–22.  Accordingly, by attributing everything occurring within a 500-foot radius of an SOB to the the SOB, the City's data inaccurately

inflates the actual effect of protected sexual expression on rates of crime, arrests, and calls for service.

Third, because not all of the SOBs included in the City's data are open twenty-four hours a day, seven days a week, the time periods studied—10 p.m. to 2 a.m., and 2 a.m. to 6 a.m.—do not necessarily reflect crime that is attributable to the SOBs. Specifically, although SOBs operating as bookstores are typically open 24 hours per day, *see* Tr. Vol. 1, at 201:16–17, testimony at the hearing indicated that, for Sunday through Thursday, several of the topless and fully nude cabaret SOBs included in the City's data close at 2 a.m. or 4 a.m., and are open later only on weekends.[26] *E.g.*, Tr. Vol. 1, at 156:12–16 (Bucks Wilds closes at 4 a.m. except on Saturdays (5 a.m.) and Sundays (6 a.m.)); *id.* at 162:11–18, 182:13–16 (Bucks Cabaret and The Men's Club close at 2 a.m., except on Fridays and Saturdays (4 a.m.)); Tr. Vol. 2, 46:7–12 (testimony of Major Palk, agreeing that he knew of several TABC-licensed SOBs that close around 2 a.m.). However, because the City's data does not account for whether the SOB in question was open when the crime, arrest, or call for service occurred, crime unrelated to the expression of protected speech is improperly attributed to SOBs. *See* Tr. Vol. 3, at 14:13–20 (testimony of Lieutenant Bishopp, agreeing that the statistics he provided do not reflect whether the SOBs in question were open at the time the criminal activity occurred). For example, if an arrest for a violent crime occurred at 5 a.m. at a location 495 feet away from a closed SOB, that arrest would be attributed to the SOB in the City's crime data. Accordingly, the City's crime

---

[26] Testimony was presented establishing that several of the SOB Plaintiffs are licensed by the Texas Alcoholic Beverage Commission ("TABC") to serve alcohol, whereas others operate as "BYOB" establishments, in which patrons bring their own alcohol to consume on the SOB's premises. Fully nude cabarets cannot receive a TABC license to serve alcohol. Tr. Vol. 2, at 41:19–42:2. The testimony presented was that all SOBs, regardless of whether they serve alcohol or are BYOB, prohibit the serving or consumption of alcohol after 2 a.m. *Id.* at 42:24–43:13.

data overstates the amount of criminal activity and need for police resources attributable to SOBs

during the 2 a.m. to 6 a.m. window and, by extension, protected speech.

Fourth, the Court notes that the crime data attributed to SOBs in the City's analysis was

inflated due to the presence of resources generated by the creation of the Task Force created by

the Dallas Police Department in March 2021. *See* SOB Briefing, at COD-015.  The Task Force

consisted of eight officers and one sergeant posted at or near SOBs, starting at midnight on

Thursday, Friday, and Saturday evenings.  According to the testimony of Major Sarmiento, Task

Force officers were instructed to have a high visibility police presence and saturate the area, and

use "probable cause to do traffic stops and what not."  Tr. Vol. 1, at 223:20–224:2.  Accordingly,

the presence of the Task Force enlarged the amount of reported crime and arrests beyond that

which would have otherwise been attributable to SOBs.  *Id.* at 224:4–6 ("[T]he people that are

there committing some violations or what not are going to be caught because I have police

presence there."); Tr. Vol. 2, 129:22–24 (Lieutenant Bishopp testifying that arrest data includes

"proactive enforcement; officers seeing things occur because they're out there").  Indeed, Deputy

Chief Watson agreed during his deposition that, for any given area at any of time day, if eight

additional officers were on patrol, additional police stops would necessarily take place by virtue

of the additional enforcement that comes with increased police presence.  Tr. Vol. 1, 85:13–18.

Deputy Chief Watson also testified that the "vast majority" of citations and arrests associated

with the Task Force's work were the result of traffic stops, such as going through a red light,

turning right without stopping, expired license plates, checking for outstanding warrants, etc.  *Id.*

at 83:17–85:23, 88:13–23.  He also agreed that many of the individuals associated with the

traffic stops had nothing to do with the SOBs.  *Id.*  Accordingly, the implementation of the Task

Force resources not only increased the amount of reported crime and arrests associated with the

SOBs during the relevant time periods, but also increased reports of crime, such as traffic stops, that were wholly unrelated to SOBs or any protected expression.

In sum, the Court concludes that the data relied on by the City Council does not fairly support the City's stated rationale for the Ordinance of reducing crime, because the data artificially enhances crime data associated with SOBs, and in doing so, unfairly attributes adverse secondary effects to SOBs. The City's data does not reasonably link the regulated activity—protected expression at SOBs—to the adverse secondary effects, namely increased reports of crime, arrests, and calls for service. *See Alameda Books*, 535 U.S. at 437 (O'Connor, J., plurality) ("[T]he city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects . . . ."); *G.M. Enters. v. Town of St. Joseph*, 350 F.3d 631, 639 (7th Cir. 2003) ("The plurality [in *Alameda Books*] did not require that a regulating body rely on research that targeted the exact activity it wished to regulate, so long as the research it relied upon *reasonably linked* the regulated activity to adverse secondary effects." (emphasis added)). At minimum, Plaintiffs have successfully cast doubt on the City's evidence, and by extension, the City's rationale for the Ordinance. *See Alameda Books*, 535 U.S. at 438.

Notwithstanding the problems with the City's data described herein, the Court further finds that the City's evidence does not reasonably show that the Ordinance has the purpose and effect of suppressing the claimed secondary effects of increased crime and use of limited police and fire resources. *See id.* at 449 (Kennedy, J., concurring). In other words, even if the Court assumes that the City's data accurately reflects the criminal offenses, arrests, and calls for service resulting from SOBs—which, as discussed, it does not—the Court finds that the City's evidence,

29

taken collectively, does not demonstrate a link between its interest in combating secondary effects and the Ordinance.  *See Baby Dolls*, 295 F.3d at 481.

As an initial matter, the evidence does not clearly establish that that there are more adverse secondary effects at SOBs from 2 a.m. to 6 a.m., the time period covered by the Ordinance, so as to justify a complete restriction on protected speech.  In the three-year period of 2019 to 2021, when considering both violent and property crime occurring at SOBs, there was less crime reported during the relevant time period of 2 a.m. to 6 a.m., compared to 10 p.m. to 2 a.m.  SOB Briefing, at COD-022.  And while the data does show more reports of violent crime from 2 a.m. to 6 a.m., compared to 10 p.m. to 2 a.m., in the same 2019 to 2021 period, there were only 21 total arrests for violent crimes at SOBs from 2 a.m. to 6 a.m., compared to 18 arrests during the 10 p.m. to 2 a.m. window.  Task Force Report, at COD-042.  An additional three arrests for violent crime over three years—*i.e.*, one additional arrest per year, distributed across approximately 28 active SOBs—does not demonstrate a reasonable link between violent crime and SOBs so as to justify a complete restriction of protected speech at all SOBs from 2 a.m. to 6 a.m. *See Alameda Books*, 535 U.S. at 449–50 ("The rationale of the ordinance must be that it will suppress secondary effects—and not by suppressing speech.").  Moreover, Lieutenant Bishopp testified that he had not considered whether the difference in 2021 in total arrests between 2 a.m. and 6 a.m. compared to 10 p.m. and 2 a.m. was statistically significant, further undermining the data's probative value.

The data is weakest when considering the SOBs operating as bookstores.  The Ordinance is a blanket restriction on all SOBs, so arcades and bookstores are treated the same as topless and fully nude cabarets.  However, the data shows that from 2019 to 2021, bookstores experienced less arrests and less violent crime arrests from 2 a.m. to 6 a.m., compared to 10 p.m. to 2 a.m.

Task Force Report, at COD-042, -045.  Bookstores likewise had almost the same number of total reported offenses across the two time periods (51 vs. 52, for 10 p.m. to 2 a.m., and 2 a.m. to 6 a.m., respectively), and comparable number of total calls for service (513 vs. 530).  *Id.* at COD-044, -046.  Major Palk described a shooting that occurred in the parking lot of a bookstore, but testified that it occurred at 10 a.m., and thus is irrelevant to justifying a prohibition on bookstores operating in the middle of the night.  Tr. Vol. 2, at 64:9–25, 65:20–22.

No reasonable effort was made to explain how the City's justification of reducing crime and conserving resources applies to the bookstores, for which there is no support in the data.[27] Accordingly, because the Ordinance encompasses bookstores, despite not being shown to be associated with any adverse secondary effects, the Ordinance is not narrowly tailored to the City's stated governmental interest.  *Renton*, 475 U.S. at 52 ("[T]he *Renton* ordinance is 'narrowly tailored' to affect only that category of theaters shown to produce the unwanted secondary effects . . . ."); *see also Annex Books, Inc. v. City of Indianapolis, Ind.*, 581 F.3d 460, 463 (7th Cir. 2009) ("If there is more misconduct at a bar than at an adult emporium, how would that justify greater legal restrictions on the bookstore—much of whose stock in trade is constitutionally protected in a way that beer and liquor are not.").

The Ordinance is not narrowly tailored, and thus fails intermediate scrutiny, for an additional significant reason.  The City provides data comparing reported crimes, arrests, and

---

[27] During closing arguments, the City attempted to justify the Ordinance's application to bookstores on the grounds that the calls for service emanating from bookstores places a significant burden on the police and fire departments during a time period when there are fewer police officers working.  Tr. Vol. 3, at 142:21–143:17.  However, the Court notes that the City's data reveals that there were only an additional 17 calls for service at bookstores during the 2 a.m. to 6 a.m. time period, compared to the 10 p.m. to 2 a.m. time period.  Task Force Report, at COD-046 (depicting 513 calls for service from 10 p.m. to 2 a.m., and 530 calls for service from 2 a.m. to 6 a.m.).  When considered across all 9 bookstores considered in the City's data, and the fact that the data was collected over the three-year period of 2019 to 2021, this results in, at most, one additional call per bookstore per year, which the Court concludes is not a sufficient adverse secondary effect to justify the complete restriction on speech mandated by the Ordinance.  In addition, as will be discussed, the Court concludes that the City cannot reasonably justify the Ordinance based on calls for service without comparing SOBs to non-SOB locations.

calls for service occurring at SOBs during different time periods, but provides no evidence from which the Court can conclude that the secondary effects are linked to the SOBs, as opposed to some other, unrelated factor. Because protected speech occurs at SOBs regardless of the time of day, the City's evidence is, at best, probative only as to which particular four-hour window has more or less crime, arrests, or calls at locations within 500 feet of SOBs, but is silent as to whether protected speech at SOBs—the unchanging constant in the City's data—caused the observed variations. The failure to include information about non-SOBs renders the City's reliance on this evidence unreasonable. *See H & A Land Corp.*, 480 F.3d at 339 ("[The municipality] Kennedale cannot reasonably believe its evidence is relevant unless it sufficiently segregates data attributable to off-site establishments from the data attributable to on-site establishments."); *Baby Dolls*, 295 F.3d at 481 (upholding ordinance based on criminal data studies showing that sex crime arrests were three to five times more frequent in the study area compared to a control area).

Lieutenant Bishopp testified that he did not consider crime statistics associated with non-SOB businesses open during the deep hours of the night, such as non-SOB dance halls or nightclubs, 24/7 convenience stores and drugstores, all-night eateries, gas stations, or motels and hotels. Tr. Vol. 2, at 165:16–166:7. However, the crime and police resource concerns associated with SOBs must also be associated with other late-night establishments, including nightclubs. For example, Major Sarmiento testified that the parking lots of SOBs create a public safety and policing concern, due to a large number of intoxicated individuals congregating with easy access to firearms that are kept in vehicles, and that almost all of the shootings which prompted the

formation of the Task Force occurred in parking lots of nightclubs or SOBs.[28]  Tr. Vol. 2, at

32:21–33:22, 39:20–40:7.  However, he also testified that there is no difference, with regard to

the capacity for violent crime, between parking lots of SOBs and other types of late-night

establishments in entertainment districts.  *Id.* at 40:14–41:3.  Similarly, Major Sarmiento testified

that a major concern with crime at SOBs is the inability to access crime scenes due to traffic,

which results in large crime scenes and the need for additional officers for crowd control, but

also acknowledged that police officers experience similar difficulty with ingress and egress

whenever confronted with traffic and full parking lots.  Tr. Vol. 1, at 225:25–226:15; Tr. Vol. 2,

at 78:14–79:4.  Major Sarmiento also testified that while strip clubs are attractive to individuals

involved in narcotics trafficking and organized crimes as locations at which to conduct business,

in his experience as a narcotics detective, he had also observed many drug transactions or gang

activity occurring at late-night eateries.  *Id.* at 36:18–37:15.

      Accordingly, the evidence indicates that some of the secondary effects the City sought to

address with the Ordinance—namely, drug- and gang-related crimes, and crimes occurring in

parking lots requiring substantial police resources—are not limited to SOBs.  Without additional

data, it is impossible to tell whether these secondary effects are the result of the SOBs, or some

other, unrelated variable, such that the City is merely using the Ordinance to "reduce secondary

effects by reducing speech in the same proportion," *i.e.*, by closing SOBs.  *Alameda Books*, 535

U.S. at 1742 (Kennedy, J., concurring).

      The City's charts purportedly comparing SOBs to the entertainment districts do not

warrant a different outcome.  As discussed, that data compared various metrics based on time

---

[28] Major Sarmiento testified about several murders that prompted the creation of the Task Force focused on SOBs, but acknowledged that at least two of them occurred at nightclubs that are not SOBs.  Tr. Vol. 1, at 220:13–223:3 (describing murders at the Kalua Club and Pryme Bar, neither of which are SOBs).

period by percentage, but did not provide the raw numbers underlying the statistics.  For example, the charts showed that of calls for service occurring between 10 p.m. and 6 a.m., for SOBs, 48% occurred in the 10 p.m. to 2 a.m. window and 52% in the 2 a.m. to 6 a.m. window; for entertainment districts, 61% occurred in 10 p.m. to 2 a.m. window, and 39% in the 2 a.m. to 6 a.m. window.  SOB Briefing, at COD-030.  However, without the raw figures underlying these percentages—*i.e.*, the actual number of calls for service that occurred at each location during each of the respective time periods—the data cannot be meaningfully compared.  Indeed, it is impossible to know whether the SOBs received an astronomically high number of calls as compared to the entertainment districts, or vice versa, because all that is being compared is the relative proportion of calls at SOBs, and entertainment districts, based on when they occurred.  For example, SOBs could have generated only 100 calls for service during 2019 and 2021, and the entertainment districts 10,000 calls during the same time period, but that relative difference in the total number of calls is not reflected in the data.[29]

The absence of meaningful non-SOB comparison data becomes more stark when considering the City's other stated justification for the Ordinance, to conserve police resources by reducing calls for service.  Major Sarmiento testified that the Ordinance is necessary to help with staffing, in that he would prefer to use officers to respond to 911 calls as opposed to staffing large crime scenes such as murders.  Tr. Vol. 1, at 235:6–236:20.  Lieutenant Bishopp testified that there are fewer officers working the overnight shift than during the day, resulting in greater strain on individual officers and resources to address incoming calls.  Tr. Vol. 2, at 127:16–23.

---

[29] The Court further notes that the City Council requested information from the Police Department specifically comparing Deep Ellum, an entertainment district, with SOBs.  Tr. Vol. 3, at 43:15–47:13.  Instead, the Police Department provided to the Council collective data on five different entertainment districts, and did not analyze any entertainment district singularly.  *Id.*  Lieutenant Bishopp agreed that Deep Ellum could have been compared with SOBs to determine which of the two had more crime, but that analysis was not performed.  *Id.* at 46:15–22.  He further testified that he would not have chosen the entertainment districts relied on as a comparison group, because "methodologically, it didn't make a lot of sense."  *Id.* at 47:20–22.

However, even assuming that a high number of police calls constitutes an adverse secondary effect capable of justifying a restriction on protected speech,[30] the lack of evidence regarding non-SOBs dooms this stated rationale because it is impossible to tell whether reducing calls for service at SOBs would actually conserve resources in a way so as to meaningfully target the alleged side effect of the speech, as opposed to the speech itself.  *See Alameda Books*, 535 U.S. at 446–47 (Kennedy, J., concurring).  For example, consider again the City's evidence comparing calls for service at SOBs and the entertainment districts.  Each call for service reflects a drain on police resources.  However, because the actual numbers of calls for service related to SOBs as compared to the entertainment districts are not provided, the relative significance of decreasing calls for service at SOBs—in the context of the entertainment districts and the city writ large—is unknown.  Hypothetically, for purposes of example, imagine that closing SOBs under the Ordinance from 2 a.m. to 6 a.m. results in 100 less calls for service annually.  Taken in isolation, without context, it is impossible to know whether that reduction in calls for service actually conserves resources, or whether the Ordinance instead targets speech without achieving its stated purpose of conserving resources.  If the City had provided data showing that the City typically receives 1,000 calls for service annually during that time period, evidence showing that reducing calls by 10%, *i.e.*, by 100 calls, could plausibly justify and support a restriction of speech; if it receives 10,000 calls for service, that 1% reduction might not.  No such evidence is in the record, nor was it apparently provided to the City Council.

---

[30] During closing arguments, the City's counsel conceded that calls for service, unrelated to an increase in crime, could not justify closure of a business protected by the First Amendment.  Tr. Vol. 3, at 145:11–16.  The Court agrees; because no evidence was presented that the expression of protected speech can cause, in and of itself, an increase in the number of calls for police or fire service, any issues with the City's resource allocation is not a result of the protected speech occurring at SOBs.  To the extent the City argues that SOBs increase crime rate, which then in turn overburdens the City's resources because there are insufficient officers on duty to handle the calls for service, this appears to be a resulting consequence of the secondary effect of increased crime, which would be, at best, a tertiary—not secondary—effect of the speech.

Because the City provided no non-SOB comparison data indicating that the problems of which the City complains are particularly associated with SOBs, the Ordinance amounts to a targeted and unjustified restriction on protected speech.  The Court is further concerned by what appears to be the Ordinance's bare restriction on speech in light of the City's failure to consider whether forcing SOBs to close at 2 a.m. could potentially result in more alcohol-related crime—and, by extension, more calls for service and need for police resources—resulting from customers being forced to leave immediately upon cessation of alcohol service at the SOBs without time to sober up, despite those concerns being readily apparent.  Specifically, Major Sarmiento agreed that patrons tend to escalate drinking as 2 a.m. approaches, and expressed concerned that, if SOBs are forced to close at 2 a.m., more inebriated people will be getting on the road.  Tr. Vol. 2 at 85:6–86:18.  He also acknowledged that, to the extent crime occurs in the parking lots of SOBs, it is generally people who have just left the business, and thus those parking-lot escalations could occur at any time of night.  *Id.*  However, despite recognizing that there are criminogenic concerns associated with closing SOBs at 2 a.m., as mandated by the Ordinance, these concerns were not considered by the City when adopting the Ordinance and, in particular, at the time periods under which SOBs cannot operate.  *Id.*

In sum, the Court finds that the City's stated rationale for the Ordinance is not fairly supported by the evidence, and accordingly, the Ordinance is not narrowly tailored to serve a substantial governmental interest.  In addition, the Court finds that the Ordinance's prohibition on SOBs operating between the hours of 2 a.m. and 6 a.m. does not leave the quantity and accessibility of speech intact.  *See Alameda Books*, 535 U.S. at 451.  Clearly, the Ordinance is overbroad as to bookstores; it limits speech during hours where the evidence shows no secondary effects are occurring, and thus disproportionately restricts speech.  *See Rock Against Racism*, 491

U.S. at 799 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.").  Evidence was also presented indicating that, for certain dancers and patrons, restricting speech from 2 a.m. to 6 a.m. substantially decreases the accessibility of the protected speech in question.  Specifically, Plaintiffs presented testimony that a substantial number of patrons visit SOBs after 2 a.m.; that clubs, including Plaintiffs, earn a significant portion of their revenue after that time; and that many of the dancers employed by Plaintiffs work other jobs or have child care obligations, which means they can only perform overnight, including after 2 a.m.  *E.g.*, Tr. Vol. 1, at 188:13–21; Tr. Vol. 2, at 77:7–24.  Accordingly, restricting SOBs from operating from 2 a.m. to 6 a.m. does not leave a substantial quantity of speech intact or accessible, in that closing the SOBs during this period would deprive numerous people access to protected speech.

Finally, the Court finds that the research studies cited by the City do not reasonably justify the Ordinance.  McCleary's article, *Rural Hotspots: The Case of Adult Businesses*, 19 Crim. Just. Pol'y Rev. 153 (2008), examines rural areas, not urban cities like Dallas, and shows that crime rates tend to increase around SOBs, but does not show increasing crime rates associated with the late-night hours.  Similarly, the other two articles provided suggest that SOBs are associated with an increase in overall crime, without addressing any particular time of day. *See* Erin S. McCord & R. Tewksbury, *Does the Presence of Sexually Oriented Businesses Relate to Increased Levels of Crime? Examination Using Spatial Analyses*, 59 Crime & Delinquency 1108–25 (2012); Alan C. Weinstein & Richard McCleary, *The Association of Adult Businesses with Secondary Effects: Legal Doctrine Social Theory, and Empirical Evidence*, 29 Cardozo Arts & Ent. L.J. 565 (2011). The City could not reasonably rely on these studies to justify the Ordinance with respect to curtailing particular hours of operation.

In sum, the Court concludes that Plaintiffs have successfully cast doubt on the evidence relied on by the City in justifying the Ordinance.  Absent any evidence to reasonably link the complained-of secondary effects and the protected speech, the Ordinance amounts to an unjustified restriction on protected expression, and does not survive intermediate scrutiny.

Because the Court concludes that the Ordinance does not pass strict or intermediate scrutiny, Plaintiffs have shown a likelihood of success on the merits, weighing in favor of an injunction.

### 2.   Balance of Hardships

The Court next considers the remaining factor of the preliminary injunction inquiry: the balance of hardships, *i.e.*, whether the harm of not granting an injunction outweighs the harm of granting it.  The Court concludes that this factor weighs in favor of an injunction.

Should the preliminary injunction be denied, the injury to Plaintiffs for a violation of their First Amendment rights is presumptively great.  As stated, the violation of Plaintiffs' First Amendment rights constitutes an irreparable injury. *See, e.g.*, *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F.Supp.3d 511, 529 (S.D. Tex. 2020) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").  The Court finds that the burden on Plaintiffs' First Amendment right to free speech and expression outweighs the City's burden in dealing with increased crime and a drain on resources, if any, associated with SOBs.  Moreover, if the injunction is entered, the City will be deprived solely of the opportunity to enforce a law that violates the First Amendment, which the Fifth Circuit has acknowledged is "no harm at all."  *See McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021).

### III.     CONCLUSION

The Court concludes that Plaintiffs have established they are entitled to a preliminary injunction.  For the above reasons, Plaintiffs' Motion for Preliminary Injunction is **GRANTED**. Plaintiffs' Motion for Leave to Amend is **GRANTED**.  The Motion to Dismiss is **DENIED AS MOOT**.

**SO ORDERED**.

May 24, 2022.

_____
BARBARA M. G. LYNN
CHIEF JUDGE