IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ASSOCIATION OF CLUB EXECUTIVES OF DALLAS, INC., et al, | § § § § § | CIVIL ACTION NO. 3:22-cv-0177-M |
| Plaintiffs, | § § | AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, |
| vs. | § § | TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, |
| CITY OF DALLAS, TEXAS, | § § | PERMANENT INJUNCTION, AND ATTORNEY'S FEES |
| Defendant | § § § § § | |

## JURISDICTION AND VENUE

1.      This is a civil action arising under the Constitution and the laws of the United States, and jurisdiction is conferred upon this Court by 28 U.S.C. §1331. Jurisdiction is also conferred upon this Court by 28 U.S.C. §1343(a)(3) and (4), 28 U.S.C. §§2201 and 2202 and 42 U.S.C. §§1983 and 1988, this being an action for declaratory judgment and equitable relief authorized by law to redress deprivations under color of law of rights, privileges and immunities secured by the Constitution of the United States.

2.      Venue in this judicial district is conferred by 28 U.S.C. §1391(b) because the events giving rise to Plaintiffs' claims took place in this judicial district.

3.      At all times pertinent to this Amended Complaint, and in taking all of the actions described in this Amended Complaint, Defendant, its officers, agents and employees, acted under color of law and were effecting, and will effect, the custom, policy and laws of the City of Dallas.

PARTIES

4.     Plaintiff Association of Club Executives of Dallas, Inc., ("ACE") is a not-for-profit corporation organized under the laws of the Texas, whose principal place of business is Dallas, Texas.

5.     Plaintiff Nick's Mainstage, Inc.-Dallas PT's", dba PT's Mens Club ("PT's") is a Texas corporation that does business in the city of Dallas, Texas.

6.     Plaintiff "Fine Dining Club, Inc.," dba Silver City ("Silver City") is a Texas corporation that does business in the City of Dallas, Texas.

7.     Plaintiff TMCD Corporation, dba The Men's Club of Dallas  ("Men's Club of Dallas") is a Texas corporation that does business in the City of Dallas, Texas.

8.     Plaintiff 11000 Reeder, LLC, dba Bucks Wild ("Buck's Wild") is a Texas limited liability company that does business in the City of Dallas, Texas.

9.     Plaintiff AVM-AUS, Ltd., dba New Fine Arts Shiloh ("New Fine Arts Shiloh") is a limited partnership organized and existing under the laws of Texas, that does business in the City of Dallas, Texas.

10.    Defendant City of Dallas, Texas is a municipal corporation organized and existing under the constitution and laws of the state of Texas.

FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

Background

11.    This action challenges an Ordinance adopted by the Dallas City Council on January 26, 2022, ("the Ordinance") which amended Chapter 41A of the Codified Ordinances of the City of Dallas to, *inter alia*, require businesses subject to that chapter's provisions to close between the hours of 2:00 a.m. and 6:00 a.m. each day. A copy of the Ordinance is attached as Exhibit A.

12.     Chapter 41A of the City of Dallas's Code of Ordinances governs "sexually oriented businesses," which are defined, in relevant part, in Section 41A-2(31) as "an adult arcade, adult bookstore or adult video store, [and] adult cabaret." Each of those types of businesses are separately defined in that same section.

13.     Section 41A-2(2) defines an "Adult Arcade" as "any place to which the public is permitted or invited wherein coin-operated or slug-operated or electronically, electrically, or mechanically controlled still or motion picture machines, projectors, or other image-producing devices are maintained to show images to five or fewer persons per machine at any one time, and where the images so displayed are distinguished or characterized by the depicting or describing of 'specified sexual activities' or "'specified anatomical areas.'"

14.     Section 41A-2(3) defines an "Adult Bookstore or Adult Video Store," in pertinent part, as "a commercial establishment that as one of its principal business purposes offers for sale or rental for any form of consideration any one or more of the following: (A) books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, DVD's, video cassettes or video reproductions, slides, or other visual representations, that depict or describe "specified sexual activities" or "specified anatomical areas."

15.     Section 41A-2(4) defines an "adult cabaret" as a "commercial establishment that regularly features the offering to customers of adult cabaret entertainment."

16.     "Adult cabaret entertainment" is a term of art under the section as is defined in Section 41A-2(5) as "live entertainment that: (A) is intended to provide sexual stimulation or sexual gratification; and (B) is distinguished by or characterized by an emphasis on matter depicting, simulating, describing, or relating to "specified anatomical areas" or "specified sexual activities."

17.     Section 41A-2(8) defines an "Adult Motion Picture Theater" as "a commercial establishment

where, for any form of consideration, films, motion pictures, video cassettes, slides, or similar photographic reproductions are regularly shown that are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas."

18.     "Specified anatomical areas," is a term of art and is defined in Section 41A-2(3) as "as any of the following, or any combination of the following, when less than completely and opaquely covered:(I) any human genitals, pubic region, or pubic hair;(ii) any buttock; or (iii)   any portion of the female breast or breasts that is situated below a point immediately above the top of the areola; or (B) human male genitals in a discernibly erect state, even if completely and opaquely covered."

19.     "Specified sexual activities" is also a term of art and is defined in Section 41A-2(34) as including "any of the following:(A) the fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts; (B) sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy; (C) masturbation, actual or simulated; or (D) excretory functions as part of or in connection with any of the activities set forth in Paragraphs (A) through (C) of this subsection."

20.     Chapter 41A imposes a number of regulatory obligations on the businesses governed by it. Among them, it requires sexually oriented businesses in the City to obtain annual licenses from the Chief of Police.

21.     Chapter 41A also sets forth a number of operational requirements for sexually oriented businesses governed by its terms, the violation of which can lead to a license suspension by the Chief of Police for up to 30 days, a revocation of the license, as well as criminal penalties.

22.     One such example is found in Section 41A-7.1, which requires sexually oriented businesses to maintain on the premises an registration card or file that "completely identifies all employees." The registration card or file must contain, for each employee, their legal name, aliases and stage

names, date of birth, race and gender, hair color, eye color, height and weight. The registration card or file must also contain the employee's residence address and phone number, and for "designated operators" and for "adult cabaret entertainers," and must list their residence addresses for the previous twelve months. In addition, that section also requires that the file or registration card contain a copy of a valid driver's license or government- issued identification card that has the employee's date of birth and photograph. *Id*.

23.     The records maintained by the sexually oriented business must also list the date on which the employee first began his or her employment or contractual relationship with the businesses, as well as a full-face color photograph of the employee. *Id.*

24.     Another is found in Section 41A-20.1(a)(2) and (3), which makes it an offense for any sexually oriented business, or any employee of a sexually oriented business to knowingly employ contract with or engage or allow a minor to perform adult cabaret entertainment or to employ a minor in a sexually oriented business, and 41A-20.1(c)(2) and (3), which makes it an offense for an employee to knowingly employ, contract with, or engage or allow a minor to perform adult cabaret entertainment or to employ a minor in a sexually oriented business.

25.     Section 41A-21 provides that a violation of any act forbidden by Chapter 41A, or failing to perform a required act required by Chapter 41A is punishable as provided by Section 243.010(b) of the Texas Local Government Code. That section provides that a violation is a Class A misdemeanor and subjects a violator to a fine of up to $4,000.00 and up to a year of confinement in the County Jail.

<u>The Plaintiffs</u>

26.     ACE is a trade association whose members include adult bookstores, adult arcades, and adult cabarets that are located in the City of Dallas. All of its members sell or present constitutionally

protected expression. Some of the adult cabarets comprising its members have liquor licenses issued by the Texas Alcoholic Beverage Commission and some do not. Some of ACE's members that operate adult cabarets remain open well past 2:00 a.m on some or all of the days of the week– some stay open until 4:00 a.m., some until 5:00 a..m, and some until 6:00 a.m. Indeed, ACE has members that provide adult oriented entertainment almost exclusively between the hours of 2:00 a.m. and 6:00 a.m. ACE members also operate adult bookstore and adult arcades that are open 24 hours a day. Among ACE's objectives are the promotion and protection of the rights of its members, and in furtherance of those objectives, it brings this action on behalf of its members who maintain late night hours and remain open after 2:00 a.m. on some or all days of the week.

27.    Plaintiff PT's is an adult cabaret as defined in Chapter 41A of the Dallas Codified Ordinances. It is also a member of ACE. The business known as PT's opened nearly 40 years ago and has, under various ownership and locations, presented constitutionally protected erotic dance performances to its patrons. PT's holds a sexually oriented business license issued by the City of Dallas, and operates as a BYOB establishment at which it presents performances to its patrons during the course of which the performers appear in a state of nudity.

28.    Silver City is an adult cabaret as defined in Chapter 41A of the Dallas Codified Ordinances and has been in business for more than 20 years. It is also a member of ACE.  It holds, and has held for many years, a sexually oriented business license issued by the City of Dallas. It also holds a mixed beverage permit from the Texas Alcoholic Beverage Commission authorizing it to sell alcoholic beverages to its patrons. Silver City presents constitutionally protected erotic dance performances to its patrons during the course of which the entertainers appear topless.

29.    The Men's Club of Dallas is an adult cabaret as defined in Chapter 41A of the Dallas Codified Ordinances, and has been in business for 30 years. It is a member of ACE. It holds, and has

held for many years, a sexually oriented business license issued by the City of Dallas, and also holds a mixed beverage license from the Texas Alcoholic Beverage Commission authorizing it to sell alcoholic beverages to its patrons. The Men's Club of Dallas presents constitutionally protected erotic dance performances to its patrons during the course of which the entertainers appear topless.

30.      Bucks Wild is an adult cabaret as defined in Chapter 41A of the Dallas Codified Ordinances, and is a member of ACE. It holds, and has held for many years, a sexually oriented business license issued by the City of Dallas. Bucks Wild operates as a BYOB establishment and presents constitutionally protected erotic dance performances to its patrons during the course of which the entertainers appear nude.

31.      Plaintiff New Fine Arts Shiloh is an adult bookstore and video store and arcade as defined in Chapter 41A of the Dallas Codified Ordinances, and has been in business since the 1960s. It is a member of ACE. It holds and has held, a sexually oriented business and arcade license issued by the City of Dallas. It sells constitutionally protected sexually oriented books, magazines, and other expressive media to its patrons. In addition, it provides its patrons with the opportunity to view expressive media in its adult arcade. It does not permit the consumption of alcohol on its premises.

<u>The Ordinance and Its Effects</u>

32.      On January 26, 2022, the Dallas City Council adopted the Ordinance, which amends Chapter 41A in ways that suppress and restrain the dissemination and presentation of constitutionally protected expression and impose a prior restraint.

33.      More specifically, Section 2 of the Ordinance creates a new section 41A-14.3, which requires sexually oriented businesses to close each day between the hours of 2:00 a.m. and 6:00 a.m.

34.      The Ordinance is a content-based restriction that curtails the sale and presentation of sexually oriented expression. Businesses that do not disseminate adult media or entertainment, such as fast

food and other restaurants, gas stations, drug stores, grocery stores, retail outlets that do not qualify as adult bookstores, non-adult nightclubs, and other enterprises are not burdened by the Ordinance's restrictions on the hours they are allowed to operate. Many of these other types of businesses do, in fact, operate during the hours the Ordinance requires Plaintiffs to be closed.

35.     As a result of the restrictions imposed by the Ordinance, the members of ACE and each of the named Plaintiffs will be irreparably harmed by not being allowed to operate between the hours of 2:00 am and 6:00 a.m.: They will lose a significant number of employees and entertainers; they will lose the goodwill they have built up over their decades of operation; and, a great number of their customers will be deprived of the constitutionally protected expression they disseminate in a legal setting.

36.     Specifically, PT's is open from 11:00 a.m. until 2:00 a.m. on Monday through Wednesday, and on Thursdays through Sundays, it is open until 4:00 a.m. A substantial number of its patrons attend the club, and a significant portion of its revenue is earned, after 2:00 a.m. on Thursdays through Sundays.

37.     Silver City operates from 11:00 a.m. to 2:00 a.m., on Sunday through Thursday, and is open from 11:00 a.m. to 4:00 a.m. on Fridays and Saturdays. On the weekends, when it is open and engaged in the presentation of constitutionally protected expression after 2:00 a.m., a substantial number of its patrons attend the club, and a significant portion of its revenue is earned after that time.

38.     Bucks Wild is open and engaged in the presentation of constitutionally protected expression to its patrons Monday through Thursday from 11:00 a.m. until 4:00 a.m., until 5:00 a.m. on Friday, and until 6:00 a.m. on Saturday. On Sunday, it opens at noon and remains open until 4:00 a.m. A substantial number of its patrons attend the club, and a significant portion of its revenue is earned after 2:00 a.m.

---

39.     The Men's Club of Dallas regularly operates after 2:00 a.m., and in particular, is open from 11:00 a.m. to 4:00 a.m. on Fridays into Saturday morning, and from 6:00 p.m. until 4:00 a.m on Saturday evening into Sunday morning. It may also remain open after 2:00 a.m. from time-to-time on other days.   When it is open and engaged in the presentation of constitutionally protected expression after 2:00 a.m.,  a substantial number of its patrons attend the club, and a significant portion of its revenue is earned after that time.

40.     New Fine Arts is currently open 24 hours each day. A significant number of its patrons shop after 2:00 a.m. and view sexually oriented media in its arcade after 2:00 a.m. A large portion of its revenue is earned after that time.

41.     The changes brought about by forcing the Plaintiffs and ACE's members to close between 2:00 a.m. and 6:00 a.m. will have a draconian effect on them. The compelled closure of ACE's members' and the named Plaintiffs' businesses will result in the complete loss of their First and Fourteenth Amendment rights to sell and present constitutionally protected media and performances during those hours, which all of the Plaintiffs have heretofore exercised.

42.     In addition to the loss and deprivation of their constitutional rights, other effects will flow from the substantial curtailment of the hours that they may be open. More particularly, as a direct and proximate result of the forced closure of the Plaintiffs' businesses, a substantial number of adult citizens will no longer be able to purchase, view and avail themselves of the constitutionally protected expression that the Plaintiffs sell and disseminate. That is particularly true with respect to adults in the City of Dallas who are "late" millennials and members of "Gen Z,"  i.e. those born in the 1990s and after, who often do not begin their evenings out until after 11:00 p.m. and stay out well after 2:00 a.m., and for service industry employees who work until 1:00 a.m. or 2:00 a.m., and go out for entertainment after their work shift ends

43.     The curtailment of hours will also detrimentally effect the Plaintiffs' businesses, and their employees and contractors as well. Compelling the Plaintiffs to close between 2:00 and 6:00 a.m., when a large number of patrons are arriving at and patronizing their establishments, will result in a substantial loss of revenue.

44.     The loss of revenue that the Plaintiffs will incur will have a downstream effect, and will cause an attendant reduction in the number of employees the business can afford to continue to employ. Stated differently, employees will lose their jobs because the businesses will no longer afford to retain them.

45.     Entertainers and contractors in adult cabarets who rely on their ability to perform during the early morning hours to support themselves and their families, will be affected as well. In addition to the loss of their opportunity to engage in constitutionally protected expression, they will lose their livelihoods.

46.     The Ordinance also imposes other restrictions. Section 5 of the Ordinance amends Section 41A-20.1(b)(2) and (3) and (c)(2) and (3) by making it unlawful for a licensee or an employee to knowingly employ, contract with, or engage or allow anyone under the age of 21 to perform adult cabaret entertainment, or to employ anyone under the age of 21 in a sexually oriented business.

47.     Plaintiffs incorporate by reference the attached deposition testimony of Deputy Chief Rick Watson of the Dallas Police Department (Exhibit B) and Lt. Stephen Bishopp (Exhibit C), excerpts of which  were read into the record at the preliminary injunction hearing on March 7, 2022; the testimony of Dr. Daniel Linz presented at the preliminary injunction hearing held on March 7, 2022; and his report, which was admitted as Plaintiffs' Exhibit 6 and is attached hereto (Exhibit D), all of which show that the data and information on which the City relied to support the Ordinance was invalid, flawed in several respects, and shoddy, and does not support or justify the Ordinance or the

rationale for the Ordinance.

48.     Further, none of the studies referenced in the preamble to the Ordinance deal with, examine, or support a restriction on the hours that sexually oriented businesses may operate.

49.     Additionally, none of the studies referenced in the preamble to the Ordinance support the claim that the operation of sexually oriented businesses between the hours of 2:00 a.m and 6:00 a.m. is detrimental to the public health, safety and general welfare.

COUNT I

50.     Plaintiffs incorporate paragraphs 1 through 49 of their Amended Complaint as though fully re-written.

51.     The Ordinance is unconstitutional under the First and Fourteenth Amendments, both on its face and as applied, for each of the following reasons:

      a.     it imposes an unconstitutional prior restraint on expression during the hours of 2:00 a.m. to 6:00 a.m.;

      b.     it is an unconstitutional content-based restriction of protected expression;

      c.     it does not further any governmental interest, compelling, substantial or otherwise, and thus, is unconstitutional under either strict or intermediate scrutiny;

      d.     it is not the least restrictive means, nor is it narrowly tailored, to further any governmental interest, and thus, is unconstitutional under either strict or intermediate scrutiny;

      e.     it was adopted without valid empirical information to support it;

      f.     the data and information on which the City relied to support the Ordinance was invalid, flawed in several respects, and shoddy, and does not support or justify the Ordinance either under strict scrutiny or intermediate scrutiny;

      g.     it is unconstitutionally overbroad because it brings within its scope businesses that are not associated with adverse secondary effects;

      h.     it deprives Plaintiffs' patrons of their First and Fourteenth Amendment rights to receive protected expression;

       I.       it impairs the constitutional right to associate and to freely contract;

       j.       it deprives Plaintiffs of the equal protection of the law.

52.     Plaintiffs are therefore entitled to a declaration that the Ordinance is unconstitutional under the First and Fourteenth Amendments to the United States Constitution, both on its face and as applied.

COUNT II

53.     Plaintiffs incorporate paragraphs 1 through 52 of their Amended Complaint as if fully rewritten.

54.     By reason of the adoption and threatened enforcement of the Ordinance, the Defendant has deprived and will deprive in the future Plaintiffs of their rights secured by the First and Fourteenth Amendments to the Constitution to engage in protected expressive activity, to be free from prior restraint, and to be free of overbroad, irrational, arbitrary and capricious laws, all of which has caused and threatens to cause in the future, irreparable harm to Plaintiffs for which there is no adequate remedy at law.

55.     By reason of the threat of enforcement of the Ordinance, and the irreparable harm Plaintiffs will suffer, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and, after final hearing, a permanent injunction demanded hereunder.

       WHEREFORE, Plaintiffs demand the following relief:

       Upon Count I of their Amended Complaint, a declaration that the Ordinance is unconstitutional on its face and as applied under the First and Fourteenth Amendments to the United States Constitution; and,

       Upon Count II of their Amended Complaint, a temporary restraining order, preliminary

injunction, and after final hearing, a permanent injunction restraining and enjoining the Defendant, its officers, agents, servants, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from enforcing the Ordinance against Plaintiffs; and,

Upon all counts of their Amended Complaint, any other relief to which Plaintiffs may be entitled, whether legal or equitable, including their reasonable attorneys' fees.

SHEILS WINNUBST
A Professional corporation
By: /s/ Roger Albright
Roger Albright
State Bar No. 00974580
T.Craig Sheils
State Bar No. 18187350
1701 N. Collins Boulevard, Suite 1100
Richardson, Texas  75080
Telephone:  (972) 644-8181
Facsimile:  (972) 644-8180
roger@sheilswinnubst.com
craig@sheilswinnubst.com

/s/ J. Michael Murray
J. MICHAEL MURRAY
(Ohio Bar No. 0019626)
jmmurray@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio  44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)

Counsel for Plaintiffs

220258

1-26-22

ORDINANCE NO. 32125

An ordinance amending Chapter 41A, "Sexually Oriented Businesses," of the Dallas City Code by amending Sections 41A-9, 41A-16, 41A-17, and 41A-20.1 and adding a new Section 41A-14.3; prohibiting a sexually oriented business from employing or contracting with a person who is under the age of 21; providing that sexually oriented businesses may not operate between 2:00 a.m. and 6:00 a.m. each day; providing that a sexually oriented business license shall be suspended for a period not to exceed 30 days for a violation of the hours of operation; providing a penalty not to exceed $4,000 and confinement in jail not to exceed one year; providing a saving clause; providing a severability clause; and providing an effective date.

WHEREAS, the 87th Texas Legislature met in regular session between January 12, 2021 and May 31, 2021; and

WHEREAS, S.B. 315 was filed on January 11, 2021; and

WHEREAS, S.B. 315 prohibits a sexually oriented business from employing or contracting with a person who is under the age of 21; and

WHEREAS, S.B. 315 was approved by both chambers of the Texas Legislature; and

WHEREAS, S.B. 315 was signed by Governor Greg Abbott on May 24, 2021 and took effect immediately; and

WHEREAS, the Dallas Police Department created the northwest club taskforce in March 2021 due to multiple shootings and other violent crimes occurring at or near sexually oriented businesses; and

WHEREAS, crime data shows a significant increase in violent crime and drug and gun arrests at or near sexually oriented businesses between the hours of 2:00 a.m. and 6:00 a.m.; and



PLAINTIFF'S
EXHIBIT
1

Chapter 41A (sexually oriented businesses) (alternate) – Page 1

**Exhibit A**

COD-001

WHEREAS, Dallas Fire-Rescue Department data shows a significant increase in the number of calls for service at sexually oriented businesses between the hours of 2:00 a.m. and 6:00 a.m.; and

WHEREAS, a 2012 research study by McCord and Tewksbery analysing sexually oriented businesses in Louisville, Kentucky showed that there were higher rates of all types of criminal offenses in the immediate vicinity of sexually oriented businesses and that the effects of sexually oriented businesses significantly impact the local community; and

WHEREAS, a 2008 study by McCleary showed that when a sexually oriented business opens on an interstate highway offramp in a rural community, total crime rises by 60 percent; and

WHEREAS, a 2012 study by Weinstein and McCleary showed that sexually oriented businesses are associated with a higher incidence of crime regardless of the business's location; and

WHEREAS, the cities of Beaumont, Texas and Amarillo, Texas produced a report showing that sexually oriented businesses: (1) promote prostitution, drug use, and other criminal activity; (2) have a deleterious effect on existing businesses and the surrounding residential areas adjacent to them, and (3) increase crime, and that there is a positive correlation between the hours of operation of a sexually oriented business and higher crime rates;  and

WHEREAS, based upon this data the Dallas City Council finds that the operation of sexually oriented businesses between the hours of 2:00 a.m. and 6:00 a.m. is detrimental to the public health, safety, and general welfare; and

WHEREAS, the city council wishes to reduce crime and conserve police and fire-rescue resources by requiring sexually oriented businesses to be closed for business between the hours of 2:00 a.m. and 6:00 a.m.; Now, Therefore,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1.  That Section 41A-9, "Suspension," of Chapter 41A, "Sexually Oriented Businesses," of the Dallas City Code is amended to read as follows:

COD-002

**"SEC. 41A-9.**          **SUSPENSION.**

The chief of police shall suspend a license for a period not to exceed 30 days if the chief of police determines that a licensee, an operator, or an employee has:

(1)      violated or is not in compliance with Section 41A-4(h), 41A-7, 41A-7.1, 41A-13, 41A-14.1, 41A-14.2, <u>41A-14.3,</u> 41A-15, 41A-16, 41A-17, 41A-18, 41A-18.1, 41A-19, or 41A-20 of this chapter;

(2)      refused to allow an inspection of the sexually oriented business premises as authorized by this chapter; or

(3)      knowingly permitted gambling by any person on the sexually oriented business premises.

SECTION 2.  That Chapter 41A, "Sexually Oriented Businesses," of the Dallas City Code is amended by adding a new Section 41A-14.3, "Hours of Operation," to read as follows:

**"SEC. 41A-14.3.**          **HOURS OF OPERATION.**

(a)      A sexually oriented business must be closed for business each day between the hours of 2:00 a.m. and 6:00 a.m.

(b)      This section shall be reviewed by the appropriate city council committee on or before January 26, 2024, and by the January of every even numbered year thereafter."

SECTION 3.  That Subsection (a) of Section 41A-16, "Additional Regulations for Nude Model Studios," of Chapter 41A, "Sexually Oriented Businesses," of the Dallas City Code is amended to read as follows:

"(a)      <u>A person commits an offense if he knowingly allows a person under 21 years of age to appear in a state of nudity in or on the premises of a nude model studio.</u> [Reserved.]"

SECTION 4.  That Subsection (a) of Section 41A-17, "Additional Regulations for Adult Motion Picture Theaters," of Chapter 41A, "Sexually Oriented Businesses," of the Dallas City Code is amended to read as follows:

"(a)      A person commits an offense if he knowingly allows a <u>person under 21 years of age</u> [minor] to appear in a state of nudity in or on the premises of an adult motion picture theater."

Chapter 41A (sexually oriented businesses) (alternate) – Page 3

COD-003

SECTION 5.  That Section 41A-20.1, "Prohibitions Against Minors In Sexually Oriented Businesses," of Chapter 41A, "Sexually Oriented Businesses," of the Dallas City Code is amended to read as follows:

**"SEC. 41A-20.1.          PROHIBITIONS   AGAINST   MINORS   IN   SEXUALLY
ORIENTED BUSINESSES.**

    (a)    A licensee or operator commits an offense if he knowingly:

        (1)    allows a minor to enter the interior premises of a sexually oriented business;

        (2)    employs, contracts with, or otherwise engages or allows a <u>person under 21 years of age</u> [minor] to perform adult cabaret entertainment; or

        (3)    employs a <u>person under 21 years of age</u> [minor] in a sexually oriented business.

    (b)    Knowledge on the part of the licensee or operator is presumed under Paragraph (2) or (3) of Subsection (a) if identification records were not kept in accordance with the requirements of Section 41A-7.1, and properly kept records would have informed the licensee or operator of the <u>person's</u> [minor's] age.

    (c)    An employee commits an offense if the employee knowingly:

        (1)    allows a minor to enter the interior premises of a sexually oriented business;

        (2)    employs, contracts with, or otherwise engages or allows a <u>person under 21 years of age</u> [minor] to perform adult cabaret entertainment; or

        (3)    employs a <u>person under 21 years of age</u> [minor] in a sexually oriented business.

    (d)    A minor commits an offense if the minor knowing enters the interior premises of a sexually oriented business."

SECTION 6.  That a person violating a provision of this ordinance, upon conviction, is punishable by a fine not to exceed $4,000 and confinement in jail not to exceed one year.

SECTION 7.  That Chapter 41A of the Dallas City Code shall remain in full force and effect, save and except as amended by this ordinance.

COD-004

32125

220258

SECTION 8.  That any act done or right vested or accrued, or any proceeding, suit, or prosecution had or commenced in any action before the amendment or repeal of any ordinance, or part thereof, shall not be affected or impaired by amendment or repeal of any ordinance, or part thereof, and shall be treated as still remaining in full force and effect for all intents and purposes as if the amended or repealed ordinance, or part thereof, had remained in force.

SECTION 9.  That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 10.  That this ordinance shall take effect immediately from and after its passage and publication in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so ordained.

APPROVED AS TO FORM:

CHRISTOPHER J. CASO, City Attorney

By _Casey Burgess_____
   Assistant City Attorney

Passed____JAN 2 6 2022_____

COD-005



# PROOF OF PUBLICATION – LEGAL ADVERTISING

**The legal advertisement required for the noted ordinance was published in the Dallas Morning News, the official newspaper of the city, as required by law, and the Dallas City Charter, Chapter XVIII, Section 7.**

**DATE ADOPTED BY CITY COUNCIL** _____ JAN 26 2022 _____

**ORDINANCE NUMBER** _____ 32125 _____

**DATE PUBLISHED** _____ JAN 29 2022 _____

ATTESTED BY:

OFFICE OF CITY SECRETARY
Z:\PROOF OF PUBLICATION.docx

COD-006

Rick Watson

**PLAINTIFF'S
EXHIBIT
4**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3

 4   ASSOCIATION OF CLUB EXECUTIVES )
     OF DALLAS, et al,               )
 5                                   )
              Plaintiffs,            ) CIVIL ACTION NO.
 6                                   ) 3:22-CV-00177-M
     vs.                             )
 7                                   )
     CITY OF DALLAS,                 )
 8                                   )
              Defendant.             )
 9   _____)

10

11        * * * * * * * * * * * * * * * * * * * * *

12                 ORAL DEPOSITION OF

13                    RICK WATSON

14            TUESDAY, FEBRUARY 22, 2022

15        * * * * * * * * * * * * * * * * * * * * *

16

17        ORAL DEPOSITION OF RICK WATSON, produced as a

18   witness at the instance of the Plaintiffs, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on Tuesday, February 22, 2022, from 9:34 a.m. to

21   11:18 a.m., before Cheryl A. Dixon, RPR, CRR, Notary

22   Public, in and for the State of Texas, reported by

23   machine shorthand, at the Dallas City Attorney's Office,

24   1500 Marilla Street, Dallas, Texas, 75201, pursuant to

25   the Federal Rules of Civil Procedure.
```

Rick Watson

(Page 2)

```
1          A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3       MR. J. MICHAEL MURRAY
4       BERKMAN, GORDON, MURRAY & DEVAN
5       55 Public Square, Suite 2200
6       Cleveland, Ohio 44113
7       216.781.5245
8       jmmurray@bgmdlaw.com
9
        MR. ROGER ALBRIGHT
10
        SHEILS WINNUBST PC
11
        1701 N. Collins Boulevard
12
        Richardson, Texas 75080
13
        972.644.8181
14
        roger@sheilswinnubst.com
15
16
   FOR THE DEFENDANT:
17
        MS. ANN MARIE "ANA" JORDAN
18
        DALLAS CITY ATTORNEY'S OFFICE
19
        1500 Marilla Street
20
        Dallas, Texas 75201
21
        214.670.3519
22
        ann.jordan@dallascityhall.com
23
24 ALSO PRESENT:
25    Steve Craft
```

(Page 3)

```
1            I N D E X
2                                        PAGE
3  Appearances                             2
4  RICK WATSON
5     Examination By Mr. Murray            4
6     Examination By Ms. Jordan           53
7     Examination By Mr. Murray           55
8  Witness Errata Sheet                   58
9  Certificate of Shorthand Reporter      60
10          E X H I B I T S
11 NO.      DESCRIPTION                   PAGE
12 Exhibit 1   Deposition Notice           9
13 Exhibit 2   Copy of Slide Presentation  10
14 Exhibit 3   Memorandum                  18
15
16
17
18
19
20
21
22
23
24
25
```

(Page 4)

```
1          P R O C E E D I N G S
2              --- oOo ---
3              RICK WATSON,
4  having been first duly sworn, testified as follows:
5              EXAMINATION
6  BY MR. MURRAY:
7     Q.   Please state your full name and business
8  address for the record.
9     A.   Yes, sir.  Rick A. Watson.  I have two
10 addresses.  I apologize for that because I -- because of
11 the two patrol divisions that I'm responsible for, I
12 have an office at each location; 9801 Harry Hines
13 Boulevard, and then 6969 McCallum Boulevard, Dallas --
14 both in Dallas, Texas.
15    Q.   And your title is Deputy Chief; is that
16 correct?
17    A.   Yes, sir.
18    Q.   Thank you.  Deputy Chief I'm going to ask you
19 a series of questions today and I'm going to do the best
20 I can to make my questions clear and understandable, but
21 can I have your agreement that if you don't understand
22 my question, you will bring that to my attention?
23    A.   Yes, sir.
24    Q.   Secondly, since our court reporter cannot
25 take down gestures, would you please be agreeable to
```

(Page 5)

```
1  make sure that all of your answers are audible,
2  verbal?
3     A.   Yes, sir.
4     Q.   And finally, I'll do my best to let you
5  finish an answer before I begin another question.  Can I
6  have your agreement that you will do your best to let me
7  finish my question before you begin your answer?
8     A.   Yes, sir.
9     Q.   Okay.  So you're obviously your occupation is
10 Deputy Chief of the Dallas Police Department; correct?
11    A.   Yes, sir.
12    Q.   Okay.  Why don't you summarize your career
13 with the police department?
14    A.   I joined the Dallas Police Department in 1977
15 April 4th.  I graduated from the academy from there,
16 then I was assigned to the Southwest Patrol Division as
17 a patrol officer.  I transferred from the Southwest
18 Patrol Division to the Central Patrol Division where I
19 was also a patrol officer at that assignment.  From
20 Central Patrol, I transferred to the Vice Division.  I
21 was a detective in the Vice Division.
22    Q.   What years are we talking about, if you don't
23 mind, approximately?
24    A.   Approximately will be the early '80s.  From
25 vice I transferred to the Narcotics Division where I was
```

Rick Watson

(Page 6)

1  a detective in narcotics. I promoted to sergeant from
2  there. I was transferred to the Southeast Patrol
3  Division as a sergeant. From Southeast I transferred to
4  the Internal Affairs Division. From the Internal
5  Affairs Division I transferred -- and this is called the
6  Legislative Coordinator. From Legislative Coordinator I
7  promoted to lieutenant. I was transferred to the
8  Northwest Patrol Division. From Northwest Division I
9  was transferred to PIO, our Public Information Office.
10  I was promoted to deputy chief. And I was sent to the
11  Southwest Patrol Division.
12      Q.   And what year were you promoted to deputy
13  chief?
14      A.   '06.
15      Q.   Well, you've done just about everything,
16  haven't you?
17      A.   Well, I'm not through yet. Sorry. From
18  Southwest, I went and I was put over the Property Crimes
19  Division, and that was for the entire city. I was
20  responsible for all property crime that occurred in the
21  city. Then I was transferred and put over the
22  Communications Division. From there I was transferred
23  to the North Central Patrol Division. And when Chief
24  Hall came on board as the new chief, I was assigned to
25  the Northwest Patrol Division and to the North Central

(Page 7)

1  Patrol Division. And that's been my current assignment
2  for the last four years.
3      Q.   Now -- and what exactly are your duties as
4  deputy chief in those patrol divisions?
5      A.   I oversee and manage the day-to-day
6  operations for both of the divisions. I have a police
7  major that is considered the division commander for each
8  one of the substations. They both report to me. But
9  overall, I'm responsible for managing and running both
10  of those patrol divisions.
11      Q.   And what exactly is the West Patrol Group?
12      A.   The West Patrol Group is North Central Patrol
13  Division and Northwest Patrol Division.
14      Q.   Okay. And how many divisions are there
15  altogether in the city?
16      A.   There's a total of seven patrol divisions
17  that make up the city.
18      Q.   Okay. And who do you report to?
19      A.   I report to Assistant Chief Jesse Reyes.
20      Q.   I'm sorry, what's the last name?
21      A.   Reyes, R-e-y-e-s.
22      Q.   Is there more than one assistant chief?
23      A.   Yes, sir, there is.
24      Q.   How many are there?
25      A.   There's, what, five -- five.

(Page 8)

1      Q.   And they, of course, then all report directly
2  to the chief?
3      A.   No, sir.
4      Q.   No? Okay.
5      A.   We have another level and it is called First
6  Executive Assistant Chief.
7      Q.   And how many officers have that title?
8      A.   Two.
9      Q.   And then those are the two that directly
10  report to the chief?
11      A.   Correct, yes, sir.
12      Q.   Okay. Now -- and how many employees of the
13  department report to you, approximately?
14      A.   Approximately probably close to 250.
15      Q.   And approximately how many members of the
16  Dallas Police Department are there in total?
17      A.   Right now I believe we're at 3,133; I'm not
18  exact but it's the 3,100.
19      Q.   What is your educational background?
20      A.   I attended elementary school. From there I
21  went to high school, I graduated from high school. I
22  entered college, got my bachelor's degree from
23  Midwestern State University out of Wichita Falls, Texas,
24  then I received my master's degree from the University
25  of Texas at Dallas in the city of Richardson, which is

(Page 9)

1  local here.
2      Q.   And what was your bachelor's degree in?
3      A.   Criminal justice.
4      Q.   And what about your master's degree?
5      A.   Same thing, criminal justice.
6      Q.   And so do you have training in statistics and
7  statistical analysis?
8      A.   No, sir, not in-depth training but I had a
9  little bit in college, but enough that it required a
10  course.
11      Q.   Now, I want to show you what has been marked
12  as Plaintiff's Exhibit 1.
13          (Exhibit 1 marked.)
14      MR. MURRAY: Copy for you as well.
15  BY MR. MURRAY:
16      Q.   And I'll ask you if you've had an opportunity
17  to see that document?
18      A.   Yes, sir.
19      Q.   And you will see that if you go to page --
20  the last page of the document, you see that in paragraph
21  four your name is mentioned at the top?
22      A.   Yes, sir.
23      Q.   Okay. And it states that you're prepared to
24  testify about the Northwest Task Force and the events
25  leading to its creation; correct?

**Rick Watson**

(Page 10)

1    A.   Yes, sir.
2    Q.   And you understand that you're going to be
3  testifying as a representative and on behalf of the City
4  of Dallas?
5    A.   Yes, sir.
6    Q.   Okay.  So let's begin, let me show you what
7  has been marked as Plaintiff's Exhibit 2?
8         (Exhibit 2 marked.)
9  BY MR. MURRAY:
10    Q.   You have seen that document before, I take
11  it?
12    A.   I saw the presentation that was made.  I
13  didn't actually have this actual presentation given to
14  me.  I was watching the public safety committee who this
15  presentation was given to, to them.
16    Q.   Okay.  I'd like to direct your attention to
17  page 9.  There are page numbers at the bottom.  There's
18  also other page numbers.   It's COD-015 and right below
19  that is page 9.
20    A.   Correct.
21    Q.   You see that?
22    A.   Yes, sir.
23    Q.   This is the page that introduces the
24  Northwest Club Task Force 2021, at least in this
25  document; correct?

(Page 11)

1    A.   Correct, yes, sir.
2    Q.   And you were present when information was
3  shared with the safety committee about that task
4  force?
5    A.   Yes, sir.
6    Q.   Okay.  So it says --
7    A.   May I clarify the question that you did?
8    Q.   Absolutely.
9    A.   When you said that I was present, I was
10  watching it via TV through television and I was in and
11  out of my office, you know, doing other things, but
12  if -- I just wanted to clarify.  I was not sitting there
13  looking at it from its start to the end, to the finish,
14  so I am -- I know that this was the presentation that
15  they did present to the Public Safety Committee, so yes,
16  sir.  Thank you.
17    Q.   And you know about the Northwest Club Task
18  Force of 2021?
19    A.   Yes, sir.
20    Q.   How was it originally created?
21    A.   Myself and Major Sam Sarmiento, who is the
22  division commander for the Northwest Patrol Division, he
23  and I discussed about what we were seeing with respect
24  to violent crime and how we were getting upticks in
25  violent crime.  And also associated with that violent

(Page 12)

1  crime, we were looking at where these violent crimes
2  were taking place.  And many of them were taking place
3  at our I'll call them our entertainment businesses in
4  the division.
5         So we looked at that and where the
6  various violent offenses were taking place.  We had our
7  crime analyst look at it and do an analysis and take a
8  look at where these violent offenses were occurring.  So
9  as a result of that, we looked at the locations of where
10  they were predominantly happening and we talked about
11  how best to do as far as putting something together to
12  address the violent crime.  The challenge we faced was
13  manpower.  The department is still currently
14  approximately 500 to 600 officers short, so we had to
15  take into consideration our officers that we had for
16  calls for service.  Anyone -- any resident, anybody that
17  calls 911 and needs police service, we had a
18  responsibility and an obligation to ensure that those
19  calls for service were answered.
20         At the same time, we were looking at how
21  are we going to get some officers and a supervisor to
22  monitor the various locations that we had identified
23  there in the Northwest Division regarding the violent
24  crime.  So what we did is we assigned one sergeant and
25  with respect to the number of officers that worked on

(Page 13)

1  that task force, it varied.  Maximum would be eight
2  officers, and at times the bare minimum would be four.
3  And the reason for that was because of officers -- the
4  officers that worked the task force, they may be taking
5  off on vacation, they may be out sick, they may be out
6  on military leave, they may be out for training.  They
7  were just -- they were not there present to carry out
8  the assignment.  Then also keeping in mind that we
9  didn't want to take more officers from the officers that
10  were answering calls for service.  So it fluctuated
11  between eight and four, no less than four.
12         So we identified the sergeant and the
13  sergeant identified the eight, and then we started the
14  task force March the 25th of 2021.
15    Q.   Now, let me back up, then.  First of all,
16  what's the name of that sergeant, by the way?
17    A.   Matt Carlson.
18    Q.   So this discussion was in and around March of
19  2021?
20    A.   Correct, yes, sir.
21    Q.   And it says here that it was created due to
22  multiple shootings, violent crimes, and crime data
23  showed it increasing after midnight; is that correct?
24    A.   Yes, sir.
25    Q.   Okay.  You mentioned there was a crime

**Rick Watson**

(Page 14)

1  analyst involved?

2  **A.    Yes, sir.**

3  Q.    Who was that?

4  **A.    Detective Jack Jernigan.**

5  Q.    And what does he do as a crime analyst?

6  **A.    He analyzes -- he's our crime**

7  **analyst/intelligence officer.  So he looks and read**

8  **about all of the offenses that occur in that -- in the**

9  **division, Northwest Patrol Division, for the day before.**

10  **So he'll look at property crime offenses and he would**

11  **also look at violent crime offenses.**

12  Q.    And what is he reading?  Incident reports?

13  **A.    Yes, sir, offense reports.  Correct, yes,**

14  **sir.**

15  Q.    Calls for service, does he look at that?

16  **A.    If requested, yes, sir.**

17  Q.    So an incident report would be something that

18  an officer would create, for example, in the -- if there

19  was a reported crime?

20  **A.    Both ways, yes, sir.  To answer your**

21  **question, yes, sir, an officer can and does do offense**

22  **reports, any kind of miscellaneous incident report which**

23  **we refer to as an "MIR."  They will also create them.**

24  **That is self-initiated on their own.**

25  **The second avenue is if we have a**

(Page 15)

1  complainant, a victim, they will take that information

2  that's reported to them by that complainant and just

3  depending on what it is, if it's an offense, they will

4  take the information and they will create an offense of

5  whatever that complainant is alleging happened.

6  Q.    So it says here that the "task force was

7  created due to multiple shootings, violent crimes, and

8  crime data showed it increasing after midnight."

9  You see that?

10  **A.    Yes, sir.**

11  Q.    Okay.  And that is what Detective Jernigan

12  reported to you?

13  **A.    Yes, sir.**

14  Q.    And how many shootings are we talking

15  about?

16  **A.    I don't know.**

17  Q.    And how many violent crimes were we talking

18  about when he reported this to you?

19  **A.    I don't know.  I do know that we looked at**

20  **homicides and aggravated assaults, non-family-violence**

21  **offenses, and I don't know what the total number was,**

22  **but I do remember we had six homicides from March 1 of**

23  **2020 through March 31st of 2021.**

24  Q.    And those were all in the Northwest

25  District?

(Page 16)

1  **A.    Yes, sir.  Division, yes, sir.**

2  Q.    And where were those?  Where did they

3  occur?

4  **A.    The first one occurred at Kalua Discotheque.**

5  Q.    What kind of business is that?

6  **A.    It's an establishment where you can dance and**

7  **they serve alcohol.**

8  Q.    It's not a sexually-oriented business?

9  **A.    No, sir.**

10  Q.    Okay.  And what time of day did that homicide

11  occur?

12  **A.    I don't recall the time, the exact time.**

13  Q.    What about the next one?

14  **A.    Okay.  The next one -- it's called Zona Rosa**

15  **and it was a SOB.  It was a totally nude.  Then --**

16  **sorry.**

17  Q.    Let's talk about that for a moment.  Was it a

18  licensed sexually-oriented business?

19  **A.    Yes, sir.**

20  Q.    And do you know what time that occurred?

21  **A.    No, sir.**

22  Q.    And do you know what the circumstances

23  were?

24  **A.    What I remember of it was a shooting in the**

25  **parking lot and an individual died as a result of the**

(Page 17)

1  shooting.

2  Q.    What about the first one that you described?

3  What were the circumstances of that?

4  **A.    If I remember correctly, it was also a**

5  **shooting in the parking lot where an individual was shot**

6  **and killed.**

7  Q.    And were the -- was it a customer of that

8  dance club?

9  **A.    I don't know if it was a customer.  I don't**

10  **know what association that individual had with the**

11  **actual Kalua Discotheque.**

12  Q.    So there might have been no relationship

13  between that --

14  **A.    That's a possibility.**

15  Q.    You've got to let me finish the question.

16  **A.    Sorry.  Sorry.**

17  Q.    That's okay.  It's a hard rule to follow,

18  believe me.

19  **A.    Yes, sir.**

20  Q.    So you don't know whether there was a

21  connection between the club and that shooting other than

22  the fact that it occurred in the parking lot?

23  **A.    Yes, sir, that's correct.**

24  Q.    And the Zona Rosa -- I want to show you what

25  has been marked as Plaintiff's Exhibit 3.

**Rick Watson**

(Page 18)

1          (Exhibit 3 marked.)
2    BY MR. MURRAY:
3          Q.   Have you seen this document?
4          A.   No, sir.
5          Q.   Okay.  Let me direct your attention to the
6    fact that the first page of this indicates that it's a
7    memorandum from Chief Garcia to the mayor and counsel.
8               Do you see that?
9          A.   Yes, sir, I do.
10         Q.   And he says that there's an attachment that
11   includes a list identifying the licensed
12   sexually-oriented business locations.
13              Do you see that?
14         A.   Yes, sir.
15         Q.   Okay.  Go to the next page.  That is the list
16   that the chief provided of the various sexually-oriented
17   businesses in the city of Dallas that are licensed.
18              Do you see that?
19         A.   Yes, sir.
20         Q.   Do you see the Zona Rosa Club on that list?
21         A.   Yes, sir, I see it down here on I guess you
22   could say number 31, if you want to call it D, as in
23   David, District 2, La Zona Rosa -- sorry.
24         Q.   Okay.  And it indicates that club is not
25   operating currently; is that correct?

(Page 19)

1          A.   That is correct.
2          Q.   Do you know how long that club has not been
3    operating?
4          A.   I would say approximately it's been maybe six
5    to eight months, approximately.
6          Q.   And do you know why it ceased operating six
7    to eight months ago?
8          A.   No, sir, I don't.
9          Q.   At the Zona Rosa Club where the second
10   homicide occurred, do you know what time it occurred?
11         A.   No, sir, I don't.
12         Q.   And do you know whether the people involved
13   actually had any connection with that club?
14         A.   No, sir, I have no indication of what their
15   association was with the club.
16         Q.   Okay.  So then what was the third homicide?
17         A.   The third, I believe, was Aces, A-c-e-s, and
18   that was a multiple shooting where three individuals
19   were shot and killed.
20         Q.   And what is Aces?
21         A.   It's a totally-nude establishment, BYOB,
22   bring your own bottle.
23         Q.   And where is that located?
24         A.   It's on Mañana, I don't know the exact
25   address.

(Page 20)

1          Q.   Do you see it on the list here under "full
2    nude cabarets" on Plaintiff's Exhibit 3?
3          A.   No, sir, I don't.
4          Q.   And do you know what time of day that
5    incident occurred?
6          A.   No, sir.
7          Q.   And do you know what connection, if any, the
8    people involved, the victims and/or the shooters, had
9    with the particular club?
10         A.   No, sir, I don't.
11         Q.   Or whether they had any connection at all?
12         A.   No, sir, I don't.
13         Q.   What about the fourth?
14         A.   Dallas Cabaret South.
15         Q.   By the way, the one at Aces, was that in the
16   parking lot?
17         A.   It was inside.
18         Q.   It was inside the club?
19         A.   Inside the club.
20         Q.   The one at Dallas Cabaret South, when did
21   that occur, approximately?
22         A.   I don't have the date.  I don't recall the
23   date or the time.
24         Q.   Okay.  And do you know where it occurred?
25         A.   The parking lot.

(Page 21)

1          Q.   And again, you don't have any information as
2    to whether there was any relationship between the victim
3    or the perpetrator and the club?
4          A.   No, sir.
5          Q.   Okay.  So then there's the -- what's the
6    fifth one?
7          A.   XTC, X-T-C.
8          Q.   And where did that occur?
9          A.   That also occurred right outside the front of
10   the business, the establishment, there in that parking
11   general area that's up front.
12         Q.   So in the parking area?
13         A.   Yes, sir.  Up front closer to the building
14   but it was still in a parking area, yes, sir.
15         Q.   And do you know what time that one
16   occurred?
17         A.   No, sir.
18         Q.   And do you know whether either the victim or
19   the perpetrator had any relationship with XTC?
20         A.   No, sir, I don't know.
21         Q.   And then what's the sixth one?
22         A.   Prym, P-r-y-m, Bar, and that was a mass
23   shooting where we had I believe it was nine individuals
24   shot and one was killed as a result of it.
25         Q.   And where did that occur?

**Rick Watson**

(Page 22)

1    A.    That occurred inside the club.
2    Q.    And is that a sexually-oriented business?
3    A.    No, sir, it is not.
4    Q.    What kind of business is it?
5    A.    It's a business that offers dancing and they
6  also offer liquor.  They sell liquor.  They have a TABC
7  license.
8    Q.    Okay.  And you don't know what time of day
9  that occurred?
10    A.    Early morning, 2, 3 o'clock in the morning.
11  And going -- if I may?
12    Q.    Sure.
13    A.    And going back to the question that you were
14  asking me about the previous five about times, I
15  couldn't give you an exact time but the times would be
16  between 2:00 and 4:00 in the morning, 2:00 and 5:00 in
17  the morning.  It was after 2 o'clock in the morning, but
18  to tell you it was at 3:15 a.m., no, sir, I don't
19  remember them.  But all six of those occurred after
20  2 a.m.  And Prym Bar, that occurred 20 minutes before
21  2 a.m. in the morning.
22    Q.    And how are you able to recall that these all
23  occurred during the times that you just described?
24    A.    Just as I said, they were early morning,
25  late -- in other words, late night, early morning, after

(Page 23)

1  2 a.m. in the morning.
2    Q.    How many homicides were there in Dallas in
3  2020?  Do you know?
4    A.    No, sir, I don't know right off the top of my
5  head in 2020.
6    Q.    Do you have any estimate at all?
7    A.    No, sir.  I'd hate to give an estimate on
8  that.  I don't.
9    Q.    What about in 2021?  Do you know what the
10  homicide rate was in the city of Dallas approximately?
11    A.    No, sir.  When you say "the rate" --
12    Q.    I'm sorry.  How many?
13    A.    I'd be speculating, and I don't recall the
14  exact number.
15    Q.    Would it be over a hundred, for example?
16    A.    Yes, sir, it would be.
17    Q.    Okay.  Would it be over 200?
18          MS. JORDAN:  Objection to the form of the
19  question.
20          THE WITNESS:  Possibly.  Because we
21  had -- in 2021, we did lower the crime as far as
22  homicides in our city.  We did lower it, and it may
23  have -- it may have topped out at, say, 200, but I don't
24  recall the exact number.
25  BY MR. MURRAY:

(Page 24)

1    Q.    Okay.  And do you know what percentage of
2  those homicides occurred after 2 -- between the hours of
3  2 a.m. and 6 a.m.?
4          MS. JORDAN:  Objection, calls for
5  speculation.
6          THE WITNESS:  No, sir, I don't.
7  BY MR. MURRAY:
8    Q.    Going back to Plaintiffs' Exhibit 2 on that
9  same page, page COD-015, we were talking about multiple
10  shootings, violent crimes, and crime data showing it
11  increasing after midnight.  Did your crime analyst do a
12  comparison of violent crimes that were occurring before
13  midnight and violent crimes occurring after midnight?
14    A.    No, sir.
15    Q.    And other than the shootings and the
16  homicides that you've described, what kind of violent
17  crimes are we talking about?  The aggravated assaults
18  primarily?
19    A.    Yes, sir.  And --
20          MS. JORDAN:  I just want to make sure
21  when we're talking about Northwest Club Task Force,
22  we're talking about just those violent crimes that
23  occurred within that division.  We're not talking about
24  the city statewide --
25          MR. MURRAY:  I understand.

(Page 25)

1          MS. JORDAN:  -- I mean citywide.  So when
2  you ask the question, if we could just -- we're just
3  specifying that it's only within that division.
4          MR. MURRAY:  Yeah, we're talking about
5  this page that refers to the Northwest Club Task Force,
6  yes.
7          MS. JORDAN:  Right.
8  BY MR. MURRAY:
9    Q.    So you're talking about -- and we're
10  referring to "It was created due to multiple shootings,
11  violent crimes, and crime data showed it increasing
12  after midnight" in that division, in that Northwest
13  area?
14    A.    Yes, sir.
15    Q.    Okay.
16    A.    And if I may?  The violent crimes, and I
17  mentioned this earlier but I forgot one.  I mentioned
18  homicide, I mentioned ag assaults non-family violence,
19  and the one I forgot to mention was robbery of
20  individuals.
21    Q.    Okay.  But again, you don't know how your
22  crime analyst, if he did, came to the conclusion that
23  these type of crimes were increasing in that area after
24  midnight, as compared with before midnight?
25    A.    No, sir.  That I know of, he didn't do an

Rick Watson

(Page 26)

1    analysis comparing what happened before midnight to what
2    was occurring after midnight, no, sir.
3         Q.    And then the next bullet point says
4    "primarily occurred at or near the sexually-oriented
5    businesses."
6              Do you see that?
7         A.    Yes, sir.
8         Q.    And what do you mean -- or what was meant by
9    near the businesses?
10        A.    Any parking lots that were adjacent to that
11   particular business and also parking lots that were
12   designated as an area that the clients -- the customers
13   could park without being -- having the fear of their
14   vehicle towed away because they were not supposed to
15   park in that area.  It was a designated area.
16        Q.    So the "near the sexually-oriented
17   businesses" was not a radius, for example, of 500 feet?
18   You weren't talking about that?
19        A.    When we looked at our -- violent crime and
20   where it was occurring, we didn't discuss was it 500
21   yards, was it a thousand yards or was it closer.  We
22   just looked and -- at where did this offense occur.
23   Where did the shooting take place?
24        Q.    Now, the task force was called the "Northwest
25   'Club' Task Force;" correct?

(Page 27)

1         A.    I'm sorry, what I read here is "Northwest" --
2    in quotes -- "'Club' Task Force 2021."
3         Q.    Right.
4         A.    Okay.  Yes, sir.
5         Q.    And what are you referring to when you use
6    the term "club"?
7         A.    It was all entertainment type of businesses
8    that could be considered a club.
9         Q.    Would that include adult bookstores?
10        A.    In some cases yes, sir.
11        Q.    So the study that you were doing or the
12   investigation that you were doing included not just
13   nightclubs but it included adult bookstores?
14        A.    If it had a high volume of violent offenses,
15   looking at the totality and looking at it all, and if
16   one particular or if several of an arcade bookstore had
17   numerous violent offenses, we would look at it and we
18   would address it.  We would -- yes, sir, we would look
19   and patrol it to see in order to reduce that violent
20   crime that was occurring.
21        Q.    Well, my question was a little bit more
22   specific than that.  When you called it the "Northwest
23   'Club' Task Force," was that intended to communicate the
24   notion that nightclubs as well as adult bookstores were
25   being studied?

(Page 28)

1         A.    No, sir, it was more clubs, nightclubs, yes,
2    sir.
3         Q.    Now, I take it that it is true that there are
4    a number of other businesses besides clubs that are open
5    after midnight?
6         A.    Yes, sir.
7         Q.    In fact, there are other businesses that are
8    open after 2 a.m.?
9         A.    Yes, sir.
10        Q.    That would include gas stations?
11        A.    Yes, sir.
12        Q.    Convenience stores?
13        A.    Yes, sir.
14        Q.    Those businesses, some of them are open
15   24/7?
16        A.    Yes, sir.
17        Q.    There are some drug stores that are open late
18   night?
19        A.    Yes, sir.
20        Q.    Between 2 a.m. and 6 a.m.?
21        A.    Yes, sir.
22        Q.    Obviously there are bars that are open until
23   at least 2:00; correct?
24        A.    Yes, sir, correct.
25        Q.    There are non-adult nightclubs,

(Page 29)

1    non-sexually-oriented business nightclubs such as the
2    two that you mentioned already?
3         A.    Yes, sir.
4         Q.    And they can be open to 4 a.m. if they have a
5    late-night permit; correct?
6         A.    Yes, sir.
7         Q.    Okay.  There are some grocery stores that are
8    open 24/7?
9         A.    Yes, sir.
10        Q.    Fast food restaurants that are open 24/7?
11        A.    Yes, sir.
12        Q.    Other restaurants besides fast food
13   restaurants that are open late night hours?
14        A.    Yes, sir.
15        Q.    For example, International House of Pancakes
16   would be one example?
17        A.    Yes, sir.
18        Q.    Are there any liquor stores that are open
19   past midnight?
20        A.    No, sir.
21        Q.    Obviously motels and hotels stay open all
22   night; correct?
23        A.    Correct.
24        Q.    There may be other retail establishments that
25   stay open between 2 a.m. and 6 a.m. that we haven't

**Rick Watson**

(Page 30)

1  mentioned?

2  **A.   Yes, sir.**

3      Q.   Including retail stores that are not
4  sexually-oriented businesses or that are not licensed as
5  sexually-oriented businesses?

6  **A.   Yes, sir.**

7      Q.   Now, did your task force study all of those
8  businesses as well or did you concentrate on the clubs
9  that we've described?

10  **A.   We concentrated on any location that showed**
11  **we had a high volume of violent offenses.  And we -- it**
12  **didn't matter to us what the business may be.  That's --**
13  **we were not interested in that.  He would look at the**
14  **offenses and if it happened to be at Walgreens and we**
15  **had an ag assault, three victims, then we certainly**
16  **would -- we would patrol it.  We would look at it.  We**
17  **would monitor it.**

18      Q.   But you called it the Northwest Club Task
19  Force; correct?

20  **A.   Yes, sir.**

21      Q.   And I think you've indicated that that was
22  primarily designed to indicate the notion that the
23  primary target of this investigation were the
24  nightclubs?

25  **A.   Yes, sir.  But never forgetting that we also**

(Page 31)

1  **have a responsibility to the list of businesses that you**
2  **just mentioned, to ensure their safety, as well as the**
3  **customers that go and shop there.**

4      Q.   Sure.  Even if you had never formed the task
5  force, your job is to protect the public and these
6  businesses, period, isn't it?

7  **A.   Yes, sir.**

8      Q.   Okay.  But the task force was created in
9  order to focus specific attention and investigations on
10  the clubs?

11  **A.   Yes, sir.**

12      Q.   Okay.  And if I understand correctly, what
13  this says is -- and you've explained that it was a
14  maximum of eight officers and a minimum of four
15  officers.  But this document says "eight officers
16  starting at midnight on Thursday, Friday, and Saturday."
17          Do you see that?

18  **A.   Yes, sir.**

19      Q.   Okay.  So that was the idea at the outset?

20  **A.   Yes, sir.**

21      Q.   Okay.  And plus the sergeant -- or did that
22  include the sergeant?

23  **A.   No, sir, that's one sergeant and eight max --**
24  **or if not, four minimum, sometimes six, but...**

25      Q.   Okay.  What is the geographic area of the

(Page 32)

1  Northwest Task Force -- of the Northwest?

2  **A.   The Northwest geographically, okay, so coming**
3  **down Loop 12, for the west side it's Loop 12.  The**
4  **southern border would be -- Oak Lawn would be the**
5  **southern border.  The -- and I already said the west**
6  **border was Loop 12.  The east border is a little bit of**
7  **Lemmon Avenue, but it goes a little bit further east**
8  **because we don't take in Highland Park, University Park,**
9  **but we border that particular city, so that's the**
10  **borders.  It's 50 square miles in size.**

11      Q.   Okay.  How does that compare in size to the
12  other districts?

13  **A.   If I'm not mistaken, Northwest is, if not the**
14  **second largest, it may be the third largest of all seven**
15  **patrol divisions.**

16      Q.   What's the largest?

17  **A.   Southeast would be the largest.**

18      Q.   And if I understand correctly, the Northwest
19  "Club" Task Force did not target any of those other
20  districts; correct?

21  **A.   Yes, sir, that's correct.**

22      Q.   So you've got eight officers starting at
23  midnight but only on Thursday, Friday, and Saturday;
24  correct?

25  **A.   Yes, sir.**

(Page 33)

1      Q.   So there was no stepped-up enforcement as a
2  result of the task force on Sunday, Monday, Tuesday,
3  Wednesday; correct?

4  **A.   Correct.**

5      Q.   And what type of officers are we talking
6  about?  Are we talking undercover?  Patrol
7  officers?

8  **A.   Patrol officers.**

9      Q.   And were they eight individual patrols or
10  were there two per car?

11  **A.   We paired them up, two per car.**

12      Q.   So four additional patrol cars basically?

13  **A.   Yes, sir.**

14      Q.   Starting at midnight?

15  **A.   Yes, sir.**

16      Q.   Okay.  And how many hours did it last in a
17  given night?

18  **A.   Depending on if the officers, say, made an**
19  **arrest and got tied up, it could end at 2:00 in the**
20  **morning.  It could end at 1:00 in the morning.  It could**
21  **end any time between the time they started and the time**
22  **they got off, which was normally 7:00 in the morning or**
23  **8:00 in the morning.  So it could end any time in**
24  **between there because depending on arrests and how many**
25  **arrests were made, you could virtually take all of those**

**Rick Watson**

(Page 34)

1  eight officers, if they all made arrests, and have them
2  tied up.  And going to the jail is a lengthy process, so
3  it may take, if not the whole entire shift, to put
4  whatever they had in jail, depending on the
5  circumstances, the offense, and things of that nature,
6  and then the property that had been recovered as a
7  result of the arrest.
8       Q.    And so these were all in marked patrol
9  cars?
10      A.    Yes, sir.
11      Q.    Okay.  So there were no undercover officers
12  as part of the Northwest Club Task Force; is that
13  correct?
14      A.    That's correct.
15      Q.    And so how would the officers stop people?
16      A.    They would patrol the areas in and around.
17  High visibility, just being seen and letting the general
18  public know that we're in the area.  If they observed,
19  say, a vehicle commit a traffic violation, they would
20  conduct a traffic stop to address the violation that
21  they had observed.  Also --
22      Q.    Go ahead.
23      A.    Also, if there were pedestrians in and around
24  the area, the officers would make contact with them as
25  well.

(Page 35)

1       Q.    How would they make contact with
2  pedestrians?
3       A.    Well, sometimes you see them walking in a
4  parking lot and just asking them, "Hey, how's it going?
5  How are you doing?  Just checking, because we've had a
6  lot of car break-ins.  We've had cars stolen out of this
7  parking lot.  We're just making sure, are you part of
8  the staff or do you belong here?"  Just asking,
9  inquiring about, you know, why would they be in that
10  parking lot.
11      Q.    How would that lead to an arrest if they're
12  just a pedestrian?
13      A.    It wouldn't necessarily lead to any type of
14  arrest.
15      Q.    So would you say that the vast majority of
16  citations, arrests, however you want to call it, were
17  the result of traffic stops?
18      A.    Yes, sir.
19      Q.    And those would -- the vast majority of those
20  would be the result of some kind of a traffic violation,
21  going through a red light, turning right without
22  stopping, things like that?
23      A.    Yes, sir.
24      Q.    An expired license plate, that kind of
25  thing?

(Page 36)

1       A.    Yes, sir.
2       Q.    And so these four groups of officers would
3  patrol the streets and if they saw a traffic violation
4  or if they had probable cause to believe a traffic
5  violation had occurred, they would stop the car?
6       A.    Yes, sir.
7       Q.    And then that would lead to potentially a
8  search?
9       A.    If they had probable cause to search, yes,
10  sir.
11      Q.    And that's what would result in the vast
12  majority of the arrests that occurred?
13      A.    Yes, sir.
14      Q.    Well, many of these people could be traveling
15  through the streets and have absolutely nothing to do
16  with any of the clubs; correct?
17      A.    Correct.
18      Q.    In fact, many of these people could have
19  something to do with many of these other businesses that
20  are open all night; correct?
21      A.    Correct.
22      Q.    Or they could just be going to and from
23  work?
24      A.    Correct.
25      Q.    Or they could just be going home from

(Page 37)

1  visiting a friend?
2       A.    Correct.
3       Q.    I gather that you would agree that if you put
4  eight officers in four squad cars at any given time of
5  the day, in any given case, if you put an additional
6  eight officers in four squad cars patrolling the
7  streets, there are going to be a number of stops that
8  otherwise wouldn't have happened; isn't that true?
9       A.    Yes, sir.
10      Q.    Just by virtue of the stepped-up enforcement;
11  correct?
12      A.    Correct.
13      Q.    And that would be true no matter what time of
14  day it was; correct?
15      A.    Correct.
16      Q.    All right.  Let's go to the next page of
17  Plaintiffs' Exhibit 2.  And this documents the Northwest
18  Club Task Force Activity from March to December of 2021;
19  correct?
20      A.    Yes, sir.
21      Q.    Did the task force conclude in December of
22  last year or is it still ongoing?
23      A.    It's still ongoing.
24      Q.    Using the same methods?
25      A.    Yes, sir.

Rick Watson

(Page 38)

1    Q.    And do you know whether any other area of the
2  city has been invested with a task force of this kind
3  besides Northwest?
4    A.    I'm not aware of any other task forces, but
5  that doesn't necessarily mean that they don't exist in
6  another division.
7    Q.    All right.  So we're talking March through
8  December, Thursday, Friday, and Saturday.  I had counted
9  there are 132 Thursdays, Fridays, and Saturdays total
10  between March and December, although you said it really
11  didn't start until the end of March; correct?
12    A.    March 25th.
13    Q.    Okay.  So the number would be smaller than
14  132 days then.  But we're talking somewhere in the
15  neighborhood of 120 days, just from the standpoint of
16  looking at the calendar; correct?
17    A.    Of Thursday, Friday, and Saturday or just the
18  Thursdays?
19    Q.    No, Thursday, Friday, Saturday.
20    A.    Okay.  I don't know.  I haven't seen it
21  but --
22    Q.    I mean, we can count it out.  I'm just saying
23  that --
24    A.    Yes, sir.
25    Q.    Okay.  So as a consequence of that stepped-up

(Page 39)

1  enforcement, you list -- I'm not saying you do but this
2  document that you're helping us understand -- indicates
3  a number of categories, felony 123, what is that
4  supposed to mean?
5    A.    Those were felony arrests that the officers
6  made from March through December of 2021.
7    Q.    So what kind of offenses would that be,
8  particularly with respect to traffic stops?
9    A.    The individual might have an outstanding
10  felony warrant, the individual may be a convicted
11  individual and in possession of a firearm.
12    Q.    Let's stop right there for a moment.
13    A.    Yes, sir.
14    Q.    How would your officer know that the person
15  that got stopped for speeding, for example, was a
16  convicted felon?
17    A.    He wouldn't know that until he made the
18  traffic stop for, as you mentioned, speeding.  He goes
19  up and he requests to see the driver's license and
20  insurance.  At that time then the officer will do a
21  warrants check and also do what we refer to as an "AIS,"
22  that is a criminal background to show if this individual
23  has -- what he -- if he or she has ever been arrested
24  for anything prior to this, and to see if they have --
25  what the charge was, and if the individual could be a

(Page 40)

1  convicted felon.
2    Q.    Okay.  But a convicted felon is still
3  allowed, assuming that the person has already served his
4  time or paid his price to society, has a right to drive
5  down the street; right?
6    A.    Yes, sir.
7    Q.    Okay.  So when you say -- so you're saying
8  that if they find out that the person has a record, a
9  felony record, and then they do, what, they search the
10  car to see if there's a firearm?
11    A.    No, sir.
12    Q.    How would they arrest him?
13    MS. JORDAN:  I'm going to object to
14  speculation.  This is not based on his actual knowledge
15  on these particular arrests.  You're giving him
16  hypotheticals that -- you know, the variables could be
17  vast.
18  BY MR. MURRAY:
19    Q.    You can answer.
20    A.    I apologize, what was the question?
21    Q.    Well -- you mentioned -- we're talking about
22  the categories of felony arrests?
23    A.    Yes, sir.
24    Q.    And you mentioned, for example, if someone
25  has a warrant that's outstanding?

(Page 41)

1    A.    Yes, sir.
2    Q.    We'll come back to the convictions.  But
3  let's start with the warrants that are outstanding.  So
4  in those instances that would be a situation where the
5  individual was arrested because of the outstanding
6  warrant, not because the person committed a felony that
7  night; correct?
8    A.    Correct.
9    Q.    Okay.  And again, no matter where you patrol
10  in the city, and no matter how many officers do the
11  patrolling, and no matter what time of day or night they
12  do it, if they stop somebody for a traffic violation,
13  they're going to check to see if that person has an
14  outstanding warrant; right?  That's standard
15  procedure?
16    A.    Correct.
17    Q.    And then they're going to arrest that person,
18  even if that person didn't do anything wrong that
19  particular occasion other than the traffic violation;
20  correct?
21    A.    Correct.
22    Q.    Okay.  Because that's standard operating
23  procedure?
24    A.    Yes, sir.
25    Q.    Okay.  So that's one category that makes up

**Rick Watson**

(Page 42)

1   the 123 felonies; correct?

2   **A.    Yes, sir.**

3   Q.    So the next one you mentioned was that --

4   maybe I misunderstood you.  I thought you said a

5   convicted person who might be in possession of a firearm

6   illegally?

7   **A.    Yes, sir.**

8   Q.    Okay.  Because if you're a convicted felon,

9   you're under a disability with respect to owning a

10  firearm?

11  **A.    Correct.**

12  Q.    Okay.  And the way that would happen -- and

13  again, I understand you didn't make these arrests but

14  the way those incidents must happen is an officer

15  discovers that the person has a conviction, and for

16  whatever reason, based on whatever circumstances,

17  discovers that the person has a firearm; correct?

18  **A.    Correct.**

19  Q.    And then that person is arrested for the

20  felony of having a firearm, despite the disability?

21  **A.    Correct.**

22  Q.    Okay.  So that's -- and that -- again, that

23  could happen anywhere in the city, any time of day, any

24  time of night?  Whenever an officer stops somebody for

25  speeding, for example, that can happen?

(Page 43)

1   **A.    Yes, sir.**

2   Q.    Okay.  What are the other categories of

3   felonies that make up the 123?

4   **A.    They could make a felony traffic stop because**

5   **of information that had come out about a particular**

6   **vehicle that may have been involved in an offense.  An**

7   **example of that could be a business robbery occurred and**

8   **with a description of the vehicle.**

9   **Also, you could -- a robbery of an**

10  **individual, and with the information that is given by**

11  **the victim, the complainant at the time, to the**

12  **officers, the officers puts it out over the radio on the**

13  **MDT and says "This particular vehicle is alleged to have**

14  **been involved in a robbery of an individual."  That's**

15  **one way.**

16  Q.    Did anybody analyze the 123?

17  **A.    I don't know.  I don't know if they analyzed**

18  **it.**

19  Q.    Do you know whether the majority were

20  outstanding warrants?

21  **A.    I don't have that information.**

22  Q.    So you have no information as to how many of

23  the 123 would have had any connection at all to a

24  sexually-oriented business; correct?

25  **A.    Correct.**

(Page 44)

1   Q.    Or for that matter to any of the other

2   numerous types of businesses that you and I talked about

3   that are open between the hours of 2 and 6 a.m.?

4   **A.    That is correct.**

5   Q.    This document then lists 183 misdemeanors;

6   correct?

7   **A.    Yes, sir.**

8   Q.    What were those?

9   **A.    They could range from again outstanding**

10  **warrants.  And what I mean by "warrants" is individuals**

11  **who didn't pay, say, for example, their traffic tickets,**

12  **they're outstanding, and they didn't make payment or**

13  **restitution for the citations they had previously**

14  **received.  Also, going back to warrants again, this**

15  **individual could be wanted for a theft misdemeanor**

16  **warrant.  He or she could also be wanted for a**

17  **misdemeanor assault and that could be maybe family**

18  **violence.  It could also mean just plain simple assault.**

19  **The misdemeanors, basically that's a lot,**

20  **if not most of misdemeanor is warrants.  Or not unless**

21  **the officer happened to observe the individual commit an**

22  **offense and that particular offense would be a**

23  **misdemeanor charge, then that would be another way for a**

24  **misdemeanor arrest.**

25  Q.    And again, those kinds of arrests can happen

(Page 45)

1   whenever a patrol officer stops someone for just

2   speeding, for example, no matter what time of day, no

3   matter what time of night, no matter where in the

4   city?

5   **A.    Yes, sir, that's correct.**

6   Q.    And there's no information that you can

7   provide us that would demonstrate that these 183

8   misdemeanors had anything at all to do with the

9   sexually-oriented businesses that were the focus of the

10  Northwest Club Task Force; correct?

11  **A.    Correct.**

12  Q.    Then there's a category called "citations."

13  I assume those would primarily be the traffic offenses

14  that led to the stop in the first place?

15  **A.    That's correct.**

16  Q.    Speeding, red lights, those kind of things?

17  **A.    Yes, sir, that's correct.**

18  Q.    And "citations," that means nobody got

19  arrested; correct?  They were just cited?

20  **A.    Correct.**

21  Q.    And they would have to appear in court

22  later?

23  **A.    Yes, sir.**

24  Q.    Okay.  And again, those citations, you put a

25  patrol officer and his partner in a squad car and you

Rick Watson

(Page 46)

1  send them out at any time of the day or in any part of
2  the city, they're going to find traffic offenses that
3  lead to stopping people; correct?
4      A.    Yes, sir.
5      Q.    And issuing citations?
6      A.    Yes, sir.
7      Q.    And you have no information that any of those
8  citations had any connection to any of the
9  sexually-oriented businesses that were the focus of the
10 Northwest Club Task Force; correct?
11     A.    Correct.
12     Q.    Then there's a category "calls answered 134,"
13 what would that consist of?
14     A.    That would be the dispatcher putting out a
15 call for service either on the MDT or it would come over
16 the air and say -- call the element out and you have a
17 disturbance at this location and the officers would go
18 and respond.  Or if the officers, say, for example, have
19 been flagged down by an individual -- business owner or
20 somebody -- and they wanted to report something, then
21 the officers would consider that as a call for service
22 as well.
23     Q.    Okay.  And again, that happens all hours of
24 the day and night throughout the city whenever a patrol
25 car is out and about?

(Page 47)

1      A.    Yes, sir.
2      Q.    And again, you have no information as to the
3  relationship between any of those calls and the
4  sexually-oriented businesses that were the focus of the
5  Northwest Club Task force?
6      A.    No, sir, I do not.
7           MS. JORDAN:  Michael, Steve Bishopp is
8  designated as the person to provide that information.
9  Chief Deputy Watson is talking about the task force
10 itself, the patrols, why it was created.  But this
11 information, he's not designated to talk about; the
12 correlation between these arrests, this information, and
13 the regulation, so I'm just -- you can keep asking him
14 the questions if you want but --
15          MR. MURRAY:  You know, it's not easy to
16 understand the demarcations, that's all, on the
17 descriptions.
18          MS. JORDAN:  But if you wanted to list
19 those for yourself, you know, then send them to me then
20 I'll find those people.  But this was my brief -- this
21 is the way I worded it.  But if you weren't
22 understanding what they were, you could have submitted
23 something that was more specific.
24          MR. MURRAY:  Okay.  Well, that's fine.  I
25 appreciate the answers that the Deputy Chief is giving.

(Page 48)

1  BY MR. MURRAY:
2      Q.    The next category is traffic stops.  That's
3  the total number of stops that were made by the eight
4  officers or the -- however many there were; correct?
5      A.    Correct.
6      Q.    So at least 600 or so didn't even end up in a
7  citation correct?
8      A.    Correct.
9      Q.    Okay.  You had eight instances of stolen
10 property recovered; correct?
11     A.    Yes, sir.
12     Q.    You had 113 instances of the citizen having a
13 weapon seized as a result of the stop?
14     A.    Yes, sir.
15     Q.    244 -- drugs seized, 244, are those
16 separate drugs?  Separate incidents?  What is that?
17     A.    If it -- the way we captured it, if it's
18 listed, it's 244 different incidences of where the
19 officers seized some type of drug.
20     Q.    And then the man hours 1241, what is that
21 calculation?
22     A.    That calculation would be on the number of
23 hours the task force worked from its inception from
24 March through December of 2021.
25     Q.    Now, I take it, though, that these eight

(Page 49)

1  officers on a given Thursday, Friday, or Saturday that
2  we're talking about were not the only officers who were
3  patrolling that district; correct?
4      A.    If I may?  Can I clarify and make sure you're
5  asking me what I think you're asking me?
6      Q.    Let me rephrase it.
7      A.    Okay.
8      Q.    If this task force had never been formed,
9  there still would be some police presence in the form of
10 patrol officers in the Northwest area?
11     A.    In the Northwest Division, yes, sir.
12     Q.    Okay.  And did those typical patrols still
13 occur in addition to the eight extra officers?
14     A.    No, sir, not necessarily.
15     Q.    So did the eight extra officers actually
16 replace the officers who otherwise would have been
17 patrolling?
18     A.    Not necessarily.  The other officers, yes,
19 they could go in and patrol as well as the club task
20 force officers.  However, what we've experienced in
21 seeing is that call loads, calls for service by
22 individuals calling 911 and asking for a police
23 response, they're usually very heavy on Thursdays,
24 Fridays, and Saturday evenings, as well as it goes into
25 early morning.  So those officers were really answering

**Rick Watson**

(Page 50)

1  calls for service, but nothing prevented them from going
2  into the area that the club task force officers were
3  patrolling.
4      Q.   So if I'm understanding it correctly then,
5  what you're saying is that the intention of the task
6  force was not to take these eight officers and
7  substitute them for whatever police presence would
8  otherwise have been there?
9      A.   No, sir.
10     Q.   It was to provide additional presence of
11  patrols?
12     A.   Yes, sir, that is correct.
13     Q.   Okay.
14          (Recess taken.)
15  BY MR. MURRAY:
16     Q.   Deputy Chief, your counsel and I were talking
17  a little bit off the record and she mentioned that in
18  2021 there was a plan put in by Chief Garcia that
19  preceded the task force; is that correct?
20     A.   Yes, sir.
21     Q.   And what was that plan?
22     A.   The plan basically was to address all crime
23  in the city, however, it focused on violent crime, which
24  that was a lot of the focus was violent crime.  And the
25  plan, what Chief Garcia did was he reached out to the

(Page 51)

1  University of Texas at San Antonio and he talked to the
2  academia about crime in our city.  Now what I'm going to
3  say next, I'm speculating because I was not privy to his
4  conversation with the academia.  So what he presented
5  and what he said to the academia, I don't know what he
6  said or what he presented to them.
7      Q.   Well, then I won't ask you to speculate.  But
8  then later on when you get to March of 2021, as an
9  evolution perhaps of Chief Garcia's plan, this task
10  force was created?
11     A.   Yes, sir.
12     Q.   Is that an accurate way to put it?
13     A.   Yes, sir.
14     Q.   Now, I want you to turn your attention to
15  page 17 of Plaintiffs' Exhibit 2.  The COD-017.
16     A.   COD-017.
17     Q.   Okay.  So it's my understanding from my
18  conversations with your counsel that Lieutenant Bishopp
19  would have more information about this particular data
20  than you would.  Is that a fair -- is that an accurate
21  statement?
22     A.   Yes, sir, it is.
23     Q.   Okay.  And that -- so there's really nothing
24  that you would be able to add to what Lieutenant Bishopp
25  could provide about this data?

(Page 52)

1      A.   No, sir, I couldn't add anything to this data
2  because he is the one responsible for pulling this data.
3      Q.   Okay.  So I will defer my questions on that
4  subject to Lieutenant Bishopp.
5          Go to the next page and I'll ask you the
6  same question.  Is there anything that -- any
7  information that you have about this particular page,
8  COD-018, that Lieutenant Bishopp wouldn't have?
9      A.   No, sir.
10     Q.   And you would agree that he would be the more
11  appropriate person to -- for me to question about
12  these -- this page?
13     A.   Yes, sir.
14     Q.   Okay.  And then, of course, beginning at
15  COD-019, your answer would be the same, Lieutenant
16  Bishopp would be the better person to address the data
17  on that page?
18     A.   Yes, sir.
19     Q.   Well, then let me consult with my colleagues
20  for a moment and we may be done.
21          (Recess taken.)
22          MR. MURRAY:  Okay.  Then given the fact
23  that Lieutenant Bishopp will be the better witness for
24  the pages that we just talked about, I have nothing
25  further of Deputy Chief, but thank you very much for

(Page 53)

1  your time.
2          THE WITNESS:  Thank you, Mr. Murray.
3          MS. JORDAN:  I just have one question
4  regarding the Chief Garcia's violent crime prevention
5  plan.
6              EXAMINATION
7  BY MS. JORDAN:
8      Q.   Can you describe what your understanding of
9  Chief Garcia's approach with respect to that plan?
10     A.   With respect to that, it's my understanding
11  he provided the academia at the University of Texas at
12  San Antonio with crime data, both property crime and
13  violent crime for the city.  As a result of that, the
14  academia did an analysis of both property and violent
15  crime and they identified the -- if I may -- the "hot
16  spot areas" within the city.  Along with that, they
17  refer to it as grids, g-r-i-d-s, which is a 300 by 300
18  space area that had numerous violent crime offenses.
19  And our focus was to go in on those particular grids
20  that had been ID'd, one being an offender grid, and the
21  other one being a high-visibility grid.
22          And the instructions that we gave to the
23  officers was that they would stay on the grids and work
24  the grids, both for individuals and then also, for
25  example, the 58 A's was a high-visibility grid.  They

**Rick Watson**

(Page 54)

1  had some violent offenses but not very many.  So in our
2  effort to try to curtail violent crime on that grid, the
3  officers would park out there with their red lights,
4  their cruising lights on and would remain there on that
5  grid for 15 minutes at certain specific times that the
6  academia had identified that offenses were occurring, in
7  an effort to keep the offenses from occurring during
8  those times.
9      Q.    And what about the offender grid?
10     A.    The offender showed more as far as more
11 violent offenses on the offenders.  Therefore, we had
12 our specialty groups, which is CRT and deployment, they
13 would work those specifically because of the high number
14 of violent crime offenses and the potential of the
15 individuals who lived in that grid.
16     Q.    What does "CRT" stand for?
17     A.    Crime Response Team.
18     Q.    Okay.  And how did this eventually evolve
19 into the Northwest Task Force?
20     A.    Well, as I said earlier, we used our CRT
21 teams to focus on the grids; therefore, we needed
22 officers to focus in and around the areas, the
23 entertainment district, that we were having high violent
24 offenses occurring, to focus in on that.  It was very
25 difficult to pull CRT off of those grids.  Our goal was

(Page 55)

1  basically to reduce crime in those grids to ultimately
2  zero.  So we focused on that and we brought these other
3  officers as part of the task force.  And like I said
4  earlier, because of shortage of manpower on the
5  department, we were trying to make the best use we could
6  of the resources we had in order to accomplish both
7  goals.
8      Q.    Okay.
9          MS. JORDAN:  I'll reserve the rest of my
10 questions for the hearing.
11         MR. MURRAY:  I'm going to ask a few
12 questions on what you just said.
13              FURTHER EXAMINATION
14 BY MR. MURRAY:
15     Q.    You said the grids -- the city was divided
16 into grids, 300 by 300?
17     A.    Yes, sir.
18     Q.    What?  300 by 300 --
19     A.    300 by 300 feet, very small.
20     Q.    How many grids did it take?
21     A.    I don't know that particularly but it's well
22 over 200, and maybe in the area of 500 plus.  I don't
23 know the exact number of grids for the entire city.
24     Q.    So -- and it's your understanding that these
25 academics at UT were consulted; correct?

(Page 56)

1      A.    Correct.
2      Q.    Do you know who?
3      A.    No, sir, I do not who the academia was that
4  was consulted.
5      Q.    Do you know whether they ever issued a
6  report?
7      A.    I don't know if they issued a report.
8      Q.    You're not aware of a report from UT being
9  submitted to City Counsel, do you?
10     A.    I hadn't seen that report, no, sir.
11     Q.    You said somebody -- did the academics you
12 say ascertained what the hot spots were in the city?
13     A.    It's my understanding through their analysis
14 of the data that was provided to them by the department,
15 they looked at it and they ascertained grids, if you
16 want to call them grids.  You can call them hot spots.
17 But basically the grids is how we become to know the
18 grid.  It's same difference, hot-spot policing.
19     Q.    Well, didn't you tell me there was like 200
20 grids?
21     A.    They're possibly could be more, yes, sir.
22     Q.    So they identified more than 200 or more hot
23 spots, also known as grids?
24     A.    They came up with grids and just because that
25 is a grid that doesn't necessarily mean that that was

(Page 57)

1  where we were going to focus, because based on the
2  information that they were given by the department, this
3  particular grid may not have generated but maybe one
4  violent offense, where a grid next to it would have
5  generated -- just an estimate -- five or six or plus
6  more.
7      Q.    Well, then what were you referring to when
8  you said it was your understanding that they identified
9  hot spots in the city?
10     A.    Well, maybe it was my incorrect terminology
11 that I used, but hot spot, grid, one and the same.
12         MR. MURRAY:  Okay.  That's all I have.
13         THE WITNESS:  Yes, sir.
14         MR. MURRAY:  Does he want to read or
15 waive?
16         MS. JORDAN:  I think we'll read.
17         (Off record at 11:18 a.m.)
18
19
20
21
22
23
24
25

(Page 58)

```
 1              WITNESS ERRATA SHEET
 2  WITNESS NAME:  RICK WATSON    DATE:  FEBRUARY 22, 2022
 3  CASE NAME:  ASSOCIATION OF CLUB EXECUTIVES OF DALLAS, et
    al
 4
 5  Reason Codes:  (1) to clarify the record; (2) to conform
    to the facts; (3) to correct a transcription error;
 6  (4) other (please explain.)
 7  PAGE  LINE   CHANGE                     REASON CODE
 8  ____  ____   _____
 9  ____  ____   _____
10  ____  ____   _____
11  ____  ____   _____
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20  ____  ____   _____
21  ____  ____   _____
22  ____  ____   _____
23  ____  ____   _____
24  ____  ____   _____
25  ____  ____   _____
```

(Page 60)

```
 1       I, CHERYL A. DIXON, Registered Professional
    Reporter, Certified Realtime Reporter and Notary Public,
 2  do hereby declare:
 3       That, prior to being examined, the witness
    named in the foregoing deposition was by me duly sworn
 4  pursuant to Section 30(f)(1) of the Federal Rules of
    Civil Procedure and the deposition is a true record of
 5  the testimony given by the witness.
 6       That said deposition was taken down by me in
    shorthand at the time and place therein named and
 7  thereafter reduced to text under my direction.
 8  _____  That the witness was requested to review the
 9          transcript and make any changes to the
            transcript as a result of that review pursuant
10          to Section 30(e) of the Federal Rules of Civil
            Procedure.
11  _____  Signature is waived.
12  _____  The changes made by the witness are appended
            to the transcript.
13
    _____  No request was made that the transcript be
14          reviewed pursuant to Section 30(e) of the
            Federal Rules of Civil Procedure.
15
         I further declare that I have no interest in
16  the event or the action.
17       I declare under penalty of perjury under the
    laws of the United States of America that the foregoing
18  is true and correct.
19       Witness my hand this 23rd day of February,
    2022.
20
21
22
23
24       Cheryl A. Dixon, RPR, CRR
25
```

(Page 59)

```
 1       I, RICK WATSON, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5       _____
            RICK WATSON
 6
 7
 8  THE STATE OF _____)
 9  COUNTY OF _____)
10       Before me, _____, on
11  this day personally appeared RICK WATSON, known to me
12  (or proved to me under oath or through _____)
13  [description of identity card or other document] to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed the
16  same for the purposes and consideration therein
17  expressed.
18       Given under my hand and seal of office this _____
19  day of _____, _____.
20
21
22
23
         _____
24       NOTARY PUBLIC IN AND FOR
         THE STATE OF _____
25       COMMISSION EXPIRES:_____
```

---

**(**

**(1)** 58:5

**(2)** 58:5

**(3)** 58:5

**(4)** 58:6

---

**0**

**06** 6:14

---

**1**

**1** 9:12,13 15:22

**113** 48:12

**11:18** 57:17

**12** 32:3,6

**120** 38:15

**123** 39:3 42:1 43:3, 16,23

**1241** 48:20

**132** 38:9,14

**134** 46:12

**15** 54:5

**17** 51:15

**183** 44:5 45:7

**1977** 5:14

**1:00** 33:20

---

**2**

**2** 10:7,8 18:23 22:10, 17,20,21 23:1 24:2,3, 8 28:8,20 29:25 37:17 44:3 51:15

**20** 22:20

**200** 23:17,23 55:22 56:19,22

**2020** 15:23 23:3,5

**2021** 10:24 11:18 13:14,19 15:23 23:9,

**21** 27:2 37:18 39:6 48:24 50:18 51:8

**2022** 58:2

**22** 58:2

**24/7** 28:15 29:8,10

**244** 48:15,18

**250** 8:14

**25th** 13:14 38:12

**2:00** 22:16 28:23 33:19

---

**3**

**3** 17:25 18:1 20:2 22:10

**3,100** 8:18

**3,133** 8:17

**300** 53:17 55:16,18, 19

**31** 18:22

**31st** 15:23

**3:15** 22:18

---

**4**

**4** 29:4

**4:00** 22:16

**4th** 5:15

---

**5**

**50** 32:10

**500** 12:14 26:17,20 55:22

**58** 53:25

**5:00** 22:16

---

**6**

**6** 24:3 28:20 29:25 44:3

**600** 12:14 48:6

**6969** 4:13

---

**7**

**7:00** 33:22

---

**8**

**80s** 5:24

**8:00** 33:23

---

**9**

**9** 10:17,19

**911** 12:17 49:22

**9801** 4:12

---

**A**

**A's** 53:25

**A-C-E-S** 19:17

**a.m.** 22:18,20,21 23:1 24:3 28:8,20 29:4,25 44:3 57:17

**absolutely** 11:8 36:15

**academia** 51:2,4,5 53:11,14 54:6 56:3

**academics** 55:25 56:11

**academy** 5:15

**accomplish** 55:6

**accurate** 51:12,20

**Aces** 19:17,20 20:15

**acknowledged** 59:15

**Activity** 37:18

**actual** 10:13 17:11 40:14

**add** 51:24 52:1

**addition** 49:13

**additional** 33:12 37:5 50:10

**address** 4:8 12:12 19:25 27:18 34:20 50:22 52:16

**addresses** 4:10

**adjacent** 26:10

**adult** 27:9,13,24

**Affairs** 6:4,5

**affix** 59:2

**ag** 25:18 30:15

**aggravated** 15:20 24:17

**agree** 37:3 52:10

**agreeable** 4:25

**agreement** 4:21 5:6

**ahead** 34:22

**air** 46:16

**AIS** 39:21

**alcohol** 16:7

**alleged** 43:13

**alleging** 15:5

**allowed** 40:3

**altogether** 7:15

**analysis** 9:7 12:7 26:1 53:14 56:13

**analyst** 12:7 14:1,5 24:11 25:22

**analyst/ intelligence** 14:7

**analyze** 43:16

**analyzed** 43:17

**analyzes** 14:6

**and/or** 20:8

**answering** 13:10 49:25

**answers** 5:1 47:25

**Antonio** 51:1 53:12

**apologize** 4:10 40:20

**appeared** 59:11

---

**approach** 53:9

**approximately**
5:23,24 8:13,14,15
12:14 19:4,5 20:21
23:10

**April** 5:15

**arcade** 27:16

**area** 21:11,12,14
25:13,23 26:12,15
31:25 34:18,24 37:5
38:1 49:10 50:2
53:18 55:22

**areas** 34:16 53:16
54:22

**arrest** 33:19 34:7
35:11,14 40:12 41:17
44:24

**arrested** 39:23 41:5
42:19 45:19

**arrests** 33:24,25
34:1 35:16 36:12
39:5 40:15,22 42:13
44:25 47:12

**ascertained** 56:12,
15

**assault** 30:15 44:17,
18

**assaults** 15:20
24:17 25:18

**assigned** 5:16 6:24
12:24

**assignment** 5:19
7:1 13:8

**assistant** 7:19,22
8:6

**association** 17:10
19:15 58:3

**assume** 45:13

**assuming** 40:3

**attachment** 18:10

**attended** 8:20

**attention** 4:22 10:16
18:5 31:9 51:14

**audible** 5:1

**avenue** 14:25 32:7

**aware** 38:4 56:8

---

**B**

**bachelor's** 8:22 9:2

**back** 13:15 22:13
24:8 41:2 44:14

**background** 8:19
39:22

**Bar** 21:22 22:20

**bare** 13:2

**bars** 28:22

**based** 40:14 42:16
57:1

**basically** 33:12
44:19 50:22 55:1
56:17

**begin** 5:5,7 10:6

**beginning** 52:14

**behalf** 10:3

**belong** 35:8

**Bishopp** 47:7 51:18,
24 52:4,8,16,23

**bit** 9:9 27:21 32:6,7
50:17

**board** 6:24

**bookstore** 27:16

**bookstores** 27:9,13,
24

**border** 32:4,5,6,9

**borders** 32:10

**bottle** 19:22

**bottom** 10:17

**Boulevard** 4:13

**break-ins** 35:6

**bring** 4:22 19:22

**brought** 55:2

**building** 21:13

**bullet** 26:3

**business** 4:7 16:5,8,
18 18:12 21:10 22:2,
4,5 26:11 29:1 30:12
43:7,24 46:19

**businesses** 12:3
18:17 26:5,9,17 27:7
28:4,7,14 30:4,5,8
31:1,6 36:19 44:2
45:9 46:9 47:4

**BYOB** 19:21

---

**C**

**Cabaret** 20:14,20

**cabarets** 20:2

**calculation** 48:21,
22

**calendar** 38:16

**call** 12:3 18:22 35:16
46:15,16,21 49:21
56:16

**called** 6:5 8:5 16:14
26:24 27:22 30:18
45:12

**calling** 49:22

**calls** 12:16,17,19
13:10 14:15 24:4
46:12 47:3 49:21
50:1

**captured** 48:17

**car** 33:10,11 35:6
36:5 40:10 45:25
46:25

**card** 59:13

**career** 5:12

**Carlson** 13:17

**carry** 13:7

**cars** 33:12 34:9 35:6
37:4,6

**CASE** 58:3

**cases** 27:10

**categories** 39:3
40:22 43:2

**category** 41:25
45:12 46:12 48:2

**ceased** 19:6

**Central** 5:18,20
6:23,25 7:12

**challenge** 12:12

**CHANGE** 58:7

**charge** 39:25 44:23

**check** 39:21 41:13

**checking** 35:5

**chief** 4:15,18 5:10
6:10,13,23,24 7:4,19,
22 8:2,6,10 18:7,16
47:9,25 50:16,18,25
51:9 52:25 53:4,9

**circumstances**
16:22 17:3 34:5
42:16

**citation** 48:7

**citations** 35:16
44:13 45:12,18,24
46:5,8

**cited** 45:19

**citizen** 48:12

**city** 6:19,21 7:15,17
8:25 10:3 18:17
23:10,22 24:24 32:9
38:2 41:10 42:23
45:4 46:2,24 50:23
51:2 53:13,16 55:15,
23 56:9,12 57:9

**citywide** 25:1

**clarify** 11:7,12 49:4
58:5

**clear** 4:20

**clients** 26:12

**close** 8:14

**closer** 21:13 26:21

**club** 10:24 11:17
17:8,21 18:20,24
19:2,9,13,15 20:9,18,
19 21:3 22:1 24:21
25:5 26:25 27:6,8,23
30:18 32:19 34:12

37:18 45:10 46:10
47:5 49:19 50:2 58:3

**Club'** 27:2

**clubs** 28:1,4 30:8
31:10 36:16

**COD-015** 10:18 24:9

**COD-017** 51:15,16

**COD-018** 52:8

**COD-019** 52:15

**CODE** 58:7

**Codes** 58:5

**colleagues** 52:19

**college** 8:22 9:9

**commander** 7:7
11:22

**COMMISSION**
59:25

**commit** 34:19 44:21

**committed** 41:6

**committee** 10:14
11:3,15

**communicate**
27:23

**Communications**
6:22

**compare** 32:11

**compared** 25:24

**comparing** 26:1

**comparison** 24:12

**complainant** 15:1,2,
5 43:11

**concentrate** 30:8

**concentrated** 30:10

**conclude** 37:21

**conclusion** 25:22

**conduct** 34:20

**conform** 58:5

**connection** 17:21
19:13 20:7,11 43:23
46:8

**consequence** 38:25

**consideration**
12:15 59:16

**considered** 7:7 27:8

**consist** 46:13

**consult** 52:19

**consulted** 55:25
56:4

**contact** 34:24 35:1

**Convenience** 28:12

**conversation** 51:4

**conversations**
51:18

**convicted** 39:10,16
40:1,2 42:5,8

**conviction** 42:15

**convictions** 41:2

**Coordinator** 6:6

**Copy** 9:14

**correct** 4:16 5:10
8:11 9:25 10:20,25
11:1 13:20,23 14:13
17:23 18:25 19:1
26:25 28:23,24 29:5,
22,23 30:19 32:20,
21,24 33:3,4 34:13,
14 36:16,17,20,21,24
37:2,11,12,14,15,19
38:11,16 41:7,8,16,
20,21 42:1,11,17,18,
21 43:24,25 44:4,6
45:5,10,11,15,17,19,
20 46:3,10,11 48:4,5,
7,8,10 49:3 50:12,19
55:25 56:1 58:5 59:3

**correctly** 17:4 31:12
32:18 50:4

**correlation** 47:12

**counsel** 18:7 50:16
51:18 56:9

**count** 38:22

**counted** 38:8

**COUNTY** 59:9

**court** 4:24 45:21

**create** 14:18,23 15:4

**created** 11:20 13:21
15:7 25:10 31:8
47:10 51:10

**creation** 9:25

**crime** 6:20 11:24,25
12:1,7,12,24 13:22,
25 14:5,6,10,11,19
15:8 23:21 24:10,11
25:11,22 26:19 27:20
50:22,23,24 51:2
53:4,12,13,15,18
54:2,14,17 55:1

**crimes** 6:18 12:1
13:22 15:7,17 24:10,
12,13,17,22 25:11,
16,23

**criminal** 9:3,5 39:22

**CRT** 54:12,16,20,25

**cruising** 54:4

**current** 7:1

**curtail** 54:2

**customer** 17:7,9

**customers** 26:12
31:3

───────────

**D**

**Dallas** 4:13,14 5:10,
14 8:16,25 10:4
18:17 20:14,20 23:2,
10 58:3

**dance** 16:6 17:8

**dancing** 22:5

**data** 13:22 15:8
24:10 25:11 51:19,25
52:1,2,16 53:12
56:14

**date** 20:22,23 58:2

**David** 18:23

**day** 14:9 16:10 20:4
22:8 37:5,14 41:11
42:23 45:2 46:1,24
59:11,19

**day-to-day** 7:5

**days** 38:14,15

**December** 37:18,21
38:8,10 39:6 48:24

**defer** 52:3

**degree** 8:22,24 9:2,4

**demarcations**
47:16

**demonstrate** 45:7

**department** 5:10,
13,14 8:13,16 12:13
55:5 56:14 57:2

**depending** 15:3
33:18,24 34:4

**deployment** 54:12

**deposition** 59:2

**deputy** 4:15,18 5:10
6:10,12 7:4 47:9,25
50:16 52:25

**describe** 53:8

**description** 43:8
59:13

**descriptions** 47:17

**designated** 26:12,
15 47:8,11

**designed** 30:22

**detective** 5:21 6:1
14:4 15:11

**died** 16:25

**difference** 56:18

**difficult** 54:25

**direct** 10:16 18:5

**directly** 8:1,9

**disability** 42:9,20

**Discotheque** 16:4
17:11

**discovers** 42:15,17

**discuss** 26:20

**discussed** 11:23

**discussion** 13:18

**Rick Watson**                    **Index: dispatcher..grid**

**dispatcher** 46:14

**district** 15:25 18:23 49:3 54:23

**districts** 32:12,20

**disturbance** 46:17

**divided** 55:15

**division** 5:16,18,20, 21,25 6:3,4,5,8,11, 19,22,23,25 7:1,7,13 11:22 12:4,23 14:9 16:1 24:23 25:3,12 38:6 49:11

**divisions** 4:11 7:4,6, 10,14,16 32:15

**document** 9:17,20 10:10,25 18:3 31:15 39:2 44:5 59:13

**documents** 37:17

**drive** 40:4

**driver's** 39:19

**drug** 28:17 48:19

**drugs** 48:15,16

**due** 13:21 15:7 25:10

**duly** 4:4

**duties** 7:3

**E**

**earlier** 25:17 54:20 55:4

**early** 5:24 22:10,24, 25 49:25

**east** 32:6,7

**easy** 47:15

**educational** 8:19

**effort** 54:2,7

**element** 46:16

**elementary** 8:20

**employees** 8:12

**end** 11:13 33:19,20, 21,23 38:11 48:6

**enforcement** 33:1 37:10 39:1

**ensure** 12:18 31:2

**entered** 8:22

**entertainment** 12:3 27:7 54:23

**entire** 6:19 34:3 55:23

**ERRATA** 58:1

**error** 58:5

**establishment** 16:6 19:21 21:10

**establishments** 29:24

**estimate** 23:6,7 57:5

**evenings** 49:24

**events** 9:24

**eventually** 54:18

**evolution** 51:9

**evolve** 54:18

**exact** 8:18 16:12 19:24 22:15 23:14,24 55:23

**EXAMINATION** 4:5 53:6 55:13

**executed** 59:15

**Executive** 8:6

**EXECUTIVES** 58:3

**exhibit** 9:12,13 10:7, 8 17:25 18:1 20:2 24:8 37:17 51:15

**exist** 38:5

**experienced** 49:20

**expired** 35:24

**EXPIRES** 59:25

**explain** 58:6

**explained** 31:13

**expressed** 59:17

**extra** 49:13,15

**F**

**faced** 12:12

**fact** 17:22 18:6 28:7 36:18 52:22

**facts** 58:5

**fair** 51:20

**Falls** 8:23

**family** 44:17

**fast** 29:10,12

**fear** 26:13

**FEBRUARY** 58:2

**feet** 26:17 55:19

**felon** 39:16 40:1,2 42:8

**felonies** 42:1 43:3

**felony** 39:3,5,10 40:9,22 41:6 42:20 43:4

**finally** 5:4

**find** 40:8 46:2 47:20

**fine** 47:24

**finish** 5:5,7 11:13 17:15

**firearm** 39:11 40:10 42:5,10,17,20

**flagged** 46:19

**fluctuated** 13:10

**focus** 31:9 45:9 46:9 47:4 50:24 53:19 54:21,22,24 57:1

**focused** 50:23 55:2

**follow** 17:17

**food** 29:10,12

**force** 9:24 10:24 11:4,18 13:1,4,14 15:6 24:21 25:5 26:24,25 27:2,23 30:7,19 31:5,8 32:1, 19 33:2 34:12 37:18, 21 38:2 45:10 46:10

47:5,9 48:23 49:8,20 50:2,6,19 51:10 54:19 55:3

**forces** 38:4

**foregoing** 59:1,14

**forgetting** 30:25

**forgot** 25:17,19

**form** 23:18 49:9

**formed** 31:4 49:8

**fourth** 20:13

**Friday** 31:16 32:23 38:8,17,19 49:1

**Fridays** 38:9 49:24

**friend** 37:1

**front** 21:9,11,13

**full** 4:7 20:1

**G**

**g-r-i-d-s** 53:17

**Garcia** 18:7 50:18,25

**Garcia's** 51:9 53:4,9

**gas** 28:10

**gather** 37:3

**gave** 53:22

**general** 21:11 34:17

**generated** 57:3,5

**geographic** 31:25

**geographically** 32:2

**gestures** 4:25

**give** 22:15 23:7

**giving** 40:15 47:25

**goal** 54:25

**goals** 55:7

**graduated** 5:15 8:21

**grid** 53:20,21,25 54:2,5,9,15 56:18,25 57:3,4,11

**grids** 53:17,19,23,24 54:21,25 55:1,15,16, 20,23 56:15,16,17, 20,23,24

**grocery** 29:7

**Group** 7:11,12

**groups** 36:2 54:12

**guess** 18:21

---

**H**

**Hall** 6:24

**hand** 59:18

**happen** 42:12,14,23, 25 44:25

**happened** 15:5 26:1 30:14 37:8 44:21

**happening** 12:10

**hard** 17:17

**Harry** 4:12

**hate** 23:7

**he'll** 14:10

**head** 23:5

**hearing** 55:10

**heavy** 49:23

**helping** 39:2

**Hey** 35:4

**high** 8:21 27:14 30:11 34:17 54:13,23

**high-visibility** 53:21,25

**Highland** 32:8

**Hines** 4:12

**home** 36:25

**homicide** 16:10 19:10,16 23:10 25:18

**homicides** 15:20,22 23:2,22 24:2,16

**hot** 53:15 56:12,16, 22 57:9,11

**hot-spot** 56:18

**hotels** 29:21

**hours** 24:2 29:13 33:16 44:3 46:23 48:20,23

**House** 29:15

**how's** 35:4

**hundred** 23:15

**hypotheticals** 40:16

---

**I**

**ID'D** 53:20

**idea** 31:19

**identified** 12:22 13:12,13 53:15 54:6 56:22 57:8

**identifying** 18:11

**identity** 59:13

**illegally** 42:6

**in-depth** 9:8

**inception** 48:23

**incidences** 48:18

**incident** 14:12,17,22 20:5

**incidents** 42:14 48:16

**include** 27:9 28:10 31:22

**included** 27:12,13

**includes** 18:11

**Including** 30:3

**incorrect** 57:10

**increasing** 13:23 15:8 24:11 25:11,23

**indication** 19:14

**individual** 16:25 17:5,10 33:9 39:9,10, 11,22,25 41:5 43:10, 14 44:15,21 46:19

**individuals** 19:18 21:23 25:20 44:10 49:22 53:24 54:15

**information** 6:9 11:2 15:1,4 21:1 43:5,10,21,22 45:6 46:7 47:2,8,11,12 51:19 52:7 57:2

**inquiring** 35:9

**inside** 20:17,18,19 22:1

**instances** 41:4 48:9, 12

**instructions** 53:22

**instrument** 59:15

**insurance** 39:20

**intended** 27:23

**intention** 50:5

**interested** 30:13

**Internal** 6:4

**International** 29:15

**introduces** 10:23

**invested** 38:2

**investigation** 27:12 30:23

**investigations** 31:9

**involved** 14:1 19:12 20:8 43:6,14

**issued** 56:5,7

**issuing** 46:5

---

**J**

**Jack** 14:4

**jail** 34:2,4

**Jernigan** 14:4 15:11

**Jesse** 7:19

**job** 31:5

**joined** 5:14

**JORDAN** 23:18 24:4,20 25:1,7 40:13

47:7,18 53:3,7 55:9 57:16

**justice** 9:3,5

---

**K**

**Kalua** 16:4 17:11

**keeping** 13:8

**killed** 17:6 19:19 21:24

**kind** 14:22 16:5 22:4 24:16 35:20,24 38:2 39:7 45:16

**kinds** 44:25

**knowledge** 40:14

---

**L**

**La** 18:23

**largest** 32:14,16,17

**late** 22:25 28:17 29:13

**late-night** 29:5

**Lawn** 32:4

**lead** 35:11,13 36:7 46:3

**leading** 9:25

**leave** 13:6

**led** 45:14

**Legislative** 6:6

**Lemmon** 32:7

**lengthy** 34:2

**letting** 34:17

**level** 8:5

**license** 22:7 35:24 39:19

**licensed** 16:18 18:11,17 30:4

**lieutenant** 6:7 51:18,24 52:4,8,15, 23

**Rick Watson**                    Index: light..occupation

**light** 35:21

**lights** 45:16 54:3,4

**liquor** 22:6 29:18

**list** 18:11,15,20 20:1
31:1 39:1 47:18

**listed** 48:18

**lists** 44:5

**lived** 54:15

**loads** 49:21

**local** 9:1

**located** 19:23

**location** 4:12 30:10
46:17

**locations** 12:9,22
18:12

**long** 19:2

**looked** 12:5,9 15:19
26:19,22 56:15

**Loop** 32:3,6

**lot** 16:25 17:5,22
20:16,25 35:4,6,7,10
44:19 50:24

**lots** 26:10,11

**lower** 23:21,22

———————

**M**

**made** 10:12 33:18,25
34:1 39:6,17 48:3

**major** 7:7 11:21

**majority** 35:15,19
36:12 43:19

**make** 4:20 5:1 7:17
24:20 34:24 35:1
42:13 43:3,4 44:12
49:4 55:5

**makes** 41:25

**making** 35:7

**man** 48:20

**manage** 7:5

**managing** 7:9

**Manaña** 19:24

**manpower** 12:13
55:4

**March** 13:14,18
15:22,23 37:18 38:7,
10,11,12 39:6 48:24
51:8

**marked** 9:11,13
10:7,8 17:25 18:1
34:8

**mass** 21:22

**master's** 8:24 9:4

**Matt** 13:17

**matter** 30:12 37:13
41:9,10,11 44:1 45:2,
3

**max** 31:23

**maximum** 13:1
31:14

**mayor** 18:7

**Mccallum** 4:13

**MDT** 43:13 46:15

**means** 45:18

**meant** 26:8

**members** 8:15

**memorandum** 18:7

**mention** 25:19

**mentioned** 9:21
13:25 25:17,18 29:2
30:1 31:2 39:18
40:21,24 42:3 50:17

**methods** 37:24

**Michael** 47:7

**midnight** 13:23 15:8
24:11,13 25:12,24
26:1,2 28:5 29:19
31:16 32:23 33:14

**Midwestern** 8:23

**miles** 32:10

**military** 13:6

**mind** 5:23 13:8

**minimum** 13:2
31:14,24

**minutes** 22:20 54:5

**MIR** 14:23

**miscellaneous**
14:22

**misdemeanor**
44:15,17,20,23,24

**misdemeanors**
44:5,19 45:8

**mistaken** 32:13

**misunderstood**
42:4

**moment** 16:17 39:12
52:20

**Monday** 33:2

**monitor** 12:22 30:17

**months** 19:5,7

**morning** 22:10,16,
17,21,24,25 23:1
33:20,22,23 49:25

**motels** 29:21

**multiple** 13:22 15:7
19:18 24:9 25:10

**Murray** 4:6 9:14,15
10:9 18:2 23:25 24:7,
25 25:4,8 40:18
47:15,24 48:1 50:15
52:22 53:2 55:11,14
57:12,14

———————

**N**

**narcotics** 5:25 6:1

**nature** 34:5

**necessarily** 35:13
38:5 49:14,18 56:25

**needed** 54:21

**neighborhood**
38:15

**night** 22:25 28:18
29:13,22 33:17 36:20
41:7,11 42:24 45:3
46:24

**nightclubs** 27:13,24
28:1,25 29:1 30:24

**non-adult** 28:25

**non-family** 25:18

**non-family-
violence** 15:20

**non-sexually-
oriented** 29:1

**North** 6:23,25 7:12

**Northwest** 6:8,25
7:13 9:24 10:24
11:17,22 12:23 14:9
15:24 24:21 25:5,12
26:24 27:1,22 30:18
32:1,2,13,18 34:12
37:17 38:3 45:10
46:10 47:5 49:10,11
54:19

**NOTARY** 59:24

**noted** 59:3

**notion** 27:24 30:22

**nude** 16:15 20:2

**number** 12:25 15:21
18:22 23:14,24 28:4
37:7 38:13 39:3 48:3,
22 54:13 55:23

**numbers** 10:17,18

**numerous** 27:17
44:2 53:18

———————

**O**

**Oak** 32:4

**oath** 59:12

**object** 40:13

**Objection** 23:18
24:4

**obligation** 12:18

**observe** 44:21

**observed** 34:18,21

**occasion** 41:19

**occupation** 5:9

**occur** 14:8 16:3,11 20:21 21:8,25 26:22 49:13

**occurred** 6:20 16:4, 20 17:22 19:10 20:5, 24 21:9,16 22:1,9,19, 20,23 24:2,23 26:4 36:5,12 43:7

**occurring** 12:8 24:12,13 26:2,20 27:20 54:6,7,24

**offender** 53:20 54:9, 10

**offenders** 54:11

**offense** 14:13,21 15:3,4 26:22 34:5 43:6 44:22 57:4

**offenses** 12:6,8 14:8,10,11 15:21 27:14,17 30:11,14 39:7 45:13 46:2 53:18 54:1,6,7,11,14, 24

**offer** 22:6

**offers** 22:5

**office** 4:12 6:9 11:11 59:18

**officer** 5:17,19 14:7, 18,21 39:14,20 42:14,24 44:21 45:1, 25

**officers** 8:7 12:14, 15,21,25 13:2,3,4,9 31:14,15 32:22 33:5, 7,8,18 34:1,11,15,24 36:2 37:4,6 39:5 41:10 43:12 46:17, 18,21 48:4,19 49:1,2, 10,13,15,16,18,20,25 50:2,6 53:23 54:3,22 55:3

**ongoing** 37:22,23

**open** 28:4,8,14,17,22 29:4,8,10,13,18,21, 25 36:20 44:3

**operating** 18:25 19:3,6 41:22

**operations** 7:6

**opportunity** 9:16

**order** 27:19 31:9 55:6

**originally** 11:20

**outset** 31:19

**outstanding** 39:9 40:25 41:3,5,14 43:20 44:9,12

**oversee** 7:5

**owner** 46:19

**owning** 42:9

**P**

**P-R-Y-M** 21:22

**pages** 52:24

**paid** 40:4

**paired** 33:11

**Pancakes** 29:15

**paragraph** 9:20

**park** 26:13,15 32:8 54:3

**parking** 16:25 17:5, 22 20:16,25 21:10, 12,14 26:10,11 35:4, 7,10

**part** 34:12 35:7 46:1 55:3

**partner** 45:25

**past** 29:19

**patrol** 4:11 5:16,17, 18,19,20 6:2,8,11,23, 25 7:1,4,10,11,12,13, 16 11:22 14:9 27:19 30:16 32:15 33:6,8, 12 34:8,16 36:3 41:9 45:1,25 46:24 49:10, 19

**patrolling** 37:6 41:11 49:3,17 50:3

**patrols** 33:9 47:10 49:12 50:11

**pay** 44:11

**payment** 44:12

**pedestrian** 35:12

**pedestrians** 34:23 35:2

**people** 19:12 20:8 34:15 36:14,18 46:3 47:20

**percentage** 24:1

**period** 31:6

**permit** 29:5

**perpetrator** 21:3,19

**person** 39:14 40:3,8 41:6,13,17,18 42:5, 15,17,19 47:8 52:11, 16 59:14

**personally** 59:11

**PIO** 6:9

**place** 12:2,6 26:23 45:14

**plain** 44:18

**Plaintiff's** 9:12 10:7 17:25 20:2

**Plaintiffs'** 24:8 37:17 51:15

**plan** 50:18,21,22,25 51:9 53:5,9

**plate** 35:24

**point** 26:3

**police** 5:10,13,14 7:6 8:16 12:17 49:9,22 50:7

**policing** 56:18

**possession** 39:11 42:5

**possibility** 17:14

**possibly** 23:20 56:21

**potential** 54:14

**potentially** 36:7

**preceded** 50:19

**predominantly** 12:10

**prepared** 9:23

**presence** 49:9 50:7, 10

**present** 11:2,9,15 13:7

**presentation** 10:12, 13,15 11:14

**presented** 51:4,6

**prevented** 50:1

**prevention** 53:4

**previous** 22:14

**previously** 44:13

**price** 40:4

**primarily** 24:18 26:4 30:22 45:13

**primary** 30:23

**prior** 39:24

**privy** 51:3

**probable** 36:4,9

**procedure** 41:15,23

**process** 34:2

**promoted** 6:1,7,10, 12

**property** 6:18,20 14:10 34:6 48:10 53:12,14

**protect** 31:5

**proved** 59:12

**provide** 45:7 47:8 50:10 51:25

**provided** 18:16 53:11 56:14

**Prym** 21:22 22:20

**public** 6:9 10:14 11:15 31:5 34:18 59:24

**pull** 54:25

**pulling** 52:2

**purposes** 59:16

**put** 6:18,21 34:3
37:3,5 45:24 50:18
51:12

**puts** 43:12

**putting** 12:11 46:14

———————

**Q**

**question** 4:22 5:5,7
11:7 14:21 17:15
22:13 23:19 25:2
27:21 40:20 52:6,11
53:3

**questions** 4:19,20
47:14 52:3 55:10,12

**quotes** 27:2

———————

**R**

**R-E-Y-E-S** 7:21

**radio** 43:12

**radius** 26:17

**range** 44:9

**rate** 23:10,11

**reached** 50:25

**read** 14:7 27:1 57:14,
16 59:1

**reading** 14:12

**reason** 13:3 42:16
58:5,7

**recall** 16:12 20:22
22:22 23:13,24

**received** 8:24 44:14

**recess** 50:14 52:21

**record** 4:8 40:8,9
50:17 57:17 58:5

**recovered** 34:6
48:10

**red** 35:21 45:16 54:3

**reduce** 27:19 55:1

**refer** 14:23 39:21

53:17

**referring** 25:10 27:5
57:7

**refers** 25:5

**regulation** 47:13

**relationship** 17:12
21:2,19 47:3

**remain** 54:4

**remember** 15:22
16:24 17:4 22:19

**rephrase** 49:6

**replace** 49:16

**report** 7:8,18,19 8:1,
10,13 14:17,22 46:20
56:6,7,8,10

**reported** 14:19 15:2,
12,18

**reporter** 4:24

**reports** 14:12,13,22

**representative** 10:3

**requested** 14:16

**requests** 39:19

**required** 9:9

**reserve** 55:9

**resident** 12:16

**resources** 55:6

**respect** 11:23 12:25
39:8 42:9 53:9,10

**respond** 46:18

**response** 49:23
54:17

**responsibility**
12:18 31:1

**responsible** 4:11
6:20 7:9 52:2

**rest** 55:9

**restaurants** 29:10,
12,13

**restitution** 44:13

**result** 12:9 16:25

21:24 33:2 34:7
35:17,20 36:11 48:13
53:13

**retail** 29:24 30:3

**Reyes** 7:19,21

**Richardson** 8:25

**Rick** 4:3,9 58:2 59:1,
5,11

**robbery** 25:19 43:7,
9,14

**Rosa** 16:14 17:24
18:20,23 19:9

**rule** 17:17

**running** 7:9

———————

**S**

**safety** 10:14 11:3,15
31:2

**Sam** 11:21

**San** 51:1 53:12

**Sarmiento** 11:21

**Saturday** 31:16
32:23 38:8,17,19
49:1,24

**Saturdays** 38:9

**school** 8:20,21

**seal** 59:18

**search** 36:8,9 40:9

**seized** 48:13,15,19

**self-initiated** 14:24

**sell** 22:6

**send** 46:1 47:19

**separate** 48:16

**sergeant** 6:1,3
12:24 13:12,13,16
31:21,22,23

**series** 4:19

**serve** 16:7

**served** 40:3

**service** 12:16,17,19
13:10 14:15 46:15,21
49:21 50:1

**sexually-oriented**
16:8,18 18:12,16
22:2 26:4,16 30:4,5
43:24 45:9 46:9 47:4

**shared** 11:3

**SHEET** 58:1

**shift** 34:3

**shooters** 20:8

**shooting** 16:24
17:1,5,21 19:18
21:23 26:23

**shootings** 13:22
15:7,14 24:10,15
25:10

**shop** 31:3

**short** 12:14

**shortage** 55:4

**shot** 17:5 19:19
21:24

**show** 9:11 10:6
17:24 39:22

**showed** 13:23 15:8
25:11 30:10 54:10

**showing** 24:10

**sick** 13:5

**side** 32:3

**signature** 59:2

**simple** 44:18

**sir** 4:9,17,23 5:3,8,11
7:23 8:3,11 9:8,18,22
10:1,5,22 11:1,5,16,
19 13:20,24 14:2,13,
14,16,20,21 15:10,13
16:1,9,19,21 17:19,
23 18:4,9,14,19,21
19:8,11,14 20:3,6,10,
12 21:4,13,14,17,20
22:3,18 23:4,7,11,16
24:6,14,19 25:14,25
26:2,7 27:4,10,18
28:1,2,6,9,11,13,16,
19,21,24 29:3,6,9,11,

14,17,20 30:2,6,20,
25 31:7,11,18,20,23
32:21,25 33:13,15
34:10 35:18,23 36:1,
6,10,13 37:9,20,25
38:24 39:13 40:6,11,
23 41:1,24 42:2,7
43:1 44:7 45:5,17,23
46:4,6 47:1,6 48:11,
14 49:11,14 50:9,12,
20 51:11,13,22 52:1,
9,13,18 55:17 56:3,
10,21 57:13

**sitting** 11:12

**situation** 41:4

**sixth** 21:21

**size** 32:10,11

**small** 55:19

**smaller** 38:13

**SOB** 16:15

**society** 40:4

**South** 20:14,20

**Southeast** 6:2,3
32:17

**southern** 32:4,5

**Southwest** 5:16,17
6:11,18

**space** 53:18

**specialty** 54:12

**specific** 27:22 31:9
47:23 54:5

**specifically** 54:13

**speculate** 51:7

**speculating** 23:13
51:3

**speculation** 24:5
40:14

**speeding** 39:15,18
42:25 45:2,16

**spot** 53:16 57:11

**spots** 56:12,16,23
57:9

**squad** 37:4,6 45:25

**square** 32:10

**staff** 35:8

**stand** 54:16

**standard** 41:14,22

**standpoint** 38:15

**start** 11:13 38:11
41:3

**started** 13:13 33:21

**starting** 31:16 32:22
33:14

**state** 4:7 8:23 59:8,
24

**statement** 51:21

**states** 9:23

**statewide** 24:24

**stations** 28:10

**statistical** 9:7

**statistics** 9:6

**stay** 29:21,25 53:23

**stepped-up** 33:1
37:10 38:25

**Steve** 47:7

**stolen** 35:6 48:9

**stop** 34:15,20 36:5
39:12,18 41:12 43:4
45:14 48:13

**stopped** 39:15

**stopping** 35:22 46:3

**stops** 35:17 37:7
39:8 42:24 45:1 48:2,
3

**stores** 28:12,17
29:7,18 30:3

**street** 40:5

**streets** 36:3,15 37:7

**studied** 27:25

**study** 27:11 30:7

**subject** 52:4

**submitted** 47:22
56:9

**subscribed** 59:14

**substations** 7:8

**substitute** 50:7

**summarize** 5:12

**Sunday** 33:2

**supervisor** 12:21

**supposed** 26:14
39:4

**sworn** 4:4

─────────────

**T**

**TABC** 22:6

**taking** 12:2,6 13:4

**talk** 16:17 47:11

**talked** 12:10 44:2
51:1 52:24

**talking** 5:22 15:14,
17 24:9,17,21,22,23
25:4,9 26:18 33:5,6
38:7,14 40:21 47:9
49:2 50:16

**target** 30:23 32:19

**task** 9:24 10:24 11:3,
17 13:1,4,14 15:6
24:21 25:5 26:24,25
27:2,23 30:7,18 31:4,
8 32:1,19 33:2 34:12
37:18,21 38:2,4
45:10 46:10 47:5,9
48:23 49:8,19 50:2,5,
19 51:9 54:19 55:3

**Team** 54:17

**teams** 54:21

**television** 11:10

**term** 27:6

**terminology** 57:10

**testified** 4:4

**testify** 9:24

**testifying** 10:3

**Texas** 4:14 8:23,25
51:1 53:11

**theft** 44:15

**thing** 9:5 35:25

**things** 11:11 34:5
35:22 45:16

**thought** 42:4

**thousand** 26:21

**Thursday** 31:16
32:23 38:8,17,19
49:1

**Thursdays** 38:9,18
49:23

**tickets** 44:11

**tied** 33:19 34:2

**time** 12:20 16:10,12,
20 19:10 20:4,23
21:15 22:8,15 33:21,
23 37:4,13 39:20
40:4 41:11 42:23,24
43:11 45:2,3 46:1
53:1

**times** 13:2 22:14,15,
23 54:5,8

**title** 4:15 8:7

**today** 4:19

**top** 9:21 23:4

**topped** 23:23

**total** 7:16 8:16 15:21
38:9 48:3

**totality** 27:15

**totally** 16:15

**totally-nude** 19:21

**towed** 26:14

**traffic** 34:19,20
35:17,20 36:3,4 39:8,
18 41:12,19 43:4
44:11 45:13 46:2
48:2

**training** 9:6,8 13:6

**transcription** 58:5

**transferred** 5:17,20,

25 6:2,3,5,7,9,21,22

**traveling** 36:14

**true** 28:3 37:8,13 59:3

**Tuesday** 33:2

**turn** 51:14

**turning** 35:21

**TV** 11:10

**type** 25:23 27:7 33:5 35:13 48:19

**types** 44:2

**typical** 49:12

---

**U**

**ultimately** 55:1

**undercover** 33:6 34:11

**understand** 4:21 10:2 24:25 31:12 32:18 39:2 42:13 47:16

**understandable** 4:20

**understanding** 47:22 50:4 51:17 53:8,10 55:24 56:13 57:8

**University** 8:23,24 32:8 51:1 53:11

**upticks** 11:24

**UT** 55:25 56:8

---

**V**

**vacation** 13:5

**variables** 40:16

**varied** 13:1

**vast** 35:15,19 36:11 40:17

**vehicle** 26:14 34:19 43:6,8,13

**verbal** 5:2

**vice** 5:20,21,25

**victim** 15:1 21:2,18 43:11

**victims** 20:8 30:15

**violation** 34:19,20 35:20 36:3,5 41:12, 19

**violence** 25:18 44:18

**violent** 11:24,25 12:1,6,8,12,23 13:22 14:11 15:7,17 24:10, 12,13,16,22 25:11,16 26:19 27:14,17,19 30:11 50:23,24 53:4, 13,14,18 54:1,2,11, 14,23 57:4

**virtually** 33:25

**virtue** 37:10

**visibility** 34:17

**visiting** 37:1

**volume** 27:14 30:11

---

**W**

**waive** 57:15

**Walgreens** 30:14

**walking** 35:3

**wanted** 11:12 44:15, 16 46:20 47:18

**warrant** 39:10 40:25 41:6,14 44:16

**warrants** 39:21 41:3 43:20 44:10,14,20

**watching** 10:14 11:10

**Watson** 4:3,9 47:9 58:2 59:1,5,11

**ways** 14:20

**weapon** 48:13

**Wednesday** 33:3

**west** 7:11,12 32:3,5

**Wichita** 8:23

**worded** 47:21

**words** 22:25

**work** 36:23 53:23 54:13

**worked** 12:25 13:4 48:23

**wrong** 41:18

---

**X**

**X-T-C** 21:7

**XTC** 21:7,19

---

**Y**

**yards** 26:21

**year** 6:12 37:22

**years** 5:22 7:2

---

**Z**

**Zona** 16:14 17:24 18:20,23 19:9

Victory Court Reporting, Inc.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS CVISION

ASSOCIATION OF CLUB   )
EXECUTIVES OF DALLAS, )
ET AL,             )
      Plaintiff, )
                )
VS              ) CIVIL ACTION NO. 3:22-CV-00177-M
                )
CITY OF DALLAS,     )
                )
                )
      Defendant. )

------------------------------

ORAL DEPOSITION OF

STEPHEN ARTHUR BISHOPP

FEBRUARY 23, 2022

VOLUME 1 OF 1

------------------------------

      ORAL DEPOSITION OF STEPHEN ARTHUR BISHOPP, produced
as a witness at the instance of the PLAINTIFF, and duly
sworn, was taken in the above-styled and -numbered cause
on February 23, 2022, from 10:17 a.m. to 2:01 p.m.,
before Janet E. Wright, CSR in and for the State of
Texas, reported by machine shorthand, at Dallas City
Attorney's Office, 1500 Marilla Street, 7DN, Dallas,
Texas  75201, pursuant to the Texas Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

Page 2

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4       ANN MARIE 'ANA' JORDAN
        Dallas City Attorney's Office
5       1500 Marilla Street
        Dallas, TEXAS  75201
6       (214) 670-3519
7
8    FOR THE DEFENDANT:
9       J. MICHAEL MURRAY
        Berkman, Gordon, Murray & DeVan
10      55 Public Square, Suite 2200
        Cleveland, Ohio  44113-1949
11      (216) 781-5245
12
        ROGER ALBRIGHT
13      Sheils Winnubst
        1100 Atrium II
14      1701 N. Collins Boulevard
        Richardson, Texas  75080
15      (972) 644-8181
16
17
18
19
20
21
22
23
24
25

Page 3

1       I N D E X
2                              PAGE
3    Appearances.....................................  2
4    STEPHEN ARTHUR BISHOPP
     Examination by Mr. Murray........................  4
5
     Signature and Changes...........................  127
6
     Court Reporter's Certificate....................  129
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1       PLAINTIFF EXHIBITS
2    NUMBER    DESCRIPTION                      PAGE
3       1    Notice of Deposition        11
4       2    City Council Briefing       12
5            1-5-22
6       3    Memorandum 1-14-22          24
7            SOB Data Info
8       4    Memorandum 1-14-22          94
9            Update on Activation of
10           of Temporary Weather Shelters
11      5    Memorandum, 2-11-22         96
12           ACE vs COD
13      6    DPD on General Orders 9-13-21  96
14      7    DPD Standard Operating Procedures 97
15      8    COD 000010                  98
16      9    List of Offenses            105
17      10   List of Arrests             115
18      11   Count of Master Incident    121
19           Number
20      12   Data, Dallas Fire and Rescue  122
21
22
23
24
25



PLAINTIFF'S
EXHIBIT
5

214-324-3733
Production@victorycourtreporting.com
Exhibit C

c98b7865-e3b8-4838-b631-8803c5a20639

Page 5

1         P R O C E E D I N G S
2            STEPHEN ARTHUR BISHOPP,
3     having been first duly sworn, testified as follows:
4               EXAMINATION
5  BY MR. MURRAY:
6     Q.  Please state your full name and business address
7  for the record.
8     A.  Stephen Arthur Bishopp and 1400 South Lamar,
9  Dallas, Texas.
10    Q.  Thank you, sir.  And you are a Lieutenant?
11    A.  Yes.
12    Q.  Lieutenant, I'm going to ask you a series of
13 questions today, and I'm going to do the best I can to
14 make them clear and understandable.  But can I have your
15 agreement that if you don't understand a question that I
16 pose to you, you'll bring that to my attention?
17    A.  Absolutely.
18    Q.  Secondly, can I have your agreement that all
19 your answers will be verbal rather tham gestures?
20    A.  Yes, sir.
21    Q.  Finally, I'll do the best I can to let you
22 finish an answer before I begin a question again.  But
23 can I have your agreement that you will do your best to
24 let me finish my question before you begin your answer?
25    A.  Yes, sir.

Page 6

1     Q.  Okay.  So you're currently a full-time officer
2  at the rank of Lieutenant for the Dallas Police
3  Department?
4     A.  Yes, sir.
5     Q.  And can you briefly summarize what your career
6  has been with the Dallas Police Department?
7     A.  Yes, sir.  My first 10 years were in patrol.
8  And I was promoted to sergeant and then became a
9  supervisor in patrol for the next four years, followed
10 with nearly three years in a deployment unit which is a
11 covert undercover unit.
12        Then I became an administrative and field
13 training sergeant at a division which is still in patrol,
14 but with an administrative function, during which time I
15 was in school.  Once I graduated school, I went back to
16 deployment and became undercover again for a few years.
17 And in 2013 went to became the Associate Director for
18 Research at the Caruth Police Institute.  Did that for
19 five years.  Went back to patrol as a sergeant in 2018.
20 And then in 2020 was promoted to lieutenant and moved to
21 a patrol division for four months.
22        And I was brought over to my current position in
23 November of 2020 which is the -- it's the UCR Crime
24 Analysis Unit.  I renamed it the Data Analysis and
25 Management Unit.  But it's essentially UCR NIBRS FBI

Page 7

1  System Crime Analysis.
2     Q.  Okay.  So when did you begin your career at
3  Dallas Police Department?
4     A.  November of 1990.
5     Q.  And you mentioned the Caruth Police Institute.
6  What is that?
7     A.  Caruth Police Institute was a collaboration
8  between the Dallas Police Department, the University of
9  North Texas Dallas, UT Dallas, and the Caruth Foundation
10 where they gave a grant to the -- the Caruth folks
11 gave a grant of I'm going to say 11 million dollars.
12 And through that grant they funded the Caruth Police
13 Institute, which is a leadership institute designed
14 around developing not only evidence based research,
15 but also mainly teaching leadership development to the
16 department.  And it's housed within the Dallas Police
17 Department at the time.  And one of the positions open,
18 of course, was for Associate Research Director, which
19 they hadn't had a full-time person until I came along,
20 so.
21    Q.  And what years were you there?
22    A.  I was there from 2013 to 2018.
23    Q.  And were you actually still employed by the
24 Dallas Police Department?
25    A.  I'm still a Dallas police sergeant, yes, sir.

Page 8

1     Q.  And were there people actually employed by
2  Caruth Police Institute?
3     A.  Yes.  So everybody else there were faculty --
4  not faculty, but staff or faculty at UNT Dallas.  We had
5  a few graduate students from -- sorry about the desk --
6  a few graduate students from UNT Dallas that was also
7  there.  I was the only full time sworn officer in the
8  office.
9     Q.  Okay.  What are your current duties?  What have
10 your duties been since November of 2020 in the position
11 that you currently hold?
12    A.  Really my position now is overseeing the numbers
13 from the Dallas Police Department.  That involves from
14 the minute the officer makes a report on the street on an
15 offense to how it's reviewed and how that review is
16 reviewed by our UCR unit who makes sure it's correct, and
17 it eventually gets reported to DPS and then to the FBI.
18 So I oversee the numbers and the collection of data for
19 the department.
20    Q.  Who do you report to?
21    A.  I report to Deputy Chief Monique Alex who
22 reports to Chief Garcia.
23    Q.  And who reports to you, if anyone?
24    A.  I have three -- currently three sworn -- sorry,
25 five sworn sergeants and one civilian supervisor who is a

c98b7865-e3b8-4838-b631-8803c5a20639

Page 9

1  civil rank equivalent to sergeant.
2  Q.  Okay.  Now I was given a copy of your CV, so I
3  won't make you go through the whole thing because I have
4  it here.  But just to summarize it, you got your Bachelor
5  of Arrests degree in December of 1989 at Shippensburg
6  University in Pennsylvania Majoring in psychology?
7  A.  Yes, sir.
8  Q.  And then you got a Master of Science?
9  A.  Yes, sir.
10  Q.  In December of 2009 at UT Dallas?
11  A.  Yes, sir.
12  Q.  In criminology?
13  A.  Yes, sir.
14  Q.  Okay.  And you did a thesis as part of that?
15  A.  Yes, sir.
16  Q.  Okay.  And then you went to UT Dallas beyond
17  that to obtain your Ph.D.?
18  A.  Yes, sir.
19  Q.  And that's in criminology?
20  A.  Yes, sir.
21  Q.  And you had to do a dissertation on that as
22  well?
23  A.  Yes, sir.
24  Q.  And that was entitled An Examination of General
25  Strain Theory and the Effects of Violent Crime Exposure

Page 10

1  on Police Suicide Ideation, Alcohol Consumption, and
2  Divorce?
3  A.  Yes, sir.
4  Q.  Now, as part of your education in any of those
5  universities, did you have training in statistic?
6  A.  Yes, sir.
7  Q.  And in statistical analysis and theory?
8  A.  Yes, sir.
9  Q.  What kind of training in that did you have?
10  A.  So my training in statistics, research methods,
11  design included survey research, designed two levels of
12  doctorate level of research design and methods,
13  descriptive statistics, regression advanced statistics,
14  and then a class that combined sort of research methods
15  and statistical analysis.
16  Q.  Okay.  So you were familiar with the concept of
17  a multivariate regression?
18  A.  Yes.
19  Q.  Okay.  And you're familiar with the concept of
20  calculating whether some data or difference in data
21  reaches the level of statistical significance?
22  A.  Yes.
23  Q.  Now, I want to show you what has been marked --
24     MR. MURRAY:  You still have your copies?
25     MS. JORDAN:  Yes, I do.

Page 11

1  Q.  (BY MR. MURRAY)  -- Plaintiff's Exhibit 1.  I
2  will ask you to tell me whether you have reviewed that
3  document?
4  A.  I did.
5  Q.  And you understand that your name appears in a
6  couple places, but most importantly on page four under --
7  at the very bottom there's a paragraph two?
8  A.  Yes, sir.
9  Q.  Which reads, "The gathering of place data used
10  to evaluate and address crime concentrations in relevant
11  areas, organize the data used in the city council
12  presentation, and gathering of data in response to city
13  council inquiries about matters including not limited to
14  the ordinance."  Correct?
15  A.  That's correct, yes, sir.
16  Q.  And you understand that your role today is to
17  serve as a representative witness on behalf of the City
18  of Dallas?
19  A.  Yes, sir.
20  Q.  And have you reviewed materials to prepare
21  yourself to be in a position to testify fully and
22  accurately on behalf of the City on those subject
23  matters?
24  A.  Yes, sir.
25  Q.  Okay.  Now, I'm going to begin at a place, which

Page 12

1  is kind of in the middle because -- I don't know if you
2  know, but we had some depositions yesterday.  And we were
3  able to get through some material, and I'm going to
4  duplicate it with you.
5  A.  Thank you.
6  Q.  But I'm going to show you what's been marked as
7  Plaintiff's Exhibit 2, and I'm going to ask you if you're
8  familiar with that document.
9  A.  Yes, sir.
10  Q.  And what is that document?
11  A.  This was the city council briefing PowerPoint
12  that we put together and related to the SOB ordinance
13  change.
14  Q.  And the sexually oriented businesses we're
15  talking about is the ordinance adopted by the city
16  council that requires sexually oriented businesses to
17  close between the hours was two a.m. and six a.m. seven
18  days a week, correct?
19  A.  Yes, sir.
20  Q.  Okay.  And you -- if I understand correctly, did
21  you actually put this document together?
22  A.  I put a chunk of it together.  So that would be
23  a lot of the information that I did my information,
24  graphs, so forth, that's what I organized for them on the
25  slide.

c98b7865-e3b8-4838-b631-8803c5a20639

Page 13

1    Q.  Okay.  So just to kind of summarize what this
2    document actually is, when you go to the second page of
3    the document, there's I guess what you might call a table
4    of contents?
5    A.  Yes, sir.
6    Q.  And then there's the next page has a definition
7    of sexually oriented businesses; is that correct?
8    A.  Yes, sir.
9    Q.  And it includes adult book store, adult arcade,
10   adult video store, adult cabaret; is that correct?
11   A.  Yes, sir.
12   Q.  And more specifically those entities as defined
13   in the Dallas City Ordinance Chapter 41A; is that
14   correct?
15   A.  Yes, sir.
16   Q.  And, for example, I won't ask you to repeat the
17   definition precisely, but to be an adult book store under
18   that chapter depends upon the sexually explicit content
19   of a substantial portion of media items that are offered
20   at retail.
21   A.  That's my understanding, but I don't have direct
22   knowledge of the vice side.
23   Q.  Are you familiar with the definitions in Chapter
24   41A?
25   A.  Yes, sir.

Page 14

1    Q.  And in the case of an adult cabaret, that
2    depends upon whether an entertainment business offers
3    erotic dancing by either topless dancers or nude dancers
4    performed before an audience, correct?
5    A.  Yes, sir.
6    Q.  All right.  Then the next page we can skip over.
7    And then there's a page dealing with constitutional
8    considerations.  Do you see that?
9    A.  Yes, sir.
10   Q.  Do you regard yourself to be an expert in that
11   area at all?
12   A.  No, sir.
13   Q.  Okay.  And then the next page talks about some
14   Texas Senate Bill 315; is that correct?
15   A.  Yes, sir.
16   Q.  And then the next page describes the regulations
17   of sexually oriented businesses that were currently in
18   effect before this ordinance, correct?
19   A.  Yes, sir.
20   Q.  And the next page delineated what some of the
21   other cities in Texas did by way of hours of operation
22   regulations for sexually oriented businesses correct?
23   A.  Yes, sir.
24   Q.  So, for example, in Fort Worth the ordinance in
25   that city allows sexually oriented businesses to remain

Page 15

1    open I guess till -- let's see.  They can remain open
2    till three o'clock a.m. on Fridays and Saturdays,
3    correct?
4    A.  Yes, sir.
5    Q.  Plus if they have a valid food establishment
6    permit, they can remain open on Fridays and Saturdays
7    until four a.m.; is that correct?
8    A.  Yes, sir.
9    Q.  And then the next page begins a description and
10   discussion of the Northwest Club Task Force, correct?
11   A.  Yes, sir.
12   Q.  And I will tell you that I went over that page
13   and the next page with the Deputy Chief yesterday.
14   A.  Right.
15   Q.  But I was told that beginning on the next page,
16   which is COD-017, and it's also page 11 of the document,
17   that you would be the person most knowledgeable about the
18   information beginning on that page; is that correct?
19   A.  No, that's not.
20   Q.  That's not correct?
21   A.  I didn't put together this data.
22   Q.  Well, who did do you know?
23   A.  I would assume it was Major Sarmienta or it came
24   from the Northwest Division.
25   Q.  Okay.  Well, you're at least familiar with the

Page 16

1    document?
2    A.  I am.
3    Q.  And you're familiar with the data that's there?
4    A.  Yes, sir.
5    Q.  Okay.  And certainly in your role in being in
6    charge of the police data, you would be familiar with the
7    underlying data that would support these?
8    A.  Yes, sir.
9    Q.  Okay.
10   A.  Um-hum.
11   Q.  Well, then, maybe you are the proper person to
12   talk to about it.
13   A.  Well, that could be.
14   Q.  Okay.  So you're familiar with the fact that
15   there was this Northwest Club Task Force?
16   A.  Yes, sir.
17   Q.  That operated, at least for purposes of this
18   document, between March and December of 2021.
19   A.  Yes, sir.
20   Q.  I guess it's still ongoing actually; is that
21   correct?
22   A.  Yes, sir.
23   Q.  But the data that we're talking about on this
24   document went through the end of 2021.
25   A.  Yes, sir.

4 (Pages 13 to 16)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 17

1    Q.  Okay.  So if you've looking again at page 017,
2  this is a page that describes the aggravated assaults
3  that occurred within the Northwest District for the year
4  2021, correct?
5    A.  Yes, sir.
6    Q.  Okay.  Now, when we're talking about aggravated
7  assaults, we're talking about UCR Part 1 crime?
8    A.  Yes, sir.
9    Q.  And how does it correspond TO the NIBRS?
10    A.  Very roughly.
11    Q.  Yes.
12    A.  So under the old UCR summary data system Part 1s
13  were defined as seven -- if you include arson, eight
14  offenses.
15    Q.  Right.
16    A.  So when they went to the NIBRS system, it
17  changed to a category A which includes all offenses from
18  murder to criminal mischief.
19    And the way -- the reason it does that is
20  because it counts the incident level data.  So an
21  incident -- a robbery under UCR would be a robbery if
22  somebody robbed me or robbed everybody in this room would
23  be one robbery under the UCR.  Under NIBRS it would be
24  robbery offense, but you would have seven or eight
25  victims so you would seven or eight different incidences.

Page 18

1  That's the way it's recorded under NIBRS.  So NIBRS
2  records every crime.  You can have several crimes within
3  one incident occur, even to the same person.  But the
4  category A covers many more crimes than UCR.
5    Q.  And --
6    A.  As far as data gathering.
7    Q.  And what is your obligation these days?  Do you
8  have to report to the FBI both UCR Part 1 and Part 2
9  crimes as well as NIBRS or what is the reporting
10  requirement?
11    A.  No, it's strictly NIBRS.  Dallas reports to
12  NIBRS.  We were to go to the NIBRS system, if I remember
13  correctly, about 2018.  This was all through what I was
14  told and the reason I was brought down there in the first
15  place.
16    But we still report both, and we're making
17  corrections towards NIBRS system to only report to NIBRS.
18  DPS will take our NIBRS create a summary data like
19  UCR data, and the FBI does much the same.  But we are
20  strictly reporting NIBRS information.
21    Q.  Okay.  All right.  So on this page we're talking
22  about aggravated assaults.  So what is the general
23  definition of an aggravated assault for purposes of the
24  data on this page?
25    A.  If somebody commits an assault that puts

Page 19

1  somebody in fear of eminent bodily injury or death.
2    Q.  And would that include domestic type aggravated
3  assaults?
4    A.  Yes, sir.
5    Q.  Family members assaulting other family members?
6    A.  Yes.  You can have aggravated assault in a
7  family, yes.
8    Q.  Okay.  So this data indicates that there were
9  459 aggravated assaults within the Northwest Patrol
10  Division's boundaries for the year 2021; is that correct?
11    A.  Yes, sir.
12    Q.  And so -- and then it indicates that between 10
13  p.m. and two a.m. there were 110 of them, which accounted
14  for 20 percent, correct?
15    A.  That's what it says, yes, sir.
16    Q.  Well, is that correct?
17    A.  Yes, sir.
18    Q.  And then between two a.m. and six a.m. there
19  were 130 that accounted for 23.7 percent, correct?
20    A.  Yes, sir.
21    Q.  Now, we're talking about reports of aggravated
22  assault, correct?
23    A.  That's correct.
24    Q.  We don't know whether -- how many of those ended
25  up with actual charges or convictions, do we?

Page 20

1    A.  No, sir.
2    Q.  Okay.  So we're just talking about someone
3  reported, whether it was a victim or some other person
4  who had knowledge, someone reported that perpetrator A or
5  unknown perpetrator for that matter committed an
6  aggravated assault upon a particular person.
7    A.  Absolutely correct.
8    Q.  Okay.  So if I understand this correctly
9  then -- and obviously there were other aggravated
10  assaults in other areas of the city, correct?
11    A.  Yes, sir.
12    Q.  This was just in that one district or division,
13  I guess.
14    A.  Yes, sir.  Patrol Division, yes, sir.
15    Q.  And in that one division, then, during the eight
16  hours that we're talking about between 10 p.m. and six
17  a.m., 43.7 percent of the aggravated assaults that were
18  reported occurred between that eight hour period of 10
19  p.m. to six a.m. correct?
20    A.  Yes, sir.
21    Q.  And that means that 56.3 percent of the
22  aggravated assaults that were reported occurred outside
23  those hours, correct?
24    A.  Yes, sir.
25    Q.  We then know --

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 21

1      MS. JORDAN:  I'm just going to object to that.
2  That assumes facts not in evidence, that last question.
3      MR. MURRAY:  Okay.
4      Q.  (BY MR. MURRAY)  And then according to this
5  document, 76.3 percent of the aggravated assaults
6  reported within the Northwest Division boundaries
7  occurred outside the hours of two a.m. to six a.m.,
8  correct?
9      A.  I'm sorry.  You said...
10      Q.  76.3 percent.  Is my math off?
11      A.  I'm sorry.  What time frame?  You said outside
12  the 2a to 6a?
13      Q.  Yes.
14      A.  Yes, sir.
15      Q.  That's correct, in other words?
16      A.  Yes, sir.
17      Q.  Apparently, at least for these purposes, there
18  was not a calculation done to determine what the
19  percentage of aggravated assaults were during the four
20  hour period between six a.m. and 10 a.m., correct?
21      A.  Correct.
22      Q.  And no one determined what the percentage of
23  aggravated assaults were between 10 a.m. and two p.m.
24      A.  Correct.
25      Q.  Or between two p.m. and six p.m.

Page 22

1      A.  That is correct.
2      Q.  Or between six p.m. and 10 p.m.
3      A.  Also correct.
4      Q.  So we have no idea, at least from this
5  presentation on this page, which four hour block during
6  the 24 hour period had the highest percentage of
7  aggravated assaults, do we?
8      A.  No, sir.
9      Q.  Or for that matter we don't know from this data
10  which four hour block had the lowest percentage of
11  aggravated assaults.
12      A.  Correct.
13      Q.  So then we go to the next page, and we see that
14  the data that was collected and presented on that page
15  related to the three most violent beats within the
16  Northwest Division, correct?
17      A.  Yes, sir.
18      Q.  And those were beats 521, 534, and 522, correct?
19      A.  Yes, sir.
20      Q.  How many beats are there in the Northwest
21  Division, if you know, approximately?
22      A.  There would be 30 and 40.  36 to 40.
23      Q.  And approximately how many are there in the
24  entire city, if you know?
25      A.  That number times seven.

Page 23

1      Q.  Okay.  So somewhere in the neighborhood of 250
2  to 280, something like that?
3      A.  Yes, sir.
4      Q.  Okay.  And how is a beat determined, the
5  geographic boundaries of a beat?
6      A.  Traditionally it was determined by crime.  The
7  borders of the boundary dealt with -- were placed because
8  of the amount or the crime rate within a certain
9  geographic area.  So those areas that had the greater
10  amount of crime were smaller.  Less crime would be
11  bigger.
12      Q.  I see.  Okay.
13      A.  I can't --
14      Q.  And do those -- I'm sorry.  I didn't mean to
15  interrupt.
16      A.  I was going to say that was the traditional way
17  of doing it.  If they have a new model or new way of
18  designing beats and division boundaries, I'm not familiar
19  with it.
20      Q.  Well, do they change over time, then?
21      A.  Yes, they seem to.  But again I'm talking
22  outside of my knowledge.  This is command staff level,
23  talks and discussions.
24      Q.  All right.  So then this page also indicates
25  that those three beats have 39 percent of the licensed

Page 24

1  sexually oriented businesses in the city, correct?
2      A.  Yes, sir.
3      Q.  And beat 521, for example, has three sexually
4  oriented businesses according to this document, correct?
5      A.  Yes, sir.
6      Q.  All right.  I want to show you what's been
7  marked as Plaintiff's Exhibit 3.
8      A.  Okay.
9      Q.  And you're familiar with that document, as well?
10      A.  Yes, sir.
11      Q.  And is that a document that you helped compile?
12      A.  Yes, sir.
13      Q.  Okay.  And I notice that the first page of it
14  is -- it's a January 14, 2022, memorandum from Chief
15  Eddie Garcia to the mayor and members of city council
16  concerning sexually oriented business data information,
17  correct?
18      A.  Yes, sir.
19      Q.  Okay.  And on the second page of that document
20  is a list of all the licensed sexually oriented
21  businesses as of that date, correct?
22      A.  Yes, sir.
23      Q.  Okay.  Now, there are 28 of them that are
24  licensed that are -- that were open for business,
25  correct?

6 (Pages 21 to 24)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 25

1    A.  Yes, sir.
2    Q.  And then there were another seven that are
3  closed, but had licenses, correct?
4    A.  Yes, sir.
5       MS. JORDAN:  Objection, form of the question.
6  Assumes facts not in evidence.
7    Q.  (BY MR. MURRAY)  Well, the document says they're
8  not operating, doesn't it?
9    A.  Correct.
10    Q.  What does it mean?
11    A.  So it either means that the club or business has
12  an SOB, but does not function as an sexually oriented
13  business or the business has bought a land or plot of
14  land near it, licensed the land as an sexually oriented
15  business to prevent other businesses from moving close to
16  that area.
17    Q.  Okay.  The last column indicates "operating as,"
18  correct?  Do you see that, to the far right?
19    A.  I see.
20    Q.  So we can -- according to the information that
21  you compiled, number 29 is closed down, correct?
22    A.  Yes, sir.
23    Q.  Number 30 is closed down, correct?
24    A.  Yes, sir.
25    Q.  Number 31 is not operating, correct?

Page 26

1    A.  Correct.
2    Q.  Number 32 is holding license but not operating,
3  correct?
4    A.  Correct.
5    Q.  Number 33 is an active license, but it's a
6  vacant strip mall, correct?
7    A.  Yes, sir.
8    Q.  And number 34 is an active license unknown at
9  present.  It's an empty lot, correct?
10    A.  Correct.
11    Q.  Okay.  Then number 35 says it's not operating,
12  correct?
13    A.  Correct.
14    Q.  Okay.  So these are seven businesses that held
15  sexually oriented business licenses that are not
16  operating, correct?
17    A.  Correct.
18    Q.  Now, if you look at the column that says Beat on
19  this page.  Do you see that?  It's the second -- last
20  column to the right.
21    A.  I see.
22    Q.  Okay.  So that tells us where -- in which beat
23  these various sexually oriented businesses are located,
24  correct?
25    A.  Yes, sir.

Page 27

1    Q.  Okay.  And there are no adult book stores in
2  Beat 521, correct?
3    A.  Correct.
4    Q.  No adult arcades or theaters in Beat 521,
5  correct?
6    A.  No, that's correct.
7    Q.  Okay.  Topless cabarets, it looks like there are
8  two.  The Men's Club of Dallas and Baby Dolls Saloon
9  West, correct?
10    A.  Correct.
11    Q.  And then full nude cabarets, there are none
12  correct?
13    A.  Correct.
14    Q.  In the not operating column there was one that
15  was in Beat 521, but it's no longer operating, correct?
16    A.  Correct.
17    Q.  Okay.  So as of this date there were actually
18  only two sexually oriented businesses that were operating
19  in Beat 521.
20    A.  Yes, sir.  According to this, yes, sir.
21    Q.  Okay.  Now, going back to the Plaintiff's
22  Exhibit 2 -- and we'll hold on to that list which is
23  Plaintiff's Exhibit 3 -- there were supposed to be 10
24  sexually oriented businesses operating in the 534 beat,
25  correct?

Page 28

1    A.  Correct.
2    Q.  Okay.  So let's take a look and see how that
3  corresponds to the list on Plaintiff's Exhibit 3, page
4  COD-040.  So on 534 it looks like of the nine -- there
5  are nine adult book store arcades, correct?
6    A.  Yes, sir.
7    Q.  Totally.  One of them is in Beat 534, correct?
8    A.  Yes, sir.
9    Q.  Then as far as topless cabarets there are a
10  total of 10 of those listed, correct?
11    A.  Yes, sir.
12    Q.  And of those 10 there are three of them in
13  Beat 534; is that correct?
14       MS. JORDAN:  Objection, mischaracterizes the
15  evidence.
16    Q.  (BY MR. MURRAY)  We're now talking about Beat
17  534, correct, Lieutenant?
18    A.  Yes.
19    Q.  Okay.  And this chart that you compiled lists in
20  what beat each of the sexually oriented business entities
21  is located, correct?
22    A.  Yes, sir.  To be clear, though, this list was
23  sent to me, as is, by license type by the vice unit.
24  Now, I've analyzed it and put this together, but I just
25  want to be clear where the source comes from.  But you're

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

## Page 29

1  absolutely correct, yes.
2      Q.  Well, do you have any reason to dispute the
3  accuracy?
4      A.  No, not at all.  I just want to be clear where
5  it came from.
6      Q.  But you've got to let me finish my question.
7      A.  I'm sorry.
8      Q.  You have no reason to dispute the accuracy of
9  this list, correct?
10     A.  No, sir.
11     Q.  Meaning?
12     A.  I do not have any reason to dispute the accuracy
13  of the list.
14     Q.  Okay.  So of the topless cabarets that are
15  listed here, the 10 on this list, how many of them are
16  located in Beat 534?
17     A.  Three.
18     Q.  Okay.  And then the full nude cabarets, there
19  are how many of those?  There are nine of those, correct?
20     A.  Yes, sir.
21     Q.  Okay.  And how many of those are in Beat 534?
22     A.  If my eyes are seeing right, four.
23     Q.  Okay.  So of the 28 businesses that are in
24  operation, the total in 534?
25     A.  Should be nine.

## Page 30

1      Q.  Looks like eight.  We have one in the adult book
2  store category, correct?
3      A.  Yes, sir.
4      Q.  We had three, I think, in the next category
5  which was topless cabaret.  So we're now to four,
6  correct?
7      A.  Yes, sir.  Maybe you're correct.  You had it
8  right, eight.
9      Q.  So there are eight.  Now there is one other one
10  that would come up which would be the ninth one, but
11  that's in the not operating category?
12     A.  That's correct.
13     Q.  Okay.  And then let's take a look at Beat 522 is
14  the other beat that is described on Plaintiff's
15  Exhibit 2?
16     A.  Yes, sir.
17     Q.  Okay.  And of the nine adult book store type
18  businesses, I don't see -- none are in Beat 522, correct?
19     A.  Correct.
20     Q.  In the topless cabaret category, it looks like
21  none are in the beat.
22     A.  That's correct.
23     Q.  Okay.  In the full nude cabaret category it
24  looks like there's one in the 522?
25     A.  Yes, sir.

## Page 31

1      Q.  Okay.  And there was another one that's not
2  operating that was in 522, correct?
3      A.  Correct.
4      Q.  Okay.  But there's only one that's actually in
5  operation?
6      A.  Yes, sir.
7      Q.  Okay.  Now, in 521, of the two -- there's the
8  Men's Club and Baby Dolls were the two in 521, correct?
9      A.  Yes, sir.
10     Q.  Okay.  Do you know whether those two clubs
11  regularly stay open after two a.m.?
12     A.  No, sir, I don't know specific clubs and
13  business hours.
14     Q.  Okay.  So you don't know what the actual hours
15  of operation are of the Men's Club or Baby Dolls Saloon
16  West?
17     A.  No, sir.
18     Q.  And you certainly don't know whether -- if they
19  are open past two a.m., whether that's true seven days a
20  week as opposed to a smaller number of days open?
21     A.  That's correct.  I don't know that.
22     Q.  And when we turn to Beat 534, you can't -- you
23  don't know which of the eight businesses that are in that
24  beat, if any of them, are open past two a.m.
25     A.  That's correct.

## Page 32

1      Q.  You don't know whether any of them are open
2  after four a.m.
3      A.  That's correct.  I do not.
4      Q.  So we don't know -- okay.  But one of the things
5  that we do know -- given me one minute.  Make sure I'm
6  not duplicating too much of what I've already asked.
7          Do we know in this data how many of these
8  aggravated assaults occurred at adult book stores?
9      A.  No, sir.
10     Q.  Do we know whether any of them did?
11     A.  From this page?  No, sir.
12     Q.  Going back to Plaintiff's Exhibit 2, the page
13  018, at the bottom it says there's a total of 38 licensed
14  sexually oriented businesses in the city.  Do you see
15  that?
16     A.  Yes, sir.
17     Q.  But when we go to Plaintiff's Exhibit 3 and the
18  list that was compiled of those businesses, we know that
19  there are a total of 28 sexually oriented businesses that
20  are open, correct?
21     A.  Yes, sir.
22     Q.  And then there were an additional seven that at
23  one point or maybe still had licenses, but were not
24  operating, correct?
25     A.  Yes, sir.

214-324-3733
Production@victorycourtreporting.com

c98b7865-e3b8-4838-b631-8803c5a20639

Page 33

1    Q.  So when you say -- when this document says that
2  "collectively these beats have 39 percent of the licensed
3  sexually oriented businesses in the city," that was based
4  upon there being a total of 38, correct?
5    A.  Yes, sir.
6    Q.  And, in fact, we know that when you add up the
7  ones that are in those three beats, I think we decided
8  there were...
9       MR. ALBRIGHT:  11 active.
10    Q.  (BY MR. MURRAY)  I think we decided or we can
11  decide there are 11 total in those three beats based on
12  the list in Plaintiff's Exhibit 3, correct?
13    A.  Yes, sir.
14    Q.  But that still actually works out to be 39
15  percent of the 28, interestingly enough.
16    A.  I was going to say it's got to go pretty close.
17    Q.  So the figure is still correct.
18       So that means that 61 percent of the sexually
19  oriented businesses are located outside those three
20  beats, correct?
21    A.  Yes, sir.
22    Q.  Okay.  And do you know why there are that many
23  sexually oriented businesses in those three beats?
24    A.  I do not know.
25    Q.  Do you know whether it might have anything to do

Page 34

1  with the zoning code and where those businesses are
2  permitted?
3    A.  No, sir.
4    Q.  Okay.  So let's now go back to Plaintiff's
5  Exhibit 2 and go to the next page which is COD-019, and
6  it's also page 13 of the presentation.  Do you see that?
7    A.  Yes, sir.
8    Q.  Okay.  And it says these are -- it says, "Crime
9  Activity Arrests," correct?
10    A.  Yes, sir.
11    Q.  And it says, "The following nine slides are data
12  related to sexually oriented business locations."  Do you
13  see that?
14    A.  Yes, sir.
15    Q.  And what does related mean in this context?
16    A.  Our data that were pulled, whether it was crime
17  data or call data or arrest data that were pulled from
18  SOB locations or within a 500 foot bumper around the
19  sexually oriented business.
20    Q.  A 500 foot radius?
21    A.  Yes, sir.
22    Q.  So when this refers to data related to sexually
23  oriented business locations, we're talking about arrests
24  that occurred within a 500 foot radius of a sexually
25  oriented business?

Page 35

1    A.  Yes, sir.
2    Q.  And is that pleasured from the property line or
3  from the building?
4    A.  From the building, I assume.
5    Q.  Why do you assume that?
6    A.  Because I don't know.  The actual address, it
7  was 500 feet from where the actual address is.  Our
8  addresses go by the building itself.  So it wouldn't be
9  the property line around the building.  It would be from
10  the building itself.
11    Q.  Are you certain of that?
12    A.  Yes.
13    Q.  So it's your belief that the 500 foot radius is
14  measured from the footprint of the building?
15    A.  That's my understanding, yes, sir.
16    Q.  So then it says that you reviewed aggravated
17  assaults, robberies, prostitution, drug related arrests
18  over the three year period of 2019 to 2021; is that
19  correct?
20    A.  Yes, sir.
21    Q.  And you talked about 58 percent of guns and
22  drugs were from 10 p.m. to two a.m., correct?
23    A.  Specifically dugs and guns arrests comprise 58
24  percent of all arrests between 10 p.m. and two a.m.
25    Q.  All types of arrests where?

Page 36

1    A.  At the sexually oriented business locations or
2  within the 500 foot buffer.
3    Q.  And then 63 percent -- well, let's back up  for
4  a minute?
5    A.  Okay.
6    Q.  It says, "Guns and drugs comprise 58 percent of
7  all arrests 10 p.m. to 2 a.m.," correct?
8    A.  Yes, sir.
9    Q.  And "63 percent of all arrests two a.m. to six
10  a.m.," correct?
11    A.  Yes, sir.
12    Q.  Okay.  So arrests that occurred within a 500
13  foot radius of a sexually oriented business between two
14  a.m. and six a.m., 63 percent of those arrests involved
15  something related to guns and drugs?
16    A.  Yes, sir.
17    Q.  Do you know how many of those arrests actually
18  led to any convictions?
19    A.  No, sir, I do not.
20    Q.  Do you know whether any of them actually led to
21  convictions?
22    A.  No, sir, I do not.
23    Q.  Okay.  If you go to the next page -- I'm sorry.
24  Back up.
25    A.  Yes.

9  (Pages 33 to 36)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 37

1    Q.  I should have asked you this question.  In the
2  year 2021 it says on the last line that there were more
3  total arrests two a.m. to six a.m., 94 versus 83.
4    A.  Yes, sir.
5    Q.  Did you do an analysis as to whether that
6  difference is statistically significant?
7    A.  That one I did not, no, sir.
8    Q.  So you don't know whether that's a statistically
9  significant difference or not?
10    A.  No, sir, I do not for that year.  No, sir.
11    Q.  Okay.  All right.  Let's turn to the next page.
12  And this is entitled Crime Activity Overview 2019 to
13  2021.  And here we're talking about UCR Part 1 crimes,
14  correct?
15    A.  Yes, sir.
16    Q.  Aggravated assault, rape, robbery, and murder,
17  correct?
18    A.  Yes, sir.
19    Q.  Okay.  There's a statistic that says that
20  between two a.m. and six a.m. comprise nearly -- a little
21  over 67 percent of all reported violent crime.  Do you
22  see that?
23    A.  Yes, sir.
24    Q.  And are we talking about all reported violent
25  crime in the entire city or in the northwest or in a

Page 38

1  particular beat?  What are we talking about?
2    A.  So this would be the same data set, the SOB or
3  the 500 foot radius buffer date.  This is where all of
4  this comes from.
5        This particular one is for all three years.  So
6  for all reported violent crimes across all three years
7  from two a.m. to six a.m. comprise just over 67 percent
8  of that.
9    Q.  Okay.  I'm still a little bit confused.
10    A.  Sure.
11    Q.  Are you saying that the -- that 67 percent of
12  all reported -- when you say all reported violent crime,
13  are you talking about all violent crime that was reported
14  in the entire city?
15    A.  No, sir.  This is only the data -- the crime
16  data from the SOB locations.  I have no data on the
17  entire city.
18    Q.  So you're saying that of all the crime -- all
19  the violent crime that was reported over a three year
20  period within a 500 foot radius of these 28 -- well,
21  let's back up.
22        How many businesses are we talking about?  The
23  28 that were open on this list, Plaintiff's Exhibit 3, or
24  are we talking about a different number.
25    A.  When I comprise this data, I just used all SOB.

Page 39

1  So it would be all the data.
2    Q.  The 35?
3    A.  All of them.  If it came, it's an sexually
4  oriented business in my data which all of those would be,
5  even the last seven.
6    Q.  Okay.  So we're talking about a 500 foot radius
7  from 35 locations?
8    A.  Yes, sir.
9    Q.  Whether they were open or closed?
10    A.  Yes, sir.
11    Q.  Okay.  And we're at saying that of all the crime
12  that was reported within that 500 foot radius surrounding
13  35 locations, two thirds of it was reported between the
14  hours of two a.m. and six a.m.
15    A.  Yes, sir.
16    Q.  And we're saying that in 2021 that number was 76
17  percent, correct?
18    A.  Yes, sir.
19    Q.  Okay.  And then you're saying that across all
20  years, violent crime decreased 29 percent, correct?
21    A.  Yes, sir, between 10 p.m. and two a.m.
22    Q.  But increased 80 percent during two a.m. to six
23  a.m.
24    A.  Yes, sir.
25    Q.  Okay.  So again we're talking only about crimes

Page 40

1  reported within 500 feet radius of 35 locations?
2    A.  Yes, sir.
3    Q.  Now, we know that there are other businesses
4  besides sexually oriented businesses that are open
5  between the hours of 10 p.m. and six a.m.
6    A.  Yes, sir.
7    Q.  We know gas stations, for example?
8    A.  Yes, sir.
9    Q.  Convenience stores?
10    A.  Yes, sir.
11    Q.  Some drug stores?
12    A.  I would assume so, yes, sir.
13    Q.  Some nonadult nightclubs can be open until four
14  a.m.
15    A.  Yes, sir.
16    Q.  Some grocery stores?
17    A.  Certainly.
18    Q.  Certainly fast food restaurants are open during
19  those hours?
20    A.  Yes, sir.
21    Q.  Other restaurants like, for example,
22  International House of Pancakes, that type of a
23  restaurant?
24    A.  Yes, sir.
25    Q.  Okay.  Motels, hotels?

10  (Pages 37 to 40)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 41

1    A. Yes, sir.
2    Q. Okay. Other retail outlets apart from adult
3  book stores?
4    A. Yes, sir.
5    Q. Now, you did not determine or make any attempt
6  to study what the percentage -- how many violent crimes
7  were reported within a 500 foot radius of any of those
8  businesses, did you?
9    A. No, sir.
10    Q. And many of those businesses can be within the
11  same 500 foot radius of the locations of the sexually
12  oriented businesses, correct?
13    A. Yes, sir.
14    Q. Or for that matter there night be some overlap.
15  Let's take one of those businesses, a fast food
16  restaurant, just as an example that is 800 feet away from
17  the location of a sexually oriented business, okay? You
18  with me on that?
19    A. Yes, sir.
20    Q. So if a violent crime occurred 400 feet from the
21  sexually oriented business, it also occurred 400 feet
22  from the fast food restaurant?
23    A. Yes, sir.
24    Q. But you never compared how many crimes were
25  committed or reported within 500 feet of the fast food

Page 42

1  restaurant. You only did it with respect to the sexually
2  oriented business; isn't that correct?
3    A. That's correct.
4    Q. So we know you never did a multivariate
5  regression analysis; isn't that true?
6    A. I did no regressions by variate or multivariate
7  No, sir.
8    Q. We also know you never developed any control
9  sites. Do you know what a control site would be in a
10  study like this?
11    A. Yes, sir, and we did.
12    Q. I'm sorry?
13    A. We did.
14    Q. Okay. I think the one control that you focused
15  on was something called an entertainment district?
16    A. Yes, sir.
17    Q. Apart from an entertainment district -- and
18  we'll talk about that later on -- did you investigate any
19  other control sites?
20    A. We did. We looked at or we're going to review
21  the TABC licensed areas. But that was back and forth
22  between UT San Antonio and myself and Chief Garcia. The
23  problem is the proper control sites, there's some
24  literature out there that relates a McDonald's or a
25  7-Eleven to a sexually oriented business in reference to

Page 43

1  the time they're open or the type of people that go.
2    So the proper way to come up with a control site
3  is you have to find one preferably in another part of the
4  city with approximately the same economic, socioeconomic
5  development with approximately the same population with
6  business that's open during the same hours, same crime
7  rate, as best you can.
8    Q. Right.
9    A. We never developed that any further.
10    Q. And that's exactly what a control site would be.
11  You want to make sure that it had a similar population, a
12  similar demographics.
13    A. Yes, sir.
14    Q. Similar hours of operation, similar economic
15  neighborhoods.
16    A. It has to be similar -- sorry.
17    Q. Correct?
18    A. Yes, that's correct.
19    Q. And then if you did that and you picked a
20  control site, you could theoretically pick a control site
21  for each one of the let's call them 28 sexually oriented
22  businesses that are open, correct? You could do that?
23    A. Yes, sir.
24    Q. Okay. In fact, studying like that, not
25  necessarily on this particular subject, but there are

Page 44

1  published studies that have done similar type analysis?
2    A. Yes, sir.
3    Q. Okay. And then if you did that and you picked a
4  control site that had those characteristics and you
5  compared it with one of the sexually oriented businesses,
6  you could actually determine whether it would be -- you
7  could conclude that whether the control site or the
8  sexually oriented business site was more criminogenic;
9  isn't that true?
10    A. With the proper methodology, you could. You
11  could conclude that.
12    Q. But you didn't do that in this?
13    A. I did not.
14    Q. Okay. So you have no way of knowing as you sit
15  here today whether, in fact -- whatever all these
16  statistics show, whether, in fact, crime within 500 feet
17  of sexually oriented businesses is less, more, or the
18  same as crime within 500 foot radius of proper control
19  sites; is that right?
20    A. That's true.
21    MS. JORDAN: Objection to the form of the
22  question. Assumes facts not in evidence.
23    Q. (BY MR. MURRAY) Go ahead and answer.
24    A. That's correct.
25    MS. JORDAN: And it's overbroad.

11 (Pages 41 to 44)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 45

1     MR. JORDAN:  That sounds like a First Amendment
2  argument.
3     Q.  Okay.  So let's get back to, now that I've
4  digressed.  We were talking about page 20, I believe.
5     Okay.  So I think we've covered that.  Let's go
6  to the next page.  And that's entitled Crime Activity
7  Overview 2019 to '21, correct?
8     A.  Yes, sir.
9     Q.  And now we're talking about property crimes
10 included in UCR Part 1, correct?
11    A.  Yes, sir.
12    Q.  Okay.  And I assume you picked UCR as opposed to
13 NIBRS because it was easier to do the analysis or what?
14    A.  It's easier to understand.
15    Q.  Okay.
16    A.  So this is an audience guided report.  So using
17 UCR, everybody understands violent crime versus property
18 crime.
19    Q.  Okay.  And again we're talking about property
20 crimes that are reported within a 500 foot radius of the
21 35 locations that either have sexually oriented
22 businesses operating or have licenses, but are not
23 operating, correct?
24    A.  Correct.
25    Q.  And when you did that analysis, you discovered

Page 46

1  that actually more property crime occurred between 10
2  p.m. and two a.m. than occurred between two a.m. and six
3  a.m., correct?
4     A.  Yes, sir.
5     Q.  So 59 percent of the reported property crimes
6  within those 500 foot radiuses occurred during the 10
7  p.m. to two a.m., but 41 percent from two a.m. to
8  six a.m.
9     A.  That's correct.
10    Q.  Okay.  But across all years property crime
11 increased during both times, correct?
12    A.  Yes, sir.
13    Q.  Although it increased by a greater percentage in
14 the 10 p.m. to two a.m. time frame than it did in the two
15 a.m. to six a.m. time frame; is that correct?
16    A.  That's correct.
17    Q.  And again we're not talking about how much
18 property crime was reported in the entire city.
19    A.  That's correct.
20    Q.  We're not talking about how much property crime
21 was reported within a 500 foot radius of convenience
22 stores that were open 24/7, correct?
23    A.  Correct.
24    Q.  Or any of the other businesses that were open
25 24/7?

Page 47

1     A.  That is correct.
2     Q.  Maybe I'm missing something, but when you look
3  at the middle bullet point.  So if 59 percent of the
4  property crime occurring between 10 p.m. and 2 a.m. and
5  41 percent occurred between two a.m. and 6 a.m., 41
6  and 59 add up to 100 percent.
7     A.  Yes, sir.
8     Q.  But you're not saying that no property crimes
9  occurred at any other time of the day?
10    A.  No, sir.  So though they come out like that, the
11 10 p.m. to the two a.m., like the other sheet, so of all
12 the reported property crime, the 10 p.m. to two a.m. the
13 59 percent occurred at the SOB locations.  Property crime
14 made up that 59 percent.
15    Q.  So -- but you were only measuring the 500 foot
16 radius, I thought.
17    A.  Yes, sir.
18    Q.  Okay.  So 59 percent of the property crimes --
19 what is the 59 --
20    A.  No, I see what you're saying.  I'm trying to say
21 the same thing, but it's coming back.  No, you're right.
22 100 percent of the crime in that eight hour period,
23 what's here versus the other page, I looked at it simply
24 across the time to show the change in the two different
25 time frame for property crimes to highlight the point

Page 48

1  that property crimes were different than the violent
2  crimes.
3     So 100 percent of the crime in that eight hour
4  period, 59 percent of it happened two p.m. to 10 a.m. and
5  2 a.m. to 6 a.m.  That's exactly the math you said there.
6     Q.  Okay.  But it doesn't tell us how much property
7  crime occurred between six a.m. and 10 p.m.
8     A.  No, it does not.
9     Q.  Or whether it was more or less than occurred
10 between 10 p.m. and six a.m., correct?
11    A.  Correct.
12    Q.  And the same is true -- was true of the violent
13 crimes on the preceding page?
14    A.  Yes, that's correct.
15    Q.  So we don't know from these two pages, at least,
16 how violent crime during the hours of six a.m. to ten
17 p.m. -- or actually I guess on the one on page 20, we
18 don't know how violent crimes between two a.m. and six
19 a.m. compared with violent crimes between six a.m. and 10
20 p.m. or six a.m. and two a.m.
21    A.  Correct.
22    Q.  And you didn't do that comparison?
23    A.  Not here, no, sir.
24    Q.  And you didn't analyze with respect to those
25 incidents what connection, if any, they had to the

12 (Pages 45 to 48)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 49

1 specific sexually oriented business locations, correct?
2     A. I'm sorry. If I could get clarification. What
3 you just asked me is I did look at if these crimes came
4 from a -- which specific location it came from?
5     Q. We know that you're measuring a 500 foot radius
6 from a location.
7     A. Right.
8     Q. Okay. For example, there could be an incident
9 within 500 feet of a particular location that is
10 connected to a fast food restaurant in terms of what
11 actually happened, correct?
12     A. I understand. Yes, sir. This is correct.
13     Q. So you're not able to ascertain what percentage
14 or how many of these incidents could actually be
15 attributed to the operation of a particular sexually
16 oriented business.
17     A. You're correct.
18     Q. Okay. So let now take a look at page 22. By
19 the way, I should have let you know. If at any time you
20 need a break, you just let us know, and we'll take one.
21 And, of course, our court reporter, whenever you need a
22 break, please let us know.
23     A. Thank you.
24     Q. So when we go to page 22 -- and I guess I'm
25 talking about COD-022, and it's also page 16 of the

Page 50

1 presentation. We have these bar graphs, correct?
2     A. Yes, sir.
3     Q. This is Comparison Crimes Reported is the title
4 of it.
5     A. Yes, sir.
6     Q. And then there are violent property crimes, one
7 bar shows between 10 p.m. and two a.m. and the red bar
8 shows two a.m. and six a.m., correct?
9     A. Correct.
10     Q. And are we talking about crimes reported in the
11 entire city?
12     A. No.
13     Q. We're still talking only about crimes reported
14 within 500 feet of these 35 locations of --
15     A. Yes, sir.
16     Q. -- sexually oriented businesses?
17     A. Yes, sir.
18     Q. So if I understand correctly, in 2019 there were
19 a total of 107 crimes -- well, let's -- strike that.
20         In 2019 there were 124 crime incidents reported
21 within 500 feet of these 35 locations. There were 124,
22 correct?
23         MS. JORDAN: Objection. Mischaracterizes the
24 testimony and the exhibit.
25     A. 124 violent property crimes 10 a.m. to two p.m.

Page 51

1 for 2019.
2     Q. (BY MR. MURRAY) And I want to make sure I
3 haven't misstated it. Tell me exactly what that means.
4 There were 124 reported incidents of either violent or
5 property crime in the 500 foot radius of the 35
6 locations?
7     A. Yes, sir.
8     Q. Okay. And between two a.m. and six a.m.,
9 however, in 2019 there were fewer violent and property
10 crimes reported within 500 foot radius of those 35
11 locations, correct?
12     A. Yes, sir.
13     Q. Okay. And that number was 107, correct?
14     A. Yes, sir.
15     Q. And if my math is correct, that means that --
16 and you can check it if you want. But that would mean
17 there was one crime reported on average every 3.4 days
18 between the hours of two a.m. and six a.m.
19     A. I'll trust your math on that, yes, sir.
20     Q. And that means we're talking about one crime
21 reported every 3.4 days involving 35 -- a total of 35
22 locations.
23     A. Theoretically, that's correct.
24     Q. Well, the math says that at least, correct?
25     A. Well, the math comes out to that time, but the

Page 52

1 math as you described it doesn't indicate groups of time.
2 There might have been six day period where nothing
3 happened, and a two day period where 25 crimes were
4 reported.
5     Q. Exactly. No, I understand. Of course.
6     A. As far as the math goes on average across the
7 times, yes, sir.
8     Q. So if we have 35 locations, and on average one
9 crime is reported every 3.4 days over the course of three
10 years, you would be talking about a very small number
11 combined at the 35 locations, correct?
12         MS. JORDAN: Objection, mischaracterizes.
13         MR. MURRAY: Let me restate that.
14     Q. (BY MR. MURRAY) If on average you have one
15 crime reported every 3.4 days, correct?
16     A. Yes, sir.
17     Q. Okay. That means that a crime was reported
18 within 500 feet of one of the 35 locations.
19     A. Yes, sir.
20     Q. Which would mean that theoretically just from
21 the mathematical standpoint that during that 3.4 day
22 period there were no crimes reported within 500 feet of
23 34 of those locations.
24     A. Yes, sir.
25     Q. Now, if you then go to 2020, what we see is

13 (Pages 49 to 52)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 53

1  there were 161 reported violent or property crimes during
2  the 10 p.m. to two a.m.
3       A.  Yes, sir.
4       Q.  And then a smaller number of reported incidents
5  of violent or property crime occurred in 2020 between the
6  two a.m. to six a.m. hours, correct?
7       A.  Yes, sir.
8       Q.  It went from 161 down to 132.
9       A.  Yes, sir.
10      Q.  And then in 2021 there were 165 reported during
11  the 10 p.m. to two a.m., and it went down a few to 160
12  between two a.m. and six a.m.
13      A.  Yes, sir.
14      Q.  And going to 2020 when you add up -- when you
15  add the 161 and the 132, if my math is correct -- and I
16  don't know that it is.  Let me do that again.
17          Well, let's focus just on the 132 reported crime
18  incidents that occurred between two a.m. and six a.m. In
19  2020.  Again, the math would say that that means that
20  there was one incident on average reported every 2.76
21  days.
22      A.  Between two a.m. and six a.m., yes, sir.
23      Q.  Okay.  So every 2.76 days, there was either one
24  violent or property crime reported within 500 feet of one
25  of the 35 locations, mathematically.

Page 54

1       A.  Yes, sir.
2       Q.  Which means that in that interval, there would
3  have been zero crimes reported within 500 feet of the
4  other 34 locations.
5       A.  Yes, sir.
6       Q.  And we can do the math.  You can combine the --
7  you could do the same type of mathematical analysis for
8  the eight hour period, 10 p.m. to six a.m.
9       A.  Correct.
10      Q.  And come up with those same calculations.  And
11  we could do that with 2021 as well.  160 reported
12  incidents within the 500 foot radius of the 35 locations
13  between two a.m. and six a.m., correct?
14      A.  Yes, sir.
15      Q.  And my math said that would be one reported
16  incident every 2.28 days.
17      A.  Okay.  Yes, sir.
18      Q.  Now, we can always recheck the math.  Certainly
19  it's possible that my calculator was wrong.  But assuming
20  that the math say that, that would mean that every 2.28
21  days within 500 feet of one of these 35 locations there
22  was a reported crime?
23      A.  Yes, sir.
24      Q.  And during that same period of time there were
25  no reported crimes at the other 34 locations,

Page 55

1  mathematically speaking.
2          MS. JORDAN:  Objection.  Mischaracterizes the
3  exhibit and the testimony.  The crimes are not just any
4  crimes.  They are violent crimes and property crimes.
5          MR. JORDAN:  I'm sorry.  You're right.
6       Q.  (BY MR. MURRAY)  We're talking about this chart
7  which is violent and property crimes, right?
8       A.  Yes, sir.
9       Q.  So let's continue to be precise with each
10  question.  So that means that in 34 of the 35 locations,
11  there were no violent or property crimes reported during
12  that 2.28 days?
13      A.  Theoretically, yes, sir.
14      Q.  Okay.  And the only variable is whether there
15  might have been -- on one day there might have been more
16  criminal offenses reported of a violent and property
17  crime that on another day, correct?
18      A.  That's correct.
19      Q.  And then the math would stretch out even further
20  so that if you had several reported on one day, there
21  might be a period of a week where nothing was reported,
22  correct?
23          MS. JORDAN:  Objection.  I withdraw that.
24      A.  Correct.
25      Q.  (BY MR. MURRAY)  Okay.  And finally in each of

Page 56

1  the three years the reported incidents of violent and
2  property crime went down between the hours of two a.m.
3  and six a.m. compared with the hours of 10 p.m. to two
4  a.m., correct?
5       A.  They were lower during the two a.m. and six a.m.
6  period for all three years, yes, sir.
7       Q.  Let's now go to page 17, COD-023, which is also
8  page 17 of the presentation.
9          Now this is a chart that says "2019 and 2021,
10  All Crimes by Time Period," correct?
11      A.  Yes, sir.
12      Q.  So was this a study of just those two years or
13  the three years between 2019 and 2021?
14      A.  These data were put to or this graph was created
15  by U.T. San Antonio researchers from the data that I gave
16  them.  So what they decided is to remove 2020 because of
17  the Covid effect.  What we've been seeing in academics
18  and research is that Covid has an odd effect depending on
19  the type of crime.  So they wanted to remove that as a
20  variable and just compare 2019 to 2021.
21      Q.  So we're talking about --
22      A.  Two years, yes, sir.
23      Q.  This is a study of two years, not the three
24  years we were talking about before.
25      A.  That is correct.

14 (Pages 53 to 56)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 57

1    Q.  Okay.  So then it says that there's a comparison
2  between sexually oriented businesses and entertainment
3  districts.  Do you see that?
4    A.  Yes, sir.
5    Q.  Okay.  Now, first of all, are we still talking
6  about a 500 foot radius?
7    A.  We are, yes, sir.
8    Q.  So all of these statistics depend upon a 500
9  foot radius surrounding various locations?
10    A.  Let me correct myself.  Only for the SOB
11  locations.  For the entertainment districts, there were
12  large areas it doesn't make sense because it's not a
13  business per se.  It's a district.  They just took the
14  area within that district.
15    So the SOBs are still -- that data is still the
16  500 foot radius as we have been discussing, but the
17  entertainment districts are just the districts
18  themselves.
19    Q.  What is an entertainment district within the
20  meaning of this chart?
21    A.  Whatever is defined by the city, and we have it
22  delineated the way we poll crime.  So we have Deep Ellum,
23  Lower Greenville, and all those are designated by
24  streets.  So that would be within those street boundaries
25  if it's designated as a particular entertainment

Page 58

1  district.  That is what the entertainment district
2  entailed.
3    Q.  Okay.  But how do you become an entertainment
4  district?
5    A.  I don't know.
6    Q.  A what kinds of businesses are in an
7  entertainment district within the meaning of this chart?
8    A.  It's every -- every business.  It's residential.
9  It could be bars, nightclubs, grocery stores.  All of
10  that falls within these entertainment districts because
11  within these entertainment districts are also houses, so
12  apartment complexes.  And it's all types of businesses
13  and residential areas.
14    Q.  Okay.  So you weren't comparing sexually
15  oriented businesses like adult book stores and adult
16  cabarets to nonadult book stores and nonadult night
17  clubs.  That is not what this is about.
18    A.  No, sir.
19    Q.  Okay.  This simply compares the same 500 foot
20  radius surrounding the 35 -- is this the 35 locations as
21  well?
22    A.  Yes, sir.
23    Q.  Okay.  All we're doing is comparing that 500
24  foot radius to some geographical boundaries that you call
25  entertainment districts.

Page 59

1    A.  That's correct.
2    Q.  Okay.
3    MS. JORDAN:  Can we go off the record for a
4  second?
5    MR. MURRAY:  Yes.
6    (Off the record)
7    MS. JORDAN:  So this is the entertainment
8  districts.  This is a copy of the map of the
9  entertainment districts that he just referenced.  If you
10  want to go over that and use that in your questioning,
11  you can.
12    MR. MURRAY:  Okay.
13    Q.  (BY MR. MURRAY)  Okay.  So comparison between
14  SOB and entertainment districts, you've got the -- I
15  guess the 2019 chart and the 2021 chart; is that correct,
16  even though you don't put the year there?
17    A.  No.  So --
18    Q.  I'm sorry.  Never mind.  Strike that.
19    The bar charts are for the two years total.
20    A.  Correct.
21    Q.  Okay.  So you take all the crimes -- and this is
22  not limited to just property crimes and violent crimes?
23  Is it all crimes or what crimes are we talking about?
24    A.  I believe they used all crimes.  Any reported
25  crime.

Page 60

1    Q.  And where did they get -- where do you get that
2  information of all crimes?
3    A.  From me.  From my data.
4    Q.  And how do you retrieve that data?  For example,
5  how do you get a number for all the crimes reported in
6  2019?  What do you go do?  Put something in a computer?
7    A.  My crime analyst.  Yes, sir.  It's the way they
8  pull the report.  So when I had the violent and property
9  crime, I went in, and I would have had all crimes from
10  the smallest to the highest.  And then I went in, and,
11  using the UCR definitions, picked out those crimes that
12  were -- those offenses related to that.  If it was a
13  homicide, a murder, I would have picked out anything that
14  had murder, negligent homicide.  If was a burglary, I
15  would have picked out burglary of a residence, burglary
16  of a building.
17    That's how I got mine, but all of it's from the
18  same data.  They had this data.  They took all crimes.
19    Q.  And the data universe we're talking about is all
20  within a computer?
21    A.  Yes, sir.
22    Q.  So all the crime statistics that we're talking
23  about are input into a computer?
24    A.  Yes, sir.
25    Q.  I mean, in addition there's obviously paper

15 (Pages 57 to 60)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 61

1 copies of reports and things like that. But
2 statistically speaking, information gets put into a
3 computer from which you can search for specific
4 information, correct?
5    A.   Yes, sir.
6    Q.   And that's what you did.  You searched that
7 database for much of the information that we're talking
8 about, correct?
9    A.   Yes, sir.
10    Q.   Okay.  All right.  So what we have, then, is
11 that between 10 p.m. and two a.m. there was greater
12 crimes reported in the entertainment districts than in
13 the areas surrounding the 35 locations with sexually
14 oriented business licenses, correct?
15    A.   That's correct.
16    Q.   52 percent in the 500 foot radius of sexually
17 oriented business locations whereas 65 percent of the
18 reported offenses were in the entertainment districts.
19    A.   That's correct.
20    Q.   And then from the two a.m. to six a.m. hour, 48
21 percent were within the 500 foot radius of the 35
22 locations, correct?
23    A.   Yes, sir.
24    Q.   And 35 percent were within the entertainment
25 districts, correct?

Page 62

1    A.   Correct.
2    Q.   Okay.  And of the 48 percent we don't know how
3 many -- what percentage of those were also within 500
4 feet of a gas station, correct?
5    A.   That's correct.
6    Q.   We don't know what percentage of those were
7 within 500 feet of a convenience store?
8    A.   That's correct.
9    Q.   Or of a nonadult night club?
10    A.   That's correct.
11    Q.   Or of a fast food restaurant?
12    A.   Correct.
13    Q.   Because no one ever does that analysis, correct?
14    A.   That's correct.
15        MR. MURRAY:  How about taking make a five or ten
16 minute break.
17        MS. JORDAN:  Sure.
18        (A break was held.)
19    Q.   (BY MR. MURRAY)  So we're on page 23, I think,
20 aren't we?
21    A.   Yes, sir.  That's where we stopped.
22    Q.   Okay.  So I want to make sure that -- and I
23 probably already asked this, but I want to make sure I do
24 understand this chart.
25        So the percentages that are shown on this page

Page 63

1 COD-023 between 10 p.m. and two a.m., the 52 percent that
2 is in the sexually oriented business bar chart, tell me
3 again.  That's 52 percent of what?
4    A.   The 52 and the 48 are the two that go together
5 here.  So you see in that eight hour period, 10 p.m. to
6 six a.m., 52 percent of the crimes at SOBs occurred at
7 10 p.m. to two a.m. and then 48 per cent occurred two
8 a.m. to six a.m.
9    Q.   But 52 percent of what crimes?
10    A.   All crimes.
11    Q.   All crimes for the 24 hour period or just during
12 the report?
13    A.   During the eight hour period.  So all crimes
14 occurred during -- trying to remember how UTSA put it
15 together.  But all crimes -- they took all crimes
16 reported in that eight hour period and, of course, divide
17 it up into four -- in the two time frames we're looking
18 at.  Of all crimes reported within an eight hour period,
19 52 per cent of all crimes at SOBs occurred 10 p.m. to two
20 a.m..  Likewise, 10 p.m. to two a.m. of all crimes
21 reported in entertainment districts between that time
22 frame occurred -- or 65 percent occurred at 10 p.m. to
23 two a.m. versus 35 between two a.m. and six a.m.
24    Q.   So it's got nothing to do with the hours with
25 whatever happened between six a.m. and ten p.m.

Page 64

1    A.   Correct.
2    Q.   We don't know what those figures would be.
3    A.   Correct.
4    Q.   All we're saying is that of all the reported
5 incidents within a 500 foot radius of the 35 locations
6 that had a sexually oriented business license, 52 percent
7 occurred within the 10 p.m. to two a.m. period and the
8 remaining 48 percent of all the crimes reported in that
9 eight hour period occurred within a period of two a.m. to
10 six a.m.  Is that what we're saying?
11    A.   Yes, sir.
12    Q.   Okay.  And the same for what you're calling the
13 entertainment districts.  All the times that reported
14 collectively in those districts between -- during that
15 eight hour period, 65 percent of that universe of crimes
16 occurred 10 p.m. to two a.m. and 35 percent occurred two
17 a.m. to six a.m.
18    A.   Correct.
19    Q.   And then that would be the same analysis on next
20 page, COD-204, correct?
21    A.   Yes, sir.  And the difference here, of course,
22 is they pulled out just violent offenses, violent crimes.
23    Q.   Right.  So, for example, in that chart the
24 entertainment districts, violent crime -- there was a
25 higher percentage of violent crime during the two a.m. to

16 (Pages 61 to 64)

c98b7865-e3b8-4838-b631-8803c5a20639

## Page 65

1  six a.m. versus the 10 p.m. to two a.m.
2    A.  Can you repeat that, please?
3    Q.  55 percent of all violent crime that was
4  reported within that eight hour period in the
5  entertainment districts occurred between two a.m. and six
6  a.m.
7    A.  Yes, sir.
8    Q.  And the 45 percent of that universe occurred
9  between 10 p.m. and two a.m.
10   A.  Yes, sir.
11   Q.  Okay.  Let's go to the next page, then.  2,082
12  custodial arrests at sexually oriented business locations
13  2019 to 2021.  That's what that first line says?
14   A.  Yes, sir.
15   Q.  And we're still talking about arrests that
16  occurred within a 500 foot radius of those 35 locations?
17   A.  Yes, sir.
18   Q.  Okay.  And then you give the -- and that would
19  include traffic stops that resulted in arrests?
20   A.  Yes, sir.
21   Q.  Outstanding warrants?
22   A.  Yes, sir.
23   Q.  Misdemeanor offenses?
24   A.  Yes, sir.
25   Q.  Okay.  And it turns out that there were more of

## Page 66

1  those between the 10 p.m. and two a.m. than between the
2  two a.m. and six a.m.
3    A.  Correct.
4    Q.  So arrests went down during the two a.m. to six
5  a.m. hours that city council now says the businesses have
6  to be closed, correct?
7    A.  There were fewer arrests during that time frame,
8  yes, sir.
9    Q.  Okay.  And then if you look at the next page, we
10  have the bar graphs expressing those arrests in that
11  form, correct?
12   A.  Yes, sir.
13   Q.  And we see that in 2019 again they went down in
14  the two a.m. to six a.m. period, correct?
15   A.  Yes, sir.
16   Q.  They went up slightly in 2020, correct?
17   A.  Yes, sir.
18   Q.  Did you determine whether that difference was
19  statistically significant --
20   A.  I did not --
21   Q.  Let me finish the question.
22   A.  Sorry.
23   Q.  Did you ascertain whether that difference was
24  statistically significant?
25   A.  No, sir.

## Page 67

1    Q.  Okay.  Then in 2021, again this time it went
2  down from 306 in the ten to two a.m. period down to 288
3  in the two a.m. to six a.m., correct?
4    A.  Yes, sir.
5    Q.  Okay.  And if you add up all the arrests that
6  occurred in the two a.m. to six a.m. period within a 500
7  foot radius of the sexually oriented business locations,
8  my math said that added up to 772 arrests over that three
9  year period.  Will you accept that?
10   A.  I'll accept that.
11   Q.  Okay.  And my math said three years equals about
12  1,095 days.  That means that there was one arrest every
13  1.41 days according to the math?
14   A.  According to the math.
15   Q.  So every day and almost a half, one arrest would
16  have occurred within 500 feet of the 28 or 35, whichever
17  number you're talking about, sexually oriented
18  businesses?
19   A.  Yes, sir.
20   Q.  Okay.  Let's go to page 21 or COD-027.  Now we
21  do the comparison between the 500 foot radius surrounding
22  the locations of licensed sexually oriented businesses
23  compared to the entertainment district's arrests,
24  correct?
25   A.  Correct.

## Page 68

1    Q.  And there is virtually no difference between
2  sexually oriented businesses and the entertainment
3  districts, wouldn't you agree?
4    A.  I would agree with that.
5    Q.  That's true both in the 10 p.m. to two a.m. time
6  frame and the two a.m. and six a.m. time frame.
7    A.  That's correct.
8    Q.  So there's nothing in that chart that would
9  support the proposition that the sexually oriented
10  businesses should be closed during those two a.m. to six
11  a.m. hours on this one bar graph?
12   A.  Actually, I don't agree with that.
13   Q.  Okay.  Let's go to the next page.
14   A.  Okay.
15   Q.  Now, we go to calls for service.  And these are
16  calls for service during the three year period of 2019 to
17  2021, correct?
18   A.  Yes, sir.
19   Q.  And you were talking about 11,999 were generated
20  at SOB locations, correct?
21   A.  Yes, sir.
22   Q.  But you really mean within a 500 foot radius,
23  correct?
24   A.  That's correct.
25   Q.  Between 10 and two a.m. there were 2171 calls

17 (Pages 65 to 68)

Page 69

1  for service within those 500 foot radius areas?
2      A. Yes, sir.
3      Q. And two a.m. to six a.m., 2396, correct?
4      A. Yes, sir.
5      Q. You didn't do an analysis to determine whether
6  that analysis was statistically significant, did you?
7      A. I did later.
8      Q. When did you do it?
9      A. Last night.
10     Q. Okay. And what did you conclude?
11     A. That it is statistically significant, the
12 difference between.
13     Q. Okay. And what statistically significant model
14 were you using?
15     A. So what I used was a Linz, et al, study from
16 2006. I believe it was when they were looking at San
17 Diego -- establishments in San Diego, but they used --
18 it's just a basic nonparametric test. I used that same
19 Mann-Whitney test on the time frames two a.m. to six a.m.
20 versus all times and found it's statistically
21 significant.
22     Q. Was it to within a 95 percent certainty?
23     A. Yes. As a matter of fact, it came out to .0000,
24 so a 99.9 percent.
25     Q. And this is -- you're saying that the 2396 minus

Page 70

1  2171 over -- you measured over a three year period?
2      A. Yes, I looked at it.
3      Q. Okay. Make sure we know what we're talking
4  about here. So 2396.
5          So we're talking about a difference of 225 over
6  the course of three years; is that correct?
7      A. Yes, sir.
8      Q. And 225 over the course of three years would
9  be...
10         Assuming my math is correct on this. Let me do
11 it one more time.
12         If there are 1095 days in three years, it would
13 appear 225 additional calls for service would mean one
14 additional call for service every 4.86 days. Does that
15 sound right mathematically?
16         MS. JORDAN: I'm going to object. I'm not sure
17 I'm following what math you're using and what -- to make
18 that calculation. So I think that the question is
19 confusing.
20     Q. (BY MR. MURRAY) Did you understand the
21 question, Lieutenant?
22     A. I assume that you took the difference between
23 the two time frames and divided it by how many days there
24 are in three years.
25     Q. Yes.

Page 71

1      A. If that's --
2      Q. I mean --
3      A. I mean, I don't have any reason to doubt you're
4  wrong.
5      Q. Okay. But, I mean, if it's true you take 2396
6  and you subtract 2171 and you get a 225, that would be
7  the number of additional calls for service over the three
8  year period.
9      A. So -- I'm sorry. Did I interrupt?
10     Q. So there were 2171 calls for service between 10
11 p.m. and two a.m., correct?
12     A. Correct.
13     Q. There were 2396 between two a.m. and six a.m.,
14 correct?
15     A. Correct.
16     Q. So what I'm saying is in the second time period
17 there were 225 more than in the 10 p.m. to two a.m. Am I
18 wrong about that?
19     A. No, no, no, you're correct. What I was going to
20 say is I followed along with Linz's line of thought. So
21 instead of looking at the difference of the four hour
22 time period before then, what he did in that study was he
23 took the two a.m. to six a.m. time frame and compared it
24 to the other 18 hours.
25     Q. Okay.

Page 72

1      A. 18? 20 hours. Sorry.
2      Q. Yes.
3      A. I didn't think that math was right. So you're
4  looking at the difference between the 11,000 -- well,
5  12,000 and 2300. And that Mann-Whitney test, I wouldn't
6  have thought about it had I not read his study. I tried
7  it, and it came out statistically significant where his
8  did not on his data set.
9      Q. You're talking about Dr. Daniel Linz?
10     A. Yes.
11     Q. And you read his published article?
12     A. A few of them, yes.
13     Q. Which ones have you read?
14     A. So I read San Diego one. And I'm sorry, I don't
15 remember the years exactly. But he did San Diego. He
16 did Charlotte. And I believe he did a comparison of
17 three from Milford, Hartford, and Richmond areas. Those
18 three. I perused maybe a couple others. I looked at the
19 methodology he used, and that was I saw that I thought I
20 could repeat fairly simply with the data I had.
21     Q. Okay. And these were all in peer reviewed
22 journals?
23     A. Yes, yes. Yeah, none of them were just reports.
24 They were all peer reviewed.
25     Q. Did you read the study that was done by -- not

18 (Pages 69 to 72)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 73

1  by Dr. Linz, but by some academics at UT San Antonio
2  several years ago?
3      A.  No.  I would have recognized that pretty quick
4  if I had seen that affiliation.  I don't believe so.
5      Q.  Okay.  So here's what I'm trying to find out, to
6  determine.  So my question was designed to elicit whether
7  the difference between the 2171 and the 2396 over the
8  course of the three year period, the difference in those
9  two numbers was statistically significant?
10     A.  I didn't test that.
11     Q.  Okay.  And just so I understand correctly, also
12  the 2396 that occurred between two a.m. and six a.m.,
13  that would be just slightly less than 20 percent of the
14  total number of calls?
15     A.  That number looks roughly correct, eyeballing
16  it.
17     Q.  So 80 percent of the calls for service occurred
18  outside of that four hour period?
19     A.  Yes, sir.
20     Q.  And then if you look at the next page, 29,
21  COD-029, which also bears the number 23 on the
22  presentation itself, you express the calls for service in
23  bar graphs, correct?
24     A.  Yes, sir.
25     Q.  And we see that between 2019 and 2021 the calls

Page 74

1  for service between two a.m. and six a.m. went down,
2  correct?
3      A.  I'm sorry?
4      Q.  So there are 845 in 2019, correct?
5      A.  Yes, sir.  Yes, sir.  I'm sorry.
6      Q.  It went down to 839 in 2020, correct?
7      A.  Yes.
8      Q.  And it went down even further in 2021 to 712
9  calls for service during the two a.m. to six a.m. period,
10  correct?
11     A.  Yes, sir.
12     Q.  Then if you go to the next page, you've got this
13  comparison between the sexually oriented business
14  locations, the 500 foot radius, and the entertainment
15  districts again, correct?
16     A.  Yes, sir.
17     Q.  And these bar graphs express the same kinds of
18  percentages that we saw in the earlier bar graph when
19  that comparison was done?
20     A.  Yes, sir.
21     Q.  It's the same analysis, in other words.
22     A.  Yes, sir.
23     Q.  So, for example, between 10 p.m. and two a.m.
24  during those two years, the calls at least within the 500
25  foot radius of sexually oriented businesses went from 48

Page 75

1  percent from 10 p.m. to two p.m. to 52 percent two a.m.
2  to six a.m., correct?
3      A.  Yes, sir.
4      Q.  Okay.  Did you do an analysis to see whether
5  that analysis was statistically significant?
6      A.  No, sir.
7      Q.  Okay.  Then on the next page you're talking
8  about calls for service directed to the fire department,
9  correct?
10     A.  Yes, sir.
11     Q.  Again, we're talking about a 500 foot radius
12  with respect to the locations where sexually oriented
13  business's are?
14     A.  So the fire department data I'm not positive
15  about here.  They sent me a PDF form that had some basic
16  information on it.  So I don't -- I can't say that it's
17  from 500 foot radius.  From looking at that data they
18  sent me, I believe it was at the locations themselves.
19  But this was not -- we didn't generate the fire
20  department data.  We don't have access to that so it came
21  from the fire department.
22     Q.  Okay.  So the fire department reported 1317
23  calls for service during that three year period somewhere
24  in relationship to the sexually oriented businesses?
25     A.  Yes, sir.

Page 76

1      Q.  Okay.  And 675 of them occurred between 10 p.m.
2  and six a.m. is what this chart shows, correct?
3      A.  Correct.
4      Q.  By the way, going back to calls for service.
5  The location of a call for service depends upon where the
6  person was when he or she made the call, right?
7      A.  Not necessarily.  So if I -- I could call the
8  police from here and say that I need to meet the police
9  at 1400 South Lamar.  That call for service would come
10  out there even though I called from here.
11         If there was a call that comes in where they
12  hang up and it sounded like somebody they have to cross
13  reference, they might look at the GPS information if they
14  can get it through a cell phone.
15         So that's not necessarily true of 911 calls.  It
16  could be -- it just depends on what the caller says or
17  needs or where at.
18     Q.  So, for example, if a -- if somebody wants to
19  report an incident that happened that the person regards
20  as dangerous to that person.  Let's say the person had an
21  encounter with a citizen, and it was an assault, and he
22  got away.  And the person, the victim, drove away and
23  went into a parking lot that was well lit, thinking that
24  was a safe place to stop and call the police, that call
25  for service might reflect the address of that business's

214-324-3733
Production@victorycourtreporting.com

c98b7865-e3b8-4838-b631-8803c5a20639

Page 77

```
 1    parking lot even though the incident didn't occur there.
 2       A.  Correct.
 3       Q.  Okay.  Okay.  Let's move to Plaintiff's
 4    Exhibit 3 next.
 5          So you've got that.  So let's take a look at
 6    Plaintiff's Exhibit 3.
 7          Okay.  We've already talked about the fact that
 8    is a memorandum from the chief to the mayor and the city
 9    council, correct?
10       A.  Correct.
11       Q.  And we've already talked about the fact that
12    there was a list of licensed sexually oriented businesses
13    including seven that are no longer open, correct?
14       A.  Correct.
15       Q.  And then we have a set of bar graphs on the next
16    page, correct?
17       A.  Yes, sir.
18       Q.  And again we're -- just to reiterate, that all
19    of the data that we're now going to go over is based upon
20    data from a 500 foot radius surrounding the building
21    footprint of locations where licensed sexually oriented
22    businesses either exist or are no longer operating,
23    correct?
24       A.  Yes, sir.
25       Q.  And you know from your own studies that a 500
```

Page 78

```
 1    foot radius is an area of 785,398 square feet, isn't it?
 2       A.  I trust you.  I've never done that math.
 3       Q.  But it's a pretty large area, isn't it?  A 500
 4    foot radius?
 5       A.  Yes, sir.
 6       Q.  Okay.  We've already talked about the other
 7    businesses that are open during late night hours that we
 8    didn't -- you didn't take into account.  I'm not going to
 9    go over that again.
10          Going to bump that.
11          Okay.  So let's talk about this bar chart on
12    page COD-041.
13       A.  Okay.
14       Q.  And it's a chart of violent crime offenses for
15    the three year period 2019 through 2021, correct?
16       A.  Correct.
17       Q.  And you have at the bottom there -- and we'll
18    talk about the bars themselves.  But you say at the
19    bottom, "From 2019 to 2021 book stores accounted for five
20    percent of violent crime offenses from 10 p.m. to two
21    p.m. and five percent of offenses from two a.m. to six
22    a.m." Do you see that?
23       A.  Yes.
24       Q.  Okay.  Are those your words?
25       A.  Yes, sir.
```

Page 79

```
 1       Q.  Okay.  So when you say accounted for, am I to
 2    understand correctly that what you really mean is that
 3    there were reported crime incidents that occurred -- a
 4    certain number of crime incidents occurred within a 500
 5    foot radius of an adult book store, for example?
 6       A.  Yes.
 7       Q.  That's what you mean by accounted for?
 8       A.  Absolutely.
 9       Q.  You're not saying that they did something wrong
10    themselves?
11       A.  No, sir.
12       Q.  Or that the crime was actually related to the
13    existence of the store?
14       A.  Yes, I don't know that.  I just know that it was
15    the 500 foot radius.
16       Q.  Okay.  So for adult book stores, there was no
17    difference between the two time frames on this chart,
18    correct?
19       A.  Correct.
20       Q.  And, in fact, within a 500 foot radius of --
21    what did we decide there were?  Nine adult book stores or
22    10?
23          There are nine adult book stores, correct?
24       A.  Yes, sir.
25       Q.  Over the three year period there were only 11
```

Page 80

```
 1    reported violent crimes within 500 feet of all nine of
 2    those bookstores?
 3       A.  Yes, sir.
 4       Q.  So we're talking about, if you round it up to
 5    12, you're talking about four reported incidents a year,
 6    correct?
 7       A.  Sounds about right, yes, sir.
 8       Q.  And we're talking about all nine of them, not
 9    just four incidents at one particular establishment.
10    This accounts for all nine of the adult book stores, the
11    500 foot radius over that three year period, correct?
12       A.  Correct.  I do not know if one book store
13    accounted for it or they were equally spread out across
14    all of them.
15       Q.  Okay.  But the statement that I made is correct?
16       A.  The statement that you made is correct.
17       Q.  Then we go to nude cabarets, and there you
18    have -- they accounted for nine percent of violent crime
19    offenses.  Let me make sure I understand what you're
20    saying.  What is that nine percent supposed to mean?
21       A.  So taking all of the violent offenses at those
22    locations from 10 p.m. to two a.m., they account for nine
23    percent of that.  Then again for 10 p.m. to two a.m.,
24    taking all those time frames into account, accounted for
25    33 percent of the violent crime offenses.
```

20  (Pages 77 to 80)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 81

1    Q. So again we're talking about a universe of
2 reported incidents of crime, violent crime, that occurred
3 during an eight hour period between 10 p.m. and six a.m.
4 over a three year period within 500 foot radius of these
5 locations?
6    A. That is correct.
7    Q. We're not talking about the entire violent
8 crimes reported for the entire city during that time
9 period?
10   A. No, sir.
11   Q. Nor for any other districts?
12   A. No, sir.
13   Q. And we're not talking about how many crime
14 incidents were reported during the other 16 hours of the
15 day during those three years, correct?
16   A. Not on this slide, no, sir.
17   Q. And we're saying that in 2019 through 2021 there
18 were a total of 66 reports of violent crime within 500
19 feet of the nine -- I think we came up with nine new
20 cabarets, correct?
21   A. Yes, sir.
22   Q. And if you do the math over a three year period,
23 that would mean that there was a report of a violent
24 crime every 16 and a half days during that eight hour
25 period.

Page 82

1    MS. JORDAN: Objection to the form of the
2 question. It assumes facts not in evidence.
3    Q. (BY MR. MURRAY) Correct?
4    A. Yes, sir.
5    Q. And that's every 16 and a half days at one of
6 the nine nude cabarets, correct?
7    MS. JORDAN: Objection. Form of the question.
8 Assumes facts not in evidence.
9    A. Yes, sir.
10   Q. Then we talk about the topless clubs. There we
11 have 15 percent during the 10 to two a.m. and 22 percent
12 two a.m. to six a.m., correct?
13   A. Yes, sir.
14   Q. And again we're talking about a total of 45 over
15 a three year period, correct?
16   A. Yes, sir.
17   Q. That might mean mathematically one incident
18 every 24 days at one of the 10 clubs?
19   MS. JORDAN: Form of question.
20 Mischaracterizes the evidence.
21   A. Yes, sir.
22   Q. (BY MR. MURRAY) Again, we can check the math
23 later on. And if it needs to be corrected, I'm sure
24 you'll correct me. I don't claim to be foolproof on
25 that, believe me. But I think that's what it shows.

Page 83

1    Okay. And the other thing that's interesting is
2 the clubs that were closed actually had an increase from
3 seven to 13 in the number of violent offenses that were
4 reported within 500 feet of those closed locations,
5 correct?
6    MS. JORDAN: Objection. Mischaracterizes the
7 evidence.
8    A. No, sir. In fact, I don't know if they were a
9 business that was operating that had a license, but not
10 functioning as an SOB. That could explain it. I don't
11 know where they come from. The vacant lot versus an open
12 business just has an SOB and not using it. But they're
13 listed as nonoperational, so either way they were not
14 functioning -- they were one of the clubs not functioning
15 as an SOB, but had an SOB license.
16   Q. Right. But going back to the list on the
17 preceding page, there was a description that showed that
18 the first two were closed down. The third was not
19 operating. The fourth was not operating. The fifth was
20 a vacant strip mall. The six was an empty lot, and the
21 seventh was not operating. That's what your list showed,
22 correct?
23   A. Correct.
24   Q. So the only information we have in these
25 documents is that these nonoperational locations had an

Page 84

1 increase in crime from seven to 13 in reported incidents
2 during the two a.m. to six a.m. period, right?
3    A. That's correct.
4    Q. Let's then go to the next one, violent crime
5 arrests. And we see this is violent crime arrests for
6 2019 through 2021, right?
7    A. Yes, sir.
8    Q. And we see that in the case of the nine adult
9 book stores, again, the violent crime arrests within 500
10 foot radius of them went down from five to two, correct,
11 in that period of time?
12   A. Yes, sir.
13   Q. And the numbers were very small to begin with.
14 Five over the course of three years within a 500 foot
15 radius is a pretty small number, wouldn't you agree?
16   A. Yes, sir.
17   Q. And then we have the full nude cabarets. The 10
18 of them had only 11 arrests within 500 feet of their
19 locations for that entire three year period, correct?
20   A. Correct.
21   Q. And then the topless clubs had seven within a
22 500 foot radius of them, violent crime arrests within 500
23 feet of their location, correct?
24   A. Correct.
25   Q. A little over two a year, correct?

21 (Pages 81 to 84)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 85

1    A.  Yes, sir.
2    Q.  And they may have had nothing to do with the
3  operation of the sexually oriented business, correct?
4    A.  May not have, that's correct.
5    Q.  And then the nonoperational ones just went from
6  one to one, correct?
7    A.  Yes, sir.
8    Q.  Okay.  So then -- and, again, I just want to
9  make sure that the record is clear.  The violent crime
10  arrests on that bar graph, what we're analyzing is the
11  fact that during the eight hour period between 10 p.m.
12  and six a.m. of the -- of all of the reported incidents
13  of violent crime that occurred within 500 feet of these
14  respective locations, that being the universe, a certain
15  percentage of those occurred between 10 and two, and the
16  rest occurred between two and six, correct?
17    A.  Correct.
18    Q.  Tells us nothing about what happened the other
19  18 hours of the day, correct?
20    A.  Correct.
21    Q.  And does nothing to compare it with other
22  businesses, correct?
23    A.  Correct.
24    Q.  Or other areas of the city?
25    A.  Correct.

Page 86

1    Q.  Okay.  Then we go to priority one calls which is
2  on the next page, COD-043.  And I think -- why don't you
3  just give us the definition of a priority one call so
4  that the record is clear?
5    A.  Dispatch has a way of prioritizing calls they
6  send off.  So priorities ones, twos, threes, and fours,
7  ones being the greatest called.  They are the typically
8  code three calls.  For instance, a shooting, a cutting, a
9  kidnapping in progress, a burglary in progress, stealing
10  a car.  UUMV will be called in progress.
11      So some sort of felony or violent crime offense
12  that's in progress, that would generate a priority one
13  response.
14    Q.  Okay.
15    A.  Lights and sirens.
16    Q.  Okay.  And again, the same parameters exist.
17  Number one, we're talking about a 500 foot radius
18  surrounding the footprint of the buildings on which
19  sexually oriented businesses are licensed.
20    A.  Correct.
21    Q.  Okay.  And we're talking about the universe of
22  priority calls between 10 p.m. and six a.m.
23    A.  Correct.
24    Q.  We're not accounting for priority one calls the
25  remaining 18 hours of the day?

Page 87

1    A.  That's correct.
2    Q.  And we're not accounting for the fact that there
3  are other businesses within the same 500 foot radius
4  other than sexually oriented businesses, correct?
5    A.  Correct.
6    Q.  And we're not comparing it to any other areas of
7  the city.
8    A.  Correct.
9    Q.  Okay.  So, for example, the adult book stores,
10  there were 56 calls within -- of this kind within 500
11  feet of the 10 -- I'm sorry, the nine adult book stores,
12  correct?
13    A.  Correct.
14    Q.  And for the full nude clubs, there were 60 calls
15  within two a.m. to six a.m. period, correct?
16    A.  Correct.
17    Q.  20 a year for three years, right?
18      MS. JORDAN:  Objection.  Mischaracterizes the
19  evidence.
20    A.  Yes, sir.
21    Q.  Which would be a little over two times a year
22  for each of the nine clubs, the 500 foot radius
23  surrounding the 9 clubs on average.
24    A.  Yes, sir.
25    Q.  Okay.  And then the topless clubs, again they

Page 88

1  had 84 within the 500 foot radius for the three year
2  period, correct?
3    A.  Yes, sir.
4    Q.  And that's for 10 clubs, according to our chart,
5  correct?
6    A.  Correct.
7    Q.  And that would be less than again on average
8  three calls a year of this kind on average for each of
9  the 10 clubs.
10    A.  Correct.
11    Q.  Now, on these -- on these various bar charts
12  starting with what we've just gone over.
13    A.  Yes, sir.
14    Q.  Pages 41, 42, and 43, did you make any effort to
15  calculate how many of the numbers associated with these
16  bar charts these events occurred when the sexually
17  oriented business whose 500 foot radius was at issue was
18  actually open for business between the hours of two a.m.
19  and six a.m.?
20    A.  No, sir.
21    Q.  And you don't know how many of these events
22  occurred when the business in question was actually
23  closed between the hours of two a.m. and six a.m.
24    A.  No, sir.
25    Q.  For all you know, a significant percentage of

214-324-3733
Production@victorycourtreporting.com

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 89

1    these events could have occurred while the businesses
2    were closed, correct?
3        A.  Correct.
4        Q.  Okay.  So then let's go to page 44.  And now we
5    talk about all offenses for the three year period during
6    the eight hour period of 10 p.m. to six a.m., correct?
7        A.  Yes, sir.
8        Q.  Okay.  And the same analysis with the same
9    parameters that we discussed in the preceding pages is
10   what this set of bar graphs displays, correct?
11       A.  Yes, sir.
12       Q.  Okay.  So, for example, when you look at the
13   adult book stores again, there's virtually no change
14   between the two time periods.  51 incidents within the
15   500 foot radius between 10 and two and 52 between ten and
16   two, correct?
17       A.  That's correct.
18       Q.  And then again for the all nude clubs you're
19   talking about 188 reported incidents during that four
20   hour period over the course of three years for the 10
21   topless clubs, correct?  I'm sorry.  Nude clubs.
22       A.  Correct.
23       Q.  And then you're talking about the -- for the
24   topless clubs it's 121 during that three year period,
25   correct?

Page 90

1        A.  Correct.
2        Q.  And that's actually down considerably from the
3    230 that corresponds to the 10 p.m. to two a.m. period,
4    correct?
5        A.  Yes, sir, it is fewer.
6        Q.  And the nonoperational clubs actually went from
7    34 to 38 while they were closed, correct?
8        A.  Well, while they were nonoperational, yes, sir.
9        Q.  Okay.  Then when we go to the next graph, we're
10   talking about all arrests for the three year period.  And
11   again the same parameters.  We're talking about the
12   universe of incidents that occurred between that --
13   during that eight hour period within a 500 foot radius of
14   the locations of the either 28 or I guess 35 potential
15   sexually oriented business locations, correct?
16       A.  Yes, sir.
17       Q.  And again we see with adult book stores it went
18   down during the two a.m. to six a.m. hours, correct?
19       A.  Yes, sir.
20       Q.  From 175 to 155.
21       A.  Yes, sir.
22       Q.  The charts seem to show consistently that
23   there's no -- no significant difference -- negative
24   difference between the 10 p.m. and two a.m. hours and two
25   a.m. and six a.m. for the adult book stores, wouldn't you

Page 91

1    agree with that?
2        A.  For the book stores?  Yes, sir.
3        Q.  Okay.  So then we go to the full nude cabarets.
4    The difference there between 10 p.m. and the two a.m.
5    charts, 274 to 305, correct?
6        A.  Correct.
7        Q.  Okay.  Did you ascertain whether that difference
8    was statistically significant?
9        A.  No, I did not.
10       Q.  Then we see that the topless clubs, the arrests
11   went down from 334 all the way by about 80 or so to 260,
12   correct, during the two a.m. to six a.m. time frame,
13   correct?
14       A.  Correct.
15       Q.  And then the nonoperational entities went from
16   48 up to 52, correct?
17       A.  Correct.
18       Q.  And then on the all calls, these are calls for
19   service, correct?
20       A.  Yes, sir.
21       Q.  And again we're same parameters.  We're talking
22   about the studying the eight hour period, correct?
23       A.  Yes, sir.
24       Q.  We're studying the entire universe of reported
25   calls for service that occurred within the 500 foot

Page 92

1    radius of these locations during that eight hour period.
2        A.  Yes, sir.
3        Q.  And then we're determining what percentage of
4    those or how many of those occurred between 10 and two
5    and how many between two and six, correct?
6        A.  That is correct.
7        Q.  Okay.  That's what this chart shows as well for
8    calls for service, correct?
9        A.  Yes, sir.
10       Q.  All right.  And the book stores, there's very
11   slight difference of 513 to 530, correct?
12       A.  Yes, sir.
13       Q.  At the full nude, it goes from 532 to 585,
14   correct?
15       A.  Yes, sir.
16       Q.  At the topless it goes from 936 to 1135; is that
17   correct?
18       A.  Correct.
19       Q.  You didn't determine whether any of those
20   differences were statistically significant?
21       A.  I did not.
22       Q.  Then the nonoperational clubs finally went down
23   a little bit from 183 to 145, correct?
24       A.  Correct.
25       Q.  Okay.  Now, the next chart shows the breakdown

23 (Pages 89 to 92)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 93

1 in crime victims, correct, for the three year period?
2 A. Correct.
3 Q. Is that for the whole city?
4 A. No. Again, the SOB data just as we've been
5 discussing.
6 Q. Okay. And what about the next -- so the next
7 chart would be the same. You're only talking about the
8 breakdown of victims within the 500 foot radius of the 35
9 locations?
10 A. Yes, sir. Those two charts are identical. Just
11 one's a pie chart, one is a fire chart.
12 Q. Then the next one is all arrestees, all the
13 citizens that were arrested, correct?
14 A. Correct.
15 Q. Again, are we talking only about the 500 foot
16 radius?
17 A. Yes, sir.
18 Q. Not the entire city?
19 A. No, sir.
20 Q. Okay. And I see that -- so 48 percent of the
21 persons who were arrested were black; is that correct?
22 A. Yes, sir.
23 Q. Is that correct. 29 percent were Hispanic or
24 Latino?
25 A. Yes, sir.

Page 94

1 Q. So 77 percent of all the arrestees were either
2 black or Hispanic or Latino?
3 A. Yes, sir.
4 Q. How does that correspond with the rest of the
5 city, do you know?
6 A. No, I don't know since I only compared with the
7 crime victims at SOB related locations. I didn't look at
8 across the city.
9 Q. And then the last chart shows, for example, that
10 during that three year period showed 1,001 of the
11 arrestees were black citizens; is that right?
12 A. Yes, sir.
13 Q. And 594 were Hispanic or Latino; is that
14 correct?
15 A. Correct.
16 Q. And only 467 were white citizens?
17 A. Correct.
18 Q. Okay. Now, this is where it gets a little bit
19 tedious. You'll have to bear with me. I'm going to go
20 as quickly as I can.
21 I want to show you what's been marked as
22 Plaintiff's Exhibit 4. I've got a copy for you.
23 Can I have that back for a moment?
24 A. Yes.
25 Q. Did I give you the original? I think I gave

Page 95

1 Ana the original?
2 MS. JORDAN: Do you want these back?
3 MR. MURRAY: Why don't you just give it to the
4 lieutenant, and I'll give you a different copy.
5 Q. (BY MR. MURRAY) Okay. So my only question
6 about this Plaintiff's Exhibit 4, these documents -- I
7 will tell you they were attached to the City's
8 response -- an early response that they filed that
9 included Plaintiff's Exhibits 2 and 3. But part of
10 Exhibit 2 included these pages.
11 Should they have been there? Do these have
12 anything to do with the case as far as you know?
13 MS. JORDAN: I can tell you that was a mistake.
14 They attached the entire agenda with this particular, and
15 that should not have been attached.
16 MR. MURRAY: So we can ignore --
17 MS. JORDAN: There are some documents within
18 there that are relevant, but they shouldn't have attached
19 the whole agenda.
20 Q. (BY MR. MURRAY) Okay. Why don't you take a
21 look at these documents, lieutenant, and tell me if there
22 are any -- which, if any, of them you think are relevant
23 to the question of whether -- of the passage of this
24 ordinance closing the businesses between the hours of two
25 and six.

Page 96

1 MS. JORDAN: I'm sorry. It doesn't look like
2 anything is wrong there.
3 MR. MURRAY: Okay. Let's move on. I didn't
4 think so, but it was there so I thought I better ask.
5 Q. (BY MR. MURRAY) So now I want to show you what
6 has been marked as Plaintiff's Exhibit 5 and ask you if
7 you can identify that document.
8 A. This would have come out of your office. It
9 looks like the attachments of everything that went
10 into -- that I had sent as part of the response to
11 your -- to this action, but I didn't send it.
12 Q. Okay. It appears to me this is a description of
13 documents that were produced to us that represent the
14 underlying data that went into the presentation that you
15 and I have just been talking about.
16 A. Yes, sir.
17 Q. Okay. So you're familiar with the underlying
18 documents?
19 A. Yes.
20 Q. Okay. Now, one of the -- the first thing,
21 though, that was attached was -- I'm going to show you
22 Plaintiff's Exhibit 6.
23 And can you tell me what, if any, relevance you
24 think this has -- Plaintiff's Exhibit 6 has to the slide
25 show and the presentation that you and I have just been

24 (Pages 93 to 96)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

## Page 97

1    talking about.
2        A.  Yes, sir.  So as you'll see on page -- I guess
3    it's the second page -- third page, I'm sorry.  Under the
4    General Order 70401, Assignment of Elements, those are a
5    list of calls that on the left side would be considered
6    priority one if they're in progress.
7        If you pull over to, then, 70403, next page,
8    emergency calls, you'll see what I'm talking about as far
9    as in progress and all the calls.
10       So every call listed on there if it comes out
11   from dispatch or is dispatched, it comes out as a
12   priority one, code three response call.
13       Q.  Okay.  So this just helps explain to us how to
14   understand priority one.
15       A.  Right.
16       Q.  Thank you.  Then let me show you what's been
17   marked as Plaintiff's Exhibit 7.  I'll ask you to help us
18   understand how that fits into the presentation that you
19   participated in with city council.
20       A.  So this is the dispatch SOP, what we -- how they
21   function in this particular part of the SOP related to
22   calls.  You'll see there, particularly just on the last
23   page, that 502.1, Number 2, Priority calls are dispatched
24   in a higher priority than priority two, and so forth.
25       So that means that if a priority one calls comes

## Page 98

1    in and there's priority twos and threes and fours that
2    were about to be dispatched, that priority one is
3    dispatched ahead of them even though it's been sitting
4    there the least amount of time.
5        So together with the general orders from the
6    Dallas Police Department and, of course, the SOP from
7    dispatch kind of describes the priority call system as we
8    talked about that.
9        Q.  Thank you.  Okay.  Then let me show you next
10   what has been marked as Plaintiff's Exhibit 8.
11       And if you look back at Plaintiff's Exhibit 5,
12   Plaintiff's Exhibit 8 corresponds with what looks like
13   item 3 on Plaintiff's Exhibit 5, which is the data
14   beginning with COD page 10.
15       Hold on to that letter.
16       A.  What did you say?  Plaintiff's Exhibit 3?
17       Q.  If you go to Plaintiff's Exhibit 5, which is the
18   email.
19       A.  Okay.  Got it.
20       Q.  So you'll see that there are 10 items listed in
21   that.
22       A.  Yes, sir.
23       Q.  Okay.  Item number three says, Entertainment raw
24   data redacted to COD 10 through 5287.  Do you see that?
25       A.  Yes, sir.

## Page 99

1        Q.  And Plaintiff's Exhibit 8 you will see is page
2    10 COD.  Do you see the page number on the -- Lieutenant,
3    right here.
4        A.  Okay.  Yes, sir.
5        Q.  So this is the first page of that group of
6    documents, correct?
7        A.  Yes, sir.
8        Q.  Okay.
9        MS. JORDAN:  Just to let him know.  We added the
10   Bates Numbers.  Those are not your Bates numbers.  We put
11   it in a PDF style.
12       THE WITNESS:  Okay.
13       MS. JORDAN:  And added a format and added the
14   Bates Numbers so we could keep track of it.
15       THE WITNESS:  Okay.
16       Q.  (BY MR. MURRAY)  So I just want to have an
17   opportunity to understand some of these documents that
18   were provided.  I'm not going to go through -- what have
19   we got 7,500 pages?
20       MR. ALBRIGHT:  And 66.
21       Q.  (BY MR. MURRAY)  But I do want to understand at
22   least the general parameters of these documents.
23       So looking at Plaintiff's Exhibit 8, can you
24   tell me what it is?
25       A.  Yes.  What it does is indicate that the location

## Page 100

1    is the entertainment district locations are what follow
2    as far as calls.
3        Q.  So these are calls --
4        A.  Let me see.  Daily arrests and offenses,
5    charges.
6        So this is -- appears to be it's called missed
7    calls that are attached here.
8        Q.  Yes, because it consists of -- the total thing
9    consists of 5,277 pages.
10       But this is the underlying data that you used,
11   correct?
12       A.  Yes, sir.
13       Q.  And you would have spit this information out at
14   some point, correct?
15       A.  Yes, sir.
16       Q.  Okay.  And so is this data involving calls for
17   service?  What exactly does this set of data consist of?
18       A.  This data is calls for service.
19       Q.  Okay.  And it calls for service.  Now, the
20   first page lists these locations.  What does that mean?
21       Lower Greenville, Uptown --
22       A.  That's the name -- I'm sorry.  I didn't mean to
23   interrupt.
24       Q.  Go ahead.
25       A.  That's the name of the five entertainment

25  (Pages 97 to 100)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 101

1  districts that we pulled that you have in your maps.  So
2  Lower Greenville, Uptown, Deep Ellum, Bishop Arts, and
3  Trinity Grove are the names of five independent districts
4  thought the city.
5        Q.  I see.  Then go to the next page, page Bates
6  stamped number 11.  And there's a whole list of columns.
7  Do you see that?
8        A.  Yes, sir.
9        Q.  Okay.  So the first column is A, and it says
10  area.  So it's the area.  I think I understand that.
11        Master Incident Number.  What would that be?  A
12  call for service number.
13        A.  Whenever -- it could be, yes.  So any time
14  there's a police incident generated, whether the police
15  do a traffic stop or if they are flagged down by a
16  citizen.  Anytime they get on a radio and say, I'm out on
17  something, or they're dispatched on a call that generates
18  an incident number.  So that incident number shows you
19  that the police were officially at or sent to a location.
20        Q.  And then the response date is just that, the
21  date they responded, correct?
22        A.  Yes, sir.
23        Q.  The response time, that seems -- what does that
24  mean?  Because there's a lot of zeros.
25        A.  No, I just don't think that come across in this

Page 102

1  form.  So the cells, when you click in them, you get this
2  full-time 100 hour clock.  I'm not sure why it came out
3  that way.
4        Q.  Okay.  So that doesn't really matter to our
5  analysis, is that what you're saying, at this juncture?
6        A.  No, sir.
7        Q.  But then it says time group, 10 p.m. to two a.m.
8  So we pretty much know what that means, correct?
9        A.  Yes, sir.  You're using the time stamp and the
10  response date that has the full date and time.  I pulled
11  out the individual time groups.
12        Q.  Okay.  And then the watch and the number one is
13  in this column.  What is the watch?
14        A.  Watches refer to time shifts or shifts that an
15  officer works.  So one would be the late night shift,
16  generally 11 to 12 to seven to eight.  They have two
17  shift, 11 to seven, 12 to eight.  This is fair watch.
18  Second is day time.  And three is third watch which is
19  evening, three to elevenish.
20        Q.  Then G is the problem, and that's just a short
21  description of what the call for service was about?
22        A.  Right.
23        Q.  The priority number is what you and I talked
24  about a moment ago?
25        A.  Yes, sir.

Page 103

1        Q.  This one happened to be a priority three, the
2  first one on the list, correct?
3        A.  Yes, sir.
4        Q.  And then the priority description is just more
5  information about the call?
6        A.  Well, that's how they're listed.  Ones are
7  emergencies, two urgent, four noncritical.  It's telling
8  you what the -- it's a useless call, but it tells you
9  what it means by one, two, three, or four.
10        Q.  Okay.  Then the location name.  Why are some of
11  those blank?  Just because it doesn't have a name --
12        A.  Right, it may have had no location or the person
13  was driving when they called so they didn't know where
14  they were at at the time.
15        Q.  And then what's -- and then the address is the
16  address for the call for service?
17        A.  Wherever it came out or they found the person or
18  that the dispatcher 911 operator finally decided that's
19  the address where they're calling from or to.
20        Q.  And then RA, what does that mean?
21        A.  That's a Reporting Area.  City's divided up into
22  smaller segments than beats called Reporting Areas.
23        Q.  And then the division is just which division of
24  the police department?
25        A.  Central.  Yes, that's one of the seven

Page 104

1  divisions.
2        Q.  And the sector is what?
3        A.  The sector, in each division there's four to
4  five sectors, and then each sector has five to seven
5  beats.  So it's just the smaller division sector beat.
6  That's how that column looks.
7        Q.  Okay.  So that goes on, as you can see, for
8  5,000 -- over 5,000 pages.
9        So that would be the calls for service for the
10  entertainment districts, correct?
11        A.  Yes, sir.
12        Q.  But I thought that you said when you did the
13  comparison, you were comparing incidents, not calls for
14  service between the 500 foot radius of the surrounding
15  sexually oriented businesses and the entertainment
16  districts.
17        A.  I didn't compare incidents.  I compared offenses
18  or arrests or calls.  So while each one of those will
19  generate an incident number, there's always going to be
20  an incident number attached.  I didn't look at incident
21  numbers across those.
22        Q.  Okay.  Let's go back to Plaintiff's Exhibit 2
23  and go to page 24.
24        A.  Okay.
25        Q.  And that was the comparison for violent crimes

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 105

1   by time period between the entertainment districts and
2   the 500 foot radius of sexually oriented businesses?
3       A.  Right.
4       Q.  So those aren't calls for service.  Those are
5   actual --
6       A.  Violent offenses reports, yes.
7       Q.  Okay.  So the 5,000 pages that are represented
8   by item number three are not going to give us the
9   information that goes on that chart, is it?
10      A.  No.
11      Q.  Because those were -- okay.  So what was the
12  relevance of the calls for service -- the 5,000 pages of
13  the calls for service for the entertainment districts?
14      A.  To compare calls of service.  And there's time
15  frames in the entertainment districts compared to the SOB
16  locations.
17      Q.  I see.  Okay.  That was page 30.  I got you,
18  okay, of Exhibit 2, correct?
19      A.  Well, 30 for the entertainment district.
20      Q.  Okay.  So that's what those 5,000 plus pages
21  represented.
22          So then number four would be -- it's called SOB
23  Crime, 500, raw data redacted.  And it's a smaller number
24  of pages.  So let's take a look at it Exhibit No. 9.
25          MS. JORDAN:  You gave me 9.

Page 106

1       MR. MURRAY:  I gave you 9.  Okay.
2       Q.  Okay.  So Plaintiff's Exhibit 9 begins with
3   Bates stamped number 005288.  Do you see that?
4       A.  Yes, sir.
5       Q.  Okay.  And that happens to be the first page of
6   the category four on Plaintiff's Exhibit 5 which is
7   called SOB Crime, 500, raw data.
8           So can you tell me what document Plaintiff's
9   Exhibit 9 is supposed to contain?
10      A.  It's just the offenses -- yes, offenses.
11  Crimes, offenses.  So this would have been used for
12  comparison in the offenses.
13      Q.  What comparison?
14      A.  The entertainment districts.  I'm sorry.  I
15  thought you handed me the another entertainment district.
16          No, this is the list of offenses that I had for
17  the way I pulled out violent crimes, property crimes, so
18  forth.  So this would have been what the data field
19  originally looked like when I got it.
20      Q.  Could you go to the first page of Plaintiff's
21  Exhibit 9?
22      A.  Um-hum.
23      Q.  So tell me what this chart is on the first page.
24      A.  What this is is a poorly printed out version of
25  the pivot table.  So when the crime analyst sent me the

Page 107

1   data I asked for, they included pivot tables.  However,
2   they have these filtered somehow that doesn't come
3   across.
4           I didn't look at the pivot tables.  I simply
5   took the raw data and dumped it into a statistical
6   package.  So this was just part of the entire
7   spreadsheet.
8       Q.  But I notice that on this first page the
9   severance is to the NIBRS system rather than the UCR?
10      A.  That's correct.
11      Q.  But I thought you said you used UCR because it
12  was easier to use for the analysis that you did?
13      A.  I did.  I used the UCR codes or the definitions
14  for violent crimes or property crimes.  I did.
15      Q.  Okay.  Well, is this -- if you go to the third
16  page -- let me ask it this way.  Why is this referring to
17  NIBRS on the first page?
18      A.  Because that's our system, our NIBRS system.  So
19  when he pulls it, he would go in and look for NIBRS
20  offenses.  So with NIBRS offenses, again as I explained
21  the differences, is you could have -- we'll go back again
22  to the number.  One incident, same victim, but the victim
23  could have two or three offenses or crimes that happened
24  to that one person.  The old UCR system didn't
25  necessarily pick up those numbers.  This NIBRS system

Page 108

1   does.
2           Now, the reports are kind of the same.  B&B is a
3   B&B.  A robbery is a robbery.  It's just you might have
4   multiple offenses on one number when that occurs.
5       Q.  Right.  But I thought you said for that reason
6   you asked the testimony to spit out the UCR data rather
7   than the NIBRS data.
8       A.  No, sir.  I just the UCR definitions for
9   aggravated assault, robbery, and so forth.
10      Q.  And plugged them into the NIBRS system or use
11  the NIBRS system --
12      A.  I used the definitions to pull these offenses
13  out.
14      Q.  But since NIBRS could take a single incident and
15  turn it into five offenses, when you were giving us the
16  numbers on, for example, aggravated assaults, was that
17  the UCR, one incident means one event, or was that the
18  NIBRS where one incident could mean five crimes?
19      A.  So when I pulled the data originally -- and I
20  believe this is what I have here is what I use -- I
21  pulled out duplicates.  So you just highlight the field
22  for it, say, Numbers remove duplicates.  And you'll get
23  the highest offense that occurred.
24          For instance, if I commit an offense against
25  you, and I have three or four crimes.  So I've robbed

c98b7865-e3b8-4838-b631-8803c5a20639

Page 109

1  you, and then did two other things. Maybe damaged your
2  car, stole your car.
3      Q.  Please don't that that.
4      A.  So you're the victim, and all three of those
5  crimes would show up.  When I run that, I would have
6  three crimes at that one location.
7          So to kind of limit that as best I could, I just
8  removed duplicates.  So if an incident number showed up
9  more than once, I removed it.
10     Q.  Okay.  So in the end you used the UCR version by
11 that method?
12     A.  Yes, sir.
13     Q.  Okay.  So the first two pages of this
14 Plaintiff's Exhibit 9 is really not something that you
15 used, is that what you're telling me?
16     A.  The first two -- right.  No, I didn't use any of
17 those pivot tables.
18     Q.  Okay.  What about the third page?  What is that?
19 I think you're too far in.
20         What is that page?
21     A.  It looks an extension of their pivot tables.
22     Q.  Okay.  So we can ignore that for our purposes
23 and focus -- start with the next page?
24     A.  Yes, sir.
25     Q.  Because that's the data that you used beginning

Page 110

1  on page 5291?
2      A.  Yes, sir.
3      Q.  Okay.  And are these -- so these are incidents,
4  not calls for service, correct?
5      A.  Correct.
6      Q.  Okay.  Okay.  So let's go through the
7  categories.  I'm not going to ask you to go through the
8  content, but it begins under A with "Objected."  What
9  does that mean?
10     A.  No idea.  It's some way they object ID.
11     Q.  Next is incident number.  It's the same as what
12 you told me before?
13     A.  No.  This is knowing the difference the system
14 doesn't often pull up.  These are actually case numbers.
15 So you have an incident generated when the police show up
16 or do something.  Then you have a case number if they
17 have an actual offense that they report through our NIBRS
18 system.
19         Again, the case number, you could have two or
20 three case numbers for one victim under one incident.
21 That's what I would look for.
22     Q.  Okay.  Data source is RNS NIBRS?
23     A.  Yes, sir.
24     Q.  Okay.  Then we have the year.  What's the
25 service number ID mean?

Page 111

1      A.  It's just a way of IDing -- I don't know.
2      Q.  Okay.  The watch you talked about.  What about
3  signal?
4      A.  Signal is the call that it originally come out
5  are that the officer generated themselves.  For instance,
6  you have a five eight called routine investigations.
7  Those are almost always police officers getting flagged
8  down by citizens on the street versus a 32, a suspicious
9  person.  55 is traffic stop.  Again, these officers, if
10 they're flagged down by an individual that says, I was
11 robbed, that 58 would become a Signal 20, robbery.
12     Q.  So are these the incidents that occurred within
13 the 500 foot radius of the locations of the sexually
14 oriented businesses?
15     A.  Yes, sir.
16     Q.  Okay.  That you used for the bar charts that we
17 talked about?
18     A.  Yes, sir.
19     Q.  And then you've got the officer incident under H
20 or offense incident, just describes what it was?
21     A.  Yes, sir.
22     Q.  The premises is the next place.
23     A.  Yes, sir.
24     Q.  Things like parking, business, nightclub,
25 highway, that kind of thing?

Page 112

1      A.  Yes, sir.
2      Q.  Now, the object attack, what does that mean?
3      A.  I don't know.  When I've used it in doing
4  reports, it is a drop down screen.  It's not required.
5  But if you -- if it was, say, a BMV, the object of the
6  attract would have been the vehicle.  It's really a
7  useless piece of information.
8      Q.  And then there's an address?
9      A.  Yes, sir.
10     Q.  And an apartment number?
11     A.  Yes, sir.
12     Q.  Why is there an apartment number there when this
13 occurred at a hotel?
14     A.  So there's two separate ways that could occur.
15 First, if this hotel, motel, or area was within a 500
16 foot radius of a club; secondly, it could be the
17 individual called police at that location in that
18 apartment, says, I was robbed, but I was robbed at
19 another -- at an SOB location or vice versa.  Even if
20 they called from the SOB location, says, I was attacked
21 at that, it may come up in the data.
22     Q.  Just for an example, this one is a robbery of
23 an individual, according to H, correct?
24     A.  Yes, sir.
25     Q.  And the premise, it says that a hotel/motel,

c98b7865-e3b8-4838-b631-8803c5a20639

Page 113

1 correct?
2 A. Yes, sir.
3 Q. So wouldn't that suggest that the -- that the
4 individual was robbed at his hotel?
5 A. No. That's where they reported it.
6 Q. That's where who reported it?
7 A. The person who reported the robbery.
8 Q. Well, then, what is the address? 1625 Regal
9 Row. Is that the address of the hotel?
10 A. Yes, sir.
11 Q. Well, the hotel wouldn't have an apartment
12 number, and that's the next category.
13 A. It would, but it has a room number.
14 Q. Okay. So that's the room number, not an
15 apartment number when you're talking about a hotel?
16 A. Correct. That could be either/or.
17 Q. This is an item that gets picked up and is
18 assigned as within 500 foot radius of one of the adult
19 establishments, right?
20 A. Yes. The addresses are picked up through their
21 GIS system. They use XY coordinates for that and then
22 whatever address comes out. I'm not an expert anywhere
23 near what I need to be for GIS to explain it. They use
24 XY coordinates. They take the bar location and 500 feet,
25 and whatever's in that XY coordinate that comes up as far

Page 114

1 as calls, offenses, and arrests. That's what would come
2 out.
3 Q. But there's nothing in this page or this
4 document for that offense that would give any indication
5 that the existence of a sexually oriented business had
6 something to do with that crime, is there?
7 A. Right. You can't tell if it absolutely is
8 because of the establishment or not.
9 Q. Okay. If you go to the next page, again much of
10 this is self-explanatory. There is a CFS, call for
11 service number under column A1. So even though this was
12 generated by NIBRS, it might have originated as a call
13 for service, correct?
14 A. Absolutely.
15 Q. And then if you go to the next page, there's
16 information about the victim, correct?
17 A. Correct.
18 Q. Okay. So the bottom line is that the data that
19 is represented by beginning on Bates stamp 5288 and going
20 all the way through 5602 would have been the crime
21 incidents that you pulled that were within 500 foot
22 radius of the locations of licensed sexually oriented
23 businesses.
24 A. Yes, sir.
25 Q. Okay. Let's take a look at the next Exhibit No.

Page 115

1 10. Plaintiffs Exhibit 10.
2 So Plaintiff's Exhibit 10 you will see begins
3 with Bates stamp number 5603, correct?
4 A. Yes, sir.
5 Q. And that corresponds on Plaintiff's Exhibit 5 to
6 category 5, arrest charge 500, law data redacted to COD
7 5603 through 5964.
8 A. Yes, sir.
9 Q. And those would be the 1682 arrests that you
10 previously explained you collected because they occurred
11 within 500 feet of the sexually oriented business
12 locations?
13 A. Yes, sir.
14 Q. What is page one -- what does the first page of
15 Plaintiff's Exhibit 10 tell us?
16 A. Again, so these are partially partial pieces of
17 the pivot table, the first three pages. So 5603 to 5605
18 are things I didn't look at or consider because it was
19 just a break down that I was going to do.
20 Q. But it does break down the 2082 arrests, right?
21 A. If that's the way they had the filtered. When
22 they sent it to me, they had filters that stuck that I
23 didn't change or bother with. I didn't look at the
24 numbers and know if it came out the same or not on these
25 pivot tables.

Page 116

1 Q. For example, on this first page it shows 148 of
2 the 2,082 involved social services referral. Do you see
3 that on line five?
4 A. Yes, sir.
5 Q. What would that be?
6 A. Somebody that has a mental problem that needs to
7 go to the hospital.
8 Q. Okay. And what would that have to do with a
9 sexually oriented business?
10 A. That depends on what the A Pal was for. So we
11 have a pretty broad policy on A Pals. Somebody who's
12 overdosed doing drugs, and they call it as an A Pal.
13 Officers will take them there instead of detox for
14 whatever reason. I'm not entirely sure, but that's the
15 way it went. Whatever call was out there, that was the
16 decision the officers made based on what they found when
17 they got there.
18 Q. For example, there's Assault Family Offense with
19 Contact, 10 of those. I thought you said you excluded
20 those in your analysis of aggravated assaults.
21 A. I didn't use the pivot tables. I have no idea
22 what he did or how he fielded them.
23 Q. Right, but he came up with the same number that
24 you did, which was 2,082.
25 A. Yes, on that page he may have. Honestly, sir, I

29 (Pages 113 to 116)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 117

1  didn't even consider it.
2     Q. Well, then, how do you know that your 2,082
3  doesn't include the aggravated assaults involving family
4  members?
5     A. I don't. I just said aggravated assaults. I
6  would have pulled all aggravated assaults.
7     Q. Then maybe I misunderstood you. It could be my
8  mistake. For some reason I thought you said when you
9  analyzed the aggravated assaults, you excluded domestic
10  type family assaults.
11     A. No, sir.
12     Q. You included those?
13     A. I included all aggravated assaults, yes, sir.
14     Q. My mistake. I take that back.
15     You also would have included warrants. People
16  arrested because they had an outstanding warrant?
17     A. So if I looked at violent arrests I would have
18  pulled out warrants for violent offenses only.
19     Q. Sure.
20     A. So, yes. If I looked at all the rest, that
21  includes every warrant and every kind of arrest.
22     Q. I got that, but within the 2,082 there seems to
23  be a fairly sizeable number of what are called warrants,
24  which I assume means that somebody got stopped, they
25  checked and realized that there was a warrant on

Page 118

1  somebody.
2     A. No. So warrant arrests can take place at the
3  scene and time of the arrest. I'll describe that as it's
4  probably easiest can homicides. Almost every homicide
5  arrest when you see it on a document like this, it shows
6  a warrant for murder. That's because when they go and
7  talk to the investigator, the investigators will actually
8  walk a warrant on somebody when they put them in jail.
9  So they just put them in for the warrant, although that
10  offense happened that night. Robberies occur like that
11  sometimes. If the investigator have to talk to several
12  people, talk to the witness, talk to complainants, they
13  find the suspect. They have him detained. They walk a
14  warrant on him and put him in jail for the warrant for
15  the robbery or the offense that just occurred.
16     So it's kind of a misnomer or
17  mischaracterization of a warrant that you would normally
18  stop somebody and say, you know, You've been wanted for
19  this arrest in Frisco for two years, so we're going to
20  put you in jail. It's all kinds of warrants.
21     Q. Take a look at page 5605.
22     A. Yes, sir.
23     Q. Category number 137 says there were 65 arrests
24  for warrant, Dallas PD, alias capias?
25     A. Yes.

Page 119

1     Q. That would not have been -- that would have been
2  somebody got arrested for something that had occurred
3  prior to that?
4     A. Yes, that's exactly what you originally
5  described. Getting stopped on a stop and finding out you
6  have traffic tickets that are warrants.
7     Q. So right there 65 of the arrests that occurred
8  within 500 feet of a sexually oriented business were for
9  something that happened not that night?
10     A. Not that night other than the traffic stop or
11  reason for it in itself.
12     Q. Then there's another. If you go down to line
13  number 153, Warrant Hold. Not a DPD warrant. That means
14  somebody was picked up because there was a warrant from
15  another jurisdiction, right?
16     A. Correct.
17     Q. That's 242 of the arrests that occurred within
18  500 feet of the sexually oriented businesses, correct?
19     A. Correct.
20     Q. So that would have not had anything to do with
21  something that happened that night other than a traffic
22  stop.
23     MS. JORDAN: Objection. Mischaracterizes
24  testimony and the evidence.
25     Q. (BY MR. MURRAY) Correct?

Page 120

1     A. Well, yes, sir, other than attracting people,
2  242.
3     Q. And 154, a warrant hold outside agency. That's
4  another 168, correct?
5     A. Correct.
6     Q. And then 155, another 81 of these were a warrant
7  for Dallas PD to use for an alias, correct?
8     A. Correct.
9     Q. Okay. So then if you go to the next page. And
10  this is the spreadsheet that gives the information about
11  each one of these 2,082 arrests, correct?
12     A. Yes, sir.
13     Q. I'm not going to go through all of this. Most
14  of it, it looks like it's pretty easy to understand.
15     Go to page 42, for example, 5642 if you can find
16  that.
17     A. (Witness complies.)
18     Q. So this one under category -- under the list of
19  AX, that gives a description of the crime category that
20  is involved in that particular arrest?
21     A. Yes, sir.
22     Q. Okay. All right. So those are the 2,082
23  arrests that we talked about that ended up in the bar
24  chart of Plaintiff's Exhibit 2, correct?
25     A. Yes, sir.

30 (Pages 117 to 120)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 121

1    Q.  Now let's go to Plaintiff's Exhibit 11.  There
2  you go, sir.
3       Okay.  So Plaintiff's Exhibit 11, unfortunately
4  I see the page numbers at the bottom aren't the greatest.
5  But this should correspond with category six, SOB calls
6  500 pages, 5965 to 7413.  Do you see that?
7    A.  Yes, sir.
8    Q.  And can you identify what Plaintiff's Exhibit 11
9  is then?
10   A.  Calls for service.
11   Q.  Okay.  And so this is the document, and then it
12 goes on for a number of pages -- I've only given you the
13 first few -- that served as the basis for analyzing the
14 calls for service that occurred during the three year
15 period within 500 feet radius of the sexually oriented
16 businesses that you were studying, correct?
17   A.  Correct.
18   Q.  And then there's information that -- about the
19 various adult businesses, for example?
20   A.  Yes, sir.
21   Q.  Although this actually goes back to 2018.
22   A.  I removed that in my analysis.
23   Q.  Okay.  And so that's the information that -- and
24 all of that is the underlying information -- all of these
25 documents, I should say that we brought over that are

Page 122

1  represented Plaintiff's Exhibit 5, represent the data
2  that you relied upon to help prepare for the presentation
3  that was presented, correct?
4    A.  Yes, sir.
5    Q.  And then let's go to Plaintiff's Exhibit 12.
6  And Plaintiff's Exhibit 12 begins with Bates stamp number
7  007414, and that corresponds with category number seven,
8  which is SOB DFR.  That must be the fire department?
9    A.  Dallas Fire and Rescue, yes, sir.
10   Q.  Okay.  So this is the information that the fire
11 department provided to you?
12   A.  Yes, sir.
13   Q.  And you weren't able to -- as I recall, you're
14 not able to say whether these calls were for service were
15 actually all at the sexually oriented business's
16 locations or just within the 500 foot radius, correct?
17   A.  That is correct.  So the first set of data that
18 were the part of the first set of slides was the PDF form
19 I was telling you about.  I got this, I believe, by the
20 last presentation to the full city council is when I got
21 this spreadsheet.
22      Right.  So I just don't recall if they did this
23 with the 500 foot radius or not.  I don't recall, but I
24 don't believe so.
25   Q.  So are you telling us --

Page 123

1    A.  Yes, I believe if it has a club -- this was all
2  pulled as part of their -- they pulled SOB dance hall
3  data for us.
4    Q.  So this includes data from nonadult nightclubs
5  that are dance halls?
6    A.  This data set does, yes.
7    Q.  Well, did your chart which had calls for service
8  for the fire department include dance halls?
9    A.  The first chart we went over, that didn't
10 include this data set at all.  That included what they
11 sent me on a separate form.
12   Q.  And that did not include dance halls?
13   A.  No.
14   Q.  Meaning correct, it did not?
15   A.  It did not.  Sorry.
16   Q.  Okay.  So you didn't really use this one,
17 Plaintiff's Exhibit 12.
18   A.  No, I don't believe I did yet.
19   Q.  Did you use any information that Major Devon
20 Palk provided to you for your analysis?
21   A.  No.  So the only information that we've gone
22 over that came from them were what they considered a
23 license type, all nude topless, that the chief went over.
24 Okay.  So I had to know that from them.  But other than
25 that, what Devon Palk -- the reason I'm involved with

Page 124

1  this in the first place is because he came to me and
2  asked me to get involved in looking at the numbers and
3  see if there was anything that I saw or any information
4  that I could provide them.  That's where all this came
5  out at.
6       No, he didn't specifically give me anything.
7  Once they told me what they wanted to do, look at crime
8  around SOBs and those locations and seeing if there was
9  any difference towards times of day.  I just went from
10 there.
11   Q.  Who decided to use the 500 foot radius?
12   A.  I don't recall.  That was above me.  That was
13 either a chief level, one of the chiefs, or Major Palk.
14 I don't recall.
15   Q.  So I don't think I quite understood.  What did
16 Major Palk provide?  The list, I think you said?
17   A.  Yeah, this sheet here.  So when they were
18 interested -- I believe this was in response to a
19 question from the city council.  They registered in the
20 license types.
21   Q.  Yes.
22   A.  I didn't know which was full nude, which was
23 topless.  I wouldn't know unless I went all the time.
24 I'm past that.
25   Q.  I see.  Do you know -- do you have any

31 (Pages 121 to 124)

c98b7865-e3b8-4838-b631-8803c5a20639

Victory Court Reporting, Inc.

Page 125

1  understanding as to why a 500 foot radius as opposed to
2  some other measurement was selected?
3      A.  Not unless whoever it came from came from the
4  research.  As you look back through research, that's a
5  pretty common radius in studies, either a thousand foot
6  or 500 feet.  I know me and Major Palk had discussion on
7  the appropriateness of those two.  Where that decision
8  came from, I don't know.
9      So the discussion would have been we wanted
10  enough to capture what we would consider related, but not
11  so far that it captures a wide net over entire areas that
12  would have very little to do with it.  And, of course,
13  then, looking back through the research in retrospect,
14  those two happen to be the numbers that come out a good
15  bit.
16      MR. MURRAY:  Okay.  Give me a couple minutes
17  with my colleagues, and we should be winding down here.
18      (A break was held.)
19      MR. MURRAY:  Thank you very much.  I appreciate
20  all your time.  That's all I have for now.
21      (Off the record)
22      MR. MURRAY:  The question was at the end of
23  every deposition whether the witness wants to read or
24  waive the right to read the deposition.  The Lieutenant
25  is saying that he would prefer to read.

Page 126

1  (Proceedings concluded at 2:01 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1      CHANGES AND SIGNATURE
2  WITNESS NAME:  STEPHEN ARTHUR BISHOPP
3  DATE:  FEBRUARY 23, 2022
4  PAGE LINE    CHANGE        REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 128

1  _____
2      I, STEPHEN ARTHUR BISHOPP, have read the
   forwarding deposition and hereby affix my signature that
3  same is true and correct, except as noted above.
4
5
6      _____
        STEPHEN ARTHUR BISHOPP
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10
11      Before me, _____, on this day
12  personally appeared _____,
13  known to me (or proved to me under oath or through
14  _____) (description of identity
15  card or other document) to be the person whose name is
16  subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
18  consideration therein expressed.
19      Given under my hand and seal of office this
20  _____ day of _____, _____.
21
22
23      _____
        NOTARY PUBLIC IN AND FOR
24      THE STATE OF _____
        COMMISSION EXPIRES:_____
25

32 (Pages 125 to 128)

c98b7865-e3b8-4838-b631-8803c5a20639

Page 129

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
 2              DALLAS CIVISION
 3   ASSOCIATION OF CLUB   )
     EXECUTIVES OF DALLAS, )
 4   ET AL,             )
            Plaintiff, )
 5                      )
     VS              ) CIVIL ACTION NO. 3:22-CV-00177-M
 6                      )
     CITY OF DALLAS,     )
 7                      )
                        )
 8         Defendant.  )
 9
10
11        REPORTER'S CERTIFICATION
       DEPOSITION OF STEPHEN ARTHUR BISHOPP
12           FEBRUARY 23, 2022
13
14       I, Janet E. Wright, Certified Shorthand Reporter in
15   and for the State of Texas, hereby certify to the
16   following:
17       That the witness, STEPHEN ARTHUR BISHOPP, was duly
18   sworn by the officer and that the transcript of the oral
19   deposition is a true record of the testimony given by
20   the witness;
21       That the deposition transcript was submitted on
22   _____ to the witness or to the attorney for
23   the witness for examination, signature and return to me
24   by _____;
25       That the amount of time used by each party at the
```

Page 130

```
 1   deposition is as follows:
 2       MR. MURRAY - 03 HOUR:55 MINUTE(S)
 3       That pursuant to information given to the
 4   deposition officer at the time said testimony was taken,
 5   the following includes counsel for all parties of
 6   record:
 7       MS. ANN MARIE JORDAN, Attorney for Plaintiff
        MR. J. MICHAEL MURRAY, Attorney for Defendant
 8       MR. ROGER ALBRIGHT, Attorney for Defendant
 9       I further certify that I am neither counsel for,
10   related to, nor employed by any of the parties or
11   attorneys in the action in which this proceeding was
12   taken, and further that I am not financially or otherwise
13   interested in the outcome of the action.
14       Further certification requirements pursuant to Rule
15   203 of TRCP will be certified to after they have
16   occurred.
17       Certified to by me this ____ day of _____, _____.
18
19              /s/ Janet E. Wright
20   _____
     Janet E. Wright, Texas CSR 1532
21   Expiration Date:    7/31/22
     VICTORY COURT REPORTING, INC.
22   Firm Registration No. CFR-11074
     6510 Abrams Road
23   Suite 215
     Dallas, Texas 75231
24   (214) 324-3733 * Telephone
     (214) 432-5415 * Facsimile
25   1-(888) 848-8845 * Toll Free
```

Page 131

```
 1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2       The original deposition was/was not returned to the
 3   deposition officer on _____;
 4       If returned, the attached Changes and Signature
 5   page contains any changes and the reasons therefor;
 6       If returned, the original deposition was delivered
 7   to _____, Custodial Attorney;
 8       That $_____ is the deposition officer's
 9   charges to the Plaintiff for preparing the original
10   deposition transcript and any copies of exhibits;
11       That the deposition was delivered in accordance
12   with Rule 203.3, and that a copy of this certificate was
13   served on all parties shown herein on and filed with the
14   Clerk.
15       Certified to by me this ____ day of _____, 20__.
16
17              /s/ Janet E. Wright
     _____
18   Janet E. Wright, Texas CSR 1532
     Expiration Date:    7/31/22
19   VICTORY COURT REPORTING, INC.
     Firm Registration No. CFR-11074
20   6510 Abrams Road
     Suite 215
21   Dallas, Texas 75231
     (214) 324-3733 * Telephone
22   (214) 432-5415 * Facsimile
     1-(888) 848-8845 * Toll Free
23
24
25
```

33 (Pages 129 to 131)

c98b7865-e3b8-4838-b631-8803c5a20639

**A**

**a.m** 1:19 12:17
12:17 15:2,7
19:13,18,18
20:17,19 21:7
21:7,20,20,23
31:11,19,24
32:2 35:22,24
36:7,9,10,14
36:14 37:3,3
37:20,20 38:7
38:7 39:14,14
39:21,22,23
40:5,14 46:2,2
46:3,7,7,8,14
46:15,15 47:4
47:5,5,11,12
48:4,5,5,7,10
48:16,18,19,19
48:20,20 50:7
50:8,8,25 51:8
51:8,18,18
53:2,6,6,11,12
53:12,18,18,22
53:22 54:8,13
54:13 56:2,3,4
56:5,5 61:11
61:20,20 63:1
63:6,7,8,8,20
63:20,23,23,23
63:25 64:7,9
64:10,16,17,17
64:25 65:1,1,5
65:6,9 66:1,2,2
66:4,5,14,14
67:2,3,3,6,6
68:5,6,6,10,11
68:25 69:3,3
69:19,19 71:11
71:13,13,17,23
71:23 73:12,12
74:1,1,9,9,23
75:1,2 76:2
78:21,22 80:22
80:23 81:3

82:11,12,12
84:2,2 85:12
86:22 87:15,15
88:18,19,23,23
89:6 90:3,18
90:18,24,25,25
91:4,12,12
102:7
**A1** 114:11
**able** 12:3 49:13
122:13,14
**above-styled**
1:18
**Abrams** 130:22
131:20
**absolutely** 5:17
20:7 29:1 79:8
114:7,14
**academics** 56:17
73:1
**accept** 67:9,10
**access** 75:20
**account** 78:8
80:22,24
**accounted** 19:13
19:19 78:19
79:1,7 80:13
80:18,24
**accounting**
86:24 87:2
**accounts** 80:10
**accuracy** 29:3,8
29:12
**accurately** 11:22
**ACE** 4:12
**acknowledged**
128:16
**action** 1:5 96:11
129:5 130:11
130:13
**Activation** 4:9
**active** 26:5,8
33:9
**Activity** 34:9
37:12 45:6

**actual** 19:25
31:14 35:6,7
105:5 110:17
**add** 33:6 47:6
53:14,15 67:5
**added** 67:8 99:9
99:13,13
**addition** 60:25
**additional** 32:22
70:13,14 71:7
**address** 5:6
11:10 35:6,7
76:25 103:15
103:16,19
112:8 113:8,9
113:22
**addresses** 35:8
113:20
**administrative**
6:12,14
**adopted** 12:15
**adult** 13:9,9,10
13:10,17 14:1
27:1,4 28:5
30:1,17 32:8
41:2 58:15,15
79:5,16,21,23
80:10 84:8
87:9,11 89:13
90:17,25
113:18 121:19
**advanced** 10:13
**affiliation** 73:4
**affix** 128:2
**agency** 120:3
**agenda** 95:14,19
**aggravated** 17:2
17:6 18:22,23
19:2,6,9,21
20:6,9,17,22
21:5,19,23
22:7,11 32:8
35:16 37:16
108:9,16
116:20 117:3,5

117:6,9,13
**ago** 73:2 102:24
**agree** 68:3,4,12
84:15 91:1
**agreement** 5:15
5:18,23
**ahead** 44:23
98:3 100:24
**al** 1:4 69:15
129:4
**ALBRIGHT**
2:12 33:9
99:20 130:8
**Alcohol** 10:1
**Alex** 8:21
**alias** 118:24
120:7
**allows** 14:25
**Amendment**
45:1
**amount** 23:8,10
98:4 129:25
**Ana** 95:1
**ANA'** 2:4
**analysis** 6:24,24
7:1 10:7,15
37:5 42:5 44:1
45:13,25 54:7
62:13 64:19
69:5,6 74:21
75:4,5 89:8
102:5 107:12
116:20 121:22
123:20
**analyst** 60:7
106:25
**analyze** 48:24
**analyzed** 28:24
117:9
**analyzing** 85:10
121:13
**ANN** 2:4 130:7
**answer** 5:22,24
44:23
**answers** 5:19

**Antonio** 42:22
56:15 73:1
**Anytime** 101:16
**apart** 41:2 42:17
**apartment**
58:12 112:10
112:12,18
113:11,15
**Apparently**
21:17
**appear** 70:13
**Appearances**
3:3
**appeared**
128:12
**appears** 11:5
96:12 100:6
**appreciate**
125:19
**appropriateness**
125:7
**approximately**
22:21,23 43:4
43:5
**arcade** 13:9
**arcades** 27:4
28:5
**area** 14:11 23:9
25:16 57:14
78:1,3 101:10
101:10 103:21
112:15
**areas** 11:11
20:10 23:9
42:21 57:12
58:13 61:13
69:1 72:17
85:24 87:6
103:22 125:11
**argument** 45:2
**arrest** 34:17
67:12,15 115:6
117:21 118:3,5
118:19 120:20
**arrested** 93:13

Victory Court Reporting, Inc.

93:21 117:16
119:2
**arrestees** 93:12
94:1,11
**arrests** 4:17 9:5
34:9,23 35:17
35:23,24,25
36:7,9,12,14
36:17 37:3
65:12,15,19
66:4,7,10 67:5
67:8,23 84:5,5
84:9,18,22
85:10 90:10
91:10 100:4
104:18 114:1
115:9,20
117:17 118:2
118:23 119:7
119:17 120:11
120:23
**arson** 17:13
**Arthur** 1:11,16
3:4 5:2,8 127:2
128:2,6 129:11
129:17
**article** 72:11
**Arts** 101:2
**ascertain** 49:13
66:23 91:7
**asked** 32:6 37:1
49:3 62:23
107:1 108:6
124:2
**assault** 18:22,23
18:25 19:6,22
20:6 37:16
76:21 108:9
116:18
**assaulting** 19:5
**assaults** 17:2,7
19:3,9 20:10
20:17,22 21:5
21:19,23 22:7
22:11 32:8

35:17 108:16
116:20 117:3,5
117:6,9,10,13
**assigned** 113:18
**Assignment**
97:4
**Associate** 6:17
7:18
**associated** 88:15
**ASSOCIATI...**
1:3 129:3
**assume** 15:23
35:4,5 40:12
45:12 70:22
117:24
**assumes** 21:2
25:6 44:22
82:2,8
**assuming** 54:19
70:10
**Atrium** 2:13
**attached** 1:25
95:7,14,15,18
96:21 100:7
104:20 131:4
**attachments**
96:9
**attack** 112:2
**attacked** 112:20
**attempt** 41:5
**attention** 5:16
**attorney** 129:22
130:7,7,8
131:7
**Attorney's** 1:22
2:4
**attorneys**
130:11
**attract** 112:6
**attracting** 120:1
**attributed** 49:15
**audience** 14:4
45:16
**average** 51:17
52:6,8,14

53:20 87:23
88:7,8
**AX** 120:19

_____
**B**
_____
**B&B** 108:2,3
**Baby** 27:8 31:8
31:15
**Bachelor** 9:4
**back** 6:15,19
27:21 32:12
34:4 36:3,24
38:21 42:21
45:3 47:21
76:4 83:16
94:23 95:2
98:11 104:22
107:21 117:14
121:21 125:4
125:13
**bar** 50:1,7,7
59:19 63:2
66:10 68:11
73:23 74:17,18
77:15 78:11
85:10 88:11,16
89:10 111:16
113:24 120:23
**bars** 58:9 78:18
**based** 7:14 33:3
33:11 77:19
116:16
**basic** 69:18
75:15
**basis** 121:13
**Bates** 99:10,10
99:14 101:5
106:3 114:19
115:3 122:6
**bear** 94:19
**bears** 73:21
**beat** 23:4,5 24:3
26:18,22 27:2
27:4,15,19,24
28:7,13,16,20

29:16,21 30:13
30:14,18,21
31:22,24 38:1
104:5
**beats** 22:15,18
22:20 23:18,25
33:2,7,11,20
33:23 103:22
104:5
**beginning** 15:15
15:18 98:14
109:25 114:19
**begins** 15:9
106:2 110:8
115:2 122:6
**behalf** 11:17,22
**belief** 35:13
**believe** 45:4
59:24 69:16
72:16 73:4
75:18 82:25
108:20 122:19
122:24 123:1
123:18 124:18
**Berkman** 2:9
**best** 5:13,21,23
43:7 109:7
**better** 96:4
**beyond** 9:16
**bigger** 23:11
**Bill** 14:14
**Bishop** 101:2
**Bishopp** 1:11,16
3:4 5:2,8 127:2
128:2,6 129:11
129:17
**bit** 38:9 92:23
94:18 125:15
**black** 93:21 94:2
94:11
**blank** 103:11
**block** 22:5,10
**BMV** 112:5
**bodily** 19:1
**book** 13:9,17

27:1 28:5 30:1
30:17 32:8
41:3 58:15,16
78:19 79:5,16
79:21,23 80:10
80:12 84:9
87:9,11 89:13
90:17,25 91:2
92:10
**bookstores** 80:2
**borders** 23:7
**bother** 115:23
**bottom** 11:7
32:13 78:17,19
114:18 121:4
**bought** 25:13
**Boulevard** 2:14
**boundaries**
19:10 21:6
23:5,18 57:24
58:24
**boundary** 23:7
**break** 49:20,22
62:16,18
115:19,20
125:18
**breakdown**
92:25 93:8
**briefing** 4:4
12:11
**briefly** 6:5
**bring** 5:16
**broad** 116:11
**brought** 6:22
18:14 121:25
**buffer** 36:2 38:3
**building** 35:3,4
35:8,9,10,14
60:16 77:20
**buildings** 86:18
**bullet** 47:3
**bump** 78:10
**bumper** 34:18
**burglary** 60:14
60:15,15 86:9

Victory Court Reporting, Inc.

Page 134

**business** 5:6
  14:2 24:16,24
  25:11,13,13,15
  26:15 28:20
  31:13 34:12,19
  34:23,25 36:1
  36:13 39:4
  41:17,21 42:2
  42:25 43:6
  44:8 49:1,16
  57:13 58:8
  61:14,17 63:2
  64:6 65:12
  67:7 74:13
  83:9,12 85:3
  88:17,18,22
  90:15 111:24
  114:5 115:11
  116:9 119:8
**business's** 75:13
  76:25 122:15
**businesses** 12:14
  12:16 13:7
  14:17,22,25
  24:1,4,21
  25:15 26:14,23
  27:18,24 29:23
  30:18 31:23
  32:14,18,19
  33:3,19,23
  34:1 38:22
  40:3,4 41:8,10
  41:12,15 43:22
  44:5,17 45:22
  46:24 50:16
  57:2 58:6,12
  58:15 66:5
  67:18,22 68:2
  68:10 74:25
  75:24 77:12,22
  78:7 85:22
  86:19 87:3,4
  89:1 95:24
  104:15 105:2
  111:14 114:23

  119:18 121:16
  121:19

**— C —**

**C** 2:1 5:1
**cabaret** 13:10
  14:1 30:5,20
  30:23
**cabarets** 27:7,11
  28:9 29:14,18
  58:16 80:17
  81:20 82:6
  84:17 91:3
**calculate** 88:15
**calculating**
  10:20
**calculation**
  21:18 70:18
**calculations**
  54:10
**calculator** 54:19
**call** 13:3 34:17
  43:21 58:24
  70:14 76:5,6,7
  76:9,11,24,24
  86:3 97:10,12
  98:7 101:12,17
  102:21 103:5,8
  103:16 111:4
  114:10,12
  116:12,15
**called** 42:15
  76:10 86:7,10
  100:6 103:13
  103:22 105:22
  106:7 111:6
  112:17,20
  117:23
**caller** 76:16
**calling** 64:12
  103:19
**calls** 68:15,16,25
  70:13 71:7,10
  73:14,17,22,25
  74:9,24 75:8

  75:23 76:4,15
  86:1,5,8,22,24
  87:10,14 88:8
  91:18,18,25
  92:8 97:5,8,9
  97:22,23,25
  100:2,3,7,16
  100:18,19
  104:9,13,18
  105:4,12,13,14
  110:4 114:1
  121:5,10,14
  122:14 123:7
**capias** 118:24
**capture** 125:10
**captures** 125:11
**car** 86:10 109:2
  109:2
**card** 128:15
**career** 6:5 7:2
**Caruth** 6:18 7:5
  7:7,9,10,12 8:2
**case** 14:1 84:8
  95:12 110:14
  110:16,19,20
**categories** 110:7
**category** 17:17
  18:4 30:2,4,11
  30:20,23 106:6
  113:12 115:6
  118:23 120:18
  120:19 121:5
  122:7
**cause** 1:18
**cell** 76:14
**cells** 102:1
**cent** 63:7,19
**Central** 103:25
**certain** 23:8
  35:11 79:4
  85:14
**certainly** 16:5
  31:18 40:17,18
  54:18
**certainty** 69:22

**certificate** 3:6
  131:12
**certification**
  129:11 130:14
  131:1
**certified** 129:14
  130:15,17
  131:15
**certify** 129:15
  130:9
**CFR-11074**
  130:21 131:19
**CFS** 114:10
**change** 12:13
  23:20 47:24
  89:13 115:23
  127:4
**changed** 17:17
**changes** 3:5
  127:1 131:4,5
**chapter** 13:13
  13:18,23
**characteristics**
  44:4
**charge** 16:6
  115:6
**charges** 19:25
  100:5 131:9
**Charlotte** 72:16
**chart** 28:19 55:6
  56:9 57:20
  58:7 59:15,15
  62:24 63:2
  64:23 68:8
  76:2 78:11,14
  79:17 88:4
  92:7,25 93:7
  93:11,11 94:9
  105:9 106:23
  120:24 123:7,9
**charts** 59:19
  88:11,16 90:22
  91:5 93:10
  111:16
**check** 51:16

  82:22
**checked** 117:25
**chief** 8:21,22
  15:13 24:14
  42:22 77:8
  123:23 124:13
**chiefs** 124:13
**chunk** 12:22
**cities** 14:21
**citizen** 76:21
  101:16
**citizens** 93:13
  94:11,16 111:8
**city** 1:6,21 2:4
  4:4 11:11,12
  11:17,22 12:11
  12:15 13:13
  14:25 20:10
  22:24 24:1,15
  32:14 33:3
  37:25 38:14,17
  43:4 46:18
  50:11 57:21
  66:5 77:8 81:8
  85:24 87:7
  93:3,18 94:5,8
  97:19 101:4
  122:20 124:19
  129:6
**City's** 95:7
  103:21
**civil** 1:5,23 9:1
  129:5
**civilian** 8:25
**CIVISION** 1:2
  129:2
**claim** 82:24
**clarification**
  49:2
**class** 10:14
**clear** 5:14 28:22
  28:25 29:4
  85:9 86:4
**Clerk** 131:14
**Cleveland** 2:10

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 82 of 399   PageID 1207
Victory Court Reporting, Inc.

Page 135

click 102:1
clock 102:2
close 12:17
  25:15 33:16
closed 25:3,21
  25:23 39:9
  66:6 68:10
  83:2,4,18
  88:23 89:2
  90:7
closing 95:24
club 1:3 15:10
  16:15 25:11
  27:8 31:8,15
  62:9 112:16
  123:1 129:3
clubs 31:10,12
  58:17 82:10,18
  83:2,14 84:21
  87:14,22,23,25
  88:4,9 89:18
  89:21,21,24
  90:6 91:10
  92:22
COD 4:12,15
  98:14,24 99:2
  115:6
COD-017 15:16
COD-019 34:5
COD-022 49:25
COD-023 56:7
  63:1
COD-027 67:20
COD-029 73:21
COD-040 28:4
COD-041 78:12
COD-043 86:2
COD-204 64:20
code 34:1 86:8
  97:12
codes 107:13
collaboration
  7:7
colleagues
  125:17

collected 22:14
  115:10
collection 8:18
collectively 33:2
  64:14
Collins 2:14
column 25:17
  26:18,20 27:14
  101:9 102:13
  104:6 114:11
columns 101:6
combine 54:6
combined 10:14
  52:11
come 30:10 43:2
  47:10 54:10
  76:9 83:11
  96:8 101:25
  107:2 111:4
  112:21 114:1
  125:14
comes 28:25
  38:4 51:25
  76:11 97:10,11
  97:25 113:22
  113:25
coming 47:21
command 23:22
COMMISSION
  128:24
commit 108:24
commits 18:25
committed 20:5
  41:25
common 125:5
compare 56:20
  85:21 104:17
  105:14
compared 41:24
  44:5 48:19
  56:3 67:23
  71:23 94:6
  104:17 105:15
compares 58:19
comparing

58:14,23 87:6
  104:13
comparison
  48:22 50:3
  57:1 59:13
  67:21 72:16
  74:13,19
  104:13,25
  106:12,13
compile 24:11
compiled 25:21
  28:19 32:18
complainants
  118:12
complexes 58:12
complies 120:17
comprise 35:23
  36:6 37:20
  38:7,25
computer 60:6
  60:20,23 61:3
concentrations
  11:10
concept 10:16
  10:19
concerning
  24:16
conclude 44:7
  44:11 69:10
concluded 126:1
confused 38:9
confusing 70:19
connected 49:10
connection
  48:25
consider 115:18
  117:1 125:10
considerably
  90:2
consideration
  128:18
considerations
  14:8
considered 97:5
  123:22

consist 100:17
consistently
  90:22
consists 100:8,9
constitutional
  14:7
Consumption
  10:1
Contact 116:19
contain 106:9
contains 131:5
content 13:18
  110:8
contents 13:4
context 34:15
continue 55:9
control 42:8,9
  42:14,19,23
  43:2,10,20,20
  44:4,7,18
convenience
  40:9 46:21
  62:7
convictions
  19:25 36:18,21
coordinate
  113:25
coordinates
  113:21,24
copies 10:24
  61:1 131:10
copy 9:2 59:8
  94:22 95:4
  131:12
correct 8:16
  11:14,15 12:18
  13:7,10,14
  14:4,14,18,22
  15:3,7,10,18
  15:20 16:21
  17:4 19:10,14
  19:16,19,22,23
  20:7,10,19,23
  21:8,15,20,21
  21:24 22:1,3

22:12,16,18
  24:1,4,17,21
  24:25 25:3,9
  25:18,21,23,25
  26:1,3,4,6,9,10
  26:12,13,16,17
  26:24 27:2,3,5
  27:6,9,10,12
  27:13,15,16,25
  28:1,5,7,10,13
  28:17,21 29:1
  29:9,19 30:2,6
  30:7,12,18,19
  30:22 31:2,3,8
  31:21,25 32:3
  32:20,24 33:4
  33:12,17,20
  34:9 35:19,22
  36:7,10 37:14
  37:17 39:17,20
  41:12 42:2,3
  43:17,18,22
  44:24 45:7,10
  45:23,24 46:3
  46:9,11,15,16
  46:19,22,23
  47:1 48:10,11
  48:14,21 49:1
  49:11,12,17
  50:1,8,9,22
  51:11,13,15,23
  51:24 52:11,15
  53:6,15 54:9
  54:13 55:17,18
  55:22,24 56:4
  56:10,25 57:10
  59:1,15,20
  61:4,8,14,15
  61:19,22,25
  62:1,4,5,8,10
  62:12,13,14
  64:1,3,18,20
  66:3,6,11,14
  66:16 67:3,24
  67:25 68:7,17

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 83 of 399   PageID 1208
Victory Court Reporting, Inc.

Page 136

68:20,23,24
69:3 70:6,10
71:11,12,14,15
71:19 73:15,23
74:2,4,6,10,15
75:2,9 76:2,3
77:2,9,10,13
77:14,16,23
78:15,16 79:18
79:19,23 80:6
80:11,12,15,16
81:6,15,20
82:3,6,12,15
82:24 83:5,22
83:23 84:3,10
84:19,20,23,24
84:25 85:3,4,6
85:16,17,19,20
85:22,23,25
86:20,23 87:1
87:4,5,8,12,13
87:15,16 88:2
88:5,6,10 89:2
89:3,6,10,16
89:17,21,22,25
90:1,4,7,15,18
91:5,6,12,13
91:14,16,17,19
91:22 92:5,6,8
92:11,14,17,18
92:23,24 93:1
93:2,13,14,21
93:23 94:14,15
94:17 99:6
100:11,14
101:21 102:8
103:2 104:10
105:18 107:10
110:4,5 112:23
113:1,16
114:13,16,17
115:3 119:16
119:18,19,25
120:4,5,7,8,11
120:24 121:16

121:17 122:3
122:16,17
123:14 128:3
**corrected** 82:23
**corrections**
18:17
**correctly** 12:20
18:13 20:8
50:18 73:11
79:2
**correspond** 17:9
94:4 121:5
**corresponds**
28:3 90:3
98:12 115:5
122:7
**council** 4:4
11:11,13 12:11
12:16 24:15
66:5 77:9
97:19 122:20
124:19
**counsel** 130:5,9
**Count** 4:18
**counts** 17:20
**COUNTY** 128:9
**couple** 11:6
72:18 125:16
**course** 7:18
49:21 52:5,9
63:16 64:21
70:6,8 73:8
84:14 89:20
98:6 125:12
**court** 1:1 3:6
49:21 129:1
130:21 131:19
**covered** 45:5
**covers** 18:4
**covert** 6:11
**Covid** 56:17,18
**create** 18:18
**created** 56:14
**crime** 6:23 7:1
9:25 11:10

17:7 18:2 23:6
23:8,10,10
34:8,16 37:12
37:21,25 38:12
38:13,15,18,19
39:11,20 41:20
43:6 44:16,18
45:6,17,18
46:1,10,18,20
47:4,12,13,22
48:3,7,16
50:20 51:5,17
51:20 52:9,15
52:17 53:5,17
53:24 54:22
55:17 56:2,19
57:22 59:25
60:7,9,22
64:24,25 65:3
78:14,20 79:3
79:4,12 80:18
80:25 81:2,2
81:13,18,24
84:1,4,5,9,22
85:9,13 86:11
93:1 94:7
105:23 106:7
106:25 114:6
114:20 120:19
124:7
**crimes** 18:2,4,9
37:13 38:6
39:25 41:6,24
45:9,20 46:5
47:8,18,25
48:1,2,13,18
48:19 49:3
50:3,6,10,13
50:19,25 51:10
52:3,22 53:1
54:3,25 55:3,4
55:4,4,7,11
56:10 59:21,22
59:22,23,23,24
60:2,5,9,11,18

61:12 63:6,9
63:10,11,13,15
63:15,18,19,20
64:8,15,22
80:1 81:8
104:25 106:11
106:17,17
107:14,14,23
108:18,25
109:5,6
**criminal** 17:18
55:16
**criminogenic**
44:8
**criminology**
9:12,19
**cross** 76:12
**CSR** 1:20
130:20 131:18
**current** 6:22 8:9
77:19,20 93:4
**currently** 6:1
8:11,24 14:17
**custodial** 65:12
131:7
**cutting** 86:8
**CV** 9:2

_____

**D**
**D** 3:1 5:1
**Daily** 100:4
**Dallas** 1:2,3,6,21
1:22 2:4,5 4:20
5:9 6:2,6 7:3,8
7:9,9,16,24,25
8:4,6,13 9:10
9:16 11:18
13:13 18:11
27:8 98:6
118:24 120:7
122:9 129:2,3
129:6 130:23
131:21
**damaged** 109:1
**dance** 123:2,5,8
123:12

**dancers** 14:3,3
**dancing** 14:3
**dangerous** 76:20
**Daniel** 72:9
**data** 4:7,20 6:24
8:18 10:20,20
11:9,11,12
15:21 16:3,6,7
16:23 17:12,20
18:6,18,19,24
19:8 22:9,14
24:16 32:7
34:11,16,17,17
34:17,22 38:2
38:15,16,16,25
39:1,4 56:14
56:15 57:15
60:3,4,18,18
60:19 72:8,20
75:14,17,20
77:19,20 93:4
96:14 98:13,24
100:10,16,17
100:18 105:23
106:7,18 107:1
107:5 108:6,7
108:19 109:25
110:22 112:21
114:18 115:6
122:1,17 123:3
123:4,6,10
**database** 61:7
**date** 24:21 27:17
38:3 101:20,21
102:10,10
127:3 130:20
131:18
**day** 47:9 52:2,3
52:21 55:15,17
55:20 67:15
81:15 85:19
86:25 102:18
124:9 128:11
128:20 130:17
131:15

**days** 12:18 18:7
31:19,20 51:17
51:21 52:9,15
53:21,23 54:16
54:21 55:12
67:12,13 70:12
70:14,23 81:24
82:5,18
**dealing** 14:7
**dealt** 23:7
**death** 19:1
**December** 9:5
9:10 16:18
**decide** 33:11
79:21
**decided** 33:7,10
56:16 103:18
124:11
**decision** 116:16
125:7
**decreased** 39:20
**Deep** 57:22
101:2
**Defendant** 1:8
2:8 129:8
130:7,8
**defined** 13:12
17:13 57:21
**definition** 13:6
13:17 18:23
86:3
**definitions**
13:23 60:11
107:13 108:8
108:12
**degree** 9:5
**delineated** 14:20
57:22
**delivered** 131:6
131:11
**demographics**
43:12
**department** 6:3
6:6 7:3,8,16,17
7:24 8:13,19

75:8,14,20,21
75:22 98:6
103:24 122:8
122:11 123:8
**depend** 57:8
**depending**
56:18
**depends** 13:18
14:2 76:5,16
116:10
**deployment**
6:10,16
**deposition** 1:10
1:16 4:3
125:23,24
128:2 129:11
129:19,21
130:1,4 131:2
131:3,6,8,10
131:11
**depositions** 12:2
**Deputy** 8:21
15:13
**describe** 118:3
**described** 30:14
52:1 119:5
**describes** 14:16
17:2 98:7
111:20
**description** 4:2
15:9 83:17
96:12 102:21
103:4 120:19
128:14
**descriptive**
10:13
**design** 10:11,12
**designated**
57:23,25
**designed** 7:13
10:11 73:6
**designing** 23:18
**desk** 8:5
**detained** 118:13
**determine** 21:18

41:5 44:6
66:18 69:5
73:6 92:19
**determined**
21:22 23:4,6
**determining**
92:3
**detox** 116:13
**DeVan** 2:9
**developed** 42:8
43:9
**developing** 7:14
**development**
7:15 43:5
**Devon** 123:19
123:25
**DFR** 122:8
**Diego** 69:17,17
72:14,15
**difference** 10:20
37:6,9 64:21
66:18,23 68:1
69:12 70:5,22
71:21 72:4
73:7,8 79:17
90:23,24 91:4
91:7 92:11
110:13 124:9
**differences**
92:20 107:21
**different** 17:25
38:24 47:24
48:1 95:4
**digressed** 45:4
**direct** 13:21
**directed** 75:8
**Director** 6:17
7:18
**discovered**
45:25
**discussed** 89:9
**discussing** 57:16
93:5
**discussion** 15:10
125:6,9

**discussions**
23:23
**dispatch** 86:5
97:11,20 98:7
**dispatched**
97:11,23 98:2
98:3 101:17
**dispatcher**
103:18
**displays** 89:10
**dispute** 29:2,8
29:12
**dissertation**
9:21
**district** 1:1,1
17:3 20:12
42:15,17 57:13
57:14,19 58:1
58:1,4,7 100:1
105:19 106:15
129:1,1
**district's** 67:23
**districts** 57:3,11
57:17,17 58:10
58:11,25 59:8
59:9,14 61:12
61:18,25 63:21
64:13,14,24
65:5 68:3
74:15 81:11
101:1,3 104:10
104:16 105:1
105:13,15
106:14
**divide** 63:16
**divided** 70:23
103:21
**division** 6:13,21
15:24 20:12,14
20:15 21:6
22:16,21 23:18
103:23,23
104:3,5
**Division's** 19:10
**divisions** 104:1

**Divorce** 10:2
**doctorate** 10:12
**document** 11:3
12:8,10,21
13:2,3 15:16
16:1,18,24
21:5 24:4,9,11
24:19 25:7
33:1 96:7
114:4 118:5
121:11 128:15
**documents**
83:25 95:6,17
95:21 96:13,18
99:6,17,22
121:25
**doing** 23:17
58:23 112:3
116:12
**dollars** 7:11
**Dolls** 27:8 31:8
31:15
**domestic** 19:2
117:9
**doubt** 71:3
**DPD** 4:13,14
119:13
**DPS** 8:17 18:18
**Dr** 72:9 73:1
**driving** 103:13
**drop** 112:4
**drove** 76:22
**drug** 35:17
40:11
**drugs** 35:22
36:6,15 116:12
**dugs** 35:23
**duly** 1:17 5:3
129:17
**dumped** 107:5
**duplicate** 12:4
**duplicates**
108:21,22
109:8
**duplicating** 32:6

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 85 of 399   PageID 1210
Victory Court Reporting, Inc.

Page 138

duties 8:9,10

**E**

**E** 1:20 2:1,1 3:1
5:1,1 129:14
130:19,20
131:17,18
**earlier** 74:18
**early** 95:8
**easier** 45:13,14
107:12
**easiest** 118:4
**easy** 120:14
**economic** 43:4
43:14
**Eddie** 24:15
**education** 10:4
**effect** 14:18
56:17,18
**Effects** 9:25
**effort** 88:14
**eight** 17:13,24
17:25 20:15,18
30:1,8,9 31:23
47:22 48:3
54:8 63:5,13
63:16,18 64:9
64:15 65:4
81:3,24 85:11
89:6 90:13
91:22 92:1
102:16,17
111:6
**either** 14:3
25:11 45:21
51:4 53:23
77:22 83:13
90:14 94:1
124:13 125:5
**either/or** 113:16
**Elements** 97:4
**elevenish** 102:19
**elicit** 73:6
**Ellum** 57:22
101:2

**email** 98:18
**emergencies**
103:7
**emergency** 97:8
**eminent** 19:1
**employed** 7:23
8:1 130:10
**empty** 26:9
83:20
**encounter** 76:21
**ended** 19:24
120:23
**entailed** 58:2
**entertainment**
14:2 42:15,17
57:2,11,17,19
57:25 58:1,3,7
58:10,11,25
59:7,9,14
61:12,18,24
63:21 64:13,24
65:5 67:23
68:2 74:14
98:23 100:1,25
104:10,15
105:1,13,15,19
106:14,15
**entire** 22:24
37:25 38:14,17
46:18 50:11
81:7,8 84:19
91:24 93:18
95:14 107:6
125:11
**entirely** 116:14
**entities** 13:12
28:20 91:15
**entitled** 9:24
37:12 45:6
**equally** 80:13
**equals** 67:11
**equivalent** 9:1
**erotic** 14:3
**essentially** 6:25
**establishment**

15:5 80:9
114:8
**establishments**
69:17 113:19
**et** 1:4 69:15
129:4
**evaluate** 11:10
**evening** 102:19
**event** 108:17
**events** 88:16,21
89:1
**eventually** 8:17
**everybody** 8:3
17:22 45:17
**evidence** 7:14
21:2 25:6
28:15 44:22
82:2,8,20 83:7
87:19 119:24
**exactly** 43:10
48:5 51:3 52:5
72:15 100:17
119:4
**examination** 3:4
5:4 9:24
129:23
**example** 13:16
14:24 24:3
40:7,21 41:16
49:8 60:4
64:23 74:23
76:18 79:5
87:9 89:12
94:9 108:16
112:22 116:1
116:18 120:15
121:19
**excluded** 116:19
117:9
**executed** 128:17
**EXECUTIVES**
1:3 129:3
**exhibit** 11:1
12:7 24:7
27:22,23 28:3

30:15 32:12,17
33:12 34:5
38:23 50:24
55:3 77:4,6
94:22 95:6,10
96:6,22,24
97:17 98:10,11
98:12,13,16,17
99:1,23 104:22
105:18,24
106:2,6,9,21
109:14 114:25
115:1,2,5,15
120:24 121:1,3
121:8 122:1,5
122:6 123:17
**exhibits** 4:1 95:9
131:10
**exist** 77:22
86:16
**existence** 79:13
114:5
**expert** 14:10
113:22
**Expiration**
130:20 131:18
**EXPIRES**
128:24
**explain** 83:10
97:13 113:23
**explained**
107:20 115:10
**explicit** 13:18
**Exposure** 9:25
**express** 73:22
74:17
**expressed**
128:18
**expressing**
66:10
**extension**
109:21
**eyeballing** 73:15
**eyes** 29:22

**F**

**Facsimile**
130:24 131:22
**fact** 16:14 33:6
43:24 44:15,16
69:23 77:7,11
79:20 83:8
85:11 87:2
**facts** 21:2 25:6
44:22 82:2,8
**faculty** 8:3,4,4
**fair** 102:17
**fairly** 72:20
117:23
**falls** 58:10
**familiar** 10:16
10:19 12:8
13:23 15:25
16:3,6,14
23:18 24:9
96:17
**family** 19:5,5,7
116:18 117:3
117:10
**far** 18:6 25:18
28:9 52:6
95:12 97:8
100:2 109:19
113:25 125:11
**fast** 40:18 41:15
41:22,25 49:10
62:11
**FBI** 6:25 8:17
18:8,19
**fear** 19:1
**February** 1:12
1:19 127:3
129:12
**feet** 35:7 40:1
41:16,20,21,25
44:16 49:9
50:14,21 52:18
52:22 53:24
54:3,21 62:4,7
67:16 78:1

80:1 81:19
83:4 84:18,23
85:13 87:11
113:24 115:11
119:8,18
121:15 125:6
**felony** 86:11
**fewer** 51:9 66:7
90:5
**field** 6:12 106:18
108:21
**fielded** 116:22
**fifth** 83:19
**figure** 33:17
**figures** 64:2
**filed** 95:8 131:13
**filtered** 107:2
115:21
**filters** 115:22
**finally** 5:21
55:25 92:22
103:18
**financially**
130:12
**find** 43:3 73:5
118:13 120:15
**finding** 119:5
**finish** 5:22,24
29:6 66:21
**fire** 4:20 75:8,14
75:19,21,22
93:11 122:8,9
122:10 123:8
**Firm** 130:21
131:19
**first** 5:3 6:7
18:14 24:13
45:1 57:5
65:13 83:18
96:20 99:5
100:20 101:9
103:2 106:5,20
106:23 107:8
107:17 109:13
109:16 112:15

115:14,17
116:1 121:13
122:17,18
123:9 124:1
**fits** 97:18
**five** 6:19 8:25
62:15 78:19,21
84:10,14
100:25 101:3
104:4,4 108:15
108:18 111:6
116:3
**flagged** 101:15
111:7,10
**focus** 53:17
109:23
**focused** 42:14
**folks** 7:10
**follow** 100:1
**followed** 6:9
71:20
**following** 34:11
70:17 129:16
130:5
**follows** 5:3
130:1
**food** 15:5 40:18
41:15,22,25
49:10 62:11
**foolproof** 82:24
**foot** 34:18,20,24
35:13 36:2,13
38:3,20 39:6
39:12 41:7,11
44:18 45:20
46:6,21 47:15
49:5 51:5,10
54:12 57:6,9
57:16 58:19,24
61:16,21 64:5
65:16 67:7,21
68:22 69:1
74:14,25 75:11
75:17 77:20
78:1,4 79:5,15

79:20 80:11
81:4 84:10,14
84:22 86:17
87:3,22 88:1
88:17 89:15
90:13 91:25
93:8,15 104:14
105:2 111:13
112:16 113:18
114:21 122:16
122:23 124:11
125:1,5
**footprint** 35:14
77:21 86:18
**Force** 15:10
16:15
**foregoing**
128:16
**form** 25:5 44:21
66:11 75:15
82:1,7,19
102:1 122:18
123:11
**format** 99:13
**Fort** 14:24
**forth** 12:24
42:21 97:24
106:18 108:9
**forwarding**
128:2
**found** 69:20
103:17 116:16
**Foundation** 7:9
**four** 6:9,21 11:6
15:7 21:19
22:5,10 29:22
30:5 32:2
40:13 63:17
71:21 73:18
80:5,9 89:19
103:7,9 104:3
105:22 106:6
108:25
**fours** 86:6 98:1
**fourth** 83:19

**frame** 21:11
46:14,15 47:25
63:22 66:7
68:6,6 71:23
91:12
**frames** 63:17
69:19 70:23
79:17 80:24
105:15
**Free** 130:24
131:22
**Fridays** 15:2,6
**Frisco** 118:19
**full** 5:6 8:7
27:11 29:18
30:23 84:17
87:14 91:3
92:13 102:10
122:20 124:22
**full-time** 6:1
7:19 102:2
**fully** 11:21
**function** 6:14
25:12 97:21
**functioning**
83:10,14,14
**funded** 7:12
**further** 43:9
55:19 74:8
130:9,12,14
131:1

─────────────
**G**

**G** 5:1 102:20
**Garcia** 8:22
24:15 42:22
**gas** 40:7 62:4
**gathering** 11:9
11:12 18:6
**general** 4:13
9:24 18:22
97:4 98:5
99:22
**generally** 102:16
**generate** 75:19

86:12 104:19
**generated** 68:19
101:14 110:15
111:5 114:12
**generates**
101:17
**geographic** 23:5
23:9
**geographical**
58:24
**gestures** 5:19
**getting** 111:7
119:5
**GIS** 113:21,23
**give** 65:18 86:3
94:25 95:3,4
105:8 114:4
124:6 125:16
**given** 9:2 32:5
121:12 128:19
129:19 130:3
**gives** 120:10,19
**giving** 108:15
**go** 9:3 13:2
18:12 22:13
32:17 33:16
34:4,5 35:8
36:23 43:1
44:23 45:5
49:24 52:25
56:7 59:3,10
60:6 63:4
65:11 67:20
68:13,15 74:12
77:19 78:9
80:17 84:4
86:1 89:4 90:9
91:3 94:19
98:17 99:18
100:24 101:5
104:22,23
106:20 107:15
107:19,21
110:6,7 114:9
114:15 116:7

118:6 119:12
120:9,13,15
121:1,2 122:5
**goes** 52:6 92:13
92:16 104:7
105:9 121:12
121:21
**going** 5:12,13
7:11 11:25
12:3,6,7 21:1
23:16 27:21
32:12 33:16
42:20 53:14
70:16 71:19
76:4 77:19
78:8,10 83:16
94:19 96:21
99:18 104:19
105:8 110:7
114:19 115:19
118:19 120:13
**good** 125:14
**Gordon** 2:9
**GPS** 76:13
**graduate** 8:5,6
**graduated** 6:15
**grant** 7:10,11,12
**graph** 56:14
68:11 74:18
85:10 90:9
**graphs** 12:24
50:1 66:10
73:23 74:17
77:15 89:10
**greater** 23:9
46:13 61:11
**greatest** 86:7
121:4
**Greenville** 57:23
100:21 101:2
**grocery** 40:16
58:9
**group** 99:5
102:7
**groups** 52:1

102:11
**Grove** 101:3
**guess** 13:3 15:1
16:20 20:13
48:17 49:24
59:15 90:14
97:2
**guided** 45:16
**guns** 35:21,23
36:6,15

___

**H**

**H** 111:19 112:23
**half** 67:15 81:24
82:5
**hall** 123:2
**halls** 123:5,8,12
**hand** 128:19
**handed** 106:15
**hang** 76:12
**happen** 125:14
**happened** 48:4
49:11 52:3
63:25 76:19
85:18 103:1
107:23 118:10
119:9,21
**happens** 106:5
**Hartford** 72:17
**held** 26:14 62:18
125:18
**help** 97:17 122:2
**helped** 24:11
**helps** 97:13
**hereto** 1:25
**higher** 64:25
97:24
**highest** 22:6
60:10 108:23
**highlight** 47:25
108:21
**highway** 111:25
**Hispanic** 93:23
94:2,13
**hold** 8:11 27:22

98:15 119:13
120:3
**holding** 26:2
**homicide** 60:13
60:14 118:4
**homicides** 118:4
**Honestly** 116:25
**hospital** 116:7
**hotel** 112:13,15
113:4,9,11,15
**hotel/motel**
112:25
**hotels** 40:25
**hour** 20:18
21:20 22:5,6
22:10 47:22
48:3 54:8
61:20 63:5,11
63:13,16,18
64:9,15 65:4
71:21 73:18
81:3,24 85:11
89:6,20 90:13
91:22 92:1
102:2
**HOUR:55** 130:2
**hours** 12:17
14:21 20:16,23
21:7 31:13,14
39:14 40:5,19
43:6,14 48:16
51:18 53:6
56:2,3 63:24
66:5 68:11
71:24 72:1
78:7 81:14
85:19 86:25
88:18,23 90:18
90:24 95:24
**House** 40:22
**housed** 7:16
**houses** 58:11

___

**I**

**ID** 110:10,25

**idea** 22:4 110:10
116:21
**Ideation** 10:1
**identical** 93:10
**identify** 96:7
121:8
**identity** 128:14
**IDing** 111:1
**ignore** 95:16
109:22
**II** 2:13
**importantly**
11:6
**incidences** 17:25
**incident** 4:18
17:20,21 18:3
49:8 53:20
54:16 76:19
77:1 82:17
101:11,14,18
101:18 104:19
104:20,20
107:22 108:14
108:17,18
109:8 110:11
110:15,20
111:19,20
**incidents** 48:25
49:14 50:20
51:4 53:4,18
54:12 56:1
64:5 79:3,4
80:5,9 81:2,14
84:1 85:12
89:14,19 90:12
104:13,17
110:3 111:12
114:21
**include** 17:13
19:2 65:19
117:3 123:8,10
123:12
**included** 10:11
45:10 95:9,10
107:1 117:12

117:13,15
123:10
**includes** 13:9
17:17 117:21
123:4 130:5
**including** 11:13
77:13
**increase** 83:2
84:1
**increased** 39:22
46:11,13
**independent**
101:3
**indicate** 52:1
99:25
**indicates** 19:8
19:12 23:24
25:17
**indication** 114:4
**individual**
102:11 111:10
112:17,23
113:4
**Info** 4:7
**information**
12:23,23 15:18
18:20 24:16
25:20 60:2
61:2,4,7 75:16
76:13 83:24
100:13 103:5
105:9 106:8
112:7 114:16
120:10 121:18
121:23,24
122:10 123:19
123:21 124:3
130:3
**injury** 19:1
**input** 60:23
**inquiries** 11:13
**instance** 1:17
86:8 108:24
111:5
**institute** 6:18

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 88 of 399   PageID 1213
Victory Court Reporting, Inc.

Page 141

7:5,7,13,13 8:2
**instrument**
128:16
**interested**
124:18 130:13
**interesting** 83:1
**interestingly**
33:15
**International**
40:22
**interrupt** 23:15
71:9 100:23
**interval** 54:2
**investigate**
42:18
**investigations**
111:6
**investigator**
118:7,11
**investigators**
118:7
**involved** 36:14
116:2 120:20
123:25 124:2
**involves** 8:13
**involving** 51:21
100:16 117:3
**issue** 88:17
**item** 98:13,23
105:8 113:17
**items** 13:19
98:20

**J**

**J** 2:9 130:7
**jail** 118:8,14,20
**Janet** 1:20
129:14 130:19
130:20 131:17
131:18
**January** 24:14
**JORDAN** 2:4
10:25 21:1
25:5 28:14
44:21,25 45:1

50:23 52:12
55:2,5,23 59:3
59:7 62:17
70:16 82:1,7
82:19 83:6
87:18 95:2,13
95:17 96:1
99:9,13 105:25
119:23 130:7
**journals** 72:22
**juncture** 102:5
**jurisdiction**
119:15

**K**

**keep** 99:14
**kidnapping** 86:9
**kind** 10:9 12:1
13:1 87:10
88:8 98:7
108:2 109:7
111:25 117:21
118:16
**kinds** 58:6 74:17
118:20
**know** 12:1,2
15:22 19:24
20:25 22:9,21
22:24 31:10,12
31:14,18,21,23
32:1,4,5,7,10
32:18 33:6,22
33:24,25 35:6
36:17,20 37:8
40:3,7 42:4,8,9
48:15,18 49:5
49:19,20,22
53:16 58:5
62:2,6 64:2
70:3 77:25
79:14,14 80:12
83:8,11 88:21
88:25 94:5,6
95:12 99:9
102:8 103:13

111:1 112:3
115:24 117:2
118:18 123:24
124:22,23,25
125:6,8
**knowing** 44:14
110:13
**knowledge**
13:22 20:4
23:22
**knowledgeable**
15:17
**known** 128:13

**L**

**Lamar** 5:8 76:9
**land** 25:13,14,14
**large** 57:12 78:3
**late** 78:7 102:15
**Latino** 93:24
94:2,13
**law** 115:6
**leadership** 7:13
7:15
**led** 36:18,20
**left** 97:5
**let's** 15:1 28:2
30:13 34:4
36:3 37:11
38:21 41:15
43:21 45:3,5
50:19 53:17
55:9 56:7
65:11 67:20
68:13 76:20
77:3,5 78:11
84:4 89:4 96:3
104:22 105:24
110:6 114:25
121:1 122:5
**letter** 98:15
**level** 10:12,21
17:20 23:22
124:13
**levels** 10:11

**license** 26:2,5,8
28:23 64:6
83:9,15 123:23
124:20
**licensed** 23:25
24:20,24 25:14
32:13 33:2
42:21 67:22
77:12,21 86:19
114:22
**licenses** 25:3
26:15 32:23
45:22 61:14
**lieutenant** 5:10
5:12 6:2,20
28:17 70:21
95:4,21 99:2
125:24
**Lights** 86:15
**Likewise** 63:20
**limit** 109:7
**limited** 11:13
59:22
**line** 35:2,9 37:2
65:13 71:20
114:18 116:3
119:12 127:4
**Linz** 69:15 72:9
73:1
**Linz's** 71:20
**list** 4:16,17
24:20 27:22
28:3,22 29:9
29:13,15 32:18
33:12 38:23
77:12 83:16,21
97:5 101:6
103:2 106:16
120:18 124:16
**listed** 28:10
29:15 83:13
97:10 98:20
103:6
**lists** 28:19
100:20

**lit** 76:23
**literature** 42:24
**little** 37:20 38:9
84:25 87:21
92:23 94:18
125:12
**located** 26:23
28:21 29:16
33:19
**location** 41:17
49:4,6,9 76:5
84:23 99:25
101:19 103:10
103:12 109:6
112:17,19,20
113:24
**locations** 34:12
34:18,23 36:1
38:16 39:7,13
40:1 41:11
45:21 47:13
49:1 50:14,21
51:6,11,22
52:8,11,18,23
53:25 54:4,12
54:21,25 55:10
57:9,11 58:20
61:13,17,22
64:5 65:12,16
67:7,22 68:20
74:14 75:12,18
77:21 80:22
81:5 83:4,25
84:19 85:14
90:14,15 92:1
93:9 94:7
100:1,20
105:16 111:13
114:22 115:12
122:16 124:8
**longer** 27:15
77:13,22
**look** 26:18 28:2
30:13 47:2
49:3,18 66:9

Victory Court Reporting, Inc.

73:20 76:13
77:5 89:12
94:7 95:21
96:1 98:11
104:20 105:24
107:4,19
110:21 114:25
115:18,23
118:21 124:7
125:4
**looked** 42:20
47:23 70:2
72:18 106:19
117:17,20
**looking** 17:1
63:17 69:16
71:21 72:4
75:17 99:23
124:2 125:13
**looks** 27:7 28:4
30:1,20,24
73:15 96:9
98:12 104:6
109:21 120:14
**lot** 12:23 26:9
76:23 77:1
83:11,20
101:24
**lower** 56:5 57:23
100:21 101:2
**lowest** 22:10

**M**

**machine** 1:21
**Major** 15:23
123:19 124:13
124:16 125:6
**Majoring** 9:6
**making** 18:16
**mall** 26:6 83:20
**Management**
6:25
**Mann-Whitney**
69:19 72:5
**map** 59:8

**maps** 101:1
**March** 16:18
**MARIE** 2:4
130:7
**Marilla** 1:22 2:5
**marked** 10:23
12:6 24:7
94:21 96:6
95:17 98:10
**Master** 4:18 9:8
101:11
**material** 12:3
**materials** 11:20
**math** 21:10 48:5
51:15,19,24,25
52:1,6 53:15
53:19 54:6,15
54:18,20 55:19
67:8,11,13,14
70:10,17 72:3
78:2 81:22
82:22
**mathematical**
52:21 54:7
**mathematically**
53:25 55:1
70:15 82:17
**matter** 20:5 22:9
41:14 69:23
102:4
**matters** 11:13
11:23
**mayor** 24:15
77:8
**McDonald's**
42:24
**mean** 23:14
25:10 34:15
51:16 52:20
54:20 60:25
68:22 70:13
71:2,3,5 79:2,7
80:20 81:23
82:17 100:20
100:22 101:24

103:20 108:18
110:9,25 112:2
**meaning** 29:11
57:20 58:7
123:14
**means** 20:21
25:11 33:18
51:3,15,20
52:17 53:19
54:2 55:10
67:12 97:25
102:8 103:9
108:17 117:24
119:13
**measured** 35:14
70:1
**measurement**
125:2
**measuring**
47:15 49:5
**media** 13:19
**meet** 76:8
**members** 19:5,5
24:15 117:4
**memorandum**
4:6,8,11 24:14
77:8
**Men's** 27:8 31:8
31:15
**mental** 116:6
**mentioned** 7:5
**method** 109:11
**methodology**
44:10 72:19
**methods** 10:10
10:12,14
**MICHAEL** 2:9
130:7
**middle** 12:1
47:3
**Milford** 72:17
**million** 7:11
**mind** 59:18
**mine** 60:17
**minus** 69:25

**minute** 8:14
32:5 36:4
62:16
**MINUTE(S)**
130:2
**minutes** 125:16
**mischaracteri...**
118:17
**mischaracteri...**
28:14 50:23
52:12 55:2
82:20 83:6
87:18 119:23
**mischief** 17:18
**Misdemeanor**
65:23
**misnomer**
118:16
**missed** 100:6
**missing** 47:2
**misstated** 51:3
**mistake** 95:13
117:8,14
**misunderstood**
117:7
**model** 23:17
69:13
**moment** 94:23
102:24
**Monique** 8:21
**months** 6:21
**motel** 112:15
**Motels** 40:25
**move** 77:3 96:3
**moved** 6:20
**moving** 25:15
**multiple** 108:4
**multivariate**
10:17 42:4,6
**murder** 17:18
37:16 60:13,14
118:6
**Murray** 2:9,9
3:4 5:5 10:24
11:1 21:3,4

25:7 28:16
33:10 44:23
51:2 52:13,14
55:6,25 59:5
59:12,13 62:15
62:19 70:20
82:3,22 95:3,5
95:16,20 96:3
96:5 99:16,21
106:1 119:25
125:16,19,22
130:2,7

**N**

**N** 2:1,14 3:1 5:1
**name** 5:6 11:5
100:22,25
103:10,11
127:2 128:15
**names** 101:3
**near** 25:14
113:23
**nearly** 6:10
37:20
**necessarily**
43:25 76:7,15
107:25
**need** 49:20,21
76:8 113:23
**needs** 76:17
82:23 116:6
**negative** 90:23
**negligent** 60:14
**neighborhood**
23:1
**neighborhoods**
43:15
**neither** 130:9
**net** 125:11
**never** 41:24 42:4
42:8 43:9
59:18 78:2
**new** 23:17,17
81:19
**NIBRS** 6:25

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 90 of 399   PageID 1215
Victory Court Reporting, Inc.

Page 143

17:9,16,23
18:1,1,9,11,12
18:12,17,17,18
18:20 45:13
107:9,17,18,19
107:20,25
108:7,10,11,14
108:18 110:17
110:22 114:12
**night** 41:14
58:16 62:9
69:9 78:7
102:15 118:10
119:9,10,21
**nightclub**
111:24
**nightclubs**
40:13 58:9
123:4
**nine** 28:4,5
29:19,25 30:17
34:11 79:21,23
80:1,8,10,18
80:20,22 81:19
81:19 82:6
84:8 87:11,22
**ninth** 30:10
**nonadult** 40:13
58:16,16 62:9
123:4
**noncritical**
103:7
**nonoperational**
83:13,25 85:5
90:6,8 91:15
92:22
**nonparametric**
69:18
**normally** 118:17
**North** 7:9
**NORTHERN**
1:1 129:1
**northwest** 15:10
15:24 16:15
17:3 19:9 21:6

22:16,20 37:25
**NOTARY**
128:23
**noted** 128:3
**notice** 4:3 24:13
107:8
**November** 6:23
7:4 8:10
**nude** 14:3 27:11
29:18 30:23
80:17 82:6
84:17 87:14
89:18,21 91:3
92:13 123:23
124:22
**number** 4:2,19
22:25 25:21,23
25:25 26:2,5,8
26:11 31:20
38:24 39:16
51:13 52:10
53:4 60:5
67:17 71:7
73:14,15,21
79:4 83:3
84:15 86:17
97:23 98:23
99:2 101:6,11
101:12,18,18
102:12,23
104:19,20
105:8,22,23
106:3 107:22
108:4 109:8
110:11,16,19
110:25 112:10
112:12 113:12
113:13,14,15
114:11 115:3
116:23 117:23
118:23 119:13
121:12 122:6,7
**numbered** 1:18
**numbers** 8:12
8:18 73:9

84:13 88:15
99:10,10,14
104:21 107:25
108:16,22
110:14,20
115:24 121:4
124:2 125:14

————————
**O**

**O** 5:1
**o'clock** 15:2
**oath** 128:13
**object** 21:1
70:16 110:10
112:2,5
**Objected** 110:8
**Objection** 25:5
28:14 44:21
50:23 52:12
55:2,23 82:1,7
82:19 83:6
87:18 119:23
**obligation** 18:7
**obtain** 9:17
**obviously** 20:9
60:25
**occur** 18:3 77:1
112:14 118:10
**occurred** 17:3
20:18,22 21:7
32:8 34:24
36:12 41:20,21
46:1,2,6 47:5,9
47:13 48:7,9
53:5,18 63:6,7
63:14,19,22,22
64:7,9,16,16
65:5,8,16 67:6
67:16 73:12,17
76:1 79:3,4
81:2 85:13,15
85:16 88:16,22
89:1 90:12
91:25 92:4
108:23 111:12

112:13 115:10
118:15 119:2,7
119:17 121:14
130:16
**occurring** 47:4
**occurs** 108:4
**odd** 56:18
**offense** 8:15
17:24 86:11
108:23,24
110:17 111:20
114:4 116:18
118:10,15
**offenses** 4:16
17:14,17 55:16
60:12 61:18
64:22 65:23
78:14,20,21
80:19,21,25
83:3 89:5
100:4 104:17
105:6 106:10
106:10,11,12
106:16 107:20
107:20,23
108:4,12,15
114:1 117:18
**offered** 13:19
**offers** 14:2
**office** 1:22 2:4
8:8 96:8
128:19
**officer** 6:1 8:7
8:14 102:15
111:5,19
129:18 130:4
131:3
**officer's** 131:8
**officers** 111:7,9
116:13,16
**officially** 101:19
**Ohio** 2:10
**okay** 6:1 7:2 8:9
9:2,14,16
10:16,19 11:25

12:20 13:1
14:13 15:25
16:5,9,14 17:1
17:6 18:21
19:8 20:2,8
21:3 23:1,4,12
24:8,13,19,23
25:17 26:11,14
26:22 27:1,7
27:17,21 28:2
28:19 29:14,18
29:21,23 30:13
30:17,23 31:1
31:4,7,10,14
32:4 33:22
34:4,8 36:5,12
36:23 37:11,19
38:9 39:6,11
39:19,25 40:25
41:2,17 42:14
43:24 44:3,14
45:3,5,12,15
45:19 46:10
47:18 48:6
49:8,18 51:8
51:13 52:17
53:23 54:17
55:14,25 57:1
57:5 58:3,14
58:19,23 59:2
59:12,13,21
61:10 62:2,22
64:12 65:11,18
65:25 66:9
67:1,5,11,20
68:13,14 69:10
69:13 70:3
71:5,25 72:21
73:5,11 75:4,7
75:22 76:1
77:3,3,7 78:6
78:11,13,24
79:1,16 80:15
83:1 85:8 86:1
86:14,16,21

87:9,25 89:4,8
89:12 90:9
91:3,7 92:7,25
93:6,20 94:18
95:5,20 96:3
96:12,17,20
97:13 98:9,19
98:23 99:4,8
99:12,15
100:16,19
101:9 102:4,12
103:10 104:7
104:22,24
105:7,11,17,18
105:20 106:1,2
106:5 107:15
109:10,13,18
109:22 110:3,6
110:6,22,24
111:2,16
113:14 114:9
114:18,25
116:8 120:9,22
121:3,11,23
122:10 123:16
123:24 125:16
**old** 17:12 107:24
**once** 6:15 109:9
124:7
**one's** 93:11
**ones** 33:7 72:13
85:5 86:6,7
103:6
**ongoing** 16:20
**open** 7:17 15:1,1
15:6 24:24
31:11,19,20,24
32:1,20 38:23
39:9 40:4,13
40:18 43:1,6
43:22 46:22,24
77:13 78:7
83:11 88:18
**operated** 16:17
**operating** 4:14

25:8,17,25
26:2,11,16
27:14,15,18,24
30:11 31:2
32:24 45:22,23
77:22 83:9,19
83:19,21
**operation** 14:21
29:24 31:5,15
43:14 49:15
85:3
**operator** 103:18
**opportunity**
99:17
**opposed** 31:20
45:12 125:1
**oral** 1:10,16
129:18
**Order** 97:4
**orders** 4:13 98:5
**ordinance** 11:14
12:12,15 13:13
14:18,24 95:24
**organize** 11:11
**organized** 12:24
**oriented** 12:14
12:16 13:7
14:17,22,25
24:1,4,16,20
25:12,14 26:15
26:23 27:18,24
28:20 32:14,19
33:3,19,23
34:12,19,23,25
36:1,13 39:4
40:4 41:12,17
41:21 42:2,25
43:21 44:5,8
44:17 45:21
49:1,16 50:16
57:2 58:15
61:14,17 63:2
64:6 65:12
67:7,17,22
68:2,9 74:13

74:25 75:12,24
77:12,21 85:3
86:19 87:4
88:17 90:15
104:15 105:2
111:14 114:5
114:22 115:11
116:9 119:8,18
121:15 122:15
**original** 94:25
95:1 131:2,6,9
**originally**
106:19 108:19
111:4 119:4
**originated**
114:12
**outcome** 130:13
**outlets** 41:2
**outside** 20:22
21:7,11 23:22
33:19 73:18
120:3
**outstanding**
65:21 117:16
**overbroad** 44:25
**overdosed**
116:12
**overlap** 41:14
**oversee** 8:18
**overseeing** 8:12
**Overview** 37:12
45:7

_____
**P**
**P** 2:1,1 5:1
**p.m** 1:19 19:13
20:16,19 21:23
21:25,25 22:2
22:2 35:22,24
36:7 39:21
40:5 46:2,7,14
47:4,11,12
48:4,7,10,17
48:20 50:7,25
53:2,11 54:8

56:3 61:11
63:1,5,7,19,20
63:22,25 64:7
64:16 65:1,9
66:1 68:5
71:11,17 74:23
75:1,1 76:1
78:20,21 80:22
80:23 81:3
85:11 86:22
89:6 90:3,24
91:4 102:7
126:1
**package** 107:6
**page** 3:2 4:2
11:6 13:2,6
14:6,7,13,16
14:20 15:9,12
15:13,15,16,18
17:1,2 18:21
18:24 22:5,13
22:14 23:24
24:13,19 26:19
28:3 32:11,12
34:5,6 36:23
37:11 45:4,6
47:23 48:13,17
49:18,24,25
56:7,8 62:19
62:25 64:20
65:11 66:9
67:20 68:13
73:20 74:12
75:7 77:16
78:12 83:17
86:2 89:4 97:2
97:3,3,7,23
98:14 99:1,2,5
100:20 101:5,5
104:23 105:17
106:5,20,23
107:8,16,17
109:18,20,23
110:1 114:3,9
114:15 115:14

115:14 116:1
116:25 118:21
120:9,15 121:4
127:4 131:5
**pages** 48:15
88:14 89:9
95:10 99:19
100:9 104:8
105:7,12,20,24
109:13 115:17
121:6,12
**Pal** 116:10,12
**Palk** 123:20,25
124:13,16
125:6
**Pals** 116:11
**Pancakes** 40:22
**paper** 60:25
**paragraph** 11:7
**parameters**
86:16 89:9
90:11 91:21
99:22
**parking** 76:23
77:1 111:24
**part** 9:14 10:4
17:7,12 18:8,8
37:13 43:3
45:10 95:9
96:10 97:21
107:6 122:18
123:2
**partial** 115:16
**partially** 115:16
**participated**
97:19
**particular** 20:6
38:1,5 43:25
49:9,15 57:25
80:9 95:14
97:21 120:20
**particularly**
97:22
**parties** 130:5,10
131:13

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 92 of 399   PageID 1217
Victory Court Reporting, Inc.

Page 145

party 129:25
passage 95:23
patrol 6:7,9,13
  6:19,21 19:9
  20:14
PD 118:24 120:7
PDF 75:15 99:11
  122:18
peer 72:21,24
Pennsylvania
  9:6
people 8:1 43:1
  117:15 118:12
  120:1
percent 19:14
  19:19 20:17,21
  21:5,10 23:25
  33:2,15,18
  35:21,24 36:3
  36:6,9,14
  37:21 38:7,11
  39:17,20,22
  46:5,7 47:3,5,6
  47:13,14,18,22
  48:3,4 61:16
  61:17,21,24
  62:2 63:1,3,6,9
  63:22 64:6,8
  64:15,16 65:3
  65:8 69:22,24
  73:13,17 75:1
  75:1 78:20,21
  80:18,20,23,25
  82:11,11 93:20
  93:23 94:1
percentage
  21:19,22 22:6
  22:10 41:6
  46:13 49:13
  62:3,6 64:25
  85:15 88:25
  92:3
percentages
  62:25 74:18
performed 14:4

period 20:18
  21:20 22:6
  35:18 38:20
  47:22 48:4
  52:2,3,22 54:8
  54:24 55:21
  56:6,10 63:5
  63:11,13,16,18
  64:7,9,9,15
  65:4 66:14
  67:2,6,9 68:16
  70:1 71:8,16
  71:22 73:8,18
  74:9 75:23
  78:15 79:25
  80:11 81:3,4,9
  81:22,25 82:15
  84:2,11,19
  85:11 87:15
  88:2 89:5,6,20
  89:24 90:3,10
  90:13 91:22
  92:1 93:1
  94:10 105:1
  121:15
periods 89:14
permit 15:6
permitted 34:2
perpetrator
  20:4,5
person 7:19
  15:17 16:11
  18:3 20:3,6
  76:6,19,20,20
  76:22 103:12
  103:17 107:24
  111:9 113:7
  128:15
personally
  128:12
persons 93:21
perused 72:18
Ph.D 9:17
phone 76:14
pick 43:20

107:25
picked 43:19
  44:3 45:12
  60:11,13,15
  113:17,20
  119:14
pie 93:11
piece 112:7
pieces 115:16
pivot 106:25
  107:1,4 109:17
  109:21 115:17
  115:25 116:21
place 11:9,25
  18:15 76:24
  111:22 118:2
  124:1
placed 23:7
places 11:6
Plaintiff 1:4,17
  2:3 4:1 129:4
  130:7 131:9
Plaintiff's 11:1
  12:7 24:7
  27:21,23 28:3
  30:14 32:12,17
  33:12 34:4
  38:23 77:3,6
  94:22 95:6,9
  96:6,22,24
  97:17 98:10,11
  98:12,13,16,17
  99:1,23 104:22
  106:2,6,8,20
  109:14 115:2,5
  115:15 120:24
  121:1,3,8
  122:1,5,6
  123:17
Plaintiffs 115:1
please 5:6 49:22
  65:2 109:3
pleasured 35:2
plot 25:13
plugged 108:10

plus 15:5 105:20
point 32:23 47:3
  47:25 100:14
police 6:2,6,18
  7:3,5,7,8,12,16
  7:24,25 8:2,13
  10:1 16:6 76:8
  76:8,24 98:6
  101:14,14,19
  103:24 110:15
  111:7 112:17
policy 116:11
poll 57:22
poorly 106:24
population 43:5
  43:11
portion 13:19
pose 5:16
position 6:22
  8:10,12 11:21
positions 7:17
positive 75:14
possible 54:19
potential 90:14
PowerPoint
  12:11
preceding 48:13
  83:17 89:9
precise 55:9
precisely 13:17
prefer 125:25
preferably 43:3
premise 112:25
premises 111:22
prepare 11:20
  122:2
preparing 131:9
present 26:9
presentation
  11:12 22:5
  34:6 50:1 56:8
  73:22 96:14,25
  97:18 122:2,20
presented 22:14
  122:3

pretty 33:16
  73:3 78:3
  84:15 102:8
  116:11 120:14
  125:5
prevent 25:15
previously
  115:10
printed 106:24
prior 119:3
priorities 86:6
prioritizing 86:5
priority 86:1,3
  86:12,22,24
  97:6,12,14,23
  97:24,24,25
  98:1,2,7
  102:23 103:1,4
probably 62:23
  118:4
problem 42:23
  102:20 116:6
Procedure 1:24
Procedures 4:14
proceeding
  130:11
Proceedings
  126:1
produced 1:16
  96:13
progress 86:9,9
  86:10,12 97:6
  97:9
promoted 6:8,20
proper 16:11
  42:23 43:2
  44:10,18
property 35:2,9
  45:9,17,19
  46:1,5,10,18
  46:20 47:4,8
  47:12,13,18,25
  48:1,6 50:6,25
  51:5,9 53:1,5
  53:24 55:4,7

Victory Court Reporting, Inc.

55:11,16 56:2
59:22 60:8
106:17 107:14
**proposition** 68:9
**prostitution**
35:17
**proved** 128:13
**provide** 124:4
124:16
**provided** 99:18
122:11 123:20
**provisions** 1:24
**psychology** 9:6
**Public** 2:10
128:23
**published** 44:1
72:11
**pull** 60:8 97:7
108:12 110:14
**pulled** 34:16,17
64:22 101:1
102:10 106:17
108:19,21
114:21 117:6
117:18 123:2,2
**pulls** 107:19
**purposes** 16:17
18:23 21:17
109:22 128:17
**pursuant** 1:23
130:3,14
**put** 12:12,21,22
15:21 28:24
56:14 59:16
60:6 61:2
63:14 99:10
118:8,9,14,20
**puts** 18:25

**Q**

**question** 5:15,22
5:24 21:2 25:5
29:6 37:1
44:22 55:10
66:21 70:18,21

73:6 82:2,7,19
88:22 95:5,23
124:19 125:22
**questioning**
59:10
**questions** 5:13
**quick** 73:3
**quickly** 94:20
**quite** 124:15

**R**

**R** 2:1 5:1
**RA** 103:20
**radio** 101:16
**radius** 34:20,24
35:13 36:13
38:3,20 39:6
39:12 40:1
41:7,11 44:18
45:20 46:21
47:16 49:5
51:5,10 54:12
57:6,9,16
58:20,24 61:16
61:21 64:5
65:16 67:7,21
68:22 69:1
74:14,25 75:11
75:17 77:20
78:1,4 79:5,15
79:20 80:11
81:4 84:10,15
84:22 86:17
87:3,22 88:1
88:17 89:15
90:13 92:1
93:8,16 104:14
105:2 111:13
112:16 113:18
114:22 121:15
122:16,23
124:11 125:1,5
**radiuses** 46:6
**rank** 6:2 9:1
**rape** 37:16

**rate** 23:8 43:7
**raw** 98:23
105:23 106:7
107:5
**reaches** 10:21
**read** 72:6,11,13
72:14,25
125:23,24,25
128:2
**reads** 11:9
**realized** 117:25
**really** 8:12
68:22 79:2
102:4 109:14
112:6 123:16
**reason** 17:19
18:14 29:2,8
29:12 71:3
108:5 116:14
117:8 119:11
123:25 127:4
**reasons** 131:5
**recall** 122:13,22
122:23 124:12
124:14
**recheck** 54:18
**recognized** 73:3
**record** 1:24 5:7
59:3,6 85:9
86:4 125:21
129:19 130:6
**recorded** 18:1
**records** 18:2
**red** 50:7
**redacted** 98:24
105:23 115:6
**refer** 102:14
**reference** 42:25
76:13
**referenced** 59:9
**referral** 116:2
**referring** 107:16
**refers** 34:22
**reflect** 76:25
**Regal** 113:8

**regard** 14:10
**regards** 76:19
**registered**
124:19
**Registration**
130:21 131:19
**regression** 10:13
10:17 42:5
**regressions** 42:6
**regularly** 31:11
**regulations**
14:16,22
**reiterate** 77:18
**related** 12:12
22:15 34:12,15
34:22 35:17
36:15 60:12
79:12 94:7
97:21 125:10
130:10
**relates** 42:24
**relationship**
75:24
**relevance** 96:23
105:12
**relevant** 11:10
95:18,22
**relied** 122:2
**remain** 14:25
15:1,6
**remaining** 64:8
86:25
**remember** 18:12
63:14 72:15
**remove** 56:16,19
108:22
**removed** 109:8,9
121:22
**renamed** 6:24
**repeat** 13:16
65:2 72:20
**report** 8:14,20
8:21 18:8,16
18:17 45:16
60:8 63:12

76:19 81:23
110:17
**reported** 1:21
8:17 20:3,4,18
20:22 21:6
37:21,24 38:6
38:12,12,13,19
39:12,13 40:1
41:7,25 45:20
46:5,18,21
47:12 50:3,10
50:13,20 51:4
51:10,17,21
52:4,9,15,17
52:22 53:1,4
53:10,17,20,24
54:3,11,15,22
54:25 55:11,16
55:20,21 56:1
59:24 60:5
61:12,18 63:16
63:18,21 64:4
64:8,13 65:4
75:22 79:3
80:1,5 81:2,8
81:14 83:4
84:1 85:12
89:19 91:24
113:5,6,7
**reporter** 49:21
129:14
**Reporter's** 3:6
129:11
**reporting** 18:9
18:20 103:21
103:22 130:21
131:19
**reports** 8:22,23
18:11 19:21
61:1 72:23
81:18 105:6
108:2 112:4
**represent** 96:13
122:1
**representative**

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 94 of 399   PageID 1219
Victory Court Reporting, Inc.

Page 147

11:17
**represented**
105:7,21
114:19 122:1
**required** 112:4
**requirement**
18:10
**requirements**
130:14
**requires** 12:16
**Rescue** 4:20
122:9
**research** 6:18
7:14,18 10:10
10:11,12,14
56:18 125:4,4
125:13
**researchers**
56:15
**residence** 60:15
**residential** 58:8
58:13
**respect** 42:1
48:24 75:12
**respective** 85:14
**responded**
101:21
**response** 11:12
86:13 95:8,8
96:10 97:12
101:20,23
102:10 124:18
**rest** 85:16 94:4
117:20
**restate** 52:13
**restaurant**
40:23 41:16,22
42:1 49:10
62:11
**restaurants**
40:18,21
**resulted** 65:19
**retail** 13:20 41:2
**retrieve** 60:4
**retrospect**

125:13
**return** 129:23
**returned** 131:2
131:4,6
**review** 8:15
42:20
**reviewed** 8:15
8:16 11:2,20
35:16 72:21,24
**Richardson** 2:14
**Richmond** 72:17
**right** 14:6 15:14
17:15 18:21
23:24 24:6
25:18 26:20
29:22 30:8
37:11 43:8
44:19 47:21
49:7 55:5,7
61:10 64:23
70:15 72:3
76:6 80:7
83:16 84:2,6
87:17 92:10
94:11 97:15
99:3 102:22
103:12 105:3
108:5 109:16
113:19 114:7
115:20 116:23
119:7,15
120:22 122:22
125:24
**RNS** 110:22
**Road** 130:22
131:20
**robbed** 17:22,22
108:25 111:11
112:18,18
113:4
**robberies** 35:17
118:10
**robbery** 17:21
17:21,23,24
37:16 108:3,3

108:9 111:11
112:22 113:7
118:15
**ROGER** 2:12
130:8
**role** 11:16 16:5
**room** 17:22
113:13,14
**roughly** 17:10
73:15
**round** 80:4
**routine** 111:6
**Row** 113:9
**Rule** 130:14
131:1,12
**Rules** 1:23
**run** 109:5

---

**S**

**S** 2:1 5:1
**s/** 130:19 131:17
**safe** 76:24
**Saloon** 27:8
31:15
**San** 42:22 56:15
69:16,17 72:14
72:15 73:1
**Sarmienta** 15:23
**Saturdays** 15:2
15:6
**saw** 72:19 74:18
124:3
**saying** 38:11,18
39:11,16,19
47:8,20 64:4
64:10 69:25
71:16 79:9
80:20 81:17
102:5 125:25
**says** 19:15 25:7
26:11,18 32:13
33:1 34:8,8,11
35:16 36:6
37:2,19 51:24
54:20 56:9

57:1 65:13
66:5 76:16
98:23 101:9
102:7 111:10
112:18,20,25
118:23
**scene** 118:3
**school** 6:15,15
**Science** 9:8
**screen** 112:4
**se** 57:13
**seal** 128:19
**search** 61:3
**searched** 61:6
**second** 13:2
24:19 26:19
59:4 71:16
97:3 102:18
**secondly** 5:18
112:16
**sector** 104:2,3,4
104:5
**sectors** 104:4
**see** 14:8 15:1
22:13 23:12
25:18,19 26:19
26:21 28:2
30:18 32:14
34:6,13 37:22
47:20 52:25
57:3 63:5
66:13 73:25
75:4 78:22
84:5,8 90:17
91:10 93:20
97:2,8,22
98:20,24 99:1
99:2 100:4
101:5,7 104:7
105:17 106:3
115:2 116:2
118:5 121:4,6
124:3,25
**seeing** 29:22
56:17 124:8

**seen** 73:4
**segments** 103:22
**selected** 125:2
**self-explanatory**
114:10
**Senate** 14:14
**send** 86:6 96:11
**sense** 57:12
**sent** 28:23 75:15
75:18 96:10
101:19 106:25
115:22 123:11
**separate** 112:14
123:11
**sergeant** 6:8,13
6:19 7:25 9:1
**sergeants** 8:25
**series** 5:12
**serve** 11:17
**served** 121:13
131:13
**service** 68:15,16
69:1 70:13,14
71:7,10 73:17
73:22 74:1,9
75:8,23 76:4,5
76:9,25 91:19
91:25 92:8
100:17,18,19
101:12 102:21
103:16 104:9
104:14 105:4
105:12,13,14
110:4,25
114:11,13
121:10,14
122:14 123:7
**services** 116:2
**set** 38:2 72:8
77:15 89:10
100:17 122:17
122:18 123:6
123:10
**seven** 12:17
17:13,24,25

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 95 of 399   PageID 1220
Victory Court Reporting, Inc.

Page 148

26:14 31:19
32:22 39:5
77:13 83:3
84:1,21 102:16
102:17 103:25
104:4 122:7
**seventh** 83:21
**severance** 107:9
**sexually** 12:14
12:16 13:7,18
14:17,22,25
24:1,3,16,20
25:12,14 26:15
26:23 27:18,24
28:20 32:14,19
33:3,18,23
34:12,19,22,24
36:1,13 39:3
40:4 41:11,17
41:21 42:1,25
43:21 44:5,8
44:17 45:21
49:1,15 50:16
57:2 58:14
61:13,16 63:2
64:6 65:12
67:7,17,22
68:2,9 74:13
74:25 75:12,24
77:12,21 85:3
86:19 87:4
88:16 90:15
104:15 105:2
111:13 114:5
114:22 115:11
116:9 119:8,18
121:15 122:15
**sheet** 47:11
124:17
**Sheils** 2:13
**Shelters** 4:10
**shift** 102:15,17
**shifts** 102:14,14
**Shippensburg**
9:5

**shooting** 86:8
**short** 102:20
**shorthand** 1:21
129:14
**show** 10:23 12:6
24:6 44:16
47:24 90:22
94:21 96:5,21
96:25 97:16
98:9 109:5
110:15
**showed** 83:17,21
94:10 109:8
**shown** 62:25
131:13
**shows** 50:7,8
76:2 82:25
92:7,25 94:9
101:18 116:1
118:5
**side** 13:22 97:5
**signal** 111:3,4
111:11
**signature** 3:5
127:1 128:2
129:23 131:4
**significance**
10:21
**significant** 37:6
37:9 66:19,24
69:6,11,13,21
72:7 73:9 75:5
88:25 90:23
91:8 92:20
**similar** 43:11,12
43:14,14,16
44:1
**simply** 47:23
58:19 72:20
107:4
**single** 108:14
**sir** 5:10,20,25
6:4,7 7:25 9:7
9:9,11,13,15
9:18,20,23

10:3,6,8 11:8
11:15,19,24
12:9,19 13:5,8
13:11,15,25
14:5,9,12,15
14:19,23 15:4
15:8,11 16:4,8
16:16,19,22,25
17:5,8 19:4,11
19:15,17,20
20:1,11,14,14
20:20,24 21:14
21:16 22:8,17
22:19 23:3
24:2,5,10,12
24:18,22 25:1
25:4,22,24
26:7,25 27:20
27:20 28:6,8
28:11,22 29:10
29:20 30:3,7
30:16,25 31:6
31:9,12,17
32:9,11,16,21
32:25 33:5,13
33:21 34:3,7
34:10,14,21
35:1,15,20
36:8,11,16,19
36:22 37:4,7
37:10,10,15,18
37:23 38:15
39:8,10,15,18
39:21,24 40:2
40:6,8,10,12
40:15,20,24
41:1,4,9,13,19
41:23 42:7,11
42:16 43:13,23
44:2 45:8,11
46:4,12 47:7
47:10,17 48:23
49:12 50:2,5
50:15,17 51:7
51:12,14,19

52:7,16,19,24
53:3,7,9,13,22
54:1,5,14,17
54:23 55:8,13
56:6,11,22
57:4,7 58:18
58:22 60:7,21
60:24 61:5,9
61:23 62:21
64:11,21 65:7
65:10,14,17,20
65:22,24 66:8
66:12,15,17,25
67:4,19 68:18
68:21 69:2,4
70:7 73:19,24
74:5,5,11,16
74:20,22 75:3
75:6,10,25
77:17,24 78:5
78:25 79:11,24
80:3,7 81:10
81:12,16,21
82:4,9,13,16
82:21 83:8
84:7,12,16
85:1,7 87:20
87:24 88:3,13
88:20,24 89:7
89:11 90:5,8
90:16,19,21
91:2,20,23
92:2,9,12,15
93:10,17,19,22
93:25 94:3,12
96:16 97:2
98:22,25 99:4
99:7 100:12,15
101:8,22 102:6
102:9,25 103:3
104:11 106:4
108:8 109:12
109:24 110:2
110:23 111:15
111:18,21,23

112:1,9,11,24
113:2,10
114:24 115:4,8
115:13 116:4
116:25 117:11
117:13 118:22
120:1,12,21,25
121:2,7,20
122:4,9,12
**sirens** 86:15
**sit** 44:14
**site** 42:9 43:2,10
43:20,20 44:4
44:7,8
**sites** 42:9,19,23
44:19
**sitting** 98:3
**six** 12:17 19:18
20:16,19 21:7
21:20,25 22:2
36:9,14 37:3
37:20 38:7
39:14,22 40:5
46:2,8,15 48:7
48:10,16,18,19
48:20 50:8
51:8,18 52:2
53:6,12,18,22
54:8,13 56:3,5
61:20 63:6,8
63:23,25 64:10
64:17 65:1,5
66:2,4,14 67:3
67:6 68:6,10
69:3,19 71:13
71:23 73:12
74:1,9 75:2
76:2 78:21
81:3 82:12
83:20 84:2
85:12,16 86:22
87:15 88:19,23
89:6 90:18,25
91:12 92:5
95:25 121:5

Victory Court Reporting, Inc.

| | | | | |
|---|---|---|---|---|
| **sizeable** 117:23 | 59:18 66:22 | **STATES** 1:1 | **street** 1:22 2:5 | 51:2 62:17,22 |
| **skip** 14:6 | 71:9 72:1,14 | 129:1 | 8:14 57:24 | 62:23 70:3,16 |
| **slide** 12:25 | 74:3,5 87:11 | **station** 62:4 | 111:8 | 80:19 82:23 |
| 81:16 96:24 | 89:21 96:1 | **stations** 40:7 | **streets** 57:24 | 85:9 102:2 |
| **slides** 34:11 | 97:3 100:22 | **statistic** 10:5 | **stretch** 55:19 | 116:14 117:19 |
| 122:18 | 106:14 123:15 | 37:19 | **strictly** 18:11,20 | **surrounding** |
| **slight** 92:11 | **sort** 10:14 86:11 | **statistical** 10:7 | **strike** 50:19 | 39:12 57:9 |
| **slightly** 66:16 | 110:22 | 10:15,21 107:5 | 59:18 | 58:20 61:13 |
| 73:13 | **sound** 70:15 | **statistically** 37:6 | **strip** 26:6 83:20 | 67:21 77:20 |
| **small** 52:10 | **sounded** 76:12 | 37:8 61:2 | **stuck** 115:22 | 86:18 87:23 |
| 84:13,15 | **sounds** 45:1 | 66:19,24 69:6 | **students** 8:5,6 | 104:14 |
| **smaller** 23:10 | 80:7 | 69:11,13,20 | **studies** 44:1 | **survey** 10:11 |
| 31:20 53:4 | **source** 28:25 | 72:7 73:9 75:5 | 77:25 125:5 | **suspect** 118:13 |
| 103:22 104:5 | 110:22 | 91:8 92:20 | **study** 41:6 42:10 | **suspicious** 111:8 |
| 105:23 | **South** 5:8 76:9 | **statistics** 10:10 | 56:12,23 69:15 | **sworn** 1:18 5:3 |
| **smallest** 60:10 | **speaking** 55:1 | 10:13,13 44:16 | 71:22 72:6,25 | 8:7,24,25 |
| **SOB** 4:7 12:12 | 61:2 | 57:8 60:22 | **studying** 43:24 | 129:18 |
| 25:12 34:18 | **specific** 31:12 | **stay** 31:11 | 91:22,24 | **system** 7:1 17:12 |
| 38:2,16,25 | 49:1,4 61:3 | **stealing** 86:9 | 121:16 | 17:16 18:12,17 |
| 47:13 57:10 | **specifically** | **Stephen** 1:11,16 | **style** 99:11 | 98:7 107:9,18 |
| 59:14 68:20 | 13:12 35:23 | 3:4 5:2,8 127:2 | **subject** 11:22 | 107:18,24,25 |
| 83:10,12,15,15 | 124:6 | 128:2,6 129:11 | 43:25 | 108:10,11 |
| 93:4 94:7 | **spit** 100:13 | 129:17 | **submitted** | 110:13,18 |
| 105:15,22 | 108:6 | **stole** 109:2 | 129:21 | 113:21 |
| 106:7 112:19 | **spread** 80:13 | **stop** 76:24 | **subscribed** | |
| 112:20 121:5 | **spreadsheet** | 101:15 111:9 | 128:16 | **T** |
| 122:8 123:2 | 107:7 120:10 | 118:18 119:5 | **substantial** | **TABC** 42:21 |
| **SOBs** 57:15 63:6 | 122:21 | 119:10,22 | 13:19 | **table** 13:3 |
| 63:19 124:8 | **square** 2:10 78:1 | **stopped** 62:21 | **subtract** 71:6 | 106:25 115:17 |
| **social** 116:2 | **staff** 8:4 23:22 | 117:24 119:5 | **suggest** 113:3 | **tables** 107:1,4 |
| **socioeconomic** | **stamp** 102:9 | **stops** 65:19 | **Suicide** 10:1 | 109:17,21 |
| 43:4 | 114:19 115:3 | **store** 13:9,10,17 | **Suite** 2:10 | 115:25 116:21 |
| **somebody** 17:22 | 122:6 | 28:5 30:2,17 | 130:22 131:20 | **take** 18:18 28:2 |
| 18:25 19:1 | **stamped** 101:6 | 62:7 79:5,13 | **summarize** 6:5 | 30:13 41:15 |
| 76:12,18 116:6 | 106:3 | 80:12 | 9:4 13:1 | 49:18,20 59:21 |
| 116:11 117:24 | **Standard** 4:14 | **stores** 27:1 32:8 | **summary** 17:12 | 71:5 77:5 78:8 |
| 118:1,8,18 | **standpoint** | 40:9,11,16 | 18:18 | 95:20 105:24 |
| 119:2,14 | 52:21 | 41:3 46:22 | **supervisor** 6:9 | 108:14 113:24 |
| **SOP** 97:20,21 | **start** 109:23 | 58:9,15,16 | 8:25 | 114:25 116:13 |
| 98:6 | **starting** 88:12 | 78:19 79:16,21 | **support** 16:7 | 117:14 118:2 |
| **sorry** 8:5,24 | **state** 1:20 5:6 | 79:23 80:10 | 68:9 | 118:21 |
| 21:9,11 23:14 | 128:8,24 | 84:9 87:9,11 | **supposed** 27:23 | **taken** 1:18 130:4 |
| 29:7 36:23 | 129:15 | 89:13 90:17,25 | 80:20 106:9 | 130:12 |
| 42:12 43:16 | **stated** 1:24 | 91:2 92:10 | **sure** 8:16 32:5 | **talk** 16:12 42:18 |
| 49:2 55:5 | **statement** 80:15 | **Strain** 9:25 | 38:10 43:11 | 78:11,18 82:10 |
| | 80:16 | | | |

89:5 118:7,11
118:12,12
**talked** 35:21
77:7,11 78:6
98:8 102:23
111:2,17
120:23
**talking** 12:15
16:23 17:6,7
18:21 19:21
20:2,16 23:21
28:16 34:23
37:13,24 38:1
38:13,22,24
39:6,25 45:4,9
45:19 46:17,20
49:25 50:10,13
51:20 52:10
55:6 56:21,24
57:5 59:23
60:19,22 61:7
65:15 67:17
68:19 70:3,5
72:9 75:7,11
80:4,5,8 81:1,7
81:13 82:14
86:17,21 89:19
89:23 90:10,11
91:21 93:7,15
96:15 97:1,8
113:15
**talks** 14:13
23:23
**Task** 15:10
16:15
**teaching** 7:15
**tedious** 94:19
**Telephone**
130:23 131:21
**tell** 11:2 15:12
48:6 51:3 63:2
95:7,13,21
96:23 99:24
106:8,23 114:7
115:15

**telling** 103:7
109:15 122:19
122:25
**tells** 26:22 85:18
103:8
**Temporary** 4:10
**ten** 48:16 62:15
63:25 67:2
89:15
**terms** 49:10
**test** 69:18,19
72:5 73:10
**testified** 5:3
**testify** 11:21
**testimony** 50:24
55:3 108:6
119:24 129:19
130:4
**Texas** 1:1,21,23
1:23 2:5,14 5:9
7:9 14:4,21
129:1,15
130:20,23
131:18,21
**tham** 5:19
**Thank** 5:10 12:5
49:23 97:16
98:9 125:19
**theaters** 27:4
**theoretically**
43:20 51:23
52:20 55:13
**theory** 9:25 10:7
**therefor** 131:5
**thesis** 9:14
**thing** 9:3 47:21
83:1 96:20
100:8 111:25
**things** 32:4 61:1
109:1 111:24
115:18
**think** 30:4 33:7
33:10 42:14
45:5 62:19
70:18 72:3

81:19 82:25
86:2 94:25
95:22 96:4,24
101:10,25
109:19 124:15
124:16
**thinking** 76:23
**third** 83:18 97:3
102:18 107:15
109:18
**thirds** 39:13
**thought** 47:16
71:20 72:6,19
96:4 101:4
104:12 106:15
107:11 108:5
116:19 117:8
**thousand** 125:5
**three** 6:10 8:24
8:24 15:2
22:15 23:25
24:3 28:12
29:17 30:4
33:7,11,19,23
35:18 38:5,6
38:19 52:9
56:1,6,13,23
67:8,11 68:16
70:1,6,8,12,24
71:7 72:17,18
73:8 75:23
78:15 79:25
80:11 81:4,15
81:22 82:15
84:14,19 86:8
87:17 88:1,8
89:5,20,24
90:10 93:1
94:10 97:12
98:23 102:18
102:19 103:1,9
105:8 107:23
108:25 109:4,6
110:20 115:17
121:14

**threes** 86:6 98:1
**tickets** 119:6
**till** 15:1,2
**time** 6:14 7:17
8:7 21:11
23:20 43:1
46:14,15 47:9
47:24,25 49:19
51:25 52:1
54:24 56:10
63:17,21 66:7
67:1 68:5,6
69:19 70:11,23
71:16,22,23
79:17 80:24
81:8 84:11
89:14 91:12
98:4 101:13,23
102:7,9,10,11
102:14,18
103:14 105:1
105:14 118:3
124:23 125:20
129:25 130:4
**times** 22:25
46:11 52:7
64:13 69:20
87:21 124:9
**title** 50:3
**today** 5:13 11:16
44:15
**told** 15:15 18:14
110:12 124:7
**Toll** 130:24
131:22
**topless** 14:3 27:7
28:9 29:14
30:5,20 82:10
84:21 87:25
89:21,24 91:10
92:16 123:23
124:23
**total** 28:10
29:24 32:13,19
33:4,11 37:3

50:19 51:21
59:19 73:14
81:18 82:14
100:8
**Totally** 28:7
**track** 99:14
**traditional**
23:16
**Traditionally**
23:6
**traffic** 65:19
101:15 111:9
119:6,10,21
**training** 6:13
10:5,9,10
**transcript**
129:18,21
131:10
**TRCP** 130:15
131:1
**tried** 72:6
**Trinity** 101:3
**true** 31:19 42:5
44:9,20 48:12
48:12 68:5
71:5 76:15
128:3 129:19
**trust** 51:19 78:2
**trying** 47:20
63:14 73:5
**turn** 31:22 37:11
108:15
**turns** 65:25
**two** 10:11 11:7
12:17 19:13,18
21:7,23,25
27:8,18 31:7,8
31:10,11,19,24
35:22,24 36:9
36:13 37:3,20
38:7 39:13,14
39:21,22 46:2
46:2,7,7,14,14
47:5,11,12,24
48:4,15,18,20

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 98 of 399   PageID 1223
Victory Court Reporting, Inc.

Page 151

50:7,8,25 51:8
51:18 52:3
53:2,6,11,12
53:18,22 54:13
56:2,3,5,12,22
56:23 59:19
61:11,20 63:1
63:4,7,7,17,19
63:20,23,23
64:7,9,16,16
64:25 65:1,5,9
66:1,2,4,14
67:2,3,6 68:5,6
68:10,25 69:3
69:19 70:23
71:11,13,17,23
73:9,12 74:1,9
74:23,24 75:1
75:1 78:20,21
79:17 80:22,23
82:11,12 83:18
84:2,10,25
85:15,16 87:15
87:21 88:18,23
89:14,15,16
90:3,18,24,24
91:4,12 92:4,5
93:10 95:24
97:24 102:7,16
103:7,9 107:23
109:1,13,16
110:19 112:14
118:19 125:7
125:14
**twos** 86:6 98:1
**type** 19:2 28:23
30:17 40:22
43:1 44:1 54:7
56:19 117:10
123:23
**types** 35:25
58:12 124:20
**typically** 86:7

**U**

**U.T** 56:15
**UCR** 6:23,25
8:16 17:7,12
17:21,23 18:4
18:8,19 37:13
45:10,12,17
60:11 107:9,11
107:13,24
108:6,8,17
109:10
**Um-hum** 16:10
106:22
**undercover** 6:11
6:16
**underlying** 16:7
96:14,17
100:10 121:24
**understand** 5:15
11:5,16 12:20
20:8 45:14
49:12 50:18
52:5 62:24
70:20 73:11
79:2 80:19
97:14,18 99:17
99:21 101:10
120:14
**understandable**
5:14
**understanding**
13:21 35:15
125:1
**understands**
45:17
**understood**
124:15
**unfortunately**
121:3
**unit** 6:10,11,24
6:25 8:16
28:23
**UNITED** 1:1
129:1
**universe** 60:19
64:15 65:8

81:1 85:14
86:21 90:12
91:24
**universities** 10:5
**University** 7:8
9:6
**unknown** 20:5
26:8
**UNT** 8:4,6
**Update** 4:9
**Uptown** 100:21
101:2
**urgent** 103:7
**use** 59:10 107:12
108:10,20
109:16 113:21
113:23 116:21
120:7 123:16
123:19 124:11
**useless** 103:8
112:7
**UT** 7:9 9:10,16
42:22 73:1
**UTSA** 63:14
**UUMV** 86:10

**V**

**vacant** 26:6
83:11,20
**valid** 15:5
**variable** 55:14
56:20
**variate** 42:6
**various** 26:23
57:9 88:11
121:19
**vehicle** 112:6
**verbal** 5:19
**versa** 112:19
**version** 106:24
109:10
**versus** 37:3
45:17 47:23
63:23 65:1
69:20 83:11

111:8
**vice** 13:22 28:23
112:19
**victim** 20:3
76:22 107:22
107:22 109:4
110:20 114:16
**victims** 17:25
93:1,8 94:7
**VICTORY**
130:21 131:19
**video** 13:10
**violent** 9:25
22:15 37:21,24
38:6,12,13,19
39:20 41:6,20
45:17 48:1,12
48:16,18,19
50:6,25 51:4,9
53:1,5,24 55:4
55:7,11,16
56:1 59:22
60:8 64:22,22
64:24,25 65:3
78:14,20 80:1
80:18,21,25
81:2,7,18,23
83:3 84:4,5,9
84:22 85:9,13
86:11 104:25
105:6 106:17
107:14 117:17
117:18
**virtually** 68:1
89:13
**VOLUME** 1:13
**vs** 1:5 4:12 129:5

**W**

**waive** 125:24
**walk** 118:8,13
**want** 10:23 24:6
28:25 29:4
43:11 51:2,16
59:10 62:22,23

85:8 94:21
95:2 96:5
99:16,21
**wanted** 56:19
118:18 124:7
125:9
**wants** 76:18
125:23
**warrant** 117:16
117:21,25
118:2,6,8,9,14
118:14,17,24
119:13,13,14
120:3,6
**warrants** 65:21
117:15,18,23
118:2 119:6
**was/was** 131:2
**watch** 102:12,13
102:17,18
111:2
**Watches** 102:14
**way** 14:21 17:19
18:1 23:16,17
43:2 44:14
49:19 57:22
60:7 76:4
83:13 86:5
91:11 102:3
106:17 107:16
110:10 111:1
114:20 115:21
116:15
**ways** 112:14
**we'll** 27:22
42:18 49:20
78:17 107:21
**we're** 12:14
16:23 17:6,7
18:16,21 19:21
20:2,16 28:16
30:5 34:23
37:13 39:6,11
39:16,25 42:20
45:9,19 46:17

Victory Court Reporting, Inc.

46:20 50:13
51:20 55:6
56:21 58:23
60:19,22 61:7
62:19 63:17
64:4,10 65:15
70:3,5 75:11
77:18,19 80:4
80:8 81:1,7,13
81:17 82:14
85:10 86:17,21
86:24 87:2,6
90:9,11 91:21
91:21,24 92:3
118:19
**we've** 45:5 56:17
77:7,11 78:6
88:12 93:4
123:21
**Weather** 4:10
**week** 12:18
31:20 55:21
**went** 6:15,17,19
9:16 15:12
16:24 17:16
53:8,11 56:2
60:9,10 66:4
66:13,16 67:1
74:1,6,8,25
76:23 84:10
85:5 90:6,17
91:11,15 92:22
96:9,14 116:15
123:9,23 124:9
124:23
**weren't** 58:14
122:13
**West** 27:9 31:16
**whatever's**
113:25
**whichever** 67:16
**white** 94:16
**wide** 125:11
**winding** 125:17
**Winnubst** 2:13

**withdraw** 55:23
**witness** 1:17
11:17 99:12,15
118:12 120:17
125:23 127:2
129:17,20,22
129:23
**words** 21:15
74:21 78:24
**works** 33:14
102:15
**Worth** 14:24
**wouldn't** 35:8
68:3 72:5
84:15 90:25
113:3,11
124:23
**Wright** 1:20
129:14 130:19
130:20 131:17
131:18
**wrong** 54:19
71:4,18 79:9
96:2

**X**

**X** 3:1
**XY** 113:21,24,25

**Y**

**Yeah** 72:23
124:17
**year** 17:3 19:10
35:18 37:2,10
38:19 59:16
67:9 68:16
70:1 71:8 73:8
75:23 78:15
79:25 80:5,11
81:4,22 82:15
84:19,25 87:17
87:21 88:1,8
89:5,24 90:10
93:1 94:10
110:24 121:14

**years** 6:7,9,10
6:16,19 7:21
38:5,6 39:20
46:10 52:10
56:1,6,12,13
56:22,23,24
59:19 67:11
70:6,8,12,24
72:15 73:2
74:24 81:15
84:14 87:17
89:20 118:19
**yesterday** 12:2
15:13

**Z**

**zero** 54:3
**zeros** 101:24
**zoning** 34:1

**0**

**0000** 69:23
**000010** 4:15
**005288** 106:3
**007414** 122:7
**017** 17:1
**018** 32:13
**03** 130:2

**1**

**1** 1:13,13 4:3
11:1 17:7 18:8
37:13 45:10
**1-(888)** 130:24
131:22
**1-14-22** 4:6,8
**1-5-22** 4:5
**1,001** 94:10
**1,095** 67:12
**1.41** 67:13
**10** 4:17 6:7
19:12 20:16,18
21:20,23 22:2
27:23 28:10,12
29:15 35:22,24
36:7 39:21

40:5 46:1,6,14
47:4,11,12
48:4,7,10,19
50:7,25 53:2
53:11 54:8
56:3 61:11
63:1,5,7,19,20
63:22 64:7,16
65:1,9 66:1
68:5,25 71:10
71:17 74:23
75:1 76:1
78:20 79:22
80:22,23 81:3
82:11,18 84:17
85:11,15 86:22
87:11 88:4,9
89:6,15,20
90:3,24 91:4
92:4 98:14,20
98:24 99:2
102:7 115:1,1
115:2,15
116:19
**10:17** 1:19
**100** 47:6,22 48:3
102:2
**105** 4:16
**107** 50:19 51:13
**1095** 70:12
**11** 4:3,18 7:11
15:16 33:9,11
79:25 84:18
101:6 102:16
102:17 121:1,3
121:8
**11,000** 72:4
**11,999** 68:19
**110** 19:13
**1100** 2:13
**1135** 92:16
**115** 4:17
**12** 4:4,20 80:5
102:16,17
122:5,6 123:17

**12,000** 72:5
**121** 4:18 89:24
**122** 4:20
**124** 50:20,21,25
51:4
**127** 3:5
**129** 3:6
**13** 34:6 83:3
84:1
**130** 19:19
**1317** 75:22
**132** 53:8,15,17
**137** 118:23
**14** 24:14
**1400** 5:8 76:9
**145** 92:23
**148** 116:1
**15** 82:11
**1500** 1:22 2:5
**153** 119:13
**1532** 130:20
131:18
**154** 120:3
**155** 90:20 120:6
**16** 49:25 81:14
81:24 82:5
**160** 53:11 54:11
**161** 53:1,8,15
**1625** 113:8
**165** 53:10
**168** 120:4
**1682** 115:9
**17** 56:7,8
**1701** 2:14
**175** 90:20
**18** 71:24 72:1
85:19 86:25
**183** 92:23
**188** 89:19
**1989** 9:5
**1990** 7:4
**1s** 17:12

**2**

**2** 3:3 4:4 12:7

Victory Court Reporting, Inc.

Page 153

18:8 27:22
30:15 32:12
34:5 36:7 47:4
48:5 95:9,10
97:23 104:22
105:18 120:24
**2-11-22** 4:11
**2,082** 65:11
116:2,24 117:2
117:22 120:11
120:22
**2.28** 54:16,20
55:12
**2.76** 53:20,23
**2:01** 1:19 126:1
**20** 19:14 45:4
48:17 72:1
73:13 87:17
111:11 131:15
**2006** 69:16
**2009** 9:10
**2013** 6:17 7:22
**2018** 6:19 7:22
18:13 121:21
**2019** 35:18
37:12 45:7
50:18,20 51:1
51:9 56:9,13
56:20 59:15
60:6 65:13
66:13 68:16
73:25 74:4
78:15,19 81:17
84:6
**2020** 6:20,23
8:10 52:25
53:5,14,19
56:16 66:16
74:6
**2021** 16:18,24
17:4 19:10
35:18 37:2,13
39:16 53:10
54:11 56:9,13
56:20 59:15

65:13 67:1
68:17 73:25
74:8 78:15,19
81:17 84:6
**2022** 1:12,19
24:14 127:3
129:12
**203** 130:15
131:1
**203.3** 131:12
**2082** 115:20
**21** 45:7 67:20
**214** 2:6 130:23
130:24 131:21
131:22
**215** 130:22
131:20
**216** 2:11
**2171** 68:25 70:1
71:6,10 73:7
**22** 49:18,24
82:11
**2200** 2:10
**225** 70:5,8,13
71:6,17
**23** 1:12,19 62:19
73:21 127:3
129:12
**23.7** 19:19
**230** 90:3
**2300** 72:5
**2396** 69:3,25
70:4 71:5,13
73:7,12
**24** 4:6 22:6
63:11 82:18
104:23
**24/7** 46:22,25
**242** 119:17
120:2
**25** 52:3
**250** 23:1
**260** 91:11
**274** 91:5
**28** 24:23 29:23

32:19 33:15
38:20,23 43:21
67:16 90:14
**280** 23:2
**288** 67:2
**29** 25:21 39:20
73:20 93:23
**2a** 21:12

———————
**3**
———————
**3** 4:6 24:7 27:23
28:3 32:17
33:12 38:23
77:4,6 95:9
98:13,16
**3.4** 51:17,21
52:9,15,21
**3:22-CV-0017...**
1:5 129:5
**30** 22:22 25:23
105:17,19
**305** 91:5
**306** 67:2
**31** 25:25
**315** 14:14
**32** 26:2 111:8
**324-3733** 130:23
131:21
**33** 26:5 80:25
**334** 91:11
**34** 26:8 52:23
54:4,25 55:10
90:7
**35** 26:11 39:2,7
39:13 40:1
45:21 50:14,21
51:5,10,21,21
52:8,11,18
53:25 54:12,21
55:10 58:20,20
61:13,21,24
63:23 64:5,16
65:16 67:16
90:14 93:8
**36** 22:22

**38** 32:13 33:4
90:7
**39** 23:25 33:2,14

———————
**4**
———————
**4** 3:4 4:8 94:22
95:6
**4.86** 70:14
**40** 22:22,22
**400** 41:20,21
**41** 46:7 47:5,5
88:14
**41A** 13:13,24
**42** 88:14 120:15
**43** 88:14
**43.7** 20:17
**432-5415** 130:24
131:22
**44** 89:4
**44113-1949** 2:10
**45** 65:8 82:14
**459** 19:9
**467** 94:16
**48** 61:20 62:2
63:4,7 64:8
74:25 91:16
93:20

———————
**5**
———————
**5** 4:11 96:6
98:11,13,17
106:6 115:5,6
122:1
**5,000** 104:8,8
105:7,12,20
**5,277** 100:9
**500** 34:18,20,24
35:7,13 36:2
36:12 38:3,20
39:6,12 40:1
41:7,11,25
44:16,18 45:20
46:6,21 47:15
49:5,9 50:14
50:21 51:5,10

52:18,22 53:24
54:3,12,21
57:6,8,16
58:19,23 61:16
61:21 62:3,7
64:5 65:16
67:6,16,21
68:22 69:1
74:14,24 75:11
75:17 77:20,25
78:3 79:4,15
79:20 80:1,11
81:4,18 83:4
84:9,14,18,22
84:22 85:13
86:17 87:3,10
87:22 88:1,17
89:15 90:13
91:25 93:8,15
104:14 105:2
105:23 106:7
111:13 112:15
113:18,24
114:21 115:6
115:11 119:8
119:18 121:6
121:15 122:16
122:23 124:11
125:1,6
**502.1** 97:23
**51** 89:14
**513** 92:11
**52** 61:16 63:1,3
63:4,6,9,19
64:6 75:1
89:15 91:16
**521** 22:18 24:3
27:2,4,15,19
31:7,8
**522** 22:18 30:13
30:18,24 31:2
**5287** 98:24
**5288** 114:19
**5291** 110:1
**530** 92:11

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 101 of 399   PageID 1226
Victory Court Reporting, Inc.

Page 154

**532** 92:13
**534** 22:18 27:24
   28:4,7,13,17
   29:16,21,24
   31:22
**55** 2:10 65:3
   111:9
**56** 87:10
**56.3** 20:21
**5602** 114:20
**5603** 115:3,7,17
**5605** 115:17
   118:21
**5642** 120:15
**58** 35:21,23 36:6
   111:11
**585** 92:13
**59** 46:5 47:3,6
   47:13,14,18,19
   48:4
**594** 94:13
**5964** 115:7
**5965** 121:6

**6**

**6** 4:13 47:5 48:5
   96:22,24
**60** 87:14
**61** 33:18
**63** 36:3,9,14
**644-8181** 2:15
**65** 61:17 63:22
   64:15 118:23
   119:7
**6510** 130:22
   131:20
**66** 81:18 99:20
**67** 37:21 38:7,11
**670-3519** 2:6
**675** 76:1
**6a** 21:12

**7**

**7** 4:14 97:17
**7-Eleven** 42:25

**7,500** 99:19
**7/31/22** 130:20
   131:18
**70401** 97:4
**70403** 97:7
**712** 74:8
**7413** 121:6
**75080** 2:14
**75201** 1:23 2:5
**75231** 130:23
   131:21
**76** 39:16
**76.3** 21:5,10
**77** 94:1
**772** 67:8
**781-5245** 2:11
**785,398** 78:1
**7DN** 1:22

**8**

**8** 4:15 98:10,12
   99:1,23
**80** 39:22 73:17
   91:11
**800** 41:16
**81** 120:6
**83** 37:3
**839** 74:6
**84** 88:1
**845** 74:4
**848-8845** 130:24
   131:22

**9**

**9** 4:16 87:23
   105:24,25
   106:1,2,9,21
   109:14
**9-13-21** 4:13
**911** 76:15
   103:18
**936** 92:16
**94** 4:8 37:3
**95** 69:22
**96** 4:11,13

**97** 4:14
**972** 2:15
**98** 4:15
**99.9** 69:24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ASSOCIATION OF CLUB EXECUTIVES OF DALLAS, *et al.*, | § § § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 3:22-CV-00177-M |
| | § | |
| CITY OF DALLAS, | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFFS' NOTICE OF DEPOSITION
## OF THE CITY OF DALLAS

TO:   Defendant City of Dallas, by and through its counsel, Stacy Rodriguez, Ann "Ana" Marie Jordan and Kathleen Fones, Dallas City Attorney's Office, 1500 Marilla Street 7DN, Dallas, Texas 75201.

PLEASE TAKE NOTICE that in accordance with and pursuant to Rule 30 of the *Federal Rules of Civil Procedure*,[1] Plaintiffs Association of Club Executives of Dallas, Inc., ("ACE"), Nick's Mainstage, Inc.—Dallas PT's, dba PT's Men's Club ("PT's"), Fine Dining Club, Inc.," dba Silver City ("Silver City"), TMCD Corporation, dba Men's Club ("Men's Club"), 11000 Reeder, LLC, dba Bucks Wild ("Buck's Wild"), AVM-AUS, Ltd., dba New Fine Arts Shiloh ("New Fine Arts Shiloh") (collectively, "Plaintiffs") will take the oral deposition of Defendant the City of Dallas ("Defendant") beginning on February 22, 2022, and will continue from day to day until completed, with the following agreed upon schedule:

---

1 The parties have also agreed to the taking of Defendant's deposition at the appointed date, time, and method.



| Date | Time (CST) | Corporate Representative (Name and Title) |
|---|---|---|
| Tuesday, February 22 | 9:30 am | Rick Watson, Deputy Chief of Police (Patrol - West Patrol Group, including Northwest and North Central Divisions) |
| Tuesday, February 22 | 1:00 pm | Samuel Sarmiento, Police Major (Patrol - Northwest Division) |
| Wednesday, February 23 | 9:30 am | Reuben Ramirez, Assistant Police Chief, Tactical & Special Operations Bureau |
| Wednesday, February 23 | 11:30 am | Stephen Bishopp, Police Lieutenant, Data Management & Analysis Unit, Intelligence Division |
| Wednesday, February 23 | 3:30 pm | Devon Palk, Police Major, Special Investigations Division for Narcotics and Vice |

The depositions will take place in person at the Dallas City Attorney's Office, 1500 Marilla Street, Room 7DN, Dallas, Texas 75201.

In accordance with F. R. Civ. P. 30(b)(6), Defendant has designated a person or persons to testify on its behalf about the topics identified in **Exhibit A** to this Notice. The deposition will be taken before a Certified Shorthand Reporter, Notary Public, or other officer duly authorized to administer oaths and may be videotaped.

Respectfully submitted,

SHEILS WINNUBST
A Professional Corporation

By:     */s/ Roger Albright*
        T. Craig Sheils
        State Bar No. 18187350
        Roger Albright
        State Bar No. 00974580
        Latrice E. Andrews
        State Bar No. 24063984

1100 Atrium II
1701 N. Collins Boulevard
Richardson, Texas 75080
Telephone No.: (972) 644-8181
Telecopier No.: (972) 644-8180
Email:  *craig@sheilswinnubst.com*
Email:  *roger@sheilswinnubst.com*
Email:  *latrice@sheilswinnubst.com*

AND

*/s/ J. Michael Murray*
J. MICHAEL MURRAY
(Ohio Bar No. 0019626)jmmurray@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113-1949
(216) 781-5245
(216) 781-8207 (Facsimile)
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via email (pursuant to consent for electronic service) on all counsel of record the 18th day of February, 2022.

                        */s/Roger Albright*
                        Roger Albright

## EXHIBIT A
## CORPORATE REPRESENTATIVE TOPICS

### I.   DEFINITIONS

The following terms have the following meanings, unless the context requires otherwise:

1. "Defendant," "City," "you," or "your" mean Defendant City of Dallas, and include its respective directors and officers, city councilmembers, Dallas Police Department (inclusive of task forces), agents, assigns, legal representatives, non-legal representatives, attorneys, employees, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on its behalf.

2. "Lawsuit" means the lawsuit styled *Association of Club Executives, et al. v. City of Dallas*, Civil Action No. 3:22-CV-00177-M, currently pending in the United States District Court for the Northern District of Texas, Dallas Division.

3. "Ordinance" means City of Dallas Ordinance, passed on January 26, 2022, that is the subject of this Lawsuit.

4. All other terms not explicitly defined herein are to be construed in accordance with their plain and ordinary meanings in the English language and the context in which those terms are used.

5. The connectives "and" and "or" should be construed either conjunctively or disjunctively as necessary to bring within the scope of the topic all matters that might otherwise be construed to be outside its scope.

### II.   CORPORATE REPRESENTATIVE TOPICS

1. How police data was used to identify areas of crime concentration. (Devon Palk, Police Major, Special Investigations Division for Narcotics and Vice).

2. The gathering of police data used to evaluate and address crime concentrations in relevant areas, organized the data used in the City Council presentations, and gathering of data in response to City Council inquiries about matters, including not limited to the Ordinance. (Stephen Bishopp, Police Lieutenant, Data Management & Analysis Unit, Intelligence Division).

3. The presentations made to City Council in relation to the Ordinance amendments. (Reuben Ramirez, Assistant Police Chief, Tactical & Special Operations Bureau).

4.    The NW Task Force and the events leading to its creation. (Rick Watson, Deputy Chief of Police (Patrol - West Patrol Group, including Northwest and North Central Divisions)).

5.    The NW Task Force and the events leading to its creation. (Samuel Sarmiento, Police Major (Patrol - Northwest Division)).

6.    To the extent not already covered by preceding topics, a representative to be deposed regarding the content, methodology and underlying documentary evidence in support of Exhibits 1 and 2 of the Response to the Motion for Temporary Restraining Order [ECF No. 10] filed by the City in the Lawsuit.



City of Dallas

Document 19-1   Filed 02/18/22   Page 9 of 121   PageID 224

# Sexually Oriented Businesses (SOB): Age Change and Hours of Operations

## City Council Briefing
## January 5, 2022

Eddie Garcia, Chief of Police
Dallas Police Department
City of Dallas


ALL-STATE LEGAL®
PLAINTIFF'S EXHIBIT
2

COD-007

1

Case 3:22-cv-00177-M   Document 19-1   Filed 02/18/22   Page 10 of 121   PageID 225

# Presentation Overview



- Definition Sexually Oriented Business
- Purpose of Chapter 41A
- Constitutional Considerations
- Texas Senate Bill 315
- Regulation of SOBs
- Crime Activity Overview
- Research & Study Findings
- Research References
- Recommendations
- Next Steps
- SOB-related Arrest December 23, 2021

# Definition Sexually Oriented Business

- Sexually oriented business means an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency or nude model studio as defined in *Dallas City Ordinance Chapter 41A.*



# Purpose of Chapter 41A

Case 3:22-cv-00177-M   Document 1-1   Filed 02/18/22   Page 12 of 121   PageID 227



- To promote the health, safety, morals and general welfare of the citizens of the city

- To establish reasonable and uniform regulations

- To minimize the secondary harm or damage inside or outside the SOBs

- NOT intending to restrict or deny access by adults; protected First Amendment





# Constitutional Considerations

Case 3:22-cv-00177-M   Document 14   Filed 06/14/22   Page 18 of 121   PageID 228

- Regulation of SOBs implicates freedom of speech protections under the U.S. and Texas Constitutions.

- Any regulation of SOBs:
  - must further a substantial governmental interest that is unrelated to the suppression of free expression; and
  - the restriction shall not be greater than is essential to the furtherance of that interest



COD-011

5

Case 3:22-cv-00177-M   Document 19-1   Filed 02/18/22   Page 14 of 121   PageID 229

# Texas Senate Bill 315

- Texas Senate Bill 315

- Became law September 1, 2021

- Prohibits a Sexually Oriented Business from employing or contracting with a person under the age of 21

- This change brings Chapter 41A in line with the new law



COD-012

6

# Regulations of SOBs

Case 3:22-cv-00177-M   Document 19-1   Filed 02/18/22   Page 15 of 121   PageID 230



- Regulated by:
- SOB ordinance
- Texas Alcohol Beverage Code
- TABC will NOT issue to an 'All Nude' Cabaret
- TABC may issue to a 'Topless' Cabaret
- 'All Nude' Cabarets in Dallas are BYOB (consumption of alcohol)
- These regulations do not restrict hours of operations for SOBs



7

# Regulation of SOBs – Hours of Operation

Case 3:22-cv-00177-M   Document 19-1   Filed 02/18/22   Page 6 of 151   PageID 231

| Texas Cities | Hours of Operation Provisions - SOBs |
|---|---|
| El Paso | requires sexually oriented businesses to be closed between 2:00 a.m. and 6:00 a.m. |
| Fort Worth | requires sexually oriented businesses to be closed between 2:00 a.m. and 10:00 a.m., Sunday through Thursday, and between 3:00 a.m. and 10:00 a.m., Fridays and Saturdays. A sexually oriented business may remain open until 4:00 a.m. on Fridays and Saturdays if the business has a valid food establishment permit issued by the city. |
| San Antonio | requires sexually oriented businesses to be closed between 2:15 a.m. and 7:00 a.m. |
| Plano | requires sexually oriented businesses to be closed between 2:00 a.m. and 10:00 a.m. |
| Grand Prairie | requires sexually oriented businesses to be closed between 2:00 a.m. and 7:00 a.m., Monday through Saturday, and between 2:00 a.m. and 12:00 p.m. on Sunday. |



# Northwest "Club" Task Force 2021

- Task Force created in March 2021.

- Created due to multiple shootings, violent crimes and crime data showed it increasing after midnight

- Primarily occurred at or near the SOBs

- 8 officers starting at Midnight on Thursday, Friday and Saturday

- The arrest range from Drugs, UCW, UPF, Warrants, and various other arrests



COD-015

9



Case 3:22-cv-00177-M   Document 22-1   Filed 02/18/22   Page 118 of 137   PageID 233

# Northwest Club Task Force Activity
## March – December 2021



| Taskforce Activity | Felony | Misdemeanor | Citations | Calls Answered | Traffic Stops | Stolen Recovered | Weapons Seized | Drug Seized | Man Hours |
|---|---|---|---|---|---|---|---|---|---|
| Total | 123 | 183 | 1,141 | 134 | 1,767 | 8 | 113 | 244 | 1,241 |

# Aggravated Assaults within Northwest

Case 3:22-cv-00177-M   Document 19-1   Filed 01/18/22   Page 19 of 121   PageID 234

- For the year 2021, 549 Aggravated Assaults have occurred within the Northwest Patrol Division's boundaries

- 10p - 2a    110 Agg. Assaults or 20% occurred

- 2a - 6a     130 Agg Assaults or 23.7% occurred





# Aggravated Assaults within Northwest

Case 3:22-cv-00177-M Document 19-1 Filed 01/18/22 Page 10 of 121 PageID 235

- NW three most violent beats are
  - 521 and 534 and 522
- Collectively, these beats have 39% of the licensed SOBs in the City
- 521 – 3 SOBs
- 534 – 10 SOBs
- 522 – 2 SOBs
- Total 38 licensed SOBs in the City



# Crime Activity-Arrests

Case 3:22-cv-00177-M   Document 1-9   Filed 02/18/22   Page 21 of 121   PageID 236



- The following 9 slides are data related to SOB locations

- Reviewed aggravated assaults, robberies, prostitution, gun and drug-related arrests over three-year period (2019-2021)

- Guns and drugs comprise 58% of all arrests 10p-2a and 63% of all arrests 2a-6a

- Gun and drug arrests have steadily increased during both time frames, the greatest increase occurring 2a-6a

- In 2021, more total arrests occurred 2a-6a, 94 vs 83



# Crime Activity Overview 2019-2021

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 120 of 399   PageID 1245

- Violent crimes include aggravated assault, rape, robbery, and murder (UCR Part I)

- 2a-6a comprised nearly 67.16% of all reported violent crime

- In 2021, 2a-6a had 76% of all reported violent crime

- Across all years, violent crime decreased 29% during 10p-2a but increased 80% during 2a-6a

# Crime Activity Overview 2019-2021

Property crimes include burglary, theft, and motor vehicle theft (UCR Part I)

- Unlike violent crime, more property crime occurred 10p-2a (59%) than 2a-6a (41%)

- Across all years, property crime increased during both times: 10p-2a (48%), 2a-6a (38%)





# Comparison Crimes Reported

## Crimes – Violent & Property

- 10P-2A
- 2A-6A

**2019**
- 124
- 107

**2020**
- 161
- 132

**2021**
- 165
- 160



COD-022

16



# 2019 & 2021 All Crimes by Time Period

## Comparison between SOB & Entertainment Districts
### 2019 & 2021 Offenses

| | 10p-2a | 2a-6a |
|---|---|---|
| SOB | 52% | 48% |
| Entertainment Districts | 65% | 35% |

- SOB
- Entertainment Districts



COD-023

17



# 2019 & 2021 Violent Crimes by Time Period

## Comparison between SOB & Entertainment Districts
### 2019 & 2021 Violent Offenses

■ SOB    Entertainment Districts

**10p-2a:** SOB 33%, Entertainment Districts 45%

**2a-6a:** SOB 67%, Entertainment Districts 55%

COD-024



18



# Arrests Activity – Certain Times

Case 3:22-cv-00177-M   Document 11   Filed 06/13/22   Page 18 of 21   PageID 242

There were 2,082 custodial arrests at SOB locations, 2019-2021.

- 1,603 (77%) occurred between 10p-6a
- 10p-2a – 831 arrests
- 2a-6a – 772 arrests
- No discernable increase/decrease



# Comparison Arrests at SOB Locations





# 2019 & 2021 Arrests by Time Period

Comparison between SOB & Entertainment Districts
2019 & 2021 Arrests

■ SOB    Entertainment Districts

54%    10p-2a

53%

46%    2a-6a

47%



COD-027
21

Case 3:22-cv-00177-M   Document 19-19   Filed 02/18/22   Page 30 of 121   PageID 245



# Calls for Service - Police

- Between 2019-2021, 11,999 calls for service (CFS) were generated at SOB locations.

- More than 4,500 were between 10p-6a

- 10p-2a – there were 2,171 CFS, 165 were Priority 1 (code 3 response)

- 2a-6a – there were 2,396 CFS, 214 were Priority 1

COD-028

22



# Calls for Service – Police

Case 3:22-cv-00177-M    Document 19-1    Filed 02/18/22    Page 31 of 121    PageID 246

## Calls for Service

Legend:
- 10P-2A
- 2A-6A

**2019**
- 812
- 845

**2020**
- 739
- 839

**2021**
- 620
- 712

Y-axis: 0, 100, 200, 300, 400, 500, 600, 700, 800, 900



# 2019 & 2021 Calls by Time Period

Comparison between SOB & Entertainment Districts
2019 & 2021 Calls for Service

■ SOB    Entertainment Districts

- 100%
- 90%
- 80%
- 70%
- 60%
- 50%
- 40%
- 30%
- 20%
- 10%
- 0%

10p-2a: 48%, 61%

2a-6a: 52%, 39%

COD-030



Case 3:22-cv-00177-M   Document 41-3   Filed 02/18/22   Page 33 of 121   PageID 248



# Calls for Service - Fire

Between 2019-2021, 1,317 calls for service (CFS) were generated at SOB locations.

- Of those, 675 occurred between 10p-6a
- 10p-2a – there were 270 CFS
- 2a-6a – there were 405 CFS

Case 3:22-cv-00177-M Document 19-1 Filed 02/18/22 Page 34 of 121 PageID 249

# Research Findings

- McCord & Tewksbery (2012): Spatial analyses using buffer zones of rates of violent, property, and public order offenses in the vicinity of sexually oriented businesses in Louisville, Kentucky.

  - Results show there were higher rates of all types of offenses in the immediate vicinity of the business

- Effects continue to significantly impact local community even further from the SOB

- McCleary (2008): Examined whether criminological theories can be generalized to rural areas.

- When an adult entertainment business opens on an interstate highway off-ramp to a small rural village, total crime rises by 60%

- Total crime in the village dropped by approximately 60% within 2 years of the SOB closing

- Weinstein & McCleary (2012): Law review examining SOB industry attacks on "secondary-effects" of crime.

- Adult businesses are associated with heightened incidences of crime regardless of location

- Routine Activities Theory is prevailing explanatory theory

- SOB industry studies finding no secondary crime effects methodologically or analytically flawed



**COD-032**

26

# Study & Report Findings

Case 3:22-cv-00177-M   Document 41-1   Filed 02/18/22   Page 35 of 121   PageID 250

- A number of Texas cities* found recognized many factors that they considered in developing city ordinances regulating SOBs.

- Recognized that conduct occurring at SOBs "is detrimental to the public health, safety and general welfare" and should be regulated

- SOBs promote prostitution, drug use, and other criminal activity

- Positive correlation between SOB, specifically their hours of operation, people attracted, and higher crime rates

- SOBs – deleterious effect on existing businesses and the surrounding residential areas adjacent to them,

- Increased crime and downgrading of property values

*Beaumont, Texas Planning Department entitled "Regulation of Adult Uses" & Amarillo, Texas – Planning Department: "A Report on Zoning and Other Methods of Regulating Adult Entertainment in Amarillo"



COD-033

27

# Research References

McCleary, R. (2008). Rural hotspots: The case of adult businesses. *Criminal Justice Policy Review, 19*(2), 153-163.

McCord, E. S., & Tewksbury, R. (2013). Does the presence of sexually oriented businesses relate to increased levels of crime? An examination using spatial analyses. *Crime & Delinquency, 59*(7), 1108-1125.

Weinstein, A. C., & McCleary, R. (2011). The association of adult businesses with secondary effects: Legal doctrine social theory, and empirical evidence. *Cardozo Arts & Ent. LJ, 29*, 565.

Case 3:22-cv-00177-M   Document 19-1   Filed 02/18/22   Page 37 of 121   PageID 252



# Recommendations

- Change City Ordinance to minimum age of 21 to comply with new state law

- Set Hours of Operations to decrease criminal activity, improve safety and reduce the demand on City Services

- Hours of operation to end at 2am and remain closed until 6 am

- Consistent with TABC and all other entertainment districts

- Adopt the 2am closing time which is consistent with surrounding cities

COD-035

29

Case 3:22-cv-00177-M Document 19-1 Filed 02/18/22 Page 38 of 121 PageID 253

# NEXT STEPS

- Seek City Council direction regarding:

  - The adoption of the recommended ordinance changes

  - The creation of a Task Force on SOB regulations as established by the Quality of Life, Arts and Culture Committee





# SOB-related Arrest December 23, 2021

Case 3:22-cv-00177-M   Document 19-1   Filed 02/18/22   Page 30 of 122   PageID 256

Recent arrests of SOB patrons

- Two arrestees just left an SOB location. "Just left a strip club."

- One arrestee was 20yrs old

- Three handguns
- One AR pistol
- Several hundred rounds (one drum magazine)

- Drugs
  - Possession of dangerous drug
  - Possession of drug paraphernalia



COD-037

31

cument 19-1  Filed 02/18/22  Page 40 of 121  PageID 255



City of Dallas

# Sexually Oriented Businesses (SOB): Age Change and Hours of Operations

## City Council Briefing
## January 5, 2022

Eddie Garcia, Chief of Police
Dallas Police Department
City of Dallas

COD-038

32

# Memorandum



**CITY OF DALLAS**

DATE January 14, 2022

TO Honorable Mayor and Members of the City Council

SUBJECT **Sexually Oriented Businesses Data Information**

In response to the request from Council, the Dallas Police Department has provided detailed analysis of the data briefed regarding the Sexually Oriented Businesses (SOBs). For your consideration, please see the attached charts and graphs comparing the different SOBs locations (including their respective 500-foot radius).

The attachments provided consist of the following:

- A list identifying the licensed SOB business/locations
- Graphs displaying data related to violent crime, arrests for violent offenses and priority 1 (emergency calls)
- Graphs displaying data related to all offenses, arrests, and calls for service
- Charts comparing race of crime victims and arrested persons

Eddie Garcia
Chief of Police
[Attachments]

c:    T.C. Broadnax, City Manager
      Chris Caso, City Attorney
      Mark Swann, City Auditor
      Bilierae Johnson, City Secretary
      Preston Robinson, Administrative Judge
      Kimberly Bizor Tolbert, Chief of Staff to the City Manager
      Majed A. Al-Ghafry, Assistant City Manager

Jon Fortune, Assistant City Manager
Joey Zapata, Assistant City Manager
Dr. Eric A. Johnson, Chief of Economic Development and Neighborhood Services
M. Elizabeth Reich, Chief Financial Officer
M. Elizabeth (Liz) Cedillo-Pereira, Chief of Equity, and Inclusion
Directors and Assistant Directors

"Our Product is Service"
Empathy | Ethics | Excellence | Equity



ALL-STATE LEGAL®
PLAINTIFF'S
EXHIBIT
3

COD-039

## ADULT BOOKSTORE/ARCADE/THEATER

| | DISTRICT | NAME OF BUSINESS | DOES BUSINESS AS (DBA) | STREET ADDRESS | TYPE OF LICENSE | BEAT | OPERATING AS |
|---|---|---|---|---|---|---|---|
| 1 | D6 | AMAZING.NET | AMAZING VIDEO SUPERSTORE | 11311 HARRY HINES BLVD #603 | SOB-ARCADE | 551 | ADULT ARCADE, ADULT BOOKSTORE, ADULT VIDEO |
| 2 | D6 | BLISS ARCADE THEATER CLUB | | 9109 JOHN W. CARPENTER FRWY | SOB | 512 | ADULT ARCADE, ADULT BOOKSTORE |
| 3 | D2 | NEW FINE ARTS - MOCKINGBIRD | | 1720 W. MOCKINGBIRD | SOB ARCADE | 514 | ADULT ARCADE, ADULT BOOKSTORE, ADULT VIDEO |
| 4 | D9 | NEW FINE ARTS - SHILOH RD. | | 12045 SHILOH RD. | SOB ARCADE | 233 | ADULT ARCADE, ADULT BOOKSTORE, ADULT VIDEO |
| 5 | D9 | NEW FINE ARTS - WEST | | 1966 W. NORTHWEST HWY | SOB ARCADE | 233 | ADULT ARCADE, ADULT BOOKSTORE, ADULT VIDEO |
| 6 | D6 | ODDYSSEY | | 11505 ANAHEIM DR. | SOB ARCADE | 552 | ADULT ARCADE, ADULT BOOKSTORE, ADULT VIDEO |
| 7 | D6 | PARIS ADULT BOOKSTORE | | 11118 HARRY HINES BLVD | SOB-ARCADE | 534 | ADULT ARCADE, ADULT BOOKSTORE, ADULT VIDEO |
| 8 | D6 | XPOSED ADULT THEATER | | 910 W. MOCKINGBIRD LN | SOB (ADULT VIDEO) | 512 | ADULT ARCADE |
| 9 | D6 | LIDO ADULT THEATER | | 7035 JOHN W CARPENTER | SOB | 512 | ADULT THEATER |

## TOPLESS CABARET

| | DISTRICT | NAME OF BUSINESS | DOES BUSINESS AS (DBA) | STREET ADDRESS | TYPE OF LICENSE | BEAT | OPERATING AS |
|---|---|---|---|---|---|---|---|
| 10 | D6 | BUCKS CABARET | | 2150 CALIFORNIA CROSSING | SOB | 533 | TOPLESS CABARET |
| 11 | D6 | CABARET ROYAL/CHICAS LOCAS | | 10723 COMPOSITE | SOB | 534 | TOPLESS CABARET |
| 12 | D6 | CHICA BONITAS | | 11044 HARRY HINES BLVD | SOB | 534 | TOPLESS CABARET |
| 13 | D6 | DG'S A GENTLEMAN'S CLUB | | 2117 W. NORTHWEST HWY | SOB | 533 | TOPLESS CABARET |
| 14 | D10 | PT'S MENS CLUB | | 10601 PLANO RD | SOB | 258 | TOPLESS CABARET |
| 15 | D6 | SILVER CITY CABARET | | 7501 N. STEMMONS FRWY STE A | SOB | 512 | TOPLESS CABARET |
| 16 | D6 | SPEARMINT RHINO GENTLEMAN'S CLIB | | 10965 COMPOSITE DR. | SOB | 534 | TOPLESS CABARET |
| 17 | D6 | THE MENS CLUB OF DALLAS | | 2340 W. NORTHWEST HWY | SOB | 521 | TOPLESS CABARET |
| 18 | D6 | THE LODGE BAR AND GRILL | | 10530 SPANGLER RD | SOB | 533 | TOPLESS CABARET |
| 19 | D6 | BABY DOLLS SALOON WEST | | 10250 SHADY TRAIL | SOB | 521 | TOPLESS CABARET |

## FULL NUDE CABARET

| | DISTRICT | NAME OF BUSINESS | DOES BUSINESS AS (DBA) | STREET ADDRESS | TYPE OF LICENSE | BEAT | OPERATING AS |
|---|---|---|---|---|---|---|---|
| 20 | D6 | BLACK ORCHID/ CLUB DULCE | | 2151 MANANA DR | SOB | 533 | FULL NUDE CABARET |
| 21 | D6 | BUCKS WILD | | 11327 REEDER RD | SOB | 534 | FULL NUDE CABARET |
| 22 | D7 | COASTER LINE - COASTER CLUB INC. | TIGER CABARET | 9125 E R L THORNTON FWY | SOB | 222 | FULL NUDE CABARET |
| 23 | D6 | DALLAS CABARET NORTH | | 11569 HARRY HINES BLVD | SOB | 551 | FULL NUDE CABARET |
| 24 | D6 | DALLAS CABARET SOUTH (ADDENDUM) | | 2432 - 2462 WALNUT RIDGE ST | SOB | 534 | FULL NUDE CABARET |
| 25 | D6 | LIPSTICK | | 10859 HARRY HINES BLVD | SOB / DH A | 534 | FULL NUDE CABARET |
| 26 | D6 | PANDORA'S MENS CLUB | | 10647-10651 HARRY HINES BLVD | SOB | 534 | FULL NUDE CABARET |
| 27 | D6 | THE CLUBHOUSE | | 2250 MANANA DR. | SOB | 533 | FULL NUDE CABARET |
| 28 | D6 | XTC CABARET | | 8550 N. STEMMONS FWY | SOB | 522 | FULL NUDE CABARET |

## NOT OPERATING

| | DISTRICT | NAME OF BUSINESS | DOES BUSINESS AS (DBA) | STREET ADDRESS | TYPE OF LICENSE | BEAT | OPERATING AS |
|---|---|---|---|---|---|---|---|
| 29 | D6 | AZUKITA INC | PRESTIGE CABARET | 9009B SOVEREIGN ROW | SOB | 512 | ACTIVE LICENSE/ CLOSED DOWN |
| 30 | D6 | GS1VE DALLAS | | 10557 WIREWAY DR. | SOB | 533 | ACTIVE LICENSE /CLOSED DOWN |
| 31 | D2 | LA ZONA ROSA | | 1676 REGAL ROW | SOB | 522 | NOT OPERATING |
| 32 | D6 | BABY DOLLS TOPLESS SALOON | COWBOY'S RED RIVER | 10310 TECHNOLOGY BLVD | SOB | 521 | HOLDING LICENSE NOT OPERATING |
| 33 | D6 | UNK AT PRESENT/STRIP MALL | | 2535 MANANA DR. | SOB | 534 | ACTIVE LICENSE/ VACANT STRIP MALL |
| 34 | D6 | UNKNOWN AT PRESENT | | 10901 STEMMONS FRWY | SOB | 533 | ACTIVE LICENSE/UNK AT PRESENT EMPTY LOT |
| 35 | D6 | WESTWOOD MEDIA & ENTERTAINMENT GROUP | | 1880 RYAN ROAD | SOB | 532 | NOT OPERATING |



COD-041

From 2019 through 2021, Bookstores accounted for 5% of violent crime offenses from 10pm to 2am and 5% of offenses from 2am to 6am.

From 2019 through 2021, Full Nude Cabarets accounted for 9% of violent crime offenses from 10pm to 2am and 33% of offenses from 2am to 6am.

From 2019 through 2021, Topless Cabarets accounted for 15% of violent crime offenses from 10pm to 2am and 22% of offenses from 2am to 6am.

From 2019 through 2021, Non-Operational SOB's accounted for 3% of violent crime offenses from 10pm to 2am and 6% of offenses from 2am to 6am.



## VIOLENT CRIME ARREST
### 2019-2021

Legend: ■ 10p to 2a   ■ 2a to 6a

COD-042

From 2019 through 2021, Bookstores accounted for 12% of Violent Crime Arrests from 10pm to 2am and 5% of Arrests from 2am to 6am.

From 2019 through 2021, Full Nude Cabarets accounted for 15% of Violent Crime Arrests from 10pm to 2am and 28% of Arrests from 2am to 6am.

From 2019 through 2021, Topless Cabarets accounted for 15% of Violent Crime Arrests from 10pm to 2am and 18% of Arrests from 2am to 6am.

From 2019 through 2021, Non-Operational SOB's accounted for 2% of Violent Crime Arrests from 10pm to 2am and 2% of Arrests from 2am to 6am.



From 2019 through 2021, Bookstores accounted for 11% of Priority 1 calls from 10pm to 2am and 15% of Calls from 2am to 6am.

From 2019 through 2021, Full Nude Cabarets accounted for 9% of Priority 1 calls from 10pm to 2am and 15% of Calls from 2am to 6am.

From 2019 through 2021, Topless Cabarets accounted for 18% of Priority 1 calls from 10pm to 2am and 22% of Calls from 2am to 6am.

From 2019 through 2021, Non-Operational SOB's accounted for 5% of Priority 1 calls from 10pm to 2am and 3% of Calls from 2am to 6am.



COD-044

From 2019 through 2021, Bookstores accounted for 6% of all offenses from 10pm to 2am and 6% of offenses from 2am to 6am.

From 2019 through 2021, Full Nude Cabarets accounted for 16% of all offenses from 10pm to 2am and 22% of offenses from 2am to 6am.

From 2019 through 2021, Topless Cabarets accounted for 27% of all offenses from 10pm to 2am and 14% of offenses from 2am to 6am.

From 2019 through 2021, Non-Operational SOB's accounted for 4% of all offenses from 10pm to 2am and 5% of offenses from 2am to 6am.



## ALL ARREST 2019-2021

From 2019 through 2021, Bookstores accounted for 11% of all arrests from 10pm to 2am and 10% of arrests from 2am to 6am.

From 2019 through 2021, Full Nude Cabarets accounted for 17% of all arrests from 10pm to 2am and 19% of arrests from 2am to 6am.

From 2019 through 2021, Topless Cabarets accounted for 20% of all arrests from 10pm to 2am and 16% of arrests from 2am to 6am.

From 2019 through 2021, Non-Operational SOB's accounted for 3% of all arrests from 10pm to 2am and 3% of arrests from 2am to 6am.

COD-045



COD-046

From 2019 through 2021, Bookstores accounted for 11% of all calls from 10pm to 2am and 12% of calls from 2am to 6am.

From 2019 through 2021, Full Nude Cabarets accounted for 12% of all calls from 10pm to 2am and 13% of calls from 2am to 6am.

From 2019 through 2021, Topless Cabarets accounted for 21% of all calls from 10pm to 2am and 25% of calls from 2am to 6am.

From 2019 through 2021, Non-Operational SOB's accounted for 4% of all calls from 10pm to 2am and 3% of calls from 2am to 6am.

COD-047

## ALL VICTIMS ALL CRIMES 2019-2021



■ American Indian or Alaska Native   ■ Asian   ■ Black   ■ Hispanic or Latino   ■ Middle Eastern   ■ Native Hawaiian/Pacific Islander   ■ White

From 2019 through 2021, the racial breakdown by percentage of all victims of all crimes is as follows:

Black 40%, White 30%, Hispanic or Latino 25%, Asian 2%, Middle Eastern 2%, Native Hawaiian/Pacific Islander 1%, American Indian or Alaska Native 0%



COD-048

From 2019 through 2021, the racial breakdown by count of all victims of all crimes is as follows:

Black 455, White 337, Hispanic or Latino 290, Asian 24, Middle Eastern 24, Native Hawaiian/Pacific Islander 12, American Indian or Alaska Native 1



## ALL ARRESTEES 2019-2021

From 2019 through 2021, the racial breakdown by percentage of all arrestees is as follows:

Black 48%, Hispanic or Latino 29%, White 22%, Asian 1%, Middle Eastern 0%, Native Hawaiian/Pacific Islander 0%, American Indian or Alaska Native 0%

COD-049



## ALL ARRESTEES 2019-2021

From 2019 through 2021, the racial breakdown by count of all arrestees is as follows:

Black 1,001, Hispanic or Latino 594, White 467, Asian 13, Middle Eastern 4, Native Hawaiian/Pacific Islander 2, American Indian or Alaska Native 1

COD-050

# Memorandum



DATE    January 14, 2022                                    CITY OF DALLAS

TO      Honorable Mayor and Members of the City Council

SUBJECT **Update on Activation of Temporary Inclement Weather Shelters by the Office of Homeless Solutions**

## Current and Upcoming Action:

The Office of Homeless Solutions has been monitoring the weather forecast and based on the National Oceanic and Atmospheric forecast, has activated the opening of temporary inclement weather shelters (TWIS) in the City of Dallas for Saturday, January 15, 2022, and will continue to monitor the weather on Sunday night, January 16, 2022. An additional activation notice will be released no later than 12pm on Saturday, January 15th should Sunday evening's trigger it, in accordance with Chapter 45 of the City Code, the notice of the activation is attached.

Individuals experiencing homelessness are encouraged to seek shelter at any one of the City's existing, overnight shelter provider locations. If those shelters are at capacity, guests can seek shelter at one of two, temporary inclement weather shelters – Oak Lawn United Methodist Church (UMC) and OurCalling.

Oak Lawn UMC is located at 3014 Oak Lawn Avenue (Council District 14) and OurCalling is located at 1702 S. Cesar Chavez Blvd. (Council District 2). Intake hours at both locations are 5:00 p.m. to 9:00 p.m. Admission to Oak Lawn UMC closes at 9:00 p.m. Any guests who present at Oak Lawn UMC after shelter intake hours will be directed to OurCalling which will remain open overnight.

Onsite rapid response COVID-19 testing will be available at both locations. Individuals who test positive will be isolated and transported to a third shelter. For the safety and security of staff and guests, the location is not being disclosed at this time. Additional information will be provided once the shelters close at 8:00 a.m. on Monday, January 17, 2022. The COVID-19 quarantine shelter will remain open indefinitely, guests are encouraged to remain in isolation until the time allotted for quarantine expires.

In partnership with Dallas County, OHS has established a quarantine shelter for homeless individuals who are Covid positive, admitted by referral through the local shelter providers and hospitals. We are extremely grateful for this partnership, which also includes North Texas Behavioral Health Authority (NTBHA), Metro Dallas Homeless Alliance (MDHA), and Parkland Hospital. Due to the rapid spread of the Omicron variant and the vulnerability of the unsheltered population, access to this

"Our Product is Service"

Empathy | Ethics | Excellence | Equity

shelter is limited to OHS and partnering staff.

**Previous Action:**
The Office of Homeless Solutions activated the opening of temporary inclement weather shelters (TWIS) in the City of Dallas on Thursday, January 6, 2022, based on the National Oceanic and Atmospheric forecast, in accordance with Chapter 45 of the City Code.

The total number of shelter stays for the night of January 6, 2022 is as follows:

- Oak Lawn UMC: **43**
- OurCalling: **158**
- Bachman Lake Recreation Center:
    - **39** Covid-Negative
    - **2** Covid-Positive in overflow isolation

After the closure of inclement weather shelter, Covid positive guests were transferred to hotels under the management of Catholic Charities with assistance from OHS staff as needed. These guests will remain in hotel for the duration of their quarantine period.

Through a tremendous amount of preparation and planning, this well-organized operation provided shelter for our unsheltered neighbors last week and is prepared to do so again this weekend. Through a tremendous amount of preparation and planning, this well-organized operation has provided shelter for our unsheltered neighbors last week and is prepared to do so again. This work would not have been possible without support from the Office of Emergency Management, the Parks Department, Dallas Fire Rescue, Oak Lawn UMC, OurCalling, Stewpot, Metro Dallas Homeless Alliance (MDHA), Downtown Dallas Inc., Catholic Charities, Austin Street Center, Kessler Park UMC, CitySquare, and all of the area homeless services providers. Collectively, they provided medical services, meals, and transportation throughout this period.

If you have any questions, please reach out to me or Christine Crossley, Director of the Office of Homeless Solutions. Thank you for your support.

Kimberly Bizor Tolbert
Chief of Staff

[Attachment]

c:   T.C. Broadnax, City Manager
     Chris Caso, City Attorney
     Mark Swann, City Auditor
     Bilierae Johnson, City Secretary
     Preston Robinson, Administrative Judge
     Majed A. Al-Ghafry, Assistant City Manager

     Jon Fortune, Assistant City Manager
     Joey Zapata, Assistant City Manager
     Dr. Eric A. Johnson, Chief of Economic Development and Neighborhood Services
     M. Elizabeth Reich, Chief Financial Officer
     M. Elizabeth (Liz) Cedillo-Pereira, Chief of Equity and Inclusion
     Directors and Assistant Directors

"Our Product is Service"

Empathy | Ethics | Excellence | Equity

## CITY OF DALLAS OFFICE OF HOMELESS SOLUTIONS

## ACTIVATION OF THE OPENING OF TEMPORARY INCLEMENT WEATHER SHELTERS

In accordance with Chapter 45 of the City of Dallas Code, the Office of Homeless Solutions is authorizing the opening of temporary inclement weather shelters on the following dates, beginning at 4:00 p.m. and ending on the following day at 8:00 a.m.

Saturday, January 15th, 2022 – 4:00 p.m.
NOAA forecast low temperature: 27 degrees

*Christine Crossley*
Christine Crossley (Jan 14, 2022 09:49 CST)

Christine Crossley, Director
City of Dallas
Office of Homeless Solutions

Jan 14, 2022

Date

## Memorandum



CITY OF DALLAS

DATE January 14, 2022

TO Honorable Mayor and Members of the City Council

SUBJECT **Sales Tax Receipts**

The November 2021 sales tax receipts from the State Comptroller's Office are $30.5 million, which represents a 21.8 percent increase in total collections compared to the same reporting period last year.

- November 2020 actual      $25,010,956

- November 2021 budget      $25,621,546

- November 2021 actual      $30,461,440

Over the most recent 12 months, sales tax receipts have increased by 19.0 percent. We will continue to monitor our sales tax receipts and provide additional information as it becomes available.

Thank you for your support. Please contact me with any questions.

M. Elizabeth Reich

M. Elizabeth Reich
Chief Financial Officer

[Attachment]

cc:  T.C. Broadnax, City Manager
Chris Caso, City Attorney
Mark Swann, City Auditor
Bilierae Johnson, City Secretary
Preston Robinson, Administrative Judge
Kimberly Bizor Tolbert, Chief of Staff to the City Manager

Majed A. Al-Ghafry, Assistant City Manager
Jon Fortune, Assistant City Manager
Joey Zapata, Assistant City Manager
Dr. Eric A. Johnson, Chief of Economic Development and Neighborhood Services
M. Elizabeth (Liz) Cedillo-Pereira, Chief of Equity and Inclusion
Directors and Assistant Directors

"Our Product is Service"
Empathy | Ethics | Excellence | Equity

# Sales Tax
*as of November 2021*

| Month | Actual FY 2020-21 | | Budget FY 2021-22 | | Actual FY 2021-22 | | YTD Variance FY 2021-22 Actuals versus FY 2020-21 Actuals ($) | | YTD Varianc 22 Actuals FY 2020-2: (% |
|---|---|---|---|---|---|---|---|---|---|
| October | $ | 25,607,902 | $ | 27,322,304 | $ | 30,717,609 | $ | 5,109,707 | |
| November | $ | 25,010,956 | $ | 25,621,546 | $ | 30,461,440 | $ | 5,450,484 | |
| December | $ | 35,927,004 | $ | 35,846,753 | | | | | |
| January | $ | 24,532,918 | $ | 25,773,030 | | | | | |
| February | $ | 22,686,079 | $ | 24,953,637 | | | | | |
| March | $ | 33,669,367 | $ | 33,512,514 | | | | | |
| April | $ | 29,131,009 | $ | 27,115,734 | | | | | |
| May | $ | 28,918,168 | $ | 27,239,676 | | | | | |
| June | $ | 34,254,068 | $ | 32,397,037 | | | | | |
| July | $ | 30,967,271 | $ | 27,039,992 | | | | | |
| August | $ | 28,404,805 | $ | 26,151,742 | | | | | |
| September | $ | 35,178,095 | $ | 31,309,102 | | | | | |
| **Total** | $ | 354,287,642 | $ | 344,283,066 | $ | 61,179,049 | $ | 10,560,191 | |



Sales Tax Collections Year-over-Year



Sales Tax Net Payments (36 Months)

## Memorandum



CITY OF DALLAS

DATE January 14, 2022

TO Honorable Mayor and Members of the City Council

SUBJECT **City License Applications**

Attached is a list of the most recent Dance Hall, Sexual Oriented Business, Billiard Hall, and/or Amusement Center license applications received for the week of January 3, 2022 – January 7, 2022 by the Tactical and Special Operations Bureau Licensing Squad of the Dallas Police Department.

Please have your staff contact Sergeant John Page, at (214) 316-3848 and/or by email at john.page@dallascityhall.com should you need further information.

Jon Fortune
Assistant City Manager
[Attachment]

c:

T.C. Broadnax, City Manager
Chris Caso, City Attorney
Mark Swann, City Auditor
Bilierae Johnson, City Secretary
Preston Robinson, Administrative Judge
Kimberly Bizor Tolbert, Chief of Staff to the City Manager

Majed A. Al-Ghafry, Assistant City Manager
Joey Zapata, Assistant City Manager
Dr. Eric A. Johnson, Chief of Economic Development and Neighborhood Services
M. Elizabeth Reich, Chief Financial Officer
M. Elizabeth (Liz) Cedillo-Pereira, Chief of Equity, and Inclusion
Directors and Assistant Directors

"Our Product is Service"
Empathy | Ethics | Excellence | Equity

WEEKLY APPLICATION LOG REPORT

| DISTRICT | NAME OF BUSINESS | STREET ADDRESS | TYPE OF LICENSE | DATE OF APPLICATION |
|---|---|---|---|---|
| D6 | CHICAS BONITAS | 11044 HARRY HINES BLVD | SOB | 1/4/2022 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**License Definitions**

*DH - Class "A" Dance Hall - Dancing Permitted Three Days or more a Week*

*DH - Class "B" Dance Hall - Dancing Permitted Less Than Three Days a Week*

*DH - Class "C"Dance Hall - Dancing Scheduled One Day At A Time*

*DH - Class "E" Dance Hall - Dancing Permitted Seven Days A Week for Persons Age 14 through Age 18 Only*

*LH - Late Hours Permit - Can Operate A Dance Hall Until 4:00*

*BH - Billiard Hall - Billiards Are Played*

*SOB - Sexually Oriented Business - Adult Arcade / Adult Book/Video Store / Adult Cabaret / Adult*

*Adult Theater / Escort Agency / Nude Model Studio*

*AC - Amusement Center*

## Memorandum



DATE January 14, 2022

CITY OF DALLAS

TO Honorable Mayor and Members of the City Council

SUBJECT **Taking Care of Business – January 13, 2022**

**New Updates**
City Manager's Corner – Employee of the Week



This week's Employee of the Week is Julia Kuiper Human Resources (HR) Analyst. Since 2019, Julia has been a highly engaged member of the HR team serving in multiple roles initially as a temporary staff, then promoted into her current role. With the swift transition from on-site to more employees working remotely due to the COVID pandemic, Julia has been an integral part of the Employee COVID-19 Core Team, consistently responding to inquiries, leave requests and other concerns submitted via the COVID-19 email box. Julia graciously accepted the role of overseeing the process for requesting and approving

COVID19 leaves for City employees; and, expends hours insuring that employees receive timely and accurate responses to their COVID-19 questions and requests. In addition to these duties, Julia has been instrumental in the implementation of the new Paid Parental Leave, a new benefit providing six (6) weeks of paid leave to employees who are welcoming a new family member by birth, adoption or foster care placement. Julia also escalates COVID issues to the COVID Core Team when appropriate, manages the HR file room and assists with open records requests for the Human Resources. She is the "HR resident expert" on flowchart development for process mapping. We are very grateful to Julia for all the work that she does for the City. Congratulations Julia!

Office of Homeless Solutions Partners Continue to Target Encampments
The DRTRR team of homeless service providers, co-led by OHS and MDHA, is currently targeting several encampments, which will result in closure through the housing of those unsheltered individuals throughout the year. The team will outreach to these sites and meet with various persons experiencing homelessness to assess their needs in preparation for site closure via housing. During this time, the OHS Street Outreach Team will continue to engage with unsheltered residents through normal street outreach, connecting people with the needed resources, such as: getting IDs, working with Community Courts on expunging eligible tickets and offenses from their records, identifying medical needs, and getting them access to the Coordinated Access System (CAS). Please see the attached schedule for homeless encampment cleaning the week of January 3rd – January 7th. Please note that these will be for debris removal and outreach only. Due to the high transmission rate of the new COVID variant, Omicron, the

DATE    January 14, 2022

SUBJECT  **Taking Care of Business – January 13, 2022**

openings of Inclement Weather Shelters, and the newly secured Covid quarantine site, all encampment cleaning requests are being resolved as time allows. We appreciate everyone's patience. OHS continues to urge people who see an encampment to report via 311 or 311's OurDallas smartphone app to ensure strategic alignment with comprehensive OHS outreach. The DRTRR Dashboard through MDHA, was presented to the Citizens Homelessness Commission and the Dallas Area Partnership Board in November of 2021 and is now live. The OHS Service Request dashboard can be utilized to track the progress of encampment resolution efforts. Please visit the dashboard and feel free to share this tool with residents. Should you have questions, please contact the Director of the Office of Homeless Solutions, Christine Crossley.

2021 Code Compliance in Review
The 2021 Code Compliance in review video highlights some of our key accomplishments for the entire department. It also gives our community stakeholders insight on ordinances we are proposing and will be implementing this year. Our goal is to keep all stakeholders engaged and informed about our department. Code Compliance is increasingly raising our profile to fulfill our departments' purpose in "Safeguarding & Supporting a Strong and Healthy CommUNITY." This video can be accessed via YouTube here: https://www.youtube.com/watch?v=VLoAIPR283Y. For additional information please contact, Carl Simpson, Director of Code Compliance.

Small Business Center Listening Sessions
The City of Dallas Small Business Center is providing several listening sessions through the end of this month. These sessions are designed to gain insight from small business advocate organizations, startups, and workforce organizations. The Small Business Center is proactively providing resources that offer assistance to small business successes. It will focus on gathering information to address current gaps in city-led programs, expand on the successes of city-led programs, and ideas to design and create new opportunities that can be presented by the Small Business Center. Participants can sign up through the Eventbrite link: https://dallassbclisteningsession.eventbrite.com. For questions or concerns, please contact Director of the Small Business Center, Joyce Williams.

Period Poverty Map Provides Hygiene Support in High-Need Neighborhoods
The Office of Data Analytics and Business Intelligence partnered with the Office of Community Care to create The Period Poverty Program Application, a map application that helps women locate places to access free menstrual products. The map application serves two purposes. First, the map application identifies high-need areas so staff can make more equitable decisions about distribution sites. Staff used the application to identify distribution sites that were located in areas with household income less than 60% of the Area Median Gross Income or with a poverty rate of at least 25%. Last, this map application is built on a web-based platform making it accessible to anyone on any digital platform to search for the nearest menstrual product distribution site within a given location. For more information, please contact Dr. Brita Andercheck, Director of the Office of Data Analytics and Business Intelligence, at data@dallascityhall.com.

2

DATE    January 14, 2022

SUBJECT **Taking Care of Business – January 13, 2022**



Office of Community Police Oversight

The Office of Community Police Oversight (OCPO) is excited to announce that a Spanish version of the complaint form is now available on the OCPO and CPOB websites. OCPO has added a way for members of the community to commend a DPD officer for doing a great job. A THANK AN OFFICER option is now available on the OCPO and CPOB websites. OCPO has already started seeing community members use that form. When a commendation comes to OCPO, the information is forward to the Office of the Chief of Police and to the Division Command staff where the officer is assigned so that DPD leadership knows that the officer has been commended. We are excited to being both of these features to the Dallas community. For additional information, please contact OCPO Director and Police Monitor Tonya McClary.

Equity Indicators Symposium

The Office of Equity and Inclusion in partnership with Communities Foundation of Texas will host the 3rd Annual Equity Indicators Symposium-The City and Community Collaborating to Advance Equity Through Measures and Accountability. The virtual symposium will be centered around the Equity Indicators report and consist of roundtable discussion with Policymakers and two panel discussions. The event is scheduled to take place on this Friday, January 14, 2022,from 8:30 am – 12:00pm as part of the Dr. Martin Luther King, Jr. Celebration Week. Please see the attached flier for registration information. Should you have any questions, please contact Dr. Lindsey Wilson, Equity Officer.

Redistricting Update

The Redistricting Commission met Monday, January 10 at 3:30 p.m. via videoconference and at Dallas City Hall – Council Briefing Room – 6ES. They received an update on redistricting marketing, map submissions and map overlays. They also agreed to submit a op-ed to local media, encouraging the public to get involved in the redistricting process. The Commission will host their fourth of eight Redistricting Town Hall / Listening sessions this Thursday, January 13, 2021 at Lake Highlands North Recreation Center at 6:30 p.m. and will host the following town hall on Saturday, January 22 at Pleasant Oaks Recreation Center at 3:30 p.m. Individuals who wish to speak during a Redistricting Town Hall should

3

DATE        January 14, 2022

SUBJECT     **Taking Care of Business – January 13, 2022**

register at bit.ly/2021RDCTH by 10 a.m. the day of the meeting. All speakers who signed up before the deadline will have three minutes to speak about anything related to the redistricting process. Please note these town halls are only offered in person, with the exception of the last town hall on February 10 at 6:30 p.m., which will be held virtually and in person at Dallas City Hall. For a complete list of all Redistricting Commission meetings, including town halls, visit DallasRedistricting.com.  We encourage you to send this information to your various constituencies. The Office of Communications, Outreach and Marketing has been promoting the Redistricting Town Halls via social media, blog posts, text alerts, PSAs, and outdoor digital advertising. Should you have any questions or concerns, please contact Brett Wilkinson, Director of Government Affairs.

Department of Aviation Unveils USO Just in Time for the Holidays
On December 16th, the Department of Aviation (DOA) proudly presented a dedicated United Services Organizations (USO) space for our traveling military members and their families. At the grand opening, USO and DOA officials gathered to cut the ceremonial ribbon and thank those involved in opening the center. The space, formerly used as a third-party administrative office, was recently transformed into a welcoming lounge offering snacks, comfortable chairs, TVs and a place to unwind for those who need it most. Once finishing touches are complete, the facility will be fully staffed and operational in the upcoming weeks. The Department hopes that this gesture will continue to demonstrate its unwavering gratitude to the entire military community as they serve and protect us. For additional information please contact Mark Duebner, Director of Aviation.

New Procurement Opportunities
The Office of Procurement Services (OPS) is excited to announce the following new contract opportunities. More information can be found on the City's electronic bid portal:

| Opportunity No. | Opportunity Name |
|---|---|
| CIZ21-PKR-2021 | Lake Highlands Trail Phase II - A&B & Lake Highlands Northern Extension - Site Development TXDOT ID: CSJ-0918-47-206, by Park and Recreation |
| CIZ-DWU-21 443 | Erosion Control at Various Locations Phase 4, Contract No. 21-443, by Dallas Water Utilities |
| BI22-00018395 | Liquid Sodium Hypochlorite |
| BI22-00017906 | Sodium Polyphosphate, Glassy |
| BV22-00018177 | Meter Test Bench Portable Meter Testers |

We are also pleased to share the latest Q2 Procurement Quarterly Report Procurement Quarterly Report FY22 Q2 listing citywide opportunities for the current quarter (of the fiscal year) and published on the OPS website.

Please be advised that once an opportunity is advertised, it is considered an open procurement until the City Council awards the contract. The Code of Ethics prohibits communication between councilmembers and vendors/ suppliers on open procurements.

4

DATE    January 14, 2022

SUBJECT    **Taking Care of Business – January 13, 2022**

Should you have any questions, please contact Chhunny Chhean, Director of Procurement Services.

**Look Ahead**

City Council Briefings
January 19, 2022
- o   2017 Bond Program Status Update
- o   On-Street Parking and Curb Lane Management Policy

Media Inquiries
As of January 10, 2022, the City has received media requests from various news outlets regarding the following topics:
- Trash pickup
- Data open portal
- COVID Numbers on the Rise in DFR
- DFR Members Able to Return Sooner from COVID Leave
- One Dead and Three Hospitalized Following Southeast Dallas Accident
- Dallas Morning News Inquires About DFRs Use of Narcan for Overdose Calls
- Elderly Woman Rescued from North Dallas House Fire

The storylines listed above references the major media inquiries addressed by DFR during the period dating from January 4th – 10th. A more detailed account of the department's responses to those inquiries, and others, can be viewed at this link. In the event you are contacted by the press, or if you have any questions or concerns, please contact Chief Artis, Dallas Fire-Rescue. The City has received other media requests from various news outlets at the following links: Communications, Outreach and Marketing or Dallas Fire Rescue.

Should you have any questions or concerns, please contact Kimberly Bizor Tolbert, Chief of Staff.

T.C. Broadnax
City Manager

c:    Chris Caso, City Attorney
Mark Swann, City Auditor
Bilierae Johnson, City Secretary
Preston Robinson, Administrative Judge
Kimberly Bizor Tolbert, Chief of Staff
Majed A. Al-Ghafry, Assistant City Manager

Jon Fortune, Assistant City Manager
Joey Zapata, Assistant City Manager
Dr. Eric A. Johnson, Chief of Economic Development and Neighborhood Services
M. Elizabeth Reich, Chief Financial Officer
M. Elizabeth (Liz) Cedillo-Pereira, Chief of Equity and Inclusion
Directors and Assistant Directors

5

**J. Michael Murray**

| | |
|---|---|
| **From:** | David, Leticia <leticia.david@dallascityhall.com> |
| **Sent:** | Friday, February 11, 2022 7:29 PM |
| **To:** | roger@sheilswinnubst.com; J. Michael Murray; latrice@sheilswinnubst.com |
| **Cc:** | craig@sheilswinnubst.com; Rodriguez, Stacy; Jordan, Ann |
| **Subject:** | ACE v. COD, No. 22-177--DPD Data update (Email 1 of 2) |
| **Attachments:** | 01.Policy_G0704_CFS Redacted2(COD 1-5).pdf; 02POLI~1.PDF; 04SOBC~1.PDF; 05SOBA~1.PDF; 07SOB_~1.PDF; 08STUD~1.PDF; 09STUD~1.PDF; 10STUD~1.PDF |

Hello all,

Please find attached the DPD Data (Email part 1 of 2). The files have been compressed. Also, the data that was provided to us contained social security numbers, DOBs and personal ID numbers, therefore this information has been redacted from the datasets. Please see the list of documents below for your convenience. Thank you.

01.Policy_G0704_CFs Redacted 2 (COD 1-5)
02.Policy_SOP502_PriorityCalls Redacted2 (COD 6-9)
03.Entertainment_rawdata Redacted2 (COD 10-5287)
04.SOBCrime500_rawdata Redacted2 (COD 5288-5602)
05.SOBArrestCharge500_rawdata Redacted2 (COD 5603-5964)
06.SOBCalls500_rawdata Redacted2 (COD 5965-7413)
07.SOB_DFRdataset Redacted2 (COD 7414-7503)
08.Study_McCleary_208CJPR Redacted2 (COD 7504-7514)
09.Study_Weinstein_2012AELJ Redacted2 (COD 7515-7548)
10.Study_McCord_2013_CD Redacted2 (COD 7549-7566)



**Leticia David**
*Paralegal*
General Litigation & Collections Section
City of Dallas
Dallas City Attorney's Office
1500 Marilla, Suite 7DN
Dallas, TX 75201
O: 214-671-8943
F: 214-670-0622
leticia.david@dallascityhall.com



PLAINTIFF'S
EXHIBIT
5
ALL-STATE LEGAL®

**Please be advised that this e-mail is subject to being disclosed pursuant to a request for public information under the Texas Public Information Act.**

CONFIDENTIALITY NOTICE: This communication, including attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient of this communication, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, you are notified that any use, dissemination, distribution, or copying of the communication is strictly prohibited, may be unlawful, and are requested to reply to this email to notify the sender that you have received the

communication in error and promptly delete this e-mail, including attachments without reading or saving them in any manner.  Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.



# Dallas Police Department

## Chief of Police
## Eddie Garcia

## General Orders
## Revised: September 13, 2021



PLAINTIFF'S EXHIBIT
6
ALL-STATE LEGAL®



**Dallas Police Department General Order**

**700.00** Radio Communications Table of Contents

Revised 03/10/10

**700.00 RADIO COMMUNICATIONS**

**701.00 F.C.C. PROCEDURES AND CARE OF COMMUNICATIONS EQUIPMENT**

701.01 Federal Communications Commission
701.02 Communications Equipment

**702.00 ASSIGNMENT OF CHANNELS, SIGNALS, AND CODES**

702.01 Channel Assignments
702.02 Signals
702.03 Codes

**703.00 RADIO AND FIELD PROCEDURES**

703.01 Radio Procedures
703.02 Field Procedures
703.03 Radio - Telephone Patch System (Deleted)

**704.00 CALLS FOR SERVICE**

704.01 Assignment of Elements
704.02 Call Dispatching Procedure
704.03 Emergency Calls
704.04 Non-Emergency Calls
704.05 Elements Missing a Radio Call

**705.00 EMERGENCY STAND-BY STATIONS**

**706.00 GOVERNMENT EMERGENCY TELECOMMUNICATIONS SERVICE (GETS) CARDS**

COD_000002



**Dallas Police Department General Order**

**704.00** Calls for Service

Revised 3/11/2021

**704.00    CALLS FOR SERVICE**

**704.01    Assignment of Elements**

A. The calls on which either a two-officer element or two one-officer elements will be dispatched include, but are not limited to the following:

**SIGNALS**

| | |
|---|---|
| Assist Officer | Explosion or Bombing |
| Auto Theft Tracking Program | Felony in Progress |
| AWARE-Family Violence Alarm (6X-01) | Hold-Up Alarm |
| Burglar Alarm | Kidnapping in Progress |
| Criminal Assault | Open Building |
| Criminal Trespass | Person in Danger |
| Cutting | Prisoner |
| Disturbance at a School (6S) | Prostitution |
| Disturbance (6X) | Prowler |
| Disturbance Armed Encounter in Vehicle | Random Gunfire |
| Disturbance Armed Encounter on Foot | Robbery |
| Disturbance Active Shooter in a Vehicle | Shooting |
| Disturbance Active Shooter on Foot | Suicide |
| Drunk | Suspicious Person |
| Kidnapping of a Child in Progress | |

B. Freeway Accidents - Regardless of their one-officer or two-officer status, two police vehicles will be assigned to any freeway accident for the purpose of officer safety. The first element to arrive may notify the dispatcher to disregard the second vehicle. A supervisor will be assigned to serve as a safety officer to ensure that all possible safety resources are utilized.

C. All other calls may be dispatched to a one-officer element unless circumstances indicate a need for more than one officer.

D. To conserve two-officer elements, the dispatcher may assign a one-officer element off its beat to handle a one-officer element call on another beat even though that beat element is available.

E. When two one-officer elements are dispatched on a call, the first officer to arrive may notify the dispatcher to disregard the second element.

F. Elements will be available for service unless on call or properly marked out via the Mobile Data Computer (MDC) or the dispatcher.

G. Elements will respond to calls for service or assistance from citizens or other elements without undue delay. No element will fail to respond unless relieved by competent authority.

H. Response to calls will be prompt and direct by the most practical known route, consistent with safety precautions and traffic laws. Elements will not delay by tending to other matters such as continuing a mark-out or making routine stops of traffic violators.

I. Officers en route to a call who observe an offense being committed, or who are notified by a citizen of an offense in progress or having just been committed, must weigh the seriousness of that offense against the nature of the assigned call. If the officer decides to continue on the assigned call, the dispatcher will be notified to start another element on the second incident. If the officer determines the second incident requires immediate attention, the dispatcher will be notified of the officer's inability to remain on the assigned call and that another element should be assigned to answer it.

J. Upon completion of all calls and related reports, officers will immediately *clear* via MDC or the dispatcher. They will not change location in conjunction with a call without updating the MDC or notifying the dispatcher.

K. A supervisor will respond to calls of armed robbery, criminal assault, murder, burglar in building, fire, assist or injured officer, or any other call of a major or unusual nature without instructions from the dispatcher.

L. Field supervisors will monitor radio traffic and coordinate with the dispatcher's office as necessary to ensure continuity to Patrol.

M. In some situations, a citizen may request that a supervisor be called to the location of a police incident. The total circumstances of any police incident must be evaluated. The situation may be such that it is impractical for a supervisor to be summoned or that the employees wait at the scene. If a supervisor is not summoned or it is deemed impractical for one to respond, the employee will provide the requesting citizen with the name and business    telephone number of the employee's immediate supervisor so that the citizen may contact the supervisor.

**704.02.    Call Dispatching Procedure**

A. The dispatcher will give the element's call number, the nature of the call, the code (if Code 3), location, and time.

B. The assigned officer will acknowledge receipt either by repeating the element number and "received" or by pressing the Code 5 key on the MDC keyboard.

C. Upon arrival at the scene, as an officer safety precaution, the officer will verbally announce his or her element number and *Code 6*. In addition, the officer will also press the Code 6 key on the MDC keyboard. Dispatchers are required to verbally acknowledge all Code 6 transmissions.

COD_000003

**Dallas Police Department General Order**
**704.00 Calls for Service**

Revised 3/11/2021

D. After completing the call, the officer either will give the element's call number and *clear* or press the appropriate MDC key.
E. The dispatcher will acknowledge by repeating the call number and give the clearing time and service number, if applicable.
F. The officer will repeat the service number.

**704.03   Emergency Calls**

A. The dispatcher will precede the broadcast with one high frequency tone signal.
B. The following calls will be considered emergency calls:

| | |
|---|---|
| Signal DASV | Disturbance Active Shooter in Vehicle |
| Signal DASF | Disturbance Active Shoot on Foot |
| Signal DAEF | Disturbance Armed Encounter on Foot |
| Signal DAEV | Disturbance Armed Encounter in Vehicle |
| Signal ET | Executive Threat |
| Signal 6S | Disturbance at a School |
| Signal 6X-01 | AWARE-Family Violence Alarm |
| Signal 6XE | Major Disturbance Violence-Emergency |
| Signal 6XEA | Major Disturbance Violence-Emergency, Ambulance |
| Signal 7XF | Major Accident on Freeway |
| Signal 7XFCE | Major Accident on Freeway City Equipment |
| Signal 14 | Cutting (including 41-14) |
| Signal 15 | Assist Officer |
| Signal 15A | Assist Officer Ambulance |
| Signal 17 | Kidnapping in Progress |
| Signal 17C | Kidnapping of a Child in Progress |
| Signal 19 | Shooting (including 41-19) |
| Signal 22A | Animal Complaint-Ambulance |
| Signal 35 | Terrorist Incident |
| Signal 41-11R | Burglary in Progress-Residence |
| Signal 41-11B | Burglary in Progress-Business |
| Signal 41-20 | Robbery in Progress |
| Signal 41-25 | Criminal Assault in Progress |
| Signal 42 | Car Chase (Assist) |
| Signal 42FP | Foot Pursuit |
| Signal 44 | Person in Danger |
| Signal 45 | Response Team Activation |
| Signal 46A | CIT Response W/Ambulance |

**Note: Signal 21 -** *Holdup Alarm,* **Signal 21B –** *Business Holdup Alarm,* **and Signal 21R –** *Residential Panic Alarm* **initially will be dispatched Code 1. The Communications Section will attempt to verify whether the alarm is authentic or false. If verification cannot be made, the code will be increased to a Code 3 assignment.**

C. Other situations such as disasters (explosions, plane crashes, tornadoes, flooding, etc.) or incidents such as unruly crowds or riots may be designated as emergency calls when available information justifies the classification.
D. Emergency calls will be dispatched as Code 3 assignments unless information available to the party receiving the initial call clearly indicates that no emergency condition exists.
E. Emergency calls will be given first priority and will be dispatched and answered without undue delay.
F. A conscious effort will be made to hold emergency vehicular traffic to the necessary minimum, giving due regard to the need for safety and the preservation of life.

**704.04.   Non-Emergency Calls**

A. Calls not classified as emergency calls will receive immediate attention and will be answered Code 1.
B. Change in Code Classification
  1. Code 1 response may be increased to Code 3 response when the responding officer's immediate knowledge of a situation justifies such change in classification.
  2. Code 3 response may be decreased to Code 1 response when the responding officer's immediate knowledge of a situation or when weather or road conditions justify such change in classification.
  3. Dispatchers or field supervisors may, based on their immediate knowledge of a situation, direct that a call be increased or decreased in code classification.
  4. No change in code classification will be exercised until the intent is broadcast to and receipt is acknowledged by the dispatcher.

**Dallas Police Department General Order**
**704.00 Calls for Service**

Revised 3/11/2021

**704.05   Elements Missing a Radio Call**

When an element is available for a call and misses a radio call for any reason the dispatcher will:
A.   Check with other elements to see if he missed a mark-out;
B.   Send the element an MDC message;
C.   Call the element on the air once a minute for three minutes;
D.   Advise a field supervisor of the situation;
E.   Notify a Communications Section supervisor.

The Communications Section supervisor will follow the procedures outlined in the Communications Section SOP.

COD_000005



# 2020

## Dallas Police Department

**STANDARD OPERATING**

**PROCEDURES**

**COMMUNICATIONS**

**SERVICES**

Rev. 10-2020



PLAINTIFF'S
EXHIBIT

7

ALL-STATE LEGAL®

COD_000006

*402.13*     *Crime Scene Response Section Referrals* ................................................................................ *158*

# 500.00  911 CALL CENTER OPERATIONS ................................................... 159

**501.00     OPERATIONAL ISSUES** ................................................................................................... **159**

*501.1*     *Phone Etiquette* ............................................................................................................... *159*
*501.2*     *When to Send Police* ........................................................................................................ *160*
*501.3*     *Requests for Service Outside of City Limits* .................................................................... *160*
*501.4*     *Cellular Telephone Calls for Service* ............................................................................... *161*
*501.5*     *Caller is Following the Suspect(s)* .................................................................................... *161*
*501.6*     *Calls from Third Party Information* .................................................................................. *162*
*501.7*     *Battered Spouses or Victims of Family Violence* .............................................................. *162*
*501.8*     *Requests to Disregard a Call* ........................................................................................... *163*
*501.9*     *Upgrading or Downgrading a Call Sheet* ......................................................................... *164*

**502.00     PRIORITY OF CALLS & TIME MANAGEMENT** ....................................................... **164**

*502.1*     *Priority of Signals* ........................................................................................................... *164*
*502.2*     *Phasing of Calls* ............................................................................................................... *164*

**503.00     SUPERVISOR NOTIFICATIONS** .................................................................................. **165**

**504.00     FOREIGN LANGUAGE CALLS** ..................................................................................... **165**

*504.1*     *Initial Call Determination* ............................................................................................... *165*
*504.2*     *Spanish Speaking Caller* ................................................................................................... *165*
*504.3*     *Other Language Caller* ..................................................................................................... *166*

**505.00     TDD CALLS** ...................................................................................................................... **166**

*505.1*     *General Information* ......................................................................................................... *166*
*505.2*     *Recognizing a TDD Incoming Call* ................................................................................... *167*
*505.3*     *Answering a TDD Call* ...................................................................................................... *167*
*505.4*     *TDD Universal Terms* ....................................................................................................... *167*
*505.5*     *911 Hang-up Calls from a TDD Machine* .......................................................................... *168*
*505.6*     *Open Line Calls from a TDD Machine* .............................................................................. *168*
*505.7*     *Relay Texas Calls* ............................................................................................................. *168*

**506.00     TEXT TO 9-1-1 CALLS** ................................................................................................... **168**

*506.1*     *Procedure* ......................................................................................................................... *169*
*506.2*     *Additional Considerations* ............................................................................................... *171*
*506.3*     *Transferring to Dallas Fire Rescue* .................................................................................. *171*
*506.4*     *Transferring to the Service Desk* ...................................................................................... *173*
*506.5*     *Transferring to a Supervisor* ............................................................................................ *173*
*506.6*     *Non-Response to Text Message/Unknown Troubles* .......................................................... *173*
*506.7*     *Initial Text Messages Containing ONLY a GPS Location* .................................................. *173*

6

location. In those circumstances the call will be placed on a Signal 40. Advise the complainant that responding officers will need to see the Protective Order.

### 501.8    REQUESTS TO DISREGARD A CALL

1. A Call Taker will never disregard a call sheet.

2. If a request to disregard is made, obtain the following information:

3. Caller's name and contact information

4. Why they are wishing to disregard the call

5. Be aware that family violence suspects may try to convince the caller to cancel a call for police. Therefore, ask the caller if they are in a safe place and disregarding the call on their own free will. Be aware if the call sounds as if the phone is on speaker.

6. The above information will be added to the Call Sheet by using the "RTC" command and phased to dispatch. It will be the Radio Room Supervisor's responsibility to determine if the call will be cancelled.

7. Notify a floor supervisor anytime a request is received to disregard a family disturbance call and the complainant is now saying no violence occurred, there was a misunderstanding, or any evidence that the complainant is being coerced.

### 501.9    UPGRADING OR DOWNGRADING A CALL SHEET

1. Once a call sheet has been entered into CAD, the call priority will not be downgraded unless directed to do so by a floor supervisor.

2. A call sheet may be upgraded at any time without a supervisor's approval.

3. If new information becomes available, the call taker will add comments to the call sheet and notify the dispatcher using the notify button.

4. If the call taker makes an error in selecting the proper signal and realizes it after the call has been entered into CAD, a floor supervisor will be notified if that change will downgrade the call sheet.

5. If the caller reports additional information while still on the line that increases the danger level for the caller or responding officers, the call sheet will be immediately changed and the dispatcher will be notified by using the notify button. A floor supervisor will also be notified after the change has been made.

## 502.00    PRIORITY OF CALLS & TIME MANAGEMENT

165

COD_000008

### 502.1     PRIORITY OF SIGNALS

1. Each signal has a call priority of 1 through 6.

2. Priority 1 calls are dispatched in higher priority than a Priority 2 and so forth. A Priority 5 call is an Expediter call. Certain calls are for informational purposes only are not dispatched, these are Priority 6 calls.

3. Call Takers should always choose the higher priority call if they are unsure of which signal to use.

4. A supervisor will be notified anytime a call taker enters a Priority 1 call.

### 502.2     PHASING OF CALLS

1. When receiving an emergency or in-progress call, it is imperative the Call Taker send the first phase as soon as the location and the nature of problem is determined.

2. Additional phases will be sent as additional information is obtained from the caller.

3. The "Emergency Notify" button will be activated with each update.

4. After the call is phased, a supervisor will be notified as soon as possible.

## 503.00     SUPERVISOR NOTIFICATIONS

Call Takers will notify a floor supervisor for the following situations:

> 1. Question on which signal to use
> 2. Multiple victims
> 3. Government locations
> 4. Any Priority 1 call
> 5. Unusual circumstances
> 6. Bomb threat or terrorism related
> 7. City employee involved
> 8. Executive Threats
> 9. When specified in Call Handling Procedures

## 504.00     FOREIGN LANGUAGE CALLS

### 504.1     INITIAL CALL DETERMINATION

1. When the Call Taker receives a call that the caller is speaking a foreign language, the call taker will ask "Do you understand English?"

2. If the caller states yes, the call taker will proceed normally.

166

COD_000009

| Location: |
| --- |
| Lower Greenville |
| Uptown |
| Deep Ellum |
| Bishop Arts |
| Trinity Groves |

| Dates: |
| --- |
| 01/01/2019 - 12/20/2021 |

| Data Type: |
| --- |
| Offenses |
| Arrest Charges |

COD_000010



| | Area | Master_Incident_Number | Response_Date | Response_Time | Timegroup | Width | Problem | Priority_Number | Priority_Description | Location_Name | Address | RA | Division | N | Sector | Beat |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | uptown | 21-1274426 | 7/17/2021 | 0:00 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | 3377 apartments | 3377 McKinney Ave | 2038 | CENTRAL | 120 | 122 | |
| 2 | uptown | 21-1326375 | 7/17/2021 | 0:00 | 10p-2a | 1 | 23 - Parking Violation | 4 - Non Critical | | | 2515-2599 McKinney Ave | 2038 | CENTRAL | 120 | 122 | |
| 3 | uptown | 21-1283755 | 7/11/2021 | 0:00 | 10p-2a | 1 | 95 - Speeding/Racing | 4 - Non Critical | | | 2917 McKinney Ave | 2038 | CENTRAL | 120 | 122 | |
| 4 | uptown | 21-1129479 | 6/27/2021 | 0:00 | 10p-2a | 1 | 28 - Major Dist (Violence) | 2 - Urgent | | | 3109 McKinney Ave | 2038 | CENTRAL | 120 | 122 | |
| 5 | uptown | 21-1125148 | 5/24/2021 | 0:00 | 10p-2a | 1 | 6M - Loud Music Disturbance | 4 - Non Critical | | | Routh St / McKinney Ave | 2038 | CENTRAL | 120 | 122 | |
| 6 | uptown | 21-0925148 | 5/29/2021 | 0:00 | 10p-2a | 1 | 6M - Major Dist (Violence) | 2 - Urgent | | TURKEY DAM | 3140 N Hall St | 2038 | CENTRAL | 120 | 122 | |
| 7 | uptown | 21-0744031 | 4/25/2021 | 0:00 | 10p-2a | 1 | 6M - Loud Music Disturbance | 4 - Non Critical | | carlisle on the key mall | 3140 N Hall St | 2038 | CENTRAL | 120 | 122 | |
| 8 | uptown | 21-0744622 | 4/25/2021 | 0:00 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | MANCHESTER STATE THOMAS | 3023 Thomas Ave | 2038 | CENTRAL | 120 | 121 | |
| 9 | uptown | 20-2416809 | 11/29/2020 | 0:00 | 10p-2a | 1 | 08 - Intoxicated Person | 3 - General Service | | | 3023 Thomas Ave | 2038 | CENTRAL | 120 | 121 | |
| 10 | uptown | 20-1690021 | 8/2/2020 | 0:00 | 10p-2a | 1 | 7X - Major Accident | 4 - Non Critical | | MANCHESTER STATE THOMAS | 3023 Thomas Ave | 2041 | CENTRAL | 120 | 121 | |
| 11 | deepellum | 20-0503380 | 2/7/2020 | 0:00 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | CLIFF PIES PIZZA | 3317 N Fitzhugh Ave | 2041 | CENTRAL | 160 | 153 | |
| 12 | uptown | 20-0392001 | 9/27/2020 | 0:00 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | CUTIE PIES PIZZA | 3351 Hudnall St | 2041 | CENTRAL | 120 | 122 | |
| 13 | uptown | 20-0913021 | 9/27/2020 | 0:00 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | HI-FI TOWER | 1900 McKinney Ave | 2041 | CENTRAL | 120 | 122 | |
| 14 | uptown | 20-0617341 | 8/1/2020 | 0:00 | 10p-2a | 1 | 08 - Intoxicated Person | 3 - General Service | | THE JORDAN | 1900 McKinney Ave | 2041 | CENTRAL | 120 | 122 | |
| 15 | uptown | 20-0517143 | 2/2/2020 | 0:00 | 10p-2a | 1 | 6X - Loud Music Disturbance | 4 - Non Critical | | | 2955 Thomas Ave | 2041 | CENTRAL | 120 | 121 | |
| 16 | uptown | 20-0916412 | 9/27/2020 | 0:00 | 10p-2a | 1 | 39 - Business Alarm | 2 - Urgent | | | Vine St / Howell St | 2016 | CENTRAL | 120 | 122 | |
| 17 | uptown | 19-2002412 | 12/26/2019 | 0:00 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | chipotle | Lemmon Ave / Cole Ave | 2016 | CENTRAL | 150 | 151 | |
| 18 | uptown | 19-2205232 | 11/23/2019 | 0:00 | 10p-2a | 1 | 7X - Major Accident | 4 - Non Critical | | | 2300 Allen St | 2016 | CENTRAL | 150 | 151 | |
| 19 | uptown | 19-2195050 | 11/21/2019 | 0:00 | 10p-2a | 1 | 95 - Speeding/Racing | 4 - Non Critical | | manchester state house houses | 2300 Ellis St | 2016 | CENTRAL | 150 | 151 | |
| 20 | uptown | 20-0558730 | 2/8/2020 | 0:00 | 10p-2a | 1 | 39 - Business Alarm | 2 - Urgent | | | 2821 N Harwood St | 2079 | CENTRAL | 150 | 153 | |
| 21 | deepellum | 19-2065412 | 11/17/2019 | 0:01 | 10p-2a | 1 | 6M - Loud Music Disturbance | 4 - Non Critical | | BAYOU BAR | 2300 N Field St | 2079 | CENTRAL | 160 | 153 | |
| 22 | deepellum | 19-2127795 | 11/6/2019 | 0:01 | 10p-2a | 1 | 128 - Business in Progress | 2 - Urgent | | THE GREEN ROOM | 2715 Elm St | 2054 | CENTRAL | 160 | 153 | |
| 23 | deepellum | 19-2120725 | 11/4/2019 | 0:01 | 10p-2a | 1 | 6M - Loud Music Disturbance | 4 - Non Critical | | | 2815 Commerce St | 2054 | CENTRAL | 160 | 153 | |
| 24 | deepellum | 19-1900352 | 10/11/2019 | 0:01 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | TWISTED ROOT BEER CO | 2815 Commerce St | 2054 | CENTRAL | 160 | 153 | |
| 25 | deepellum | 21-1995979 | 10/30/2021 | 0:00 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | FUTURA LOFTS | 3321 Commerce St | 2000 | CENTRAL | 150 | 153 | |
| 26 | deepellum | 21-0909591 | 4/24/2021 | 0:01 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | Monument St / N Good Latimer Expy | 2066 | CENTRAL | 150 | 153 | | |
| 27 | deepellum | 21-0667762 | 4/16/2021 | 0:01 | 10p-2a | 1 | 28 - Major Accident | 4 - Non Critical | | | Live Oak St / Cole St | 2066 | CENTRAL | 150 | 153 | |
| 28 | deepellum | 21-0661190 | 4/15/2021 | 0:01 | 10p-2a | 1 | 7X - Major Accident | 4 - Non Critical | | sweet bar | 2950 Elm St | 2066 | CENTRAL | 150 | 153 | |
| 29 | deepellum | 20-0503380 | 2/7/2020 | 0:00 | 10p-2a | 1 | 31 - Criminal Mischief | 3 - General Service | | M'M BAR | 2830 Elm St | 2066 | CENTRAL | 160 | 153 | |
| 30 | deepellum | 20-0695992 | 4/12/2020 | 0:01 | 10p-2a | 1 | 7X - Major Accident | 4 - Non Critical | | chipotle | N Malcolm X Blvd / Main St | 2079 | CENTRAL | 160 | 153 | |
| 31 | deepellum | 19-2061412 | 11/17/2019 | 0:00 | 10p-2a | 1 | 6M - Loud Music Disturbance | 4 - Non Critical | | | Elm St / N Walton St | 2079 | CENTRAL | 160 | 153 | |
| 32 | uptown | 20-0560730 | 2/8/2020 | 0:00 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | | Elm St / N Walton St | 2079 | CENTRAL | 110 | 153 | |
| 33 | deepellum | 19-2420426 | 11/17/2019 | 0:00 | 10p-2a | 1 | 128 - Residential Alarm | 2 - Urgent | | black dog | 2867 Main St | 2054 | CENTRAL | 160 | 153 | |
| 34 | deepellum | 20-2264391 | 11/6/2020 | 0:00 | 10p-2a | 1 | 82 - Other | 4 - Non Critical | | DC CAMPFIELDS USED CARS TRUCKS | 2954 Main St | 2054 | CENTRAL | 110 | 153 | |
| 35 | deepellum | 19-1370591 | 9/10/2019 | 0:00 | 10p-2a | 1 | 128 - Business Alarm | 2 - Urgent | | | 2815 Commerce St | 2018 | CENTRAL | 160 | 153 | |
| 36 | deepellum | 18-1925061 | 9/6/2019 | 0:00 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | | 2735 Elm St | 2018 | CENTRAL | 150 | 153 | |
| 37 | deepellum | 21-2127795 | 11/6/2021 | 0:01 | 10p-2a | 1 | 128 - Business Alarm | 2 - Urgent | | TWISTED ROOT BEER CO | 2815 Commerce St | 2066 | CENTRAL | 150 | 153 | |
| 38 | deepellum | 21-1999379 | 10/30/2021 | 0:01 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | ALLERTON16 ( mockingbird & juvanna) | 3321 Commerce St | 2000 | CENTRAL | 150 | 153 | |
| 39 | deepellum | 21-1898911 | 4/26/2021 | 0:01 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | | 3100 Commerce St | 2066 | CENTRAL | 150 | 153 | |
| 40 | deepellum | 21-0667762 | 4/16/2021 | 0:01 | 10p-2a | 1 | 28 - Major Accident | 4 - Non Critical | | | Monument St / N Good Latimer Expy | 2066 | CENTRAL | 150 | 153 | |
| 41 | deepellum | 20-2609693 | 12/30/2020 | 0:01 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | | Elm St / Exposition Ave | 2000 | CENTRAL | 150 | 153 | |
| 42 | deepellum | 19-2277006 | 11/24/2019 | 0:01 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | | 2427 Allen St | 2000 | CENTRAL | 160 | 153 | |
| 43 | deepellum | 20-2105262 | 11/20/2020 | 0:01 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | McKinney Ave / Oak Grove Ave | 2079 | CENTRAL | 160 | 153 | | |
| 44 | deepellum | 19-2404754 | 12/19/2019 | 0:01 | 10p-2a | 1 | 1133 - Residential Alarm | 2 - Urgent | | | 2807 Elm St | 2079 | CENTRAL | 160 | 153 | |
| 45 | deepellum | 19-1807003 | 9/25/2019 | 0:01 | 10p-2a | 1 | 82 - Suspicious Person | 3 - General Service | | | 1899 McKinney Ave | 2079 | CENTRAL | 160 | 153 | |
| 46 | deepellum | 19-1210400 | 9/21/2019 | 0:01 | 10p-2a | 1 | 82 - Suspicious Person | 3 - General Service | | | 2355 Thomas Ave | 2041 | CENTRAL | 160 | 153 | |
| 47 | uptown | 19-1809648 | 9/25/2019 | 0:01 | 10p-2a | 1 | 48 - LOT | 2 - Urgent | | GARAGE BAR | 2601 Cole Ave | 2041 | CENTRAL | 160 | 153 | |
| 48 | deepellum | 20-1888794 | 7/11/2012 | 0:01 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | turtle creek terrace | 3215 Carlisle St | 2010 | CENTRAL | 160 | 153 | |
| 49 | deepellum | 21-1491120 | 7/27/2021 | 0:01 | 10p-2a | 1 | 128 - Business in Progress | 2 - Urgent | | | 3205 STATE ST | 2010 | CENTRAL | 150 | 154 | |
| 50 | uptown | 21-1488755 | 7/16/2021 | 0:01 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | CHASE BANK ( McKinney & Lemmon) | 3213 Hall St | 2018 | CENTRAL | 150 | 154 | |
| 51 | deepellum | 21-1391882 | 7/26/2021 | 0:01 | 10p-2a | 1 | 40/01 - Other | 4 - Non Critical | | | 2612 Commerce St | 2052 | CENTRAL | 150 | 153 | |
| 52 | deepellum | 7/12/2021 | 7/12/2021 | 0:02 | 10p-2a | 1 | 40 - Other | 3 - General Service | | N Good Latimer Expy / Live Oak St | 2052 | CENTRAL | 150 | 153 | | |
| 53 | deepellum | 21-1018998 | 5/29/2021 | 0:00 | 10p-2a | 1 | 69V - LKW | 2 - Urgent | | N Good Latimer Expy / Live Oak St | 9922 | CENTRAL | 150 | 153 | | |
| 54 | deepellum | 21-0495593 | 3/21/2021 | 0:01 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | 7-ELEVEN | Elm St / N Good Latimer Expy | 9922 | CENTRAL | 150 | 153 | |
| 55 | deepellum | 21-0496324 | 3/21/2021 | 0:01 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | TREES | 2709 Elm St | 9966 | CENTRAL | 150 | 153 | |
| 56 | deepellum | 20-2072132 | 11/15/2020 | 0:01 | 10p-2a | 1 | 39 - Theft | 2 - Urgent | | DINER MILL | Main St / N Crowdus St | 2078 | CENTRAL | 150 | 153 | |
| 57 | deepellum | 20-2003902 | 11/20/2020 | 0:00 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | | 2803 Elm St | 2078 | CENTRAL | 150 | 153 | |
| 58 | deepellum | 19-1494364 | 8/11/2019 | 0:01 | 10p-2a | 1 | 15 - LKW | 2 - Urgent | | | 2709 Elm St | 2078 | CENTRAL | 150 | 153 | |
| 59 | deepellum | 19-0884005 | 5/28/2019 | 0:01 | 10p-2a | 1 | 40 - Other | 1 - Emergency | | 100 - 199 N GOOD LATIMER EXPY | 3201 Beall St | 2066 | CENTRAL | 150 | 153 | |
| 60 | deepellum | 19-0901689 | 9/27/2019 | 0:00 | 10p-2a | 1 | 32/01 - Crim Msch/Prop Felo | 3 - General Service | | CARLISLE ON THE VINE | 3201 Beall St | 2078 | CENTRAL | 150 | 153 | |
| 61 | uptown | 21-1899904 | 9/27/2019 | 0:02 | 10p-2a | 1 | 128 - Business Alarm | 2 - Urgent | | ONE UPTOWN | 2929 Cityville Ave | 2078 | CENTRAL | 150 | 153 | |
| 62 | deepellum | 21-1391382 | 7/26/2021 | 0:02 | 10p-2a | 1 | 6X - Major Dist (Violence) | 2 - Urgent | | HOUSE HEROES | 3433 McKinney Ave | 2038 | CENTRAL | 150 | 153 | |
| 63 | uptown | 21-0918998 | 5/28/2021 | 0:02 | 10p-2a | 1 | 095 - LKW | 2 - Urgent | | SOUTH STREET FLATS | 3031 Routh St | 2038 | CENTRAL | 150 | 122 | |
| 64 | uptown | 21-1062056 | 6/4/2021 | 0:02 | 10p-2a | 1 | 6M - Loud Music Disturbance | 4 - Non Critical | | MONTGOMERY PLAZA | 3200 Maple Ave | 2037 | CENTRAL | 150 | 122 | |
| 65 | uptown | 21-0665856 | 4/16/2021 | 0:02 | 10p-2a | 1 | 6X - Loud Music Disturbance | 4 - Non Critical | | MONTAGE CLUB / THE OLD WARSAW ROOM | 2632 Allen St | 2066 | CENTRAL | 150 | 153 | |
| 66 | deepellum | 21-0565808 | 4/2/2021 | 0:02 | 10p-2a | 1 | 6X - Loud Music Disturbance | 4 - Non Critical | | STATE THOMAS SAVELLO | 2810 Elm St | 2037 | CENTRAL | 150 | 122 | |
| 67 | uptown | 21-0492721 | 3/19/2021 | 0:02 | 10p-2a | 1 | 15 - LKW | 2 - Urgent | | old warsaw /kennedy room | 2838 Elm St | 2000 | CENTRAL | 150 | 122 | |
| 68 | deepellum | 21-0377000 | 3/2/2021 | 0:02 | 10p-2a | 1 | 6M - Loud Music Disturbance | 4 - Non Critical | | DEEP ELLUM HOSTEL | 2512 Maple Ave | 2000 | CENTRAL | 150 | 122 | |
| 69 | deepellum | 20-0499745 | 2/2/2021 | 0:02 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | the standard pour bar | 2820 Carlisle St | 2038 | CENTRAL | 150 | 122 | |
| 70 | uptown | 20-1618877 | 7/26/2020 | 0:02 | 10p-2a | 2 | 40 - Other | 4 - Non Critical | | MONTEREY APT | 1906 Marilla St | 2038 | CENTRAL | 150 | 122 | |
| 71 | uptown | 20-1784143 | 8/19/2020 | 0:00 | 10p-2a | 1 | 37 - Street Blockage | 4 - Non Critical | | THE STONELEIGH | 2900 McKinney Ave | 4524 | CENTRAL | 150 | 323 | |
| 72 | uptown | 20-2079743 | 10/25/2020 | 0:00 | 10p-2a | 1 | 6X - Loud Music Disturbance | 4 - Non Critical | | 1900 WOODALL RODGERS SERV VB | 2327 McKinney Ave | 2038 | CENTRAL | 150 | 323 | |
| 73 | uptown | 20-1807483 | 7/24/2019 | 0:00 | 10p-2a | 1 | 6X - Robbery | 2 - Urgent | | 3950 McKinney Ave | 3227 McKinney Ave | 2038 | CENTRAL | 120 | 124 | |
| 74 | uptown | 19-1300212 | 7/24/2019 | 0:00 | 10p-2a | 1 | 6X - Loud Music Disturbance | 4 - Non Critical | | TOWNHOMES | 3227 McKinney Ave | 2003 | CENTRAL | 120 | 124 | |
| 75 | uptown | 19-0764567 | 4/28/2019 | 0:00 | 10p-2a | 1 | 6M - Major Dist (Violence) | 2 - Urgent | | POST OAK APT | 2006 Routh St | 2003 | CENTRAL | 120 | 124 | |
| 76 | uptown | 19-0764367 | 4/28/2019 | 0:00 | 10p-2a | 1 | 40 - Other | 4 - Non Critical | | VELVET TACO | McKinney Ave / Lemmon Ave | 2003 | CENTRAL | 120 | 124 | |
| 77 | uptown | 19-0350720 | 4/5/2019 | 0:02 | 10p-2a | 2 | 40 - Other | 4 - Non Critical | | WALMART ( central & hall) | 2250 N Central Expy 2b | 2015 | CENTRAL | 120 | 121 | |

COD_000012

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

COD_000013

| Server | NIBRS_Crime_Comp/Desc (All) | Time Group | | AGG ASSAULT - FV | | AGG ASSAULT - MFV | | | AGG ASSAULT - MFV Total | RAPE | | RAPE Total | BURGLARY-BUSINESS | | BURGLARY-BUSINESS Total | BURGLARY-RESIDENCE | BURGLARY-RESIDENCE Total | ROBBERY | ROBBERY Total | MURDER & NONNEGLIGENT MANSLAUGHTER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AGG ASSAULT - FV | | | | | | | | | | | | | | | | | | | |
| | 10p to 2a | 2a to 6a | AGG ASSAULT - FV Total | 10p to 2a | 2a to 6a | AGG ASSAULT - MFV Total | 10p to 2a | 2a to 6a | RAPE Total | 10p to 2a | 2a to 6a | | 10p to 2a | 2a to 6a | | 2a to 6a | | 2a to 6a | | 10p to 2a |
| USER_SPD_Name | | | | | | | | | | | | | | | | | | | | |
| AMAZONS | 1 | | 1 | | 1 | 1 | | | | 1 | | 1 | | | | | | | | |
| BABY DOLLS SALOON | | | | 4 | | 4 | 22 | 2 | 24 | 2 | | 2 | 3 | | 3 | | | | | |
| BABY DOLLS SALOON WEST | | | | 10 | | 10 | 8 | 9 | 17 | | | | | | | | | | | |
| BABY DOLLS TOPLESS SALOON | 2 | | 2 | 2 | | 2 | 2 | 2 | | | | | | | | | | | | |
| BLISS ARCADE THEATER CLUB | 1 | 1 | 2 | 4 | | 4 | 5 | 2 | 7 | | 1 | 1 | | | | | | | | |
| BUCK WILD | | | | 2 | | 2 | 6 | 1 | 7 | | | | | | | | | | | |
| BUCKS CABARET | | | | | | | 3 | | 3 | | | | | | | | | | | |
| BUCKS WILD | | | | | | | | | | | | | | | | | | | | |
| CABARET ROYALE/CUGAS LOCAS | | | | | | | 1 | 2 | | 3 | | | | | | 2 | | | | |
| CHICA BONITA | | | | | | | | | | | | | | | | | | | | |
| COASTER LINE - COASTER CLUB INC | | 1 | 1 | | 1 | | 10 | 4 | | 9 | 3 | | 7 | 2 | | | | | | |
| DALLAS CABARET | | 1 | | 5 | | 5 | 8 | 8 | 16 | | | | | 1 | | | | | | |
| DALLAS CABARET SOUTH | | | | 3 | | 3 | 43 | 36 | 77 | | | | 3 | | | | | | | |
| DC'S MEN'S CLUB | 1 | 1 | | 1 | | | 5 | 1 | | 48 | | 3 | | | | | | | | |
| DON'S AGENT/DON'S CLUB | | | | | | | 2 | 1 | 3 | | | | | | | | | | | |
| FONY'S CABARET | 2 | | 2 | 2 | | 2 | | | | | | | | | | | | | | |
| LA ZONA ROSA | | | | | | | 6 | | 6 | 1 | | 1 | | | | 3 | | | | 1 |
| LIDO'S ADULT THEATER | 1 | | 1 | 7 | | 7 | 5 | 2 | 7 | | | | | | | | | | | |
| LIPSTICK | | | | 1 | | 1 | 9 | 2 | 11 | | 1 | | 1 | | | | | | | |
| NEW FINE ARTS - HOOD/HIGBEE | | | | | | | 1 | | | | | | | | | | | | | |
| NEW FINE ARTS - WEST | | | | 1 | | 1 | 2 | | | 3 | | 3 | | 1 | | | | | | |
| NEW FINE ARTS SHILOH RD | | | | | | | | 1 | 1 | | | | | | | | | | | |
| ODYSSEY | | | | | | | | | | | | | | | | | | | | |
| PANDORA'S MENS CLUB | | | | 3 | | 3 | 1 | | 1 | 2 | | 2 | 2 | | 2 | | | | | |
| PANTERA | | | | | | | | | | | | | | | | | | | | |
| PT'S MENS CLUB | | | | 2 | | 2 | 3 | 1 | | | | | | | | | | | | |
| SILVER CITY CABARET | | | | | | | 2 | | 2 | 1 | | 1 | 4 | | 4 | | | | | |
| SILVER CITY CABARET | | | | | | | | | | | | | | | | | | | | |
| SPEARMINT RHINO /DEREK'S/SAMY'S CLUB | | | | 2 | | 2 | 29 | 8 | 39 | 16 | | | | | | | | | | |
| THE CLUBHOUSE | | | | 1 | | 1 | 2 | | 2 | 1 | | | 8 | | 8 | | | | | |
| THE LODGE BAR AND GRILL | | | | | | | | | | | | | | | | | | | | |
| THE LODGE DALLAS | | | | 1 | | 1 | 5 | 4 | 9 | | | | 1 | | 1 | | | | | |
| THE MEN'S CLUB OF DALLAS | | | | | | | | | | | | | | | 1 | | | | | |
| UNK AT PRESENT/STRIP MALL | | | | | | | | | | | | | | | | | | | | |
| UNKNOWN AT PRESENT | | | | | | | | | | | | | | | | | | | | |
| WEST/WHISPERS/RISQUE | | 1 | 1 | | 1 | 1 | | | 1 | 1 | | | | | | | 1 | | | |
| WEST/HOLLYWOOD ADULT THEATER/ENTERTAINMENT GROUP | | | | | | | | | | | | | | | | | | | | |
| XTC CABARET | | | | | | | | | | | | | | | | | | | | |
| XPOSED ADULT THEATER | | | | 1 | | 1 | 1 | | 1 | 1 | | 1 | 1 | | 1 | 1 | | | 1 | |
| Grand Total | 4 | 6 | 8 | 30 | | 39 | 169 | 12 | 266 | 111 | 337 | 26 | 31 | | 25 | 46 | 8 | 4 | 5 | 1 |

ALL-STATE LEGAL®
PLAINTIFF'S
EXHIBIT
9

COD_005288

COD_005289

| | MURDER & NONNEGLIGENT MANSLAUGHTER 2a to 6a | MURDER & NONNEGLIGENT MANSLAUGHTER Total | OTHER THEFT 10p to 2a | OTHER THEFT 2a to 6a | OTHER THEFT Total | RAPE 10p to 2a | RAPE 2a to 6a | RAPE Total | ROBBERY-BUSINESS 10p to 2a | ROBBERY-BUSINESS 2a to 6a | ROBBERY-BUSINESS Total | ROBBERY-INDIVIDUAL 10p to 2a | ROBBERY-INDIVIDUAL 2a to 6a | ROBBERY-INDIVIDUAL Total | SEXUAL ASSAULT WITH AN OBJECT 2a to 6a | SEXUAL ASSAULT WITH AN OBJECT Total | SHOPLIFTING 10p to 2a | SHOPLIFTING 2a to 6a | SHOPLIFTING Total | SODOMY 10p to 2a |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

COD_005290

COD_005291

| OBJECTID | IncidentNum | Datasource | ServYr | ServNumID | Watch | Signal | OffenseDesc | Premise | ObjAttack | Address | Apt | City | State | Date1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79 | 255222-2019 | RMS/NIBRS | 2019 | 255222-2019-01 | 1 | 40/01 -OTHER | ROBBERY OF INDIVIDUAL | Hotel/Motel/ETC | N/A | 1825 REGAL ROW | 109 | DALLAS | TX | 2019-12-21 00:00:00 |
| 97 | 040064-2019 | RMS/NIBRS | 2019 | 040064-2019-01 | 1 | UNAUTHORIZED ENTER-MOTOR VEH | AUTO THEFT/UNAUTH USE OF MOTOR VEH - TRUCK OR BUS | Auto Dealership-New/Used | N/A | 2400 COMPOSITE DR | | DALLAS | TX | 2019-01-18 00:00:00 |
| 115 | 080664-2019 | RMS/NIBRS | 2019 | 080664-2019-01 | 1 | 58- ROUTINE INVESTIGATION | THEFT OF PROP > OR EQUAL $2,500-$30K (NOT SHOPLIFT) PC31.03(e)(4) | Business Office | N/A | 10301 TECHNOLOGY BLVD E | 17 | DALLAS | TX | 2019-04-04 00:00:00 |
| 164 | 047948-2019 | RMS/NIBRS | 2019 | 047948-2019-01 | 1 | 55- TRAFFIC STOP | THEFT OF PROP > OR EQUAL $2,500-$30K (NOT SHOPLIFT) PC31.03(e)(4) | Business Office | N/A | 2036 PREEWOOD DR | | DALLAS | TX | 2019-02-25 00:00:00 |
| 205 | 227623-2019 | RMS/NIBRS | 2019 | 227623-2019-01 | 1 | 11B- BURG OF BUS | BURGLARY OF BUILDING - FORCED ENTRY | Commercial Property Occupied/Vacant | Commercial Property Occupied/Vacant | 13118 HARRY HINES BLVD | | DALLAS | TX | 2019-11-25 00:00:00 |
| 238 | 247904-2019 | RMS/NIBRS | 2019 | 247904-2019-01 | 1 | 118- BURG OF BUS | BURGLARY OF BUILDING - FORCED ENTRY | Commercial Property Occupied/Vacant | N/A | 13050 HARRY HINES BLVD | | DALLAS | TX | 2019-12-09 00:00:00 |
| 313 | 233340-2019 | RMS/NIBRS | 2019 | 233340-2019-01 | 1 | 58- ROUTINE INVESTIGATION | THEFT OF PROP > OR EQUAL $2,500-$30K (NOT SHOPLIFT) PC31.03(e)(4) | Parking (Business) | N/A | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2019-12-02 00:00:00 |
| 324 | 255163-2019 | RMS/NIBRS | 2019 | 255163-2019-01 | 1 | 41/21- ROBBERY - IN PROGRESS | ROBBERY OF INDIVIDUAL (AGG) | Bar/NightClub/Dancehall ETC | N/A | 2014 N STEMMONS FWY | | DALLAS | TX | 2019-12-21 00:00:00 |
| 331 | 199636-2019 | RMS/NIBRS | 2019 | 199636-2019-01 | 1 | 41/21B -BURG BUSN IN PROGRESS | ROBBERY OF INDIVIDUAL | Highway, Street, Alley ETC | Parking Lot | 2030 W NORTHWEST HWY | | DALLAS | TX | 2019-10-11 00:00:00 |
| 442 | 111093-2019 | RMS/NIBRS | 2019 | 111093-2019-01 | 1 | 58- ROUTINE INVESTIGATION | ROBBERY OF INDIVIDUAL (AGG) | Outdoor Area Public/Private | N/A | 11608 HARRY HINES BLVD | | DALLAS | TX | 2019-05-14 00:00:00 |
| 373 | 224141-2019 | RMS/NIBRS | 2019 | 224141-2019-01 | 1 | 32- BURGLARY OF VEH | BURGLARY OF BUILDING - FORCED ENTRY | Bar/NightClub/Dancehall ETC | N/A | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2019-11-23 00:00:00 |
| 497 | 032043-2020 | RMS/NIBRS | 2020 | 032043-2020-01 | 1 | 32- BURGLARY OF VEH | THEFT OF PROP > OR EQUAL $2,500-$30K (NOT SHOPLIFT) PC31.03(e)(4) | Parking (Business) | N/A | 2444 WALNUT RIDGE ST | C105 | DALLAS | TX | 2020-02-06 00:00:00 |
| 498 | 101363-2020 | RMS/NIBRS | 2020 | 101363-2020-01 | 1 | 58- ROUTINE INVESTIGATION | THEFT OF MATERIAL ALUM/BRNZE/COPPER <$20K PC31.03(e4) | Parking (Business) | N/A | 13050 HARRY HINES BLVD | | DALLAS | TX | 2020-05-20 00:00:00 |
| 508 | 097765-2020 | RMS/NIBRS | 2020 | 097765-2020-01 | 1 | 11V- BURG MOTOR VEH | BMV | Parking (Business) | Motor Vehicle | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2020-05-15 00:00:00 |
| 507 | 097765-2020 | RMS/NIBRS | 2020 | 097765-2020-01 | 1 | 11V- BURG MOTOR VEH | BMV | Parking (Business) | Motor Vehicle | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2020-05-15 00:00:00 |
| 556 | 089408-2020 | RMS/NIBRS | 2020 | 089408-2020-01 | 1 | 11B- BURG OF BUS | BMV | Parking (Business) | N/A | 13311 HARRY HINES BLVD | | DALLAS | TX | 2020-05-05 00:00:00 |
| 508 | 097765-2020 | RMS/NIBRS | 2020 | 097765-2020-01 | 1 | 11V- BURG MOTOR VEH | BMV | Parking (Business) | Motor Vehicle | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2020-05-15 00:00:00 |
| 625 | 134679-2020 | RMS/NIBRS | 2020 | 134679-2020-01 | 1 | 58- ROUTINE INVESTIGATION | THEFT OF PROP > OR EQUAL $2,500-$30K (NOT SHOPLIFT) PC31.03(e)(4) | Commercial Property Occupied/Vacant | N/A | 10317 SHADY TRL | | DALLAS | TX | 2020-06-30 00:00:00 |
| 660 | 120894-2020 | RMS/NIBRS | 2020 | 120894-2020-01 | 1 | 11V- BURG MOTOR VEH | BMV | Parking (Business) | N/A | 10601 HARRY HINES BLVD | | DALLAS | TX | 2020-06-18 00:00:00 |
| 687 | 149753-2020 | RMS/NIBRS | 2020 | 149753-2020-01 | 1 | 58- ROUTINE INVESTIGATION | THEFT - THEFT | Parking Lot | Parking Lot | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2020-07-20 00:00:00 |
| 704 | 161709-2020 | RMS/NIBRS | 2020 | 161709-2020-01 | 1 | 11V- BURG MOTOR VEH | BMV | Parking (Business) | N/A | 2016 W NORTHWEST HWY | | DALLAS | TX | 2020-08-09 00:00:00 |
| 722 | 217110-2020 | RMS/NIBRS | 2020 | 217110-2020-01 | 1 | 11V- BURG MOTOR VEH | BMV | Parking (Business) | N/A | 10525 WALNUT ST | 7011 | DALLAS | TX | 2020-11-01 00:00:00 |
| 733 | 195986-2020 | RMS/NIBRS | 2020 | 195986-2020-01 | 1 | 11V- BURG MOTOR VEH | BMV | Parking (Business) | N/A | 2117 W NORTHWEST HWY | | DALLAS | TX | 2020-12-10 00:00:00 |
| 786 | 195986-2020 | RMS/NIBRS | 2020 | 195986-2020-01 | 1 | 58- ROUTINE INVESTIGATION | BMV | Parking (Business) | N/A | 2117 W NORTHWEST HWY | | DALLAS | TX | 2020-12-10 00:00:00 |
| 821 | 210577-2020 | RMS/NIBRS | 2020 | 210577-2020-01 | 1 | 25- CRIMINAL ASSAULT | ASSAULT (AGG) - AGAINST SECURITY OFF (AGG) | Bar/NightClub/Dancehall ETC | N/A | 2150 CALIFORNIA CROSSING RD | 203 | DALLAS | TX | 2020-10-18 00:00:00 |
| 883 | 058915-2021 | RMS/NIBRS | 2021 | 058915-2021-01 | 1 | 40- OTHER | SEX ASSAULT (RAPE) | Commercial Property Occupied/Vacant | N/A | 8550 N STEMMONS FWY | | DALLAS | TX | 2020-11-20 00:00:00 |
| 980 | 066887-2021 | RMS/NIBRS | 2021 | 066887-2021-01 | 1 | 58 - ROUTINE INVESTIGATION | ASSAULT (AGG) SERIOUS BODILY INJURY | Bar/NightClub/Dancehall ETC | N/A | 8550 N STEMMONS FWY | | DALLAS | TX | 2020-12-15 00:00:00 |
| 1001 | 804462-2021 | RMS/NIBRS | 2021 | 804462-2021-01 | 1 | DEADLY CONDUCT | SEX ASSAULT OF CHILD (SODOMY) (AGG) | Entertainment/Sports Venue | N/A | 1870 REGAL ROW | | DALLAS | TX | 2021-06-04 00:00:00 |
| 1025 | 804462-2021 | RMS/NIBRS | 2021 | 804462-2021-01 | 1 | 58- ROUTINE INVESTIGATION | BMV | Entertainment/Sports Venue | Motor Vehicle | 1870 REGAL ROW | | DALLAS | TX | 2021-06-04 00:00:00 |
| 945 | 058169-2021 | RMS/NIBRS | 2021 | 058169-2021-01 | 1 | DAIF-DIST ARMED ENCOUNTER FOOT | BMV | Parking (Business) | Motor Vehicle | 9255 E R L THORNTON FWY | | DALLAS | TX | 2021-03-19 00:00:00 |
| 950 | 059506-2021 | RMS/NIBRS | 2021 | 059506-2021-01 | 1 | 58- ROUTINE INVESTIGATION | BMV | Parking (Business) | N/A | 9125 E R L THORNTON FWY | | DALLAS | TX | 2021-04-06 00:00:00 |
| 952 | 074666-2021 | RMS/NIBRS | 2021 | 074666-2021-01 | 1 | 25 - CRIMINAL ASSAULT | ASSAULT (AGG) - AGAINST SECURITY OFF (AGG) | Restaurant/Food Service/TABC Location | N/A | 10333 TECHNOLOGY BLVD E | 9183 | DALLAS | TX | 2021-04-20 00:00:00 |
| 1035 | 086492-2021 | RMS/NIBRS | 2021 | 086492-2021-01 | 1 | 58- ROUTINE INVESTIGATION | BMV | Parking (Business) | N/A | 9125 E R L THORNTON FWY | | DALLAS | TX | 2021-04-06 00:00:00 |
| 953 | 074666-2021 | RMS/NIBRS | 2021 | 074666-2021-01 | 1 | 25 - CRIMINAL ASSAULT | ASSAULT (AGG) - AGAINST SECURITY OFF (AGG) | Restaurant/Food Service/TABC Location | N/A | 10333 TECHNOLOGY BLVD E | | DALLAS | TX | 2021-04-20 00:00:00 |
| 980 | 066887-2021 | RMS/NIBRS | 2021 | 066887-2021-01 | 1 | 40 - OTHER | THEFT OF FIREARM | Parking (Business) | N/A | 910 W MOCKINGBIRD LN | | DALLAS | TX | 2021-05-14 00:00:00 |
| 1038 | 095911-2021 | RMS/NIBRS | 2021 | 095911-2021-01 | 1 | 58- ROUTINE INVESTIGATION | BMV | Parking (Business) | Motor Vehicle | 11055 HARRY HINES BLVD | | DALLAS | TX | 2021-05-06 00:00:00 |
| 1280 | 064191-2019 | RMS/NIBRS | 2019 | 064191-2019-01 | 1 | UNAUTHORIZED USE OF MOTOR VEH | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | N/A | Motor Vehicle | 10333 TECHNOLOGY BLVD W | | DALLAS | TX | 2019-03-31 00:00:00 |
| 1287 | 108724-2019 | RMS/NIBRS | 2019 | 108724-2019-01 | 1 | UNAUTHORIZED USE OF MOTOR VEH | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | N/A | Motor Vehicle | 2117 W NORTHWEST HWY | 2211 | DALLAS | TX | 2019-05-27 00:00:00 |
| 1291 | 150492-2021 | RMS/NIBRS | 2021 | 150492-2021-01 | 1 | BURGLARY OF BUILDING / FORCED ENTRY | BMV | Parking (Business) | N/A | 11569 HARRY HINES BLVD | | DALLAS | TX | 2021-08-21 00:00:00 |
| 1074 | 803237-2021 | RMS/NIBRS | 2021 | 803237-2021-01 | 1 | THEFT OF PROP > OR EQUAL $2,500 <$30K (NOT SHOPLIFT) PC31.03(e)(4) | BMV | Parking (Business) | N/A | 2130 W NORTHWEST HWY | 304 | DALLAS | TX | 2021-05-11 00:00:00 |
| 1046 | 052111-2021 | RMS/NIBRS | 2021 | 052111-2021-01 | 1 | THEFT OF PROP > OR EQUAL $2,500 <$30K (NOT SHOPLIFT) PC31.03(e)(4) | BMV | Parking (Business) | N/A | 7501 N STEMMONS FWY | | DALLAS | TX | 2021-05-07 00:00:00 |
| 1094 | 803223-2021 | RMS/NIBRS | 2021 | 803223-2021-01 | 1 | 11B- BURG OF BUS | DEADLY CONDUCT | Bar/NightClub/Dancehall ETC | N/A | 10301 TECHNOLOGY BLVD E | | DALLAS | TX | 2021-05-07 00:00:00 |
| 1201 | 084690-2021 | RMS/NIBRS | 2021 | 084690-2021-01 | 1 | ODD -OFF DUTY JOB | THEFT OF PROP > OR EQUAL $2,500 <$30K (NOT SHOPLIFT) PC31.03(e)(4) | Bar/NightClub/Dancehall ETC | N/A | 2230 W NORTHWEST HWY | | DALLAS | TX | 2021-04-04 00:00:00 |
| 1118 | 119337-2021 | RMS/NIBRS | 2021 | 119337-2021-01 | 1 | 58- ROUTINE INVESTIGATION | BURGLARY OF BUILDING / FORCED ENTRY | Bar/NightClub/Dancehall ETC | N/A | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2021-06-30 00:00:00 |
| 1140 | 118317-2021 | RMS/NIBRS | 2021 | 118317-2021-01 | 1 | ODV -UMMV | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | N/A | N/A | 2444 WALNUT RIDGE ST | | DALLAS | TX | 2021-07-06 00:00:00 |
| 1228 | 155528-2021 | RMS/NIBRS | 2021 | 155528-2021-01 | 1 | 58- ROUTINE INVESTIGATION | BMV | Parking (Business) | N/A | 11055 HARRY HINES BLVD | | DALLAS | TX | 2021-08-30 00:00:00 |
| 1259 | 010254-2021 | RMS/NIBRS | 2021 | 010254-2021-01 | 1 | 25 - CRIMINAL ASSAULT | DEADLY CONDUCT | Entertainment/Sports Venue | N/A | 910 W MOCKINGBIRD LN | | DALLAS | TX | 2021-01-16 00:00:00 |
| 1280 | 064191-2019 | RMS/NIBRS | 2019 | 064191-2019-01 | 1 | UNAUTHORIZED USE OF MOTOR VEH | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | N/A | Motor Vehicle | 10333 TECHNOLOGY BLVD W | | DALLAS | TX | 2019-03-31 00:00:00 |
| 1287 | 108724-2019 | RMS/NIBRS | 2019 | 108724-2019-01 | 1 | PSE/11V - BURG MOTOR VEH | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | N/A | Motor Vehicle | 2117 W NORTHWEST HWY | | DALLAS | TX | 2019-05-27 00:00:00 |
| 1291 | 150492-2021 | RMS/NIBRS | 2021 | 150492-2021-01 | 1 | PSE/11V -BURG MOTOR VEH | BMV | Parking (Business) | N/A | 11569 HARRY HINES BLVD | | DALLAS | TX | 2021-08-21 00:00:00 |
| 1328 | 220978-2020 | RMS/NIBRS | 2020 | 220978-2020-02 | 1 | PSE/11V -BURG MOTOR VEH | BMV | Parking (Business) | N/A | 2117 W NORTHWEST HWY | | DALLAS | TX | 2020-12-11 00:00:00 |
| 1331 | 168918-2021 | RMS/NIBRS | 2021 | 168918-2021-01 | 1 | PSE/11V -BURG MOTOR VEH | BMV | Parking (Business) | N/A | 11035 ABELES LN | | DALLAS | TX | 2021-09-18 00:00:00 |
| 1359 | 010254-2021 | RMS/NIBRS | 2021 | 010254-2021-01 | 1 | PSE/11V -BURG MOTOR VEH | BMV | Parking (Business) | N/A | 910 W MOCKINGBIRD LN | | DALLAS | TX | 2021-01-16 00:00:00 |
| 1371 | 090242-2021 | RMS/NIBRS | 2021 | 090242-2021-01 | 1 | ODV - UMMV | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | N/A | N/A | 1865 W NORTHWEST HWY | | DALLAS | TX | 2021-05-08 00:00:00 |
| 1372 | 236425-2019 | RMS/NIBRS | 2019 | 236425-2019-01 | 1 | ODV - UMMV | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | Other | N/A | 2117 W NORTHWEST HWY | | DALLAS | TX | 2019-12-05 00:00:00 |
| 1405 | 064262-2021 | Bar/NightClub/Dancehall ETC | 2021 | 064262-2021-01 | 1 | ODV - UMMV | | | | 2117 W NORTHWEST HWY | | DALLAS | TX | 2021-04-14 00:00:00 |
| 1415 | 107689-2021 | RMS/NIBRS | 2021 | 107689-2021-02 | 1 | | | | | 10301 TECHNOLOGY BLVD W | | DALLAS | TX | 2021-06-16 00:00:00 |

| Year1 | Month1 | Day1 | Time1 | Time Group | Date2DayofYear | Date2 | Year2 | Month2 | Day2 | Time2 | Date2DayofYear | ReportedDate | EDate | EYear | EMonth | EDay | ETime | EdateDayofYear | CFS Number | CallOrigine | CallReceived | CallCleared | CallDispatched |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

COD_005316

| # | Involvement | VictimType | CompName | CompRace | CompEthnicity | CompSex | RD1Badge | RD1Name | RD2Badge |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Victim | Individual | LINDSAS, CHELSEA, LYNN | White | Non-Hispanic or Latino | Female | 11474 | CHOUDER,WON IL | 11155 |
| 2 | Victim | Individual | | | | | 6862 | BONETT,PATRICK JOHN | |
| 3 | Victim | Individual | LAUDERDALE, EVERETT, LEE | White | | Male | 129060 | CASTRO,ADALINDA | |
| 4 | Victim | Business | DESOTO PD | | | | 9783 | KOSS,KELLY HARRISON | 10643 |
| 5 | Victim | Business | USA AUTO PERFORMANCE | | | | 11565 | SANDOVAL,SARAH | 9474 |
| 6 | Victim | Business | GILEX, INC | White | Non-Hispanic or Latino | Male | 11073 | GUZMAN-MARTINEZ,ROBERTO,ALEJANDRO | |
| 7 | Victim | Business | PENSKE TRUCK LEASING | | | | 6236 | PERRY,JAMES,M | |
| 8 | Victim | Individual | DIAZ, YOSMANY | Hispanic or Latino | Hispanic or Latino | Male | 8090 | GRAY,YOCONDA,JEANETTE | |
| 9 | Victim | Individual | GREENE, LEON | Black | Non-Hispanic or Latino | Male | 11821 | GONZALEZ,ANNETTE | |
| 10 | Victim | Individual | LINDENHAUM-AUSTIN, MADISON | White | Non-Hispanic or Latino | Female | 10661 | JARAMILLO,CARLOS | |
| 11 | Victim | Individual | URBAN, MICHI | White | Non-Hispanic or Latino | Female | 94392 | WILLS,LINDA,M | |
| 12 | Victim | Individual | | Black | Non-Hispanic or Latino | Female | 6798 | RUFF,ALBERT,W | |
| 13 | Victim | Business | SMOKE DEPOT | Black | Non-Hispanic or Latino | | 8689 | DAVIS,DAVID,EARL | 9522 |
| 14 | Victim | Individual | BARDAJA, JOSE | Hispanic or Latino | Non-Hispanic or Latino | Male | 11508 | OSBORN,WALTON | |
| 15 | Victim | Individual | BENTZ, JOSEPH, DANIEL | White | Non-Hispanic or Latino | Male | 11152 | VALENTINE,CLAYTON | |
| 16 | Victim | Individual | CLASBERRY, BRANDON, ANTHONY | Black | Non-Hispanic or Latino | Male | 7978 | BRANCH,MICHAEL,ALLEN | |
| 17 | Victim | Individual | JACKSON, JESSICA | Black | Non-Hispanic or Latino | Female | 9430 | AGUACINDA,JOSEPH | 11121 |
| 18 | Victim | Individual | BROWN, MARCUS | Black | Hispanic or Latino | Male | 94392 | WILLS,LINDA,M | |
| 19 | Victim | Individual | VILLALOBOS, JESSE, ANTHONY | Hispanic or Latino | Hispanic or Latino | Male | 7217 | SCOTT,BILLY,RAY | |
| 20 | Victim | Individual | COX, TRAVIS, RICHARD | White | Non-Hispanic or Latino | Male | 10461 | HARRIS,MERRICK | |
| 21 | Victim | Individual | DAIL, TREYVONTE | Black | Non-Hispanic or Latino | Male | 6798 | RUFF,ALBERT,W | |
| 22 | Victim | Business | DALLAS POWER SPORT | | | | | | |
| 23 | Victim | Individual | SHOWS, BRIAN | Black | Non-Hispanic or Latino | Female | 10351 | OSBORN,WALTON | |
| 24 | Victim | Individual | FRANKLIN, ANTAVIUM | Black | Non-Hispanic or Latino | Male | 7377 | ANDERSON,GERMAINE | |
| 25 | Victim | Individual | HA, CHONG | Asian | Non-Hispanic or Latino | Female | 11684 | PEREZ,BONNIE | 10354 |
| 26 | Victim | Business | AVIS BUDGET GROUP | | Non-Hispanic or Latino | Male | 9133 | SIMS,JOSHUA,BRYON | |
| 27 | Victim | Individual | CUINTANILLA, PABLO | Hispanic or Latino | Non-Hispanic or Latino | Male | 10197 | ARRIAGA,RAUL | |
| 28 | Victim | Individual | HOLMES, KODI | Black | Non-Hispanic or Latino | Male | 11190 | HILL,MAURICIO,ANTRON | |
| 29 | Victim | Individual | MORENA, MIKI | White | Non-Hispanic or Latino | Female | 11190 | MAYFIELD,LAUREN,MICHAEL | |
| 30 | Victim | Individual | JANUSKA, MARIA, M | White | Non-Hispanic or Latino | Female | 7128 | SIMS,JOHN,BRYON | |
| 31 | Victim | Individual | LEWIS, RAECIA | Black | Non-Hispanic or Latino | Female | 94392 | TREGLE,JR,FRANKLIN,STEVEN | |
| 32 | Victim | Individual | STUBBS, SOPHD | Black | Non-Hispanic or Latino | Female | 8581 | WILLS,LINDA,M | |
| 33 | Victim | Individual | MAUTHIAN, ZACHARY, WAMBUA | Black | Non-Hispanic or Latino | Male | 11755 | PATTERSON,FREDRICK,TYRONE | |
| 34 | Victim | Individual | JOHNSON, MARCUS | Black | Non-Hispanic or Latino | Male | 6798 | MONEY,MICHAEL | |
| 35 | Victim | Business | | Hispanic or Latino | Non-Hispanic or Latino | Male | 10824 | JACKSON,AUSTIN | 9543 |
| 36 | Victim | Business | AUSBORNE, TERRY | Black | Non-Hispanic or Latino | Male | 9965 | LANDERO,DANNY | |
| 37 | Victim | Individual | THOMPSON, JOSHUA, THEODORE | Black | Non-Hispanic or Latino | Male | 5664 | MCDERMOTT,CAMILLE,ELIZABETH | |
| 38 | Victim | Individual | OSEPCHUNNOS, DIANA, BELLE | White | Non-Hispanic or Latino | Female | 10994 | WELDON,JOSHUA,C | |
| 39 | Victim | Individual | GRACY, KARTISHA, KARSHAY | Black | Non-Hispanic or Latino | Female | 11912 | MERCEDES,LUIS,CAMACHO | |
| 40 | Victim | Individual | BROWN, JASMINE | Black | Non-Hispanic or Latino | Female | 9922 | ROMANO,EMMANUEL | 9398 |
| 41 | Victim | Individual | MIRAMONTEZ CISNEROS, STEPHANIE | Hispanic or Latino | Non-Hispanic or Latino | Female | 129060 | CASTRO,ADALINDA | |
| 42 | Victim | Individual | POOLE, LAQUAN | Black | Non-Hispanic or Latino | Male | | | |
| 43 | Victim | Individual | KNIGHTON, KEITH | Black | Non-Hispanic or Latino | Male | 94392 | WILLS,LINDA,M | 9675 |
| 44 | Victim | Individual | HUNT, GLENN, CORYELL | Black | Non-Hispanic or Latino | Male | 11021 | HERE,ANDREW | 9675 |
| 45 | Victim | Individual | COLLINS, EDUARDO, DION | Black | Non-Hispanic or Latino | Male | 11021 | HERE,ANDREW | |
| 46 | Victim | Individual | FISHER, CARL | Black | Non-Hispanic or Latino | Male | 123515 | COGGIN,MICHAEL,CLARK | |
| 47 | Victim | Individual | WARE, ANTHONY, DELANO | Black | Non-Hispanic or Latino | Male | 123515 | MORENO,DENISE | |
| 48 | Victim | Individual | JEANS, SIMONE | Black | Non-Hispanic or Latino | Female | | | |
| 49 | Victim | Business | USA ROYAL | White | Non-Hispanic or Latino | | | | |
| 50 | Victim | Individual | HAYES, MISTY | Black | Non-Hispanic or Latino | Female | 129062 | HANNA,MARIA | |
| 51 | Victim | Individual | ENRIS, BUFFY | White | Non-Hispanic or Latino | Female | 9543 | GONZALEZ,REGGIE | |
| 52 | Victim | Business | GRAVES, MCKENZIE | White | Non-Hispanic or Latino | Female | 11574 | CRAVEN,KIERAN | |
| 53 | Victim | Registered Owner | SONG, BRYAN | Asian | Non-Hispanic or Latino | Male | 9437 | OYER,JAMES | |
| 54 | Victim | Registered Owner | CHANDLER, JASON | White | Non-Hispanic or Latino | Male | 11763 | BURTON,ERIC | 10073 |
| 55 | Victim | Registered Owner | WYATT, ELONTE | Black | Non-Hispanic or Latino | Male | 129320 | WEBB,LITCHALL | |
| 56 | Victim | Registered Owner | | Black | Non-Hispanic or Latino | Male | 6236 | PERRY,JAMES,M | |
| 57 | Victim | Individual | SLIMMONS, BRALEN | Black | Non-Hispanic or Latino | Male | 8581 | BURROW,JOHN | |
| 58 | Victim | Individual | CHANEY, JOHN, SCOTT | White | Non-Hispanic or Latino | Male | 10603 | KNIGTSON,DANICA | |
| 59 | Victim | Individual | LOPEZ-ESPINOZA, AUDNDRA | Hispanic or Latino | Hispanic or Latino | Female | 10261 | DOREY,RYAN,ANTHONY | |
| 60 | Victim | Registered Owner | DURAN, FERNANDO | Hispanic or Latino | Hispanic or Latino | Male | 129062 | HANNA,MARIA | |
| 61 | Victim | Registered Owner | SIMS, DIONNE | Black | Non-Hispanic or Latino | Female | 9437 | CARDINAL,JOHN | |
| 62 | Victim | Registered Owner | | Black | Hispanic or Latino | Male | 9703 | RODRIGUEZ,JESSE,FRANK | |
| 63 | Victim | Registered Owner | | Hispanic or Latino | Hispanic or Latino | Male | 7990 | SHEPARD,LARITHA,LAVEL | |
| 64 | Victim | Individual | WADE, MICHAEL | Black | Non-Hispanic or Latino | Female | 7983 | EVANS,PHYLLIS,RENEE | |
| 65 | Victim | Individual | | Black | Non-Hispanic or Latino | Male | | | |
| 66 | Victim | Individual | MORA CERDA, ANGEL | Hispanic or Latino | Hispanic or Latino | Male | 10824 | JACKSON,AUSTIN | |
| 67 | Victim | Registered Owner | | | | | | | |

COD_005341

| | RD2Name | RptrOff | AssOffRange | ReviewBudgetNum | EleNum | FollowUp1 | FollowUp2 | Status | UCR_Disp | VictimInjDesc | VictimCond |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | BB | BC | BD | BE | BF | BG | BH | BI | BJ | BK | BL |
| 1 | CALIX-BARAHONA,ELVIN | 11474 | 7939 | 54282 | A553 | Investigations | Capers / Family Violence | Clear by Arrest | | | |
| 2 | | 6862 | 7276 | 105995 | B512 | Investigations | Capers / Sex Assaults | Suspended | | | |
| 3 | GARCIA,JOSE,ALONSO | 12600 | 6295 | 120427 | E303 | Investigations | Property Crime Division | Suspended | | | |
| 4 | RODRIGUEZ,WILLIAM,ANTHONY | 9783 | 9176 | 057074 | E583 | Investigations | Property Crime Division / NW Property Crimes | Clear by Exceptional Arrest | | | |
| 5 | | 11565 | 6746 | 121184 | A534 | Investigations | Special Investigations / Auto Theft | Clear by Arrest | CBEA (Over Age 17) | | |
| 6 | | 11073 | 7161 | 118918 | A514 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 7 | | 6269 | 8009 | 155356 | B509 | Investigations | Property Crime Division | Suspended | | | |
| 8 | ROBLES,SAMMY,EVAN | 11621 | 8801 | 131047 | A542 | Investigations | Capers / Robbery | Suspended | | | |
| 9 | | 8050 | 5881 | 47835 | OFFDTY | Investigations | Capers / Robbery | Suspended | | | |
| 10 | | 10601 | 7072 | 70495 | A556 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 11 | | 9450 | 7887 | 70495 | E301 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 12 | PUENTE,JR,HECTOR,MANUEL | 8691 | 7887 | 70495 | C596 | Investigations | Property Crime Division / NW Property Crimes | Clear by Arrest | CBA (Over Age 17) | | |
| 13 | | 11508 | 8632 | 155356 | A622 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 14 | | 7974 | 7161 | 151912 | E565 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 15 | | 9430 | 6295 | 155356 | B209 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 16 | | 9133 | 7887 | 122184 | L144 | Investigations | Capers / Assaults | Suspended | | | |
| 17 | | 10397 | 6295 | 47835 | G133 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 18 | | 10391 | 7151 | 118185 | E510 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 19 | | 7128 | 6941 | 47835 | B553 | Investigations | Capers / Assaults | Suspended | | | |
| 20 | | 94392 | 7887 | 120420 | E107 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 21 | | 7371 | 7887 | 120420 | E510 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 22 | | 10461 | 7661 | 47835 | E515 | Investigations | Property Crime Division / Gang | Suspended | | | |
| 23 | | 7128 | 7151 | 120495 | E538 | Investigations | Strategic Deployment | Suspended | | | |
| 24 | | 94392 | 6879 | 3366 | OFFDTY | Investigations | Capers / Homicide | Suspended | | | |
| 25 | | 9055 | 7151 | 118918 | B517 | Investigations | Property Crime Division / NE Property Crimes | Suspended | | | |
| 26 | GONZALEZ,REGGIE | 9664 | 7671 | 118075 | A556 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 27 | | 11911 | 7671 | 11259 | D433 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | BRUISES ON BOTH LEGS | |
| 28 | | 11912 | 7544 | 81075 | A651 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 29 | | 10594 | 7887 | 81075 | E110 | Investigations | Capers / Child Exploitation | Suspended | | | |
| 30 | ORTIZ,VIVES,JOSE,MIGUEL | 9922 | 9922 | 126627 | Y244 | Investigations | Capers / Sex Assaults | Suspended | | | |
| 31 | | 129690 | 7072 | 126527 | E109 | Investigations | Property Crime Division / Financial Crime | Closed/Cleared | Closed/Cleared | | |
| 32 | | 7683 | 7683 | 126627 | E407 | Investigations | Special Investigations / Financial Crime | Closed | Closed | | |
| 33 | BARNETT,RYAN | 94392 | 7072 | 155356 | E407 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 34 | | 8060 | 3866 | 122184 | E266 | Investigations | Capers / Assaults | Suspended | | GSW TO LEFT HAND | |
| 35 | | 7161 | 7161 | 122184 | G113 | Investigations | Capers / Assaults | Suspended | | | |
| 36 | | 6941 | 6941 | 106291 | E266 | Investigations | Special Investigations / Auto Theft | Clear by Arrest | CBA (Over Age 17) | | |
| 37 | KIMPEL,JASON,DONALD | 8273 | 8273 | 118185 | A352 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 38 | | 10379 | 10379 | 81075 | G609 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 39 | | 7072 | 7072 | 111210 | E305 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 40 | | 6579 | 6579 | 111210 | E510 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 41 | | 8214 | 8214 | 111210 | E208 | Investigations | Property Crime Division / NW Property Crimes | Suspended | | | |
| 42 | | 7072 | 7072 | 70095 | E517 | Investigations | Special Investigations / Auto Theft | Clear by Arrest | | | |
| 43 | | 6679 | 6679 | 70095 | C399 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 44 | KIMPEL,JASON,DONALD | 8855 | 8855 | 121184 | G114 | Investigations | Special Investigations / Auto Theft | Clear by Arrest | CBA (Over Age 17) | | |
| 45 | | 8273 | 8273 | 118185 | A352 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 46 | | 7200 | 7168 | 55356 | C399 | Investigations | Special Investigations / Auto Theft | Clear by Arrest | CBA (Over Age 17) | | |
| 47 | | 7200 | 7200 | 55356 | G266 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 48 | | 7161 | 7161 | 106845 | E301 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 49 | | 8515 | 8515 | 118185 | B515 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 50 | | 7171 | 7171 | 155356 | E508 | Investigations | Property Crime Division / Auto Theft | Clear by Arrest | Clear by Arrest | | |
| 51 | | 7161 | 7161 | 155356 | E709 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 52 | | 7161 | 7161 | 155356 | E301 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 53 | | 7168 | 7168 | 106291 | A225 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 54 | DELARED,JOSEPH,D | 7168 | 7168 | 106291 | A321 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 55 | | 7168 | 7168 | 118185 | L223 | Investigations | Special Investigations / Auto Theft | Clear by Arrest | Clear by Arrest | | |
| 56 | | 7200 | 7200 | 55356 | E310 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 57 | | 8556 | 8556 | 155356 | B709 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 58 | | 7200 | 7200 | 155356 | E310 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 59 | | 7171 | 7171 | 155356 | E301 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 60 | | 9176 | 9176 | 131185 | B515 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 61 | | 10261 | 10261 | 118185 | E301 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 62 | | 7168 | 7168 | 111210 | A225 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 63 | | 7168 | 7168 | 106291 | L223 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 64 | | 7168 | 7168 | 55356 | L223 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 65 | | 7473 | 7168 | 121172 | B194 | Investigations | Special Investigations / Auto Theft | Suspended | | | |
| 66 | | 7072 | 7072 | 96201 | E310 | Investigations | Property Crime Division / Auto Theft | Suspended | | | |
| 67 | | 10874 | 7168 | 113531 | E538 | Investigations | Investigations | Suspended | | | |

| | A | B |
|---|---|---|
| | Count of IncidentNum | |
| | Chargetype | Total |
| | APOWW (SOCIAL SERVICES REFERRAL) | 148 |
| | ASSAULT (AGG)-AGAINST SECURITY OFF (AGG) | 1 |
| | ASSAULT (AGG) -DEADLY WEAPON | 14 |
| | ASSAULT (AGG) FAM VIO DEADLY WEAPON- NO SBI | 1 |
| | ASSAULT (AGG) FAM VIO SBI | 4 |
| | ASSAULT (AGG)-FAM VIO W/WEAPON (AGG) | 4 |
| | ASSAULT (AGG) -SERIOUS BODILY INJURY | 1 |
| | ASSAULT (AGG)- BODILY INJURY ONLY | 5 |
| | ASSAULT -FAM VIO, IMPED BREATH/CIRC - NO LOSS OF CONSC | 5 |
| | ASSAULT -FAM VIO, PREV CONV - BOD INJ ONLY | 2 |
| | ASSAULT -FAM VIO, OFFENSIVE CONTACT PC 22.01(A)(3) | 10 |
| | ASSAULT -FAM VIO, THREA | |
| | ASSAULT -FAMILY VIOLENCE - BODILY INJURY ONLY | 14 |
| | ASSAULT -OF SECURITY OFFICER - BODILY INJURY ONLY | 4 |
| | ASSAULT -OFFENSIVE CONTACT | 1 |
| | ASSAULT -SER (PEACE OFFICER/JUDGE) | 9 |
| | ASSAULT -VERBAL THREAT | 2 |
| | BMV | 2 |
| | BURGLARY OF BUILDING - FORCED ENTRY | 1 |
| | BURGLARY OF HABITATION -NO FORCED ENTRY | 1 |
| | CREDIT CARD OR DEBIT CARD ABUSE | 1 |
| | CRIM MISCHIEF > OR EQUAL, $100 < $750 | 5 |
| | CRIM MISCHIEF > OR EQUAL, $1,500 < $30K | 2 |
| | CRIM MISCHIEF > OR EQUAL, $750 < $2,500 | 2 |
| | CRIMINAL TRESPASS | 21 |
| | CRIMINAL TRESPASS HABIT/SHLTR/SUPERLUND/INFSTRT | 1 |
| | DEADLY CONDUCT | 4 |
| | DEADLY CONDUCT DISCHARGE FIREARM | 1 |
| | DISCHARGE FIREARM IN CERTAIN MUNICIPALITIES | 4 |
| | DISORDERLY CONDUCT | 3 |
| | DISORDERLY CONDUCT DISCHARGE/DISPLAY FIREARM | 1 |
| | DWI | 45 |
| | DWI 1 PREV CONV | 16 |
| | DWI 2 OR MORE PREV CONV | |
| | DWI W/CHILD UNDER 15 YOA | 9 |
| | DWI W/OPEN CONTAINER | 1 |
| | ESCAPE FROM CUSTODY | 1 |
| | EVADING ARREST DETENTION | 11 |
| | EVADING ARREST DETENTION W/PREV CONVICTION PC38.04(B)1 | 1 |
| | EVADING ARREST DETENTION W/VEHICLE PC38.04(b)(2)(A) | 5 |
| | FAIL TO COMPLY SEX OFFENDERS DUTY TO REGISTER LIFE/ANNUALLY | 1 |
| | FAIL TO -FUGITIVE FROM JUSTICE | 3 |
| | FAIL TO -FUGITIVE INTENT GIVE FALSE INFO | 18 |
| | FAIL TO ID-GIVING FALSE/FICTITIOUS INFO PC 38.02(G)(2) | 3 |
| | FLEEING POLICE OFFICER | 1 |
| | FORGERY FINANCIAL INSTRUMENT > OR EQUAL $2500<$30K IAT | 1 |
| | FRAUD USE/POSS IDENTIFYING INFO # ITEMS < 5 | 2 |
| | FRAUD USE/POSS IDENTIFYING INFO # ITEMS 10<50 | 1 |
| | FRAUD USE/POSS IDENTIFYING INFO # ITEMS 5<10 | 8 |
| | FRAUD USE/POSS IDENTIFYING INFO # ITEMS 50 OR MORE | 1 |
| | HARASSMENT OF PUBLIC SERVANT | 1 |
| | IMPERSONATE PUBLIC SERVANT | 1 |
| | INDECENT EXPOSURE | 3 |
| | INTERFERE W/ PUBLIC DUTIES | 2 |
| | INTERFERE W/EMERGENCY CALL | 1 |
| | MAN DEL CONT SUB PEN GRP 1 <1G | 2 |
| | MAN DEL CONT SUB PEN GRP 1 >1G | 2 |
| | MAN DEL CONT SUB PEN GRP 1 > OR EQUAL 1G<4G | 14 |
| | MAN DEL CONT SUB PEN GRP 1 > OR EQUAL 200G <400G | 1 |
| | MAN DEL CONT SUB PEN GRP 1 > OR EQUAL 4G<200G | 14 |
| | MAN DEL CONT SUB PEN GRP 3/4 <28G | 2 |
| | MANIFESTING FOR PROSTITUTION (BUYER) | 13 |
| | MANIFESTING FOR PROSTITUTION (SELLER) | 13 |
| | MANIFESTING THE PURPOSE OF ENGAGING IN PROSTITUTION | 6 |

COD_005603



ALL-STATE LEGAL®

PLAINTIFF'S EXHIBIT
16

| | A | B |
|---|---|---|
| 68 | OBSTRUCT HIGHWAY PASSAGEWAY | 8 |
| 69 | OBSTRUCTION OR RETALIATION | 3 |
| 70 | OTHER OFFENSE - FELONY | 2 |
| 71 | OTHER OFFENSE - MISDEMEANOR | 1 |
| 72 | POSS CONT SUB NOT IN PEN GRP | 27 |
| 73 | POSS CONT SUB PEN GRP 1 ≤1G | 109 |
| 74 | POSS CONT SUB PEN GRP 1 > OR EQUAL 1G<4G | 25 |
| 75 | POSS CONT SUB PEN GRP 1 > OR EQUAL 4G<200G | 8 |
| 76 | POSS CONT SUB PEN GRP 2 > OR EQUAL 1G<4G | 3 |
| 77 | POSS CONT SUB PEN GRP 2 > OR EQUAL 4G<400G | 1 |
| 78 | POSS CONT SUB PEN GRP 3 <28G | 7 |
| 79 | POSS CONT SUB PEN GRP 3 > OR EQUAL 4G<400G | 1 |
| 80 | POSS CONT SUB PEN GRP 4 <28G | 1 |
| 81 | POSS MARIJUANA <2OZ *DRUG FREE ZONE* | 1 |
| 82 | POSS MARIJUANA <2OZ | 66 |
| 83 | POSS MARIJUANA >2OZ< OR EQUAL 4OZ | 5 |
| 84 | POSS MARIJUANA >4OZ< OR EQUAL 5LBS | 1 |
| 85 | POSS OF DANGEROUS DRUG | 2 |
| 86 | POSSESION OF DRUG PARAPHERNALIA | 28 |
| 87 | PROHIBITED WEAPON KNUCKLES | 1 |
| 88 | PROSTITUTION (BUYER) | 35 |
| 89 | PROSTITUTION (SELLER) | 34 |
| 90 | PROSTITUTION COMPELLING UNDER AGE 18 | 3 |
| 91 | PROSTITUTION W/1 OR 2 PREV CONVICTIONS (SELLER) | 1 |
| 92 | PROSTITUTION W/3 OR MORE CONVICTIONS (SELLER) | 1 |
| 93 | PUBLIC INTOXICATION | 233 |
| 94 | RECKLESS DAMAGE | 1 |
| 95 | RECKLESS DRIVING | 2 |
| 96 | RESIST ARREST SEARCH OR TRANSPORT | 16 |
| 97 | ROBBERY OF BUSINESS | 2 |
| 98 | ROBBERY OF INDIVIDUAL | 7 |
| 99 | ROBBERY OF INDIVIDUAL (AGG) | 7 |
| 100 | SEX ASSAULT OF CHILD (RAPE) | 1 |
| 101 | SLEEPING IN A PUBLIC PLACE | 1 |
| 102 | TAKE WEAPON FROM AN OFFICER (ATT) | 1 |
| 103 | TAMPER FABRICATE PHYSICAL EVD WITH INTENT TO IMPAIR | 1 |
| 104 | TERRORISTIC THREAT FEAR IMMINENT SBI | 1 |
| 105 | THEFT OF PROP (AUTO ACC) <$100 - (NOT EMP) | 1 |
| 106 | THEFT OF PROP (AUTO ACC) > OR EQUAL $750<$2,500 (NOT EMP) PC31.03 (e3) | 2 |
| 107 | THEFT OF PROP <$100 (SHOPLIFT) (NOT EMP) PC31.03(f) | 7 |
| 108 | THEFT OF PROP <$2,500 3-PREV CONV (NOT SHOPLIFT) PC31.03 (e4A) | 2 |
| 109 | THEFT OF PROP > OR EQUAL $100<$750 (NOT SHOPLIFT) PC31.03(e2A) | 7 |
| 110 | THEFT OF PROP > OR EQUAL $2,500<$30K (NOT SHOPLIFT) PC31.03(e4) | 5 |
| 111 | THEFT OF PROP > OR EQUAL $2,500<$30K (NOT SHOPLIFT) PC31.03(e5G) | 5 |
| 112 | THEFT OF PROP > OR EQUAL $30K<$150K (NOT SHOPLIFT) PC31.03(e6) | 1 |
| 113 | THEFT OF PROP > OR EQUAL $750<$2,500 (NOT SHOPLIFT) PC31.03(e3) | 1 |
| 114 | THEFT OF SERVICE <$100 | 1 |
| 115 | THEFT OF SERVICE > OR EQUAL $2,500<$30K PC31.04(e4) | 2 |
| 116 | TRAF VIO - DRIVER LICENSE/ID FALSE | 1 |
| 117 | TRAF VIO -DISPLAY FICTITIOUS LICENSE PLATE | 2 |
| 118 | TRAF VIO -OPERATE MOTOR VEH W/O FIN RESP | 1 |
| 119 | TRAF VIO -OPER/RENT MTR VEH W/EXP DL W/O/D FIN RESP | 3 |
| 120 | TRAF VIO -RACING ON HIGHWAY | 2 |
| 121 | TRAF VIO -RECKLESS DRIVING | 2 |
| 122 | TRAFFIC VIOLATION - HAZARDOUS | 8 |
| 123 | TRAFFIC VIOLATION - NON HAZARDOUS | 42 |
| 124 | TRAFFICKING OF PERSONS (PROSTITUTION/FORCED LABOR) <18 FOR | 1 |
| 125 | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | 23 |
| 126 | UNAUTHORIZED USE OF MOTOR VEH - TRUCK OR BUS | 6 |
| 127 | UNLAWFUL CARRYING WEAPON | 44 |
| 128 | UNLAWFUL CARRYING WEAPON IN ALCOHOL PREMISES | 1 |
| 129 | UNLAWFUL POSS FIREARM BY FELON | 19 |
| 130 | UNLAWFUL POSS METAL OR BODY ARMOR BY FELON | 1 |
| 131 | UNLAWFUL RESTRAINT | 1 |
| 132 | URINATING OR DEFECATING IN PUBLIC | 1 |
| 133 | VIO BOND/PROTECTIVE ORDER | 1 |
| 134 | WARRANT DALLAS PD (AGG ASSAULT - FV) | 2 |

COD_005604

| | A | B |
|---|---|---|
| 135 | WARRANT DALLAS PD (AGG ASSAULT - NFV) | 5 |
| 136 | WARRANT DALLAS PD (AGG ROBBERY - INDIVIDUAL) | 2 |
| 137 | WARRANT DALLAS PD (ALIAS/CAPIAS) | 65 |
| 138 | WARRANT DALLAS PD (ASSAULT - FV) | 5 |
| 139 | WARRANT DALLAS PD (BURGLARY - BUSINESS) | 3 |
| 140 | WARRANT DALLAS PD (CRIMINAL TRESPASS) | 4 |
| 141 | WARRANT DALLAS PD (DRUG/NARCOTICS VIOLATIONS) | 3 |
| 142 | WARRANT DALLAS PD (EVADING) | 1 |
| 143 | WARRANT DALLAS PD (KIDNAPPING) | 3 |
| 144 | WARRANT DALLAS PD (OTHERS) | 36 |
| 145 | WARRANT DALLAS PD (PROSTITUTION) | 1 |
| 146 | WARRANT DALLAS PD (PUBLIC INTOXICATION) | 2 |
| 147 | WARRANT DALLAS PD (ROBBERY - INDIVIDUAL) | 1 |
| 148 | WARRANT DALLAS PD (SEX OFFENSES) | 1 |
| 149 | WARRANT DALLAS PD (SEXUAL ASSAULT WITH OBJECT) | 1 |
| 150 | WARRANT DALLAS PD (THEFT - SHOPLIFT) | 1 |
| 151 | WARRANT DALLAS PD (THEFT OTHER) | 1 |
| 152 | WARRANT DALLAS PD (TRAFFIC VIOLATION - OTHER THAN ALIAS OR CAPIAS) | 3 |
| 153 | WARRANT HOLD (NOT A DPD WARRANT) | 242 |
| 154 | WARRANT HOLD (OUTSIDE AGENCY) | 168 |
| 155 | WARRANT-DALLAS PD (ALIAS) | 81 |
| 156 | WARRANT-DALLAS PD (CAPIAS) | 17 |
| 157 | Grand Total | 2082 |

COD_005605

| | OBJECTID | Join_Count | TARGET_FID | DataSource | IncidentNum | ArrestYr | ArrestNumber | ArrestDate | Time | Group | ArbBDate | AChgNumID | ArChargeCT | OffenseCode | ChargeFlag |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 187 | 1 | 26930 | RMS/NIBRS | 000681-2021 | 2021 | 21-006175 | 2021-01-02 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-01-02 3:03:03 Saturday | 21-000121-01 | | FS-24110010-633 | County |
| 2 | 827 | 1 | 20590 | RMS/NIBRS | 000561-2021 | 2021 | 21-006175 | 2021-01-02 13:00:00 | 1:00 PM 1p to 2p | Saturday | 2021-02-23 18:42:51 Monday | 21-005170-01 | | MC-99999999-HC04 | County |
| 5 | 2538 | 1 | 26652 | RMS/NIBRS | 005966-2021 | 2021 | 21-008637 | 2021-03-25 1:00:00 | 1:00 AM 1:00 to 2a | Thursday | 2021-03-25 3:04:03 Thursday | 21-008637-01 | | NA-99999999-HC310 | No Offense |
| 7 | 277 | 1 | 28567 | RMS/NIBRS | 005094-2021 | 2021 | 21-008637 | 2021-03-25 13:00:00 | 1:00 PM 1p to 2p | Thursday | 2021-03-25 13:04:03 Thursday | 21-008637-01 | | NA-99999999-HC310 | No Offense |
| 9 | 3841 | 1 | 38412 | RMS/NIBRS | 005772-2021 | 2021 | 21-009567 | 2021-04-03 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-04-03 3:46:36 Saturday | 21-009567-01 | | F3-35900015-G35 | County |
| 11 | 389 | 1 | 38747 | RMS/NIBRS | 005772-2021 | 2021 | 21-009567 | 2021-04-03 13:00:00 | 1:00 PM 1p to 2p | Saturday | 2021-04-03 13:46:36 Saturday | 21-009567-01 | | F3-35900015-G35 | County |
| 12 | 403 | 1 | 10092 | RMS/NIBRS | 164537-2021 | 2021 | 21-007784 | 2021-09-11 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:00 Saturday | 21-005656-01 | | NA-99999999-HC08 | County |
| 17 | 409 | 1 | 10091 | RMS/NIBRS | 164537-2021 | 2021 | 21-007784 | 2021-09-11 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:00 Saturday | 21-006656-01 | | NA-99999999-HC139 | No Offense |
| 18 | 625 | 1 | 61800 | RMS/NIBRS | 089550-2021 | 2021 | 21-027785 | 2021-09-11 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:00 Saturday | 21-005656-01 | | NA-99999999-HC197 | County |
| 24 | 635 | 1 | 63056 | RMS/NIBRS | 009958-2021 | 2021 | 21-016996 | 2021-06-06 1:00:00 | 1:00 AM 1:00 to 2a | Sunday | 2021-06-06 5:21:55 Sunday | 21-016996-01 | | MC-55000015-G161 | City |
| 27 | 827 | 1 | 78279 | RMS/NIBRS | 143106-2021 | 2021 | 21-004136 | 2021-08-18 18:00:00 | 1:00 PM 1p to 2p | Tuesday | 2021-08-18 19:33:53 Tuesday | 21-003006-01 | | F3-35200006-01 | County |
| 28 | 888 | 1 | 86884 | RMS/NIBRS | 095936-2021 | 2021 | 21-008637 | 2021-09-11 17:00:00 | 1:00 PM 1p to 2p | Saturday | 2021-09-11 17:17:02 Saturday | 21-027786-03 | | MB-35200020-043 | County |
| 29 | 1072 | 1 | 96723 | RMS/NIBRS | 164537-2021 | 2021 | 21-027784 | 2021-09-11 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:00 Saturday | 21-027786-02 | | MA-35590135-065 | County |
| 31 | 1129 | 1 | 101092 | RMS/NIBRS | 164537-2021 | 2021 | 21-027784 | 2021-09-11 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:00 Saturday | 21-027786-01 | | MB-35020007-M20 | County |
| 35 | 1633 | 1 | 10999 | RMS/NIBRS | 055772-2021 | 2021 | 21-009567 | 2021-04-03 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-04-03 3:46:36 Saturday | 21-009567-01 | | F3-35900015-G35 | County |
| 36 | 1633 | 1 | 13410B | RMS/NIBRS | 164537-2021 | 2021 | 21-027785 | 2021-09-11 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:00 Saturday | 21-027786-02 | | NA-99999999-HC139 | City |
| 44 | 2038 | 1 | 16974 | RMS/NIBRS | 164537-2021 | 2021 | 21-027785 | 2021-09-11 1:00:00 | 1:00 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:00 Saturday | 21-027786-04 | | NA-99999999-HC04 | County |
| 46 | 2058 | 1 | 18274 | RMS/NIBRS | 164537-2021 | 2021 | 21-027785 | 2021-04-18 1:06:00 | 1:06 AM 1:00 to 2a | Sunday | 2021-04-18 4:49:01 Sunday | 21-011500-01 | | NA-99999999-2-043 | County |
| 53 | 390 | 1 | 38839 | RMS/NIBRS | 066610-2021 | 2021 | 21-011502 | 2021-04-18 1:06:00 | 1:06 AM 1:00 to 2a | Sunday | 2021-04-18 4:49:01 Sunday | 21-011500-01 | | MB-35020027-M20 | County |
| 54 | 403 | 1 | 39510 | RMS/NIBRS | 066610-2021 | 2021 | 21-011502 | 2021-04-18 1:06:00 | 1:06 AM 1:00 to 2a | Sunday | 2021-04-18 4:49:01 Sunday | 21-011500-01 | | F3-35900015-G35 | County |
| 57 | 492 | 1 | 49021 | RMS/NIBRS | 066610-2021 | 2021 | 21-011502 | 2021-04-18 1:06:00 | 1:06 AM 1:00 to 2a | Sunday | 2021-04-18 4:49:01 Sunday | 21-011500-01 | | F3-35900015-G35 | County |
| 59 | 1300 | 1 | 13901 | RMS/NIBRS | 200702-2021 | 2021 | 21-031466 | 2020-11-05 1:07:00 | 1:07 AM 1:00 to 2a | Friday | 2021-11-05 5:39:32 Friday | 21-031466-01 | | F3-35900015-G35 | County |
| 62 | 1580 | 1 | 129182 | RMS/NIBRS | 163791-2021 | 2021 | 21-027656 | 2021-09-11 1:08:00 | 1:08 AM 1:00 to 2a | Saturday | 2021-09-11 17:17:36 Saturday | 21-027786-01 | | NA-99999999-HC197 | County |
| 66 | 951 | 1 | 127062 | RMS/NIBRS | 163791-2021 | 2021 | 21-090667 | 2021-08-01 1:08:00 | 1:08 AM 1:00 to 2a | Sunday | 2021-09-05 10:41:47 Friday | 21-090667-01 | | NA-99999999-HC197 | County |
| 67 | 1546 | 1 | 127062 | RMS/NIBRS | 163791-2021 | 2021 | 21-090667 | 2021-09-01 11:00:00 | 1:00 AM 1:00 to 2a | Sunday | 2021-09-05 5:53:02 Friday | 21-090667-01 | | NA-99999999-HC197 | County |
| 76 | 1618 | 1 | 143571 | RMS/NIBRS | 184374-2021 | 2021 | 21-030967 | 2021-10-08 1:09:00 | 1:09 AM 1:00 to 2a | Friday | 2021-10-08 7:01:47 Friday | 21-030667-01 | | NA-99999999-HC197 | County |
| 77 | 1628 | 1 | 143571 | RMS/NIBRS | 184374-2021 | 2021 | 21-030967 | 2021-10-08 1:09:00 | 1:09 AM 1:00 to 2a | Friday | 2021-10-08 7:01:47 Friday | 21-030667-01 | | NA-99999999-HC197 | County |
| 85 | 717 | 1 | 69231 | RMS/NIBRS | 098140-2021 | 2021 | 21-030667 | 2021-06-04 1:14:00 | 1:14 AM 1:00 to 2a | Friday | 2021-06-04 3:56:10 Friday | 21-016693-01 | | NA-99999999-HC197 | No Offense |
| 88 | 549 | 1 | 54411 | RMS/NIBRS | 070868-2021 | 2021 | 21-016693 | 2020-04-14 13:07:00 | 1:07 PM 1p to 2p | Friday | 2021-04-20 5:57:07 Monday | 21-011500-01 | | NA-99999999-G142 | No Offense |
| 89 | 1965 | 1 | 165650 | RMS/NIBRS | 122372-2021 | 2021 | 21-020780 | 2021-07-10 13:13:00 | 1:13 PM 1p to 2p | Saturday | 2021-07-12 13:23:33 Sunday | 21-020780-01 | | NA-99999999-HC310 | No Offense |
| 93 | 1980 | 1 | 147451 | RMS/NIBRS | 189141-2021 | 2021 | 21-031204 | 2021-10-18 13:17:00 | 1:00 PM 1p to 2p | Monday | 2021-10-18 5:57:07 Monday | 21-031204-01 | | NA-99999999-1-84 | County |
| 94 | 1595 | 1 | 84087 | RMS/NIBRS | 070868-2021 | 2021 | 21-016693 | 2020-06-16 13:00:00 | 1:00 PM 1p to 2p | Wednesday | 2020-10-15 15:44:01 Friday | 21-016696-01 | | MC-99999999-HC213 | City |
| 97 | 772 | 1 | 9326 | RMS/NIBRS | 009888-2021 | 2021 | 21-001461 | 2021-01-15 13:00:00 | 1:00 PM 1p to 2p | Friday | 2021-01-15 16:01:40 Friday | 21-001461-01 | | MC-99999999-HC213 | City |
| 101 | 60 | 1 | 7348 | RMS/NIBRS | 006488-2021 | 2021 | 21-002198 | 2021-01-20 1:20:00 | 1:20 AM 1:00 to 2a | Wednesday | 2021-07-05 19:05:05 Monday | 21-003184-01 | | F5-24110009-H435 | County |
| 102 | 28 | 1 | 7413A | RMS/NIBRS | 118697-2021 | 2021 | 21-002102 | 2021-01-20 13:20:00 | 1:20 PM 1p to 2p | Wednesday | 2021-07-05 19:05:05 Monday | 21-003184-01 | | NA-99999999-HC213 | County |
| 105 | 1245 | 1 | 108512 | RMS/NIBRS | 177282-2021 | 2021 | 21-030214 | 2020-10-23 1:15:00 | 1:15 AM 1:00 to 2a | Saturday | 2021-10-23 3:03:01 Saturday | 21-030214-05 | | F5-24110009-H435 | County |
| 107 | 1288 | 1 | 111186 | RMS/NIBRS | 193492-2021 | 2021 | 21-032214 | 2021-10-23 1:15:00 | 1:15 AM 1:00 to 2a | Saturday | 2021-10-23 3:03:05 Saturday | 21-032214-04 | | NA-99999999-0-142 | County |
| 108 | 1567 | 1 | 128485 | RMS/NIBRS | 193492-2021 | 2021 | 21-032214 | 2021-10-23 1:15:00 | 1:15 AM 1:00 to 2a | Saturday | 2021-10-23 3:03:14-02 Saturday | 21-032214-02 | | F5-35990014-034 | County |
| 109 | 1776 | 1 | 146768 | RMS/NIBRS | 193492-2021 | 2021 | 21-032214 | 2021-10-23 1:15:00 | 1:15 AM 1:00 to 2a | Saturday | 2021-10-23 3:03:05 Saturday | 21-032214-03 | | M4-48010006-452 | County |
| 111 | 1816 | 1 | 147894 | RMS/NIBRS | 193492-2021 | 2021 | 21-032214 | 2021-10-23 1:15:00 | 1:15 AM 1:00 to 2a | Saturday | 2021-10-23 3:03:05 Saturday | 21-032214-03 | | MA-48010006-452 | County |
| 112 | 811 | 1 | 76575 | RMS/NIBRS | 113550-2021 | 2021 | 21-029255 | 2020-06-27 13:21:00 | 1:21 PM 1p to 2p | Sunday | 2021-09-27 19:08:23 Sunday | 21-028700-02 | | F3-26040034-H435 | County |
| 113 | 1279 | 1 | 110615 | RMS/NIBRS | 169885-2021 | 2021 | 21-028700 | 2020-09-19 13:22:00 | 1:22 PM 1p to 2p | Sunday | 2021-09-19 19:08:23 Sunday | 21-028700-02 | | MC-99999999-HC84 | No Offense |
| 115 | 1463 | 1 | 111086 | RMS/NIBRS | 169885-2021 | 2021 | 21-028700 | 2020-09-19 13:22:00 | 1:22 PM 1p to 2p | Sunday | 2021-09-19 19:08:23 Sunday | 21-028700-03 | | MB-35020027-M20 | County |
| 116 | 1979 | 1 | 164646 | RMS/NIBRS | 181670-2021 | 2021 | 21-000389 | 2021-04-04 13:22:00 | 1:22 PM 1p to 2p | Monday | 2021-09-19 19:08:23 Wednesday | 21-005050-01 | | F5-35590014-035 | County |
| 118 | 1445 | 1 | 104704 | RMS/NIBRS | 169885-2021 | 2021 | 21-028700 | 2020-09-19 13:22:00 | 1:22 PM 1p to 2p | Sunday | 2021-09-19 19:08:23 Sunday | 21-028700-01 | | F5-35590014-035 | County |
| 119 | 47266 | 1 | 108494 | RMS/NIBRS | 169885-2021 | 2021 | 21-028700 | 2020-09-19 13:22:00 | 1:22 PM 1p to 2p | Sunday | 2021-09-19 19:08:23 Sunday | 21-028700-01 | | NA-99999999-HC84 | No Offense |
| 121 | 1198 | 1 | 93451 | RMS/NIBRS | 169885-2021 | 2021 | 21-028700 | 2020-09-19 13:22:00 | 1:22 PM 1p to 2p | Sunday | 2021-09-19 19:08:23 Sunday | 21-028700-02 | | MB-35020027-M20 | County |
| 122 | 1000 | 1 | 92074 | RMS/NIBRS | 169889-2021 | 2021 | 21-028700 | 2020-09-19 13:22:00 | 1:22 PM 1p to 2p | Sunday | 2021-09-19 19:08:23 Sunday | 21-028700-02 | | MA-35020027-M20 | County |
| 123 | 1000 | 1 | 94851 | RMS/NIBRS | 169889-2021 | 2021 | 21-028700 | 2020-09-19 13:22:00 | 1:22 PM 1p to 2p | Sunday | 2021-09-19 19:08:23 Sunday | 21-028700-01 | | F3-26040034-H435 | County |
| 124 | 20959 | 1 | 20959 | RMS/NIBRS | 003919-2021 | 2021 | 21-000389 | 2021-01-04 13:23:00 | 1:23 AM 1p to 2p | Monday | 2021-01-04 5:36:49 Monday | 21-000390-01 | | NA-99999999-HC310 | No Offense |
| 125 | 189 | 1 | 20959 | RMS/NIBRS | 003919-2021 | 2021 | 21-000389 | 2021-01-04 1:23:00 | 1:23 AM 1p to 2p | Monday | 2021-01-04 5:36:49 Monday | 21-000390-01 | | F3-26040034-H435 | County |
| 127 | 1404 | 1 | 48059 | RMS/NIBRS | 085182-2021 | 2021 | 21-014569 | 2022-05-16 13:23:00 | 1:23 PM 1p to 2p | Sunday | 2021-05-16 7:48:15 Sunday | 21-014568-01 | | MA-35020027-M20 | County |
| 128 | 2043 | 1 | 48059 | RMS/NIBRS | 085182-2021 | 2021 | 21-014569 | 2022-05-16 13:23:00 | 1:23 PM 1p to 2p | Sunday | 2021-05-16 7:48:15 Sunday | 21-014568-01 | | MA-35020027-M20 | County |
| 129 | 478 | 1 | 48059 | RMS/NIBRS | 085182-2021 | 2021 | 21-014569 | 2022-05-16 13:23:00 | 1:23 PM 1p to 2p | Sunday | 2021-05-16 7:48:15 Sunday | 21-014568-01 | | MA-35020027-M20 | County |
| 130 | 491 | 1 | 48060 | RMS/NIBRS | 085182-2021 | 2021 | 21-014640 | 2022-05-16 1:24:00 | 1:24 AM 1p to 2p | Sunday | 2021-05-16 7:47:54 Sunday | 21-014640-01 | | F3-52120009-H435 | County |
| 131 | 575 | 1 | 57644 | RMS/NIBRS | 085182-2021 | 2021 | 21-014568 | 2022-05-16 1:24:00 | 1:23 AM 1p to 2p | Sunday | 2021-05-16 7:47:54 Sunday | 21-014568-01 | | MA-35020027-M20 | County |
| 132 | 607 | 1 | 59418 | RMS/NIBRS | 085182-2021 | 2021 | 21-014509 | 2022-05-16 1:23:00 | 1:23 AM 1p to 2p | Sunday | 2021-05-16 7:48:15 Sunday | 21-014509-01 | | MB-35020020-C01 | County |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2054 | 139 | 1 | 15670 | RMS/NIBRS | 02398-2021 | 2021 | 21-004054 | 2021-02-08 05:52:00 | 12:52 PM | 10p to 2a | Monday | 2021-02-08 07:35:01 | 21-004054-03 | 1 | MB-3999004149 | County |
| 2055 | 140 | 1 | 15671 | RMS/NIBRS | 02398-2021 | 2021 | 21-004054 | 2021-02-08 05:52:00 | 12:52 PM | 10p to 2a | Monday | 2021-02-08 07:35:01 | 21-004054-01 | 1 | FJ-3999082-I444 | County |
| 2056 | 167 | 1 | 18355 | RMS/NIBRS | 02398-2021 | 2021 | 21-004054 | 2021-02-08 05:52:00 | 12:52 PM | 10p to 2a | Monday | 2021-02-08 07:35:01 | 21-004054-04 | 1 | MA-4801000-U51 | County |
| 2057 | 799 | 1 | 75901 | RMS/NIBRS | 10285-2021 | 2021 | 21-017499 | 2021-06-11 05:52:00 | 12:52 PM | 10p to 2a | Friday | 2021-06-11 12:29:46 | 21-017499-01 | 1 | NC-9999999-NC213 | City |
| 799 | 799 | 1 | 75901 | RMS/NIBRS | 10285-2021 | 2021 | 21-017499 | 2021-06-11 05:52:00 | 12:54 PM | 10p to 2a | Saturday | 2021-09-11 05:54:05 | 21-017791-08 | 2 | NC-9999999-NC197 | No Offense |
| 1534 | 1341 | 1 | 13415 | RMS/NIBRS | 16454-2021 | 2021 | 21-027793 | 2021-09-11 05:54:00 | 12:54 PM | 10p to 2a | Saturday | 2021-09-11 05:54:05 | 21-027793-01 | 1 | MB-5911000-CG11 | County |
| 2066 | 1961 | 1 | 16436 | RMS/NIBRS | 16454-2021 | 2021 | 21-027791 | 2021-09-11 05:54:00 | 12:54 PM | 10p to 2a | Saturday | 2021-09-11 05:54:05 | 21-027791-01 | 1 | MA-3200000-N420 | County |
| 1961 | 1961 | 1 | 16875 | RMS/NIBRS | 16454-2021 | 2021 | 21-027791 | 2021-09-11 05:54:00 | 12:54 PM | 10p to 2a | Saturday | 2021-09-11 05:54:05 | 21-027791-02 | 1 | F3-1399007-F417 | County |
| 2067 | 2039 | 1 | 16875 | RMS/NIBRS | 16454-2021 | 2021 | 21-000001 | 2021-07-03 12:55:00 | 12:55 PM | 10p to 2a | Saturday | 2021-07-03 16:34:40 | 21-000001-01 | 1 | No Offense | No Offense |
| 2039 | 943 | 1 | 87858 | RMS/NIBRS | 11768-2021 | 2021 | 21-000001 | 2021-07-03 12:55:00 | 12:55 PM | 10p to 2a | Saturday | 2021-07-03 16:34:40 | 21-000001-02 | 2 | NC-9999999-NC197 | No Offense |
| 943 | 943 | 1 | 94321 | RMS/NIBRS | 11768-2021 | 2021 | 21-024437 | 2021-06-13 05:58:00 | 12:58 PM | 10p to 2a | Friday | 2021-08-13 16:56:43 | 21-024437-01 | 1 | MA-5406001-A2 | County |
| 2070 | 1028 | 1 | 79000 | RMS/NIBRS | 14880-2021 | 2021 | 21-024437 | 2021-06-13 05:58:00 | 12:58 PM | 10p to 2a | Friday | 2021-08-13 16:56:43 | 21-024437-03 | 1 | NC-9999999-NC307 | City |
| 2071 | 845 | 1 | 79135 | RMS/NIBRS | 14880-2021 | 2021 | 21-024437 | 2021-06-13 05:58:00 | 12:58 PM | 10p to 2a | Friday | 2021-08-13 16:56:43 | 21-024437-05 | 1 | NC-9999999-NC208 | City |
| 1028 | 849 | 1 | 90941 | RMS/NIBRS | 14880-2021 | 2021 | 21-024437 | 2021-06-13 05:58:00 | 12:58 PM | 10p to 2a | Friday | 2021-08-13 16:56:43 | 21-024437-02 | 1 | MC-9999999-NC205 | City |
| 845 | 1699 | 1 | 16739 | RMS/NIBRS | 14880-2021 | 2021 | 21-024437 | 2021-06-13 05:58:00 | 12:58 PM | 10p to 2a | Friday | 2021-08-13 16:56:43 | 21-024437-04 | 1 | NC-9999999-NC181 | City |
| 2020 | 2020 | 1 | 16770 | RMS/NIBRS | 14880-2021 | 2021 | 21-024437 | 2021-06-13 05:58:00 | 12:58 PM | 10p to 2a | Friday | 2021-08-13 16:56:43 | 21-024437-04 | 1 | NC-9999999-NC308 | City |

| # | ChargeDesc | PrimaryArstChrg | UCRArrestChg | Severity | PClass | UCR | UCRWord | UCDOffense | Statute | Type | UCR_ArChg | | HoldType | Bail/OrigAmt | ReleaseType | WarrantNum | WarrantType |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | UNAUTHORIZED USE OF MOTOR VEH - AUTOMOBILE | Yes | | F | F5 | | | | PC 31.07 | 24110003 | | | | 0 | | F2315019 | WRNT_C |
| 4 | MANIFESTING THE PURPOSE OF ENGAGING IN PROSTITUTION | Yes | | M | MC | | | | DALLAS CITY CODE 31-27 | 99999999 | | | | | Other | | |
| 6 | POSS CONT SUB PEN GRP 1 OR EQUAL 1G<4G | Yes | | F | F3 | | | | HSC 481.115(d) | | | | | | | F2313830 | WRNT_C |
| 9 | WARRANT HOLD (NOT A APD WARRANT) | | | N | NA | | | | Warrant Dallas PD | 99999999 | | | | | | F2313830 | WRNT_C |
| 12 | POSS MARIJUANA <2OZ | Yes | | M | MB | | | | HSC 481.121(b)(1) | 35500015 | | | | | | F2313830 | WRNT_C |
| 16 | POSS CONT SUB PEN GRP 1 OR EQUAL 1G<4G | Yes | | F | F3 | | | | HSC 481.115(d) | | | | | | | | WRNT_C |
| 17 | POSS MARIJUANA >2OZ<=4OZ OR EQUAL 4OZ | | | M | MA | | | | HSC 481.121(b)(2) | | | | | | | | WRNT_C |
| 18 | POSSESSION OF DRUG PARAPHERNALIA | | | M | MC | | | | HSC 481.125(A) | | | | | | | | WRNT_C |
| 24 | TRAFFIC VIOLATION - NON HAZARDOUS | Yes | | N | NA | | | | TC | 99999999 | | | | | | | WRNT_C |
| 28 | WARRANT HOLD (NOT A APD WARRANT) | | | N | NA | | | | Warrant Dallas PD | 99999999 | | | | | | | WRNT_C |
| 29 | UNLAWFUL CARRYING WEAPON | Yes | | M | MA | | | | PC 46.02(a) | | | | | | | | WRNT_C |
| 31 | POSSESSION OF DRUG PARAPHERNALIA | Yes | | M | MC | | | | HSC 481.125(A) | | | | | | | | WRNT_C |
| 36 | POSS MARIJUANA <2OZ | Yes | | M | MB | | | | HSC 481.121(b)(1) | | | | | | | | WRNT_C |
| 41 | TRAFFIC VIOLATION - NON HAZARDOUS | Yes | | N | NA | | | | TC | 99999999 | | | | | | | WRNT_C |
| 44 | WARRANT HOLD (NOT A APD WARRANT) | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | DSO | | | | | WRNT_C |
| 54 | UNLAWFUL CARRYING WEAPON | Yes | | M | MA | | | | PC 46.02(a) | | | | | | | | WRNT_C |
| 56 | UNLAWFUL CARRYING WEAPON | Yes | | M | MA | | | | PC 46.02(a) | | | | | | | | WRNT_C |
| 58 | POSS MARIJUANA <2OZ | | | M | MB | | | | HSC 481.121(b)(1) | | | | | | | | WRNT_C |
| 59 | POSS MARIJUANA <2OZ | Yes | | M | MB | | | | HSC 481.121(b)(1) | | | | | | | | WRNT_C |
| 62 | WARRANT HOLD (NOT A APD WARRANT) | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | DSO | | | | | WRNT_C |
| 66 | POSS CONT SUB PEN GRP 1 OR EQUAL 1G<4G | Yes | | F | F3 | | | | HSC 481.115(d) | | | | | | | | WRNT_C |
| 70 | TAMPER FABRICATE PHYSICAL EVID WITH INTENT TO IMPAIR | Yes | | F | F3 | | | | PC 37.09(d) | | | | | | | | WRNT_C |
| 76 | WARRANT HOLD (NOT A APD WARRANT) | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | Other | 5920 | | | | WRNT_C |
| 78 | UNLAWFUL CARRYING WEAPON | Yes | | M | MA | | | | PC 46.02(b) | | | | | | | | WRNT_C |
| 80 | UNLAWFUL CARRYING WEAPON | Yes | | M | MA | | | | PC 46.02(a) | | | | | | | | WRNT_C |
| 87 | POSS MARIJUANA <2OZ | Yes | | M | MB | | | | HSC 481.121(b)(1) | | | | | | | | WRNT_C |
| 93 | WARRANT HOLD (NOT A APD WARRANT) | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | | | | Released to Appear | | WRNT_C |
| 94 | TRAF VIO - DRIVER LICENSE/ID FALSE | Yes | | M | MA | | | | TC 521.451 | | | | | | | | WRNT_C |
| 97 | OTHER OFFENSE - MISDEMEANOR | Yes | | M | MA | | | | New or Missing Misd Codes | | | | | | | | WRNT_C |
| 101 | WARRANT HOLD (NOT A APD WARRANT) | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | | | | | | WRNT_C |
| 102 | EVADING ARREST DETENTION | Yes | | M | MA | | | | PC 38.04(a) | | | | | | | | WRNT_C |
| 105 | OTHER OFFENSE - MISDEMEANOR | Yes | | M | MA | | | | New or Missing Misd Codes | | | | | | | | WRNT_C |
| 107 | POSS CONT SUB PEN GRP 1 <1G | | | F | F5 | | | | HSC 481.115(b) | | | | | | | | WRNT_C |
| 108 | RESIST ARREST SEARCH OR TRANSPORT | Yes | | M | MA | | | | PC 38.03(a) | | | | | | | | WRNT_C |
| 109 | APDWW [SOCIAL SERVICES REFERRAL] | Yes | | | NA | | | | Social Services Referral | 99999999 | | | | | | | WRNT_C |
| 110 | DWI W/CHILD UNDER 15 YOA | Yes | | F | F5 | | | | PC 49.02 | 99999999 | | | | | | M2160396 | WRNT_C |
| 111 | PUBLIC INTOXICATION | Yes | | M | MC | | | | PC 49.02 | 99999999 | | | | | Other | | WRNT_C |
| 113 | APDWW [SOCIAL SERVICES REFERRAL] | Yes | | | NA | | | | Social Services Referral | 99999999 | | | | | Other | | WRNT_C |
| 114 | DWI W/CHILD UNDER 15 YOA | Yes | | F | F5 | | | | PC 49.045 | | | | | | | M2160124 | WRNT_C |
| 115 | APDWW [SOCIAL SERVICES REFERRAL] | Yes | | | NA | | | | Social Services Referral | 99999999 | | | | | | M2161080 | WRNT_C |
| 118 | UNLAWFUL POSS FIREARM BY FELON | Yes | | F | F3 | | | | PC 46.04(a) | | | | | 5675 | | M2160078 | WRNT_C |
| 119 | POSS CONT SUB PEN GRP 1 OR EQUAL 1G<4G | Yes | | F | F3 | | | | HSC 481.115(d) | 35500013 | | | | | | F2159644 | WRNT_C |
| 121 | DWI W/CHILD UNDER 15 YOA | Yes | | F | F5 | | | | PC 49.045 | | | | | 5738 | | F2159644 | WRNT_C |
| 122 | WARRANT DALLAS CO [ASSAULT/CAPIAS] | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | | | | | F2157223 | WRNT_C |
| 124 | POSS MARIJUANA <2OZ | Yes | | M | MB | | | | HSC 481.121(b)(1) | 35500008 | | | | | | M2160078 | WRNT_C |
| 125 | WARRANT HOLD (NOT A APD WARRANT) | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | | $5415 | | | M2160078 | WRNT_C |
| 126 | FRAUD USE/POSS IDENTIFYING INFO # ITEMS 5<10 | Yes | | F | F3 | | | | PC 32.51(c)(2) | 26040043 | | Other | | | | F2160028 | WRNT_C |
| 128 | WARRANT HOLD (NOT A APD WARRANT) | Yes | | N | NA | | | | Warrant Dallas PD | 99999999 | | | | | | M2160077 | WRNT_C |
| 129 | UNLAWFUL CARRYING WEAPON | Yes | | M | MA | | | | PC 46.02(a) | 52030027 | | | 0 | | | M2156005 | WRNT_C |
| 130 | UNLAWFUL POSS FIREARM BY FELON | Yes | | F | F3 | | | | PC 46.04(a) | 52120009 | | | | | | M2156001 | WRNT_C |
| 132 | POSS MARIJUANA <2OZ | Yes | | M | MB | | | | HSC 481.121(b)(1) | 35500008 | | | | | | M2156005 | WRNT_C |

| | A1 WarrantIssuedAgency | ChargeDtID | AJ ChangeDate | AK StaffIDReviewDate | AL | AM JailID | AN OFCR_RPT_Written_By_Date | OFCR_Approved_By_Date | AO Date | OFCR_Received_By_Date | AP | Apprehended_Date | AQ Final_Disp | AR Final_Disp_Date | AS ALPremise | AT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DALLAS PD | | | | | | | | | | | | Accepted | | Highway, Street, Alley ETC | |
| 2 | DALLAS PD | | | | | | | | | | | | Accepted | | Highway, Street, Alley ETC | |

(Columns continue: A1 WarrantIssuedAgency, ChargeDtID, ChangeDate, StaffIDReviewDate, JailID, OFCR_RPT_Written_By_Date, OFCR_Approved_By_Date, OFCR_Received_By_Date, Apprehended_Date, Final_Disp, Final_Disp_Date, ALPremise. Agency column values are "DALLAS PD" and "DPD"; Final_Disp column values are predominantly "Accepted"; ALPremise column values are predominantly "Highway, Street, Alley ETC".)

| # | Arrdction (AU) | ObjsCode (AV) | AW | NBIRS_Group | NBIRS_Crime_Category | NIBRS_Crime (AX) | NIBRS_Complaint (AY) | NIBRS_CrimeAgainst (BA) |
|---|---|---|---|---|---|---|---|---|
| 1 | Arrested - Law Sterrett | | | A | MOTOR VEHICLE THEFT | UUMV | UUMV | PROPERTY |
| 2 | Arrested - CDC | | | B | ALL OTHER OFFENSES | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY |
| 3 | Arrested - Law Sterrett | | | A | ALL OTHER OFFENSES | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY |
| 4 | Arrested - Law Sterrett | | | A | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | PERSON, PROPERTY, OR SOCIETY |
| 5 | Arrested - CDC | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 6 | Arrested - Released To Hospital (APOWW) | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 9 | Arrested - Law Sterrett | | | A | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | SOCIETY |
| 11 | Arrested - Released To Hospital (APOWW) | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 12 | Arrested - Law Sterrett | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 14 | Arrested - Law Sterrett | H | | A | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 16 | Arrested - Law Sterrett | H | | A | WARRANT DALLAS PD | WARRANT DALLAS PD (AGG ASSAULT - NFV) | WARRANT DALLAS PD (AGG ASSAULT - NFV) | PERSON |
| 18 | Arrested - Law Sterrett | | | B | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY |
| 24 | Arrested - Law Sterrett | | | C | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 26 | Arrested - Law Sterrett | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 27 | Arrested - Law Sterrett | | | A | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | SOCIETY |
| 28 | Arrested - Law Sterrett | H | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 30 | Arrested - Law Sterrett | H | | A | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 35 | Arrested - Law Sterrett | H | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 36 | Arrested - Law Sterrett | H | | A | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY |
| 41 | Arrested - Law Sterrett | H | | A | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY |
| 44 | Arrested - Law Sterrett | H | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 58 | Arrested - Law Sterrett | H | | B | DRIVING UNDER THE INFLUENCE | DRIVING UNDER THE INFLUENCE | DRIVING UNDER THE INFLUENCE | SOCIETY |
| 59 | Arrested - Law Sterrett | H | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 61 | Arrested - Law Sterrett | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 62 | Arrested - Law Sterrett | | | B | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY |
| 66 | Arrested - Law Sterrett | | | A | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 67 | Arrested - Law Sterrett | | | A | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 69 | Arrested - Law Sterrett | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 70 | Arrested - Law Sterrett | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 76 | Arrested - Law Sterrett | | | A | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 80 | Arrested - Law Sterrett | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 85 | Arrested - Law Sterrett | | | A | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 89 | Arrested - Law Sterrett | | | B | ALL OTHER OFFENSES | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY |
| 93 | Arrested - Law Sterrett | | | C | ALL OTHER OFFENSES | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY |
| 94 | Arrested - Law Sterrett | | | C | FALSE PRETENSES/SWINDLE/CONFIDENCE GAME | FALSE PRETENSES/SWINDLE/CONFIDENCE GAME | FRAUD OFFENSES | PROPERTY |
| 97 | Arrested - Law Sterrett | | | B | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 102 | Arrested - Law Sterrett | | | B | ALL OTHER OFFENSES | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY |
| 105 | Arrested - Law Sterrett | | | B | ALL OTHER OFFENSES | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY |
| 106 | Arrested - Law Sterrett | | | B | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 108 | Arrested - Released To Hospital (APOWW) | | | C | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | PERSON, PROPERTY, OR SOCIETY |
| 109 | Arrested - Released To Hospital (APOWW) | | | C | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | PERSON, PROPERTY, OR SOCIETY |
| 110 | Arrested - Law Sterrett | | | B | DRIVING UNDER THE INFLUENCE | DRIVING UNDER THE INFLUENCE | DRIVING UNDER THE INFLUENCE | SOCIETY |
| 111 | Arrested - Law Sterrett | | | B | PUBLIC INTOXICATION | PUBLIC INTOXICATION | PUBLIC INTOXICATION | SOCIETY |
| 112 | Arrested - Law Sterrett | | | B | DUI | DUI | DUI | SOCIETY |
| 113 | Arrested - Released To Hospital (APOWW) | | | C | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | PERSON, PROPERTY, OR SOCIETY |
| 114 | Arrested - Law Sterrett | | | B | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 115 | Arrested - Released To Hospital (APOWW) | | | C | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | APOWW (SOCIAL SERVICES REFERRAL) | PERSON, PROPERTY, OR SOCIETY |
| 116 | Arrested - Law Sterrett | | | A | PUBLIC INTOXICATION | PUBLIC INTOXICATION | PUBLIC INTOXICATION | SOCIETY |
| 117 | Arrested - Law Sterrett | | | A | DRIVING UNDER THE INFLUENCE | DRIVING UNDER THE INFLUENCE | DRIVING UNDER THE INFLUENCE | SOCIETY |
| 119 | Arrested - Law Sterrett | | | A | MOTOR VEHICLE THEFT | MOTOR VEHICLE THEFT | MOTOR VEHICLE THEFT | PROPERTY |
| 121 | Arrested - Law Sterrett | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |
| 122 | Arrested - Law Sterrett | | | B | WARRANT DALLAS PD (AAA/CAPIAS) | WARRANT DALLAS PD (AAA/CAPIAS) | WARRANT DALLAS PD (AAA/CAPIAS) | PERSON, PROPERTY, OR SOCIETY |
| 123 | Arrested - Law Sterrett | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 124 | Arrested - Law Sterrett | | | C | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 125 | Arrested - Law Sterrett | | | A | FRAUD OFFENSES | FRAUD OFFENSES | FRAUD OFFENSES | PROPERTY |
| 126 | Arrested - Law Sterrett | | | A | IDENTITY THEFT | IDENTITY THEFT | IDENTITY THEFT | PROPERTY |
| 127 | Arrested - Law Sterrett | | | A | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY |
| 128 | Arrested - Law Sterrett | | | C | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 129 | Arrested - Law Sterrett | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 130 | Arrested - Law Sterrett | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 131 | Arrested - Law Sterrett | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 132 | Arrested - Law Sterrett | | | A | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY |
| 133 | Arrested - Law Sterrett | | | A | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY |

| # | BB NIBRS_Code | BC NIBRS_Group_CrimeAgainst | BD NIBRS_Type | BE ChargeSynopsis | BF CFS_Number | BG Name | BH NickName | BI AliasName | BK BirthPlace | BN Height | BO Weight | BP Hair | BQ Eye |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 35A | SOCIETY | Coded | | 22-0007789 | YOUNG-RAMOS, GABRIEL, ROBERT | | | DALLAS,TX | 5-08 | 175 | Black | Brown |
| 2 | 240 | PROPERTY | Coded | | 21-0923647 | PLEASANT, DEZARAE, OPAL | | | HOUSTON | 5-10 | 150 | Brown | Green |
| 3 | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-0923647 | ROMO, MICHAEL | | | | 5-4 | 135 | Blonde | Blue |
| 4 | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-0518393 | FOSTER, JAYVIE, MICHELLE | | | | 5-05 | 110 | Blonde | Blue |
| 5 | 35A | SOCIETY | Coded | | 21-0573633 | VENABLE, RONNIE, KENT | | | OKLAHOMA | 5-11 | 180 | White | Brown |
| 6 | 35A | SOCIETY | Coded | | 21-0573633 | VENABLE, RONNIE, KENT | | | OKLAHOMA | 5-11 | 180 | White | Brown |
| 7 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-0573633 | VENABLE, RONNIE, KENT | | | OKLAHOMA | 5-11 | 180 | White | Brown |
| 8 | 35A | SOCIETY | Coded | | 21-0571646 | SABBIKKA, TSVETIANA | | | BULGARIA | 6-00 | 183 | Black | Brown |
| 9 | 13A | PERSON | Coded | | 21-0571646 | SABBIKKA, TSVETIANA | | | BULGARIA | 6-00 | 183 | Black | Brown |
| 10 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-1017506 | ALVAREZ ZAPATERO, JULIO, CESAR | | | | 5-10 | 150 | Brown | Brown |
| 11 | 35A | SOCIETY | Coded | | 21-1500879 | HINES, KELDRICE, OUERTERIOUS | | | JACKSON, MISSISSIPPI | 5-10 | 150 | Black | Brown |
| 12 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-1500879 | HINES, KELDRICE, OUERTERIOUS | | | JACKSON, MISSISSIPPI | 5-10 | 150 | Black | Brown |
| 13 | 13A | PERSON | Coded | | 21-1017506 | THOMPSON, RODRIGOS, KENDALL | | | | 6-00 | 185 | Black | Brown |
| 14 | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 21-1724614 | SABRINSKA, TSVITIANA | | | BULGARIA | 6-00 | 185 | Black | Brown |
| 15 | 900 | SOCIETY | Coded | | 21-1724614 | SABRINSKA, TSVETIANA | | | BULGARIA | 6-00 | 185 | Black | Brown |
| 16 | 13A | PERSON | Coded | | 21-1724614 | STUART, DEZRE, TYRONE | | | TEXAS | 6-00 | 185 | Black | Brown |
| 17 | 900 | SOCIETY | Coded | | 21-1724614 | STUART, DEZRE, TYRONE | | | TEXAS | 6-00 | 185 | Black | Brown |
| 18 | 900 | SOCIETY | Coded | | 21-1724614 | STUART, DEZRE, TYRONE | | | TEXAS | 6-00 | 185 | Black | Brown |
| 19 | 35A | SOCIETY | Coded | | 21-1724614 | STUART, DEZRE, TYRONE | | | TEXAS | 6-00 | 185 | Black | Brown |
| 20 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-1724614 | STUART, DEZRE, TYRONE | | | TEXAS | 6-00 | 185 | Black | Brown |
| 21 | 24 | PROPERTY | Coded | | 21-1724614 | STUART, DEZRE, TYRONE | | | TEXAS | 6-03 | 185 | Black | Blue |
| 22 | 35A | SOCIETY | Coded | | 21-1724614 | MITCHELL, JACQUES | | | | 6-00 | 265 | Black | Brown |
| 23 | 26 | PROPERTY | Coded | | 21-0680994 | MITCHELL, JACQUES | | | | 5-06 | 175 | Black | Brown |
| 24 | 35A | SOCIETY | Not Coded | | 21-0680994 | MITCHELL, JACQUES | | | | 5-08 | 245 | Black | Brown |
| 25 | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 22-0680994 | MITCHELL, JACQUES | | | | 5-06 | 175 | Black | Brown |
| 26 | 520 | PROPERTY | Coded | | 22-0011573 | ABRAROZ, BERNARDO | | | | 5-09 | 150 | Black | Brown |
| 27 | 27 | PROPERTY | Coded | | 22-2105572 | BOYSTON, MERRIVINNE, E | | | CITY OF DALLAS | 5-5 | 130 | Other | Blue |
| 28 | 520 | PROPERTY | Not Coded | | 22-2105572 | BOYSTON, MERRIVINNE, E | | | CITY OF DALLAS | 5-5 | 130 | Other | Blue |
| 29 | 520 | PROPERTY | Coded | | 22-1916985 | SANCHEZ, PAUL, LUIS | | | | 5-09 | 142 | Black | Brown |
| 30 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 22-1916985 | SANCHEZ, PAUL, LUIS | | | | 5-09 | 142 | Black | Brown |
| 31 | 35A | SOCIETY | Coded | | 21-1716982 | RAMIREZ, ASTRIO, GISSELL | | | | 5-02 | 265 | Black | Brown |
| 32 | 520 | PROPERTY | Coded | | 21-1919185 | SANDOVAL, RAFAEL, OMAR | | | | 6-00 | 265 | Black | Brown |
| 33 | 35A | SOCIETY | Coded | | 22-2038886 | SANDOVAL, RAFAEL, OMAR | | | | 6-00 | 265 | Black | Brown |
| 34 | 358 | SOCIETY | Coded | | 22-2038886 | SANDOVAL, RAFAEL, OMAR | | | | 6-00 | 265 | Black | Brown |
| 35 | 35A | SOCIETY | Coded | | 22-2038886 | SANDOVAL, RAFAEL, OMAR | | | | 6-00 | 265 | Black | Brown |
| 36 | 358 | SOCIETY | Not Coded | | 22-2038886 | RAMIREZ CONTRERAS, ANTONIO | | | | 5-09 | 150 | Black | Brown |
| 37 | 520 | PROPERTY | Coded | | 22-1919185 | HOLBERT, KATRINA, ANNETTE | | | | 6-00 | 200 | Black | Brown |
| 38 | 520 | PROPERTY | Coded | | 22-1919185 | MYERS, SUDRICK, LADON | | | | 5-8 | 220 | Black | Brown |
| 39 | 41 | PERSON | Coded | | 21-1279411 | MYERS, SUDRICK, LADON | | | | 5-8 | 220 | Black | Brown |
| 40 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-1003137 | MYERS, SUDRICK, LADON | | | | 5-8 | 220 | Black | Brown |
| 41 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-1003137 | MYERS, SUDRICK, LADON | | | | 5-8 | 220 | Black | Brown |
| 42 | 520 | PROPERTY | Coded | | 21-0722100 | MYERS, SUDRICK, LADON | | | | 5-8 | 220 | Black | Brown |
| 43 | 44 | PERSON | Coded | | 21-0531311 | RAMIREZ CONTRERAS, ANTONIO | | | | 5-09 | 150 | Black | Brown |
| 44 | 520 | PROPERTY | Coded | | 21-0531311 | GOMEZ, ARTURO | | | MEXICO | 5-09 | 150 | Black | Brown |
| 45 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-0084631 | PERSAUD, PAUL, LEE | | | | 6-00 | 178 | Black | Brown |
| 46 | 358 | SOCIETY | Coded | | 21-1337073 | MAYS, DUSTIN, LEE | | | | 5-07 | 126 | Black | Brown |
| 47 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-1867945 | HOLBERT, KATRINA, ANNETTE | | | | 6-00 | 200 | Black | Brown |
| 48 | 89 | PROPERTY | Coded | | 22-2038886 | OROZCO MARTINEZ, LUIS, JAVIER | | | MEXICO | 5-5 | 130 | Red | Brown |
| 49 | 35A | SOCIETY | Coded | | 21-2038886 | OROZCO MARTINEZ, LUIS, JAVIER | | | MEXICO | 5-5 | 130 | Red | Brown |
| 50 | 85 | PROPERTY | Coded | | 21-1907903 | OROZCO MARTINEZ, LUIS, JAVIER | | | MEXICO | 5-5 | 130 | Red | Brown |
| 51 | 520 | PROPERTY | Coded | | 21-1907903 | OROZCO MARTINEZ, LUIS, JAVIER | | | MEXICO | 5-11 | 170 | Black | Brown |
| 52 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-1907903 | ROBLES, CHRISTINA | | | CITY OF DALLAS | 5-08 | 170 | Black | Brown |
| 53 | 520 | PROPERTY | Coded | | 21-1171509 | WONG, JHON | | | NEW YORK | 5-08 | 170 | Black | Brown |
| 54 | 80 | PROPERTY | Coded | | 21-1782253 | NOLASCA RODRIGUEZ, DANIEL | | | MEXICO | 5-08 | 180 | Black | Brown |
| 55 | 35A | SOCIETY | Coded | | 21-1782253 | DEPAZ, MIGEL, ANGEL | | | | 5-09 | 195 | Black | Brown |
| 56 | 59 | PERSON | Coded | | 21-1782253 | DEPAZ, MIGEL, ANGEL | | | | 5-09 | 195 | Black | Brown |
| 57 | 58 | PROPERTY | Coded | | 21-1782253 | DEPAZ, MIGEL, ANGEL | | | | 5-09 | 195 | Black | Brown |
| 58 | 35A | SOCIETY | Coded | | 21-1782253 | DEPAZ, MIGEL, ANGEL | | | | 5-09 | 195 | Black | Brown |
| 59 | 59 | PERSON | Not Coded | | 22-0011014 | DEPAZ, MIGEL, ANGEL | | | | 5-09 | 195 | Black | Brown |
| 60 | 35A | SOCIETY | Coded | | 21-0870041 | CRAWFORD, ALEXIS | | | | 5-6 | 194 | Brown | Brown |
| 61 | 62 | PROPERTY | Coded | | 21-0870041 | MOLDEN, PEYTON | | | ARKANSAS | 5-6 | 140 | Black | Brown |
| 62 | 999 | PERSON, PROPERTY, OR SOCIETY | Coded | | 21-0870041 | MOLDEN, PEYTON | | | ARKANSAS | 5-6 | 140 | Black | Brown |
| 63 | 35A | SOCIETY | Coded | | 21-0870041 | MOSENY, KEYSHAWN, LAMONT | | | | 5-7 | 154 | Black | Brown |
| 64 | 66 | PROPERTY | Coded | | | MOSENY, KEYSHAWN, LAMONT | | | | 5-6 | 140 | Black | Brown |

| # | Race | Ethnicity | Sex | | | DrLic_St | DrLic_Type | HLAddress | HLApt | HLZip | HLCity | HLState | HLCounty | HLArea | HLstate | HLDivision | AlternateAddress |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 2326 AUGIE DR | | 75051 | GRAND PRAIRIE | TX | DALLAS | 4038 | 423 | SOUTHWEST | |
| 2 | Hispanic or Latino | Non-Hispanic or Latino | Female | | | TX | | 12603 NORTHBOROUGH DR | 2320 | 75069 | HOUSTON | TX | | | | | |
| 3 | Black | Non-Hispanic or Latino | Male | | | LA | | 103 SEATTLE ST | | 75060 | LAFAYETTE | LA | | | | | |
| 5 | White | Non-Hispanic or Latino | Male | | | TX | | 740 N SAMUEL BLVD | | 76110 | FORT WORTH | TX | | | | | |
| 6 | White | Non-Hispanic or Latino | Female | | | LA | | 7428 SAN GABRIEL | | 76107 | LAFAYETTE | LA | | | | | |
| 7 | White | Non-Hispanic or Latino | Male | | | TX | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 8 | White | Non-Hispanic or Latino | Male | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 9 | White | Non-Hispanic or Latino | Male | | | TX | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 11 | White | Non-Hispanic or Latino | Male | | | TX | | 1109 JEANETTE WAY | 149 | 75006 | CARROLLTON | TX | | | | | |
| 12 | White | Non-Hispanic or Latino | Male | | | TX | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 3058 | 537 | NORTHWEST | |
| 14 | White | Non-Hispanic or Latino | Female | | | TX | | 126 HAMILTON DR | | 75160 | TERRELL | TX | | | | | |
| 15 | Black | Non-Hispanic or Latino | Male | | | MS | | 4209 DOUGLAS ST | | 77018 | HOUSTON | TX | | | | | |
| 17 | White | Non-Hispanic or Latino | Female | | | TX | | 857 DUBLIN DR | C | 75080 | RICHARDSON | TX | DALLAS | 4038 | 423 | SOUTHWEST | |
| 18 | Black | Non-Hispanic or Latino | Male | | | TX | | 857 DUBLIN DR | C | 75080 | RICHARDSON | TX | DALLAS | 4038 | 423 | SOUTHWEST | |
| 21 | White | Non-Hispanic or Latino | Female | | | TX | | 1955 KRAFT ST | | 75080 | RICHARDSON | TX | DALLAS | 4038 | 423 | SOUTHWEST | |
| 24 | Black | Non-Hispanic or Latino | Female | | | TX | | 1955 KRAFT ST | | 75212 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | |
| 26 | White | Non-Hispanic or Latino | Female | | | TX | | 1955 KRAFT ST | | 75212 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | |
| 28 | White | Non-Hispanic or Latino | Female | | | TX | | 1955 KRAFT ST | | 75212 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | |
| 29 | White | Non-Hispanic or Latino | Female | | | TX | | 1955 KRAFT ST | | 75080 | RICHARDSON | TX | DALLAS | 4038 | 423 | NORTHWEST | |
| 30 | Black | Non-Hispanic or Latino | Male | | | TX | | 1109 JEANETTE WAY | | 75006 | CARROLLTON | TX | | | | | |
| 35 | Black | Non-Hispanic or Latino | Male | | | TX | | 3801 GANNON LN | | 75237 | DALLAS | TX | DALLAS | 4380 | 451 | SOUTHWEST | |
| 36 | Black | Non-Hispanic or Latino | Male | | | TX | | 3801 GANNON LN | | 75237 | DALLAS | TX | DALLAS | 4380 | 451 | SOUTHWEST | |
| 41 | White | Non-Hispanic or Latino | Male | | | TX | | 3801 GANNON LN | | 75237 | DALLAS | TX | DALLAS | 4380 | 451 | SOUTHWEST | |
| 44 | White | Non-Hispanic or Latino | Female | | | TX | | 3801 GANNON LN | | 75237 | DALLAS | TX | DALLAS | 4380 | 451 | SOUTHWEST | |
| 45 | Black | Non-Hispanic or Latino | Male | | | TX | | 1817 BAXLEY DR | | 75206 | DALLAS | TX | DALLAS | | | | |
| 55 | Black | Non-Hispanic or Latino | Female | | | TX | | 1818 CORSICANA ST | | 75201 | CARROLLTON | TX | | | | | |
| 58 | Black | Non-Hispanic or Latino | Male | | | TX | | 1818 CORSICANA ST | | 75220 | ARLINGTON | TX | | | | | |
| 59 | Black | Non-Hispanic or Latino | Female | | | TX | | 1818 CORSICANA ST | | 76014 | ARLINGTON | TX | | | | | |
| 62 | Black | Non-Hispanic or Latino | Female | | | TX | | 2515 COMMUNITY DR | 2002 | 75220 | DALLAS | TX | DALLAS | 3067 | 522 | NORTHWEST | |
| 65 | White | Non-Hispanic or Latino | Male | | | TX | | 2515 COMMUNITY DR | 2002 | 75220 | DALLAS | TX | DALLAS | 3067 | 522 | NORTHWEST | |
| 66 | White | Non-Hispanic or Latino | Female | | | TX | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 3043 | 535 | NORTHWEST | |
| 67 | White | Non-Hispanic or Latino | Female | | | TX | | 1818 CORSICANA ST | | 75235 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 69 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 2507 W AMHERST AVE | | 75235 | DALLAS | TX | DALLAS | 3081 | 522 | NORTHWEST | |
| 70 | Hispanic or Latino | Non-Hispanic or Latino | Female | | | TX | | 2507 W AMHERST AVE | | 75235 | DALLAS | TX | DALLAS | 3081 | 522 | NORTHWEST | |
| 74 | Hispanic or Latino | Non-Hispanic or Latino | Female | | | TX | | 1200 S KENTUCKY ST | | 75069 | MCKINNEY | TX | | | | | |
| 76 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | | | 1900 JUBILEE TRL | | 76014 | ARLINGTON | TX | | | | | |
| 80 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | | | 1900 JUBILEE TRL | | 76014 | ARLINGTON | TX | | | | | |
| 88 | Black | Non-Hispanic or Latino | Male | | | | | 10010 FOREST LN | 632 | 75243 | DALLAS | TX | DALLAS | 1042 | 257 | NORTHEAST | |
| 89 | Black | Non-Hispanic or Latino | Female | | | TX | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 93 | Black | Non-Hispanic or Latino | Male | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 94 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 2515 COMMUNITY DR | | 75220 | DALLAS | TX | DALLAS | 1248 | 331 | SOUTHEAST | |
| 97 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | | | | |
| 102 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | | | | |
| 105 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 106 | Hispanic or Latino | Non-Hispanic or Latino | Female | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 107 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 108 | Black | Non-Hispanic or Latino | Male | | | | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 109 | Black | Non-Hispanic or Latino | Male | | | TX | | 2027 FARNHAM ST WAY | | 75243 | DALLAS | TX | DALLAS | 1042 | 257 | NORTHEAST | |
| 111 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 2027 FARNHAM ST WAY | | 75237 | DALLAS | TX | | | | | |
| 112 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | KY | | 2306 29TH ST | 28 | 11105 | ASTORIA | NY | | | | | |
| 113 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | MX | | 11621 FERGUSON RD | 2132 | 75228 | DALLAS | TX | DALLAS | 441 | 227 | NORTHEAST | |
| 115 | Hispanic or Latino | Non-Hispanic or Latino | Female | | | | | 3606 MT WASHINGTON ST | | 75211 | DALLAS | TX | DALLAS | 4113 | 441 | SOUTHWEST | |
| 116 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 5116 BRYCE CANYON RD | | 75201 | DALLAS | TX | DALLAS | 8820 | 432 | SOUTHWEST | |
| 118 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 5116 BRYCE CANYON RD | | 75211 | DALLAS | TX | DALLAS | 8820 | 432 | SOUTHWEST | |
| 119 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 5116 BRYCE CANYON RD | | 75211 | DALLAS | TX | DALLAS | 8820 | 432 | SOUTHWEST | |
| 121 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 5116 BRYCE CANYON RD | | 76155 | FTWORTH | TX | | | | | |
| 122 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 14300 STATLER BLVD | | 76155 | DALLAS | TX | DALLAS | 3006 | 553 | NORTHWEST | |
| 123 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 3323 HIGH BLUFF DR | | 75234 | DALLAS | TX | DALLAS | 3006 | 553 | NORTHWEST | |
| 124 | Hispanic or Latino | Non-Hispanic or Latino | Female | | | TX | | 3323 HIGH BLUFF DR | | 75234 | DALLAS | TX | DALLAS | 3006 | 553 | NORTHWEST | |
| 125 | Hispanic or Latino | Non-Hispanic or Latino | Male | | | TX | | 3323 HIGH BLUFF DR | | 75234 | DALLAS | TX | DALLAS | 3006 | 553 | NORTHWEST | |
| 126 | Black | Non-Hispanic or Latino | Male | | | TX | | 3323 HIGH BLUFF DR | | 75201 | DALLAS | TX | DALLAS | 3006 | 553 | NORTHWEST | |
| 127 | Black | Non-Hispanic or Latino | Female | | | TX | | 1818 CORSICANA ST | | 75201 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | |
| 128 | Black | Non-Hispanic or Latino | Male | | | TX | | 3323 HIGH BLUFF DR | | 75234 | DALLAS | DALLAS | DALLAS | 8820 | 432 | SOUTHWEST | |
| 129 | Black | Non-Hispanic or Latino | Female | | | TX | | 1400 OLD FORGE DR | | 75201 | DALLAS | AR | | | | | |
| 130 | Black | Non-Hispanic or Latino | Male | | | AR | | 505 BALLARD AVE | E | 72227 | LITTLE ROCK | AR | | | | | |
| 131 | Black | Non-Hispanic or Latino | Male | | | AR | | 1515 W 2ND ST | | 72120 | SHERWOOD | AR | | | | | |
| 132 | Black | Non-Hispanic or Latino | Male | | | AR | | 1400 OLD FORGE DR | | 72227 | LITTLE ROCK | AR | | | | | |

| Row | CM ArTatoo | CN ArTatooComments | CO AcDcomments | AcDcoupln | CP AcHoldrStatus | CQ ArEmployer | CR | CS DrugRelated | CT DrugUse | DrugType | CU ArClothingWorn | CV Expunged | CW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | WAREHOUSE | | TEMP SERVICE | | No | | | T-SHIRT, SHORTS, SWEAT PANTS, TENNIS SHOES | | |
| 2 | | | | | | | | No | | | BLACK TOP, BLACK SKIRT, TALL BLACK BOOTS | | |
| 3 | | | | | | | | No | | | BLUE DRESS, BLACK JACKET, BLACK BOOTS | | |
| 6 | | | | | | | | No | | | BLUE JEANS/WHITE SHIRT/BROWN JACKET | | |
| 9 | | | | | | | | Unknown | | | DAKR BLUE HOODIE AND BLUE JEANS | | |
| 7 | | | | | | | | Unknown | | | DAKR BLUE HOODIE AND BLUE JEANS | | |
| 11 | | | | | | | | Unknown | | | DAKR BLUE HOODIE AND BLUE JEANS | | |
| 12 | | | | | | | | Unknown | | | DAKR BLUE HOODIE AND BLUE JEANS | | |
| 14 | | | | | | | | No | | | LSW WHITE T SHIRT AND BLACK JEANS | | |
| 17 | | | | | | | | No | | | LONG SLEEVED T/SHIRT AND JEANS | | |
| 18 | | | | | | | | Unknown | | | BLACK SHIRT, BLUE SHORTS | | |
| 19 | | | | | | | | Unknown | | | BLACK SHIRT, RED PLAID PAJAMA PANTS | | |
| 24 | | | | | | | | No | | | BLACK SHIRT, RED PLAID PAJAMA PANTS | | |
| 26 | | | | | | | | No | | | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES | | |
| 27 | | | | | | | | Yes | | Processed Marijuana | ORANGE SHIRT, RED PLAID PAJAMA PANTS | | |
| 28 | | | | | | | | Yes | | Processed Marijuana | BLACK SHIRT, RED PLAID PAJAMA PANTS | | |
| 29 | | | | | | | | Yes | | Processed Marijuana | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES | | |
| 30 | | | | | | | | Yes | | Processed Marijuana | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES | | |
| 31 | | | | | | | | Yes | | Processed Marijuana | WHITE HAT, BLACK SHIRT, BLACK PANTS | | |
| 35 | | | | | | | | Yes | | Processed Marijuana | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES. | | |
| 36 | | | | | | | | Yes | | Processed Marijuana | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES. | | |
| 41 | | | | | | | | No | | | BLUE BUTTON UP, KHAKI PANTS | | |
| 44 | | | | | MANAGER | KFC | | No | | | BLK HOODIE, BLK PANTS | | |
| 56 | | | | | | | | No | | | BLK HOODIE, BLK PANTS | | |
| 58 | | | | | | | | No | | | BLK HOODIE, BLK PANTS | | |
| 59 | | | | | | | | No | | | BLK HOODIE, BLK PANTS | | |
| 61 | | | | | | | | Yes | | Methamphetamine | BLU SHIRT AND BLUE JEANS | | |
| 62 | | | | | | | | Yes | | Methamphetamine | BLK HOODIE, BLK PANTS | | |
| 66 | | | | | | | | Yes | | Methamphetamine | BLACK JACKET AND BLACK PANTS | | |
| 67 | | | | | | | | Yes | | Methamphetamine | BLACK JACKET AND BLACK PANTS | | |
| 69 | | | | | | | | Yes | | Cultivated Marijuana | WHITE HAT, BLACK SHIRT, BLACK PANTS | | |
| 70 | | | | | | | | Yes | | Cultivated Marijuana | WHITE HAT, BLACK SHIRT, BLACK PANTS | | |
| 76 | | | | | | | | No | | | TAN DRESS | | |
| 78 | | | | | | | | No | | | BLUE JERSEY, JEANS | | |
| 80 | | | | | | | | No | | | BLUE JERSEY, JEANS | | |
| 85 | | | | | | | | No | | | BLUE JERSEY, JEANS | | |
| 89 | | | | | | | | No | | | BLACK TUBE TOP, WHITE AND BLACK SLACKS | | |
| 93 | | | | | | | | No | | | BLACK TUBE TOP, WHITE AND BLACK SLACKS | | |
| 94 | | | | | | | | Yes | | Methamphetamine | WHITE HOODIE BLUE JEANS BRWON BOOTS | | |
| 97 | | | | | | | | Yes | | Methamphetamine | BLACK PANTS | | |
| 101 | | | | | | | | Yes | | Methamphetamine | BLACK PANTS | | |
| 102 | | | | | | | | Yes | | Methamphetamine | BLACK PANTS | | |
| 105 | | | | | | | | Yes | | Methamphetamine | BLACK PANTS | | |
| 106 | | | | | | | | Yes | | Methamphetamine | BLACK PANTS | | |
| 107 | | | | | | | | Yes | | Methamphetamine | GREEN SHIRT, BLACK PANTS | | |
| 108 | | | | | | | | No | | — | BLACK JACKET AND JEANS | | |
| 109 | | | | | | | | No | | | GREEN SHIRT, BLACK PANTS | | |
| 110 | | | | | | | | No | | | COWBOYS JERSEY GRAY SHORTS BLUE COWBOYS HAT | | |
| 111 | | | | | | | | No | | | PLAID SHIRT, JEANS | | |
| 112 | | | | | | | | No | | | BLACK POLO BLUE JEANS | | |
| 115 | | | | | | | | No | | | NAKED | | |
| 116 | | | | | | | | No | | | RED/YELLOW JACKET, JEAN SHORTS, RED SHOES | | |
| 118 | | | | | | | | No | | | RED/YELLOW JACKET, JEAN SHORTS, RED SHOES | | |
| 119 | | | | | | | | No | | | RED/YELLOW JACKET, JEAN SHORTS, RED SHOES | | |
| 121 | | | | | | | | No | | | SHORTS, SHIRT, BASEBALL HAT | | |
| 122 | | | | | | | | No | | | BLACK T SHIRT, SHORTS | | |
| 123 | | | | | | | | No | | | BLACK T SHIRT, SHORTS | | |
| 124 | | | | | | | | No | | | BLACK T SHIRT, SHORTS | | |
| 125 | | | | | | | | No | | | BLACK T SHIRT, SHORTS | | |
| 126 | | | | | | | | No | | | BLACK T SHIRT, SHORTS | | |
| 127 | | | | | | | | No | | | BLACK T SHIRT, SHORTS | | |
| 128 | | | | | | | | No | | | BLACK T SHIRT, JEANS | | |
| 129 | | | | | | | | No | | | WHITE SHIRT/BLUE JEANS | | |
| 130 | | | | | | | | No | | | WHITE SHIRT/BLUE JEANS | | |
| 131 | | | | | | | | No | | | BLACK TSHIRT/ BLACK JEANS | | |
| 133 | | | | | | | | No | | | BLACK TSHIRT/ BLACK JEANS | | |

| | AcLAddress | CX | CV AcCity | CZ | AcState | BA | Beat | DD Division | DE Sector | DF District | DG New District | TAAG Name | DH Community | VGIP Area | DJ | GridID | DK Point_X | Point_Y | DM Updtdate | DN | DO | USER_Address | DP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2333 W NORTHWEST HWY | | DALLAS | 75220 | TX | 4451 | 521 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 63838 | 2460467.555 | 6988889.322 | 2021-04-28 | | XTC CABARET | 2333 W NORTHWEST HWY | |
| 2 | 10849 COMPOSITE DR | | DALLAS | 75220 | TX | 3040 | 534 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 78014 | 2460585.273 | 7006169.444 | 2021-02-23 | | UNKNOWN AT PRESENT | 10849 COMPOSITE DR | |
| 3 | 10849 COMPOSITE DR | | DALLAS | 75220 | TX | 3040 | 534 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 77041 | 2460585.273 | 7006169.444 | 2021-02-23 | | UNKNOWN AT PRESENT | 10849 COMPOSITE DR | |
| 4 | 10101 TECHNOLOGY BLVD W | | DALLAS | 75220 | TX | 3055 | 521 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 77041 | 2460605.188 | 7006616.197 | 2021-02-23 | | BABY DOLLS SALOON WEST | 10101 TECHNOLOGY BLVD W | |
| 5 | 1985 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3055 | 521 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 71392 | 2456576.798 | 7003272.57 | 2021-04-02 | | NEW FINE ARTS WEST | 1985 W NORTHWEST HWY | |
| 6 | 1985 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3055 | 521 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 77395 | 2456576.798 | 7003272.57 | 2021-04-02 | | NEW FINE ARTS WEST | 1985 W NORTHWEST HWY | |
| 7 | 1985 W NORTHWEST HWY | | DALLAS | 75229 | TX | 3025 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72534 | 2457313.185 | 7005984.841 | 2021-04-02 | | NEW FINE ARTS - WEST | 1985 W NORTHWEST HWY | |
| 8 | 1985 W NORTHWEST HWY | | DALLAS | 75229 | TX | 3025 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2460759.273 | 7006328.445 | 2021-09-13 | | THE MEN'S CLUB OF DALLAS | 1985 W NORTHWEST HWY | |
| 9 | 11044 HARRY HINES BLVD | | DALLAS | 75229 | TX | 3025 | 534 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 77041 | 2460759.273 | 7006328.445 | 2021-09-13 | | THE MEN'S CLUB OF DALLAS | 11044 HARRY HINES BLVD | |
| 10 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 3025 | 534 | NORTHWEST | 520 | 6 | D6 | John Carpenter Stemmons | | STEMMONS_EMP/RESIDENTIAL_VC | | 2 | 2458417.32 | 7001830.996 | 2021-07-24.28 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 11 | 2030 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3025 | 534 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 75518 | 2458467.320 | 7007384.045 | 2021-09-11.7.24.28 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 2030 W NORTHWEST HWY | |
| 12 | 8550 N STEMMONS FWY | | DALLAS | 75247 | TX | 3057 | 521 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 78014 | 2458467.320 | 7007384.045 | 2021-09-11.7.24.28 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 8550 N STEMMONS FWY NB | |
| 13 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 3025 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 78014 | 2458467.320 | 7007384.045 | 2021-09-11.7.24.28 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 14 | 1985 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3025 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 78014 | 2458467.320 | 7007384.045 | 2021-09-11.7.24.28 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 1985 W NORTHWEST HWY | |
| 15 | 1985 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3025 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 75518 | 2458467.320 | 7007384.045 | 2021-09-11.7.24.28 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 1985 W NORTHWEST HWY | |
| 16 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 75518 | 2457943.663 | 7003897.443 | 2021-09-13.7.33.11 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 17 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 75516 | 2457943.663 | 7003897.443 | 2021-09-13.7.33.11 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 18 | 11044 HARRY HINES BLVD | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 75516 | 2460759.178 | 7007384.045 | 2021-09-13.7.33.11 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 11044 HARRY HINES BLVD | |
| 19 | 2030 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3040 | 534 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 77041 | 2460759.178 | 7007384.045 | 2021-09-13.7.33.11 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 2030 W NORTHWEST HWY | |
| 20 | 10101 TECHNOLOGY BLVD W | | DALLAS | 75220 | TX | 3057 | 521 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 77041 | 2460759.178 | 7007384.045 | 2021-09-13.7.33.11 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 10101 TECHNOLOGY BLVD W | |
| 21 | 2117 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3057 | 534 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 77041 | 2460759.178 | 7007384.045 | 2021-09-13.7.33.11 | | SPEARMINT RHINO GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | |
| 22 | 2117 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3057 | 534 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 75518 | 2460759.178 | 7007384.045 | 2021-09-13.7.33.11 | | DO'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY - WEST | |
| 23 | 2117 W NORTHWEST HWY | | DALLAS | 75220 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 75518 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY - WEST | |
| 24 | 2117 W NORTHWEST HWY | | DALLAS | 75220 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB - WEST | 2117 W NORTHWEST HWY | |
| 25 | 2117 W NORTHWEST HWY | | DALLAS | 75220 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | |
| 26 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB - WEST | 2439 WALNUT HILL LN | |
| 27 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456576.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB - WEST | 2439 WALNUT HILL LN | |
| 28 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 29 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 30 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 31 | 2439 WALNUT HILL LN | | DALLAS | 75229 | TX | 6000 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2456751.504 | 7003261.943 | 2021-10-08.7.13.20 | | DO'S A GENTLEMAN'S CLUB | 2439 WALNUT HILL LN | |
| 32 | 2150 CALIFORNIA CROSSING RD | | DALLAS | 75220 | TX | 6000 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | | | | 72793 | 2457100.797 | 7003530.954 | 2021-10-23.10.001 | | 2150 CALIFORNIA CROSSING RD | 2150 CALIFORNIA CROSSING RD | |
| 33 | 2150 CALIFORNIA CROSSING RD | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | STEMMONS_EMP/RESIDENTIAL_VC | | 72793 | 2457100.797 | 7003530.954 | 2021-10-23.10.001 | | NEW FINE ARTS WEST | 2150 CALIFORNIA CROSSING RD | |
| 34 | 2150 CALIFORNIA CROSSING RD | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | | 72538 | 2458467.36 | 7003931.943 | 2020-10-06.19.3521 | | NEW FINE ARTS WEST | 2150 CALIFORNIA CROSSING RD | |
| 35 | 2150 CALIFORNIA CROSSING RD | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | | 72538 | 2458467.36 | 7003931.943 | 2020-10-06.19.3521 | | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | |
| 36 | 2150 CALIFORNIA CROSSING RD | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | | 72726 | 2457100.797 | 7003530.954 | 2021-10-23.10.001 | | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | |
| 37 | 2150 CALIFORNIA CROSSING RD | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | | 72726 | 2457100.797 | 7003530.954 | 2021-10-23.10.001 | | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | |
| 38 | 2150 CALIFORNIA CROSSING RD | | DALLAS | 75220 | TX | 3099 | 512 | NORTHWEST | 530 | 7 | D7 | John Carpenter Stemmons | | | | 63657 | 2462809.301 | 6990995.166 | 2021-06-27.5.44.54 | | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | |
| 39 | 900 W MOCKINGBIRD LN | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 7 | 07 | John Carpenter Stemmons | | | | 63657 | 2462809.301 | 6990995.166 | 2021-06-27.5.44.54 | | BABY DOLLS TOPLESS SALOON | 900 W MOCKINGBIRD LN | |
| 40 | 1607 REGAL ROW | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | Back Creek | | | | 53940 | 2325164.849 | 6977936.144 | 2020-10-18.6006.21 | | 9125 E EL THORNTON FWY WB | 1607 REGAL ROW | |
| 41 | 2850 N STEMMONS FWY | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | Buckner | | | | 53940 | 2325164.849 | 6977936.144 | 2020-10-18.6006.21 | | COASTER CLUB INC - COASTER CLUB INC | 2850 N STEMMONS FWY | |
| 42 | 10313 TECHNOLOGY BLVD E | | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | John Carpenter Stemmons | | | | 11103 | 2460337.955 | 7000171.55 | 2021-05-11.10.22 | | BABY DOLLS SALOON WEST | 10313 TECHNOLOGY BLVD E | |
| 43 | 11044 HARRY HINES BLVD | | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | John Carpenter Stemmons | | | | 78840 | 2461115.10 | 7000171.55 | 2021-05-11.10.22 | | NEW FINE ARTS WEST | 11044 HARRY HINES BLVD | |
| 44 | 8850 N STEMMONS FWY | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | John Carpenter Stemmons | | | | 72237 | 2457957.482 | 7001526.93 | 2021-05-11.10.22 | | BUCKS CABARET | 8850 N STEMMONS FWY NB | |
| 45 | 8850 N STEMMONS FWY | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | John Carpenter Stemmons | | | | 72793 | 2456998.555 | 7002063.152 | 2021-06-19.9121 | | BUCKS CABARET | 8850 N STEMMONS FWY NB | |
| 46 | 8850 N STEMMONS FWY | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | John Carpenter Stemmons | | | | 62433 | 2467819.988 | 6990689.596 | 2020-12-19.9121 | | BUCKS CABARET | 8850 N STEMMONS FWY NB | |
| 47 | 8850 N STEMMONS FWY | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | NWHwy WaltonWalker | | | | 62433 | 2467819.988 | 6990689.596 | 2020-12-19.9121 | | BUCKS CABARET | 8850 N STEMMONS FWY NB | |
| 48 | 2050 W NORTHWEST HWY | | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | 02 | NWHwy WaltonWalker | | | | 62433 | 2467819.988 | 6990689.596 | 2022-01-24.9596 | | LA ZONA ROSA | 2050 W NORTHWEST HWY | |
| 49 | 2332 W NORTHWEST HWY | | DALLAS | 75220 | TX | 4451 | 521 | NORTHWEST | 520 | 6 | D6 | NWHwy WaltonWalker | | | | 62433 | 2467819.988 | 6990689.596 | 2022-01-24.9596 | | LA ZONA ROSA | 2332 W NORTHWEST HWY | |
| 50 | 2050 W NORTHWEST HWY | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | | | | 62433 | 2467819.988 | 6990689.596 | 2022-05-16.8.062.21 | | LA ZONA ROSA | 2050 W NORTHWEST HWY | |
| 51 | 2050 W NORTHWEST HWY | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | | | | 62433 | 2467819.988 | 6990689.596 | 2022-05-16.8.062.21 | | LA ZONA ROSA | 2050 W NORTHWEST HWY | |
| 52 | 10920 SHADY TRL | | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | | | | 63433 | 2478.19.988 | 7000689.596 | 2021-05-16.8.062.21 | | BABY DOLLS TOPLESS SALOON | 10920 SHADY TRL | |
| 53 | 8850 N STEMMONS FWY | | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 06 | 06 | John Carpenter Stemmons | | | | 72793 | 2456998.555 | 7002063.152 | 2021-06-19.9121 | | BUCKS CABARET | 8850 N STEMMONS FWY NB | |

| | USER_License_Type | OR<br>BUFF_DIST |
|---|---|---|
| 1 | CABARET | 500 |
| 2 | CABARET | 500 |
| 4 | CABARET | 500 |
| 6 | CABARET | 500 |
| 7 | CABARET | 500 |
| 11 | ARCADE | 500 |
| 12 | ARCADE | 500 |
| 14 | ARCADE | 500 |
| 17 | CABARET | 500 |
| 18 | CABARET | 500 |
| 24 | CABARET | 500 |
| 26 | CABARET | 500 |
| 27 | CABARET | 500 |
| 28 | CABARET | 500 |
| 35 | CABARET | 500 |
| 35 | CABARET | 500 |
| 36 | CABARET | 500 |
| 41 | CABARET | 500 |
| 44 | CABARET | 500 |
| 56 | CABARET | 500 |
| 58 | CABARET | 500 |
| 59 | CABARET | 500 |
| 61 | CABARET | 500 |
| 62 | CABARET | 500 |
| 66 | CABARET | 500 |
| 67 | CABARET | 500 |
| 69 | CABARET | 500 |
| 76 | CABARET | 500 |
| 80 | CABARET | 500 |
| 83 | CABARET | 500 |
| 85 | CABARET | 500 |
| 89 | CABARET | 500 |
| 93 | CABARET | 500 |
| 94 | CABARET | 500 |
| 97 | CABARET | 500 |
| 101 | ARCADE | 500 |
| 102 | ARCADE | 500 |
| 105 | ARCADE | 500 |
| 106 | ARCADE | 500 |
| 107 | ARCADE | 500 |
| 108 | ADULT VIDEO | 500 |
| 109 | CABARET | 500 |
| 110 | CABARET | 500 |
| 111 | CABARET | 500 |
| 113 | CABARET | 500 |
| 115 | CABARET | 500 |
| 116 | CABARET | 500 |
| 118 | CABARET | 500 |
| 119 | CABARET | 500 |
| 121 | CABARET | 500 |
| 122 | CABARET | 500 |
| 123 | CABARET | 500 |
| 124 | CABARET | 500 |
| 125 | CABARET | 500 |
| 126 | CABARET | 500 |
| 127 | CABARET | 500 |
| 128 | CABARET | 500 |
| 129 | CABARET | 500 |
| 130 | CABARET | 500 |
| 131 | CABARET | 500 |
| 132 | CABARET | 500 |

COL 005702

| OBJECTID | Join_Count | TARGET_FID | DataSource | IncidentNum | ArrestY | ArrestNumber | ArrestDate | Time | Group | ArrestDay | ArkDate | ArkDay | AcngNumID | AChargeCt | OffenseCode | ChargeEng | ChargeDesc | PrimaryArstDag |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 468 | RMX/NIBRS | 00068 | 2021 | 21-000121 | 2021-01-02 | 1:00 AM | 10p to 2a | Saturday | 2021-01-02 3:03 | Saturday | 21-000121-0 | 1 | FS-24110000-613 | County | TRAFFIC VIOLATION - NON HAZARDOUS | Yes |
| 2 | 1 | 187 | RMX/NIBRS | 03051 | 2021 | 21-005175 | 2021-02-12 | 1:00 AM | 10p to 2a | Friday | 2021-02-12 14:54 | Friday | 21-005175-01 | 1 | MC-99999999-U404 | City | MANIFESTING THE PURPOSE OF ENGAGING IN PROSTITUTION | Yes |

*Wide tabular spreadsheet data — 67 rows across columns: OBJECTID, Join_Count, TARGET_FID, DataSource, IncidentNum, ArrestY, ArrestNumber, ArrestDate, Time, Group, ArrestDay, ArkDate, ArkDay, AcngNumID, AChargeCt, OffenseCode, ChargeEng, ChargeDesc, PrimaryArstDag. Individual cell values are not legible at this resolution.*

COD_005714

| | T | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK | AL | AM | AN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | UCRArrestCha | Severity | PClass | UCR | UCRWord | UCROffense | Statute | CIB | Type | UCR_ActAg | HoldType | BailType | BailAgent | ReleaseType | WarrantNum | WarrantType | WarrantIssuedAgency | WarrantIssuedDate | ChangeDate | StaffIDRetrieveDate | JailSgtID | OFCR_RPT_Written_By_Date |

| # | AO OFCR_Approved_By_Date | AP OFCR_Received_By_Date | AQ Apprehended_Date | AR Final_Disp | AS Final_Disp_Date | AT Ad Premise | AU ArAction | AV Disp Code | NIBRS Group | AW NIBRS Crime Category | AX |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2021-01-02 10:03:03 | 2021-01-02 10:04:00 | | Accepted | 2021-01-02 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | MOTOR VEHICLE THEFT | |
| 2 | | 2021-02-21 14:43:00 | | Accepted | 2021-02-22 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | B | ALL OTHER OFFENSES | |
| 3 | 2021-02-21 14:43:00 | 2021-03-23 10:43:00 | | Accepted | 2021-03-23 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | B | ALL OTHER OFFENSES | |
| 4 | 2021-03-23 10:43:02 | 2021-04-02 4:03:00 | | Accepted | 2021-04-02 0:00:00 | Highway, Street, Alley ETC | Arrested - Released To Hospital (APOWH) | | B | APOWH (SOCIAL SERVICES REFERRAL) | |
| 5 | 2021-04-02 3:06:24 | 2021-04-02 4:03:00 | | Accepted | 2021-04-02 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | B | DRUG/NARCOTIC VIOLATIONS | |
| 6 | 2021-04-03 3:46:26 | 2021-04-02 4:03:00 | | Accepted | 2021-04-02 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 7 | 2021-04-02 3:46:28 | 2021-04-02 4:03:00 | | Accepted | 2021-04-02 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 8 | 2021-05-14 3:15:12 | 2021-05-25 5:20:00 | | Accepted | 2021-05-25 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WARRANT DALLAS PD | |
| 9 | 2021-06-06 5:12:03 | 2021-06-06 5:39:00 | | Accepted | 2021-06-06 0:00:00 | Apartment Complex/Building | Arrested - Law Sherrett | H | C | DRIVING UNDER THE INFLUENCE | |
| 10 | | 2021-06-10 16:47:00 | 2021-08-10 13:00:00 | Accepted | 2021-08-10 0:00:00 | Bar/NightClub/DanceHall ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 11 | 2021-06-10 16:47:00 | 2021-09-11 1:23:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 12 | 2021-09-11 1:23:01 | 2021-09-11 7:18:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | WEAPON LAW VIOLATIONS | |
| 13 | 2021-09-11 7:17:01 | 2021-09-11 7:31:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 14 | 2021-09-11 7:17:01 | 2021-09-11 7:31:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | TRAFFIC VIOLATION - NON HAZARDOUS | |
| 15 | 2021-09-11 7:17:30 | 2021-09-11 7:31:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 16 | 2021-09-11 7:17:30 | 2021-09-11 5:05:00 | 2021-04-18 3:06:00 | Accepted | 2021-04-18 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 17 | 2021-09-11 7:17:30 | 2021-09-11 7:31:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 18 | 2021-09-11 7:17:30 | 2021-09-11 7:31:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 19 | 2021-09-11 16:33:35 | 2021-09-11 7:31:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | WEAPON LAW VIOLATIONS | |
| 20 | 2021-09-11 7:17:30 | 2021-09-11 7:31:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 21 | 2021-04-18 4:49:01 | 2021-04-18 5:05:00 | 2021-04-18 3:06:00 | Accepted | 2021-04-18 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | ALL OTHER OFFENSES | |
| 22 | 2021-04-18 4:49:01 | 2021-04-18 5:05:00 | 2021-04-18 3:06:00 | Accepted | 2021-04-18 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | WEAPON LAW VIOLATIONS | |
| 23 | 2021-04-18 4:20:53 | 2021-04-18 4:22:00 | | Accepted | 2021-04-18 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | B | ALL OTHER OFFENSES | |
| 24 | 2021-04-18 4:49:01 | 2021-04-18 5:05:00 | | Accepted | 2021-04-18 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 25 | 2021-04-18 4:49:01 | 2021-04-18 5:05:00 | | Accepted | 2021-04-18 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 26 | 2013-11-05 3:39:22 | 2021-11-05 5:59:00 | | Accepted | 2021-11-05 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 27 | 2021-11-05 5:39:00 | 2021-10-09 8:16:00 | | Accepted | 2021-10-09 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 28 | 2021-10-09 5:03:26 | 2021-10-09 8:16:00 | | Accepted | 2021-10-09 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 29 | 2021-10-09 5:03:26 | 2021-10-09 8:16:00 | | Accepted | 2021-10-09 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | WEAPON LAW VIOLATIONS | |
| 30 | 2021-09-10 3:38:48 | 2021-09-11 11:00:00 | | Accepted | 2021-09-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 31 | 2021-10-08 7:01:47 | 2021-10-08 7:11:00 | | Declined by Magistrate | | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | A | DRUG/NARCOTIC VIOLATIONS | |
| 32 | 2021-10-08 7:01:47 | 2021-10-08 7:11:00 | | Accepted | 2021-10-08 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | B | ALL OTHER OFFENSES | |
| 33 | 2021-10-08 7:01:47 | 2021-10-08 7:11:00 | | Accepted | 2021-10-08 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | B | ALL OTHER OFFENSES | |
| 34 | 2021-06-04 3:56:10 | 2021-06-04 3:56:00 | | Accepted | 2021-06-04 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 35 | 2021-03-18 5:37:07 | 2021-03-18 6:04:00 | | Accepted | 2021-03-18 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | FRAUD OFFENSES | |
| 36 | 2021-02-17 3:31:44 | 2021-05-13 15:00:00 | | Accepted | 2021-05-13 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | C | PUBLIC INTOXICATION | |
| 37 | 2021-10-23 9:30:52 | 2021-10-23 9:45:00 | | Accepted | 2021-10-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Released To Hospital (APOWH) | | B | APOWH (SOCIAL SERVICES REFERRAL) | |
| 38 | 2021-10-23 9:30:52 | 2021-10-23 9:45:00 | | Accepted | 2021-10-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | B | APOWH (SOCIAL SERVICES REFERRAL) | |
| 39 | 2021-10-23 9:30:52 | 2021-10-23 9:45:00 | | Accepted | 2021-10-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | B | ALL OTHER OFFENSES | |
| 40 | 2021-10-23 9:30:52 | 2021-10-23 9:45:00 | | Accepted | 2021-10-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | B | ALL OTHER OFFENSES | |
| 41 | 2021-10-23 9:30:53 | 2021-07-11 8:00:00 | | Accepted | 2021-07-11 0:00:00 | Highway, Street, Alley ETC | Arrested - Released To Hospital (APOWH) | | B | APOWH (SOCIAL SERVICES REFERRAL) | |
| 42 | 2021-07-11 7:33:33 | 2021-04-27 0:00:00 | | Accepted | 2021-04-27 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 43 | 2021-04-28 3:37:10 | 2021-03-18 6:04:00 | | Accepted | 2021-03-18 0:00:00 | Gas or Service Station | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 44 | 2021-03-18 5:37:07 | 2021-10-18 6:04:00 | | Accepted | 2021-10-18 0:00:00 | Bar/NightClub/DanceHall ETC | Arrested - Law Sherrett | | A | FRAUD OFFENSES | |
| 45 | 2021-03-15 15:44:41 | 2021-03-15 15:70:00 | | Accepted | 2021-07-05 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | C | DRIVING UNDER THE INFLUENCE | |
| 46 | 2021-07-05 2:00:05 | 2021-07-05 2:00:00 | | Accepted | 2021-07-05 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | H | C | PUBLIC INTOXICATION | |
| 47 | 2021-10-01 2:29:28 | 2021-10-01 0:00:00 | | Accepted | 2021-10-01 0:00:00 | Highway, Street, Alley ETC | Arrested - Released To Hospital (APOWH) | | B | APOWH (SOCIAL SERVICES REFERRAL) | |
| 48 | 2021-10-06 19:05:26 | 2021-10-06 19:34:00 | | Accepted | 2021-10-06 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | MOTOR VEHICLE THEFT | |
| 49 | 2021-10-06 19:05:26 | 2021-10-06 19:34:00 | | Accepted | 2021-10-06 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WEAPON LAW VIOLATIONS | |
| 50 | 2021-10-23 9:30:52 | 2021-10-23 3:59:00 | | Accepted | 2021-10-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | B | ALL OTHER OFFENSES | |
| 51 | 2021-06-27 4:33:21 | 2021-06-27 3:59:00 | | Accepted | 2021-06-27 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WARRANT UNDER THE (AJ JUA/CAPIAS) | |
| 52 | 2021-09-19 7:08:23 | 2021-09-19 7:23:00 | | Accepted | 2021-09-19 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WARRANT DALLAS PD (ALL CAPIAS) | |
| 53 | 2021-09-19 7:08:23 | 2021-09-19 7:23:00 | | Accepted | 2021-09-19 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WEAPON LAW VIOLATIONS | |
| 54 | 2021-09-19 7:08:23 | 2021-09-19 7:23:00 | | Accepted | 2021-09-19 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | FRAUD OFFENSES | |
| 55 | 2021-09-19 7:08:23 | 2021-09-19 7:23:00 | | Accepted | 2021-09-19 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WEAPON LAW VIOLATIONS | |
| 56 | 2021-09-19 7:08:23 | 2021-09-19 7:23:00 | | Accepted | 2021-09-19 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WEAPON LAW VIOLATIONS | |
| 57 | 2021-09-19 7:08:23 | 2021-09-19 7:23:00 | | Accepted | 2021-09-19 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 58 | 2021-05-14 3:39:49 | 2021-05-14 3:40:00 | | Accepted | 2021-05-14 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 59 | 2021-05-16 7:48:15 | 2021-05-16 8:06:00 | | Accepted | 2021-05-16 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WEAPON LAW VIOLATIONS | |
| 60 | 2021-05-16 7:47:03 | 2021-05-16 8:06:00 | | Accepted | 2021-05-16 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 61 | 2021-05-16 7:48:15 | 2021-05-16 9:15:00 | | Accepted | 2021-05-16 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WEAPON LAW VIOLATIONS | |
| 62 | 2021-05-16 7:48:15 | 2021-05-16 8:06:00 | | Accepted | 2021-05-16 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 63 | 2021-05-16 7:47:03 | 2021-05-16 8:06:00 | | Accepted | 2021-05-16 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 64 | 2021-05-16 7:47:03 | 2021-05-16 8:06:00 | | Accepted | 2021-05-16 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | DRUG/NARCOTIC VIOLATIONS | |
| 65 | 2021-05-16 7:47:05 | 2021-04-29 3:59:00 | | Accepted | 2021-04-29 0:00:00 | Highway, Street, Alley ETC | Arrested - Law Sherrett | | A | WEAPON LAW VIOLATIONS | |
| 66 | 2021-04-28 3:00:29 | 2021-04-29 3:59:00 | | Accepted | 2021-04-29 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | C | WARRANT HOLD (NOT A DPD WARRANT) | |
| 67 | 2021-05-19 4:16:59 | 2021-05-19 4:10:00 | | Accepted | 2021-05-19 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | C | TRAFFIC VIOLATION - NON HAZARDOUS | |

| # | NIBRS_Crime (AV) | NIBRS_Crime_CompStat (AZ) | NIBRS_CrimeAgainst (BA) | NIBRS_Code (BB) | NIBRS_Group_CrimeAgainst (BC) | NIBRS_Type (BD) | ChargeSynopsis / CFS_Number (BF) | Name (BG) |
|---|---|---|---|---|---|---|---|---|
| 1 | UUWV | UUWV | PROPERTY | 240 | PROPERTY | Coded | 21-0007769 | YOUNG-RAMOS, GABRIEL, ROBERT |
| 2 | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | Not Coded | 21-0281842 | PLEASANT, PERRY, PORTIA |
| 3 | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | Not Coded | 21-0303647 | PLEASANT, PERRY, PORTIA |
| 4 | APRWW (SOCIAL SERVICES REFERRAL) | APRWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | SOCIETY | Not Coded | 21-0518893 | FOSTER, JAYLEE, MICHELLE |
| 5 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0527833 | VENABLE, RONNIE, KENT |
| 6 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0527833 | VENABLE, RONNIE, KENT |
| 7 | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | SOCIETY | 35B | SOCIETY | Coded | 21-0527833 | VENABLE, RONNIE, KENT |
| 8 | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | SOCIETY | 35B | SOCIETY | Coded | 21-0527833 | VENABLE, RONNIE, KENT |
| 9 | WARRANT DALLAS PD (ARD WARRANT) | WARRANT DALLAS PD (ARD WARRANT) | PERSON | 13A | PERSON | Not Coded | 21-0491646 | HINES, KELDRICK, QUETTERIOUS |
| 10 | WARRANT DALLAS PD (AGG ASSAULT - NFV) | WARRANT DALLAS PD (AGG ASSAULT - NFV) | PERSON | 13A | PERSON | Not Coded | 21-0491646 | HINES, KELDRICK, QUETTERIOUS |
| 11 | DUI | DUI | SOCIETY | 90D | SOCIETY | Not Coded | 21-1504079 | ALVARADO, RENE |
| 12 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-1724614 | THOMPSON, RODRIGO, KENDALL |
| 13 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-1724614 | THOMPSON, RODRIGO, KENDALL |
| 14 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-1724614 | SARBINSKA, TSVETLINA |
| 15 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-1724614 | SARBINSKA, TSVETLINA |
| 16 | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY | 999 | SOCIETY | Not Coded | 21-1724614 | SARBINSKA, TSVETLINA |
| 17 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0599815 | STUART, DEEZIE, TYRONE |
| 18 | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | SOCIETY | 35B | SOCIETY | Coded | 21-0599815 | STUART, DEEZIE, TYRONE |
| 19 | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY | 999 | SOCIETY | Not Coded | 21-0599815 | ST EDDIE, TIMOTHY, STEPHEN |
| 20 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-2088994 | STUART, DEEZIE, TYRONE |
| 21 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-2088994 | STUART, DEEZIE, TYRONE |
| 22 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-2088994 | RAMIREZ, JACQUES |
| 23 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 22-0018886 | MITCHELL, JACQUES |
| 24 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 22-0018886 | ARISMENDEZ, BERNARDO |
| 25 | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | SOCIETY | Not Coded | 21-2071579 | MITCHELL, JACQUES |
| 26 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 22-0088998 | MITCHELL, JACQUES |
| 27 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-2129572 | BOYNTON, MERMEHINE, E |
| 28 | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | SOCIETY | 35B | SOCIETY | Coded | 21-2129572 | BOYNTON, MERMEHINE, E |
| 29 | DRUG EQUIPMENT VIOLATIONS | DRUG EQUIPMENT VIOLATIONS | SOCIETY | 35B | SOCIETY | Coded | 21-2129572 | BOYNTON, MERMEHINE, E |
| 30 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-1919185 | SANDOVAL, RAFAEL, OMAR |
| 31 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-1919185 | SANDOVAL, RAFAEL, OMAR |
| 32 | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | SOCIETY | Not Coded | 22-1208898 | SANCHEZ, PAUL, LUIS |
| 33 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-1918985 | RAMIREZ, CONTRERAS, ANTONIO |
| 34 | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | SOCIETY | Not Coded | 21-1918985 | RAMIREZ, CONTRERAS, ANTONIO |
| 35 | FALSE PRETENSES/SWINDLE/CONFIDENCE GAME | FALSE PRETENSES/SWINDLE/CONFIDENCE GAME | PROPERTY | 26A | PROPERTY | Coded | 21-1003137 | RAMIREZ, ASTRID, GISSEL |
| 36 | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | Not Coded | 21-1003137 | SANCHEZ, PAUL, LUIS |
| 37 | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | SOCIETY | Not Coded | 22-1003137 | RAMIREZ, CONTRERAS, ANTONIO |
| 38 | ALL OTHER OFFENSES | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | Not Coded | 21-2026886 | SANDOVAL, RAFAEL, OMAR |
| 39 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 22-0018886 | MYERS, SUDRICK, LADON |
| 40 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 22-1279411 | MYERS, SUDRICK, LADON |
| 41 | APRWW (SOCIAL SERVICES REFERRAL) | APRWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | SOCIETY | Not Coded | 22-0721200 | MYERS, SUDRICK, LADON |
| 42 | APRWW (SOCIAL SERVICES REFERRAL) | APRWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | SOCIETY | Not Coded | 21-2090046 | MAYS, DUSTIN, LEE |
| 43 | APRWW (SOCIAL SERVICES REFERRAL) | APRWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | SOCIETY | Not Coded | 22-0406833 | MAYS, DUSTIN, LEE |
| 44 | DUI | DUI | SOCIETY | 90D | SOCIETY | Not Coded | 21-1807945 | HOLBERT, KATRINA, ANNETTE |
| 45 | PUBLIC INTOXICATION | PUBLIC INTOXICATION | SOCIETY | 90E | SOCIETY | Not Coded | 21-1807945 | WONG, JHON |
| 46 | PUBLIC INTOXICATION | PUBLIC INTOXICATION | SOCIETY | 90E | SOCIETY | Not Coded | 21-1232073 | WONG, JHON |
| 47 | APRWW (SOCIAL SERVICES REFERRAL) | APRWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | SOCIETY | Not Coded | 22-1232073 | NOLASCA, RODRIGUEZ, DANIEL |
| 48 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-1807945 | ROBLES, CHRISTINA |
| 49 | UUWV | UUWV | PROPERTY | 240 | PROPERTY | Coded | 21-1507909 | OROZCO MARTINEZ, LUIS, JAVIER |
| 50 | UUWV | UUWV | PROPERTY | 240 | PROPERTY | Coded | 21-1907903 | OROZCO MARTINEZ, LUIS, JAVIER |
| 51 | DUI | DUI | SOCIETY | 90D | SOCIETY | Not Coded | 21-1171503 | PRYOR, DEVIN, MARCE |
| 52 | WARRANT DALLAS PD (ALIAS/CAPIAS) | WARRANT DALLAS PD (ALIAS/CAPIAS) | SOCIETY | 90J | SOCIETY | Not Coded | 21-1907903 | OROZCO MARTINEZ, LUIS, JAVIER |
| 53 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-1782253 | DEPAZ, ANGEL, ANGEL |
| 54 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-1782253 | DEPAZ, ANGEL, ANGEL |
| 55 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-1782253 | DEPAZ, ANGEL, ANGEL |
| 56 | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | SOCIETY | Not Coded | 22-0002034 | DEPAZ, ANGEL, ANGEL |
| 57 | IDENTITY THEFT | IDENTITY THEFT | PROPERTY | 26F | PROPERTY | Coded | 22-0002034 | MORGAN, KEYSHAWN, LAMONT |
| 58 | FRAUD OFFENSES | FRAUD OFFENSES | PROPERTY | 26A | PROPERTY | Coded | 21-0870241 | DEPAZ, ANGEL, ANGEL |
| 59 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-0870241 | JAMES, TERRANCE, RAYVON |
| 60 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-0870241 | JAMES, TERRANCE, RAYVON |
| 61 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0870241 | MORGAN, PEYTON |
| 62 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0870241 | CRAWFORD, ALEXIS |
| 63 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0870241 | MORGAN, KEYSHAWN, LAMONT |
| 64 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0870241 | MUGISUMA, JABBARI, DANTE |
| 65 | DRUG/NARCOTIC VIOLATIONS | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | Coded | 21-0870241 | JAMES, TERRANCE, RAYVON |
| 66 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-0870241 | JAMES, TERRANCE, RAYVON |
| 67 | WEAPON LAW VIOLATIONS | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | Coded | 21-0509105 | MUGISUMA, JABBARI, DANTE |
| 68 | WARRANT HOLD (NOT A DPD WARRANT) | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | SOCIETY | Not Coded | 21-0509105 | LEYVA DE LA, FRANKLIN |
| 69 | TRAFFIC VIOLATION - NON HAZARDOUS | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY | 999 | SOCIETY | Not Coded | 22-0800712 | CUEVANNA, CHRIS |

COD_005747

This page contains a single wide spreadsheet/table. Column headers (left to right): row index, NickName, AliasName, BirthPlace, [BL], [BM], Height, Weight, Hair, Eye, Race, Ethnicity, Sex, [BV], [BW], DrLic_St, DrLic_Type, HUAddress, [CA], HUApt, [CB]. The NickName, AliasName, and most marked columns are blank. Best reading of the legible data:

| # | BirthPlace | Height | Weight | Hair | Eye | Race | Ethnicity | Sex | DrLic_St | HUAddress | HUApt | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | 5-08 | 175 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 12603 NORTHBOROUGH DR | 2330 | 77069 |
| 2 | HOUSTON | 5-10 | 110 | Blonde | Blue | Black | Non-Hispanic or Latino | Female | LA | 2336 ADDIE DR | | 70506 |
| 3 | DALLAS,TX | 5-02 | 110 | Green | White | Black | Non-Hispanic or Latino | Female | TX | 103 SEATTLE ST | | |
| 4 | | 5-05 | 130 | Blonde | White | White | Non-Hispanic or Latino | Female | TX | 7424 SAN ISABEL CT | | |
| 5 | | 5-05 | 130 | Blonde | Brown | White | Non-Hispanic or Latino | Female | | 1818 CORSICANA ST | | 75201 |
| 6 | OKLAHOMA | 5-11 | 180 | Black | Brown | White | Non-Hispanic or Latino | Male | | 1818 CORSICANA ST | | 75201 |
| 7 | OKLAHOMA | 5-11 | 180 | Black | White | White | Non-Hispanic or Latino | Male | LA | 2841 CLOVEDALE DR | 149 | 75203 |
| 8 | OKLAHOMA | 6-00 | 170 | White | Brown | White | Non-Hispanic or Latino | Male | | 1818 CORSICANA ST | | 75201 |
| 9 | LOUISIANA | 5-11 | 190 | Black | Brown | Black | Non-Hispanic or Latino | Male | LA | 4256 DOUGLAS ST | | 75219 |
| 10 | | 5-08 | 170 | Black | Brown | Black | Non-Hispanic or Latino | Male | MS | 12614 HAMILTON DR | | 77018 |
| 11 | JACKSON, MISSISSIPPI | 5-10 | 190 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 857 DUBLIN DR | C | 75080 |
| 12 | BULGARIA | 5-10 | 150 | Blue | Blonde | White | Non-Hispanic or Latino | Female | | 857 DUBLIN DR | C | 75080 |
| 13 | BULGARIA | 6-00 | 150 | Blue | Brown | White | Non-Hispanic or Latino | Female | | 1955 KRAFT ST | | 75212 |
| 14 | BULGARIA | 6-00 | 185 | Blonde | White | White | Non-Hispanic or Latino | Male | TX | 1955 KRAFT ST | | 75212 |
| 15 | TEXAS | 6-00 | 185 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 1955 KRAFT ST | | 75212 |
| 16 | TEXAS | 6-00 | 185 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 1955 KRAFT ST | | 75212 |
| 17 | TEXAS | 6-00 | 185 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 1955 KRAFT ST | | 75212 |
| 18 | TEXAS | 6-03 | 185 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 1109 JEANETTE WAY | | 75006 |
| 19 | TEXAS | 6-00 | 185 | Brown | Brown | White | Non-Hispanic or Latino | Male | | 3801 GANNON LN | | 75237 |
| 20 | | 5-08 | 245 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 3801 GANNON LN | | 75237 |
| 21 | | 5-08 | 350 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 1817 BAXLEY DR | | 75217 |
| 22 | | 5-08 | 245 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 3801 GANNON LN | | 75237 |
| 23 | CITY OF DALLAS | 5-05 | 245 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 2515 COMMUNITY DR | | 75220 |
| 24 | | 5-05 | 245 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 2515 COMMUNITY DR | 2002 | 75220 |
| 25 | | 5-08 | 175 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 1313 MACKENZIE ST | | 75201 |
| 26 | | 5-05 | 245 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 1818 CORSICANA ST | | 75201 |
| 27 | CITY OF DALLAS | 6-00 | 245 | Black | White | White | Non-Hispanic or Latino | Male | | 1818 CORSICANA ST | | 75201 |
| 28 | | 5-09 | 150 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Female | TX | 1818 CORSICANA ST | | 75005 |
| 29 | | 5-09 | 150 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Female | TX | 2507 W AMHERST AVE | | 75209 |
| 30 | | 5-09 | 140 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Female | TX | 2507 W AMHERST AVE | | 75209 |
| 31 | | 6-00 | 285 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1206 S KENTUCKY ST | | 75069 |
| 32 | | 6-00 | 285 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1900 JUBILEE TRL | | 76014 |
| 33 | | 6-00 | 285 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1900 JUBILEE TRL | | 76014 |
| 34 | MEXICO | 5-09 | 150 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 35 | MEXICO | 5-09 | 150 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 2515 COMMUNITY DR | 2002 | 75220 |
| 36 | DALLAS | 6-00 | 210 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 37 | | 5-08 | 210 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 38 | | 5-08 | 210 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 39 | | 5-08 | 178 | Red | Brown | White | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 40 | | 5-08 | 210 | Black | Brown | Black | Non-Hispanic or Latino | Female | TX | 10010 FOREST LN | 632 | 75243 |
| 41 | | 5-08 | 200 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 42 | | 5-07 | 126 | Red | Brown | White | Non-Hispanic or Latino | Female | TX | 2027 EARNHARDT WAY | | 75217 |
| 43 | | 5-07 | 200 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 44 | | 5-07 | 126 | Black | Brown | White | Non-Hispanic or Latino | Female | NY | 2360 29TH ST | 48 | 11105 |
| 45 | MEXICO | 5-08 | 180 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | MX | 11621 FERGUSON RD | 28 | 75228 |
| 46 | NEW YORK | 5-09 | 245 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 3606 MT WASHINGTON ST | 2132 | 75211 |
| 47 | MEXICO | 5-09 | 245 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | | 5116 BRYCE CANYON RD | | 75211 |
| 48 | | 5-11 | 160 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | | 5116 BRYCE CANYON RD | | 75211 |
| 49 | | 5-11 | 170 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | | 5116 BRYCE CANYON RD | | 75211 |
| 50 | | 5-06 | 178 | Black | Brown | Black | Non-Hispanic or Latino | Female | | 1518 S ZILLA BLVD | | 75211 |
| 51 | | 5-11 | 170 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | | 5116 BRYCE CANYON RD | | 75211 |
| 52 | | 5-11 | 200 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 1818 CORSICANA ST | | 75201 |
| 53 | DALLAS, TEXAS | 5-09 | 195 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 3323 HIGH BLUFF DR | | 75234 |
| 54 | | 5-09 | 195 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 3323 HIGH BLUFF DR | | 75234 |
| 55 | | 5-09 | 195 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 3323 HIGH BLUFF DR | | 75234 |
| 56 | | 5-09 | 195 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 3323 HIGH BLUFF DR | | 75234 |
| 57 | | 5-08 | 194 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 3323 HIGH BLUFF DR | | 75234 |
| 58 | ARKANSAS | 5-09 | 194 | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 1818 CORSICANA ST | | 75201 |
| 59 | | 5-08 | 140 | Brown | Brown | Black | Non-Hispanic or Latino | Female | AR | 1400 OLD FORGE DR | E | 72227 |
| 60 | ARKANSAS | 5-08 | 194 | Brown | Brown | Black | Non-Hispanic or Latino | Male | AR | 505 RIDGELEA AVE | | 72206 |
| 61 | | 5-07 | 154 | Brown | Brown | Black | Non-Hispanic or Latino | Male | AR | 1616 W 24TH ST | | 72120 |
| 62 | ARKANSAS | 5-06 | 130 | Brown | Brown | Black | Non-Hispanic or Latino | Male | AR | 1400 OLD FORGE DR | E | 72227 |
| 63 | ARKANSAS | 5-06 | 130 | Brown | Brown | Black | Non-Hispanic or Latino | Male | AR | 505 RIDGELEA AVE | | 72205 |
| 64 | | 5-08 | 220 | Brown | Brown | Black | Non-Hispanic or Latino | Male | AR | 505 RIDGELEA AVE | | 72205 |
| 65 | CUBA | 5-08 | 160 | Black | White | White | Non-Hispanic or Latino | Male | TX | 713 OUACHITA DR | | 72120 |
| 66 | | 5-08 | 160 | Black | Black | White | Non-Hispanic or Latino | Male | TX | 6705 SANMEYER DR | 105 | 78137 |
| 67 | | 5-3 | 140 | Black | Black | | Hispanic or Latino | Male | TX | 10058 AURELIA RD | 1016 | 75243 |

COD_005758

| # | HitCity | HitState | HitCounty | HIDTA | HIReset | HIDivision | AlterAddress | ArOccupin | ArEmployer | DrugRelated | DrugType |
|---|---------|----------|-----------|-------|---------|------------|--------------|-----------|------------|-------------|----------|
| 1 | DALLAS | TX | | | | NORTHEAST | | | TEMP SERVICE | No | |
| 2 | GRAND PRAIRIE | TX | DALLAS | | | | | | | No | |
| 3 | HOUSTON | TX | | | | | | | | No | |
| 4 | LAFAYETTE | LA | | | | | | | | No | |
| 5 | FORT WORTH | TX | | 2088 | 135 | CENTRAL | | | | Unknown | |
| 6 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Unknown | |
| 7 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Unknown | |
| 8 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Unknown | |
| 9 | DALLAS | TX | DALLAS | 1908 | 537 | NORTHWEST | | | | Unknown | |
| 10 | TERRELL | TX | | | | | | | | No | |
| 11 | HOUSTON | TX | | | | | | | | Unknown | |
| 12 | RICHARDSON | TX | | | | | | | | No | |
| 13 | RICHARDSON | TX | | | | SOUTHWEST | | | | Yes | Processed Marijuana |
| 14 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | | | | Yes | Processed Marijuana |
| 15 | RICHARDSON | TX | | 4038 | 423 | SOUTHWEST | | | | Yes | Processed Marijuana |
| 16 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | | | | Yes | Processed Marijuana |
| 17 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | | | | Yes | Processed Marijuana |
| 18 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | | | | Yes | Processed Marijuana |
| 19 | DALLAS | TX | DALLAS | 4038 | 423 | SOUTHWEST | | | | Yes | Processed Marijuana |
| 20 | CARROLLTON | TX | | 4380 | 451 | SOUTHWEST | | | | No | |
| 21 | CARROLLTON | TX | | 4380 | 451 | SOUTHWEST | | | | No | |
| 22 | RICHARDSON | TX | | 4380 | 451 | SOUTHWEST | | | | No | |
| 23 | DALLAS | TX | DALLAS | 4380 | 451 | SOUTHWEST | | | | No | |
| 24 | CARROLLTON | TX | | 4380 | 451 | SOUTHWEST | | | | No | |
| 25 | DALLAS | TX | DALLAS | 4380 | 451 | SOUTHWEST | | | | Yes | Processed Marijuana |
| 26 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Yes | Processed Marijuana |
| 27 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Yes | Cultivated Marijuana |
| 28 | DALLAS | TX | DALLAS | 3081 | 522 | CENTRAL | | | | Yes | Cultivated Marijuana |
| 29 | DALLAS | TX | | 3081 | 522 | NORTHWEST | | | XTC | Yes | Cultivated Marijuana |
| 30 | MCKINNEY | TX | | | | | | | | No | |
| 31 | ARLINGTON | TX | | | | NORTHWEST | | | | No | |
| 32 | ARLINGTON | TX | | 3067 | 522 | NORTHWEST | | | | No | |
| 33 | ARLINGTON | TX | | 3067 | 522 | NORTHWEST | | | | No | |
| 34 | DALLAS | TX | DALLAS | 3067 | 522 | CENTRAL | | | | No | |
| 35 | DALLAS | TX | DALLAS | 3043 | 585 | CENTRAL | | | | No | |
| 36 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | No | |
| 37 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Yes | Methamphetamine |
| 38 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Yes | Methamphetamine |
| 39 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | Yes | Methamphetamine |
| 40 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | MANAGER | | Yes | Methamphetamine |
| 41 | DALLAS | TX | DALLAS | 2088 | 135 | NORTHWEST | | | | Yes | Methamphetamine |
| 42 | DALLAS | TX | DALLAS | 1042 | 257 | NORTHWEST | | | | Yes | Methamphetamine |
| 43 | DALLAS | TX | DALLAS | 1248 | 331 | CENTRAL | | | | Yes | Methamphetamine |
| 44 | DALLAS | TX | DALLAS | | | NORTHWEST | | | | No | |
| 45 | ASTORIA | NY | | 1258 | 227 | SOUTHWEST | | | | No | |
| 46 | DALLAS | TX | DALLAS | 4113 | 441 | SOUTHWEST | | | | No | |
| 47 | DALLAS | TX | DALLAS | 8820 | 432 | SOUTHWEST | | | | No | |
| 48 | DALLAS | TX | DALLAS | 8820 | 432 | NORTHWEST | | | | No | |
| 49 | DALLAS | TX | DALLAS | 8820 | 432 | SOUTHWEST | | | | No | |
| 50 | DALLAS | TX | DALLAS | 8820 | 432 | SOUTHWEST | | | | No | |
| 51 | FTWORTH | TX | | | | NORTHWEST | | | | No | |
| 52 | DALLAS | TX | DALLAS | 2088 | 135 | NORTHWEST | | | | No | |
| 53 | DALLAS | TX | | 3006 | 553 | NORTHWEST | | | | No | |
| 54 | DALLAS | TX | | 3006 | 553 | NORTHWEST | | | | No | |
| 55 | DALLAS | TX | | 3006 | 553 | NORTHWEST | | | | No | |
| 56 | DALLAS | TX | | 3006 | 553 | NORTHWEST | | | | No | |
| 57 | DALLAS | TX | | 3006 | 553 | NORTHWEST | | | | No | |
| 58 | DALLAS | TX | | 3006 | 553 | NORTHWEST | | | | No | |
| 59 | SHERWOOD | AR | | 2088 | 135 | CENTRAL | | | | No | |
| 60 | SHERWOOD | AR | | | | CENTRAL | | | | No | |
| 61 | LITTLE ROCK | AR | | | | | | | | No | |
| 62 | LITTLE ROCK | AR | | | | | | | | No | |
| 63 | LITTLE ROCK | AR | | | | | | | | No | |
| 64 | SHERWOOD | AR | | | | | | | | No | |
| 65 | LITTLE ROCK | AR | | | | | | | | No | |
| 66 | FT WORTH | TX | | | | | | | | No | |
| 67 | DALLAS | TX | | 1055 | 246 | NORTHEAST | | | | No | |

| # | ACClothingWorn | AcAddress | ArCity | CV | CZ | DA | DB | DC | Division | New District | District | TAAG Name | Community |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ACClothingWorn | | | | | | | | | | | | |
| 2 | T-SHIRT, SHORTS, SWEAT PANTS, TENNIS SHOES | 2332 W NORTHWEST HWY | DALLAS | 75220 | TX | 4451 | 521 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 3 | BLACK TOP, BLACK PANTS, TALL BLACK BOOTS | 10849 COMPOSITE DR | DALLAS | 75220 | TX | 3040 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 4 | BLUE DRESS, BLACK JACKET, BLACK BOOTS | 10849 TECHNOLOGY BLVD | DALLAS | 75220 | TX | 3040 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 5 | BLUE/GRAY/WHITE SHIRT (BROWN JACKET) | 10318 TECHNOLOGY BLVD W | DALLAS | 75220 | TX | 3055 | 521 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 6 | DARK BLUE HOODIE AND BLUE JEANS | 1985 W NORTHWEST HWY | DALLAS | 75220 | TX | 3055 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 7 | DARK BLUE HOODIE AND BLUE JEANS | 1985 W NORTHWEST HWY | DALLAS | 75220 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 8 | DARK BLUE HOODIE AND BLUE JEANS | 1985 W NORTHWEST HWY | DALLAS | 75220 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 9 | LONG SLEEVED T SHIRT AND JEANS | 10500 NEWKIRK ST | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 10 | LONG SLEEVED T SHIRT AND JEANS | 10500 NEWKIRK ST | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 11 | BLACK SHIRT, BLUE SHORTS | 11044 HARRY HINES BLVD | DALLAS | 75229 | TX | 3055 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 12 | BLACK SHIRT, RED PLAID PAJAMA PANTS | 2030 W NORTHWEST HWY | DALLAS | 75220 | TX | 3055 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 13 | BLACK SHIRT, RED PLAID PAJAMA PANTS | 2117 W NORTHWEST HWY | DALLAS | 75220 | TX | 3055 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 14 | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES | 2439 WALNUT HILL LN | DALLAS | 75229 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 15 | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES | 2439 WALNUT HILL LN | DALLAS | 75229 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 16 | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES | 2439 WALNUT HILL LN | DALLAS | 75229 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 17 | ORANGE SHIRT, RED PLAID PAJAMA PANTS | 2439 WALNUT HILL LN | DALLAS | 75229 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 18 | BLACK JACKET, RED PLAID PAJAMA PANTS | 2439 WALNUT HILL LN | DALLAS | 75229 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 19 | BLACK JACKET AND BLUE JEANS | 2439 WALNUT HILL LN | DALLAS | 75229 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 20 | ORANGE SHIRT, BLACK PANTS, ORANGE NIKE SHOES | 2439 WALNUT HILL LN | DALLAS | 75229 | TX | 3040 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 21 | WHITE HAT, BLACK SHIRT, BLACK PANTS | 8550 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 22 | BLK HOODIE, BLK PANTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 23 | BLK HOODIE, BLK PANTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 24 | BLUE JERSEY, JEANS | 2248 LOMBARDY LN | DALLAS | 75220 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 25 | BLUE JERSEY, JEANS | 2248 LOMBARDY LN | DALLAS | 75220 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 26 | BLACK TUBE TOP, WHITE AND BLACK SLACKS | 2100 W NORTHWEST HWY | DALLAS | 75220 | TX | 3040 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 27 | WHITE HOODIE BLUE JEANS BRWON BOOTS | 2150 CALIFORNIA CROSSING RD | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 28 | BLACK JACKET AND BLACK PANTS | 8100 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | |
| 29 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 30 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 31 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 32 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 33 | TAN DRESS | 2500 WILLOWBROOK RD | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 7 | D6 | NWHwy WaltonWalker | |
| 34 | WHITE HAT, BLACK SHIRT, BLACK PANTS | 2500 WILLOWBROOK RD | DALLAS | 75220 | TX | 3057 | 522 | NORTHWEST | 520 | 7 | D6 | NWHwy WaltonWalker | |
| 35 | GREEN SHIRT, BLACK SHORTS | 10905 COMPOSITE DR | DALLAS | 75220 | TX | 3025 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 36 | BLK HOODIE, BLK PANTS | 8100 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 37 | BLK HOODIE, BLK PANTS | 8100 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 38 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 39 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 40 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 41 | BLACK PANTS | 2000 W NORTHWEST HWY | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 7 | D6 | NWHwy WaltonWalker | |
| 42 | GREEN SHIRT, BLACK SHORTS | 1607 REGAL ROW | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | |
| 43 | BLACK POLO BLUE JEANS | 3861 DILIDO RD | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | |
| 44 | PLAID SHIRT, JEANS | 10310 TECHNOLOGY BLVD E | DALLAS | 75220 | TX | 3025 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 45 | COWBOYS JERSEY GRAY SHORTS BLUE COWBOYS HAT | 2248 LOMBARDY LN | DALLAS | 75220 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 46 | BLK HOODIE, BLK PANTS | 2100 CALIFORNIA CROSSING RD | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | |
| 47 | WHITE HOODIE BLUE JEANS BRWON BOOTS | 2150 CALIFORNIA CROSSING RD | DALLAS | 75220 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | |
| 48 | RED/YELLOW JACKET, JEAN SHORTS, RED SHOES | 2030 W NORTHWEST HWY | DALLAS | 75220 | TX | 3055 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 49 | RED/YELLOW JACKET, JEAN SHORTS, RED SHOES | 2030 W NORTHWEST HWY | DALLAS | 75220 | TX | 3055 | 534 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 50 | RED/YELLOW JACKET, JEAN SHORTS, RED SHOES | 10209 SHADY TRL | DALLAS | 75220 | TX | 3057 | 522 | NORTHWEST | 520 | 2 | D6 | NWHwy WaltonWalker | |
| 51 | BLACK T SHIRT, SHORTS | 2070 N STEMMONS FWY | DALLAS | 75207 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 52 | BLACK T SHIRT, SHORTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 53 | BLACK T SHIRT, SHORTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 54 | BLACK T SHIRT, SHORTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 55 | BLACK T SHIRT, SHORTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 56 | BLACK T SHIRT, SHORTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 57 | BLACK T SHIRT, SHORTS | 8850 N STEMMONS FWY | DALLAS | 75247 | TX | 4451 | 521 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 58 | JEANS TSHIRT JACKET | 2332 W NORTHWEST HWY | DALLAS | 75220 | TX | 4451 | 521 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 59 | WHITE SHIRT, BLUE JEANS | 8600 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 60 | WHITE SHIRT, BLUE JEANS | 8600 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 61 | WHITE SHIRT, BLUE JEANS | 8600 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 62 | BLACK TSHIRT BLACK JEANS | 8600 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 63 | WHITE SHIRT, BLUE JEANS | 8600 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 64 | WHITE SHIRT, BLUE JEANS | 8600 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 65 | WHITE SHIRT, BLUE JEANS | 8600 N STEMMONS FWY | DALLAS | 75247 | TX | 3078 | 522 | NORTHWEST | 520 | 2 | D2 | John Carpenter Stemmons | STEMMONS_EMP/RECENTRAL_VC |
| 66 | TSHIRT BLUE JEANS | 1900 W NORTHWEST HWY | DALLAS | 75229 | TX | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | NWHwy WaltonWalker | |
| 67 | T-SHIRT BLACK SWEATS | 11600 HARRY HINES BLVD | DALLAS | 75229 | TX | 3004 | 551 | NORTHWEST | 550 | 6 | D6 | Forest Dennis | |

| # | Update | USER_SOR_Name | USER_Address | USER_License_Type | BUFF_DIST |
|---|---|---|---|---|---|
| 1 | Update | USER_SOR_Name | USER_Address (DP) | USER_License_Type (DQ) | BUFF_DIST (DR) |
| 2 | 2021-02-03 3:09:23 | THE MEN'S CLUB OF DALLAS | 2340 W NORTHWEST HWY | CABARET | 500 |
| 3 | 2021-02-23 10:37:34 | UNKNOWN AT PRESENT | 10901 N STEMMONS FWY SB | CABARET | 500 |
| 4 | 2021-02-23 10:42:13 | BABY DOLLS SALOON WEST | 10920 N STEMMONS FWY SB | CABARET | 500 |
| 5 | 2021-02-23 3:42:13 | BABY DOLLS SALOON WEST | 10310 TECHNOLOGY BLVD W | CABARET | 500 |
| 6 | 2021-04-02 4:23:53 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | ARCADE | 500 |
| 7 | 2021-04-02 4:23:53 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | ARCADE | 500 |
| 8 | 2021-04-02 4:23:53 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | ARCADE | 500 |
| 9 | 2021-08-25 3:07:03 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 10 | 2021-06-06 5:42:07 | CHICA BONITAS | 10044 HARRY HINES BLVD | CABARET | 500 |
| 11 | 2021-10-02 17:07:47 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 12 | 2021-03-02 2:49:25 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 13 | 2021-10-18 10:57:09 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 14 | 2021-10-18 10:57:09 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 15 | 2021-04-13 13:24:28 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 16 | 2021-09-11 7:32:11 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 17 | 2021-09-11 7:32:11 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 18 | 2021-09-11 7:32:11 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 19 | 2021-09-11 7:32:11 | SPEARMINT RHINO GENTLEMAN'S CLUB | 8550 N STEMMONS FWY SB | CABARET | 500 |
| 20 | 2021-09-11 7:32:11 | SPEARMINT RHINO GENTLEMAN'S CLUB | 8550 N STEMMONS FWY SB | CABARET | 500 |
| 21 | 2021-10-18 10:57:09 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 22 | 2021-04-21 13:35:51 | DOS'S GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 23 | 2021-04-21 13:35:51 | DOS'S GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 24 | 2021-04-13 13:55:51 | DOS'S GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 25 | 2021-10-07 7:13:20 | DOS'S GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 26 | 2021-11-05 6:03:01 | DOS'S GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 27 | 2021-11-05 6:03:01 | DOS'S GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 28 | 2021-10-18 10:57:09 | DOS'S GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 29 | 2021-10-18 10:57:09 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 30 | 2021-10-30 10:50:04 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 31 | 2021-10-07 7:13:20 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 32 | 2021-10-07 7:13:20 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 33 | 2021-10-07 7:13:20 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 34 | 2021-06-04 4:19:29 | EXPOSED ADULT THEATER | 1976 REGAL ROW, DALLAS | CABARET | 500 |
| 35 | 2021-06-04 4:19:29 | EXPOSED ADULT THEATER | 919 W MOCKINGBIRD LN | ADULT VIDEO | 500 |
| 36 | 2021-02-28 10:02:07 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | ADULT THEATER | 500 |
| 37 | 2021-10-23 10:00:01 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | ARCADE | 500 |
| 38 | 2021-10-23 10:00:01 | COASTER LINE - COASTER CLUB INC | 9125 E R L THORNTON FWY WB | CABARET | 500 |
| 39 | 2021-10-23 10:00:01 | BABY DOLLS SALOON WEST | 10310 TECHNOLOGY BLVD W | CABARET | 500 |
| 40 | 2021-10-23 10:00:01 | CHICA BONITAS | 11044 HARRY HINES BLVD | CABARET | 500 |
| 41 | 2021-10-23 10:00:01 | SPEARMINT RHINO GENTLEMAN'S CLUB | 8550 N STEMMONS FWY SB | CABARET | 500 |
| 42 | 2021-07-11 17:59:26 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 43 | 2021-04-27 13:18:23 | LA ZONA ROSA | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 44 | 2021-10-18 6:00:51 | BABY DOLLS SALOON WEST | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 45 | 2021-05-15 13:32:21 | BABY DOLLS SALOON WEST | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 46 | 2021-02-02 12:25:37 | CHICA BONITAS | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 47 | 2021-10-01 13:41:55 | BUCKS CABARET | 10250 SHADY TRL | CABARET | 500 |
| 48 | 2021-10-06 19:35:21 | BUCKS CABARET | 2340 W NORTHWEST HWY | CABARET | 500 |
| 49 | 2021-10-06 19:35:21 | LA ZONA ROSA | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 50 | 2021-10-06 19:35:21 | LA ZONA ROSA | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 51 | 2021-06-27 5:44:54 | BABY DOLLS TOPLESS SALOON | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 52 | 2021-09-19 13:19:36 | LA ZONA ROSA | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 53 | 2021-09-19 13:19:36 | LA ZONA ROSA | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 54 | 2021-09-19 13:19:36 | LA ZONA ROSA | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 55 | 2021-09-19 13:19:36 | LA ZONA ROSA | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 56 | 2021-09-19 13:19:36 | LA ZONA ROSA | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 57 | 2021-09-19 13:19:36 | LA ZONA ROSA | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 58 | 2021-01-05 5:50:55 | THE MEN'S CLUB OF DALLAS | 2340 W NORTHWEST HWY | CABARET | 500 |
| 59 | 2021-05-20 15:40:58 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 60 | 2021-05-18 8:56:25 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 61 | 2021-05-18 8:56:25 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 62 | 2021-05-02 15:40:58 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 63 | 2021-05-18 8:56:25 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 64 | 2021-05-18 8:56:25 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 65 | 2021-05-18 8:56:25 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 66 | 2021-01-29 3:23:46 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | ARCADE | 500 |
| 67 | 2021-01-29 9:40:39 | DALLAS CABARET NORTH | 11503 HARRY HINES BLVD | CABARET | 500 |

| OBJECTID | Join_Count | TARGET_FID | IncidentNum | DataSource | IncidentDa | ArrestNum | ArrestDate | Time | Group | ArrestDay | ArBkDate | ArChrgNumB | OffenseCode | ArChargeCd | ChargeDesc | PrimaryArstChg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | | RMS/NIBRS | | | 2020 | 1:50 AM | 10p to 2a | Sunday | | | | NA-99999999-NC77 | No Offense | WARRANT DALLAS PD (IASO) | No |
| 2 | 1 | | | RMS/NIBRS | | | 2020 | 1:50 AM | 10p to 2a | Wednesday | | | | | | FAIL TO ID FUGITIVE INTENT GIVE FALSE INFO | Yes |
| 3 | 1 | | | RMS/NIBRS | | | 2020 | 1:50 AM | 10p to 2a | Sunday | | | | | | PUBLIC LEWDNESS | Yes |
| 4 | 1 | | | RMS/NIBRS | | | 2020 | 1:50 AM | 10p to 2a | Saturday | | | | | | WARRANT DALLAS PD (IASO/CAPIAS) | No |
| 5 | 1 | | | RMS/NIBRS | | | 2020 | 1:00 AM | 10p to 2a | Wednesday | | | | | | POSS MARIJUANA <2OZ | No |
| 6 | 1 | | | RMS/NIBRS | | | 2020 | 1:00 AM | 10p to 2a | Wednesday | | | | | | PUBLIC INTOXICATION | Yes |
| 7 | 1 | | | RMS/NIBRS | | | 2020 | 1:00 AM | 10p to 2a | Friday | | | | | | MAN DEL CONT SUB PEN GRP 1 <1G | Yes |
| 8 | 1 | | | RMS/NIBRS | | | 2020 | 1:00 AM | 10p to 2a | Sunday | | | | | | PUBLIC INTOXICATION | Yes |
| 9 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Tuesday | | | | | | ARFOWW (SOCIAL SERVICES REFERRAL) | Yes |
| 10 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Sunday | | | | | | WARRANT DALLAS PD (IASO/CAPIAS) | No |
| 11 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Sunday | | | | | | POSS CONT SUB PEN GRP 1 <1G | Yes |
| 12 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Saturday | | | | | | WARRANT DALLAS PD (IASO) | No |
| 13 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Sunday | | | | | | WARRANT HOLD (NOT A DPD WARRANT) | No |
| 14 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Sunday | | | | | | TRAFFIC VIOLATION - NON HAZARDOUS | No |
| 15 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Wednesday | | | | | | MAN DEL CONT SUB PEN GRP 1 <1G | Yes |
| 16 | 1 | | | RMS/NIBRS | | | 2020 | 1:00 AM | 10p to 2a | Friday | | | | | | TRAFFIC VIOLATION - NON HAZARDOUS | No |
| 17 | 1 | | | RMS/NIBRS | | | 2020 | 1:20 AM | 10p to 2a | Sunday | | | | | | PUBLIC INTOXICATION | Yes |
| 18 | 1 | | | RMS/NIBRS | | | 2020 | 1:20 AM | 10p to 2a | Wednesday | | | | | | WARRANT DALLAS PD (IASO/CAPIAS) | No |
| 19 | 1 | | | RMS/NIBRS | | | 2020 | 1:20 AM | 10p to 2a | Sunday | | | | | | WARRANT DALLAS PD (IASO) | No |
| 20 | 1 | | | RMS/NIBRS | | | 2020 | 1:10 AM | 10p to 2a | Saturday | | | | | | POSS CONT SUB PEN GRP 1 <1G | Yes |
| 21 | 1 | | | RMS/NIBRS | | | 2020 | 1:11 AM | 10p to 2a | Thursday | | | | | | PUBLIC INTOXICATION | Yes |
| 22 | 1 | | | RMS/NIBRS | | | 2020 | 1:11 AM | 10p to 2a | Friday | | | | | | EVADING ARREST DETENTION | Yes |
| 23 | 1 | | | RMS/NIBRS | | | 2020 | 1:33 AM | 10p to 2a | Friday | | | | | | ARFOWW (SOCIAL SERVICES REFERRAL) | Yes |
| 24 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Saturday | | | | | | DWI INTOXICATION | Yes |
| 25 | 1 | | | RMS/NIBRS | | | 2020 | 1:36 AM | 10p to 2a | Sunday | | | | | | OPEN CONTAINER | Yes |
| 26 | 1 | | | RMS/NIBRS | | | 2020 | 1:40 AM | 10p to 2a | Wednesday | | | | | | TRAFFIC VIOLATION - NON HAZARDOUS | No |
| 27 | 1 | | | RMS/NIBRS | | | 2020 | 1:40 AM | 10p to 2a | Saturday | | | | | | PROSTITUTION (BUYER) | Yes |
| 28 | 1 | | | RMS/NIBRS | | | 2020 | 1:16 AM | 10p to 2a | Sunday | | | | | | UNLAWFUL CARRYING WEAPON | Yes |
| 29 | 1 | | | RMS/NIBRS | | | 2020 | 1:30 AM | 10p to 2a | Friday | | | | | | ASSAULT 4-FAM VIOL OFFENDER CONTACT PC 22.01(A)(3) | Yes |
| 30 | 1 | | | RMS/NIBRS | | | 2020 | 1:45 AM | 10p to 2a | Wednesday | | | | | | ASSAULT CAUSES BODILY INJURY | Yes |
| 31 | 1 | | | RMS/NIBRS | | | 2020 | 1:45 AM | 10p to 2a | Saturday | | | | | | ASSAULT FAMILY/MEMBER IMPEDE BREATH/CIRCULATION | Yes |
| 32 | 1 | | | RMS/NIBRS | | | 2020 | 1:45 AM | 10p to 2a | Monday | | | | | | ASSAULT PUB SERV (PEACE OFFICER/JUDGE) | Yes |
| 33 | 1 | | | RMS/NIBRS | | | 2020 | 1:33 AM | 10p to 2a | Thursday | | | | | | INTERFERE W/ PUBLIC DUTIES | Yes |
| 34 | 1 | | | RMS/NIBRS | | | 2020 | 1:50 AM | 10p to 2a | Saturday | | | | | | PUBLIC INTOXICATION | Yes |
| 35 | 1 | | | RMS/NIBRS | | | 2020 | 1:50 AM | 10p to 2a | Thursday | | | | | | DWI W/ RECKLESS DRIVING | Yes |
| 36 | 1 | | | RMS/NIBRS | | | 2020 | 1:54 AM | 10p to 2a | Saturday | | | | | | TRAFFIC VIOLATION - NON HAZARDOUS | No |
| 37 | 1 | | | RMS/NIBRS | | | 2020 | 1:40 AM | 10p to 2a | Thursday | | | | | | THEFT OF PROP <$2,500 2+PREV CONV (HOT SHOPLIFT) PC31.03 (46D) | Yes |
| 38 | 1 | | | RMS/NIBRS | | | 2020 | 1:41 AM | 10p to 2a | Thursday | | | | | | WARRANT HOLD (NOT A DPD WARRANT) | No |
| 39 | 1 | | | RMS/NIBRS | | | 2020 | 1:45 AM | 10p to 2a | Sunday | | | | | | ASSAULT FAM/HAS NO DEADLY WEAPON-NO SBI | Yes |
| 40 | 1 | | | RMS/NIBRS | | | 2020 | 1:00 AM | 10p to 2a | Wednesday | | | | | | ARFOWW (SOCIAL SERVICES REFERRAL) | Yes |
| 41 | 1 | | | RMS/NIBRS | | | 2020 | 1:24 AM | 10p to 2a | Wednesday | | | | | | ARFOWW (SOCIAL SERVICES REFERRAL) | Yes |
| 42 | 1 | | | RMS/NIBRS | | | 2020 | 1:24 AM | 10p to 2a | Monday | | | | | | ARFOWW (SOCIAL SERVICES REFERRAL) | Yes |
| 43 | 1 | | | RMS/NIBRS | | | 2020 | 1:22 AM | 10p to 2a | Friday | | | | | | PUBLIC INTOXICATION | Yes |
| 44 | 1 | | | RMS/NIBRS | | | 2020 | 1:34 AM | 10p to 2a | Saturday | | | | | | ARFOWW (SOCIAL SERVICES REFERRAL) | Yes |
| 45 | 1 | | | RMS/NIBRS | | | 2020 | 1:57 AM | 10p to 2a | Tuesday | | | | | | TRAFFIC VIOLATION - NON HAZARDOUS | No |
| 46 | 1 | | | RMS/NIBRS | | | 2020 | 1:47 AM | 10p to 2a | Friday | | | | | | DWI 2ND | Yes |
| 47 | 1 | | | RMS/NIBRS | | | 2020 | 1:56 AM | 10p to 2a | Friday | | | | | | WARRANT HOLD (NOT A DPD WARRANT) | No |
| 48 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Saturday | | | | | | WARRANT HOLD (NOT A DPD WARRANT) | No |
| 49 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Sunday | | | | | | WARRANT DALLAS PD (IASO) | No |
| 50 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Monday | | | | | | ASSAULT CAUSES BODILY INJURY FAMILY VIOLENCE | Yes |
| 51 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Wednesday | | | | | | ROBBERY | Yes |
| 52 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Thursday | | | | | | WARRANT DALLAS PD (IASO/CAPIAS) | No |
| 53 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Friday | | | | | | INTERFERE W/ PUBLIC DUTIES | Yes |
| 54 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Thursday | | | | | | MAN DEL CONT SUB PEN GRP 1 <1G | Yes |
| 55 | 1 | | | RMS/NIBRS | | | 2020 | 2:00 AM | 2a to 6a | Wednesday | | | | | | PUBLIC INTOXICATION | Yes |
| 56 | 1 | | | RMS/NIBRS | | | 2020 | 2:09 AM | 2a to 6a | Friday | | | | | | MAN DEL CONT SUB PEN GRP 1 <1G EQUAL 4G<200G | Yes |
| 57 | 1 | | | RMS/NIBRS | | | 2020 | 2:08 AM | 2a to 6a | Friday | | | | | | PUBLIC INTOXICATION | Yes |
| 58 | 1 | | | RMS/NIBRS | | | 2020 | 2:06 AM | 2a to 6a | Friday | | | | | | MAN DEL CONT SUB PEN GRP 1 <1G | Yes |
| 59 | 1 | | | RMS/NIBRS | | | 2020 | 2:04 AM | 2a to 6a | Wednesday | | | | | | WARRANT DALLAS PD (IASO/CAPIAS) | No |
| 60 | 1 | | | RMS/NIBRS | | | 2020 | 2:03 AM | 2a to 6a | Monday | | | | | | PUBLIC INTOXICATION | Yes |
| 61 | 1 | | | RMS/NIBRS | | | 2020 | 2:03 AM | 2a to 6a | Wednesday | | | | | | WARRANT HOLD (NOT A DPD WARRANT) | No |
| 62 | 1 | | | RMS/NIBRS | | | 2020 | 2:03 AM | 2a to 6a | Thursday | | | | | | PUBLIC INTOXICATION | Yes |
| 63 | 1 | | | RMS/NIBRS | | | 2020 | 2:11 AM | 2a to 6a | Friday | | | | | | PUBLIC INTOXICATION | Yes |
| 64 | 1 | | | RMS/NIBRS | | | 2020 | 2:15 AM | 2a to 6a | Saturday | | | | | | WARRANT DALLAS PD (IASO) | No |
| 65 | 1 | | | RMS/NIBRS | | | 2020 | 2:15 AM | 2a to 6a | Monday | | | | | | PUBLIC INTOXICATION | Yes |
| 66 | 1 | | | RMS/NIBRS | | | 2020 | 2:15 AM | 2a to 6a | Saturday | | | | | | WARRANT DALLAS PD (OTHERS) | No |
| 67 | 1 | | | RMS/NIBRS | | | 2020 | 2:15 AM | 2a to 6a | Saturday | | | | | | PUBLIC INTOXICATION | Yes |

| S | T | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK | AL | AM | AN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UCRArrestChg | Severity | PClass | UCR | UCRWord | UCROffense | Statute | CDS | ArrOff_Type UCR_ArChg | HoldType | BailOrJailAmt | ReleaseType | WarrantNum | WarrantType | WarrantIssuedAgency | WarrantIssuedDate | ChangeDate | StaffOfficeReviewDate | JailID | OFCR_RPT Written_By_Date | |

| # | AO OFCR_Approved_By_Date | AP OFCR_Received_By_Date | AQ Apprehended_Date | AR Final_Disp | AS Final_Disp_Date | AT Ad Premise | AU Arrest/Action | AV DispCode | AW NIBRS_Group | AX NIBRS_Crime_Category |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2020-05-10 15:04:09 | 2020-05-10 5:07:00 | | Accepted | 2020-05-10 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | C | PUBLIC INTOXICATION |
| 2 | 2020-05-18 14:15:35 | 2020-05-18 4:19:00 | | Accepted | 2020-05-18 0:00:00 | | Arrested - CDC | | C | FRAUD OFFENSES |
| 3 | 2020-05-08 14:45:34 | 2020-05-08 4:22:00 | 2020-05-08 1:00:00 | Accepted | 2020-05-08 0:00:00 | Commercial Property Occupied/Vacant | Arrested - Lew Sterrett | | C | DISORDERLY CONDUCT |
| 4 | 2020-05-18 14:15:35 | 2020-05-18 4:15:00 | | Accepted | 2020-05-18 0:00:00 | | Arrested - Lew Sterrett | | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 5 | 2020-05-08 14:18:00 | 2020-05-08 4:18:00 | | Accepted | 2020-05-08 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 6 | 2020-06-05 13:54:54 | 2020-06-06 0:00:00 | | Accepted | 2020-06-06 0:00:00 | Outdoor Area Public/Private | Arrested - Released To Hospital (APOWW) | H | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 7 | 2020-07-26 11:05:38 | | | Accepted | 2020-07-26 0:00:00 | | Arrested - CDC | | C | PUBLIC INTOXICATION |
| 8 | 2020-03-30 13:00:00 | 2020-03-30 3:00:00 | | Accepted | 2020-03-30 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | C | DRUG NARCOTIC VIOLATIONS |
| 9 | 2020-05-30 8:08:30 | 2020-05-29 8:13:00 | | Accepted | 2020-05-29 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | C | DRUG NARCOTIC VIOLATIONS |
| 10 | 2020-05-29 8:08:30 | 2020-05-29 8:13:00 | | Accepted | 2020-05-29 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 11 | 2020-05-29 8:08:30 | 2020-05-29 8:13:00 | | Accepted | 2020-05-29 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | TRAFFIC VIOLATION - NON HAZARDOUS |
| 12 | 2020-09-12 23:50:29 | 2020-09-13 0:00:00 | | Accepted | 2020-09-12 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | TRAFFIC VIOLATION - NON HAZARDOUS |
| 13 | 2020-12-27 5:14:48 | 2020-12-27 5:30:00 | 2020-12-27 1:00:00 | Accepted | 2020-12-27 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 14 | 2020-12-27 5:14:48 | 2020-12-27 5:30:00 | 2020-12-27 1:00:00 | Accepted | 2020-12-27 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 15 | 2020-12-27 5:14:48 | 2020-12-27 5:30:00 | 2020-12-27 1:00:00 | Accepted | 2020-12-27 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 16 | 2020-12-27 5:14:48 | 2020-12-27 5:30:00 | 2020-12-27 1:00:00 | Accepted | 2020-12-27 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 17 | 2020-12-27 5:14:48 | 2020-12-27 5:30:00 | 2020-12-27 1:00:00 | Accepted | 2020-12-27 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 18 | 2020-06-08 3:24:10 | 2020-06-08 4:26:00 | | Accepted | 2020-06-06 0:00:00 | Apartment Residence | Arrested - CDC | H | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 19 | 2020-08-05 5:36:56 | 2020-08-06 6:13:00 | | Accepted | 2020-08-06 0:00:00 | Apartment Residence | Arrested - CDC | H | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 20 | 2020-09-05 6:33:59 | | | Accepted | 2020-09-05 16:00:00 | Bar/NightClub/Dancehall ETC | Arrested - CDC | | C | PUBLIC INTOXICATION |
| 21 | 2020-10-23 2:00:33 | 2020-10-23 2:21:00 | | Accepted | 2020-10-23 0:00:00 | Bar/NightClub/Dancehall ETC | Arrested - Lew Sterrett | | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 22 | 2020-10-23 2:00:33 | 2020-10-23 2:00:00 | | Accepted | 2020-10-23 0:00:00 | Bar/NightClub/Dancehall ETC | Arrested - Released To Hospital (APOWW) | B | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 23 | 2020-09-18 3:39:19 | 2020-09-18 3:00:00 | | Accepted | 2020-09-18 0:00:00 | Restaurant/Food Service/TABC Location | Arrested - Lew Sterrett | | C | ALL OTHER OFFENSES |
| 24 | 2020-06-02 3:27:27 | 2020-06-01 0:00:00 | | Accepted | 2020-06-01 0:00:00 | Restaurant/Food Service/TABC Location | Arrested - Lew Sterrett | | C | ALL OTHER OFFENSES |
| 25 | 2020-11-19 22:07 | 2020-11-20 0:00:00 | | Accepted | 2020-11-19 0:00:00 | | Arrested - Released To Hospital (APOWW) | B | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 26 | 2020-05-03 5:36:17 | 2020-05-03 5:00:00 | | Accepted | 2020-05-16 0:00:00 | Outdoor Area Public/Private | Arrested - Lew Sterrett | | A | PROSTITUTION OFFENSES |
| 27 | 2020-10-16 3:18:05 | 2020-10-16 3:44:00 | | Accepted | 2020-10-16 0:00:00 | Outdoor Area Public/Private | Arrested - Lew Sterrett | | A | ASSAULT OFFENSES |
| 28 | 2020-10-16 3:18:02 | 2020-10-03 5:56:00 | | Accepted | 2020-12-28 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 29 | 2020-10-10 2:35:25 | 2020-10-10 2:37:00 | 2020-12-28 13:00:00 | Accepted | 2020-10-10 0:00:00 | Highway, Street, Alley ETC | Arrested - Released To Hospital (APOWW) | B | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 30 | 2020-10-03 5:36:17 | 2020-10-03 5:56:00 | | Accepted | 2020-10-16 0:00:00 | Restaurant/Food Service/TABC Location | Arrested - Lew Sterrett | | A | ASSAULT OFFENSES |
| 31 | 2020-09-07 5:22:28 | 2020-09-07 6:04:00 | | Accepted | 2020-10-17 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | ALL OTHER OFFENSES |
| 32 | 2020-10-10 2:35:25 | 2020-10-22 2:37:00 | | Accepted | 2020-10-10 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | PUBLIC INTOXICATION |
| 33 | 2020-07-09 4:42:38 | 2020-07-09 6:04:00 | | Accepted | 2020-07-09 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | A | DRIVING UNDER THE INFLUENCE |
| 34 | 2020-02-23 8:32:07 | 2020-02-23 8:00:00 | | Accepted | 2020-02-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | TRAFFIC VIOLATION - NON HAZARDOUS |
| 35 | 2020-08-22 8:59:00 | 2020-08-22 8:59:00 | | Accepted | 2020-08-06 0:00:00 | Highway, Street, Alley ETC | Arrested - Released To Hospital (APOWW) | B | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 36 | 2020-02-12 2:57:24 | 2020-02-12 2:58:00 | | Accepted | 2020-12-00 0:00:00 | Bar/NightClub/Dancehall ETC | Arrested - Lew Sterrett | | C | LARCENY THEFT OFFENSES |
| 37 | 2020-05-18 3:29:33 | 2020-05-18 3:36:00 | 2020-05-18 14:00:00 | Accepted | 2020-05-17 0:00:00 | Bar/NightClub/Dancehall ETC | Arrested - Lew Sterrett | | C | PUBLIC INTOXICATION |
| 38 | 2020-12-26 3:19:03 | 2020-12-26 3:00:00 | | Accepted | 2020-12-26 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 39 | 2020-11-24 4:24:57 | 2020-11-24 4:29:00 | | Accepted | 2020-11-29 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | A | ASSAULT OFFENSES |
| 40 | 2020-11-24 4:24:57 | 2020-11-24 4:29:00 | | Accepted | 2020-11-29 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 41 | 2020-12-09 15:49:51 | 2020-12-09 0:00:00 | | Accepted | 2020-12-09 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | | C | ALL OTHER OFFENSES |
| 42 | 2020-11-29 3:11:14 | 2020-12-23 4:24:57 | 2020-12-09 19:00:00 | Accepted | 2020-11-29 0:00:00 | Bar/NightClub/Dancehall ETC | Arrested - Lew Sterrett | | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 43 | 2020-10-22 2:15:47 | 2020-10-22 2:56:00 | | Accepted | 2020-10-22 0:00:00 | Bar/NightClub/Dancehall ETC | Arrested - Released To Hospital (APOWW) | H | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 44 | 2020-11-14 2:52:10 | 2020-11-14 2:55:00 | | Accepted | 2020-11-14 0:00:00 | Other | Arrested - Released To Hospital (APOWW) | H | B | APOWW (SOCIAL SERVICES REFERRAL) |
| 45 | 2020-06-28 3:24:49 | 2020-06-28 8:00:00 | | Accepted | 2020-03-14 0:00:00 | Parking Lot (All Other) | Arrested - Lew Sterrett | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 46 | 2020-06-05 3:30:23 | 2020-02-23 3:53:00 | | Accepted | 2020-02-02 0:00:00 | | Arrested - Lew Sterrett | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 47 | 2020-07-31 18:57:19 | | | Accepted | 2020-11-05 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | PUBLIC INTOXICATION |
| 48 | 2020-12-13 3:44:22 | 2020-12-13 0:00:00 | | Accepted | 2020-12-13 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 49 | 2020-12-13 3:11:14 | 2020-12-13 0:00:00 | | Accepted | 2020-01-29 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 50 | 2020-11-20 3:44:16 | 2020-12-28 3:00:00 | | Accepted | 2020-12-28 0:00:00 | Apartment Complex/Building | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 51 | 2020-11-20 3:46:00 | 2020-11-20 3:49:00 | | Accepted | 2020-01-29 0:00:00 | Bar/NightClub/Dancehall ETC | Arrested - Lew Sterrett | | C | PUBLIC INTOXICATION |
| 52 | 2020-11-29 3:11:14 | 2020-11-29 0:00:00 | | Accepted | 2020-11-13 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | H | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 53 | 2020-11-06 3:28:54 | 2020-11-06 3:00:00 | | Accepted | 2020-11-06 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 54 | 2020-12-23 5:49:28 | 2020-12-23 5:52:00 | | Accepted | 2020-12-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WEAPON LAW VIOLATIONS |
| 55 | 2020-12-23 5:49:26 | 2020-12-23 5:52:00 | | Accepted | 2020-12-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 56 | 2020-12-23 5:49:26 | 2020-12-23 5:52:00 | | Accepted | 2020-12-23 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | PUBLIC INTOXICATION |
| 57 | 2020-12-23 5:09:36 | 2020-12-23 5:00:00 | | Accepted | 2020-11-06 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 58 | 2020-12-17 16:48:09 | 2020-12-17 16:58:00 | 2020-12-17 14:00:00 | Accepted | 2020-12-17 0:00:00 | | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 59 | 2020-12-17 16:48:09 | 2020-12-17 16:58:00 | 2020-12-17 14:09:00 | Accepted | 2020-12-17 0:00:00 | Other | Arrested - Lew Sterrett | | C | WARRANT HOLD (NOT A DPD WARRANT) |
| 60 | 2020-12-17 16:48:20 | 2020-12-17 16:58:00 | 2020-12-17 14:09:00 | Accepted | 2020-12-17 0:00:00 | | Arrested - Lew Sterrett | | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 61 | 2020-09-30 3:45:01 | 2020-08-02 14:30:00 | | Accepted | 2020-08-06 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | DRUG NARCOTIC VIOLATIONS |
| 62 | 2020-09-30 7:25:19 | 2020-09-02 7:00:00 | | Accepted | 2020-09-19 0:00:00 | | Arrested - Lew Sterrett | | C | PUBLIC INTOXICATION |
| 63 | 2020-06-05 3:30:23 | 2020-06-05 3:43:00 | | Accepted | 2020-06-05 0:00:00 | Highway, Street, Alley ETC | Arrested - Lew Sterrett | | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 64 | 2020-05-06 3:54:14 | 2020-05-06 3:00:00 | | Accepted | 2020-08-08 0:00:00 | Restaurant/Food Service/TABC Location | Arrested - CDC | | C | PUBLIC INTOXICATION |
| 65 | 2020-02-23 4:18:09 | 2020-02-23 4:57:00 | | Accepted | 2020-01-04 0:00:00 | Restaurant/Food Service/TABC Location | Arrested - CDC | | C | DRUG NARCOTIC VIOLATIONS |
| 66 | 2020-02-23 4:18:09 | 2020-02-23 4:57:00 | | Accepted | 2020-01-04 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | B | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |
| 67 | 2020-02-23 4:18:09 | 2020-02-23 4:57:00 | | Accepted | 2020-03-23 0:00:00 | Highway, Street, Alley ETC | Arrested - CDC | B | C | WARRANT DALLAS PD (ALIAS/CAPIAS) |

| # | AV | NIBRS_Crime_CompStat | NIBRS_CrimeAgainst | NIBRS_Code | NIBRS_Group_CrimeAgainst | NIBRS_Code | NIBRS_Type | CFS_Number | Name |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | WARRANT DALLAS PD (ALIAS) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-0158770 | CASTELLANOS, EDUARDO |
| 2 | | WARRANT DALLAS PD (ALIAS) | SOCIETY | 999 | PROPERTY | 26A | Not Coded | 20-0266649 | BENTON, ANTHONY |
| 3 | | FRAUD OFFENSES | PROPERTY | 26A | PROPERTY | 90C | Not Coded | 20-0343435 | MITCHELL, MORITA, GAY |
| 4 | | FALSE PRETENSES/ SWINDLE/ CONFIDENCE GAME | SOCIETY | 90C | SOCIETY | 999 | Coded | 20-0058680 | BENTON, TIMOTHY |
| 5 | | DISORDERLY CONDUCT | SOCIETY | 90C | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-0058680 | BENTON, TIMOTHY |
| 6 | | WARRANT DALLAS PD (ALIAS/CAPIAS) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 35A | Not Coded | 20-0244970 | BENTON, TIMOTHY |
| 7 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-0314489 | HILL, SAMUEL |
| 8 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | SOCIETY | 999 | Not Coded | 20-0314489 | OCHOA, JESSE |
| 9 | | PUBLIC INTOXICATION | PERSON, PROPERTY, OR SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | 90E | Coded | 20-3153484 | CATES, TYSON |
| 10 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-0716985 | HEBERT, JOHN |
| 11 | | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 35A | Not Coded | 20-3154795 | MICHAEL, LEE |
| 12 | | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | SOCIETY | 999 | Not Coded | 20-3154795 | OSMANOVIC, SENAD |
| 13 | | WARRANT DALLAS PD (ALIAS/CAPIAS) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-3337739 | OSMANOVIC, SENAD |
| 14 | | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-3337739 | MITCHELL, MICHAEL, LEE |
| 15 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-3337739 | MITCHELL, MICHAEL, LEE |
| 16 | | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-3337739 | MITCHELL, MICHAEL, LEE |
| 17 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-3337739 | MITCHELL, MICHAEL, LEE |
| 18 | | DRUG/ NARCOTIC VIOLATIONS - HAZARDOUS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-3337739 | MITCHELL, MICHAEL, LEE |
| 19 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-1654795 | JEFFERSON, DERRICK, DEWAINE |
| 20 | | WARRANT DALLAS PD (ALIAS/CAPIAS) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-1412121 | JEFFERSON, DERRICK, DEWAINE |
| 21 | | SIMPLE ASSAULT | PERSON | 13B | PERSON | 13B | Coded | 20-1412121 | JEFFERSON, DERRICK, DEWAINE |
| 22 | | PUBLIC INTOXICATION | SOCIETY | 90E | SOCIETY | 90E | Coded | 20-0020810 | PERKINS, ELMER |
| 23 | | PUBLIC INTOXICATION | PERSON, PROPERTY, OR SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | 90E | Coded | 20-3376151 | PIERCE, ERIC |
| 24 | | ALL OTHER OFFENSES | SOCIETY | 90Z | SOCIETY | 90Z | Coded | 20-0995279 | DUVAL, KRYSTAL, EDOUARD |
| 25 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-3376151 | CROSS, CLARK, JAY |
| 26 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-1412121 | BAYTE, DAYVION, Q |
| 27 | | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | 520 | Coded | 20-3792521 | BENTON, TIMOTHY |
| 28 | | PUBLIC INTOXICATION | SOCIETY | 90E | SOCIETY | 90E | Coded | 20-3792521 | BAYTE, DAYVION, Q |
| 29 | | PURCHASING PROSTITUTION | SOCIETY | 40C | SOCIETY | 40C | Coded | 20-2175790 | WEAVER, GENO |
| 30 | | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-3185923 | MENDEZ-ARAMBULA, JUAN, MANUEL |
| 31 | | AGG ASSAULT - FV | PERSON | 13A | PERSON | 13A | Coded | 20-2175790 | BLOUNT, PAUL, ANTHONY |
| 32 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-0842541 | BRINKLEY, NATHAN, LEE |
| 33 | | PUBLIC INTOXICATION | SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | 90E | Coded | 20-0842541 | BRINKLEY, NATHAN, LEE |
| 34 | | DUI | SOCIETY | 90D | SOCIETY | 90D | Coded | 20-0842541 | PENA, JOSEPH, BERTIL |
| 35 | | SIMPLE ASSAULT | PERSON | 13B | PERSON | 13B | Coded | 20-3092366 | SILVA, ALEJANDRO |
| 36 | | TRAFFIC VIOLATION - NON HAZARDOUS | SOCIETY | 23H | SOCIETY | 23H | Coded | 20-0496054 | ARJONA, RICHARD |
| 37 | | OTHER THEFT | PROPERTY | 23H | PROPERTY | 23H | Coded | 20-0496054 | THOMPSON, BRIANNE |
| 38 | | PUBLIC INTOXICATION | SOCIETY | 90E | SOCIETY | 90E | Coded | 20-0039042 | MUNIR, RYAN, ALEXANDER |
| 39 | | AGG ASSAULT - FV | PERSON | 13A | PERSON | 13A | Coded | 20-0039042 | SALAZAR-SOLETO, LOUIS |
| 40 | | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-2277495 | IZABRAS, MELISSA, ESPARZA |
| 41 | | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-2277495 | ASH, SAMUEL |
| 42 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-0340906 | HUNTER, LUMARK, DESHAWN |
| 43 | | SIMPLE ASSAULT | PERSON | 13B | PERSON | 13B | Coded | 20-3132838 | HUNTER, LUMARK, DESHAWN |
| 44 | | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | 999 | Coded | 20-3132838 | HUNTER, LUMARK, DESHAWN |
| 45 | | PUBLIC INTOXICATION | SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | 90E | Coded | 20-3162230 | MEXITOA-ECHEVEA, JOSE, DAVID |
| 46 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-3162230 | CROCKER, STEPHANIE |
| 47 | | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-3162230 | CARSON, ANTWUAN, LANDRIS |
| 48 | | APOWW (SOCIAL SERVICES REFERRAL) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-2432230 | HUNTER, MARQUIS |
| 49 | | AGG ASSAULT - FV | PERSON | 13A | PERSON | 13A | Coded | 20-2432230 | HUNTER, MARQUIS |
| 50 | | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-2087725 | CARSON, ANTWAUN, LANDRIS |
| 51 | | WARRANT DALLAS PD (AGG ASSAULT - FV) | PERSON, PROPERTY, OR SOCIETY | 13A | PERSON | 13A | Not Coded | 20-3231817 | HUNTER, MARQUIS |
| 52 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | 35A | Coded | 20-2132230 | CROCKETT, STEPHANIE |
| 53 | | WARRANT DALLAS PD (ALIAS/CAPIAS) | SOCIETY | 999 | SOCIETY | 999 | Not Coded | 20-2163110 | CROCKETT, STEPHANIE |
| 54 | | PUBLIC INTOXICATION | SOCIETY | 90E | SOCIETY | 90E | Coded | 20-3192232 | ARJONA, RICHARD |
| 55 | | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | 520 | Coded | 20-3192232 | WEATHERSPOON, DEON, LEE |
| 56 | | WEAPON LAW VIOLATIONS | SOCIETY | 520 | SOCIETY | 520 | Coded | 20-3313831 | WEATHERSPOON, DEON, LEE |
| 57 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | 35A | Coded | 20-3313831 | WEATHERSPOON, DEON, LEE |
| 58 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | 35A | Coded | 20-2277495 | ROSAS-CRUZ, CIPRIANO |
| 59 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | 35A | Coded | 20-2277495 | ROSAS-CRUZ, CIPRIANO |
| 60 | | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-1438406 | ROSAS, ELGRA, DELPHAIR |
| 61 | | WARRANT HOLD (NOT A DPD WARRANT) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-1500000 | HERNANDEZ, RUBEIS, M |
| 62 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | 35A | Coded | 20-1500000 | LOPEZ, RICARDO, MAURICIO |
| 63 | | PUBLIC INTOXICATION | SOCIETY | 90E | SOCIETY | 90E | Coded | 20-0012246 | STARR-EWART, CHESS, DAWN |
| 64 | | DRUG/ NARCOTIC VIOLATIONS | SOCIETY | 35A | SOCIETY | 35A | Coded | 20-0012246 | STARR-EWART, CHESS, DAWN |
| 65 | | PUBLIC INTOXICATION | SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | 90E | Coded | 20-0012246 | STARR-EWART, CHESS, DAWN |
| 66 | | WARRANT DALLAS PD (CAPIAS) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 999 | Not Coded | 20-0491940 | REYNOLDS, TESSA, LEE |
| 67 | | WARRANT DALLAS PD (OTHERS) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | 902 | Not Coded | | |

COD_005832

| # | NickName (BI) | AliasName | BirthPlace (BK) | Height | Weight | Hair | Eye | Race | Ethnicity | Sex | DrLic_St | HLAddress | HLApt | HLZip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | HONDURAS | 5-06 | 130 | Other | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | | 619 KNOTTWOOD DR | | 75232 |
| 2 | | | | 5-07 | 190 | Black | Blue | Black | Non-Hispanic or Latino | Male | TX | 7720 MCCALLUM BLVD | 1058 | 75248 |
| 3 | | | | 5-07 | 135 | Blonde | Blue | White | Non-Hispanic or Latino | Female | TX | 251 COUNTRY RD 4338 | | 76078 |
| 4 | | | FT WORTH | 5-10 | 190 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 7720 MCCALLUM BLVD | 1058 | 75248 |
| 5 | | | | 5-08 | 172 | Black | Brown | Black | Non-Hispanic or Latino | Male | | 7720 MCCALLUM BLVD | 1058 | 75248 |
| 6 | | | | 5-05 | 190 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 7 | NATASHA | | | 6-1 | 140 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 8 | | | FREEPORT | 5-10 | N/A | Brown | Brown | Black | Non-Hispanic or Latino | Male | | 2422 WALNUT HILL LN | 120 | 75229 |
| 9 | | | FREEPORT | 6-0 | 190 | Brown | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 10 | | | BOSNIA | 5-10 | 165 | Brown | Brown | White | Non-Hispanic or Latino | Male | | 3130 KINGSBRIDGE ST | 31 | 75212 |
| 11 | | | BOSNIA | 5-10 | 165 | Black | White | White | Non-Hispanic or Latino | Male | TX | 3130 KINGSBRIDGE ST | 31 | 75212 |
| 12 | | | | 5-06 | 170 | Black | Brown | White | Non-Hispanic or Latino | Male | | 3130 KINGSBRIDGE ST | | 75212 |
| 13 | | | | 5-10 | 290 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 14 | | | DALLAS | 5-10 | 290 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 10658 OAK GATE LN | 1058 | 75217 |
| 15 | | | DALLAS | 5-10 | 230 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 10658 OAK GATE LN | | 75217 |
| 16 | | | DALLAS | 5-10 | 230 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 10658 OAK GATE LN | | 75217 |
| 17 | | | DALLAS | 5-10 | 230 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 10658 OAK GATE LN | | 75217 |
| 18 | | | DALLAS | 5-08 | 140 | Brown | Black | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75148 |
| 19 | | | DALLAS, TX | 6-02 | 250 | Brown | Brown | Black | Non-Hispanic or Latino | Male | TX | 1546 HANCOCK DR | | 75149 |
| 20 | | | DALLAS | 6-02 | 250 | Brown | Brown | Black | Non-Hispanic or Latino | Male | TX | 613 MOONLIGHT DR | | 75040 |
| 21 | | | DALLAS, TX | 5-4 | 165 | Brown | Brown | Black | Non-Hispanic or Latino | Male | TX | 613 MOONLIGHT DR | | 75040 |
| 22 | | | DALLAS | 5-4 | 165 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1323 S MONTE CARLO ST | | 75051 |
| 23 | | | | 6-0 | 200 | Brown | Brown | White | Non-Hispanic or Latino | Male | TX | 1323 S MONTE CARLO ST | | 75224 |
| 24 | | | | 5-09 | 180 | Brown | Brown | White | Non-Hispanic or Latino | Male | TX | 1013 SE 4TH ST | | 75201 |
| 25 | | | DALLAS, TX | 6-2 | 180 | Brown | Unknown | White | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75081 |
| 26 | | | MEXICO | 5-7 | 215 | Brown | Hazel | Hispanic or Latino | Non-Hispanic or Latino | Male | MS | 2939 BAY OAKS DR | 69 | 75219 |
| 27 | | | DALLAS, TX | 5-11 | 215 | Brown | Brown | White | Non-Hispanic or Latino | Male | TX | 2939 BAY OAKS DR | | 75219 |
| 28 | | | DALLAS | 6-2 | 230 | Brown | Blue | White | Non-Hispanic or Latino | Male | MS | 1428 MARAC ST | 1424 | 76011 |
| 29 | | | DALLAS | 5-7 | 155 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 701 TRUMAN ST | | 75201 |
| 30 | JUAN MENDEZ | | DALLAS, TX | 6-2 | 195 | Black | Black | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1615 JOHN WEST RD | 1424 | 75228 |
| 31 | | | DALLAS, TX | 5-6 | 155 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1615 JOHN WEST RD | | 75228 |
| 32 | | | DALLAS | 5-10 | 150 | Black | White | Black | Non-Hispanic or Latino | Male | TX | 5855 HARVEST HILL RD | | 75147 |
| 33 | JAMES | | DALLAS | 5-10 | 150 | Brown | Brown | Non-Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1311 UT CR 2604 | | 75230 |
| 34 | | | MX. MEXICO CITY | 5-8 | 160 | Brown | White | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 914 HILLTOP DR | 240 | 75230 |
| 35 | | | | 5-8 | 183 | Brown | Brown | White | Non-Hispanic or Latino | Male | TX | 914 HILLTOP DR | A | 75060 |
| 36 | | | | 5-6 | 240 | Brown | Hazel | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 2939 CARROLL LN | A | 75060 |
| 37 | | | | 5-6 | 165 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Female | TX | 8139 LA FRONTERA | | 76012 |
| 38 | | | DALLAS | 4-11 | 150 | Black | Brown | White | Non-Hispanic or Latino | Female | TX | 1818 CORSICANA ST | | 75239 |
| 39 | ESPARZA | | CALIFORNIA | 6-2 | 190 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 5904 PRESTON VIEW BLVD | 2088 | 75243 |
| 40 | | | DALLAS, TX | 5-7 | 155 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 9240 DALLAS MH ST | | 75243 |
| 41 | | | | 6-2 | 190 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 5904 PRESTON VIEW BLVD | 2088 | 75240 |
| 42 | | | | 5-11 | 205 | Black | Black | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 5833 FORT LARAMIE | | 78239 |
| 43 | | | | 6-2 | 190 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 4440 W AIRPORT FWY | 1220 | 78239 |
| 44 | | | | 5-07 | 225 | Black | Brown | White | Non-Hispanic or Latino | Male | TX | 679 SOUTH ST HWY 121 | | 75062 |
| 45 | | | | 5-11 | 145 | Black | Brown | White | Non-Hispanic or Latino | Male | TX | 1309 PADLEY ST | 240 | 75201 |
| 46 | | | | 5-8 | 183 | Brown | Blue | White | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75230 |
| 47 | | | | 5-01 | 200 | Brown | Blue | White | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 48 | | | | 5-7 | 155 | Brown | Unknown | White | Non-Hispanic or Latino | Female | TX | 10404 CASTLEROCK DR | | 75217 |
| 49 | | | | 5-06 | N/A | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 5124 LAKEHURST ST | 158 | 75227 |
| 50 | | | | 6-05 | 250 | Black | White | White | Non-Hispanic or Latino | Male | TX | 816 CREST RIDGE DR | | 75061 |
| 51 | | | | 5-10 | 200 | Black | Black | Black | Non-Hispanic or Latino | Male | TX | 5621 SPRING VALLEY RD | | 75254 |
| 52 | | | DALLAS | 5-10 | 200 | Brown | Brown | White | Non-Hispanic or Latino | Male | TX | 2041 ELM GROV | | 75254 |
| 53 | | | | 5-07 | 140 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 5621 SPRING VALLEY RD | 158 | 75254 |
| 54 | | | | 5-7 | 180 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75201 |
| 55 | | | | 6-01 | 180 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75228 |
| 56 | | | | 6-02 | 180 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75228 |
| 57 | | | DALLAS, TEXAS | 6-02 | 180 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75228 |
| 58 | | | | 6-02 | 180 | Black | Brown | Black | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75228 |
| 59 | | | | 5-06 | 135 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 1818 CORSICANA ST | | 75009 |
| 60 | | | MEXICO | 5-06 | 170 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 5607 PR 901 | | 75009 |
| 61 | | | MEXICO | 5-11 | 208 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 2441 MARGUERITA DR | | 75040 |
| 62 | | | MEXICO | 5-06 | 170 | Black | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 506 COLGATE DR | | 75134 |
| 63 | | | MEXICO | 5-05 | 158 | Brown | Brown | Hispanic or Latino | Non-Hispanic or Latino | Male | TX | 5607 PR 901 | | 75009 |
| 64 | | | | 5-06 | 170 | Brown | White | White | Non-Hispanic or Latino | Female | TX | 1818 CORSICANA ST | | 75201 |
| 65 | | | | 5-07 | 135 | Black | Blue | White | Non-Hispanic or Latino | Female | TX | 1818 CORSICANA ST | | 75201 |
| 66 | | | | 5-07 | 230 | Brown | Brown | White | Non-Hispanic or Latino | Female | TX | 1818 CORSICANA ST | | 75201 |
| 67 | | | | 5-06 | 150 | Brown | Brown | White | Non-Hispanic or Latino | Female | TX | 1818 CORSICANA ST | | 75201 |

| # | HiCity | HiState | HiCounty | HiBeat | HiBeat | HiDivision | AbertAddress | | | | | ArFaInc | ArFaComments | ArOccupn | ArJobStatus | ArEmployer | DrugRelated | DrugUse | DrugType |
|---|--------|---------|----------|--------|--------|------------|--------------|--|--|--|--|---------|--------------|----------|-------------|------------|-------------|---------|----------|
| 1 | DALLAS | TX | | 1234 | 135 | SOUTHEAST | | | | | | | | | | | No | | |
| 2 | DALLAS | TX | DALLAS | 6209 | 623 | NORTH CENTRAL | | | | | | | | | | | No | | |
| 3 | DALLAS | TX | | | | NORTH CENTRAL | | | | | | | | | | | No | | |
| 4 | HASLET | TX | | | | | | | | | | | | | | | No | | |
| 5 | DALLAS | TX | DALLAS | 6209 | 623 | NORTH CENTRAL | | | | | | | | | | | No | | |
| 6 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 7 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 8 | DALLAS | TX | DALLAS | 3040 | 534 | NORTHWEST | | | | | | | | | | | No | | |
| 9 | DALLAS | TX | | | | | | | | | | | | | | | No | | |
| 10 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 11 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 12 | DALLAS | TX | DALLAS | 4035 | 426 | SOUTHWEST | | | | | | | | | | | No | | |
| 13 | DALLAS | TX | DALLAS | 4035 | 426 | SOUTHWEST | | | | | | | | | | | No | | |
| 14 | DALLAS | TX | DALLAS | 1257 | 327 | SOUTHEAST | | | | | | | | | | | No | | |
| 15 | DALLAS | TX | DALLAS | 1257 | 327 | SOUTHEAST | | | | | | | | | | | No | | |
| 16 | DALLAS | TX | DALLAS | 1257 | 327 | SOUTHEAST | | | | | | | | | | | No | | |
| 17 | DALLAS | TX | DALLAS | 1257 | 327 | SOUTHEAST | | | | | | | | | | | No | | |
| 18 | DALLAS | TX | DALLAS | 1257 | 327 | SOUTHEAST | | | | | | | | | | | No | | |
| 19 | MESQUITE | TX | | | | | | | | | | | | | | | No | | |
| 20 | GARLAND | TX | | | | | | | | | | | | | | | Unknown | | |
| 21 | GARLAND | TX | | | | | | | | | | | | | | | Unknown | | |
| 22 | GRAND PRAIRIE | TX | | | | | | | | | | | | | | | No | | |
| 23 | DALLAS | TX | DALLAS | 4239 | 445 | SOUTHWEST | | | | | | | | | | | No | | |
| 24 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 25 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 26 | RICHARDSON | TX | | | | | | | | | | | | | | | Unknown | | |
| 27 | DALLAS | TX | DALLAS | 1177 | 223 | NORTHEAST | | | | | | | | | | SELF | No | | |
| 28 | DALLAS | TX | DALLAS | 3026 | 535 | NORTHWEST | | | | | | | | | | | Unknown | | |
| 29 | DALLAS | TX | DALLAS | 3026 | 535 | NORTHWEST | | | | | | | | | | | No | | |
| 30 | BEDFORD | TX | | | | | | | | | | | | | | | Unknown | | |
| 31 | ARLINGTON | TX | | | | | | | | | | | | | | | Unknown | | |
| 32 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 33 | MABANK | TX | | | | | | | | | | | | | | | No | | |
| 34 | DALLAS | TX | DALLAS | 1024 | 641 | NORTH CENTRAL | | | | | | | | | | | Unknown | | |
| 35 | IRVING | TX | | | | | | | | | | | | | | | No | | |
| 36 | IRVING | TX | | | | | | | | | | | | | | | No | | |
| 37 | DALLAS | TX | | 3026 | 535 | NORTHWEST | | | | | | | | | | | No | | |
| 38 | ARLINGTON | TX | | | | | | | | | | | | | | | No | | |
| 39 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | UNEMPLOYED | No | | |
| 40 | DALLAS | TX | DALLAS | 1013 | 635 | NORTH CENTRAL | | | | | | | | WAREHOUSE | | UNEMPLOYED | No | | |
| 41 | DALLAS | TX | DALLAS | 1042 | 257 | NORTHEAST | | | | | | | | | | UNEMPLOYED | No | | |
| 42 | DALLAS | TX | DALLAS | 1013 | 635 | NORTH CENTRAL | | | | | | | | WAREHOUSE | | UNEMPLOYED | No | | |
| 43 | DALLAS | TX | DALLAS | 1013 | 635 | NORTH CENTRAL | | | | | | | | | | | No | | |
| 44 | SAN ANTONIO | TX | | | | | | | | | | | | | | | No | | |
| 45 | IRVING | TX | | | | | | | | | | | | | | | No | | |
| 46 | IRVING | TX | | | | | | | | | | | | | | | No | | |
| 47 | LEWISVILLE | TX | | | | | | | | | | | | | | | No | | |
| 48 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 49 | DENTON | TX | | | | | | | | | | | | | | | No | | |
| 50 | DALLAS | TX | DALLAS | 1257 | 327 | SOUTHEAST | | | | | | | | | | | No | | |
| 51 | DALLAS | TX | DALLAS | 1216 | 317 | SOUTHEAST | | | | | | | | | | | Yes | | Powder Cocaine |
| 52 | IRVING | TX | | | | | | | | | | | | | | | No | | |
| 53 | DALLAS | TX | DALLAS | 1009 | 632 | NORTH CENTRAL | | | | | | | | | | | No | | |
| 54 | WYLIE | TX | | | | | | | | | | | | | | | Yes | | Methamphetamine |
| 55 | DALLAS | TX | DALLAS | 1202 | 221 | NORTHEAST | | | | | | | | | | | Yes | | Methamphetamine |
| 56 | DALLAS | TX | DALLAS | 1202 | 221 | NORTHEAST | | | | | | | | | | | No | | |
| 57 | DALLAS | TX | DALLAS | 1202 | 221 | NORTHEAST | | | | | | | | | | | Yes | | Methamphetamine |
| 58 | DALLAS | TX | DALLAS | 1202 | 221 | NORTHEAST | | | | | | | | | | | Yes | | Methamphetamine |
| 59 | CELINA | TX | | | | | | | | | | | | | | | No | | |
| 60 | CELINA | TX | | | | | | | | | | | | | | | No | | |
| 61 | CELINA | TX | | | | | | | | | | | | | | | No | | |
| 62 | CELINA | TX | | | | | | | | | | | | | | | No | | |
| 63 | GARLAND | TX | | | | | | | | | | | | | | | No | | |
| 64 | LANCASTER | TX | | | | | | | | | | | | | | | No | | |
| 65 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 66 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |
| 67 | DALLAS | TX | DALLAS | 2088 | 135 | CENTRAL | | | | | | | | | | | No | | |

COD_005852

| # | AcCatalogWorn | CV | Exp. | AcAddress | CX | CY | CZ | DA | DB | DC | DD Division | DE Sector | DF District | DG New District | DH TAAG Name | Community | DJ VCOP Area | DK Global Point | DL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BLACK SHIRT, RED SHIRT WITH JEANS | | | | 11500 REEDER RD | DALLAS | TX | 75235 | | | NORTHWEST | 550 | 2 | D2 | NWHwy Walton/Walker | | | 2460812.43 | 83171 |
| 2 | BLACK JACKET, RED PANTS, BLACK SHOES | | | | 1616 W MOCKINGBIRD LN | DALLAS | TX | 75235 | 3100 | 534 | NORTHWEST | 530 | 6 | D6 | | | | 2473105.476 | 93938 |
| 3 | POLO SHIRT, BROWN PANTS, BLACK SLIDES | | | | 1616 W MOCKINGBIRD LN | DALLAS | TX | 75247 | 3100 | 534 | NORTHWEST | 530 | 6 | D6 | | | | 2473105.476 | 55955 |
| 4 | ALLIGATOR SKIN PATTERN STRETCH PANTS | | | | 10250 SHADOW OAK | DALLAS | TX | | 3087 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2453058.793 | 77391 |
| 5 | POLO SHIRT, BROWN PANTS, BLACK SLIDES | | | | 10290 COMPOSITE DR | DALLAS | TX | | 3077 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2460058.377 | 53471 |
| 6 | BLACK JACKET, BLACK PANTS, BLACK SLIDES | | | | 7501 N STEMMONS SERV SB | DALLAS | TX | | 3055 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | STEMMONS_EMPIRECENTRAL_VC | | 2464064.377 | 53471 |
| 7 | BLUE HOSPITAL TOP AND BOTTOMS | | | | 10900 STEMMONS FWY | DALLAS | TX | 75220 | 3040 | 551 | SOUTHEAST | 200 | 7 | D7 | Buckner 30 | | | 2554558.512 | 11005 |
| 8 | BLUE HOSPITAL TOP AND BOTTOMS | | | | 10900 STEMMONS FWY | DALLAS | TX | 75229 | 1217 | 318 | SOUTHEAST | 200 | 7 | D7 | Buckner 30 | | | 2554558.512 | 71103 |
| 9 | BLK SHIRT BLUE SHORTS/ BLK SHOES/ RED HAT | | | | 9200 E R L THORNTON FWY | DALLAS | TX | 75228 | 3041 | 534 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2460897.955 | 71103 |
| 10 | T-SHIRT WITH BLUE JEANS AND TENNIS SHOES | | | | 4415 W MOCKINGBIRD LN | DALLAS | TX | 75209 | 3041 | 534 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2460897.955 | 78013 |
| 11 | BLK SHIRT/ BLUE SHORTS/ BLK SHOES/ RED HAT | | | | 4415 W MOCKINGBIRD LN | DALLAS | TX | | 3041 | 534 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2460897.955 | 78013 |
| 12 | NO SHIRT, BLACK PANTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3041 | 534 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2464546.093 | 72295 |
| 13 | WHITE SHIRT, BLUE JEANS, BLACK SHOES | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3078 | 551 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2457516.87 | 78088 |
| 14 | WHITE SHIRT, WHITE JEANS, BLACK SHOES | | | | 1995 W NORTHWEST HWY | DALLAS | TX | 75220 | 3078 | 551 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | STEMMONS_EMPIRECENTRAL_VC | | 2457516.87 | 81838 |
| 15 | WHITE SHIRT, WHITE JEANS, BLACK SHOES | | | | 8550 N STEMMONS SERV WB | DALLAS | TX | 75247 | 3055 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | STEMMONS_EMPIRECENTRAL_VC | | 2464546.093 | 73988 |
| 16 | WHITE SHIRT, WHITE JEANS, BLACK SHOES | | | | 8550 N STEMMONS SERV WB | DALLAS | TX | 75247 | 3055 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2464546.093 | 73988 |
| 17 | WHITE SHIRT, BLUE T-SHIRT | | | | 11100 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2465745.101 | 76231 |
| 18 | WHITE SHIRT, WHITE JEANS, BLACK SHOES | | | | 11100 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2465745.101 | 76231 |
| 19 | BLACK SHIRT, RED SHIRT WITH WHITE HOOD | | | | 11300 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2466048.099 | 76393 |
| 20 | WHITE SHIRT, BLUE JEANS, BLACK SHOES | | | | 11300 HARRY HINES BLVD | DALLAS | TX | 75220 | 6040 | 533 | NORTHWEST | 530 | 6 | D6 | | | | 2457938.251 | 72516 |
| 21 | POLO SHIRT BROWN SHORTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | STEMMONS_EMPIRECENTRAL_VC | | 2455924.837 | 23531 |
| 22 | GREEN JACKET BLACK POLO GREEN PANTS AND BLACK KYRIE SNEAKERS | | | | 11139 HARRY HINES BLVD | DALLAS | TX | 75229 | 6040 | 533 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2467661.233 | 81838 |
| 23 | BLUE JEANS BLACK SHIRT | | | | 2000 W NORTHWEST HWY | DALLAS | TX | 75220 | 6041 | 533 | NORTHWEST | 530 | 6 | D6 | | | | 2455924.837 | 23531 |
| 24 | WHITE SHIRT, NAVY BLUE BASKETBALL SHORTS | | | | 2295 W NORTHWEST HWY | DALLAS | TX | 75220 | 1201 | 222 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2459780.664 | 71681 |
| 25 | WHITE SHIRT, BLUE T SHIRT | | | | 9235 E R L THORNTON FWY | DALLAS | TX | 75228 | 1203 | 222 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2452185.723 | 53704 |
| 26 | BLACK SHORTS, BLUE T SHIRT | | | | 9235 E R L THORNTON FWY | DALLAS | TX | 75228 | 1202 | 221 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2452185.723 | 53704 |
| 27 | BLACK T-SHIRT, JEANS, RED SANDALS | | | | 9235 E R L THORNTON FWY | DALLAS | TX | 75228 | 1202 | 221 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2452185.723 | 53704 |
| 28 | GREEN SWEATSHIRT AND BEIGE PANTS | | | | 9253 E R L THORNTON FWY | DALLAS | TX | 75228 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2452185.723 | 53704 |
| 29 | GREEN JACKET BLACK POLO GREEN PANTS AND BLACK KYRIE SNEAKERS | | | | 9253 E R L THORNTON FWY | DALLAS | TX | 75228 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2452185.723 | 53704 |
| 30 | BLACK T-SHIRT JOGGING PANTS | | | | 2456 WALNUT HILL LN | DALLAS | TX | 75229 | 6060 | 533 | NORTHWEST | 530 | 6 | D6 | | | | 2466760.233 | 78014 |
| 31 | BLACK SHORTS, BLUE T SHIRT | | | | 2456 WALNUT HILL LN | DALLAS | TX | 75228 | 1202 | 221 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2452185.723 | 53704 |
| 32 | CLEAN | | | | 18900 HARRY HINES BLVD | DALLAS | TX | 75228 | 1202 | 221 | NORTHEAST | 530 | 6 | D6 | | | | 2460585.253 | 78014 |
| 33 | BLK SHIRT/ BLUE JEANS | | | | 2456 WALNUT HILL LN | DALLAS | TX | 75228 | 3041 | 534 | NORTHEAST | 530 | 6 | D6 | | | | 2454913.441 | 73410 |
| 34 | SOILED | | | | 2100 W NORTHWEST HWY | DALLAS | TX | 75220 | 6040 | 533 | NORTHWEST | 530 | 6 | D6 | | | | 2457938.062 | 72516 |
| 35 | CAMO JACKET, BLUE JEANS | | | | 2100 W NORTHWEST HWY | DALLAS | TX | 75220 | 6040 | 533 | NORTHWEST | 530 | 6 | D6 | | | | 2600508.083 | 72516 |
| 36 | T-SHIRT, JEANS, TENNIS SHOES | | | | 10910 TECHNOLOGY BLVD W | DALLAS | TX | 75220 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2460508.083 | 23531 |
| 37 | ORANGE DRESS | | | | 10900 N STEMMONS FWY | DALLAS | TX | 75247 | 3040 | 551 | NORTHWEST | 530 | 6 | D6 | Forest Dennis | | | 2554554.103 | 81676 |
| 38 | BLACK JACKET, BLACK PANTS | | | | 10900 N STEMMONS FWY | DALLAS | TX | 75247 | 3040 | 551 | NORTHWEST | 530 | 6 | D6 | Forest Dennis | | | 2554554.103 | 81676 |
| 39 | BROWN PANTS, RED HOODED SWEATSHIRT, GRAY TOBAGGIN | | | | 7200 N STEMMONS FWY | DALLAS | TX | 75247 | 3040 | 551 | NORTHWEST | 530 | 6 | D6 | Forest Dennis | | | 2462541.103 | 58202 |
| 40 | HOODIE AND SHORTS | | | | 11300 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2466048.099 | 76393 |
| 41 | HOODIE AND SHORTS | | | | 11300 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2466048.099 | 76393 |
| 42 | HOODIE AND PANTS | | | | 11300 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2466048.099 | 76393 |
| 43 | BLACK JACKET, RED PANTS, BOOTS | | | | 11300 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2466048.099 | 76393 |
| 44 | SUIT, JEANS, BOOTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2464546.093 | 76393 |
| 45 | SUIT, JEANS, BOOTS | | | | 1995 W NORTHWEST HWY | DALLAS | TX | 75220 | 3078 | 551 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | STEMMONS_EMPIRECENTRAL_VC | | 2457516.87 | 81838 |
| 46 | BLK SHIRT, BLUE JEANS, BROWN SHOES | | | | 8550 N STEMMONS SERV WB | DALLAS | TX | 75247 | 3055 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | STEMMONS_EMPIRECENTRAL_VC | | 2464546.093 | 73988 |
| 47 | BLUE JEANS BLACK SHIRT, KHAKI PANTS, TAN BROWN BOOTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2455924.837 | 23531 |
| 48 | BLUE T SHIRT, BLUE SHORTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2455924.837 | 23531 |
| 49 | BLACK JACKET, RED PANTS, BOOTS | | | | 11100 HARRY HINES BLVD | DALLAS | TX | 75229 | 3041 | 534 | NORTHEAST | 550 | 6 | D6 | NWHwy Walton/Walker | | | 2465745.101 | 76231 |
| 50 | HOODIE AND SHORTS | | | | 9200 E R L THORNTON FWY | DALLAS | TX | 75228 | 1203 | 222 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2460571.955 | 53704 |
| 51 | BLACK SHIRT, RED PANTS, BLACK SHOES | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2455924.837 | 23531 |
| 52 | BLACK SHIRT, BLUE JEANS | | | | 9200 E R L THORNTON FWY | DALLAS | TX | 75228 | 1203 | 222 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2460897.955 | 53704 |
| 53 | SOILED | | | | 9200 E R L THORNTON FWY | DALLAS | TX | 75228 | 1203 | 222 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2460897.955 | 53704 |
| 54 | WHITE SHIRT, BLUE JEANS | | | | 9200 E R L THORNTON FWY | DALLAS | TX | 75228 | 1041 | 534 | NORTHEAST | 220 | 7 | D7 | Buckner 30 | | | 2460897.955 | 72516 |
| 55 | CAMO JACKET, BLUE JEANS | | | | 2100 W NORTHWEST HWY | DALLAS | TX | 75220 | 6040 | 533 | NORTHWEST | 530 | 6 | D6 | | | | 2600508.083 | 72516 |
| 56 | WHITE TEE SHIRT, BLUE SHIRT | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2455924.837 | 23531 |
| 57 | GREEN JUMP SUIT, WHITE SHOES | | | | 10900 STEMMONS FWY | DALLAS | TX | 75220 | 3040 | 551 | NORTHEAST | 200 | 7 | D7 | Buckner 30 | | | 2554558.512 | 11005 |
| 58 | GREEN JUMP SUIT, WHITE SHOES | | | | 10900 STEMMONS FWY | DALLAS | TX | 75220 | 3040 | 551 | SOUTHEAST | 200 | 7 | D7 | Buckner 30 | | | 2554558.512 | 11005 |
| 59 | POLO SHIRT AND SHORTS | | | | 10900 STEMMONS FWY | DALLAS | TX | 75229 | 1202 | 221 | NORTHWEST | 530 | 6 | D6 | | | | 2451421.201 | 23913.481 |
| 60 | BLACK AND WHITE PANTS, BLACK SHIRT | | | | 7501 N STEMMONS SERV SB | DALLAS | TX | | 3055 | 521 | NORTHWEST | 530 | 6 | D6 | Buckner 30 | | | 2464064.377 | 53471 |
| 61 | HOODIE AND SHORTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75220 | 3056 | 521 | NORTHWEST | 530 | 6 | D6 | John Carpenter Stemmons | | | 2455924.837 | 23531 |
| 62 | NO SHIRT AND SHORTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75229 | 3057 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2463004.793 | 71691 |
| 63 | WHITE TANK TOP BLACK PANTS | | | | 10250 SHADOW OAK | DALLAS | TX | | 3087 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2453058.793 | 77391 |
| 64 | WHITE TANK TOP, JEANS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75229 | 3057 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2463004.793 | 71691 |
| 65 | WHITE DRESS SHIRT, BLUE BLACK JEANS, WHITE TENNIS SHOES | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75229 | 3057 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2463004.793 | 71691 |
| 66 | WHITE TANK TOP, BLACK PANTS | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75229 | 3057 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2463004.793 | 71691 |
| 67 | BLACK T-SHIRT, BLUE JEANS, BLACK SHOES | | | | 10910 TECHNOLOGY BLVD E | DALLAS | TX | 75229 | 3057 | 512 | NORTHWEST | 530 | 6 | D6 | | | | 2463004.793 | 71691 |

COD_005862

Case 3:22-cv-00177-M Document 47 Filed 05/24/22 Page 213 of 399 PageID 1338

| # | Point_Y | UpDate | USER_SOB_Name | USER_Address | USER_License_Type | BUFF_DIST |
|---|---|---|---|---|---|---|
| 1 | 6977760.879 | 2020-01-19 10:29:20 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 2 | 6977601.234 | 2020-11-18 16:08:49 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 3 | 6987085.124 | 2020-11-18 16:08:49 | COASTER LINE - COASTER CLUB INC | 9109 JOHN W CARPENTER FWY SB | CABARET | 500 |
| 4 | 6977601.234 | 2020-11-18 16:08:49 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 5 | 6977975.508 | 2020-12-28 12:07:06 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 6 | 6977601.234 | 2020-11-18 16:08:49 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 7 | 7011905.103 | 2020-06-04 14:33:29 | AMAZING.NET | 10310 TECHNOLOGY BLVD W | CABARET | 500 |
| 8 | 6977975.508 | 2020-12-28 12:07:06 | BABY DOLLS SALOON WEST | 10310 TECHNOLOGY BLVD W | ARCADE | 500 |
| 9 | 7007205.154 | 2020-12-31 8:26:24 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 10 | 7007280.523 | 2020-12-31 8:26:24 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 11 | 7007280.523 | 2020-12-15 13:13:42 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 12 | 6991272.877 | 2020-09-12 3:25:31 | LA ZONA ROSA | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 13 | 6991272.877 | 2020-09-12 3:25:31 | LA ZONA ROSA | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 14 | 6977975.508 | 2020-12-28 12:07:06 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 15 | 6977975.508 | 2020-12-28 12:07:06 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 16 | 6977601.234 | 2020-11-18 16:08:40 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 17 | 6977975.508 | 2020-12-28 12:07:06 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 18 | 6977975.508 | 2020-12-28 12:07:06 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 19 | 7004508.2 | 2020-06-04 14:51:55 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET DH A | 500 |
| 20 | 7005233.946 | 2020-12-03 8:17:45 | LIPSTICK | 10959 HARRY HINES BLVD | CABARET | 500 |
| 21 | 6977326.993 | 2020-06-07 9:53:46 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 22 | 6988288.383 | 2020-12-31 13:16:57 | XTC CABARET | 8550 N STEMMONS FWY SB | CABARET | 500 |
| 23 | 7003083.996 | 2020-12-31 13:15:09 | NEW FINE ARTS - WEST | 2117 W NORTHWEST HWY | ARCADE | 500 |
| 24 | 7003383.995 | 2020-12-31 13:15:09 | NEW FINE ARTS - WEST | 2117 W NORTHWEST HWY | ARCADE | 500 |
| 25 | 7007281.503 | 2020-02-03 7:44:20 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 26 | 6977601.234 | 2020-05-11 17:12:24 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 27 | 7007284.065 | 2020-12-24 13:16:07 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET DH A | 500 |
| 28 | 7005233.946 | 2020-12-03 8:17:45 | LIPSTICK | 10959 HARRY HINES BLVD | CABARET | 500 |
| 29 | 7005916.127 | 2020-10-16 3:52:12 | PARIS ADULT BOOKSTORE | 11118 N W CARPENTER FWY SB | ARCADE | 500 |
| 30 | 6983140.577 | 2020-01-28 16:07:57 | UNKNOWN AT PRESENT | 10959 HARRY HINES BLVD | CABARET | 500 |
| 31 | 7005916.127 | 2020-10-16 3:52:17 | PARIS ADULT BOOKSTORE | 7035 JOHN W CARPENTER FWY SB | ARCADE | 500 |
| 32 | 7006025.276 | 2020-08-17 17:17:48 | BABY DOLLS TOPLESS SALOON | 10250 SHADY TRL | CABARET | 500 |
| 33 | 7001572.153 | 2020-10-12 6:11:58 | BABY DOLLS SALOON WEST | 10310 TECHNOLOGY BLVD W | ARCADE | 500 |
| 34 | 7006064.2 | 2020-12-29 6:48:07 | DG'S A GENTLEMAN'S CLUB | 11899 HARRY HINES BLVD | CABARET | 500 |
| 35 | 7001815.979 | 2020-06-06 15:41:20 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET DH A | 500 |
| 36 | 7001815.979 | 2020-06-06 15:41:20 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | ARCADE | 500 |
| 37 | 7003939.481 | 2020-03-12 7:53:34 | BABY DOLLS SALOON WEST | 1964 W NORTHWEST HWY | ARCADE | 500 |
| 38 | 7002163.754 | 2020-05-18 23:37:38 | BUCKS CABARET | 3350 CALIFORNIA CROSSING RD | CABARET | 500 |
| 39 | 7006297.96 | 2020-12-17 18:27:46 | UNKNOWN AT PRESENT | 10959 HARRY HINES BLVD | CABARET | 500 |
| 40 | 7001575.499 | 2020-12-30 13:55:57 | AMAZING.NET | 11311 HARRY HINES BLVD | ARCADE | 500 |
| 41 | 6983721.040 | 2020-12-09 21:50:29 | UDO ADULT THEATER | 11311 HARRY HINES BLVD | ARCADE | 500 |
| 42 | 7001575.499 | 2020-12-30 13:55:57 | AMAZING.NET | 11311 HARRY HINES BLVD | ARCADE | 500 |
| 43 | 7001575.499 | 2020-12-30 13:55:57 | AMAZING.NET | 10310 TECHNOLOGY BLVD W | ARCADE | 500 |
| 44 | 7000172.153 | 2020-12-12 10:30:21 | BABY DOLLS SALOON WEST | 9125 E EL THORNTON FWY WB | CABARET DH A | 500 |
| 45 | 7000567.052 | 2020-12-14 23:47:04 | NEW FINE ARTS - WEST | 2117 W NORTHWEST HWY | ARCADE | 500 |
| 46 | 7003152.57 | 2020-12-16 23:47:04 | NEW FINE ARTS - WEST | 1964 W NORTHWEST HWY | ARCADE | 500 |
| 47 | 6998301.279 | 2020-09-03 9:20:50 | XTC CABARET | 8550 N STEMMONS FWY SB | ARCADE | 500 |
| 48 | 7003957.655 | 2020-11-05 16:36:55 | PARIS ADULT BOOKSTORE | 11118 N W CARPENTER FWY SB | ARCADE | 500 |
| 49 | 7005233.946 | 2020-12-03 8:18:28 | LIPSTICK | 10959 HARRY HINES BLVD | CABARET DH A | 500 |
| 50 | 7001575.499 | 2020-12-12 11:33:32 | AMAZING.NET | 11311 HARRY HINES BLVD | ARCADE | 500 |
| 51 | 6977677.565 | 2020-12-30 15:42:33 | BABY DOLLS SALOON WEST | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 52 | 7000372.155 | 2020-11-20 3:54:23 | AMAZING.NET | 11311 HARRY HINES BLVD | ARCADE | 500 |
| 53 | 7001575.499 | 2020-01-16 10:16:46 | BABY DOLLS SALOON WEST | 10310 TECHNOLOGY BLVD W | CABARET | 500 |
| 54 | 7000372.155 | 2020-12-30 3:54:23 | AMAZING.NET | 11311 HARRY HINES BLVD | ARCADE | 500 |
| 55 | 6977526.993 | 2021-01-08 8:44:47 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 56 | 6977526.993 | 2021-01-08 8:44:47 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 57 | 6977526.993 | 2021-01-08 8:44:47 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 58 | 6977526.993 | 2021-01-08 8:44:47 | COASTER LINE - COASTER CLUB INC | 9125 E EL THORNTON FWY WB | CABARET | 500 |
| 59 | 7006297.96 | 2020-12-17 16:57:09 | UNKNOWN AT PRESENT | 10901 N STEMMONS FWY SB | CABARET | 500 |
| 60 | 7006297.96 | 2020-12-17 16:57:09 | UNKNOWN AT PRESENT | 10901 N STEMMONS FWY SB | CABARET | 500 |
| 61 | 7006297.96 | 2020-12-17 16:57:09 | UNKNOWN AT PRESENT | 10901 N STEMMONS FWY SB | CABARET | 500 |
| 62 | 6985159.861 | 2020-12-10 12:27:20 | SILVER CITY CABARET | 7501 N STEMMONS FWY SB | CABARET | 500 |
| 63 | 6991013.583 | 2020-05-18 23:37:38 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 64 | 7006656.355 | 2020-05-06 6:32:41 | BABY DOLLS TOPLESS SALOON | 10965 COMPOSITE DR | CABARET | 500 |
| 65 | 6985756.153 | 2020-01-04 9:52:20 | NEW FINE ARTS - MOCKINGBIRD | 1720 W MOCKINGBIRD LN | ARCADE | 500 |
| 66 | 6985756.153 | 2020-01-04 9:52:20 | NEW FINE ARTS - MOCKINGBIRD | 1720 W MOCKINGBIRD LN | ARCADE | 500 |
| 67 | 7031575.798 | 2020-08-07 11:06:54 | BUCKS WILD | 11327 REEDER RD | CABARET | 500 |

COD_005872

| OBJECTID | Job_Count | TARGET_FID | DataSource | IncidentNum | ArrestNumber | ArrestDate | Time | Group | ArrestDay | ArrBkDate | ArrBkDay | ACDHJobNumID | ArChargeCt | OffenseCode | ChargeFlag | ChargeDesc | PrimaryArrChg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

COD_005893

COD_005905

| # | OHCR_Approval_By_Date | AO OHCR_Received_By_Date | AP Apprehended_Date | AR Final_Disp | AS Final_Disp_Date | AT AY_Premise | Arrestion | AU | AV DispCode | NIBRS_Group | AW NIBRS_Crime_Category | AX NIBRS_Crime | AY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Representative / legible data values appearing across the rows include:

- Final_Disp column: "Accepted" (most rows)
- AY_Premise column values: "Highway, Street, Alley ETC", "Bar/Nightclub/Dancehall ETC", "Restaurant/Food Service/FMX Location", "Outdoor Area Public/Private", "Commercial Property Occupied/Vacant", "Business Office", "Commercial Property Occupied/Vacant"
- Arrestion column values: "Arrested - CDC", "Arrested - Law Sherreff", "Arrested - Other", "Arrested - Released To Hospital (APOWW)"
- NIBRS_Crime_Category / NIBRS_Crime column values include: "PUBLIC INTOXICATION", "WARRANT DALLAS PD", "WARRANT DALLAS PD (OTHERS)", "WARRANT DALLAS PD (OUTSIDE AGENCY)", "WARRANT DALLAS PD (ALIAS)", "WARRANT DALLAS PD (CAPIAS)", "TRAFFIC VIOLATION - NON-HAZARDOUS", "DRUG/NARCOTIC VIOLATIONS", "PROSTITUTION", "PURCHASING PROSTITUTION", "ALL OTHER OFFENSES", "WEAPON LAW VIOLATIONS", "APOWW", "FRAUD OFFENSES", "FALSE PRETENSE/SWINDLE/CONFIDENCE GAME", "DRIVING UNDER THE INFLUENCE", "WARRANT HOLD (OUTSIDE AGENCY)", "ASSAULT"

| # | NIBRS_Crime_CompStat (AZ) | NIBRS_CrimeAgainst (BA) | NIBRS_Code (BB) | NIBRS_Group_CrimeAgainst (BC) | NIBRS_Type (BD) | ChargeSynopsis (BE) | CFS_Number (BF) | Name (BH) | NickName | AltName | BirthPlace (BL) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0369825 | DOCARUSO, FRANK, A | | | DALLAS, TX |
| 2 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0836734 | KYLE, WALTER, EARL | | | DALLAS, TX |
| 3 | PUBLIC INTOXICATION | SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0836734 | KYLE, WALTER, EARL | | | DALLAS, TX |
| 4 | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0836734 | KYLE, WALTER, EARL | | | DALLAS, TX |
| 5 | TRAFFIC VIOLATION-HAZARDOUS | SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0836734 | KYLE, WALTER, EARL | | | DALLAS, TX |
| 6 | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0836734 | KYLE, WALTER, EARL | | | |
| 7 | PUBLIC INTOXICATION | SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0840876 | JONES, DARRYL TERRELL | | | |
| 8 | FRAUD OFFENSES | PROPERTY | 26A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0836734 | KYLE, WALTER, EARL | | | DALLAS TX |
| 9 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0074312 | MARION, BRIANNA, SHENDA | | | EL SALVADOR |
| 10 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0074312 | JONES, DARRYL TERRELL | | | |
| 11 | APD/WW | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-2140120 | KYLE, WALTER EARL | | | |
| 12 | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-2111128 | NIETO, VIOLA, MARIE | | | |
| 13 | TRAFFIC VIOLATION-HAZARDOUS | SOCIETY | 90E | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-2111128 | JOHNSON, TAMAYREA, PARADISE | | | MEXICO |
| 14 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0405401 | JOHNSON, TAMAYREA, PARADISE | | | |
| 15 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0405401 | FLEMING, NICHELLE, GLADYS | | | |
| 16 | WARRANT DALLAS PD (ALIAS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1370037 | MARSHALL, RHINENDE | | | |
| 17 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1370037 | HINAJOSA, DESIREE | | | LOUISIANA |
| 18 | SIMPLE ASSAULT | PERSON | 13B | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1321995 | BROOKER, CASEY, LEWIS | | | MEMPHIS |
| 19 | FRAUD OFFENSES | PROPERTY | 26A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1321995 | BROOKER, CASEY, LEWIS | | | |
| 20 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-2024362 | BURNETT, CRYSTAL, LEIGH | | | |
| 21 | WARRANT DALLAS PD PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1426476 | TURNER, JAZMYN | | | |
| 22 | WARRANT DALLAS PD (ALIAS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1650957 | TURNER, JAZMYN | | | |
| 23 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-1650957 | BURNETT, CRISTINA, LEIGH | | | OKLAHOMA CITY, OKLAHOMA |
| 24 | WARRANT DALLAS PD (ALIAS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1426604 | TURNER, JAZMYN | | | |
| 25 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-2024362 | MILES, RICKI, DE WAYNE | | | OKLAHOMA CITY, OKLAHOMA |
| 26 | PURCHASING PROSTITUTION | SOCIETY | 40B | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-2429028 | BURNETT, ARNETTA, LASHAUN | | | |
| 27 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0509040 | MILES, RICKI, DE WAYNE | | | |
| 28 | WARRANT DALLAS PD (ALIAS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0509040 | WILLS, RODNEY, LAMAR | | | MEXICO |
| 29 | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0518591 | MARSHALL, RHINENDE | | | |
| 30 | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 40C | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0518591 | MARSHALL, RHINENDE | | | MEMPHIS |
| 31 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-113775 | WILLS, RODNEY, LAMAR | | | |
| 32 | WARRANT DALLAS PD (ALIAS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-111275 | BROWN, OMAR, SHARIF | | | DALLAS, TEXAS |
| 33 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-111275 | BROWN, OMAR, SHARIF | | | WISCONSIN |
| 34 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-107273 | HANCOCK, MONICA | | | ARKANSAS |
| 35 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-107273 | BROOKS, STEPHEN, MICHAEL | | | |
| 36 | PURCHASING PROSTITUTION | SOCIETY | 40B | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1196092 | PEAVY, JAMARI, LEIGH | | | MEXICO |
| 37 | WARRANT DALLAS PD (ALIAS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1373037 | GARCIA, CESAR, ANDRES | | | |
| 38 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0715552 | CRUTCHFIELD, GEORGIA, MELINDA | | | |
| 39 | PURCHASING PROSTITUTION | SOCIETY | 40B | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0715552 | ACEVEDO, VICTOR, MANUEL | | | |
| 40 | PURCHASING PROSTITUTION | SOCIETY | 40B | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0981366 | HARRIS, ROBERT, WILLIAM | | | |
| 41 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0981366 | GARCIA, CESAR, ANDRES | | | |
| 42 | WARRANT DALLAS PD (OTHERS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1545989 | PIPKINS, BRITTNEY, SHAMARA | | | |
| 43 | WARRANT DALLAS PD (CAPIAS) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0577330 | FULLER, LINNETTE, LATRICE | | | DALLAS, TX |
| 44 | WARRANT DALLAS PD (ALIAS) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0577330 | FULLER, LINNETTE, LATRICE | | | |
| 45 | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1296922 | ASHBECK, LARRY | | | BEVERLY HILLS, CA |
| 46 | PURCHASING PROSTITUTION | SOCIETY | 40B | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1286092 | PEAVY, JAMARI, LEIGH | | | DALLAS, TX |
| 47 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1286092 | PEAVY, JAMARI, LEIGH | | | BEVERLY HILLS, CA |
| 48 | ALL OTHER OFFENSES | SOCIETY | 90Z | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1286092 | GILLIS, MICHAEL, JEROME | | | |
| 49 | APD/WW | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0968120 | VANDENHENDE, SARA, LINDSAY | | | |
| 50 | APD/WW | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0968120 | MORALES-SOTO, CONSUELO, OFELIA | CONNIE | | |
| 51 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1907602 | LEIVAS, ALBERT, CORNELIUS | | | LOUISIANA |
| 52 | WEAPON LAW VIOLATIONS | SOCIETY | 520 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0073028 | REED, DERRICK, MIGUEL | TAYTHA TAYEOHA | | DALLAS, TX |
| 53 | SIMPLE ASSAULT | PERSON | 13B | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-0903739 | JACKSON, OPAL, LOUISE | | | IRAN |
| 54 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-0903739 | TRANLONG, RAMIR | | | IRAN |
| 55 | PROSTITUTION | SOCIETY | 40A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1807036 | HAMILTON, TRICIA, LYNN | | | MARYLAND |
| 56 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-1807036 | THOMPSON, COREY, JERWAINE | | | MARYLAND |
| 57 | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-1847111 | THOMPSON, COREY, JERWAINE | | | TULSA, TEXAS |
| 58 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-1847111 | BERTIE, ZACKERY | | | TULSA, TEXAS |
| 59 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-2408282 | SANCHEZ, TOMAS | | | TEXAS |
| 60 | APD/WW | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-2408282 | SANCHEZ, TOMAS | | | TEXAS |
| 61 | DRUG/NARCOTIC VIOLATIONS | SOCIETY | 35A | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-2408282 | BECK, KELLY, MAUREEN | | | MEXICO |
| 62 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | 19-1813744 | HAMILTON, TRICIA, LYNN | | | MARYLAND |
| 63 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 902 | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1813744 | HAMILTON, TRICIA, LYNN | | | MEXICO |
| 64 | ALL OTHER OFFENSES | PROPERTY | 90Z | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1832544 | NAVARRO, VICTOR, DANIEL | | NAVARRO ESTANES, VICTOR | MEXICO |
| 65 | FRAUD OFFENSES | PROPERTY | 26A | PERSON, PROPERTY, OR SOCIETY | Coded | | 19-1832544 | NAVARRO ESTANES, VICTOR | | NAVARRO ESTANES, VICTOR | |
| 66 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | | FILICO, CRYSTAL, LEE | HAIL, CRYSTAL | | KAUFMAN |
| 67 | WARRANT HOLD (OUTSIDE AGENCY) | SOCIETY | 999 | PERSON, PROPERTY, OR SOCIETY | Not Coded | | | FILICO, CRYSTAL, LEE | HAIL, CRYSTAL | | KAUFMAN |

| BN | BO Height | BP Weight | BQ | BR Race | BS | BT Ethnicity | BU Sex | BV | BW | BX DLIC_St | BY DLIC_Type | BZ HLAddress | CA HLCity | CB HLZip | CC | CD HLState | CE HLCounty | CF HLURA | CG HLBeat | CH HLDivision | AlertAddress | CI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5-09 | 190 | Black | Black | | Non-Hispanic or Latino | Male | | | TX | 19031 | 2212 COPPER ST | 73281 | 73283 | | TX | DALLAS | | | NORTHWEST | | |
| 2 | 5-09 | 190 | Black | Black | | Non-Hispanic or Latino | Male | | | TX | | 1853 W MOCKINGBIRD LN | 73235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 3 | 5-09 | 190 | Black | Black | | Non-Hispanic or Latino | Male | | | TX | | 1853 W MOCKINGBIRD LN | 73235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 4 | 5-09 | 190 | Black | Black | | Non-Hispanic or Latino | Male | | | TX | | 1853 W MOCKINGBIRD LN | 73235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 5 | 5-09 | 190 | Black | Black | | Non-Hispanic or Latino | Male | | | TX | | 1853 W MOCKINGBIRD LN | 73235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 6 | 5-09 | 190 | Black | Black | | Non-Hispanic or Latino | Male | | | TX | | 1853 W MOCKINGBIRD LN | 73235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 7 | 5-09 | 190 | Red | White | | Non-Hispanic or Latino | Male | | TX | | | 7353 VERNON | 75235 | 75235 | | TX | DALLAS | 4525 | 427 | NORTHWEST | | |
| 8 | 5-09 | 190 | Black | Black | | Non-Hispanic or Latino | Male | | | TX | | 1853 W MOCKINGBIRD LN | 73235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 9 | 5-08 | 130 | Black | Black | | Non-Hispanic or Latino | Male | | TX | A | | 1341 TENNIS DR | 76022 | 76022 | | TX | BEDFORD | | | | | |
| 10 | 5-08 | 175 | Black | Black | | Non-Hispanic or Latino | Male | | TX | 2038 | | 2838 ROYAL LN | 75229 | 75229 | | TX | DALLAS | 3026 | 535 | NORTHWEST | | |
| 11 | 5-06 | 120 | Black | Hispanic or Latino | | Non-Hispanic or Latino | Female | | | | | | | | | | | | | | | |
| 12 | 5-04 | 175 | Black | Black | | Non-Hispanic or Latino | Female | | TX | | | 1004 ROCKMONT DR | 75115 | 75115 | | TX | DESOTO | | | | | |
| 13 | 6-03 | 180 | Black | Black | | Non-Hispanic or Latino | Male | | TX | | | 1004 ROCKMONT DR | 75115 | 75115 | | TX | DESOTO | | | | | |
| 14 | 6-03 | 180 | Black | Black | | Non-Hispanic or Latino | Male | | TX | | | 1004 ROCKMONT DR | 75115 | 75115 | | TX | DESOTO | | | | | |
| 15 | 5-10 | 180 | Black | Black | | Non-Hispanic or Latino | Male | | TX | 609 | | 9448 FOREST LN | 75243 | 75243 | | TX | DALLAS | 4525 | 242 | NORTHEAST | | |
| 16 | 5-00 | 145 | Blue | Hispanic or Latino | | Non-Hispanic or Latino | Female | | TX | | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 17 | 6-04 | 300 | Black | White | | Non-Hispanic or Latino | Male | | TX | 139 | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 18 | 5-05 | 205 | Black | Black | | Non-Hispanic or Latino | Male | | TX | | | 9023 E R L THORNTON FWY | 75228 | 75228 | | TX | DALLAS | | | NORTHEAST | | |
| 19 | 5-05 | 125 | Red | Black | | Non-Hispanic or Latino | Female | | TX | | | 1550 EMPIRE CENTRAL | 75235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 20 | 5-08 | 120 | Brown | White | | Non-Hispanic or Latino | Male | | TX | | | 128 E MIMOSA LN | 75149 | 75149 | | TX | MESQUITE | | | | | |
| 21 | 6-01 | 205 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | | | 128 E MIMOSA LN | 75149 | 75149 | | TX | MESQUITE | | | | | |
| 22 | 5-06 | 205 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1524 FOX RUN DR | 75217 | 75217 | | TX | DALLAS | 1257 | 327 | SOUTHEAST | | |
| 23 | 5-06 | 140 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1524 FOX RUN DR | 75217 | 75217 | | TX | DALLAS | 1257 | 327 | SOUTHEAST | | |
| 24 | 5-06 | 140 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1524 FOX RUN DR | 75217 | 75217 | | TX | DALLAS | 1257 | 327 | SOUTHEAST | | |
| 25 | 5-06 | 140 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 2234 TRACKWOOD DR | 75227 | 75227 | | TX | DALLAS | | | | | |
| 26 | 5-06 | 205 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | 77 | | 1125 SUSAN DR | 75040 | 75040 | | TX | GARLAND | | | | | |
| 27 | 5-07 | 160 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1125 SUSAN DR | 75040 | 75040 | | TX | GARLAND | | | | | |
| 28 | 5-11 | 160 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 3119 KELLOGG AVE | 75216 | 75216 | | TX | DALLAS | 4249 | 728 | SOUTH CENTRAL | | |
| 29 | 5-11 | 145 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 3119 KELLOGG AVE | 75216 | 75216 | | TX | DALLAS | 4249 | 728 | SOUTH CENTRAL | | |
| 30 | 5-11 | 145 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | 423 | | 5850 BELT LINE RD | 75254 | 75254 | | TX | DALLAS | 1009 | 632 | NORTH CENTRAL | | |
| 31 | 5-09 | 225 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | 423 | | 5850 BELT LINE RD | 75254 | 75254 | | TX | DALLAS | 1009 | 632 | NORTH CENTRAL | | |
| 32 | 5-06 | 130 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 33 | 5-09 | 205 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 34 | 5-05 | 200 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | 218 | | 2421 WALNUT HILL LN | 75229 | 75229 | | TX | DALLAS | 3025 | 534 | | | |
| 35 | 5-05 | 205 | Brown | White | | Non-Hispanic or Latino | Female | | TX | | | 7308 ROBIN DR | 75209 | 75209 | | TX | DALLAS | | | CENTRAL | | |
| 36 | 5-04 | 205 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1040 PARK LN | 75231 | 75231 | | TX | DALLAS | | | | | |
| 37 | 5-04 | 190 | Black | Black | | Non-Hispanic or Latino | Female | | AR | 123 | | 1931 PRATT RD | 72206 | 72206 | | AR | LITTLE ROCK | | | | | |
| 38 | 5-11 | 104 | Black | Black | | Non-Hispanic or Latino | Male | | TX | | | 1040 PARK LN | 75231 | 75231 | | TX | DALLAS | | | | | |
| 39 | 5-08 | 300 | Black | Brown | | Non-Hispanic or Latino | Female | | AR | | | 1931 PRATT RD | 72206 | 72206 | | AR | LITTLE ROCK | | | | | |
| 40 | 6-02 | 300 | Brown | Hispanic or Latino | | Non-Hispanic or Latino | Male | | TX | 123 | | 3040 PARK LN | 75206 | 75206 | | TX | DALLAS | 4552 | 536 | NORTHWEST | | |
| 41 | 6-02 | 130 | Brown | Brown | | Non-Hispanic or Latino | Male | | TX | | | 2513 RUGER DR | 75006 | 75006 | | TX | CARROLLTON | | | | | |
| 42 | 6-0 | 175 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | | | 7313 SHADY MEADOW LN | 75254 | 75254 | | TX | DALLAS | 1009 | 632 | NORTH CENTRAL | | |
| 43 | 6-0 | 175 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | | | 7313 SHADY MEADOW LN | 75254 | 75254 | | TX | DALLAS | 1009 | 632 | NORTH CENTRAL | | |
| 44 | 6-0 | 175 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 45 | 5-10 | 200 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 46 | 5-07 | 190 | Black | Black | | Non-Hispanic or Latino | Female | | WI | | | 1125 N CALLAHAN PL | 53233 | 53233 | | WI | MILWAUKEE | | | | | |
| 47 | 5-07 | 140 | Brown | Black | | Non-Hispanic or Latino | Female | | WI | | | 1125 N CALLAHAN PL | 53233 | 53233 | | WI | MILWAUKEE | | | | | |
| 48 | 5-07 | 140 | Brown | Black | | Non-Hispanic or Latino | Female | | WI | | | 1125 N CALLAHAN PL | 53233 | 53233 | | WI | MILWAUKEE | | | | | |
| 49 | 6-0 | 145 | Black | Black | | Non-Hispanic or Latino | Female | | NC | 1616 | | 2050 KELLEYSPRINGS | 75006 | 75006 | | AR | CARROLLTON | | | CENTRAL | | |
| 50 | 5-04 | 125 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 5800 DIANA DR | 75043 | 75043 | | TX | GARLAND | | | | | |
| 51 | 5-04 | 170 | Black | White | | Non-Hispanic or Latino | Female | | TX | 243 | | 1000 E PLEASANT RUN RD | 75104 | 75104 | | TX | CEDAR HILL | | | | | |
| 52 | 5-08 | 140 | Black | Black | | Non-Hispanic or Latino | Male | | TX | 24424 | | 9023 E R L THORNTON FWY | 75228 | 75228 | | TX | DALLAS | 1202 | 221 | NORTHEAST | | |
| 53 | 5-05 | 135 | Blonde | Asian | | Non-Hispanic or Latino | Female | | TX | 596 | | 8150 N STEMMONS FWY | 75247 | 75247 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 54 | 5-08 | 150 | Green | White | | Non-Hispanic or Latino | Male | | TX | 3113 | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 55 | 5-08 | 195 | Black | Black | | Non-Hispanic or Latino | Male | | TX | | | 1818 CORSICANA ST | 75201 | 75201 | | TX | DALLAS | 2088 | 135 | CENTRAL | | |
| 56 | 6-0 | 150 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | 243 | | 3924 LAKESIDE DR | 75088 | 75088 | | TX | ROWLETT | 4031 | 421 | | | |
| 57 | 6-0 | 125 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | 243 | | 3924 LAKESIDE DR | 75088 | 75088 | | TX | ROWLETT | 4031 | 421 | | | |
| 58 | 5-03 | 150 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | | | 1550 EMPIRE CENTRAL | 75235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 59 | 5-10 | 190 | Brown | Black | | Non-Hispanic or Latino | Male | | TX | | | 1550 EMPIRE CENTRAL | 75235 | 75235 | | TX | DALLAS | 3091 | 513 | NORTHWEST | | |
| 60 | 5-10 | 210 | Black | Asian | | Non-Hispanic or Latino | Male | | TX | | | 11540 THOUSAND PINES | 75243 | 75243 | | TX | DALLAS | 1202 | 221 | NORTHEAST | | |
| 61 | 5-08 | 150 | Brown | Black | | Non-Hispanic or Latino | Female | | TX | | | 1208 N MARYLAND ST | 75006 | 75006 | | TX | CARROLLTON | 3091 | 513 | | | |
| 62 | 5-03 | 130 | Brown | White | | Non-Hispanic or Latino | Female | | TX | | | 1208 N MARYLAND ST | 75201 | 75201 | | TX | CARROLLTON | 2088 | 135 | CENTRAL | | |
| 63 | 5-06 | 160 | Brown | White | | Non-Hispanic or Latino | Female | | TX | | | 3132 MORNING LN | 75116 | 75116 | | TX | ROWLETT | 3091 | 513 | | | |
| 64 | 6-02 | 140 | Brown | Hispanic or Latino | | Non-Hispanic or Latino | Male | | TX | 2137 | | 3120 DRAKDELL LN | 75235 | 75235 | | TX | DALLAS | 3091 | 512 | NORTHEAST | | |
| 65 | 5-06 | 140 | Black | Hispanic or Latino | | Non-Hispanic or Latino | Female | | TX | 2137 | | 1144 MONTERREY TRL | 75149 | 75149 | | TX | MESQUITE | 3059 | 538 | | | |
| 66 | 5-06 | 140 | Green | Green | | Non-Hispanic or Latino | Female | | | | | 1144 MONTERREY TRL | 75149 | 75149 | | TX | MESQUITE | 3059 | 538 | | | |
| 67 | 5-03 | 120 | Brown | White | | Non-Hispanic or Latino | Female | | | | | 1144 MONTERREY TRL | 75149 | 75149 | | TX | MESQUITE | 3059 | 538 | NORTHWEST | | |

| # | CK | CL | CM | ArTatoo | CN | ArTasoComments | AcOccupn | AraksAbstatus | ArEmployer | CR | DrugRelated | CS | DrugSlee | CT | DrugType | AcClothingWorn | CV | Expunged / AcAddress | CX | AcCity | CY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | No | | | | | BLUE HOODIE, BLUE JEANS, BLACK TENNIS SHOES | | 10649 HARRY HINES BLVD | | DALLAS | |
| 2 | | | | | | | | | | | Yes | | | | Cultivated Marijuana | GREY SWEATPANTS, WHITE T-SHIRT | | 1600 REGAL ROW | | DALLAS | |
| 3 | | | | | | | | | | | Yes | | | | Cultivated Marijuana | GREY SWEATPANTS, WHITE T-SHIRT | | 1600 REGAL ROW | | DALLAS | |
| 4 | | | | | | | | | | | Yes | | | | Cultivated Marijuana | GREY SWEATPANTS, WHITE T-SHIRT | | 1600 REGAL ROW | | DALLAS | |
| 5 | | | | | | | | | | | Yes | | | | Cultivated Marijuana | GREY SWEATPANTS, WHITE T-SHIRT | | 1600 REGAL ROW | | DALLAS | |
| 6 | | | | | | | | | | | Yes | | | | Cultivated Marijuana | GREY SWEATPANTS, WHITE T-SHIRT | | 1600 REGAL ROW | | DALLAS | |
| 7 | | | | | | | | | | | Yes | | | | | BLUE T-SHIRT, BLUE JEANS, BLUE SHOES | | 2425 WALNUT HILL LN | | DALLAS | |
| 8 | | | | | | | | | | | Yes | | | | | GREY SWEATPANTS, WHITE T-SHIRT | | 1600 REGAL ROW | | DALLAS | |
| 9 | | | | | | | | | | | No | | | | | PROVOCATIVE AND REVEALING PINK LINGERIE | | 10900 HARRY HINES BLVD | | DALLAS | |
| 10 | | | | | | | | | | | No | | | | | SWEATPANTS AND SHIRT | | 11058 HARRY HINES BLVD | | DALLAS | |
| 11 | | | | | | | | | | | Unkown | | | | Processed Marijuana | SWEAT PANTS/ZIP UP HOODIE | | 10900 HARRY HINES BLVD | | DALLAS | |
| 12 | | | | | | | | | | | Yes | | | | Processed Marijuana | SWEAT PANTS/ZIP UP HOODIE | | 11500 COMPOSITE DR | | DALLAS | |
| 13 | | | | | | | | | | | Yes | | | | Processed Marijuana | SWEAT PANTS/ZIP UP HOODIE | | 12035 SHILOH RD | | DALLAS | |
| 14 | | | | | | | | | | | Yes | | | | Cultivated Marijuana | BLACK SHIRT, BLUE JEANS | | 2425 WALNUT HILL LN | | DALLAS | |
| 15 | | | | | | | | | | | Yes | | | | | BLUE SHORTS, BLOUSE | | 11500 ANAHEIM DR | | DALLAS | |
| 16 | | | | | | | | | | | Yes | | | | | BLACK TOP AND BLACK SHORTS | | 9033 E EL THORNTON SERV WB | | DALLAS | |
| 17 | | | | | | | | | | | No | | | | | BLUE POLO SHIRT, BLUE JEANS, SANDALS | | 10899 HARRY HINES BLVD | | DALLAS | |
| 18 | | | | | | | | | | | Yes | | | | Cultivated Marijuana | SEE THROUGH PINK DRESS, THONG | | 9033 E EL THORNTON SERV WB | | DALLAS | |
| 19 | | | | | | | | | | | No | | | | | DARK BLUE ZIP UP HOODIE, BLACK SHIRT, BLUE JEANS | | 9033 E EL THORNTON SERV WB | | DALLAS | |
| 20 | | | | | | | | | | | No | | | | | DARK BLUE ZIP UP HOODIE, BLACK SHIRT, BLUE JEANS | | 12035 SHILOH RD | | DALLAS | |
| 21 | | | | | | | | | | | No | | | | | BLUE SHORTS, BLOUSE | | 11500 ANAHEIM DR | | DALLAS | |
| 22 | | | | | | | | | | | No | | | | | BLUE SHORTS, BLOUSE | | 11500 ANAHEIM DR | | DALLAS | |
| 23 | | | | | | | | | | | No | | | | | GREY PANTS | | 10000 HARRY HINES BLVD | | DALLAS | |
| 24 | | | | | | | | | | | No | | | | | TAN SKIRT, BLUE SHIRT | | 10899 HARRY HINES BLVD | | DALLAS | |
| 25 | | | | | | | | | | | No | | | | | GREY PANTS | | 10000 HARRY HINES BLVD | | DALLAS | |
| 26 | | | | | | | | | | | No | | | | | FISHNET AND PINK THONG | | 10900 HARRY HINES BLVD | | DALLAS | |
| 27 | | | | | | | | | | | No | | | | | FISHNET AND PINK THONG | | 10900 HARRY HINES BLVD | | DALLAS | |
| 28 | | | | | | | | | | | No | | | | | STRIPED DRESS | | 2444 WALNUT RIDGE ST | | DALLAS | |
| 29 | | | | | | | | | | | No | | | | | STRIPED DRESS | | 2444 WALNUT RIDGE ST | | DALLAS | |
| 30 | | | | | | | | | | | No | | | | | SHORT-SLEEVE SHIRT, BLUE JEANS, BROWN HAT | | 2425 WALNUT HILL LN | | DALLAS | |
| 31 | | | | | | | | | | | No | | | | | SHORT-SLEEVE SHIRT, BLUE JEANS, BROWN HAT | | 2425 WALNUT HILL LN | | DALLAS | |
| 32 | | | | | | | | | | | No | | | | | GREY PANTS | | 10000 HARRY HINES BLVD | | DALLAS | |
| 33 | | | | | | | | | | | No | | | | | GREY PANTS | | 10000 HARRY HINES BLVD | | DALLAS | |
| 34 | | | | | | | | | | | No | | | | | RED SINGLE SWIMSUIT | | 10900 HARRY HINES BLVD | | DALLAS | |
| 35 | | | | | | | | | | | No | | | | | BLUE HOODED SWEATSHIRT | | 2020 NORTHWEST HWY | | DALLAS | |
| 36 | | | | | | | | SELF EMPLOYED | | | No | | | | | BLUE T-SHIRT, BLACK JEANS, BROWN BOOTS | | 9033 E EL THORNTON SERV WB | | DALLAS | |
| 37 | | | | | | FLOORING | | UNEMPLOYED | | | No | | | | | BLACK DRESS | | 10800 HARRY HINES BLVD | | DALLAS | |
| 38 | | | | | | | PROJECT MANAGER | SELF EMPLOYED | | | No | | | | | BLACK DRESS | | 10899 HARRY HINES BLVD | | DALLAS | |
| 39 | | | | | | FLOORING | | GET | | | No | | | | | BLACK T-SHIRT, BLACK FALL SHORTS | | 9033 E EL THORNTON SERV WB | | DALLAS | |
| 40 | | | | | | PROJECT MANAGER | | NOT EMPLOYED | | | No | | | | | BLUE T-SHIRT, BLACK JEANS, BROWN BOOTS | | 9033 E EL THORNTON SERV WB | | DALLAS | |
| 41 | | | | | | | | NOT EMPLOYED | | | No | | | | | GRAY T-SHIRT, BLUE JEANS, BLACK AND WHITE CONVERSE | | 9033 E EL THORNTON SERV WB | | DALLAS | |
| 42 | | | | | | | | NOT EMPLOYED | | | No | | | | | BLACK DRESS ROMPER | | 10900 HARRY HINES BLVD | | DALLAS | |
| 43 | | | | | | | | | | | No | | | | | BLACK DRESS ROMPER | | 10900 COMPOSITE DR | | DALLAS | |
| 44 | | | | | | | | | | | No | | | | | NONE | | 9033 E EL THORNTON FWY | | DALLAS | |
| 45 | | | | | | | | | | | No | | | | | NONE | | 11005 ABLES LN | | DALLAS | |
| 46 | | | | | | | | | | | No | | | | | LIGHT GREEN POLO, BLACK SHORTS AND CROCKS | | 9033 E EL THORNTON FWY | | DALLAS | |
| 47 | | | | | | | | | | | No | | | | | BLACK TUBE TOP, BLACK THONG, FISH NET STOCKINGS | | 10900 HARRY HINES BLVD | | DALLAS | |
| 48 | | | | | | | | | | | No | | | | | BLACK TUBE TOP, BLACK THONG, FISH NET STOCKINGS | | 2536 MANANA DR | | DALLAS | |
| 49 | | | | | | | | | | | No | | | | | YELLOW JACKET WITH A GRAY AND RED HOODIE UNDER WITH GRAY SWEAT PANTS | | 10800 HARRY HINES BLVD | | DALLAS | |
| 50 | | | | | | | | | | | No | | | | | BLACK BODY SUIT | | 10900 COMPOSITE DR | | DALLAS | |
| 51 | | | | | | | | | | | No | | | | | BLACK SHIRT, BLACK PANTS, BLACK SHOES | | 9033 E EL THORNTON FWY | | DALLAS | |
| 52 | | | | | | | | | | | No | | | | | BLACK SHIRT, BLACK PANTS | | 9033 E EL THORNTON FWY | | DALLAS | |
| 53 | | | | | | | | | | | No | | | | | NO SHIRT AND KHAKI PANTS | | 2536 MANANA DR | | DALLAS | |
| 54 | | | | | | | | | | | No | | | | | NO SHIRT BLUE JEAN | | 2536 MANANA DR | | DALLAS | |
| 55 | | | | | | | | | | | No | | | | | BLACK SHIRT BLUE TOP | | 2126 W NORTHWEST HWY | | DALLAS | |
| 56 | | | | | | | | | | | No | | | | | NO SHIRT BLUE JEAN | | 1625 REGAL ROW | | DALLAS | |
| 57 | | | | | | | | | | | Yes | | | Methamphetamine | | PINK TEE EYE SHIRT BLACK TIGHTS | | 2126 W NORTHWEST HWY | | DALLAS | |
| 58 | | | | | | | | | | | No | | | | | TUPAC SHAKUR SHIRT, CAMO SHORTS, BLUE NIKE TENNIS SHOES | | 11118 HARRY HINES BLVD | | DALLAS | |
| 59 | | | | | | | | | | | No | | | | | TUPAC SHAKUR SHIRT, CAMO SHORTS, BLUE NIKE TENNIS SHOES | | 11118 HARRY HINES BLVD | | DALLAS | |
| 60 | | | | | | | | | | | No | | | | | HAT, GREY HOODIE AND JEANS WITH RED SHOES | | 7502 N STEMMONS SERV SB | | DALLAS | |
| 61 | | | | | | | | | | | No | | | | | GREY HOODIE AND JEANS WITH RED SHOES | | 1625 REGAL ROW | | DALLAS | |
| 62 | | | | | | | | | | | No | | | | | PINK TEE EYE SHIRT BLACK TIGHTS | | 1625 REGAL ROW | | DALLAS | |
| 63 | | | | | | | | | | | Yes | | | Methamphetamine | | PINK TEE EYE SHIRT BLACK TIGHTS | | 2126 W NORTHWEST HWY | | DALLAS | |
| 64 | | | | | | | | | | | No | | | | | MAROON SHIRT, BLACK JACKET, GREY PANTS, AND BLACK TENNIS SHOES | | 11600 HARRY HINES BLVD | | DALLAS | |
| 65 | | | | | | | | | | | No | | | | | MAROON SHIRT, BLACK JACKET, GREY PANTS, AND BLACK TENNIS SHOES | | 11600 HARRY HINES BLVD | | DALLAS | |
| 66 | | | | | | | | | | | No | | | Methamphetamine | | MAROON SHIRT, BLACK JACKET, GREY PANTS, AND BLACK TENNIS SHOES | | 11600 HARRY HINES BLVD | | DALLAS | |
| 67 | | | | | | | | | SELF EMPLOYED | | No | | | | | BLACK SHIRT, JEAN OVERALLS | | 11300 HARRY HINES BLVD | | DALLAS | |
| 68 | | | | | | | | | SELF EMPLOYED | | No | | | | | BLACK SHIRT, JEAN OVERALLS | | 11300 HARRY HINES BLVD | | DALLAS | |
| 69 | | | | | | | | | | | No | | | | | | | 11300 HARRY HINES BLVD | | DALLAS | |

COD_005941

| Count of Master_Incident_Number MBeat | Total |
|---|---|
| 221 | 5 |
| 222 | 736 |
| 227 | 296 |
| 233 | 112 |
| 258 | 94 |
| 318 | 233 |
| 437 | 704 |
| 512 | 19 |
| 513 | 1421 |
| 514 | 183 |
| 515 | 710 |
| 521 | 31 |
| 522 | 2174 |
| 532 | 1495 |
| 533 | 39 |
| 534 | 2958 |
| 535 | 4146 |
| 551 | 3 |
| 552 | 607 |
| (blank) | 190 |
| **Grand Total** | **16172** |


ALL-STATE LEGAL®
PLAINTIFF'S EXHIBIT

Count of Master_Incident_Number

| USER_DOB_Name | Priority_Description | 2018 10p to 2a | 2018 2a to 6a | 2018 Total | 2019 10p to 2a | 2019 2a to 6a | 2019 Total | 2020 10p to 2a | 2020 2a to 6a | 2020 Total | 2021 10p to 2a | 2021 2a to 6a | 2021 Total | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMAZING.NET | 1-Emergency | 14 | 10 | 24 | 15 | 8 | 23 | 11 | 16 | 27 | 1 | | 16 | 90 |
| | 2-Urgent | 2 | | 2 | 5 | 2 | 7 | 2 | 2 | 4 | 2 | | 2 | 28 |
| | 3-General Service | 6 | 2 | 8 | 2 | | | 1 | 2 | | 5 | 3 | 8 | |
| | 4-Non Critical | | 2 | | 8 | 5 | | 3 | 6 | 9 | 4 | | | 38 |
| AMAZING.NET Total | | 22 | 14 | 36 | 30 | 15 | 45 | 17 | 26 | 43 | 14 | 14 | 28 | 152 |
| AZUNITA INC-DBA CLUB LACY | 1-Emergency | | 1 | | 6 | 13 | | 4 | 1 | | 1 | 2 | | 32 |
| | 2-Urgent | 2 | | | 2 | 2 | | 2 | 2 | | 2 | 4 | | 15 |
| | 3-General Service | 3 | 2 | | 5 | 1 | | 1 | | | 2 | 1 | | 15 |
| | 4-Non Critical | | 3 | | | | | | | | 2 | 1 | | 5 |
| AZUNITA INC-DBA CLUB LACY Total | | 3 | 6 | 9 | 18 | | 22 | 7 | 5 | 12 | 4 | 8 | | 67 |
| BABY DOLLS SALOON WEST | 1-Emergency | 2 | | | 4 | 1 | | 3 | 2 | | 3 | 6 | | 31 |
| | 2-Urgent | 5 | 4 | | 5 | | | 4 | 1 | | 8 | 3 | | 11 |
| | 3-General Service | 6 | 2 | | 8 | | | 6 | 1 | | 6 | 3 | | 18 |
| | 4-Non Critical | | | | | | | | | | | | | |
| BABY DOLLS SALOON WEST Total | | 13 | | | 10 | | 21 | 5 | | 12 | 1 | 9 | 15 | 67 |
| BABY DOLLS SOUTH | 1-Emergency | | | | | | | | | | | | | |
| | 2-Urgent | | | | | | | | | | | | | |
| | 3-General Service | 4 | | | 6 | 4 | | 4 | 2 | | 2 | 2 | | 12 |
| BABY DOLLS SOUTH Total | | 4 | 1 | 5 | 6 | 4 | | 4 | 2 | | 2 | 2 | | 12 |
| BABY DOLLS TOPLESS SALOON | 1-Emergency | 3 | 6 | 9 | 9 | 35 | 1 | 28 | 4 | | 8 | 25 | 9 | 33 |
| | 2-Urgent | 30 | | 59 | 35 | 9 | 37 | 72 | 27 | 55 | 25 | 25 | | 236 |
| | 3-General Service | 17 | 16 | 33 | 33 | 12 | 32 | 21 | 20 | 30 | 18 | 16 | | 116 |
| | 4-Non Critical | 7 | 4 | 11 | 9 | 3 | 9 | 6 | 4 | 7 | 4 | 3 | | 34 |
| BABY DOLLS TOPLESS SALOON Total | | 57 | 55 | 112 | 56 | 53 | 109 | 43 | 57 | 100 | 49 | 49 | 98 | 419 |
| BLACK ORCHID | 1-Emergency | | 1 | | | | | 2 | | | 1 | | | 10 |
| | 2-Urgent | 2 | 1 | | 1 | 2 | | | | | 1 | 3 | | 7 |
| | 3-General Service | 2 | 1 | | 3 | 1 | | 4 | 1 | | 1 | 1 | | 17 |
| BLACK ORCHID Total | | 2 | 1 | | 3 | 1 | | 4 | 2 | | 2 | 1 | | 12 |
| BLISS ARCADE THEATER CLUB | 1-Emergency | 17 | 8 | 25 | 25 | 14 | 17 | 17 | 13 | 22 | 14 | 4 | | 82 |
| | 2-Urgent | 8 | 4 | 12 | 12 | 4 | 9 | 9 | 9 | 14 | 4 | 4 | | 42 |
| | 3-General Service | 1 | 2 | 4 | 4 | | | 2 | | | 3 | 1 | | 9 |
| | 4-Non Critical | | | | | | | | | | | | | |
| BLISS ARCADE THEATER CLUB Total | | 30 | 15 | 45 | 23 | 7 | 30 | 23 | 12 | 35 | 24 | 10 | 34 | 144 |
| BUCKS CABARET | 1-Emergency | 4 | 4 | 8 | 4 | 4 | 8 | 4 | 8 | 12 | 2 | | 11 | 34 |
| | 2-Urgent | 21 | 34 | 55 | 35 | 45 | 80 | 29 | 45 | 74 | 18 | 32 | 50 | 259 |
| | 3-General Service | 15 | 24 | 39 | 23 | 21 | 44 | 26 | 26 | 18 | 25 | 19 | | 134 |
| | 4-Non Critical | 3 | | 12 | 12 | 1 | | 3 | 8 | 11 | 6 | | 8 | 42 |
| | (blank) | 1 | | | | | | | | 1 | | | 1 | |
| BUCKS CABARET Total | | 43 | 71 | 114 | 65 | 74 | 139 | 45 | 78 | 123 | 61 | 33 | 94 | 470 |
| BUCKS WILD | 1-Emergency | 2 | 4 | | 10 | 16 | 26 | 7 | 4 | 11 | 2 | 2 | | 1 |
| | 2-Urgent | 5 | 5 | 10 | 12 | 16 | 28 | 19 | 12 | 31 | 12 | 15 | | 107 |
| | 3-General Service | 2 | 16 | 28 | 4 | 2 | | 3 | 4 | | 5 | 4 | | 27 |
| | 4-Non Critical | 2 | 8 | 8 | 5 | | | 4 | | | 6 | 2 | | 20 |
| BUCKS WILD Total | | 11 | 31 | 42 | 16 | 25 | 41 | 29 | | 50 | 23 | 21 | 44 | 177 |
| CABARET ROYAL/CHICAS LOCAS | 1-Emergency | 2 | 4 | | 4 | 12 | | 1 | 9 | | 4 | 4 | | 43 |
| | 2-Urgent | 5 | 10 | | 10 | 2 | | 5 | 2 | | 2 | 2 | | 4 |
| | 3-General Service | 1 | 1 | | 1 | | | | 4 | | 2 | 3 | | 14 |
| | 4-Non Critical | 1 | 1 | | 1 | 1 | | 1 | | | 2 | 1 | | 6 |
| CABARET ROYAL/CHICAS LOCAS Total | | 5 | 11 | 16 | 16 | 10 | 26 | 7 | 4 | 11 | 8 | 6 | 14 | 67 |
| CHICA BONITAS | 1-Emergency | 11 | 5 | 16 | 10 | 6 | 16 | 2 | 2 | 4 | 10 | 2 | | 12 |
| | 2-Urgent | 10 | 2 | 28 | 12 | 5 | 37 | 13 | 19 | 30 | 12 | 17 | | 123 |
| | 3-General Service | 2 | 1 | 9 | 8 | 5 | 11 | 11 | 9 | 10 | 4 | 9 | | 39 |
| | 4-Non Critical | 2 | 1 | 3 | 5 | 3 | 3 | 2 | | 3 | 2 | 4 | | 13 |
| CHICA BONITAS Total | | 15 | 29 | 44 | 32 | 32 | 54 | 25 | 47 | | 19 | 23 | 42 | 187 |
| COASTER LINE - COASTER CLUB INC | 1-Emergency | 39 | 45 | 84 | 55 | 44 | 99 | 43 | 46 | 89 | 28 | 42 | 70 | 342 |
| | 2-Urgent | 22 | 26 | 48 | 21 | 25 | 46 | 28 | 28 | 54 | 18 | 22 | 40 | 188 |
| | 3-General Service | 12 | 20 | | 20 | 11 | 15 | 15 | 11 | 18 | 16 | 2 | | 61 |
| | 4-Non Critical | | | | | | | | | | | | | |
| COASTER LINE - COASTER CLUB INC Total | | 77 | 84 | 161 | 84 | 86 | 170 | 78 | 94 | 172 | 56 | 78 | 134 | 637 |
| DALLAS CABARET NORTH | 1-Emergency | | | | | | | | | | | | | |
| | 2-Urgent | 4 | 4 | | 2 | 2 | | 5 | 5 | | 3 | 1 | | 46 |
| | 3-General Service | 1 | 4 | 5 | 10 | 9 | 18 | 6 | 6 | 1 | 10 | 3 | 3 | 15 |

| | A | B | C | D | E | F | G | H | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68 | DALLAS CABARET NORTH | 4 - Non Critical | 4 | | | | | | 3 | 3 | | 2 | | 13 |
| 69 | DALLAS CABARET NORTH Total | | 11 | 12 | 23 | 17 | 12 | 13 | 17 | 24 | | 5 | 2 | |
| 70 | DALLAS CABARET SOUTH | 1 - Emergency | 1 | | | | | | | | | | | 1 |
| 71 | | 2 - Urgent | 9 | 10 | 19 | 13 | 9 | 22 | 7 | 16 | 11 | 8 | 19 | 76 |
| 72 | | 3 - General Service | 6 | 5 | 11 | 8 | 7 | 6 | 5 | 10 | 5 | 5 | 11 | 37 |
| 73 | | 4 - Non Critical | | 3 | 4 | | | 3 | | 3 | | 1 | 4 | 25 |
| 74 | DALLAS CABARET SOUTH Total | | 16 | 22 | 38 | 21 | 16 | 37 | 13 | 29 | 16 | 14 | 35 | 139 |
| 75 | DOS A GENTLEMAN'S CLUB | 1 - Emergency | | 2 | 2 | 1 | 1 | 1 | 1 | 7 | 3 | 3 | 8 | 21 |
| 76 | | 2 - Urgent | 15 | 14 | 29 | 16 | 16 | 29 | 18 | 27 | 10 | 22 | 32 | 151 |
| 77 | | 3 - General Service | 12 | 11 | 23 | 14 | 13 | 19 | 5 | 19 | 10 | 14 | 24 | 32 |
| 78 | | 4 - Non Critical | 5 | 5 | 10 | 7 | 5 | 9 | 6 | 8 | 4 | 6 | 8 | 24 |
| 79 | DOS A GENTLEMAN'S CLUB Total | | 32 | 32 | 64 | 30 | 49 | 79 | 30 | 50 | 80 | 27 | 45 | 295 |
| 80 | FOXY'S CABARET | 2 - Urgent | 2 | 2 | | | | 1 | 2 | 1 | | 3 | | 8 |
| 81 | | 3 - General Service | | | | | | | | | | | | |
| 82 | FOXY'S CABARET Total | | 4 | 2 | 2 | | 2 | 1 | 4 | 1 | 1 | 3 | | 13 |
| 83 | LA ZONA ROSA | 1 - Emergency | 23 | 29 | 52 | 5 | 6 | 28 | 6 | 44 | 15 | 12 | 10 | 197 |
| 84 | | 2 - Urgent | 24 | 40 | 40 | 48 | 26 | 74 | 16 | 41 | 27 | | | 120 |
| 85 | | 3 - General Service | 6 | 16 | 11 | 11 | 11 | 29 | 17 | 28 | 14 | 23 | 27 | |
| 86 | | 4 - Non Critical | 53 | 48 | 101 | 71 | 47 | 118 | 35 | 87 | 41 | 26 | 67 | 373 |
| 87 | LA ZONA ROSA Total | | | | | | | | | | | | | |
| 88 | LIDO ADULT THEATER | 1 - Emergency | 1 | 4 | 5 | 5 | 4 | 4 | 7 | 11 | 4 | 4 | 6 | 25 |
| 89 | | 2 - Urgent | 24 | 24 | 48 | 25 | 23 | 46 | 28 | 49 | 26 | 15 | 41 | 184 |
| 90 | | 3 - General Service | 10 | 14 | 24 | 8 | 6 | 23 | 8 | 17 | 5 | 7 | 15 | 22 |
| 91 | | 4 - Non Critical | 4 | 4 | 8 | 6 | 3 | 9 | 3 | 9 | 6 | 4 | 5 | 35 |
| 92 | LIDO ADULT THEATER Total | | 39 | 46 | 85 | 46 | 36 | 82 | 48 | 86 | 41 | 22 | 63 | 316 |
| 93 | LIPSTICK | 1 - Emergency | 3 | 1 | 3 | 3 | 2 | 2 | 2 | 2 | 4 | 4 | 3 | 7 |
| 94 | | 2 - Urgent | 6 | 12 | 24 | 16 | 11 | 17 | 11 | 20 | 9 | 4 | 14 | 16 |
| 95 | | 3 - General Service | 2 | 2 | 5 | 6 | 2 | 9 | 3 | 9 | 3 | 6 | 10 | 75 |
| 96 | | 4 - Non Critical | 2 | 2 | 2 | 2 | 2 | 5 | 2 | 6 | 1 | 2 | 5 | |
| 97 | LIPSTICK Total | | 11 | 33 | 44 | 17 | 16 | 33 | 18 | 37 | 15 | 17 | 32 | 146 |
| 98 | NEW FINE ARTS - MOCKINGBIRD | 1 - Emergency | | | | | | | | | | | | |
| 99 | | 2 - Urgent | 6 | 6 | 12 | 3 | 3 | 6 | 3 | 9 | 3 | 2 | 10 | 23 |
| 100 | | 3 - General Service | 4 | 4 | 8 | 3 | 1 | 3 | 6 | 6 | 2 | 4 | 4 | 15 |
| 101 | | 4 - Non Critical | 2 | 1 | 3 | 1 | 1 | 1 | 2 | 6 | 2 | 2 | 3 | 15 |
| 102 | NEW FINE ARTS - MOCKINGBIRD Total | | 12 | 11 | 23 | 7 | 5 | 13 | 13 | 17 | 6 | 11 | 97 | 97 |
| 103 | NEW FINE ARTS - WEST | 1 - Emergency | 4 | 4 | 19 | 15 | 12 | 12 | 8 | 26 | 7 | 3 | 10 | 25 |
| 104 | | 2 - Urgent | 11 | 19 | 30 | 11 | 9 | 23 | 8 | 18 | 8 | 8 | 27 | 27 |
| 105 | | 3 - General Service | 10 | 10 | 20 | 11 | 12 | 15 | 5 | 14 | 7 | 8 | 15 | 57 |
| 106 | | 4 - Non Critical | 2 | 2 | 4 | 2 | 2 | 4 | 2 | 7 | 3 | | 7 | 22 |
| 107 | NEW FINE ARTS - WEST Total | | 20 | 40 | 60 | 29 | 23 | 52 | 14 | 45 | 20 | 31 | 51 | 208 |
| 108 | NEW FINE ARTS -SHILOH RD | 1 - Emergency | 6 | 1 | 1 | 1 | 3 | 2 | 3 | 1 | 3 | | | 6 |
| 109 | | 2 - Urgent | 6 | 12 | 15 | 2 | 9 | 10 | 6 | 11 | 8 | 8 | | 42 |
| 110 | | 3 - General Service | 4 | 3 | 1 | 2 | 2 | 3 | 1 | 4 | 3 | 1 | | 4 |
| 111 | NEW FINE ARTS -SHILOH RD Total | | 8 | 12 | 20 | 13 | 11 | 21 | 6 | 17 | 8 | 7 | | 73 |
| 112 | ODYSSEY | 1 - Emergency | 1 | 1 | 2 | 1 | 2 | 2 | 3 | 1 | 1 | 1 | 3 | 4 |
| 113 | | 2 - Urgent | 6 | 2 | 15 | 2 | 4 | 10 | 9 | 11 | 11 | 7 | 8 | 36 |
| 114 | | 3 - General Service | 4 | 3 | 9 | 2 | 2 | 9 | 3 | 6 | 4 | 3 | 7 | |
| 115 | | 4 - Non Critical | 1 | 2 | 2 | 5 | 2 | 2 | 1 | 5 | 1 | 3 | 8 | 27 |
| 116 | | (blank) | 2 | 3 | 2 | 6 | 2 | 1 | 2 | 1 | 3 | 1 | | 12 |
| 117 | ODYSSEY Total | | 8 | 12 | 20 | 13 | 11 | 14 | 21 | 45 | 20 | | | |
| 118 | PANDORA'S MENS CLUB | 1 - Emergency | 11 | 11 | 22 | 10 | 11 | 21 | 12 | 24 | 8 | 5 | 13 | 80 |
| 119 | | 2 - Urgent | 6 | 4 | 4 | 3 | 1 | 2 | 1 | 8 | 6 | 2 | 1 | 11 |
| 120 | | 3 - General Service | 5 | 8 | 14 | 9 | 10 | 10 | 10 | 29 | 10 | 10 | 12 | 63 |
| 121 | | 4 - Non Critical | 5 | 4 | 5 | 2 | 5 | 7 | 2 | 16 | 7 | 6 | 7 | 37 |
| 122 | PANDORA'S MENS CLUB Total | | 16 | 28 | 24 | 24 | 36 | 12 | 18 | 30 | 12 | 14 | 26 | 120 |
| 123 | PANDORA'S ADULT BOOKSTORE | 1 - Emergency | 10 | 12 | 22 | 9 | 25 | 25 | 8 | 29 | 10 | 10 | 22 | 107 |
| 124 | | 2 - Urgent | 7 | 15 | 15 | 9 | 13 | 16 | 9 | 16 | 7 | 6 | 16 | 63 |
| 125 | | 3 - General Service | 5 | 4 | 2 | 4 | 4 | 9 | 4 | 9 | 2 | 1 | 6 | 25 |
| 126 | | 4 - Non Critical | 17 | 25 | 42 | 19 | 45 | 64 | 20 | 57 | 19 | 30 | 49 | 212 |
| 127 | PANDORA'S ADULT BOOKSTORE Total | | | | | | | | | | | | | |
| 128 | PARIS ADULT BOOKSTORE | 1 - Emergency | | | | | | | | | | | | 3 |
| 129 | | 2 - Urgent | 3 | 3 | 3 | 3 | 7 | 5 | 5 | 9 | 5 | 3 | 8 | 36 |
| 130 | | 3 - General Service | 3 | 2 | 5 | 1 | 3 | 4 | 2 | 7 | 2 | 1 | 5 | 15 |
| 131 | | 4 - Non Critical | 3 | 2 | 1 | 2 | 1 | 9 | 4 | 5 | 2 | 1 | 1 | 8 |
| 132 | PARIS ADULT BOOKSTORE Total | | 9 | 8 | 17 | 7 | 11 | 1 | 1 | 18 | 7 | 7 | 13 | 62 |
| 133 | PT'S MENS CLUB | 1 - Emergency | 1 | 3 | 3 | | 1 | 1 | | 1 | 2 | 3 | 5 | 9 |
| 134 | SILVER CITY CABARET | 1 - Emergency | | | | | | | | | | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 135 | SILVER CITY CABARET | | | | | | | | | | | | | | |
| 136 | | 2 - Urgent | 6 | 10 | 16 | 16 | 13 | 29 | 14 | 13 | 27 | 12 | 8 | 20 | 92 |
| 137 | | 3 - General Service | 14 | 3 | 17 | 5 | 4 | 9 | 5 | 3 | 8 | 7 | 9 | 16 | 50 |
| 138 | | 4 - Non Critical | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 3 | 6 |
| | SILVER CITY CABARET Total | | 21 | 13 | 34 | 22 | 17 | 39 | 20 | 16 | 36 | 20 | 19 | 39 | 148 |
| 139 | SPEARMINT RHINO GENTLEMAN'S CLUB | 1 - Emergency | 4 | 8 | 12 | 12 | 17 | 3 | 7 | 12 | 19 | 8 | 6 | 5 | 43 |
| 140 | | 2 - Urgent | 31 | 41 | 72 | 32 | 45 | 77 | 43 | 57 | 29 | 28 | 57 | 67 | 303 |
| 141 | | 3 - General Service | 17 | 20 | 37 | 6 | 25 | 42 | 15 | 15 | 30 | 18 | 40 | 40 | 67 |
| 142 | | 4 - Non Critical | 12 | 15 | 27 | 6 | 10 | 16 | 8 | 10 | 18 | 5 | 6 | 11 | 67 |
| 143 | SPEARMINT RHINO GENTLEMAN'S CLUB Total | | 64 | 84 | 148 | 56 | 82 | 138 | 73 | 91 | 164 | 54 | 58 | 112 | 562 |
| 144 | THE CLUBHOUSE | 1 - Emergency | | | | | | | | | | | | | |
| 145 | | 2 - Urgent | 1 | 6 | 7 | 1 | 4 | 5 | 3 | 2 | 5 | | 1 | 5 | 18 |
| 146 | | 3 - General Service | 1 | | 1 | | | | | | | | | 1 | 2 |
| 147 | | 4 - Non Critical | 1 | | 1 | | | | | | | | | | 1 |
| 148 | THE CLUBHOUSE Total | | 2 | 6 | 8 | 1 | 4 | 5 | 3 | 2 | 5 | | 2 | 6 | 18 |
| | THE LODGE BAR AND GRILL | 1 - Emergency | 3 | 10 | 13 | 1 | 6 | 6 | 4 | 3 | 7 | 2 | 2 | 5 | 31 |
| 149 | | 2 - Urgent | 2 | 2 | 4 | 4 | 1 | 6 | 3 | 5 | 8 | 7 | 9 | 15 | 33 |
| 150 | | 3 - General Service | 2 | 2 | 4 | 1 | 2 | 2 | 4 | 1 | 5 | 2 | 4 | 10 | 26 |
| 151 | | 4 - Non Critical | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 2 | 1 | 5 | 2 | 11 |
| 152 | THE LODGE BAR AND GRILL Total | | 8 | 19 | 27 | 7 | 15 | 17 | 7 | 12 | 24 | 10 | 15 | 25 | 108 |
| 153 | THE MEN'S CLUB OF DALLAS | 1 - Emergency | 4 | 5 | 9 | 6 | 7 | 13 | 8 | 6 | 14 | 7 | 6 | 13 | 45 |
| 154 | | 2 - Urgent | 2 | 5 | 7 | 9 | 9 | 18 | 11 | 12 | 23 | 10 | 8 | 8 | 47 |
| 155 | | 3 - General Service | 20 | 27 | 47 | 19 | 36 | 55 | 33 | 28 | 59 | 24 | 24 | 47 | 208 |
| 156 | | 4 - Non Critical | 8 | 19 | 27 | 17 | 15 | 32 | 12 | 12 | 24 | 10 | 15 | 25 | 108 |
| 157 | | | 1 | | 1 | 4 | 3 | 7 | 4 | | 4 | 5 | 5 | 5 | 30 |
| 158 | THE MEN'S CLUB OF DALLAS Total | | 31 | 57 | 88 | 45 | 56 | 101 | 50 | 46 | 96 | 36 | 51 | 87 | 372 |
| 159 | LINK AT PRESENT/STRIP MALL | 1 - Emergency | | | | | | | | | | | | | |
| 160 | | 2 - Urgent | 5 | 6 | 11 | 4 | 1 | 6 | 1 | 5 | 6 | 2 | 5 | 7 | 29 |
| 161 | | 3 - General Service | 2 | 2 | 4 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 4 | 11 |
| 162 | | 4 - Non Critical | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 2 | | 1 | 1 | 8 |
| 163 | (blank) | | | | | | | | | | | | | | |
| 164 | LINK AT PRESENT/STRIP MALL Total | | 7 | 10 | 17 | 8 | 5 | 13 | 2 | 10 | 12 | 5 | 7 | 12 | 54 |
| 165 | UNKNOWN AT PRESENT | 1 - Emergency | | | | | | | | | | | | | |
| 166 | | 2 - Urgent | 1 | 2 | 3 | | 3 | | 1 | 1 | 2 | 1 | 1 | 2 | 7 |
| 167 | | 3 - General Service | | | | | | | | | | | | | |
| 168 | | 4 - Non Critical | 1 | 1 | 1 | | | | 1 | 2 | | | 1 | 2 | 1 |
| 169 | UNKNOWN AT PRESENT Total | | 1 | 2 | 3 | | 3 | | 1 | 3 | 2 | 1 | 4 | 11 | 11 |
| 170 | WESTWOOD MEDIA & ENTERTAINMENT GROUP | 2 - Urgent | 1 | 1 | 1 | 2 | 1 | 5 | 1 | 1 | 1 | 1 | 2 | 10 | 10 |
| 171 | | 3 - General Service | 1 | 1 | 1 | | | | 1 | | 1 | | 7 | | 7 |
| 172 | WESTWOOD MEDIA & ENTERTAINMENT GROUP Total | | 1 | 1 | 1 | 2 | 1 | 5 | 1 | 1 | 1 | 1 | 2 | 10 | 10 |
| 173 | XPOSED ADULT THEATER | 1 - Emergency | 2 | 2 | 21 | 6 | | 13 | 8 | 15 | 23 | 2 | | 17 | 74 |
| 174 | | 2 - Urgent | 9 | 12 | 21 | 7 | 7 | 8 | 8 | 15 | 23 | 2 | 7 | 10 | 74 |
| 175 | | 3 - General Service | 10 | 3 | 3 | 2 | 2 | 1 | 1 | 8 | | 1 | 2 | 7 | 38 |
| 176 | | 4 - Non Critical | | 19 | 38 | 14 | 14 | 28 | 11 | 25 | 36 | 13 | 19 | 30 | 132 |
| 177 | XPOSED ADULT THEATER Total | | 19 | 19 | 38 | 14 | 14 | 28 | 11 | 25 | 36 | 13 | 19 | 30 | 132 |
| 178 | XTC CABARET | 1 - Emergency | 1 | 3 | 3 | 2 | 2 | 4 | 2 | 4 | 3 | 3 | 6 | 6 | 17 |
| 179 | | 2 - Urgent | 14 | 18 | 32 | 6 | 11 | 23 | 11 | 11 | 22 | 7 | 15 | 22 | 99 |
| 180 | | 3 - General Service | 7 | 9 | 16 | 10 | 3 | 3 | 3 | 3 | 7 | 2 | 5 | 4 | 44 |
| 181 | | 4 - Non Critical | 3 | 2 | 5 | 3 | 1 | 3 | 3 | 7 | 4 | 3 | 4 | 8 | 15 |
| 182 | XTC CABARET Total | | 25 | 31 | 56 | 26 | 17 | 43 | 19 | 17 | 36 | 15 | 25 | 40 | 175 |
| 183 | Grand Total | | 704 | 894 | 1588 | 812 | 845 | 1657 | 739 | 839 | 1578 | 620 | 712 | 1332 | 6155 |

| OBJECTID | Join_Count | TARGET_FID | ID | Master_Incident_Number | Response_Date | Response_Time | Watch | Jurisdiction | MRA | MBeat | MSector | MDivision | Problem | Priority_Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 433 | 1 | 61096 | 30539255 | 18-0003873 | 2018-01-01 0:00:00 | 01:18 | 1 | Dallas Police | 3078 | 522 | 520 | Northwest | 40/01 - Other | 3 |
| 434 | 1 | 61246 | 30540350 | 18-0002659 | 2018-01-01 0:00:00 | 02:32 | 1 | Dallas Police | 3025 | 534 | 530 | Northwest | 40 - Other | 3 |
| 435 | 1 | 61260 | 30540590 | 18-0002740 | 2018-01-01 0:00:00 | 02:42 | 1 | Dallas Police | 3025 | 221 | 220 | Northwest | 6X - Major Dist (Violence) | |
| 436 | 1 | 61274 | 30540472 | 18-0002830 | 2018-01-01 0:00:00 | 02:50 | 1 | Dallas Police | 3098 | 512 | 510 | Northwest | 6XA - Major Dist Ambulance | |
| 437 | 1 | 61276 | 30540489 | 18-0002826 | 2018-01-01 0:00:00 | 02:53 | 1 | Dallas Police | 3040 | 534 | 530 | Northwest | 11V - Burg Motor Veh | |
| 438 | 1 | 61292 | 30540589 | 18-0002908 | 2018-01-01 0:00:00 | 03:03 | 1 | Dallas Police | 6060 | 533 | 530 | Northwest | 07 - Minor Accident | |
| 439 | 1 | 61318 | 30540713 | 18-0002987 | 2018-01-01 0:00:00 | 03:20 | 1 | Dallas Police | 6041 | 533 | 530 | Northwest | 6X - Major Dist (Violence) | |
| 440 | 1 | 61351 | 30540842 | 18-0003083 | 2018-01-01 0:00:00 | 03:41 | 1 | Dallas Police | 3025 | 534 | 530 | Northwest | 12B - Business Alarm | |
| 441 | 1 | 61360 | 30540861 | 18-0003102 | 2018-01-01 0:00:00 | 05:13 | 1 | Dallas Police | 3078 | 534 | 530 | Northwest | 6X - Major Dist (Violence) | |
| 429 | 1 | 60504 | 30541571 | 18-0003647 | 2018-01-01 0:00:00 | 05:38 | 1 | Dallas Police | 3078 | 522 | 520 | Northwest | 24 - Abandoned Property | 4 |
| 442 | 1 | 61443 | 30542014 | 18-0003953 | 2018-01-01 0:00:00 | 07:50 | 1 | Dallas Police | 3078 | 522 | 520 | Northwest | 09V - UUMV | 4 |
| 443 | 1 | 61560 | 30542647 | 18-0004406 | 2018-01-01 0:00:00 | 10:22 | 2 | Dallas Police | 3100 | 514 | 510 | Northwest | 31 - Criminal Mischief | 4 |
| 444 | 1 | 61597 | 30542832 | 18-0004544 | 2018-01-01 0:00:00 | 11:04 | 2 | Dallas Police | 3005 | 552 | 550 | Northwest | 32 - Suspicious Person | |
| 445 | 1 | 61598 | 30542834 | 18-0004559 | 2018-01-01 0:00:00 | 11:05 | 2 | Dallas Police | 3100 | 521 | 520 | Northwest | 11V - Burg Motor Veh | |
| 446 | 1 | 61659 | 30543131 | 18-0004778 | 2018-01-01 0:00:00 | 12:11 | 2 | Dallas Police | 3078 | 222 | 220 | Northeast | 12B - Business Alarm | |
| 447 | 1 | 61720 | 30543444 | 18-0004960 | 2018-01-01 0:00:00 | 13:03 | 2 | Dallas Police | 6041 | 533 | 530 | Northwest | 38 - Meet Complainant | 4 |
| 448 | 1 | 61747 | 30543591 | 18-0005063 | 2018-01-01 0:00:00 | 13:32 | 2 | Dallas Police | 3078 | 522 | 520 | Northwest | 40/01 - Other | |
| 449 | 1 | 61815 | 30543933 | 18-0005400 | 2018-01-01 0:00:00 | 14:53 | 3 | Dallas Police | 3100 | 514 | 510 | Northwest | 04 - 911 Hang Up | |
| 450 | 1 | 62084 | 30545547 | 18-0006572 | 2018-01-01 0:00:00 | 19:03 | 3 | Dallas Police | 1203 | 222 | 220 | Northeast | 12B - Business Alarm | 4 |
| 451 | 1 | 62099 | 30545637 | 18-0006616 | 2018-01-01 0:00:00 | 19:14 | 3 | Dallas Police | 3041 | 534 | 530 | Northwest | 12B - Business Alarm | |
| 452 | 1 | 62109 | 30545698 | 18-0006669 | 2018-01-01 0:00:00 | 19:26 | 3 | Dallas Police | 3078 | 522 | 520 | Northwest | 40 - Other | |
| 453 | 1 | 62169 | 30546021 | 18-0006901 | 2018-01-01 0:00:00 | 20:22 | 3 | Dallas Police | 3098 | 510 | 510 | Northwest | 06 - Minor Disturbance | 4 |
| 454 | 1 | 62242 | 30546430 | 18-0007231 | 2018-01-01 0:00:00 | 21:28 | 3 | Dallas Police | 1117 | 310 | 310 | Southeast | 12B - Business Alarm | |
| 455 | 1 | 62293 | 30546718 | 18-0007467 | 2018-01-01 0:00:00 | 22:21 | 3 | Dallas Police | 1203 | 222 | 220 | Northeast | 40 - Other | |
| 456 | 1 | 62478 | 30547722 | 18-0008281 | 2018-01-01 0:00:00 | 22:49 | 1 | Dallas Police | 3099 | 512 | 510 | Northwest | 40/01 - Other | |
| 457 | 1 | 62506 | 30547913 | 18-0008407 | 2018-01-02 0:00:00 | 03:57 | 1 | Dallas Police | 3078 | 522 | 520 | Northwest | 6X - Major Dist (Violence) | |
| 463 | 1 | 63286 | 30552020 | 18-0010165 | 2018-01-02 0:00:00 | 12:39 | 2 | Dallas Police | 3041 | 534 | 530 | Northwest | 6X - Major Dist (Violence) | |
| 466 | 1 | 63744 | 30550948 | 18-0010165 | 2018-01-02 0:00:00 | 13:23 | 2 | Dallas Police | 3025 | 534 | 530 | Northwest | 6X - Major Dist (Violence) | |
| 460 | 1 | 62854 | 30550088 | 18-0010885 | 2018-01-02 0:00:00 | 14:20 | 2 | Dallas Police | 4451 | 521 | 520 | Northwest | 6XFA - Disturbance Emerg Amb | 1 |
| 462 | 1 | 63239 | 30551190 | 18-0010719 | 2018-01-02 0:00:00 | 15:07 | 2 | Dallas Police | 3025 | 534 | 530 | Northwest | 09 - Theft | |
| 458 | 1 | 62655 | 30552979 | 18-0012337 | 2018-01-02 0:00:00 | 19:19 | 3 | Dallas Police | 3041 | 534 | 530 | Northwest | 40 - Other | |
| 464 | 1 | 63336 | 30553527 | 18-0012756 | 2018-01-02 0:00:00 | 20:46 | 3 | Dallas Police | 1203 | 222 | 220 | Northeast | DAS/DA5 Active Shooter Veh | |
| 465 | 1 | 63420 | 30554963 | 18-0013837 | 2018-01-03 0:00:00 | 01:06 | 1 | Dallas Police | 3100 | 514 | 510 | Northwest | 11V - Burg Motor Veh | |
| 461 | 1 | 62979 | 30555556 | 18-0014916 | 2018-01-03 0:00:00 | 02:20 | 1 | Dallas Police | 3008 | 504 | 500 | Northwest | 12B - Business Alarm | |
| 468 | 1 | 62981 | 30555577 | 18-0014936 | 2018-01-03 0:00:00 | 08:36 | 1 | Dallas Police | 4451 | 521 | 520 | Northwest | 12B - Business Alarm | |
| 467 | 1 | 64347 | 30561858 | 18-0019135 | 2018-01-03 0:00:00 | 21:29 | 2 | Dallas Police | 1203 | 222 | 220 | Northeast | 40 - Other | |
| 469 | 1 | 64811 | 30562487 | 18-0019618 | 2018-01-03 0:00:00 | 23:17 | 3 | Dallas Police | 3099 | 512 | 510 | Northwest | 41/40 - Other - In Progress | 1 |
| 470 | 1 | 65033 | 30563413 | 18-0020397 | 2018-01-04 0:00:00 | 02:18 | 3 | Dallas Police | 3100 | 514 | 510 | Northwest | 6X - Major Dist (Violence) | |
| 499 | 1 | 68412 | 30564691 | 18-0021302 | 2018-01-04 0:00:00 | 08:43 | 2 | Dallas Police | 1202 | 221 | 220 | Northwest | 07 - Minor Accident | |
| 500 | 1 | 68456 | 30566555 | 18-0022743 | 2018-01-04 0:00:00 | 13:51 | 2 | Dallas Police | 3005 | 552 | 550 | Northwest | 6X - Major Dist (Violence) | |
| 478 | 1 | 66337 | 30566996 | 18-0022084 | 2018-01-04 0:00:00 | 14:58 | 2 | Dallas Police | 3040 | 530 | 530 | Northwest | 04 - 911 Hang Up | |
| 492 | 1 | 67547 | 30567315 | 18-0023333 | 2018-01-04 0:00:00 | 15:36 | 2 | Dallas Police | 1203 | 222 | 220 | Northeast | 6X - Major Dist (Violence) | |
| 498 | 1 | 68059 | 30568617 | 18-0024963 | 2018-01-04 0:00:00 | 18:31 | 3 | Dallas Police | 3098 | 512 | 510 | Northwest | 07 - Minor Accident | |
| 493 | 1 | 67568 | 30569659 | 18-0025042 | 2018-01-04 0:00:00 | 20:41 | 3 | Dallas Police | 3100 | 514 | 510 | Northwest | 40/01 - Other | |
| 501 | 1 | 68485 | 30569899 | 18-0025552 | 2018-01-04 0:00:00 | 21:44 | 3 | Dallas Police | 4451 | 521 | 520 | Northwest | 11V - Burg Motor Veh | |
| 502 | 1 | 68697 | 30569942 | 18-0025598 | 2018-01-04 0:00:00 | 21:51 | 3 | Dallas Police | 3078 | 522 | 520 | Northwest | 32 - Suspicious Person | |
| 471 | 1 | 65568 | 30571044 | 18-0026301 | 2018-01-05 0:00:00 | 01:50 | 1 | Dallas Police | 4451 | 521 | 520 | Northwest | 6X - Major Dist (Violence) | |
| 489 | 1 | 67281 | 30571373 | 18-0026571 | 2018-01-05 0:00:00 | 03:20 | 1 | Dallas Police | 1202 | 522 | 520 | Northeast | 40/01 - Other | |
| 497 | 1 | 67865 | 30571400 | 18-0026591 | 2018-01-05 0:00:00 | 03:28 | 1 | Dallas Police | 3078 | 221 | 220 | Northwest | 11B - Burg of Bus | |
| 474 | 1 | 65888 | 30571597 | 18-0026753 | 2018-01-05 0:00:00 | 04:22 | 1 | Dallas Police | 1202 | 222 | 220 | Northeast | 7X - Major Accident | |
| 472 | 1 | 65379 | 30572064 | 18-0027136 | 2018-01-05 0:00:00 | 07:01 | 1 | Dallas Police | 3040 | 534 | 530 | Northwest | 12B - Business Alarm | |
| 491 | 1 | 65379 | 30572837 | 18-0027742 | 2018-01-05 0:00:00 | 09:36 | 2 | Dallas Police | 3100 | 521 | 520 | Northwest | 7X - Major Accident | |
| 496 | 1 | 67331 | 30573178 | 18-0028023 | 2018-01-05 0:00:00 | 10:38 | 2 | Dallas Police | 4451 | 521 | 520 | Northwest | 09V - UUMV | |
| 496 | 1 | 67850 | 30574588 | 18-0029145 | 2018-01-05 0:00:00 | 14:04 | 2 | Dallas Police | 3099 | 512 | 510 | Northwest | 37F - Freeway Blockage | 2 |

| P | Priority_Description | Location_Name | Address | Apt | City | State | Postal_Code | Map_Info | Call_Disposition |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 - Urgent | MOTEL 6 | 1625 Regal Row | 217 | Dallas | TX | 75247 | 33-K | NP - No Police Action |
| 2 | 3 - General Service | DALLAS CABARET SOUTH | 2444 Walnut Ridge St | | Dallas | TX | 75229 | 22-M | NP - No Police Action |
| 3 | 2 - Urgent | LAMPLIGHTER HOTEL | 9033 E R L Thornton Serv Wb | | Dallas | TX | 75247 | 48-F | NC - No Compliant |
| 4 | 4 - Non Critical | JACK OF DIAMONDS NIGHT CLUB | 9009 Sovereign Row | | Dallas | TX | 75247 | 33-S | NP - No Police Action |
| 5 | 2 - Urgent | | 10945 Composite Dr | | Dallas | TX | 75220 | 22-R | NP - No Police Action |
| 6 | 4 - Non Critical | ONYX CLUB | 2151 Manana Dr | | Dallas | TX | 75220 | 22-P | NC - No Compliant |
| 7 | 3 - General Service | | 2030 W Northwest Hwy | | Dallas | TX | 75220 | 22-U | NP - No Police Action |
| 8 | 2 - Urgent | IMPORT WAREHOUSE INC | 11029 Harry Hines Blvd | | Dallas | TX | 75229 | 23-J | AF - Alarm False |
| 9 | 4 - Non Critical | ONYX CLUB | 2151 Manana Dr | | Dallas | TX | 75220 | 22-P | NP - No Police Action |
| 10 | 2 - Urgent | WHATABURGER | 8850 N Stemmons Serv Nb | | Dallas | TX | 75247 | 33-K | NP - No Police Action |
| 11 | 4 - Non Critical | WHATABURGER ( stemmons @ regal row | 8850 N Stemmons Serv Nb | | Dallas | TX | 75247 | 33-K | NC - No Compliant |
| 12 | 4 - Non Critical | WHATABURGER ( stemmons @ regal row | 8850 N Stemmons Serv Nb | | Dallas | TX | 75247 | 33-K | NP - No Police Action |
| 13 | 4 - Non Critical | ROYAL INN | 7050 N Stemmons Serv Nb | 207 | Dallas | TX | 75247 | 22-U | NC - No Compliant |
| 14 | 2 - Urgent | CROWNE PLAZA MKT CTR | 7050 N Stemmons Serv Nb | 110 | Dallas | TX | 75247 | 33-U | NP - No Police Action |
| 15 | 4 - Non Critical | TOYOTA OF DALLAS | 2610 Forest Ln | | Dallas | TX | 75235 | 13-W | C - Cover Only |
| 16 | 2 - Urgent | SUBWAY | 1710 W Mockingbird Ln | | Dallas | TX | 75235 | 14-Q | C - Cover Only |
| 17 | 2 - Urgent | THE GARDEN INN SUITES | 9211 E R L Thornton Fwy Wb | | Dallas | TX | 75220 | 48-G | AF - Alarm False |
| 18 | 4 - Non Critical | FIESTA FURNITURE | 2287 W Northwest Hwy | 108 | Dallas | TX | 75220 | 23-P | NP - No Police Action |
| 19 | 2 - Urgent | WHATABURGER ( stemmons @ regal row | 8850 N Stemmons Serv Nb | | Dallas | TX | 75247 | 23-S | AF - Alarm False |
| 20 | 3 - General Service | | 10679 Harry Hines Blvd | 8 | Dallas | TX | 75220 | 23-K | R - Report |
| 21 | 3 - General Service | T MOBILE | 2361 W Northwest Hwy | | Dallas | TX | 75220 | 23-W | R - Report |
| 22 | 3 - Emergency | BEST WESTERN | 8850 N Stemmons Serv Nb | | Dallas | TX | 75247 | 33-N | C - Cover Only |
| 23 | 3 - General Service | MATH DISCOUNT MERCHANDISE | 9200 John W Carpenter Fwy Nb | 210 | Dallas | TX | 75228 | 33-N | C - Cover Only |
| 24 | 1 - Emergency | EL PAISA | 9208 E R L Thornton Fwy Eb | | Dallas | TX | 75228 | 48-G | AF - Alarm False |
| 25 | 3 - General Service | GARDEN INN AND SUITES | 9211 E R L Thornton Serv Wb | | Dallas | TX | 75228 | 48-G | NP - No Police Action |
| 26 | 2 - Urgent | XPOSED ADULT VIDEO | 910 W Mockingbird Ln | | Dallas | TX | 75247 | 33-X | C - Cover Only |
| 27 | 4 - Non Critical | CLUB XTC ( (stemmons & viceroy) | 8550 N Stemmons Serv Nb | | Dallas | TX | 75247 | 33-P | C - Cover Only |
| 28 | 2 - Urgent | | Firewood Dr / Harry Hines Blvd | | Dallas | TX | 75220 | 23-S | R - Report |
| 29 | 1 - Emergency | | 11159 Reeder Rd | | Dallas | TX | 75229 | 22-H | R - Report |
| 30 | 4 - Non Critical | S&F T LOC STORAGE | 2361 W Northwest Hwy | 209 | Dallas | TX | 75220 | 23-W | R - Report |
| 31 | 1 - Emergency | | 11093 Harry Hines Blvd | 203 | Dallas | TX | 75229 | 23-J | R - Report |
| 32 | 3 - General Service | | 10844 Harry Hines Blvd | | Dallas | TX | 75220 | 23-N | NP - No Police Action |
| 33 | 3 - General Service | | 9211 E R L Thornton Serv Wb | 108 | Dallas | TX | 75228 | 48-G | NP - No Police Action |
| 34 | 1 - Emergency | Tiger Cabaret | 9125 E R L Thornton Fwy Wb | | Dallas | TX | 75228 | 48-G | NP - No Police Action |
| 35 | 2 - Urgent | CROWNE PLAZA | 7050 N Stemmons Serv Nb | | Dallas | TX | 75247 | 33-U | R - Report |
| 36 | 3 - General Service | LAS HADAS MEXICAN RESTAURANT | 13111 Harry Hines Blvd | 601 | Dallas | TX | 75229 | 22-H | AF - Alarm False |
| 37 | 3 - General Service | *TEXAS CAR WORLD | 2333 W Northwest Hwy | 102 | Dallas | TX | 75220 | 23-W | AF - Alarm False |
| 38 | 3 - General Service | | 2351 W NORTHWEST HWY | | Dallas | TX | 75220 | 23-W | NP - No Police Action |
| 39 | 1 - Emergency | | N STEMMONS FWY NB / JOHN W CARPENTER FWY NB | | Dallas | TX | 75220 | 33-U | NP - No Police Action |
| 40 | 2 - Urgent | CROWNE PLAZA MKT CTR | 7050 N Stemmons Serv Nb | | Dallas | TX | 75247 | 33-U | NP - No Police Action |
| 41 | 3 - General Service | lamp lighter motel | E R L Thornton Serv Wb / Dilido Rd | | Dallas | TX | 75228 | 48-F 48-F | NP - No Police Action |
| 42 | 3 - General Service | TOYOTA OF DALLAS | 2610 Forest Ln | 211 | Dallas | TX | 75229 | 13-W | NP - No Police Action |
| 43 | 2 - Urgent | PEOPLE READY | 2526 MANANA DR | | Dallas | TX | 75220 | 22-V | C - Cover Only |
| 44 | 2 - Urgent | CASH, PLUS PAWN | 9103 E R L Thornton Fwy Wb | | Dallas | TX | 75228 | 48-F | M - Mark Out Only |
| 45 | 3 - General Service | BLISS ADULT ARCADE THEATER | 9109 John W Carpenter Serv Sb | | Dallas | TX | 75247 | 33-N | R - Report |
| 46 | 2 - Urgent | | 1200 Plantation Rd | | Dallas | TX | 75235 | 14-R | R - Report |
| 47 | 4 - Non Critical | HOLIDAY INN EXPRESS | 2287 W Northwest Hwy | | Dallas | TX | 75220 | 22-Z | R - Report |
| 48 | 2 - Urgent | MOTEL 6 | 1625 Regal Row | | Dallas | TX | 75247 | 33-K | M - Mark Out Only |
| 49 | 2 - Urgent | HOLIDAY INN | 2287 W Northwest Hwy | | Dallas | TX | 75220 | 22-Z | NP - No Police Action |
| 50 | 2 - Urgent | MOTEL 6 | 1625 Regal Row | | Dallas | TX | 75247 | 33-K | C - Cover Only |
| 51 | 3 - General Service | LAMPLIGHTER HOTEL | 9033 E R L Thornton Serv Wb | 124 | Dallas | TX | 75228 | 48-F | R - Report |
| 52 | 2 - Urgent | Tiger Cabaret | 9125 E R L Thornton Serv Wb | | Dallas | TX | 75228 | 48-G | AF - Alarm False |
| 53 | 3 - General Service | METROPLEX BATTERY | 2750 Electronic Ln | | Dallas | TX | 75247 | 33-U | R - Report |
| 54 | 4 - Non Critical | CROWNE PLAZA MKT CTR | 7050 N Stemmons Serv Nb | 1616 | Dallas | TX | 75220 | 33-U | NC - No Compliant |
| 55 | 2 - Urgent | | 2351 W NORTHWEST HWY | | Dallas | TX | 75220 | 23-W | NC - No Compliant |
| 56 | 2 - Urgent | | John W Carpenter Fwy Nb / N Stemmons Fwy Nb | 1014 | Dallas | TX | 75247 | 33-U | NP - No Police Action |

COD_006258

| | Y | Z | AA | | AC | AD | AE | AF | AG | AH |
|---|---|---|---|---|---|---|---|---|---|---|
| | Cancel_Reason | Year | Time_PhonePickUp | Time_PhonePickUp | Group_Time | Group_A_B | Time_FirstCallTakingKeyStroke | Fixed_Time_CallEnteredQueue | Time_CallEnteredQueue | Time_First_Unit_Assigned |

| | Time_First_Unit_Enroute | Time_First_Unit_Arrived | TimeFirstCallCleared | Elapsed_CallRcvd2CallClosed | Time_CallClosed | TAAG_Name | RA | Division | Sector | Beat | District | New District | Community |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2018-03-29 21:09:00 | 2018-03-29 21:21:41 | 2018-03-29 23:39:49 | 1900-01-01 02:47:58 | 2018-03-29 23:39:49 | John Carpenter Stemmons | 3078 | NORTHWEST | 520 | 522 | 2 | D6 | |
| 2 | 2018-07-05 14:14:15 | 2018-07-05 14:18:20 | 2018-07-05 14:35:59 | 1900-01-01 03:28 | 2018-07-05 14:35:59 | John Carpenter Stemmons | 6060 | NORTHWEST | 530 | 532 | 2 | D6 | |
| 3 | 2018-07-17 23:11:40 | 2018-07-17 23:08:57 | 2018-07-17 23:19:20 | 1900-01-01 0:58:48 | 2018-07-17 23:19:20 | NWHwy WaltonWalker | 6060 | NORTHWEST | 520 | 521 | 6 | D6 | |
| 4 | 2018-07-29 23:54:46 | 2018-07-29 3:08:09 | 2018-07-29 7:10:44 | 1900-01-01 4:36:51 | 2018-07-29 7:10:44 | NWHwy WaltonWalker | 3025 | NORTHWEST | 520 | 534 | 6 | D6 | |
| 5 | 2018-08-02 9:33:37 | 2018-08-02 9:33:37 | 2018-08-02 10:16:59 | 1900-01-01 1:02:20 | 2018-08-02 10:20:57 | NWHwy WaltonWalker | 3025 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 6 | 2018-08-15 05:58:36 | 2018-08-15 1:03:57 | 2018-08-15 1:08:47 | 1900-01-01 0:14:59 | 2018-08-15 1:08:47 | NWHwy WaltonWalker | 3025 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 7 | 2018-09-06 4:26:52 | 2018-09-06 4:26:52 | 2018-09-06 6:08:57 | 1900-01-01 2:08:52 | 2018-09-06 6:08:57 | NWHwy WaltonWalker | 3025 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 8 | 2018-09-30 16:34:52 | 2018-09-30 16:38:20 | 2018-09-30 16:38:20 | | 2018-09-30 16:38:20 | NWHwy WaltonWalker | 3078 | NORTHWEST | 520 | 522 | 2 | D2 | |
| 9 | 2018-09-30 18:28:42 | 2018-10-06 11:55:04 | 2018-09-30 18:38:20 | | 2018-10-06 12:11:50 | John Carpenter Stemmons | 4451 | NORTHWEST | 520 | 521 | 6 | D6 | |
| 10 | 2019-02-12 3:39:08 | 2019-02-12 3:44:51 | 2019-02-12 3:53:12 | | 2019-02-12 3:53:12 | John Carpenter Stemmons | 4451 | NORTHWEST | 530 | 521 | 6 | D6 | |
| 11 | 2019-05-17 11:03:19 | 2019-05-17 11:26:45 | 2019-05-17 11:41:45 | | 2019-05-17 11:41:45 | NWHwy WaltonWalker | 3025 | NORTHWEST | 520 | 534 | 6 | D6 | |
| 12 | 2019-09-12 12:20:37 | 2019-09-12 12:39:28 | 2019-09-12 13:47:18 | 1900-01-01 1:45:39 | 2019-09-12 13:47:18 | NWHwy WaltonWalker | 3025 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 13 | 2019-10-15 09:06:37 | 2019-10-15 10:16:42 | 2019-10-15 10:16:42 | 1900-01-01 2:16:21 | 2019-10-15 11:18:47 | NWHwy WaltonWalker | 3025 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 14 | 2019-10-15 17:03:13 | 2019-10-15 18:11 | 2019-10-15 19:52:56 | | 2019-10-15 19:52:56 | | 3025 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 15 | 2019-10-23 10:06:46 | 2019-11-20 1:20:38 | 2019-11-20 1:20:38 | | 2019-11-20 2:02:09 | NWHwy WaltonWalker | 4451 | NORTHWEST | 530 | 521 | 6 | D6 | |
| 16 | 2020-02-14 8:05:37 | 2018-10-20 8:02:46 | 2018-10-20 8:40:45 | 1900-01-01 0:38:46 | 2018-10-20 8:40:45 | Bucknell 30 | 3041 | NORTHEAST | 220 | 221 | 7 | D7 | |
| 17 | 2019-11-21 1:49:19 | 2020-03-11 2:10:53 | 2018-10-20 8:46:58 | 1900-01-01 0:46:39 | 2018-10-20 8:49:46 | Bucknell 30 | 4451 | NORTHWEST | 520 | 521 | 6 | D6 | |
| 18 | 2020-06-10 21:39:11 | 2019-09-11 1:23:51:44 | 2020-03-11 2:21:44 | 1900-01-01 0:58:36 | 2020-03-11 2:21:44 | NWHwy WaltonWalker | 3099 | NORTHWEST | 530 | 534 | 6 | D7 | |
| 19 | 2021-02-06 18:27:57 | 2020-06-10 21:39:11 | 2020-06-10 22:01:22 | 1900-01-01 1:13:08 | 2020-06-10 22:01:22 | NWHwy WaltonWalker | 3040 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 20 | 2021-02-15 00:14:00 | 2021-02-06 18:43:45 | 2021-02-06 18:48:32 | 1900-01-01 1:10:39 | 2021-02-06 18:48:32 | Bucknell 30 | 1217 | SOUTHEAST | 310 | 318 | 7 | D7 | |
| 21 | 2021-02-15 23:08:51 | 2021-02-15 21:01:18 | 2021-02-15 21:01:18 | | 2021-02-15 21:01:18 | | 3025 | NORTHWEST | 530 | 521 | 6 | D6 | |
| 22 | 2021-02-15 20:28:51 | 2021-02-28 15:16:39 | 2021-02-28 15:16:26 | 1900-01-01 0:57:37 | 2021-02-28 1:54:26 | NWHwy WaltonWalker | 3055 | NORTHWEST | 510 | 533 | 6 | D6 | |
| 23 | 2021-04-14 15:57:34 | 2021-04-14 14:56:39 | 2021-04-14 15:05:05 | 1900-01-01 1:36:01 | 2021-04-14 15:05:05 | NWHwy WaltonWalker | 6060 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 24 | 2021-06-19 17:58:36 | 2021-06-19 17:58:36 | 2021-06-19 19:39:39 | 1900-01-01 2:52:19 | 2021-06-19 19:39:39 | NWHwy WaltonWalker | 6060 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 25 | 2018-08-06 4:41:05 | 2018-08-06 4:41:05 | 2018-08-06 4:49:05 | 1900-01-01 2:28:15 | 2021-08-06 4:49:21 | NWHwy WaltonWalker | 4451 | NORTHWEST | 520 | 521 | 6 | D6 | |
| 26 | 2018-07-27 15:59:08 | 2018-07-27 15:59:08 | 2018-07-27 16:03:07 | 1900-01-01 0:28:04 | 2018-07-27 16:09:48 | NWHwy WaltonWalker | 1202 | NORTHEAST | 220 | 221 | 7 | D7 | |
| 27 | 2018-10-20 20:48 | 2018-10-20 8:32:12 | 2018-10-20 8:46:58 | 1900-01-01 0:46:39 | 2018-10-20 8:46:58 | John Carpenter Stemmons | 4451 | NORTHWEST | 520 | 521 | 6 | D6 | |
| 28 | 2019-11-20 1:20:46 | 2019-11-20 1:20:46 | 2018-10-20 8:46:48 | 1900-01-01 1:36:01 | 2018-11-20 8:55:08 | NWHwy WaltonWalker | 3025 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 29 | 2020-02-14 8:20:57 | 2020-02-11 6:12:14 | 2020-02-12 7:04:05 | 1900-01-01 1:05:47 | 2020-02-14 16:52:07 | NWHwy WaltonWalker | 6040 | NORTHWEST | 520 | 533 | 6 | D6 | |
| 30 | 2020-05-13 15:18:47 | 2020-05-13 15:20:31 | 2020-05-13 15:36:11 | 1900-01-01 2:07:46 | 2020-05-13 15:36:11 | NWHwy WaltonWalker | 6040 | NORTHWEST | 520 | 521 | 6 | D6 | |
| 31 | 2020-06-22 2:23:59 | 2020-06-22 2:38:49 | 2020-06-22 2:46:19 | 1900-01-01 0:24:39 | 2020-06-23 3:01:33 | NWHwy WaltonWalker | 4451 | NORTHWEST | 510 | 521 | 6 | D2 | |
| 32 | 2021-02-22 15:40:38 | 2021-02-22 15:49:46 | 2021-02-22 16:30:05 | 1900-01-01 4:11:28 | 2021-02-22 18:11:52 | NWHwy WaltonWalker | 3100 | NORTHWEST | 510 | 544 | 2 | D2 | |
| 33 | 2021-05-12 10:40 | 2021-05-12 3:24:04 | 2021-05-12 3:48:05 | | | | 3100 | NORTHWEST | 510 | 521 | 6 | D6 | |
| 34 | 2018-03-16 13:39:36 | 2018-03-16 13:45:52 | 2018-03-16 15:38:36 | 1900-01-01 2:07:59 | 2018-03-16 15:38:36 | John Carpenter Stemmons | 3056 | NORTHWEST | 510 | 512 | 6 | D6 | |
| 35 | 2018-06-15 20:38:02 | 2018-06-15 20:51:18 | 2018-06-15 21:41:03 | 1900-01-01 1:52:48 | 2018-06-15 21:41:03 | | 3098 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 36 | 2018-12-04 4:54:25 | 2018-12-04 5:47:34 | 2018-12-04 6:12:37 | 1900-01-01 1:01:27 | 2018-12-04 5:12:37 | Bucknell 30 | 3040 | NORTHWEST | 530 | 534 | 10 | D10 | |
| 37 | 2019-06-18 8:59:58 | 2019-06-18 9:01:27 | 2019-06-18 9:21:20 | 1900-01-01 0:39:18 | 2019-06-18 9:21:20 | NWHwy WaltonWalker | 3100 | NORTHWEST | 510 | 521 | 6 | D6 | |
| 38 | 2021-06-20 12:57:06 | 2021-06-20 13:19:14 | 2021-06-20 13:29:24 | 1900-01-01 2:15:21 | 2021-06-20 13:29:24 | NWHwy WaltonWalker | 3100 | NORTHWEST | 530 | 534 | 2 | D2 | |
| 39 | 2021-09-26 7:49:18 | 2021-09-26 7:49:18 | 2021-09-26 7:49:33 | 1900-01-01 2:51:54 | 2021-09-26 7:49:33 | NWHwy WaltonWalker | 3025 | NORTHWEST | 520 | 534 | 6 | D6 | |
| 40 | 2018-06-13 4:26:58 | 2018-06-13 4:34:16 | 2018-06-13 4:59:45 | 1900-01-01 1:22:14 | 2018-06-13 5:48:35 | John Carpenter Stemmons | 3025 | NORTHWEST | 520 | 533 | 6 | D6 | |
| 41 | 2019-06-22 3:02:10 | 2019-06-22 3:02:10 | 2019-06-22 4:44:05 | 1900-01-01 2:11:49 | 2019-06-22 4:44:05 | John Carpenter Stemmons | 3078 | NORTHWEST | 520 | 522 | 6 | D6 | |
| 42 | 2020-04-01 9:09:29 | 2020-04-01 9:09:29 | 2020-04-01 9:19:25 | 1900-01-01 0:19:53 | 2020-04-01 9:10:39 | John Carpenter Stemmons | 3091 | NORTHWEST | 530 | 513 | 6 | D6 | |
| 43 | 2020-05-16 1:38:37 | 2020-05-16 2:06:50 | 2020-05-16 2:08:07 | 1900-01-01 2:17:28 | 2020-05-16 2:08:07 | Bucknell 30 | 1202 | NORTHEAST | 220 | 221 | 7 | D7 | |
| 44 | 2020-07-19 17:30:28 | 2020-07-19 17:37:53 | 2020-07-19 18:47:59 | 1900-01-01 1:56:32 | 2020-07-19 18:47:59 | NWHwy WaltonWalker | 6041 | NORTHWEST | 520 | 533 | 6 | D6 | |
| 45 | 2021-01-04 13:08:19 | 2021-01-04 13:08:19 | 2021-01-04 13:56:58 | 1900-01-01 1:14:37 | 2021-01-04 13:56:58 | NWHwy WaltonWalker | 1057 | NORTHWEST | 530 | 534 | 10 | D10 | |
| 46 | 2021-05-06 13:01:47 | 2021-05-06 13:07:27 | 2021-05-06 13:18:22 | 1900-01-01 0:20:43 | 2021-05-06 13:18:22 | NWHwy WaltonWalker | 3040 | NORTHWEST | 510 | 534 | 6 | D6 | |
| 47 | 2021-07-01 8:14:23 | 2021-07-01 8:22:47 | 2021-07-01 8:31:41 | 1900-01-01 1:19:17 | 2021-07-01 8:31:41 | | 3025 | NORTHWEST | 520 | 534 | 6 | D6 | |
| 48 | 2018-07-07 1:08:39 | 2021-07-07 1:09:39 | 2021-07-07 1:29:16 | | 2021-07-07 1:29:16 | NWHwy WaltonWalker | 6041 | NORTHWEST | 520 | 533 | 6 | D6 | |
| 49 | 2018-09-05 15:14:15 | 2018-09-05 15:14:15 | 2021-07-07 8:52:34 | 1900-01-01 0:26:03 | 2021-07-05 8:52:34 | NWHwy WaltonWalker | 6041 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 50 | 2018-09-05 15:09:34 | 2018-09-05 15:12:41 | 2018-09-05 15:33:51 | 1900-01-01 0:50:59 | 2018-09-05 15:57:07 | NWHwy WaltonWalker | 6060 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 51 | 2018-09-15 12:10:32 | 2018-09-15 12:19:41 | 2018-09-15 12:38:55 | 1900-01-01 1:07:22 | 2018-09-15 12:39:08 | Bucknell 30 | 1202 | NORTHEAST | 220 | 221 | 7 | D7 | |
| 52 | 2018-11-20 17:53:28 | 2018-11-20 18:16:02 | 2018-11-20 20:31:46 | 1900-01-01 2:54:03 | 2018-11-20 20:31:46 | NWHwy WaltonWalker | 6040 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 53 | 2019-04-14 11:18:45 | 2019-04-14 11:30:25 | 2019-04-14 11:35:42 | 1900-01-01 4:11:35:42 | 2019-04-14 11:35:42 | NWHwy WaltonWalker | 6041 | NORTHWEST | 530 | 533 | 6 | D6 | |
| 54 | 2019-08-03 12:37:40 | 2019-08-03 12:37:40 | 2018-08-03 13:25:59 | 1900-01-01 1:41:52 | 2019-08-03 14:09:16 | NWHwy WaltonWalker | 3056 | NORTHWEST | 520 | 521 | 6 | D6 | |
| 55 | 2019-09-22 20:37:58 | 2019-09-22 20:33:10 | 2019-09-22 20:33:10 | | 2019-09-22 21:04:52 | NWHwy WaltonWalker | 3040 | NORTHWEST | 530 | 534 | 6 | D6 | |
| 56 | 2020-06-29 13:26:29 | 2020-06-29 13:33:13 | 2020-06-29 14:34:31 | 1900-01-01 1:13:08 | 2020-06-29 14:37:07 | NWHwy WaltonWalker | 6041 | NORTHWEST | 530 | 533 | 6 | D6 | |

COD_006836

| | AV | AW | AX | AY | AZ | BA | BB | BC | BD |
|---|---|---|---|---|---|---|---|---|---|
| 1 | VCRP_Area | ZipCode | GridID | POINT_X | POINT_Y | USER_SOB_Name | USER_Address | USER_License_Type | BUFF_DIST |
| 2 | STEMMONS_EMP/RECENTRAL_VC | 75247 | 61833 | 2468300.139 | 6988261.494 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 3 | | 75247 | 63886 | 2468073.763 | 6991126.544 | LA ZONA ROSA | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 4 | | 75220 | 72538 | 2458328.771 | 7003751.75 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 5 | | 75229 | 78661 | 2463814.735 | 7008232.749 | CHICA BONITAS | 11044 HARRY HINES BLVD | ARCADE | 500 |
| 6 | | 75229 | 79588 | 2463382.132 | 7009215.052 | PARIS ADULT BOOKSTORE | 11118 HARRY HINES BLVD | ARCADE | 500 |
| 7 | | 75220 | 70545 | 2464008.39 | 6999565.293 | THE MEN'S CLUB OF DALLAS | 2340 W NORTHWEST HWY | CABARET | 500 |
| 8 | | 75247 | 63658 | 2467913.937 | 6999934.504 | LA ZONA ROSA | 1676 REGAL ROW, DALLAS | CABARET | 500 |
| 9 | | 75220 | 70826 | 2463277.074 | 6999853.765 | THE MEN'S CLUB OF DALLAS | 2340 W NORTHWEST HWY | CABARET | 500 |
| 10 | | 75220 | 70826 | 2463277.074 | 6999853.765 | THE MEN'S CLUB OF DALLAS | 2340 W NORTHWEST HWY | CABARET | 500 |
| 11 | | 75220 | 70545 | 2464008.39 | 6999565.293 | THE MEN'S CLUB OF DALLAS | 2340 W NORTHWEST HWY | CABARET | 500 |
| 12 | | 75229 | 81871 | 2460793.464 | 7011653.607 | BUCKS WILD | 11327 REEDER RD | CABARET | 500 |
| 13 | | 75229 | 81871 | 2460793.464 | 7011653.607 | BUCKS WILD | 11327 REEDER RD | CABARET | 500 |
| 14 | | 75229 | 79588 | 2463434.549 | 7009220.223 | PARIS ADULT BOOKSTORE | 11118 HARRY HINES BLVD | ARCADE | 500 |
| 15 | | 75229 | 81871 | 2460793.464 | 7011653.607 | BUCKS WILD | 11327 REEDER RD | CABARET | 500 |
| 16 | | 75229 | 81871 | 2460793.464 | 7011653.607 | BUCKS WILD | 11327 REEDER RD | CABARET | 500 |
| 17 | | 75220 | 70545 | 2464008.39 | 6999864.486 | THE MEN'S CLUB OF DALLAS | 2340 W NORTHWEST HWY | CABARET | 500 |
| 18 | | 75247 | 57928 | 2459283.067 | 6983182.067 | LIDO ADULT THEATER | 7035 JOHN W CARPENTER FWY SB | CABARET | 500 |
| 19 | | 75229 | 77694 | 2460873.688 | 7007264.254 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 20 | | 75229 | 81871 | 2460793.464 | 7011653.607 | BUCKS WILD | 11327 REEDER RD | CABARET | 500 |
| 21 | | 75228 | 79597 | 2460873.688 | 7009220.223 | PARIS ADULT BOOKSTORE | 11118 HARRY HINES BLVD | CABARET | 500 |
| 22 | | 75229 | 73592 | 2460078.605 | 7000651.088 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 23 | | 75220 | 72517 | 2458583.398 | 7003805.247 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 24 | | 75229 | 78661 | 2463815.886 | 7008201.264 | CHICA BONITAS | 11044 HARRY HINES BLVD | CABARET | 500 |
| 25 | | 75220 | 77694 | 2460778.843 | 7007262.806 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 26 | | 76392 | 2464046.048 | 7000568.753 | | BABY DOLLS TOPLESS SALOON | 10250 SHADY TRL | CABARET | 500 |
| 27 | | 75228 | 63705 | 2525090.915 | 6977795.125 | COASTER LINE - COASTER CLUB INC. | 9125 E R L THORNTON FWY WB | CABARET DH A | 500 |
| 28 | | 75228 | 63705 | 2525090.915 | 6977795.125 | COASTER LINE - COASTER CLUB INC. | 9125 E R L THORNTON FWY WB | CABARET | 500 |
| 29 | | 75220 | 72440 | 2458243.161 | 7002050.625 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 30 | | 75220 | 72440 | 2458583.398 | 7003805.247 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 31 | | 75220 | 71109 | 2463213.316 | 7000212.902 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 32 | | 75220 | 60102 | 2472525.848 | 7000200.932 | LIPSTICK | 7501 N STEMMONS FWY NB | CABARET | 500 |
| 33 | | 75220 | 60102 | 2473324.159 | 6985985.208 | BABY DOLLS CABARET SOUTH | 1720 W MOCKINGBIRD LN | CABARET | 500 |
| 34 | | 71400 | 2462655.62 | 7000529.73 | | BABY DOLLS TOPLESS SALOON | 10250 SHADY TRL | CABARET | 500 |
| 35 | | 75247 | 2464871.567 | 6987184.68 | 61100 | BLISS ARCADE THEATER CLUB | 9109 JOHN W CARPENTER FWY SB | CABARET | 500 |
| 36 | | 75247 | 77694 | 2460881.767 | 7006956.197 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 37 | | 75220 | 78334 | 2460070.607 | 7007807.799 | DALLAS CABARET SOUTH | 2444 WALNUT RIDGE ST | CABARET | 500 |
| 38 | | 75235 | 60102 | 2473357.682 | 6985981.549 | NEW FINE ARTS - MOCKINGBIRD | 1720 W MOCKINGBIRD LN | CABARET | 500 |
| 39 | | 75235 | 59840 | 2473621.336 | 6985704.964 | NEW FINE ARTS - MOCKINGBIRD | 1720 W MOCKINGBIRD LN | CABARET | 500 |
| 40 | | 75229 | 80653 | 2522926.376 | 7010025.671 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10920 PETAL ST | ARCADE | 500 |
| 41 | STEMMONS_EMP/RECENTRAL_VC | 75888 | 2463346.399 | 7009443.002 | | PARIS ADULT BOOKSTORE | 11118 HARRY HINES BLVD | ARCADE | 500 |
| 42 | | 75247 | 61833 | 2468300.139 | 6988261.494 | XTC CABARET | 8550 N STEMMONS FWY NB | CABARET | 500 |
| 43 | STEMMONS_EMP/RECENTRAL_VC | 59328 | 2460476.342 | 7002122.435 | | CITY CABARET | 2444 WALNUT RIDGE ST | CABARET | 500 |
| 44 | | 75228 | 63705 | 2525090.915 | 6977795.125 | COASTER LINE - COASTER CLUB INC. | 9125 E R L THORNTON FWY WB | CABARET | 500 |
| 45 | | 75234 | 80653 | 2522926.376 | 7010025.671 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10920 PETAL ST | ARCADE | 500 |
| 46 | | 75228 | 63705 | 2525090.915 | 6977795.125 | COASTER LINE - COASTER CLUB INC. | 9125 E R L THORNTON FWY WB | CABARET | 500 |
| 47 | | 75220 | 77695 | 2457908.941 | 7002159.525 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 48 | | 75220 | 77695 | 2457299.977 | 7002084.344 | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 49 | | 75220 | 78653 | 2461029.494 | 7008366.073 | DALLAS CABARET SOUTH | 2444 WALNUT RIDGE ST | CABARET | 500 |
| 50 | | 75220 | 72517 | 248323.1 | 7003946.29 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 51 | | 75228 | 53705 | 2525090.915 | 6977795.125 | COASTER LINE - COASTER CLUB INC. | 9125 E R L THORNTON FWY WB | CABARET | 500 |
| 52 | | 75220 | 72240 | 2458243.343 | 7001664.308 | DG'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | CABARET | 500 |
| 53 | | 72794 | 2457908.941 | 7002159.525 | | BUCKS CABARET | 2150 CALIFORNIA CROSSING RD | CABARET | 500 |
| 54 | | 72794 | 2462655.62 | 7000529.73 | | BABY DOLLS TOPLESS SALOON | 10250 SHADY TRL | CABARET | 500 |
| 55 | | 75220 | 77695 | 2461048.88 | 7007217.006 | SPEARMINT RHINO GENTLEMAN'S CLUB | 10965 COMPOSITE DR | CABARET | 500 |
| 56 | | 75220 | 73995 | 2456647.363 | 7002384.735 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | ARCADE | 500 |

COD_007414

Table columns (left to right):

| Master Incident Number | Response Date | Incident Closed | IncidentTime_Seconds | IncidentTime_Minutes | Problem | Address | City | CAD Organization Name | Longitude | Latitude | Mtg_desc | Month | Day | Hour | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



PLAINTIFF'S
EXHIBIT

12

ALL-STATE LEGAL®

| # | Case Type | Time Period | Status | Match Score | Match Type | Address | AddrType | County |
|---|-----------|-------------|--------|-------------|-----------|---------|----------|--------|
| 1 | Medical Emergency | Common Hours | M | 100 | A | 3911 CEDAR SPRINGS RD, DALLAS, 75219 | StreetAddress | 113 |
| 2 | Fire (Other) | Common Hours | M | 100 | A | 2250 MANANA DR, DALLAS, 75220 | StreetAddress | 113 |
| 3 | Medical Emergency | Common Hours | M | 90.92 | A | 3014 THROCKMORTON ST, DALLAS, 75219 | StreetAddress | 113 |
| 4 | Medical Emergency | Common Hours | M | 100 | A | 11118 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 5 | Structure Fire | Common Hours | M | 100 | A | 8550 N STEMMONS FWY NB, DALLAS, 75247 | StreetAddress | 113 |
| 6 | Fire (Other) | Common Hours | M | 100 | A | 3911 CEDAR SPRINGS RD, DALLAS, 75219 | StreetAddress | 113 |
| 7 | Medical Emergency | After Hours (0200am - 0600am) | M | 90.92 | A | 9125 E EL THORNTON FWY WB, DALLAS, 75228 | StreetAddress | 113 |
| 8 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 9109 JOHN W CARPENTER FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 9 | Medical Emergency | After Hours (0200am - 0600am) | T | 100 | A | 910 W MOCKINGBIRD LN, DALLAS, 75220 | StreetAddress | 113 |
| 10 | Medical Emergency | After Hours (0200am - 0600am) | M | 92.43 | A | 10310 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 11 | Medical Emergency | Common Hours | M | 100 | A | 11118 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 12 | Medical Emergency | Common Hours | M | 100 | A | 2117 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 13 | Fire (Other) | Common Hours | M | 98.96 | A | 9125 E EL THORNTON FWY WB, DALLAS, 75228 | StreetAddress | 113 |
| 14 | Medical Emergency | After Hours (0200am - 0600am) | M | 98.96 | A | 2444 WALNUT HILL LN, DALLAS, 75229 | StreetAddress | 113 |
| 15 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 11569 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 16 | Medical Emergency | Common Hours | M | 90.92 | A | 7501 N STEMMONS FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 17 | Medical Emergency | Common Hours | M | 100 | A | 11118 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 18 | Medical Emergency | Common Hours | M | 100 | A | 2117 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 19 | Medical Emergency | Common Hours | M | 100 | A | 10310 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 20 | Medical Emergency | Common Hours | M | 100 | A | 10310 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 21 | Medical Emergency | Common Hours | M | 100 | A | 2250 CALIFORNIA CROSSING RD, DALLAS, 75220 | StreetAddress | 113 |
| 22 | Medical Emergency | Common Hours | M | 100 | A | 2250 MANANA DR, DALLAS, 75220 | StreetAddress | 113 |
| 23 | Medical Emergency | Common Hours | M | 98.96 | A | 3911 CEDAR SPRINGS RD, DALLAS, 75219 | StreetAddress | 113 |
| 24 | Medical Emergency | Common Hours | M | 100 | A | 3911 CEDAR SPRINGS RD, DALLAS, 75219 | StreetAddress | 113 |
| 25 | Medical Emergency | Common Hours | M | 100 | A | 2444 WALNUT HILL LN, DALLAS, 75229 | StreetAddress | 113 |
| 26 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 3014 THROCKMORTON ST, DALLAS, 75219 | StreetAddress | 113 |
| 27 | Medical Emergency | After Hours (0200am - 0600am) | M | 92.43 | A | 2117 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 28 | Non-Emergency | After Hours (0200am - 0600am) | M | 92.43 | A | 910 W MOCKINGBIRD LN, DALLAS, 75220 | StreetAddress | 113 |
| 29 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 910 W MOCKINGBIRD LN, DALLAS, 75220 | StreetAddress | 113 |
| 30 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 11044 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 31 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 8550 N STEMMONS FWY NB, DALLAS, 75247 | StreetAddress | 113 |
| 32 | Medical Emergency | After Hours (0200am - 0600am) | M | 92.43 | A | 2117 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 33 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 10310 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 34 | Medical Emergency | Common Hours | M | 100 | A | 10310 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 35 | Medical Emergency | Common Hours | M | 100 | A | 2444 WALNUT HILL LN, DALLAS, 75229 | StreetAddress | 113 |
| 36 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 1966 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 37 | Medical Emergency | After Hours (0200am - 0600am) | T | 100 | A | 2117 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 38 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 10310 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 39 | Fire (Other) | Common Hours | M | 100 | A | 7501 N STEMMONS FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 40 | Medical Emergency | Common Hours | M | 100 | A | 10310 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 41 | Medical Emergency | Common Hours | M | 100 | A | 10330 TECHNOLOGY BLVD W, DALLAS, 75220 | StreetAddress | 113 |
| 42 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 2443 WALNUT HILL LN, DALLAS, 75229 | StreetAddress | 113 |
| 43 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 3911 CEDAR SPRINGS RD, DALLAS, 75219 | StreetAddress | 113 |
| 44 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 2444 WALNUT HILL LN, DALLAS, 75229 | StreetAddress | 113 |
| 45 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 9125 E EL THORNTON FWY WB, DALLAS, 75228 | StreetAddress | 113 |
| 46 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 9109 JOHN W CARPENTER FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 47 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 7501 N STEMMONS FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 48 | Medical Emergency | After Hours (0200am - 0600am) | M | 83.38 | A | 7501 N STEMMONS FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 49 | Medical Emergency | After Hours (0200am - 0600am) | M | 98.96 | A | 9125 E EL THORNTON FWY WB, DALLAS, 75228 | StreetAddress | 113 |
| 50 | Medical Emergency | Common Hours | M | 98.96 | A | 10333 TECHNOLOGY BLVD E, DALLAS, 75220 | StreetAddress | 113 |
| 51 | Medical Emergency | Common Hours | M | 100 | A | 2117 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 52 | Medical Emergency | Common Hours | M | 100 | A | 11118 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 53 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 7035 JOHN W CARPENTER FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 54 | Medical Emergency | After Hours (0200am - 0600am) | M | 90.49 | A | 10530 SPANGLER RD, DALLAS, 75220 | StreetAddress | 113 |
| 55 | Medical Emergency | Common Hours | M | 100 | A | 2444 WALNUT HILL LN, DALLAS, 75229 | StreetAddress | 113 |
| 56 | Medical Emergency | Common Hours | M | 100 | A | 10250 SHADY TRL, DALLAS, 75220 | StreetAddress | 113 |
| 57 | Medical Emergency | Common Hours | T | 100 | A | 2117 W NORTHWEST HWY, DALLAS, 75220 | StreetAddress | 113 |
| 58 | Medical Emergency | Common Hours | M | 100 | A | 8501 PLANO RD, DALLAS, 75227 | StreetAddress | 113 |
| 59 | Fire (Other) | Common Hours | M | 100 | A | 7501 N STEMMONS FWY SB, DALLAS, 75247 | StreetAddress | 113 |
| 60 | Medical Emergency | Common Hours | M | 100 | A | 10310 TECHNOLOGY BLVD E, DALLAS, 75220 | StreetAddress | 113 |
| 61 | Medical Emergency | After Hours (0200am - 0600am) | M | 90.49 | A | 11118 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 62 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 11569 HARRY HINES BLVD, DALLAS, 75229 | StreetAddress | 113 |
| 63 | Medical Emergency | After Hours (0200am - 0600am) | M | 100 | A | 11327 REEDER RD, DALLAS, 75229 | StreetAddress | 113 |
| 64 | Medical Emergency | Common Hours | M | 100 | A | 1720 W MOCKINGBIRD LN, DALLAS, 75235 | StreetAddress | 113 |
| 65 | Medical Emergency | Common Hours | M | 90.92 | A | 5610 BOTHAM JEAN BLVD, DALLAS, 75215 | StreetAddress | 113 |
| 66 | Medical Emergency | Common Hours | M | 100 | A | 3014 THROCKMORTON ST, DALLAS, 75219 | StreetAddress | 113 |
| 67 | Medical Emergency | Common Hours | M | 100 | A | 12045 SHILOH RD, DALLAS, 75228 | StreetAddress | 113 |

| # | Country | ZIP | LicCode | Distance | X | Y | Ref ID | StreetID | Unit Ad | N Street | N City | N Zip | USER DISTRICT | USER TYPE OF BUSINESS | USER BUSINESS ADDRESS | USER TYPE OF LICENSE | USER LICENSE STATUS RENEWAL NEW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | USA | 75219 | 0 | X | 2487514.433 | 6981947.434 | 113035 | 113035 | | 3911 CEDAR SPRINGS RD | DALLAS | | 19_06 | | 3911 CEDAR SPRINGS RD | DM A LH | RENEWAL |
| 2 | USA | 75220 | 0 | | 2492359.161 | 7006510.238 | 102542 | 102542 | | 2219 MANANA DR | DALLAS | | 19_06 | THE CLUBHOUSE | 2219 MANANA DR | SOB ADULT VIDEO | RENEWAL |
| 3 | USA | 75247 | 0 | X | 2487104.877 | 6981966.557 | 113168 | 113168 | | 3014 THROCKMORTON | DALLAS | | 9_02 | | 3014 THROCKMORTON | DH CLASS A LH | RENEWAL |
| 4 | USA | 75247 | 0 | | 2463364.208 | 7004410.813 | 421084 | 421084 | | 1010 W TECHNOLOGY BLVD | DALLAS | | 37_06 | THE CLUBHOUSE | 1010 W TECHNOLOGY BLVD | SOB | RENEWAL |
| 5 | USA | 75247 | 0 | | 2487775.321 | 7009193.221 | 100659 | 100659 | | 1111B HARRY HINES BLVD | DALLAS | | 19_06 | PARIS ADULT BOOKSTORE | 1111B HARRY HINES BLVD | SOB | RENEWAL |
| 6 | USA | 75247 | 0 | X | 2487167.171 | 6986576.468 | 100659 | 100659 | | 8550 N STEMMONS FRWY | DALLAS | | 12_02 | BUCKS CABARET | 8550 N STEMMONS FRWY | SOB | RENEWAL |
| 7 | USA | 75219 | 0 | | 2487514.433 | 6981947.434 | 113035 | 113035 | | 3911 CEDAR SPRINGS RD | DALLAS | | 7_02 | XTC CABARET | 3911 CEDAR SPRINGS RD | DM A LH | RENEWAL |
| 8 | USA | 75219 | 0 | | 2487514.433 | 6981947.434 | 113035 | 113035 | | 3911 CEDAR SPRINGS RD | DALLAS | | 12_02 | STATION 4 | 3911 CEDAR SPRINGS RD | SOB | RENEWAL |
| 9 | USA | 75247 | 0 | | 2452574.132 | 6977926.132 | 44875 | 44875 | | 9125 E EL THORNTON FRWY | DALLAS | | 47_07 | COASTER CLUB INC. TIGER CABARET | 9125 E EL THORNTON FRWY | SOB | RENEWAL |
| 10 | USA | 75240 | 0 | X | 2487514.433 | 6981947.434 | 113035 | 113035 | | 9125 E EL THORNTON FRWY | DALLAS | | 47_07 | COASTER CLUB INC. TIGER CABARET | 9125 E EL THORNTON FRWY STE A | DM A LH | RENEWAL |
| 11 | USA | 75240 | 0 | | 2486775.213 | 6987293.384 | 510672 | 510672 | | 9109 J CARPENTAR FRWY | DALLAS | | 27_06 | BLISS ARCADE THEATER CLUB | 9109 J CARPENTAR FRWY | SOB | NEW |
| 12 | USA | 75220 | 0 | | 2452694.132 | 6977659.121 | 44875 | 44875 | | 9125 E EL THORNTON FRWY | DALLAS | | 47_07 | XTC CABARET | 9125 E EL THORNTON FRWY | SOB | RENEWAL |
| 13 | USA | 75229 | 0 | | 2464853.111 | 6982821.213 | 146618 | 146618 | | 910 W MOCKINGBIRD LN | DALLAS | | 26_06 | XTC CABARET | 910 W MOCKINGBIRD LN | SOB (ADULT VIDEO) | RENEWAL |
| 14 | USA | 75247 | 0 | | 2463519.406 | 6982811.213 | 146618 | 146618 | | 910 W MOCKINGBIRD LN | DALLAS | | 26_06 | XPOSED ADULT THEATER | 910 W MOCKINGBIRD LN | SOB (ADULT VIDEO) | RENEWAL |
| 15 | USA | 75229 | 0 | | 2461404.994 | 7015322.056 | 200185 | 200185 | | 2250 MANANA DR | DALLAS | | 19_06 | THE CLUBHOUSE | 2250 MANANA DR | SOB | RENEWAL |
| 16 | USA | 75229 | 0 | | 2487775.321 | 7004567.198 | 102542 | 102542 | | 2250 MANANA DR | DALLAS | | 19_06 | THE CLUBHOUSE | 2250 MANANA DR | SOB | RENEWAL |
| 17 | USA | 75247 | 0 | | 2468319.456 | 6982811.213 | 146618 | 146618 | | 910 W MOCKINGBIRD LN | DALLAS | | 26_06 | XPOSED ADULT THEATER | 910 W MOCKINGBIRD LN | SOB (ADULT VIDEO) | RENEWAL |
| 18 | USA | 75229 | 0 | | 2487775.321 | 7005522.254 | 200185 | 200185 | | 1111B HARRY HINES BLVD | DALLAS | | 19_06 | DALLAS CABARET NORTH | 1111B HARRY HINES BLVD | SOB | RENEWAL |
| 19 | USA | 75229 | 0 | | 2452594.132 | 6977659.121 | 44875 | 44875 | | 9125 E EL THORNTON FRWY | DALLAS | | 47_07 | STATION 4 | 9125 E EL THORNTON FRWY STE A | SOB | RENEWAL |
| 20 | USA | 75247 | 0 | | 2487514.433 | 6981947.434 | 113035 | 113035 | | 3911 CEDAR SPRINGS RD | DALLAS | | 7_02 | STATION CABARET SOUTH (ADDENDUM) | 3911 CEDAR SPRINGS RD | DM A LH | RENEWAL |
| 21 | USA | 75247 | 0 | | 2488107.173 | 6988576.468 | 109659 | 109659 | | 8550 N STEMMONS FRWY | DALLAS | | 7_02 | DO'S A GENTLEMAN'S CLUB | 8550 N STEMMONS FRWY | SOB | RENEWAL |
| 22 | USA | 75247 | 0 | | 2488107.173 | 6988576.468 | 109659 | 109659 | | 2117 W NORTHWEST HWY | DALLAS | | 15_06 | DO'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | SOB (ADULT VIDEO) | PREVIOUSLY APPROVED |
| 23 | USA | 75220 | 0 | | 2468319.456 | 6982811.213 | 146618 | 146618 | | 2117 W NORTHWEST HWY | DALLAS | | 15_06 | XPOSED ADULT THEATER | 2117 W NORTHWEST HWY | SOB (ADULT VIDEO) | RENEWAL |
| 24 | USA | 75247 | 0 | | 2468319.456 | 6982811.213 | 146618 | 146618 | | 910 W MOCKINGBIRD LN | DALLAS | | 26_06 | XPOSED ADULT THEATER | 910 W MOCKINGBIRD LN | SOB (ADULT VIDEO) | PREVIOUSLY APPROVED |
| 25 | USA | 75229 | 0 | | 2488107.173 | 7008075.801 | 101505 | 101505 | | 2432 2462 WALNUT RIDGE ST | DALLAS | | 33_06 | CHICA BONITA | 2432 2462 WALNUT RIDGE ST | SOB | PREVIOUSLY APPROVED |
| 26 | USA | 75247 | 0 | | 2487514.433 | 6981947.434 | 113035 | 113035 | | 3911 CEDAR SPRINGS RD | DALLAS | | 14_06 | XTC CABARET | 3911 CEDAR SPRINGS RD | DM A LH | RENEWAL |
| 27 | USA | 75247 | 0 | | 2465693.042 | 7003769.301 | 109659 | 109659 | | 8550 N STEMMONS FRWY | DALLAS | | 7_02 | XTC CABARET | 8550 N STEMMONS FRWY | SOB | RENEWAL |
| 28 | USA | 75229 | 0 | | 2488107.173 | 7008075.801 | 101505 | 101505 | | 2442 WALNUT RIDGE ST | DALLAS | | 33_06 | SUE ELLEN'S | 2442 WALNUT RIDGE ST | SOB | RENEWAL |
| 29 | USA | 75247 | 0 | | 2487775.321 | 7003769.301 | 200185 | 200185 | | 910 W MOCKINGBIRD LN | DALLAS | | 26_06 | DALLAS CABARET SOUTH (ADDENDUM) | 910 W MOCKINGBIRD LN | SOB (ADULT VIDEO) | RENEWAL |
| 30 | USA | 75247 | 0 | | 2487104.877 | 6981966.557 | 113168 | 113168 | | 3014 THROCKMORTON | DALLAS | | 9_02 | SUE ELLEN'S | 3014 THROCKMORTON | DH CLASS A LH | RENEWAL |
| 31 | USA | 75247 | 0 | | 2465056.093 | 7003808.26 | 109659 | 109659 | | 8550 N STEMMONS FRWY | DALLAS | | 33_06 | COWBOYS RED RIVER | 8550 N STEMMONS FRWY | SOB | RENEWAL |
| 32 | USA | 75220 | 0 | | 2465693.042 | 7003769.301 | 109659 | 109659 | | 1010 W TECHNOLOGY BLVD | DALLAS | | 33_06 | COWBOYS RED RIVER | 1010 W TECHNOLOGY BLVD | SOB | RENEWAL |
| 33 | USA | 75219 | 0 | | 2487514.433 | 6981947.434 | 113035 | 113035 | | 3911 CEDAR SPRINGS RD | DALLAS | | 7_02 | STATION 4 | 3911 CEDAR SPRINGS RD | DM A LH | RENEWAL |
| 34 | USA | 75247 | 0 | | 2487775.321 | 7002394.394 | 101702 | 101702 | | 1966 W NORTHWEST HWY | DALLAS | | 8_02 | NEW FINE ARTS - WEST | 1966 W NORTHWEST HWY | SOB | RENEWAL |
| 35 | USA | 75220 | 0 | | 2465693.042 | 7007284.394 | 145766 | 145766 | | 10330 SPANGLER RD | DALLAS | | 17_06 | PARK AVENUE | 10330 SPANGLER RD | SOB | RENEWAL |
| 36 | USA | 75220 | 0 | | 2482694.288 | 7005942.813 | 145766 | 145766 | | 10310 TECHNOLOGY BLVD | DALLAS | | 15_06 | DO'S A GENTLEMAN'S CLUB | 10310 W TECHNOLOGY BLVD | SOB DM A | RENEWAL |
| 37 | USA | 75220 | 0 | | 2465875.701 | 7005300.028 | 420090 | 420090 | | 2117 W NORTHWEST HWY | DALLAS | | 15_06 | PARK AVENUE BOOKSTORE | 2117 W NORTHWEST HWY | SOB ARCADE | RENEWAL |
| 38 | USA | 75229 | 0 | | 2482694.288 | 7005942.813 | 145766 | 145766 | | 10310 W TECHNOLOGY BLVD | DALLAS | | 15_06 | DALLAS CABARET SOUTH (ADDENDUM) | 10310 W TECHNOLOGY BLVD | SOB DM A | PREVIOUSLY APPROVED |
| 39 | USA | 75247 | 0 | | 2520788.309 | 7011538.119 | 101072 | 101072 | | 2444 WALNUT RIDGE ST | DALLAS | | 37_06 | BABY DOLLS TOPLESS SALOON | 2432 2462 WALNUT RIDGE ST | SOB | RENEWAL |
| 40 | USA | 75247 | 0 | | 2465056.093 | 7003808.26 | 109659 | 109659 | | 2442 WALNUT RIDGE ST | DALLAS | | 23_06 | PARIS ADULT BOOKSTORE | 2442 WALNUT RIDGE ST | SOB | RENEWAL |
| 41 | USA | 75247 | 0 | | 2465056.093 | 7003808.26 | 109659 | 109659 | | 8550 N STEMMONS FRWY | DALLAS | | 37_06 | SILVER CITY CABARET | 8550 N STEMMONS FRWY | SOB | RENEWAL |
| 42 | USA | 75247 | 0 | | 2513892.869 | 7000600.296 | 101695 | 101695 | | 7501 N STEMMONS FRWY STE G | DALLAS | | 29_06 | SILVER CITY CABARET | 7501 N STEMMONS FRWY STE G | DM A LH | RENEWAL |
| 43 | USA | 75241 | 0 | | 2486550.627 | 7000600.296 | 101695 | 101695 | | 10333 TECHNOLOGY | DALLAS | | 27_07 | TYCOON COMMISSION LLC "Primo Bar" | 10333 TECHNOLOGY | DM A LH | RENEWAL |
| 44 | USA | 75241 | 0 | | 2486550.627 | 7000600.296 | 104045 | 104045 | | 9125 E EL THORNTON FRWY | DALLAS | | 27_07 | TYCOON COMMISSION LLC "Primo Bar" | 9125 E EL THORNTON FRWY | DM A LH | RENEWAL |
| 45 | USA | 75229 | 0 | | 2252594.132 | | 44875 | 44875 | | 9125 E EL THORNTON FRWY | DALLAS | | 47_07 | COASTER CLUB INC. TIGER CABARET | 9125 E EL THORNTON FRWY | SOB ARCADE | RENEWAL |
| 46 | USA | 75220 | 0 | | 2469050.627 | 7006000.296 | 104045 | 104045 | | 10333 TECHNOLOGY | DALLAS | | 29_06 | TYCOON COMMISSION LLC | 10333 TECHNOLOGY | DM A LH | RENEWAL |
| 47 | USA | 75228 | 0 | | 2477003.321 | 6977630.121 | 44875 | 44875 | | 2117 W NORTHWEST HWY | DALLAS | | 15_06 | DO'S A GENTLEMAN'S CLUB | 2117 W NORTHWEST HWY | SOB DM A | RENEWAL |
| 48 | USA | 75228 | 0 | | 2513892.813 | | 125598 | 125598 | | 7035 JOHN W CARPENTAR FRWY | DALLAS | | 39_06 | COASTER CLUB INC. TIGER CABARET | 7035 JOHN W CARPENTAR FRWY | SOB DM A | RENEWAL |
| 49 | USA | 75228 | 0 | | 2459041.096 | 7002923.188 | 145766 | 145766 | | 10330 SPANGLER RD | DALLAS | | 41_06 | THE LOOSE BAR AND GRILL | 10330 SPANGLER RD | SOB DM A | RENEWAL |
| 50 | USA | 75220 | 0 | | 2465693.042 | 7009295.521 | 125598 | 125598 | | 2442 WALNUT RIDGE ST | DALLAS | | 37_06 | PARIS ADULT BOOKSTORE | 2442 WALNUT RIDGE ST | SOB DM A | RENEWAL |
| 51 | USA | 75229 | 0 | | 2470075.331 | 7004552.813 | 145766 | 145766 | | 10330 SPANGLER RD | DALLAS | | 15_06 | PARIS ADULT BOOKSTORE | 10330 SPANGLER RD | SOB DM A | RENEWAL |
| 52 | USA | 75229 | 0 | | 2460000.926 | 7007284.394 | 145766 | 145766 | | 2442 WALNUT RIDGE ST | DALLAS | | 37_06 | PARK AVENUE | 2442 WALNUT RIDGE ST | SOB DM A LH | RENEWAL |
| 53 | USA | 75229 | 0 | | 2465693.042 | 7007284.394 | 145766 | 145766 | | 2117 W NORTHWEST HWY | DALLAS | | 15_06 | BUCKS CABARET | 2117 W NORTHWEST HWY | SOB DM A | RENEWAL |
| 54 | USA | 75228 | 0 | | 2452694.288 | 7005942.813 | 145766 | 145766 | | 1111B HARRY HINES BLVD | DALLAS | | 15_06 | TYCOON COMMISSION - MOCKINGBIRD | 1111B HARRY HINES BLVD | SOB ARCADE | RENEWAL |
| 55 | USA | 75235 | 0 | | 2486040.627 | 7002523.054 | 109659 | 109659 | | 1720 W MOCKINGBIRD LN | DALLAS | | 12_02 | TYCOON COMMISSION - MOCKINGBIRD | 1720 W MOCKINGBIRD LN | SOB ARCADE | RENEWAL |
| 56 | USA | 75220 | 0 | | 2488107.173 | 6987230.384 | 109659 | 109659 | | 10333 TECHNOLOGY | DALLAS | | 28_06 | NEW FINE ARTS - MOCKINGBIRD | 10333 TECHNOLOGY | SOB ARCADE | RENEWAL |
| 57 | USA | 75235 | 0 | | 2488107.173 | 6988576.468 | 109659 | 109659 | | 1111B HARRY HINES BLVD | DALLAS | | 12_06 | NEW FINE ARTS - MOCKINGBIRD | 1111B HARRY HINES BLVD | DM A LH | RENEWAL |
| 58 | USA | 75235 | 0 | | 2486040.627 | 7002523.054 | 109659 | 109659 | | 8550 N STEMMONS FRWY | DALLAS | | 12_02 | TYCOON COMMISSION - "Primo Bar" | 8550 N STEMMONS FRWY | SOB | RENEWAL |
| 59 | USA | 75247 | 0 | | 2448107.173 | 6987230.384 | 109659 | 109659 | | 1111B HARRY HINES BLVD | DALLAS | | 19_06 | XTC CABARET | 1111B HARRY HINES BLVD | SOB | RENEWAL |
| 60 | USA | 75247 | 0 | | 2464604.994 | 7015322.054 | 200185 | 200185 | | 11569 HARRY HINES BLVD | DALLAS | | 24_06 | DALLAS CABARET NORTH | 11569 HARRY HINES BLVD | SOB | RENEWAL |
| 61 | USA | 75247 | 0 | | 2488107.173 | 6987230.384 | 109659 | 109659 | | 3939 N FITZHUGH | DALLAS | | 15_06 | XTC CABARET | 3939 N FITZHUGH | SOB | RENEWAL |
| 62 | USA | 75247 | 0 | | 2464051.111 | 6982821.213 | 146618 | 146618 | | 5650 L LAMAR ST | DALLAS | | 19_06 | CLUB PLATINUM | 5650 L LAMAR ST | DMA 1H | RENEWAL |
| 63 | USA | 75219 | 0 | | 2488107.173 | 6986576.468 | 109659 | 109659 | | 11569 HARRY HINES BLVD | DALLAS | | 48_07 | BLISS ARCADE THEATER CLUB | 11569 HARRY HINES BLVD | SOB | RENEWAL |
| 64 | USA | 75219 | 0 | | 2487104.877 | 6981966.557 | 113168 | 113168 | | 3014 THROCKMORTON | DALLAS | | 9_02 | UNDER THE BRIDGE | 3014 THROCKMORTON | DHA 1H | RENEWAL |
| 65 | USA | 75219 | 0 | | 2481184.263 | 6969587.585 | 438390 | 438390 | | 3014 THROCKMORTON | DALLAS | | 5030 | SUE ELLEN'S | 3014 THROCKMORTON | SOB | RENEWAL |
| 66 | USA | 75219 | 0 | | 2487104.877 | 6981966.557 | 113168 | 113168 | | 3014 THROCKMORTON | DALLAS | | 9_02 | SUE ELLEN'S | 3014 THROCKMORTON | DH CLASS A LH | RENEWAL |
| 67 | USA | 75228 | 0 | | 2531633.6 | 7001011.52 | 132533 | 132533 | | 12045 SHILOH RD | DALLAS | | 46_09 | NEW FINE ARTS / SHILOH RD | 12045 SHILOH RD | SOB ARCADE | RENEWAL |

COD_007444

| | USER ADJUDANT NAME | USER CITY | USER UTILITY ADDRESS | USER ADDR ROSS |
|---|---|---|---|---|
| 1 | GREGORY KILLHOFER | DALLAS | 3911 CEDAR SPRINGS RD | |
| 2 | RICK BERKMAN | DALLAS | 2250 MANANA DR | |
| 3 | RICK BERKMAN | DALLAS | 3014 THROCKMORTON | |
| 4 | GREGORY KILLHOFER | DALLAS | 3014 THROCKMORTON | |
| 5 | PAUL RADNITZ | DALLAS | 11118 HARRY HINES BLVD | |
| 6 | CURTIS WISE | DALLAS | 11327 REEDER RD | |
| 7 | ERIC LANGAN | DALLAS | 8550 N STEMMONS FRWY | |
| 8 | GREGORY KILLHOFER | DALLAS | 3911 CEDAR SPRINGS RD | |
| 9 | CURTIS WISE | DALLAS | 11327 REEDER RD | |
| 10 | CURTIS WISE | DALLAS | 9125 E RL THORNTON FRWY | |
| 11 | JAMES RICHARD BRIGHT | DALLAS | 9109 J CARPENTAR FRWY | |
| 12 | MICHAEL JAY MURPHY | DALLAS | 10310 W TECHNOLOGY BLVD | |
| 13 | ERIC LANGAN | DALLAS | 8550 N STEMMONS FRWY | |
| 14 | CURTIS WISE | DALLAS | 11118 HARRY HINES BLVD | |
| 15 | CURTIS WISE | DALLAS | 2250 CALIFORNIA CROSSING | |
| 16 | GREGORY KILLHOFER | DALLAS | 2250 MANANA DR | |
| 17 | YISVAT SABIR BHATT | DALLAS | 3911 CEDAR SPRINGS RD | |
| 18 | ERNEST DOUGLAS | DALLAS | 910 W MOCKINGBIRD LN | |
| 19 | ERIC LANGAN | DALLAS | 11509 HARRY HINES BLVD | |
| 20 | PAUL RADNITZ | DALLAS | 11118 HARRY HINES BLVD | SITE A |
| 21 | PAUL RADNITZ | DALLAS | 11118 HARRY HINES BLVD | |
| 22 | GREGORY KILLHOFER | DALLAS | 9125 E RL THORNTON FRWY | |
| 23 | DOUGLAS ERNEST | DALLAS | 2444 WALNUT RIDGE ST | |
| 24 | YISVAT SABIR BHATT | DALLAS | 910 W MOCKINGBIRD LN | |
| 25 | YISVAT SABIR BHATT | DALLAS | 910 W MOCKINGBIRD LN | |
| 26 | TROY H. BIESSEL | DALLAS | 8550 N STEMMONS FRWY | |
| 27 | ERIC LANGAN | DALLAS | 11044 HARRY HINES BLVD | |
| 28 | DALLAS HALE | DALLAS | 2250 MANANA DR | |
| 29 | DOUGLAS ERNEST | DALLAS | 2444 WALNUT RIDGE ST | |
| 30 | YISVAT SABIR BHATT | DALLAS | 910 W MOCKINGBIRD LN | |
| 31 | DOUGLAS ERNEST | DALLAS | 910 W MOCKINGBIRD LN | |
| 32 | ERIC LANGAN | DALLAS | 8550 N STEMMONS FRWY | |
| 33 | GREGORY KILLHOFER | DALLAS | 3911 CEDAR SPRINGS RD | |
| 34 | MICHAEL JAY MURPHY | DALLAS | 10310 W TECHNOLOGY BLVD | |
| 35 | MICHAEL JAY MURPHY | DALLAS | 10310 W TECHNOLOGY BLVD | |
| 36 | GREGORY KILLHOFER | DALLAS | 2117 W NORTHWEST HWY | |
| 37 | NICK MEHMETI | DALLAS | 2117 W NORTHWEST HWY | |
| 38 | STEVEN CRAFT | DALLAS | 10250 SHADY TRAIL | |
| 39 | DOUGLAS ERNEST | DALLAS | 10801 PLANO RD | |
| 40 | PAUL RADNITZ | DALLAS | 7501 N STEMMONS FRWY | SITE A |
| 41 | DARYUSH FERDOWS | DALLAS | 10333 E TECHNOLOGY | |
| 42 | PAUL RADNITZ | DALLAS | 9125 E RL THORNTON FRWY | |
| 43 | PAUL RADNITZ | DALLAS | 10333 E TECHNOLOGY | |
| 44 | ERIC LANGAN | DALLAS | 10530 SPANGLER RD | |
| 45 | MICHAEL JAY MURPHY | DALLAS | 2117 W NORTHWEST HWY | |
| 46 | TROY H. BIESSEL | DALLAS | 2117 W NORTHWEST HWY | |
| 47 | DARRY AUSTIN TAYLOR | DALLAS | 7035 JOHN W CARPENTAR FRWY | |
| 48 | DAWN MICKEY | DALLAS | 10530 SPANGLER RD | |
| 49 | TROY H. BIESSEL | DALLAS | 2117 W NORTHWEST HWY | |
| 50 | ERIC LANGAN | DALLAS | 11118 HARRY HINES BLVD | |
| 51 | DARRY AUSTIN TAYLOR | DALLAS | 11118 HARRY HINES BLVD | |
| 52 | ERIC LANGAN | DALLAS | 2443 WALNUT HILLS LN | |
| 53 | NICK MEHMETI | DALLAS | 2443 WALNUT HILLS LN | |
| 54 | CHRISTOPHER POLK | DALLAS | 1720 W MOCKINGBIRD LN | |
| 55 | DARYUSH FERDOWS | DALLAS | 11327 REEDER RD | |
| 56 | CURTIS WISE | DALLAS | 11327 REEDER RD | |
| 57 | PAUL RADNITZ | DALLAS | 1720 W MOCKINGBIRD LN | |
| 58 | CHRISTOPHER POLK | DALLAS | 10333 E TECHNOLOGY | |
| 59 | PAUL RADNITZ | DALLAS | 11118 HARRY HINES BLVD | |
| 60 | PAUL RADNITZ | DALLAS | 8550 N STEMMONS FRWY | |
| 61 | ERIC LANGAN | DALLAS | 11509 HARRY HINES BLVD | |
| 62 | ERNEST DOUGLAS | DALLAS | 9109 J CARPENTAR FRWY | |
| 63 | JAMES RICHARD BRIGHT | DALLAS | 9109 J CARPENTAR FRWY | |
| 64 | STANNARD HODGES | DALLAS | 5635 LAMAR ST | |
| 65 | GREGORY KILLHOFER | DALLAS | 3014 THROCKMORTON | |
| 66 | GREGORY KILLHOFER | DALLAS | 3014 THROCKMORTON | |
| 67 | GREGORY KILLHOFER | DALLAS | 12045 SHILOH RD | |

COD_007459

COD_007474

| # | Bar_Business_Name | M | N | O | P | Q | R | S | Call_Type | Hours | USER_TYPE_OF_LICENSE | USER_DISTRICT | USER_NAME_OF_BUSINESS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CAVEN ENTERPRISES | -96.810383 | 32.810487 | 28-F | 5 | 12 | 0 | 2021 | Medical Emergency | Common Hours | DH/A LH | STATION 4 | STATION 4 |
| 2 | IT'S MENS CLUB | -96.790625 | 32.809291 | 28-K | 6 | 28 | 0 | 2021 | Medical Emergency | Common Hours | D2 | IT'S MENS CLUB | THE CLUBHOUSE |
| 3 | THE LODGE | -96.913084 | 32.863617 | 33-X | 10 | 30 | 0 | 2021 | Fire (Other) | Common Hours | D2 | SUE ELLEN'S | SUE ELLEN'S |
| 4 | ZONA ROSA CABARET I (REGAL ROW & STEMMONS) | -96.868641 | 32.884116 | 23-J | 6 | 23 | 0 | 2021 | Medical Emergency | Common Hours | D6 | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 5 | CHICAS BONITAS | -96.868641 | 32.884116 | 23-J | 6 | 28 | 0 | 2021 | Medical Emergency | Common Hours | D6 | BUCKS WILD | BUCKS WILD |
| 6 | | -96.890529 | 32.907294 | 23-A | 6 | 21 | 0 | 2021 | Medical Emergency | Common Hours | D7 | XTC CABARET | XTC CABARET |
| 7 | DOS NIGHTCLUB (W NORTHWEST & LOMBARDY) | -96.890529 | 32.907294 | 22-U | 9 | 28 | 0 | 2021 | Medical Emergency | Common Hours | D2 | STATION 4 | STATION 4 |
| 8 | VIDEO SCENE | -96.890506 | 32.907258 | 22-U | 9 | 10 | 0 | 2021 | Medical Emergency | Common Hours | D7 | BUCKS WILD | BUCKS WILD |
| 9 | CONDOMS RED RIVER | -96.897133 | 32.86245 | 22-C | 2 | 15 | 0 | 2020 | Fire (Other) | Common Hours | D7 | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 10 | STATION A NIGHT CLUB | -96.890506 | 32.907258 | 22-U | 10 | 21 | 0 | 2020 | Medical Emergency | Common Hours | D2 | COASTER CLUB INC. TIGER CABARET | COASTER CLUB INC. TIGER CABARET |
| 11 | | -96.912694 | 32.863114 | 22-T | 8 | 10 | 0 | 2020 | Medical Emergency | Common Hours | D5 | BLISS ARCADE THEATER CLUB | BLISS ARCADE THEATER CLUB |
| 12 | THE LODGE | -96.886841 | 32.884116 | 23-J | 8 | 14 | 0 | 2020 | Medical Emergency | Common Hours | D6 | COWBOYS RED RIVER | COWBOYS RED RIVER |
| 13 | CHICAS BONITAS | -96.895942 | 32.810456 | 35-W | 7 | 38 | 0 | 2020 | Medical Emergency | Common Hours | D7 | BUCKS CABARET | BUCKS CABARET |
| 14 | | -96.910625 | 32.863617 | 33-X | 10 | 29 | 0 | 2020 | Medical Emergency | Common Hours | D2 | THE CLUBHOUSE | THE CLUBHOUSE |
| 15 | NEW FINE ARTS | -96.826500 | 32.876274 | 23-H | 7 | 24 | 0 | 2021 | Medical Emergency | Common Hours | D2 | STATION 4 | STATION 4 |
| 16 | LIPSTICK MENS CLUB | -96.870105 | 32.3159 | 33-U | 8 | 25 | 0 | 2021 | Medical Emergency | Common Hours | D6 | XPOSED ADULT THEATER | XPOSED ADULT THEATER |
| 17 | SILVER CITY CABARET | -96.870105 | 32.8386 | 33-P | 7 | 19 | 0 | 2019 | Medical Emergency | Common Hours | D6 | DALLAS CABARET NORTH | DALLAS CABARET NORTH |
| 18 | | -96.877258 | 32.8286 | 33-P | 1 | 18 | 0 | 2019 | Structure Fire | Common Hours | D6 | SILVER CITY CABARET | SILVER CITY CABARET |
| 19 | STATION 04 | -96.870105 | 32.3159 | 33-U | 4 | 25 | 0 | 2020 | Medical Emergency | Common Hours | D7 | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 20 | PRIMERAAR | -96.870326 | 32.86286 | 22-C | 5 | 15 | 0 | 2020 | Fire (Other) | Common Hours | SOB | XTC CABARET | XTC CABARET |
| 21 | COWBOY CLUB | -96.890606 | 32.86234 | 22-C | 2 | 15 | 0 | 2020 | Medical Emergency | Common Hours | SOB | COASTER CLUB INC. TIGER CABARET | COASTER CLUB INC. TIGER CABARET |
| 22 | | -96.877298 | 32.3159 | 33-P | 10 | 10 | 0 | 2021 | Medical Emergency | Common Hours | SOB | STATION 4 | STATION 4 |
| 23 | CLUB XTC I (STEMMONS & VICEROY) | -96.900657 | 32.860097 | 22-U | 9 | 10 | 0 | 2020 | Fire (Other) | Common Hours | SOB (ADULT VIDEO) | DALLAS CABARET SOUTH (ADDENDUM) | DALLAS CABARET SOUTH (ADDENDUM) |
| 24 | DALLAS CABARET SOUTH | -96.895942 | 32.888613 | 22-M | 1 | 10 | 0 | 2021 | Medical Emergency | Common Hours | SOB | DO'S A GENTLEMAN'S CLUB | DO'S A GENTLEMAN'S CLUB |
| 25 | | -96.863696 | 32.86296 | 22-Z | 11 | 9 | 0 | 2021 | Medical Emergency | Common Hours | SOB (ADULT VIDEO) | XPOSED ADULT THEATER | XPOSED ADULT THEATER |
| 26 | BOMBSHELLS | -96.870105 | 32.3139 | 33-U | 8 | 22 | 0 | 2021 | Medical Emergency | Common Hours | SOB (ADULT VIDEO) | XPOSED ADULT THEATER | XPOSED ADULT THEATER |
| 27 | CLUB XTC I (STEMMONS & VICEROY) | -96.877258 | 32.8286 | 33-P | 7 | 27 | 0 | 2021 | Medical Emergency | Common Hours | SOB | CHICA BONITAS | CHICA BONITAS |
| 28 | SPEARMINT RHINO GENTLEMEN'S CLUB | -96.877258 | 32.3239 | 33-U | 1 | 28 | 0 | 2019 | Medical Emergency | Common Hours | D2 | XPOSED ADULT THEATER | XPOSED ADULT THEATER |
| 29 | | -96.870105 | 32.3239 | 33-U | 4 | 24 | 0 | 2019 | Medical Emergency | Common Hours | D6 | STATION 4 | STATION 4 |
| 30 | DOS NIGHTCLUB (W NORTHWEST & LOMBARDY) | -96.900507 | 32.860097 | 22-U | 1 | 17 | 0 | 2019 | Medical Emergency | Common Hours | SOB | XTC CABARET | XTC CABARET |
| 31 | DOS NIGHTCLUB (W NORTHWEST & LOMBARDY) | -96.897218 | 32.86286 | 22-C | 4 | 24 | 0 | 2019 | Medical Emergency | Common Hours | D6 | SILVER CITY CABARET | SILVER CITY CABARET |
| 32 | TIGER CABARET | -96.887218 | 32.386513 | 33-X | 8 | 31 | 0 | 2021 | Medical Emergency | Common Hours | D6 | COWBOYS RED RIVER | COWBOYS RED RIVER |
| 33 | SILVER CITY CABARET | -96.870105 | 32.3239 | 33-U | 9 | 9 | 0 | 2019 | Medical Emergency | Common Hours | D6 | COWBOYS RED RIVER | COWBOYS RED RIVER |
| 34 | | -96.890022 | 32.893742 | 22-H | 1 | 27 | 0 | 2019 | Medical Emergency | Common Hours | SOB | COWBOYS RED RIVER | COWBOYS RED RIVER |
| 35 | DOS NIGHTCLUB (W NORTHWEST & LOMBARDY) | -96.900657 | 32.860097 | 22-U | 1 | 24 | 0 | 2021 | Medical Emergency | Common Hours | DH/A LH | NEW FINE ARTS - WEST | NEW FINE ARTS - WEST |
| 36 | BABY DOLLS I (SHADY TRL & NORTHWEST) | -96.860097 | 32.886741 | 22-H | 1 | 26 | 0 | 2021 | Medical Emergency | Common Hours | SOB | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 37 | PMNL | -96.893743 | 32.862696 | 22-C | 2 | 28 | 0 | 2021 | Medical Emergency | Common Hours | SOB | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 38 | | -96.893742 | 32.893742 | 22-H | 7 | 7 | 0 | 2021 | Medical Emergency | Common Hours | SOB-ARCADE | DO'S A GENTLEMAN'S CLUB | DO'S A GENTLEMAN'S CLUB |
| 39 | COWBOYS RED RIVER | -96.890022 | 32.893742 | 22-H | 9 | 25 | 0 | 2021 | Medical Emergency | Common Hours | SOB | DO'S A GENTLEMAN'S CLUB | DO'S A GENTLEMAN'S CLUB |
| 40 | SILVER CITY CABARET | -96.897218 | 32.862696 | 22-C | 2 | 9 | 0 | 2019 | Medical Emergency | Common Hours | D6 | DALLAS CABARET SOUTH (ADDENDUM) | DALLAS CABARET SOUTH (ADDENDUM) |
| 41 | BABY DOLLS I (SHADY TRL & NORTHWEST) | -96.884116 | 32.884116 | 23-J | 9 | 27 | 0 | 2019 | Non Emergency | Common Hours | D6 | COWBOYS RED RIVER | COWBOYS RED RIVER |
| 42 | | -96.870105 | 32.386296 | 22-Z | 11 | 3 | 0 | 2019 | Medical Emergency | Common Hours | DH/A LH | DO'S A GENTLEMAN'S CLUB | DO'S A GENTLEMAN'S CLUB |
| 43 | COWBOYS RED RIVER | -96.884116 | 32.884116 | 23-J | 9 | 17 | 0 | 2019 | Medical Emergency | Common Hours | DH CLASS A LH | DALLAS CABARET SOUTH (ADDENDUM) | DALLAS CABARET SOUTH (ADDENDUM) |
| 44 | DOS NIGHTCLUB (W NORTHWEST & LOMBARDY) | -96.887214 | 32.307213 | 33-S | 9 | 30 | 0 | 2021 | Medical Emergency | Common Hours | SOB | COWBOYS RED RIVER | COWBOYS RED RIVER |
| 45 | | -96.904507 | 32.860097 | 22-U | 1 | 15 | 0 | 2019 | Medical Emergency | Common Hours | DH/A LH | SILVER CITY CABARET | SILVER CITY CABARET |
| 46 | JACK OF DIAMONDS NIGHT CLUB | -96.897211 | 32.863245 | 22-Z | 1 | 30 | 0 | 2021 | Medical Emergency | Common Hours | SOB | TYCOON COMMISSION LLC "Prime Bar" | TYCOON COMMISSION LLC "Prime Bar" |
| 47 | DOS NIGHTCLUB (W NORTHWEST & LOMBARDY) | -96.864507 | 32.860097 | 22-U | 3 | 14 | 0 | 2020 | Medical Emergency | Common Hours | DH CLASS A LH | TYCOON COMMISSION LLC "Prime Bar" | TYCOON COMMISSION LLC "Prime Bar" |
| 48 | | -96.897298 | 32.3239 | 33-U | 2 | 28 | 0 | 2019 | Medical Emergency | Common Hours | SOB | DO'S A GENTLEMAN'S CLUB | DO'S A GENTLEMAN'S CLUB |
| 49 | TIGER CABARET | -96.897211 | 32.863245 | 22-Z | 4 | 9 | 0 | 2019 | Medical Emergency | Common Hours | D7 | LIDO ADULT THEATER | LIDO ADULT THEATER |
| 50 | BABY DOLLS I (SHADY TRL & W NORTHWEST) | -96.899507 | 32.863234 | 23-J | 12 | 17 | 0 | 2019 | Medical Emergency | Common Hours | SOB-ARCADE | THE LODGE BAR AND GRILL | THE LODGE BAR AND GRILL |
| 51 | SPEARMINT RHINO | -96.887832 | 32.887473 | 23-J | 4 | 22 | 0 | 2019 | Medical Emergency | Common Hours | DH/A | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 52 | PARIS ADULT VIDEO | -96.900789 | 32.866633 | 23-J | 4 | 16 | 0 | 2021 | Medical Emergency | Common Hours | SOB-ARCADE | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 53 | BUCKS CABARET | -96.873200 | 32.816563 | 33-K | 6 | 23 | 0 | 2021 | Medical Emergency | Common Hours | D2 | DALLAS CABARET NORTH | DALLAS CABARET NORTH |
| 54 | | -96.810682 | 32.810456 | 35-W | 1 | 1 | 0 | 2021 | Medical Emergency | Common Hours | D2 | STATION 4 | STATION 4 |
| 55 | BOMBSHELLS | -96.810682 | 32.810456 | 35-W | 5 | 3 | 0 | 2021 | Medical Emergency | Common Hours | D6 | DALLAS CABARET NORTH | DALLAS CABARET NORTH |
| 56 | DALLAS CABARET NORTH (HARRY HINES & STEMMONS) | -96.893737 | 32.902267 | 22-O | 8 | 20 | 0 | 2021 | Medical Emergency | Common Hours | D6 | PARK AVENUE | PARK AVENUE |
| 57 | SUE ELLENS | -96.883552 | 32.863554 | 33-W | 6 | 9 | 0 | 2021 | Medical Emergency | Common Hours | SOB | BLISS ARCADE THEATER CLUB | BLISS ARCADE THEATER CLUB |
| 58 | | -96.877258 | 32.3239 | 33-U | 2 | 30 | 0 | 2019 | Medical Emergency | Common Hours | SOB | UNDER THE BRIDGE | UNDER THE BRIDGE |
| 59 | COWBOYS RED RIVER | -96.887332 | 32.826525 | 22-Z | 3 | 3 | 0 | 2019 | Medical Emergency | Common Hours | D6 | NEW FINE ARTS - MOCKINGBIRD | NEW FINE ARTS - MOCKINGBIRD |
| 60 | SPEARMINT RHINO | -96.887013 | 32.887013 | 23-J | 1 | 8 | 0 | 2020 | Medical Emergency | Common Hours | D2 | TYCOON COMMISSION LLC "Prime Bar" | TYCOON COMMISSION LLC "Prime Bar" |
| 61 | COWBOYS RED RIVER | -96.826527 | 32.826524 | 22-K | 2 | 8 | 0 | 2020 | Medical Emergency | Common Hours | D6 | NEW FINE ARTS - MOCKINGBIRD | NEW FINE ARTS - MOCKINGBIRD |
| 62 | STATION 4 | -96.886029 | 32.810456 | 22-M | 4 | 16 | 0 | 2020 | Medical Emergency | Common Hours | D2 | PARIS ADULT BOOKSTORE | PARIS ADULT BOOKSTORE |
| 63 | ZONA ROSA CABARET I (REGAL ROW & STEMMONS) | -96.873200 | 32.816567 | 33-K | 6 | 23 | 0 | 2019 | Medical Emergency | Common Hours | D2 | DALLAS CABARET NORTH | DALLAS CABARET NORTH |
| 64 | BAISD 04 | -96.810682 | 32.810456 | 35-W | 8 | 1 | 0 | 2019 | Medical Emergency | Common Hours | D6 | DALLAS CABARET NORTH | DALLAS CABARET NORTH |
| 65 | COWBOYS RED RIVER | -96.897133 | 32.862516 | 22-C | 14 | 33 | 0 | 2020 | Fire (Other) | Common Hours | D7 | SUE ELLEN'S | SUE ELLEN'S |
| 66 | COWBOYS RED RIVER | -96.904824 | 32.867213 | 22-Z | 2 | 14 | 0 | 2020 | Medical Emergency | Common Hours | D7 | SUE ELLEN'S | SUE ELLEN'S |
| 67 | STATION 04 | -96.810402 | 32.810456 | 35-W | 1 | 2 | 0 | 2019 | Medical Emergency | Common Hours | D9 | NEW FINE ARTS - SMITH RD | NEW FINE ARTS - SMITH RD |

**Report of Daniel Linz, Ph.D.**

**Opinions Concerning the City of Dallas Ordinance amending**

**Chapter 41A requiring sexually oriented businesses**

**to close each day between the hours of 2:00 a.m. and 6:00 a.m.**

**March 2, 2022**

1.   I am currently a professor in the Department of Communication at the University of California Santa Barbara. I am a tenured professor and have been at this position since 1988. I received bachelor degrees in psychology and sociology from Northern Kentucky University in 1978, and a master's degree in psychology and sociology and a Ph.D. in psychology from the University of Wisconsin, Madison. My research focus has been on the effects of sexually oriented and violent entertainment upon human psychology and behavior, and on the alleged secondary effects of adult entertainment. I have been qualified as an expert witness on the question of alleged secondary effects from adult entertainment and the effects of such entertainment on human behavior in numerous federal courts. I am also a published author in peer-reviewed journals on these above subjects. My curriculum vitae is attached hereto as **Exhibit 1,** and accurately reflects my teaching positions, the honors and awards that I have received, the papers that I have either authored or co-authored which have been published in peer-reviewed journals, my professional activities, research grants that I have received, professional conferences where I have presented various papers, invited addresses where I have spoken, and public testimony that I have given.

2.   I have been asked by attorney Michael Murray to render an opinion in this case in regard to the hours of operation restriction in an Ordinance amending Chapter 41A by, among other things, requiring sexually oriented businesses to close each day between the



**Exhibit D**

hours of 2:00 a.m. and 6:00 a.m. The Dallas City Council adopted this ordinance on January 26, 2022. I am being compensated at a rate of $450.00 per hour for my services.

3. I reviewed the City Council Briefing of January 5th (Plaintiff's Exhibit 2). I also reviewed the Memorandum of January 14, 2022 (Plaintiff's exhibit 3) and the attachments of graphs displaying data related to violent crime, arrests for violent offenses and priority 1 (emergency class); graphs displaying data related to all offenses, arrests, and calls for service; and charts comparing race of crime victims and arrested persons. I also reviewed the oral deposition of Samuel Sarmiento (ORAL DEPOSITION OF SAMUEL SARMIENTO TUESDAY, FEBRUARY 22, 2022), the oral deposition of Rick Watson (ORAL DEPOSITION OF RICK WATSON, TUESDAY, FEBRUARY 22, 2022) and the oral deposition of Stephen Arthur Bishop (ORAL DEPOSITION OF STEPHEN ARTHUR BISHOPP FEBRUARY 23, 2022).

4. From the Memorandums, the exhibits, the attachments and the depositions it is my opinion that the City of Dallas' own crime data as presented in these materials, on their face, show there is lack of scientifically valid evidence of adverse secondary crime effects due to the presence of adult businesses in the City. Further, in my opinion the city's own report and charts indicate that the time regulations that are required by the ordinance are not justified. All opinions expressed in this report are expressed to a reasonable degree of scientific certainty. I elaborate on my opinions below.

5. As shown below in COD-022 total reported violent and property crimes **decreased in the 2am to 6am period** compared to the 10pm to 2am period. This decrease would indicate fewer secondary crime effects during the 2am-6am period and the need for fewer rather than more police resources in the 2am to 6am period.



COD-022

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP
FEBRUARY 23, 2022

Q. Okay. So let now take a look at page 22. By
19 the way, I should have let you know. If at any time you
20 need a break, you just let us know, and we'll take one.
21 And, of course, our court reporter, whenever you need a
Page 51
1 for 2019.
2 Q. (BY MR. MURRAY) And I want to make sure I
3 haven't misstated that. Tell me exactly what that means.
4 There were 124 reported incidents of either violent or
5 property crime in the 500 foot radius of the 35
6 locations?
7 A. Yes, sir.
8 Q. Okay. And between two a.m. and six a.m.,
9 however, in 2019 there were fewer violent and property
10 crimes reported within 500 foot radius of those 35
11 locations, correct?
12 A. Yes, sir.
13 Q. Okay. And that number was 107, correct?
14 A. Yes, sir.22 break, please let us know.
23 A. Thank you.
24 Q. So when we go to page 22 -- and I guess I'm
25 talking about COD-022, and it's also page 16 of the

Page 52

Page 3

25 Q. Now, if you then go to 2020, what we see is

Page 53

1 there were 161 reported violent or property crimes during
2 the 10 p.m. to two a.m.
3 A. Yes, sir.
4 Q. And then a smaller number of reported incidents
5 of violent or property crime occurred in 2020 between the
6 two a.m. to six a.m. hours, correct?
7 A. Yes, sir.
8 Q. It went from 161 down to 132.
9 A. Yes, sir.
10 Q. And then in 2021 there were 165 reported during
11 the 10 p.m. to two a.m., and it went down a few to 160
12 between two a.m. and six a.m.

7. In my opinion the city's own report and charts showing arrests indicate that the time regulations that are required by the ordinance are not justified. As shown below in COD-025 there were **fewer arrests at the adult locations from 2am to 6am** (772) compared with the 10pm to 2am time period (831). This decrease would suggest the need for fewer rather than more police resources in the 2am to 6am period.



8. In my opinion the City's own report and charts indicate that there is no difference between sexually oriented businesses and the entertainment districts in arrests for either the

Page 4

10pm to 2am time period or the 2am to 6am period (see COD-027). This would suggest that

there is no need for greater police resources in the 2am to 6am period.

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP
FEBRUARY 23, 2022
Page 67

20 Q. Okay. Let's go to page 21 or COD-027. Now we
21 do the comparison between the 500 foot radius surrounding
22 the locations of licensed sexually oriented businesses
23 compared to the entertainment district's arrests,
24 correct?
25 A. Correct.

Page 68
1 Q. And there is virtually no difference between
2 sexually oriented businesses and the entertainment
3 districts, wouldn't you agree?
4 A. I would agree with that.
5 Q. That's true both in the 10 p.m. to two a.m. time
6 frame and the two a.m. and six a.m. time frame.
7 A. That's correct.



15   Q. And we're still talking about arrests that

16 occurred within a 500 foot radius of those 35 locations?
17 A. Yes, sir.
18 Q. Okay. And then you give the -- and that would
19 include traffic stops that resulted in arrests?
20 A. Yes, sir.
21 Q. Outstanding warrants?
22 A. Yes, sir.
23 Q. Misdemeanor offenses?
24 A. Yes, sir.

9. There was no attempt to determine with a statistical test whether the difference in calls

for service between the time periods of 10pm to 2am and 2am to 6am was statistically

significant. Further, according to the City's own data the vast majority of calls for service do not

occur within the 2am to 6 am period (see COD-028).

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP
FEBRUARY 23, 2022

Page 73

5 Q. Okay. So here's what I'm trying to find out, to
6 determine. So my question was designed to elicit whether
7 the difference between the 2171 and the 2396 over the
8 course of the three year period, the difference in those
9 two numbers was statistically significant?
10 A. I didn't test that.
11 Q. Okay. And just so I understand correctly, also
12 the 2396 that occurred between two a.m. and six a.m.,
13 that would be just slightly less than 20 percent of the
14 total number of calls?
15 A. That number looks roughly correct, eyeballing
16 it.
17 Q. So 80 percent of the calls for service occurred
18 outside of that four hour period?
19 A. Yes, sir.



10.  In my opinion the City's own report and charts indicate that the areas around adult bookstores show essentially no violent crime offenses by the City's calculations (see COD 041 and 042). Further, the City's analysis shows that violent crime arrests decreased in the 2am to 6am hours. In fact, the City's own data show that the areas surrounding the adult bookstores had only 2 arrests during the entire study in the 2am to 6am time period. This pattern of findings do not justify the imposition of time of operation restrictions on these businesses.

11 Okay. So let's talk about this bar chart on
12 page COD-041.
13 A. Okay.
14 Q. And it's a chart of violent crime offenses for
15 the three year period 2019 through 2021, correct?
16 A. Correct.
17 Q. And you have at the bottom there -- and we'll
18 talk about the bars themselves. But you say at the
19 bottom, "From 2019 to 2021 book stores accounted for five
20 percent of violent crime offenses from 10 p.m. to two
21 p.m. and five percent of offenses from two a.m. to six
22 a.m." Do you see that?
23 A. Yes.
24 Q. Okay. Are those your words?
25 A. Yes, sir.



11. In my opinion the City's own report and charts indicate that the areas around closed adult establishments had an in increase in crime across the study period. This finding is, in my opinion, counter to the City's claimed justification for limiting the hours of operation of open adult businesses.

```
Page 83
1  Okay. And the other thing that's interesting is
2  the clubs that were closed actually had an increase from
3  seven to 13 in the number of violent offenses that were
4  reported within 500 feet of those closed locations,
5  correct?
6  MS. JORDAN: Objection. Mischaracterizes the
7  evidence.
8  A. No, sir. In fact, I don't know if they were a
9  business that was operating that had a license, but not
10 functioning as an SOB. That could explain it. I don't
11 know where they come from. The vacant lot versus an open
12 business just has an SOB and not using it. But they're
13 listed as nonoperational, so either way they were not
14 functioning -- they were one of the clubs not functioning
15 as an SOB, but had an SOB license.
```

Page 8

16  Q. Right. But going back to the list on the
17  preceding page, there was a description that showed that
18  the first two were closed down. The third was not
19  operating. The fourth was not operating. The fifth was
20  a vacant strip mall. The six was an empty lot, and the
21  seventh was not operating. That's what your list showed,
22  correct?
23  A. Correct.
24  Q. So the only information

12. I will testify that on the basis of my past research and peer reviewed publications I have established the following criteria for conducting a valid secondary effects study of crime when attempting to determine if adult businesses in a community or region are associated with criminogenic activity.  Several of these principles have been validated by Court of Appeals in <u>Annex Books v. City of Indianapolis</u>, 740 F.3d 1136 (7th Cir. 2014), cert. denied 135 S. Ct. 99 (2014). Without adherence to these standards, the Court of Appeals has opined, a city or municipality may not assume adult businesses are related to crime events within its jurisdiction.

13. It is my opinion that:

**a.   A valid secondary effects study must establish a defined zone around the business(es) in question. For example, a 500 or 1000 feet zone could be established. Crime incidents must be counted within that zone. A valid study should also take into account all crime incidents within the 500 zone across all "time periods."**

**b. "Control zones" around other possibly criminogenic businesses must be established for comparison purposes. These controls should also be matched to the adult site in terms of demographic characteristics, population size and business composition.**

**c. A comparison should be made between the adult business areas and the properly constructed control areas to determine if the area around the adult business has a greater frequency of crime than the control area.**

**d. When such a comparison is made a multiple regression (or similar multivariate statistical technique) must be undertaken to control for other variables related to crime.**

**e. Police procedures such as stepped-up enforcement in the adult area must be considered. Stepped enforcement may result in the detection of more crime activity, or may be targeting one or another demographic group for special vigilance.**

**f. When engaging in time crime comparisons across years, multiple years are needed to eliminate the possibility that one time crime fluctuations are occurring.**

14. In my opinion the City of Dallas in one form or another has failed to meet all of these standards in assessing the secondary effects of adult businesses within the city and therefore cannot come to any valid conclusions regarding the criminogenic effects of adult businesses in the City of Dallas. I will elaborate on the City's failures below. In doing so I reference the oral deposition of Stephen Arthur Bishopp taken by attorney J. Michael Murray on February 23, 2022.

15, **A valid study must establish a defined zone around the business(es) in question. For example, a 500 feet zone. Crime incidents must be counted within that zone. The business must be open and operating for some period of time under which the crime count is undertaken. A valid study should also take into account all crime incidents within the 500 zone across all "time periods."**

16. The city included in its study of adult businesses, business addresses which according to the City's own records were no longer operating as adult locations.

17. The City established a 500-foot zone around "adult" locations but they failed to account for adult businesses that were closed during part or all of the study period.

ORAL DEPOSITION OF

STEPHEN ARTHUR BISHOPP FEBRUARY 23, 2022

Page 34

Q. And it says, "The following nine slides are data
12 related to sexually oriented business locations." Do you
13 see that?
14 A. Yes, sir.
15 Q. And what does related mean in this context?
16 A. Our data that were pulled, whether it was crime
17 data or call data or arrest data that were pulled from

18 SOB locations or within a 500 foot bumper around the
19 sexually oriented business.
20 Q. A 500 foot radius?
21 A. Yes, sir.
22 Q. So when this refers to data related to sexually
23 oriented business locations, we're talking about arrests
24 that occurred within a 500 foot radius of a sexually
        25 oriented business?

18. Many of the 500 feet zones did not contain an operating adult establishment.

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP FEBRUARY 23, 2022
Page 25, 26

Q. Okay. The last column indicates "operating as,"
18 correct? Do you see that, to the far right?
19 A. I see.
20 Q. So we can -- according to the information that
21 you compiled, number 29 is closed down, correct?
22 A. Yes, sir.
23 Q. Number 30 is closed down, correct?
24 A. Yes, sir.
25 Q. Number 31 is not operating, correct?
Page 27
1 Q. Okay. And there are no adult book stores in
2 Beat 521, correct?
3 A. Correct.
4 Q. No adult arcades or theaters in Beat 521,
5 correct?
6 A. No, that's correct.
7 Q. Okay. Topless cabarets, it looks like there are
8 two. The Men's Club of Dallas and Baby Dolls Saloon
9 West, correct?
10 A. Correct.
11 Q. And then full nude cabarets, there are none
12 correct?
13 A. Correct.
14 Q. In the not operating column there was one that
15 was in Beat 521, but it's no longer operating, correct?
16 A. Correct.
17 Q. Okay. So as of this date there were actually
18 only two sexually oriented businesses that were operating
19 in Beat 521.
20 A. Yes, sir. According to this, yes, sir.
21 Q. Okay. Now, going back to the Plaintiff's

Page 11

22 Exhibit 2 -- and we'll hold on to that list which is
23 Plaintiff's Exhibit 3 -- there were supposed to be 10
24 sexually oriented businesses operating in the 534 beat,
25 correct?
Page 26
1 A. Correct.
2 Q. Number 32 is holding license but not operating,
3 correct?
4 A. Correct.
5 Q. Number 33 is an active license, but it's a
6 vacant strip mall, correct?
7 A. Yes, sir.
8 Q. And number 34 is an active license unknown at
9 present. It's an empty lot, correct?
10 A. Correct.
11 Q. Okay. Then number 35 says it's not operating,
12 correct?
13 A. Correct.
14 Q. Okay. So these are seven businesses that held
15 sexually oriented business licenses that are not
16 operating, correct?

19. In my opinion it is, therefore, impossible to come to a valid conclusion about the level of crime associated with these businesses when many of locations included in the count do not have an operating adult business during the study period. Further, the City's own data suggest that 500 feet areas used in their study that contained closed businesses experienced increases in crime. (see paragraph 11 above.) The inclusion of these locations in the City's study may well artificially inflate crime levels in the misidentified areas. This artificial crime inflation would lead the City to believe that it had justification for its hour of operation ordinance when, in fact, it did not.

20. Relatedly, the City purports to do a "hours of operation study" but has not taken account the crime incidents for the adult business zones for the entire 24 hour period.

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP FEBRUARY 23, 2022
Page 21

17 Q. Apparently, at least for these purposes, there
18 was not a calculation done to determine what the
19 percentage of aggravated assaults were during the four
20 hour period between six a.m. and 10 a.m., correct?
21 A. Correct.
22 Q. And no one determined what the percentage of
23 aggravated assaults were between 10 a.m. and two p.m.
24 A. Correct.
25 Q. Or between two p.m. and six p.m.
Page 22
1 A. That is correct.
2 Q. Or between six p.m. and 10 p.m.
3 A. Also correct.
4 Q. So we have no idea, at least from this
5 presentation on this page, which four hour block during
6 the 24 hour period had the highest percentage of
7 aggravated assaults, do we?
8 A. No, sir.
9 Q. Or for that matter we don't know from this data
10 which four hour block had the lowest percentage of
11 aggravated assaults.
12 A. Correct.

21. Because the City failed to measure crime for the entire 24 hour period it is not

possible to come to a valid conclusion about the level of crime associated with the adult

businesses during the mandated closing hours. There is no way of knowing if the City has a

special crime problem during the mandated closing hours without at least a rudimentary

comparison to additional time periods during the day.

22. "Control zones" around other possibly criminogenic businesses must be established

for comparison purposes.

23. In my opinion the City did not establish proper "control zones" around other possibly

criminogenic businesses.

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP FEBRUARY 23, 2022
Page 40

3 Q. Now, we know that there are other businesses

Page 13

4 besides sexually oriented businesses that are open
5 between the hours of 10 p.m. and six a.m.
6 A. Yes, sir.
7 Q. We know gas stations, for example?
8 A. Yes, sir.
9 Q. Convenience stores?
10 A. Yes, sir.
11 Q. Some drug stores?
12 A. I would assume so, yes, sir.
13 Q. Some nonadult nightclubs can be open until four
14 a.m.
15 A. Yes, sir.
16 Q. Some grocery stores?
17 A. Certainly.
18 Q. Certainly fast food restaurants are open during
19 those hours?
20 A. Yes, sir.
21 Q. Other restaurants like, for example,
22 International House of Pancakes, that type of a
23 restaurant?
24 A. Yes, sir.
25 Q. Okay. Motels, hotels?
Page 41
1 A. Yes, sir.
2 Q. Okay. Other retail outlets apart from adult
3 book stores?
4 A. Yes, sir.
5 Q. Now, you did not determine or make any attempt
6 to study what the percentage -- how many violent crimes
7 were reported within a 500 foot radius of any of those
8 businesses, did you?
9 A. No, sir.
10 Q. And many of those businesses can be within the
11 same 500 foot radius of the locations of the sexually
12 oriented businesses, correct?
13 A. Yes, sir.
14 Q. Or for that matter there night be some overlap.
15 Let's take one of those businesses, a fast food
16 restaurant, just as an example that is 800 feet away from
17 the location of a sexually oriented business, okay? You
18 with me on that?
19 A. Yes, sir.
20 Q. So if a violent crime occurred 400 feet from the
21 sexually oriented business, it also occurred 400 feet
22 from the fast food restaurant?
23 A. Yes, sir.

24 Q. But you never compared how many crimes were
25 committed or reported within 500 feet of the fast food
Page 42
1 restaurant. You only did it with respect to the sexually
2 oriented business; isn't that correct?
3 A. That's correct.

24. **These controls should also be matched to the adult site in terms of demographic characteristics, population size and business composition.**

25. The City did not establish "control zones" around other possibly criminogenic

businesses matched in terms of demographic, population size and business composition.

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP
FEBRUARY 23, 2022

Page 43
1 the time they're open or the type of people that go.
2 So the proper way to come up with a control site
3 is you have to find one preferably in another part of the
4 city with approximately the same economic, socioeconomic
5 development with approximately the same population with
6 business that's open during the same hours, same crime
7 rate, as best you can.
8 Q. Right.
9 A. We never developed that any further.
10 Q. And that's exactly what a control site would be.
11 You want to make sure that it had a similar population, a
12 similar demographics.
13 A. Yes, sir.
14 Q. Similar hours of operation, similar economic
15 neighborhoods.
16 A. It has to be similar -- sorry.
17 Q. Correct?
18 A. Yes, that's correct.
19 Q. And then if you did that and you picked a
20 control site, you could theoretically pick a control site
21 for each one of the let's call them 28 sexually oriented
22 businesses that are open, correct? You could do that?
23 A. Yes, sir.
24 Q. Okay. In fact, studying like that, not
25 necessarily on this particular subject, but there are

Page 44

1 published studies that have done similar type analysis?
2 A. Yes, sir.
3 Q. Okay. And then if you did that and you picked a
4 control site that had those characteristics and you
5 compared it with one of the sexually oriented businesses,
6 you could actually determine whether it would be -- you
7 could conclude that whether the control site or the
8 sexually oriented business site was more criminogenic;
9 isn't that true?
10 A. With the proper methodology, you could. You
11 could conclude that.
12 Q. But you didn't do that in this?
13 A. I did not.
14 Q. Okay. So you have no way of knowing as you sit
15 here today whether, in fact -- whatever all these
16 statistics show, whether, in fact, crime within 500 feet
17 of sexually oriented businesses is less, more, or the
18 same as crime within 500 foot radius of proper control
19 sites; is that right?
20 A. That's true.

**26. A comparison should be made between the adult business areas and the properly constructed control areas to determine if the area around the adult business has a greater frequency of crime than the control area.**

27. Because the City by their own admission did not choose the proper control sites they could not validly compare adult business areas to control areas to determine if the area around the adult business has a greater or lesser frequency of crime than the designated control sites.

28. The City maintains that they employed the so called "entertainment districts" as control sites but there was no attempt made to match demographic, population size and business composition within the entertainment districts to the adult business 500-feet areas.

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP FEBRUARY 23, 2022
Page 42

8 Q. We also know you never developed any control
9 sites. Do you know what a control site would be in a
10 study like this?
11 A. Yes, sir, and we did.
12 Q. I'm sorry?

Page 16

13 A. We did.
14 Q. Okay. I think the one control that you focused
15 on was something called an entertainment district?
16 A. Yes, sir.
17 Q. Apart from an entertainment district -- and
18 we'll talk about that later on -- did you investigate any
19 other control sites?
20 A. We did. We looked at or we're going to review
21 the TABC licensed areas. But that was back and forth
22 between UT San Antonio and myself and Chief Garcia. The
23 problem is the proper control sites, there's some
24 literature out there that relates a McDonald's or a
25 7-Eleven to a sexually oriented business in reference to

Page 57
1 Q. Okay. So then it says that there's a comparison
2 between sexually oriented businesses and entertainment
3 districts. Do you see that?
4 A. Yes, sir.
5 Q. Okay. Now, first of all, are we still talking
6 about a 500 foot radius?
7 A. We are, yes, sir.
8 Q. So all of these statistics depend upon a 500
9 foot radius surrounding various locations?
10 A. Let me correct myself. Only for the SOB
11 locations. For the entertainment districts, there were
12 large areas it doesn't make sense because it's not a
13 business per se. It's a district. They just took the
14 area within that district.
15 So the SOBs are still -- that data is still the
16 500 foot radius as we have been discussing, but the
17 entertainment districts are just the districts
18 themselves.

29. In my opinion no valid information can be obtained from a comparison of the areas

500 feet areas surrounding the adult businesses to the "entertainment districts" used as "control"

site. Crime counts vary considerably across municipal areas and crime events are are associated

with certain demographic, population and business characteristics of an area. These features must

be matched between the adult business site and the cool site in order to make valid comparisons.

There is no indication that the entertainment districts are suitably matched to the adult business

areas. In my opinion without such matching no conclusions can be reached concerning the

secondary crime effects of adult businesses in the City.

30. **When such a comparison is made a multiple regression (or similar multivariate statistical technique) must be undertaken to control for other variables related to crime.**

ORAL DEPOSITION OF
STEPHEN ARTHUR BISHOPP FEBRUARY 23, 2022

Page 42

4 Q. So we know you never did a multivariate
5 regression analysis; isn't that true?
6 A. I did no regressions by variate or multivariate
7 No, sir.

31.  In my opinion because the City failed to conduct a multiple regression (or similar

multivariate technique) to control for the business and demographic features of an area no valid

crime comparisons can be undertaken. Without the use of such a statistical technique no

conclusions can be reached concerning the secondary crime effects of adult businesses in the

City.

32. **Police procedures such as stepped-up enforcement in the adult area must be considered. Stepped enforcement may result in the detection of more crime activity, or may be targeting one or another demographic group for special vigilance.**

33. The City employed a "Special Task Force."  This special force patrolled the area for

possible criminal activity. This stepped-up enforcement occurred primarily through police car

patrols. These patrols resulted in persons in the area of the adult business being pulled over for

traffic offenses or other vehicle violations. Once stopped, the police conducted further

examinations of the driver and thereby discovered outstanding arrest warrants or other

indications of criminal activity which did not occur in the vicinity of the adult business. These

were counted as crime incidents in the adult area despite the fact that they occurred nowhere near

the adult business location or for that matter during the crime counting period. In my opinion the Northwest Club Task Force created by the City of Dallas Police is an example of what I refer to as "stepped up enforcement." The police of the special task force were tasked with monitoring the areas in the vicinity of adult businesses. This stepped up activity will generate more arrests than would normally occur under usual enforcement procedures and will result in invalid crime comparisons between the stepped up vigilance in the adult business areas and comparison areas.

34. In my opinion, and in summary, the City of Dallas engaged in a shoddy study, misinterpreted their own data as evidence for adverse secondary crime effects and as justification for the the regulation of adult businesses during the hours of 2am to 6am.

34. I have also reviewed Plaintiff's Exhibit 2, COD-32, 33, and 34 in which the City presents information from previous studies of adverse secondary effects. I am familiar with the studies and reports referenced on those pages. I have reviewed these reports and studies and I conclude that due to methodological limitations they do not support the proposition that adult businesses are associated with secondary crime effects. Further, none of these reports or studies specifically address the presence or absence of criminal activity and hours of operation or mandated closing hours.

35. I have conducted several secondary effects studies across multiple municipalities examining crime and its association with adult businesses. I have also attached the peer reviewed article entitled: "A Legal and Empirical Perspective on Crime and Adult Establishments: A Secondary Effects Study in San Antonio Texas" by Roger Enriquez, Jeffery Cancino and Sean Varano. These studies have been peer-reviewed and published in scientific and legal journals. The peer reviewed published papers have been attached to this report as **Exhibit 2**. From these

studies I conclude that there is no valid evidence that adult businesses when properly matched with control areas are a special source of crime.

March 2, 2022

*Daniel Linz*

Daniel Linz

EXHIBIT 1: Curriculum vita

CURRICULUM VITAE
October, 2021

DANIEL G. LINZ

Department of Communication
University of California, Santa Barbara
Santa Barbara, California 93106
linz@comm.ucsb.edu

## EDUCATION

| Degree Earned | | Institution | Year |
|---|---|---|---|
| Bachelor of Science | Sociology | Northern Kentucky University | 1978 |
| Bachelor of Science | Psychology | Northern Kentucky University | 1978 |
| Master of Science | Sociology | University of Wisconsin-Madison | 1981 |
| Doctor of Philosophy | Psychology | University of Wisconsin-Madison | 1985 |

## CURRENT EMPLOYMENT AND PREVIOUS EXPERIENCE

2011-pres.     Adjunct Professor, Black Studies Department
               University of California, Santa Barbara.

1994-pres.     Professor, Department of Communication
               University of California, Santa Barbara.

1994-2010      Professor, Law and Society Program
               University of California, Santa Barbara.

2005-2008.     Graduate Director
               Department of Communication
               University of California, Santa Barbara.

2002-2003      Assistant Executive Director: Center On Police Practices And
               Community (COPPAC)

2000-2002.     Director
               University of California Santa Barbara Survey Research Center

1994-2000.     Program Chair
               Law and Society Program
               University of California, Santa Barbara.

1990-1994      Associate Professor
               Department of Communication and   Law and Society Program
               University of California, Santa Barbara.

1990           Visiting professor
               Department of Law and International Politics, University of Beijing,
               China.

1988-1990      Assistant Professor
               Communication Studies Program, University of California, Santa Barbara.

1987-1988      Research Psychologist
               Communication Studies Program, University of California, Santa Barbara.

1987-1988      Lecturer
               Department of Psychology and the Communication Studies Program,
               University of California, Los Angeles.

## CURRENT TEACHING AND PAST TEACHING EXPERIENCE

University of California, Santa Barbara, Department of Communication

Comm. 127 Communication, Gender and Leadership.
Comm. 132 Communication, psychology, electronic media policy and regulation.
Comm. 176 Forensic Communication.
Comm. 180 Senior Honors Thesis.
Comm. 113 Mass Media and the Individual.
Comm. 170 Communication Law.
Comm. 175sx Sex and the Judiciary.
Comm. 175cc Communication and Sexual Consent
Comm. 194S. The Design and Analysis of Surveys
Comm. 181a,b,c Senior Honors Program

University of California, Santa Barbara, Law and Society Program

Interpreting Socio-legal Research.
Law and Social Science.
Media Law.
Psychology and the Legal System.
Seminar in Speech and Violence.
Juries and Justice.

Graduate Seminars:

Research Methods in Communication.
Applications in Advanced Research Methods.

Law and Policy Issues in Justice in Communication.

University of California, Los Angeles, Department of Psychology

Social Psychology Laboratory.
Social Psychology and the Law.

University of California, Los Angeles, Communication Studies Program

Mass Media and Aggression Against Women.
Freedom of Communication: Mass Media and the Law.
The Effects of Mass Media.
Communication Theory.

HONORS AND AWARDS

2012 International Communication Association: Top Papers in Intergroup
Communication: Immigration Issues in Applied Contexts. Paper Title: "Intergroup
Accommodations in Traffic Stops: Ethnicity, Accent and Extensive Policing."

2011 National Communication Association: Top Paper - Communication and Law.  Paper
Title: "Indecency in the 21st Century: Revisiting the Assumptions of the Regulation of
Indecent Broadcasting."

2011 International Communication Association, Communication Law & Policy Division:
Best Paper Award. Paper Title: "The Secondary Effects Doctrine Since Alameda: An
Empirical Re-examination of the Justifications for Laws Limiting First Amendment
Protection."

2009 National Communication Association: Top Scholarship in Freedom of Expression.
Paper Title: "Erotic Dancing, Liquor, and Crime: An Empirical Critique of Virginia
Statute Changes Restricting Liquor Service and Adult Entertainment."

2007 National Communication Association: Top Freedom of Expression Scholarship.
Paper Title: "Evaluating the Potential Secondary Effects of Adult Video/Bookstores in
Indianapolis, IN."

2006 National Communication Association: Top Four Refereed Papers in Freedom of
Expression.  Paper Title: "Testing Supreme Court Assumptions in California v. la Rue: Is
There Justification for Prohibiting Sexually Explicit Messages in Establishments that Sell
Liquor?"

2006 National Communication Association: Top Three Refereed Papers in Mass Communication. "Video game play and the role of frustration: How playing non-violent video games can lead to aggressive effects."

2006 International Communication Association:  Top Three Refereed Papers in Games and Communication. Paper Title:  "Sexual Priming, Gender Stereotyping, and Likelihood to Sexually Harass: Examining the Effects of Playing a Sexually Explicit Video Game."

2002 International Communication Association:  Top Four Refereed Papers in Communication, Law and Policy. Paper Title:  "Testing Assumptions Made by the Supreme Court Concerning the Negative Secondary Effects of Adult Businesses: A Quasi-Experimental Approach to a First Amendment Issue."

2002 Center for Successful Parenting Award. Recognition of outstanding research in the area of media violence.  Paper Title: "Violence in children's television programming: Assessing the risks."

2000 International Communication Association:  Top Three Refereed Papers in Communication, Law and Policy.  Paper Title:  "Government regulation of "adult" businesses through zoning and anti-nudity ordinances: Debunking the legal myth of negative secondary effects."

1999 National Communication Association: Top Three Refereed Papers in Mass Communication Division.  Paper Title:  "Race and the Misrepresentation of Victimization on Local Television News."

1992 International Communication Association: Top Three Refereed Papers in Communication Law and Policy. Paper Title: "Defining the limits of public tolerance for sexually explicit and sexually violent materials: A field experiment."

1990-91 UCSB Plous Memorial Award. Presented to an Assistant professor in the college of Letters and Science "who has demonstrated outstanding performance by creative action or contribution to the intellectual life of the college community."

1990 International Communication Association.  Top Ten Paper in Mass Communication. Paper Title: Applying social science to film ratings: A shift from what is considered offensive to what is harmful to children.

1986 Wisconsin Psychological Association Margaret Bernauer Psychology Research Award.  Paper Title: Individual differences in hostility and psychoticism, exposure to sexual violence in the media and reactions to a rape victim.

1985 First prize: American Psychological Association Division 41 (American Psychology-Law Society, AP-LS) Dissertation Award. Title: Sexual Violence in the Media: Effects on Male Viewers and Implications for Society

1985 First prize: American Psychological Association Division 9 (Society for the Psychological Study of Social Issues, SPSSI) Dissertation Award. Title: Sexual Violence in the Media: Effects on Male Viewers and Implications for Society.

SCHOLARLY PUBLICATIONS

Whitestone, S. B., Giles, H., Linz, D. (2020). Overcoming ungrievability: Transgender expectations for authentic expression after death. *Sociological Inquiry, 9* (2): 316-338. https://onlinelibrary.wiley.com/doi/abs/10.1111/soin.12357

Huppin M., Malamuth N.M., Linz D. (2019) An Evolutionary Perspective on Sexual Assault and Implications for Interventions. In: O'Donohue W., Schewe P. (eds) Handbook of Sexual Assault and Sexual Assault Prevention. Springer, Cham. https://doi.org/10.1007/978-3-030-23645-8_2

Malamuth, N.M. Huppin, M. and Linz, D. (2018). Sexual assault interventions may be doing more harm than good with high-risk males. *Aggression and Violent Behavior* 41 (2018) 20–24.

Seaman C. & Linz, D. (2014).  Are Adult Businesses Crime Hotspots? Comparing Adult Businesses to Other Locations in Three Cities. *Journal of Criminology*. Volume 2014, Article ID 783461, 14 pages http://dx.doi.org/10.1155/2014/783461 Hindawi Publishing Corporation

Hald, GM, Seaman, C & Linz, D. (2014), Sexuality and Pornography. in D Tolman, L Diamond, J Bauermeister, W George, J Pfaus & M Ward (eds), *APA Handbook of Sexuality and Psychology: Contextual Approaches*. vol. 2, American Psychological Association, Washington, DC, pp. 3-35. DOI: 10.1037/14194-000

Malamuth, N.M., Linz, D., & Weber, R. (2013). Chapter 7: The Internet and Aggression: Motivation, Disinhibitory and Opportunity Aspects. In Yair Amichai-Hamburger, Y. (Ed.), *The Social Net: The Social Psychology of the Internet*.

Giles, H., Linz, D., Bonilla, D. & Gomez, M.L. (2013). Police Stops of and Interactions with Latino and White (Non-Latino) drivers: Extensive Policing and Communication Accommodation. *Communication Monographs*.

Byrne, S., Lee, T., Katz, S.J., Linz, D. & McIlrath, M. (2013). Predators, Porn and Peers: Predicting Parent Underestimation of their Children's Risky Internet Experiences. *Journal of Computer Mediated Communication*.

Linz, D. (2012). Effects of Sexually Oriented Messages on Individuals and Communities: A History of Challenging Assumptions in the Courtroom. In: Motley, M.T. (Ed.). *Forensic Communication: Application of Communication Science to Courtroom Litigation*. New Jersey, Hampton Press.

Riddle, K., Potter, J.W., Metzger, M., Nabi, R.L., and Linz, D.G. (2011). Beyond Cultivation: Exploring the Effects of Frequency, Recency, and Vivid Autobiographical Memories for Violent Media. *Media Psychology,* 14 (2) 168-191.

Seaman, C. & Linz, D. (2011).  Indecency in the 21st Century: Revisiting the Assumptions Underlying the Regulation of Indecent Broadcasting in Light of Empirical Evidence. *Free Speech Yearbook*, Vol. 45, 67-80.

Rudy, R. M. , Popova, L. and Linz, D. G. (2011). Contributions to the Content Analysis of Gender Roles: An Introduction to a Special Issue. *Sex Roles, 64:* 151-159.

Seaman, C. & Linz, D. (2010). "The Secondary Effects Doctrine since Alameda: An Empirical Re-examination of the Justifications for Laws Limiting First Amendment Protection." *Journal of Media Law & Ethics, Volume 2, Numbers 3/4 (Summer/Fall), 192 -214.*

Rudy, R. M., Popova, L. & Linz, D. (2010). The Context of Current Content Analysis of Gender Roles: An Introduction to a Special Issue. *Sex Roles*, 62: 705–720.

Yao, M. Z., Mahood, C. & Linz, D. (2010). Sexual Priming, Gender Stereotyping, and Likelihood to Sexually Harass: Examining the Effects of Playing a Sexually-Explicit Video Game. *Sex Roles,* 62: 77–88.

Byrne, S., Linz, D., & Potter, W. J. (2009). A test of competing cognitive explanations for the boomerang effect in response to the deliberate disruption of media-induced aggression. *Media Psychology, 12*, 1-23.

Linz, D.  (2009). Pornography is not addictive and does not lead to violence against women / Daniel Linz. In: Addiction (Opposing Viewpoints) by Christina Fisanick. Detroit, MI: Greenhaven Press.

Yao, M. Z. & Linz, D. (2008). Predicting self-protections of online privacy. *CyberPsychology and Behavior*. Volume 11, Number 5, 615-617.

Moyer-Guse, E., Giles, H. & Linz, D. (2008). Communication Studies, Overview Communal Violence. In Lester Kurtz (Ed.) Vol.1 (1) *Encyclopedia of Violence Peace & Conflict*. Volumes 1-3, Oxford: Elsevier, 368-379.

Rudy, R. M., & Linz, D. G. (2008). Desensitization. In W. Donsbach (Ed.), *The

*International Encyclopedia of Communication* (Vol. 3, pp. 1211-1213). Oxford, United Kingdom: Wiley-Blackwell.

Paul, B. & Linz D. G. (2008). The Effects of Exposure to Virtual Child Pornography on Viewer Cognitions and Attitudes Toward Deviant Sexual Behavior. *Communication Research,* 35(1), 3-38.

Linz, D. (2007).  Media violence and behavior. In Brian L. Cutler (Ed.), *Encyclopedia of Psychology and Law.* Newbury Park, Sage Publications, Inc.

Linz, D. (2007).  Pornography, Effects of exposure to. In Brian L. Cutler (Ed.), *Encyclopedia of Psychology and Law.* Newbury Park, Sage Publications, Inc.

Linz, D., Yao, M., & Byrne, S. (2007). Testing Supreme Court assumptions in *California v. la Rue*: Is there justification for prohibiting sexually explicit messages in establishments that sell liquor? *Communication Law Review*. 7(1), 23-53.

Zwarun, L., Linz, D., Metzger, M., & Kunkel, D. (2006). Effects of showing risk in beer commercials to young drinkers. *Journal of Broadcasting & Electronic Media*, 50(1), 2006, pp. 52–77.

Linz, D., Paul, B. & Yao, M. Z. (2006).  Peep Show Establishments, Police Activity, Public Place and Time:  A Study of Secondary Effects in San Diego, California.  *Journal of Sex Research*, Volume 43, Number 2. 182-193.

Linz, D., Paul, B. & Yao, M. Z. (2006).  Peep Show Establishments, Police Activity, Public Place, and Time: A Response to McCleary and Meeker.  *Journal of Sex Research*, Volume 43, Number 2. 197-201.

Malamuth, N. Linz, D. and Yao., M. (2005).  Aggression and the Internet.  In Yair Amichai-Hamburger, Y. (Ed.), *The social net: The social psychology of the Internet*. 163-190.

Linz, D., Land, K., Williams, J. Ezell, M. & Paul, B. (2004).  An examination of the assumption that adult businesses are associated with crime in surrounding areas: A secondary effects study in Charlotte, North Carolina.  *Law and Society Review*, Volume 38, Number 1, 69-101.

Anderson, C., Berkowitz, Donnerstein, E., Huesmann, L.R., Johnson, J., Linz, D., Malamuth, N.M. and Wartella, E. (2003).  The influence of media violence on youth. *Psychological Science in the Public Interest*, 4 (3), 81-110.

Mulac, A., Jansma, L.G., & Linz, D. (2002).  Men's behavior toward women after viewing sexually explicit films: Degradation makes a difference.  *Communication Monographs*, 69(4), 311-328.

Dixon, T. & Linz, D. (2002). Television news, prejudicial pretrial publicity and the depiction of race. *Journal of Broadcasting and Electronic Media*, 46(1), pp. 112-136.

Wilson, B., Smith, S., Potter, W.J., Kunkel, D., Linz, D., Colvin, C., & Donnerstein, E. (2002). Violence in children's television programming: Assessing the risks. *Journal of Communication*, 52 (1), 5-34.

Linz, D. (2001). Desensitization. In the *Encyclopedia of Communication and Information*. Macmillan Reference, New York, NY.

Paul, B., Linz, D. & Shafer, B.J. (2001). Government regulation of adult businesses through zoning and anti-nudity ordinances: Debunking the legal myth of negative secondary effects. *Communication Law and Policy*, 6. 2, 355-391.

Linz, D. (2001). Child Pornography. In: S.O. White, (Ed). *Handbook of Law and Social Science: Youth and Justice*. Kluwer Academic/Plenum Press, 79-111.

Dixon, T. & Linz, D. (2000). Race and the misrepresentation of victimization on local television news. *Communication Research*, 27, 5, 547-573.

Linz, D., Blumenthal, E., Donnerstein, E., Kunkel, D. Shafer, B.J. & Lichtenstein, A. (2000). Testing Legal Assumptions Regarding the Effects of Dancer Nudity and Proximity to Patron on Erotic Expression. *Law and Human Behavior*, 24, 5, 507-533.

Dixon, T.L. & Linz, D.L. (2000). Overrepresentation and underrepresentation of African Americans and Latinos as lawbreakers on television news. *Journal of Communication*, 50, 2, 131-154.

Wilson, B., Linz, D., Federman, J., Smith, S., Paul, B., Nathanson, A., Donnerstein, E. & Lingsweiler, R. (1999). *The Choices and Consequences Evaluation: A Study of Court TV's Anti-Violence Curriculum*. Center for Communication and Social Policy, Institute for Social, Behavioral and Economic Research (ISBER), University of California, Santa Barbara.

Smith, S.L., Wilson, B.J., Kunkel, D., Linz, D., Potter, J., Donnerstein, E. and Colvin, C. (1998). Violence in Television Programming Overall; University of California, Santa Barbara Study. In: *National Television Violence Study: Volume 3*. Sage Publications, Thousand Oaks, CA.

Wilson, B., Kunkel, D. Linz, D., Potter, J., Donnerstein, E., Smith, S., Blumenthal, E., & Berry, M. (1998). The nature and context of violence on American television. In Carlsson & von Feilitzen (Eds.), *Children and media violence*. Goteborg, Sweden: UNESCO. (pp. 63-79).

Donnerstein, E., & Linz, D. (1998). Mass media: A general view. In L. Kurtz (Ed). *Encyclopedia of Violence, Peace, and Conflict*. New York: Academic Press.

Wilson, B., Donnerstein, E., Linz, D.,, Kunkel, D., Potter, J., Smith, S., Blumenthal, E., & Grey, T. (1998). Content analysis of entertainment television: The importance of context. In J. Hamilton (Ed). *Television Violence and Public Policy*. Ann Arbor, MI: University of Michigan Press.

Potter, J., Linz, D., Wilson, B., Donnerstein, E., Kunkel, D., Smith, S., Blumenthal, E., & Grey, T. (1998). Content analysis of entertainment television: New methodological developments. In J. Hamilton (Ed). *Television Violence and Public Policy*. Ann Arbor, MI: University of Michigan Press.

Wilson, B., Potter, J., Linz, D., Donnerstein, E., Kunkel, D., Smith, S., Blumenthal, E., & Grey, T. (1998). Content analysis of entertainment television: Results for 1994-95. In J. Hamilton (Ed). *Television Violence and Public Policy*. Ann Arbor, MI: University of Michigan Press.

Kunkel, D., Wilson, B., Potter, J., Linz, D.,, Donnerstein, E., Smith, S., Blumenthal, E., & Grey, T. (1998). Content analysis of entertainment television: Implications for public policy. In J. Hamilton (Ed*). Television Violence and Public Policy*. Ann Arbor, MI: University of Michigan Press.

Wilson, B.J., Kunkel, D., Linz, D., Potter, J., Donnerstein, E. Smith, S.L., Blumenthal, E. & Gray, T. (1998). Violence in Television Programming Overall; University of California, Santa Barbara Study. In: *National Television Violence Study: Volume 2*. Sage Publications, Thousand Oaks, CA, 3-267.

Dexter, H.R., Penrod, S., Linz, D. and Saunders, D. (1997). Attributing responsibility to female victims after exposure to sexually violent films. *Journal of Applied Social Psychology*, 27 (24), 2149-2171.

Dixon, T. L. & Linz, D. (1997). Obscenity law and rap music: Understanding the effects of sex, attitudes and beliefs. *Journal of Applied Communication Research*, 25, 217-241.

Krafka, C., Linz, D., Donnerstein, E.& Penrod, S. (1997). Women's reactions to sexually aggressive mass media depictions. *Violence Against Women*, 3,2, 149-181.

Wilson, B.J., Kunkel, D., Linz, D., Potter, J., Donnerstein, E. Smith, S.L., Blumenthal, E. & Gray, T. (1997). Violence in Television Programming Overall; University of California, Santa Barbara Study. In: *National Television Violence Study: Volume 1*. Sage Publications, Thousand Oaks, CA, 3-267.

Jansma, L., Linz, D., Mulac, A. & Imrich, D. (1997). Men's interactions with women after viewing sexually explicit films: Does degradation make a difference? *Communication Monographs*, 64, 1, March, 1-24.

Malamuth, N., Heavy, C & Linz, D. (1996). The confluence model of sexual aggression: Combining hostile masculinity and impersonal sex. In *Sex offender treatment: Biological dysfunction, intrapsychic conflict, interpersonal violence*, 13-37.

Mullin, C., Imrich, D. & Linz, D. (1996). The impact of acquaintance rape stories and case-specific pretrial publicity on juror decision making. *Communication Research*, 23, 1, 100-135.

Mullin, C & Linz, D. (1995). Desensitization and resensitization to sexualized violence: The effects of exposure to sexually violent films on judgments of domestic violence victims. *Journal of Personality and Social Psychology*, 69, 3. 449-459.

Kunkel, D., Wilson, B., Donnerstein, E., Linz, D., Smith, S., Gray, T., Blumenthal, E. & Potter, J. (1995). Measuring television violence: The importance of context. *Journal of Broadcasting and Electronic Media,* 39, 2, 284-291.

Malamuth, N., Linz, D., & Heavy, C., Barnes, G. & Acker, M. (1995). Using the confluence model of sexual aggression to predict men's conflict with women: A ten year follow-up study. *Journal of Personality and Social Psychology*, 69, 2, 353-369.

Donnerstein, E. & Linz, D. (1995). The Mass Media: A Role in Injury Causation and Prevention. *Adolescent Medicine*, 6, 2, 271-284.

Imrich, D. Mullin, C. & Linz, D. (1995). Measuring the Extent of Pretrial Publicity in Major American Newspapers: A Content Analysis. *Journal of Communication*, 45, 3, 94-117.

Linz, D., E. Donnerstein, K. Land, P. McCall, B.J. Shafer, & A. Graesner. (1995). Measuring community standards for sex and violence: An empirical challenge to assumptions in obscenity law. *Law and Society Review*, 29, 1, 127-168.

Donnerstein, E. & Linz, D. (1995) Media. In J.Q. Wilson & J. Petersilia (Eds). *Crime: Twenty-eight leading experts look at the most pressing problem of our time*. Institute for Contemporary Studies, 237-266.

Donnerstein, E., Wilson B.J. & Linz, D. (1995). Mass media violence and film ratings: Redressing shortcomings in the current system. In: *Proceedings of the House of Delegates*, 143rd Annual Meeting. Chicago, Ill: American Medical Association, 78-89.

Donnerstein, E. & Linz, D. (1994). Sexual violence in the mass media. In S. Oskamp and M. Costanzo (Eds). *Violence and the law*. Sage Publications, Newbury Park, CA, 9-36.

Linz, D. & Donnerstein, E. (1994). Sex and Violence in slasher films: A reinterpretation. *Journal of Broadcasting and Electronic Media*, 38, 2, 243-246.

Linz, D. & Malamuth, N.M. (1993).  Communication Concepts 5:  Pornography.  In S. Chaffee (Ed.) *Communication Concepts Series*, Sage Publications, Newbury Park, CA.

Malamuth, N. M., Heavey, C.L. & Linz, D. (1993). Predicting men's antisocial behavior against women:  The interaction model of sexual aggression.  In Hall, G. C. N., R. Hirschman, J. Graham & M. Zaragoza (Eds.) *Sexual Aggression: Issues in etiology*, assessment and treatment.  Washington, D.C.: Hemisphere, 63-97.

Linz, D. & Donnerstein, E. (Sept. 1992).  Research can help us explain violence and pornography.  *The Chronicle of Higher Education*, 39, (6) A33-34.

Wilson, B.J., Linz, D., E. Donnerstein & H. Stipp (1992).  The impact of social issue television programming on attitudes toward rape.  *Human Communication Research*, 19, (2) 179-208.

Donnerstein, E., Wilson, B. J., & Linz, D. (1992).  On the regulation of broadcast indecency to protect children.  *Journal of Broadcasting and Electronic Media*. 36 (2) 111-117.

Linz, D., Wilson, B.J. & Donnerstein, E. (1992).  Sexual violence in the mass media: Legal solutions, warnings, and mitigation through education.  *The Journal of Social Issues,* 48, 1, 145-172.

Linz, D. & Malamuth, N. &  Beckett, C. (1992).  Civil Liberties and Research on the Effects of Pornography.  In  P. Suedfeld and P. Tetlock (Eds.), *Psychology and Social Policy*. New York: Hemisphere, 149-162.

Linz, D. & Penrod, S.  (1991).  Exploring the First and Sixth Amendments:  Pretrial Publicity and Jury Decision-making.  In Kagehiro, D. K., & Laufer, W.S. (Eds.). *Handbook of Psychology and Law*.  New York:  Springer-Verlag.

Linz, D., Donnerstein, E., Land, K., McCall, P., Scott, J., Klein, L. J., Shafer, B.J. & Lance, L. (1991).  Estimating community tolerance for obscenity: The use of social science evidence. *Public Opinion Quarterly*, Spring, 80-112.

Linz, D. & Donnerstein, E. (1990).  The role of social scientists in policy decision making about pornography: A reply to Page.  *Canadian Psychology*, 31 (4), 368-371.

Linz, D. & Donnerstein, E. (1990).  The relationship between exposure to pornography and anti-social behavior. *The Expert Witness, the Trial Attorney and the Trial Judge*. 5, (Summer), 26-30.

Imrich, D., Mullin, C. & Linz, D.  (1990).  Sexually violent media and criminal justice policy.  In  R. Surette (Ed.), *The Media and criminal justice policy: Recent research and social effects*.  Springfield, IL: C. C. Thomas, 103-128.

Wilson, B.J., Linz, D. & Randall, B. (1990) Applying social science research to film ratings: A shift from what is considered offensive to what is considered harmful to children. *Journal of Broadcasting and Electronic Media*, 34:(4) 443-468.

Linz, D., Arluk, I. & Donnerstein, E. (1990). Mitigating the negative effects of sexually violent mass media through pre-exposure briefings. *Communication Research*. 17 (5) 641-674.

Yang, N. & Linz, D. (1990). Movie Ratings and the Content of Adult Videos: The Sex Violence Ratio. *Journal of Communication*, 40 (2),Spring, 28-42.

Linz, D. & Donnerstein, E. (1990). Sexual violence in the media. *World Health*, April-May, 26-27.

Hurley, J., Linz, D. (1990). Assessing the effects of the Medicare prospective payment system on the demand for VA inpatient services: An examination of transfers and discharges of problem patients. *Health Services Research*, Vol. 25,(1), 239-255.

Linz, D., Donnerstein, E. & Adams, S. (1989). Physiological desensitization and judgments about female victims of violence. *Human Communication Research*, 15, 4, pp. 509-522.

Linz, D. & Donnerstein, E. (1989). The effects of violent messages in the mass media: Contemporary theory and research. In J. E. Bradac (Ed.), *Messages in communication science: Contemporary approaches to the study of effects, Vol. 17* in Sage Annual Review of Communication Research. Newbury Park, CA: Sage.

Linz, D., & Donnerstein, E. (1989). Effects of counter-information on the acceptance of rape myths. In D. Zillmann & J. Bryant (Eds.), *Pornography: Recent research, interpretations, and policy considerations*. Hillsdale, NJ: Erlbaum, 259-288.

Linz, D. (1989). Exposure to sexually explicit materials and attitudes towards rape: A comparison of study results. *The Journal of Sex Research*, 26, 1, 50-84.

Linz, D., & Donnerstein, E. (1988). Methodological issues in the content analysis of pornography. *University of Michigan Journal of Law Reform*. 21, 1-2, 47-54.

Linz, D., Donnerstein, E. & Penrod, S. (1988). Long-term exposure to violent and sexually degrading depictions of women. *Journal of Personality and Social Psychology*, 55(5), 758-768.

Donnerstein, E. & Linz, D. (1988). A critical analysis of "a critical analysis of recent research on violent erotica." *The Journal of Sex Research*, 24, 348-352.

Linz, D., & Donnerstein, E. (1988). The methods and merits of pornography research. *Journal of Communication*, 38(2), 180-184.

Linz, D., Penrod, S., & Donnerstein, E. (1987). The Attorney General's Commission on Pornography: The gap between "findings" and facts. *The American Bar Foundation Research Journal*, 1987(4), 301-324.

Linz, D., Donnerstein, E., & Penrod, S. (1987). Sexual violence in the mass media: Social psychological implications. In P. Shaver & C. Hendrick (Eds.), *Review of personality and social psychology (Vol. 7)* (pp. 135-175). Newbury Park, CA: Sage.

Saunders, D. G., Lynch, A. B., Grayson, M., & Linz, D. (1987). The inventory of beliefs about wife beating: The construction and initial validation of a measure of beliefs and attitudes. *Violence and Victims*, 2 (1), 39-57.

Linz, D., Donnerstein, E., & Penrod, S. (1987). The findings and recommendations of the Attorney General's Commission on Pornography: Do the psychological facts fit the political fury? *American Psychologist*, 42(10), 946-953.

Donnerstein, E., Linz, D., & Penrod, S. (1987). *The question of pornography: Research findings and policy implications*. New York: Free Press.

Linz, D., Penrod, S., & Donnerstein, E. (1986). Issues bearing on the legal regulation of violent and sexually violent media. *Journal of Social Issues*, 42(3), 171-193.

Linz, D., Penrod, S., & McDonald, E. (1986). Attorney communication in the courtroom: Views from off the bench. *Law and Human Behavior*, 10(4), 281-302.

Linz, D., Donnerstein, E., Bross, M., & Chapin, M. (1986). Mitigating the influence of violence on television and sexual violence in the media. In R. Blanchard (Ed.), *Advances in the study of aggression (Vol. 2)* (pp. 165-194). New York: Academic Press.

Donnerstein, E., & Linz, D. (1986). Mass media sexual violence and male viewers: Current theory and research. *American Behavioral Scientist*, 29(5), 601-18.

Donnerstein, E. I., & Linz, D. G. (1986, December). The question of pornography: It is not sex, but violence that is an obscenity in our society. *Psychology Today*, 20(12), 56-59.

Penrod, S., & Linz, D. (1985). Voir dire: Uses and abuses. In M. F. Kaplan (Ed.), *Impact of social psychology on procedural justice*. Springfield, IL: C. C. Thomas.

Linz, D., & Penrod, S. (1984). Increasing attorney persuasiveness in the courtroom. *Law and Psychology Review*, 8, 1-47.

Linz, D., Donnerstein, E., & Penrod, S.  (1984).  The effects of multiple exposures to filmed violence against women.  *Journal of Communication*, 34 (3), 130-147

Donnerstein, E., & Linz, D.  (1984, January).  Sexual violence in the media: A warning.  *Psychology Today*, pp. 14-15.

Linz, D., Turner, C., Hesse, B., & Penrod, S.  (1984).  Bases of liability for injuries produced by media portrayals of violent pornography.  In N. Malamuth & E. Donnerstein (Eds.), *Pornography and sexual aggression* (pp. 277-302).  New York: Academic Press.

Penrod, S., & Linz, D.  (1984).  Using psychological research on violent pornography to inform legal change.  In N. Malamuth & E. Donnerstein (Eds.), *Pornography and sexual aggression* (pp. 247-273).  New York: Academic Press.

Linz, D., & Heberlein, T. A.  (1984).  Development of a personal obligation to shift electricity use: Initial determinants and maintenance over time.  *Energy: The International Journal,* 9, 255-263.

Penrod, S., Linz, D., Heuer, L. Coates, D., Atkinson, M. & Herzberg, S.  (1983).  The implications of social science research for trial practice attorneys.  In D. J. Muller, D. G. Blackman, & A. J. Chapman (Eds.), *Perspectives in psychology and law* (pp. 435-455).  London: Wiley.

Penrod, S. E. Donnerstein & Linz D. (1982). Scientific research on pornography and violence: The implications for American law. *Bulletin of the British Psychological Society*, 35, A100 (Abstract).

Penrod, S, Linz, D. Coates, D. & Herzberg, S. (1982). The implications of social science research for trial practice attorneys. *Bulletin of the British Psychological Society*, 35, A100 (Abstract).

Heberlein, T. A., Linz, D., & Ortiz, B.  (1982).  Satisfaction, commitment, and knowledge of customers on a mandatory participation time-of-day electricity pricing experiment.  *Journal of Consumer Research*, 9, 106-114.

Heberlein, T. A., Linz, D., & Ortiz, B.  (1981).  Time-of-day electricity pricing.  In J. D. Claxton, C. D. Anderson, J. R. B. Ritchie, & H. G. McDougall (Eds.), *Consumers and energy conservation: International perspective on research and policy options*.  New York: Praeger.

Scholarly Publications (reprinted)

Paul, B., Linz, D. & Shafer, B.J. (2002).  Government regulation of adult businesses through zoning and anti-nudity ordiances: Debunking the legal myth of negative secondary effects.  Communication Law and Policy, 6. 2, 355-391.  In "2002 Zoning and Planning Law Handbook" (West Group).

Donnerstein E, Linz D. Mass media, violence and the male viewer. In: Oden ME, ClayWarner J, editors. Wilmington (DE)7 SR Books/Scholarly Resources; 1998. p. 181–98.

Linz, D., Donnerstein, E., Land, K., McCall, P., Scott, J., Klein, L. J., Shafer, B.J. & Lance, L. (1991).  Estimating community tolerance for obscenity: The use of social science evidence. Public Opinion Quarterly, Spring, 80-112.  In: Monahan, J. & Walker, L. Social Science in Law, (Fourth Edition), The University of Chicago Press (1998).

Linz, D., Penrod, S., & Donnerstein, E.  (1987).  The Attorney General's Commission on Pornography: The gap between "findings" and facts.  The American Bar Foundation Research Journal, 1987(4), 301-324. In: Monahan, J. & Walker, L. Social Science in Law, (Fourth Edition), The University of Chicago Press (1998).

Donnerstein, E., & Linz, D.  (1986).  Mass-media sexual violence and male viewers: Current theory and research.  American Behavioral Scientist, 29(5), 601-618.  In: Disch, E.  Reconstructing Gender, Mayfield Publishing Company (1997).

Donnerstein, E., & Linz, D.  (1986).  Mass-media sexual violence and male viewers: Current theory and research.  American Behavioral Scientist, 29(5), 601-618. In: Men confronting pornography

Donnerstein, E., & Linz, D.  (1986).  Mass-media sexual violence and male viewers: Current theory and research.  American Behavioral Scientist, 29(5), 601-618. In M.S. Kimmel & M.I. Messner (Eds.), Men's Lives. (1989), New York, NY, Macmillan.

Donnerstein, E. I., & Linz, D. G.  (1986, December).  The question of pornography: It is not sex, but violence that is an obscenity in our society.  Psychology Today, 20(12), 56-59.  In O. Pocs (Ed.) Human Sexuality 89/90.  Guilford, CT:  Dushkin Publishing Group.

Donnerstein, E., & Linz, D.  (1986).  Mass-media sexual violence and male viewers: Current theory and research.  American Behavioral Scientist, 29(5), 601-618.  In M. Kimmel (Ed.), Changing men: New directions in research on men and masculinity. (1987), Newbury Park, CA: Sage.

Linz, D., Donnerstein, E., & Penrod, S.  (1984).  The effects of long term exposure to violence against women.  Journal of Communication, 34, 130-147.  In K. Deming & S. Becker (Eds.), Media in society: Readings in mass communication.  Evansville, IL: Scott-Foresman (1988).

Donnerstein, E., & Linz, D.  (1984, January).  Sexual violence in the media: A warning.  Psychology Today, pp. 14-15. In A. Wells (Ed.)  Mass Media and Society.  D.C. Heath and Company: Lexington MA (1987).

PROFESSIONAL ACTIVITIES

Research Grants (submitted)

President's Task Force on Preventing and  Responding to Sexual Violence and Sexual Assault: Evaluation Research Group Proposal. UC Office of the President. Year 1: $904,000, (May, 2016).

Linz, D.  Identifying barriers to victim reports of sexual assault to the police and developing a  mass media campaign to increase reporting.  Submitted to the National Institute of Justice.  $196,541 (10/1/98-3/31/00).

Research Grants (funded)

Campus Sexual Misconduct: Using Perpetrator Risk Assessment and Tailored Treatment to Individualize Sanctioning. Department of Justice, SMART FY14 Campus Sexual Assault Perpetrator Treatment Program. $3,000 (10/2014-9/2017).

Linz, D. & O'Connor, J. Evaluation of a multi-mode intervention (SHARe--The Word) designed to modify adolescent attitudes about dating violence.  California Public Health Department. $18,600 (10/00-10/03).

Wilson, B., Linz D., & E. Donnerstein. Evaluation of the "Choices and Consequences" Initiative.  Court TV. $120,635 (6/98-6/99).

Donnerstein, E., Wilson. B., Kunkel, D. & D. Linz. National television violence study. National Cable Television Association. $3,326,449 (6/94-1/98).

Malamuth, N., & Linz, D.  Predicting Sexual Coercion and Antisocial Behavior Against Women.  ($414,284, National Institute of Mental Health, 06/01/89-5/31/91).

Linz, D.  Pretrial exposure to mass media and legal decision-making.  ($41,804, National Science Foundation, 7/1/88-10/1/89).

Malamuth, N. & Linz, D.  Predicting sexual coercion and antisocial behaviors against women: An eight year follow-up. ($2000, Small Research Grant Program, UCLA Center for the Study of Women, 1/1/88-10/1/88).

Linz, D.  Home Box Office presentations of sexual violence and female homicide. ($1880, Small Research Grant Program, UCLA Center for the Study of Women, 3/1/87-10/1/87).

Spear, M., Linz, D., & Wolfe, B.  Effect of Medicare's Prospective Payment on Use of VA Inpatient Services.  ($147,524, Veteran's Administration Health Systems Research and Development, 10/1/87 to 9/30/89).

Donnerstein, E., Penrod, S., & Linz, D.  Sexually violent media and social behavior. ($347,104, National Institute of Mental Health, 7/15/86-6/30/89).

Linz, D., Eichelman, B., & Saunders, D.  The frequency of violent acts among inpatients and the incidence of domestic violence among outpatients in VA Medical District 16. ($10,000, Veteran's Administration Health systems Research and Development, 1/1/86-12/31/86).

**Professional Conference Presentations**

Whitestone, S. B., Chuk, K. A., Linz, D. (2021, November). *Marginalized posthumous identities: An innovative application of the communication theory of identity.* Annual Conference of the National Communication Association, Seattle.

Whitestone, S. B., Giles, H., Linz, D. (2019, November). Transgender identities after death: Authenticity in eternity. Paper submitted to the Annual Conference of the National Communication Association, Baltimore, MD.

Whitestone, S. B., Linz, D. (2019, May) Trans porn realness: Transgender pornography as a provider of both sex education and identity affirmation among transgender adults. *Rethinking (and Retheorizing) Transgender Media Representation*. 69th Annual Conference of International Communication Association, San Diego, CA.

Stamps, D. & Linz, D. (2019, February). I Don't See Color, But I See Myself Everywhere: Perceptions of Race and Support for Diversity at a Predominately White Institution. Paper presented at the Western States Communication Association annual conference,
Seattle, WA.

Yao, M. Z., Zou, Y. X., Linz, D., & Jaoude, P. (2017, June). *The impacts of privacy hypocrisy, victim characterization, gender, and context on bystanders' guilt attribution in a cyberbullying suicide.* 67th Annual Conference of International Communication Association, San Diego, USA.

Whitestone, S. B. & Linz, D. (2017, May). *Quantifying stereotypes of transgender characters on television*. Round table participant at the 67th Annual Conference International Communication Association, San Diego, CA.

Zamanzadeh, N. N., & Linz, D. (2016, June). *The mood regulatory function of media multitasking*. Paper presented at the 66th Annual Conference of International Communication Association, Fukuoka, Japan.

Yao, M. Z. & Linz, D. (2016, June). *"You have the right to privacy, unless you have something to hide!"– Examining the impacts of a perceptual difference between privacy and secrecy on online privacy concerns and bystander apathy.* Paper presented at the 66th Annual Conference of International Communication Association, Fukuoka, Japan.

Zamanzadeh, N.N., Dixon, T.L., Linz, D.G. (2015, November). "*Is It Me You Are Looking For" Nonresponse as Online Aggression*. Paper presented at National Communication Association, Las Vegas.

Seaman, C.S. & Linz D. (2012*). Are Adult Businesses Crime Hotspots? Comparing Adult Businesses to Other Locations in Three Cities.* Paper presented at the annual meeting of the International Communication Association in Phoenix, AZ.

Giles, H. Bonilla, D, Linz, D. Gomez, M. (2012). "Intergroup Accommodations in Traffic Stops: Ethnicity, Accent and Extensive Policing." Paper presented at the International Communication Association: Top Papers in Intergroup Communication: Immigration Issues in Applied Contexts (Phoenix, AZ).

Seaman, C. and Linz, D. (2011). Indecency in the 21st Century: Revisiting the Assumptions of the Regulation of Indecent Broadcasting. Top Papers - Communication and Law Division. A paper presented at the annual conference of the National Communication Association, Division: Family Communication (New Orleans, LA).

Byrne, S., Lee, T., Katz, S. J., Linz, D. & McIrath, M. (2011). "Predators, peers, and porn: Predicting parent underestimation of children's risky Internet experiences." Paper presented at the annual conference of the National Communication Association, Division: Family Communication (New Orleans, LA).

Seaman, C. and Linz, D. (2011). "The Secondary Effects Doctrine Since Alameda: An Empirical Re-examination of the Justifications for Laws Limiting First Amendment Protection," Paper presented at the Annual Meeting of the International Communication Association "Communication @ the Center," (Boston, MA).

Popova, L., Rudy, R. and Linz, D. (2010). Content Analysis Research on Sex Roles: Past, Present, and Future. Paper presented at the 96th Annual Convention of the National Communication Association, November, San Francisco.

Linz, D., Paul, B., Seaman, C. (2010). Empirical Jurisprudence Applied to Speech Regulations: A Longitudinal Investigation of the Secondary Effects of Adult Businesses in Indianapolis. Paper presented at the 96th Annual Convention of the National Communication Association, November, San Francisco.

Linz, D.  (2009, November). <u>Effects of Sexually Oriented Messages on Individuals and Communities</u>. Communication and the Law Division. Presentation at the 95th Annual Convention of the National Communication Association, November 12-15, Chicago.

Seaman, C. & Linz, D. (2009, November). "Erotic Dancing, Liquor, and Crime: An Empirical Critique of Virginia Statute Changes Restricting Liquor Service and Adult Entertainment." Top Scholarship in Freedom of Expression: The Driving Force for Stability and Change. Presentation at the 95th Annual Convention of the National Communication Association, November 12-15, Chicago.

Rudy, R. & Linz, D. (2008, November). Sex Differences in Media Desensitization: Evidence and Theory. Panel Title: New directions in research on gender differences and the media. Paper presented at the meeting of the National Communication Association, San Diego.

Byrne, S. & Linz, D. (2008, May). "Investigating the Boomerang Effect in Anti-Aggression Media Literacy Interventions." Panel presentation at the Annual Meeting of the International Communication Association in Montreal, Canada.

Rudy, R., & Linz, D. (2007, November). "Domains of Media Desensitization: A Model of the Relationships Among Cognitive, Emotional, Physiological, and Behavioral Response Systems." Paper presented at the meeting of the National Communication Association, Chicago, IL.

Byrne, S. & Linz, D. (2007, November). "I Might Not Hit, but I Can Still Be Mean: Media Interventions and Gender Differences in Overt and Relational Aggression." Paper presentation at the meeting of the National Communication Association, Chicago, IL.

Paul, B., Linz, D., & Yao, M. (November, 2007). Top Freedom of Expression Scholarship. Paper Title: Evaluating the Potential Secondary Effects of Adult Video/Bookstores in Indianapolis, IN." Paper presented in Freedom of Expression Division of the National Communication Association, (Chicago, IL).

Tajima, S., Suzuki, K., Sado, M., Hasegawa, M., Horiuchi, Y., Sakamoto, A., Linz, D., Smith, S. L., & Donnerstein, E. (2007) Content analysis of violent images in Japanese TV commercials. Paper presented at the 7th Biennial Conference of Asian Association of Social Psychology, Kota Kinabalu, Malaysia.

Fisher, R. D., Linz, D., Seaman, C. (2007). *Viewer Judgments Concerning the Sexually Explicit DVD American Bukkake #14.* Paper presented at the annual meeting of the Society for the Scientific Study of Sexuality.

Horiuchi, Y., Sado, M., Suzuki, K., Hasegawa, M., Sakamoto, A., Isshiki, N., Hattori, H., Linz, D., Smith, S. L., & Donnerstein, E. (2006). Content analysis of violence appearing in Japanese news programs: Its characteristic features compared to the real world and to other TV genres, 26th International Congress of Applied Psychology, Athens, Greece.

Sado, M., Suzuki, K., Horiuchi, Y., Hasegawa, M., Sakamoto, A., Isshiki, N., Hattori, H., Linz, D., Smith, S. L., & Donnerstein, E. (2006). What types of violence are Japanese children exposed to through daily TV viewing?: Content analysis of TV programs broadcasted in 2004, 26th International Congress of Applied Psychology, Athens, Greece.

Linz, D., (November, 2006) Creating Connections in Graduate Education: What is the Relationship between MA-only and Doctoral Programs? National Communication Association, (San Antonio, TX).

Linz, D., Yao, M., Byrne, S. & Lichtenstein, A. (November, 2006). Testing  Supreme Court Assumptions in California v. la Rue: Is There  Justification for Prohibiting Sexually Explicit Messages in  Establishments that Sell Liquor? Freedom of Expression Division of the National Communication Association, (San Antonio, TX). Top Four Refereed Papers in Freedom of Expression.

Mahood, C. & Linz, D. G. (November, 2006). "Video game play and the role of frustration: How playing non-violent video games can lead to aggressive effects." Mass Communication Division of the National Communication Association, San Antonio, TX. Top Three Refereed Papers in Mass Communication.

Mahood, C., Yao, M. and Linz, D. (2006, May).  Sexual Priming, Gender Stereotyping, and Likelihood to Sexually Harass: Examining the Effects of Playing a Sexually-Explicit Video Game. Panel presentation at the Annual Meeting of the International Communication Association in Dresden, Germany.

Yao, M,  Daniel G. Linz, Bryant Paul (2004, November).  A Multi-city Investigation of Adverse Secondary Effects of Adult Oriented Business on Sex Crimes.  Sexual Science and Politics: Mutual Interactions. Conference of the Society for the Scientific Study of Sexuality, Orlando, FL.

Linz, D. (2004, November).  Symposium Chair: Empirical research on sex, media, and society. Annual meeting of the National Communication Association, Chicago, IL.

Yao, M. Daniel Linz (2004, November),  "A Multi-city Investigation of Adverse Secondary Effects of Adult Oriented Business on Sex Crimes." Annual meeting of the National Communication Association, Chicago, IL.

Fisher, R.D., Linz, D. & Paul, B. (2004, May). "Examining the Link Between Sexual Entertainment and Sexual Aggression: The Presence of Adult Businesses and the Prediction of Rape Rates in Florida." Presentation to the Law and Policy Division at the 2004 annual meeting of the International Communication Association: New Orleans, LA.

Linz, D. & Paul, B. (2004, April). "A Secondary Effects Study of Peep Show Establishments in San Diego, California." "Sexuality Across Cultures: From the Brain Lab to the Bedroom." The Western Region Conference of the Society for the Scientific Study of Sexuality, San Diego.

Yao, M., Mahood, C., Paul, B., Bryne, S. and Linz, D. (2003, November). "The role of individual differences in the effects of video game violence on aggressive thoughts and self-reported arousal." Annual meeting of the National Communication Association, Miami, FL.

Paul, B., & Linz, D. (2003, November). "Sexual communication and the First Amendment: Using communication science to inform law and policy debates." Seminar 9, The Far Reaching Interdisciplinary Scholarship of HIV/AIDS, STD's & Sexual Behavior Research. Annual meeting of the National Communication Association, Miami, FL.

Zwarun, L. & Linz, D. (May 2003). "College Students' Expectancies about Drinking: Effects of Gender, Risk Taking, Identification with Television Characters, and Exposure to Beer Commercials," International Communication Association, San Diego, California.

Linz, D. (February, 2003). We write, judges cite: Communication scholars impact on the judiciary. Western States Speech Association Annual Meeting. Salt lake City, Utah.

Paul, B., & Linz, D. (May, 2002). Testing Assumptions Made by the Supreme Court Concerning the Negative Secondary Effects of Adult Businesses: A Quasi-Experimental Approach. International Communication Association: Communication Law and Policy. Seoul, Korea.

Paul, B., A. Fraser, D. Linz, B. J. Wilson, S. L. Smith (May, 2001). Reducing Harmful Risk Taking Among Adolescents Using a School-based Media Curriculum. Instructionl and developmental Communication Division of the International Communication Association meeting. Washington, D.C.

Dixon, T., & Linz, D. (May, 2001). The Portrayal of Race and Crime on Network News. Mass Communication Divison of the International Communication Association, Washington, D.C.

Dixon, T., & Linz, D. (May, 2000). Misrepresentation of African American and Latinio Juvenile Lawbreakers on Local Televison News. Mass Communication Divison of the International Communication Association, Acapulco, Mexico.

Paul, B., Linz, D., Wilson, B., Smith, S.Federman, J., Nathanson, A., Lingsweiler R., & Donnerstein, E. (May, 2000). Reducing interpersonal violence and risk taking among adolescents by increasing awareness of consequences and empathy: An evaluation of a school-based media curriculum. Instructionl and developmental Communication Division of the International Communication Association meeting. Acapulco, Mexico.

Linz, D, Paul, B & Shfer, B.J. (May, 2000). Government regulation of adult businesses through zoning and anti-nudity ordiances: Debunking the legal myth of negative secondary effects. International Communication Association: Top Three Refereed Papers in Communication Law and Policy. Acapulco, Mexico.

Linz, D. (August, 1999). Methodological Analysis of Secondary Effects of Adult Businesses Studies Cited by Communities Across the Country. First Amendment Lawyers Association Annual meeting, San Fransico, CA.

Linz, D. (August, 1999). Testing Legal Assumptions Regarding the Effects of Dancer Nudity and Proximity on Erotic Expression.. First Amendment Lawyers Association Annual meeting, San Fransico, CA.

Dixon, T. & Linz, D. (August, 1999). The Portrayal of Race and Crime on Network News: An Exploratory Study. Association for Education in Journalism and Mass Communication. New Orleans, LA.

Dixon, T. & Linz, D. (May, 1999). Race and the Misrepresentation of Victimization on Local Television News.1999 National Communication Association: Top Three Refereed Papers in Mass Communication Division. Chicago, IL.

Dixon, T. & Linz, D. (1999). Televsion news, prejudicial publicity and the depiction of race. International Communication Association Annual meeting. San Fransisco, CA.

Mulac, A., Jansma, L. & Linz, D. (July, 1998). Interpersonal consequences of exposure to pornography: Does men's viewing of degrading, sexually explicit film affect their behavior toward women? International Communication Association annual meeting, Jerusalem, Israel.

Linz, D. (June, 1998). Predicting Sexual Aggression. A Symposium at the 1998 SPSSI Convention. Ann Arbor, MI.

Linz, D. & Blumenthal, E. (June, 1998). Testing legal assumptions regarding the effects of dancer nudity and proximity on erotic expression. Law and Society annual meeting, Aspen CO.

Linz, D. Donnerstein, E., Shafer, B.J., Blumenthal, E., Gray, T. & Kunkel, D. (February, 1996). Measuring the Communicative Aspects of Nude Dancing: An Experimental Field

Test of Social Psychological Assumptions in Barnes v. Glen Theatre.  American Psychology Law Society Biannual meeting, Hilton Head SC.

Heuer, L. Scelfo, J., Gross, E., Penrod, S., Stroessner, S. & Linz, D. (June, 1995).  A test of a contextual priming model of procedural fairness.  Eighth Annual Conference of the International Association for Conflict Management, Lo-Skolen, Elsinore, Denmark.

Linz, D.  (May, 1995).  Violence on Television: A Panel Discussion.  International Communication Association Annual Meeting, Albuquerque, NM.

Linz, D. (July, 1994).  Examining parallels between the regulation of TV violence and broadcast indecency.  International Communication Association Annual Meeting, Sydney, Australia.

Linz, D. (July, 1994).  Children's exposure to and comprehension of sexually-oriented remarks in radio broadcasts: A case analysis of the Howard Stern Show.  International Communication Association Annual Meeting, Sydney, Australia.

Linz, D. (October, 1993).  Measuring standards for sex and violence: Misperceptions between self and community.  Society of Experimental Social Psychology (SESP) Annual Meeting, Santa Barbara, CA.

Linz, D (August, 1993). Presidential Mini Convention on Sex Love and Psychology.  The Future of Sex and Love: A Town Hall Meeting.  American Psychological Association Annual Meeting, Toronto, Ontario, Canada.

Linz, D (August, 1993).  Discussion:  Patently Offensive: Porn under siege.  Ad hoc Committee on Films and Other Media.  American Psychological Association Annual Meeting, Toronto, Ontario, Canada.

Malamuth, N., Heavey, C.L., Linz, D. & Barnes, G. (May, 1993).  The longitudinal prediction of men's antisocial behavior against women.  International Communication Association, Washington D.C.

Linz, D., Imrich, D. Mullin, C., Eskenazi, J., & Weiss, A. (Sept., 1992).  Assessing the incidence of pretrial publicity and strategies to offset its effects.  The Third European Conference of Law and Psychology, Oxford, United Kingdom.

Linz, D. & Wilson, B.J. (August, 1992).  Adolescents and sexual violence: Mitigating the effects of mass media.  American Psychological Association Annual Meeting, Washington D.C.

Linz, D., E. Donnerstein, K. Land, P. McCall, J. Scott, L. J. Klein, B.J. Shafer, &  A. Graesner (May, 1992). Defining the limits of public tolerance for sexually explicit and sexually violent materials: A field experiment.  Top Three Refereed Papers in

Communication Law and Policy. Communication Law and Policy Interest Group, International Communication Association.

Donnerstein, E., Wilson, B. & Linz, D.  (1992, May).  Can we deal with sexual violence in the media:? Legal, self-regulatory, and educational solutions.  Communication Law and Policy Interest Group, International Communication Association.

Wilson, B., D.Linz, E. Donnerstein & H. Stipp (1992, May).  The Impact of social issue television programming on Attitudes Toward Rape.  Mass Communication Division of the International Communication Association.

Linz, D. (1991, Aug.).  The utilization of mass media research in obscenity trials.  Symposium on the role of mass media research in public policy.  American Psychological Association Annual Meeting, San Francisco.

Weiss, A. & Linz, D. (1991, Aug.)  Impression formation and memory in the attribution of legal responsibility.  American Psychological Association Annual Meeting, San Francisco.

Imrich, D., Mullin, C. & Linz, D. (1991, Aug.) Measuring the extent of prejudicial publicity in the United States newspapers: A content analysis. American Psychological Association Annual Meeting, San Francisco.

Eskenazi, J. & Linz, D. (1991, August).  The ameliorating effect of jury deliberation on prejudicial pretrial publicity.  American Psychological Association Annual Meeting, San Francisco.

Wilson, B.J., Linz, D. & Randall, B. (June, 1990) Applying Social Science Research to Film Ratings: A Shift From What is Considered Offensive to What is Considered Harmful to Children.  International Communication Association, Dublin.

Linz, D.  (November, 1989).  Obscenity and the law:  Psychological assessments of community standards concerning explicit sexual material.  The American Society of Criminology Annual Meeting, Reno, NV.

Mullin, C., Imrich, D., & Linz, D. (August, 1989). The effects of date rape information and prejudicial and nonprejudicial pretrial publicity on jury decision making in a sexual assault case.  American Psychological Association Annual Meeting, New Orleans.

Linz, D., Dexter, H., Penrod, S. & Donnerstein, E. (August, 1989).  Exposure to mass media sexual violence and judgments about domestic abuse victims.  American Psychological Association Annual Meeting, New Orleans.

Arluk, I., Linz, D. & Donnerstein, E. (August, 1989).  Mitigating the negative effects of sexually violent media through pre-movie interventions.  American Psychological Association Annual Meeting, New Orleans.

Page 45

Linz, D. & Randall, B.  (1989, June) R-rated movies and violence:  Recent legal challenges to the MPAA rating system.  Law and Society Annual Meeting, Madison, WI.

Linz, D. (August, 1988).  Social Psychology and Social Advocacy:  Research on pornography and violence. American Psychological Association Annual Meeting, Atlanta.

Donnerstein E. & Linz, D.  (June 1988).  Social science research and the Attorney General's and the Surgeon General's Commissions on Pornography. XIVth Annual Congress on Law and Mental Health, Montreal.

Malamuth, N. & Linz, D.  (June, 1988).  Legal debates in pornography: What social science can and cannot contribute.  Law and Society Association Annual Meeting, Vale.

Dexter, H., Linz, D., Penrod, S. & Saunders, D.  (March, 1988).   Exposure to media violence and the blaming of assault victims.  American Psychology and Law Society Biannual Meeting, Miami.

Donnerstein, E. & Linz, D.  (1987, November).  Uses and abuses of social science research in the final report of the Attorney General's Commission on Pornography. Dimension Series Presentation, Speech Communication Association Meeting, Boston.

Linz, D.  (1987, August).  The findings and recommendations of the U.S. Attorney General's Commission on pornography.  American Psychological Association Annual Meeting, New York.

Linz, D.  (1987, July).  Desensitization to filmed violence and reactions to victims of battering.  The Third National Family Violence Research Conference, Durham, NH.

Linz, D.  (1986, July).  Desensitization to media violence against women: Theory and findings.  Biennial World Meeting of the International Society for Research on Aggression, Chicago.

Adams, S., Linz, D., Donnerstein, E., & Penrod, S.  (1986, May).  Physiological desensitization and changes in perception of violence after exposure to filmed violence against women.  Annual meeting, Midwestern Psychological Association, Chicago.

Krafka, C., Linz, D., & Penrod, S.  (1985, May).  Male and female desensitization to graphic filmed violence against women.  Annual Meeting of the Midwestern Psychological Association, Chicago.

Linz, D., Penrod, S., & Donnerstein, E.  (1984, October).  Sexual violence: Desensitization to filmed portrayals and callousness toward victims in other contexts. Annual Meeting of the Society for Experimental Social Psychology, Snowbird, UT.

Linz, D., Donnerstein, E., & Penrod, S. (1984, August). Desensitization to violence against women. Annual Meeting of the American Psychological Association, Toronto.

Linz, D., & Penrod, S. (1983, October). The effects of prior attitudes, victim photographs, and victim coping on jury decision making in a rape case. American Psychology and Law Society Convention, Chicago.

Donnerstein, E., Linz, D., & Penrod, S. (1983, October). Mitigating the influence of mass media influenced rape related attitudes and behavior. American Psychology and Law Society Convention, Chicago.

Krafka, C., Linz, D., & Penrod, S. (1983, October). Factor analysis and further validation of the Rape Myth Acceptance and Rape Empathy Scales. American Psychology and Law Society Convention, Chicago.

Penrod, S., Linz, D., & Rios, P. (1983, June). Juror questions during trial: A courtroom experiment. Law and Society Annual Meeting, Denver, Colorado.

Linz, D., Penrod, S., Bream, J., & Baltaxe, D. (1983, May). Impact of photographs in the courtroom: Memory availability or emotional arousal? Midwestern Psychological Association annual meeting, Chicago.

Zimmerman, R. S., Linz, D., Leventhal, H., & Penrod, S. (1983, May). Symptoms, coping, and lay models of hypertension. Annual Meeting of the Midwestern Psychological Association, Chicago.

Penrod, S., & Linz, D. (1982, October). Voir dire: Uses and abuses. Annual Meeting of the Society for Experimental Social Psychology, Nashville, Indiana.

Penrod, S., & Linz, D. (1982, August). Pornography and harmful behavior: A comparative legal perspective. Annual Meeting of the American Psychological Association, Washington D.C.

Linz, D., Siverhus, S., & Penrod, S. (1982, August). Chronicity, causation, severity, responsibility and emotion: The structure of illness cognition. Annual Meeting of the American Psychological Association, Washington D.C.

Linz, D., & Penrod, S. (1982, August). Using psychological research on violent pornography to inform legal change. Annual Meeting of the American Psychological Association, Washington D.C.

Penrod, S., Donnerstein, E., & Linz, D. (1982, July). Scientific research on pornography and violence: The implications for American law. International Conference on Psychology and Law, Swansea, Wales.

Penrod, S., Linz, D., Coates, D., & Herzberg, S. (1982, July). The implications of social science research for trial practice attorneys. International Conference on Psychology and Law, Swansea, Wales.

Penrod, S., Coates, D., Linz, D., Heuer, L., Atkinson, M., & Herzberg, S. (1982, July). Using social science to improve criminal trial advocacy. 20th International Congress of Applied Psychology, Edinburgh, Scotland.

Penrod, S., Linz, D., & Leventhal, H. (1982, July). Assessing patient- physician communication difficulties: Pinpointing differences in conceptions of disease. 20th International Congress of Applied Psychology, Edinburgh, Scotland.

Linz, D., Penrod, S., & Leventhal, H. (1982, July). The cognitive organization of disease among lay persons. 20th International Congress of Applied Psychology, Edinburgh, Scotland.

Coates, D., Atkinson, M., Heuer, L., Linz, D., Herzberg, S., & Penrod, S. (1982, July). Attorney inferences about jurors' trial perceptions: Fact or fantasy? 20th International Congress of Applied Psychology, Edinburgh, Scotland.

Linz, D. (1982, June). Assessing courtroom performance from the perspective of the social science observer, the trial practice attorney, and the "jury box." Annual Meeting of the Law and Society Association, Toronto.

Linz, D., & Penrod, S. (1982, May). Emotional versus rational appeals in closing statements. Panel at Annual Meeting of the Midwestern Psychological Association, Minneapolis, MN.

Linz, D., Penrod, S., Coates, D., Atkinson, M., Heuer, L., & Herzberg, S. (1982, March). The use of experts in the courtroom: Attorney judgments of expert witness credibility. Annual Meeting of the Academy of Criminal Justice Sciences.

Penrod, S., Linz, D., & Donnerstein, E. (1982, March). Scientific research on pornography and violence: The legal context. Annual Meeting of the Academy of Criminal Justice Sciences.

Donnerstein, E., Linz, D., & Penrod, S. (1982, March). Scientific research on pornography and violence: The empirical findings. Annual Meeting of the Academy of Criminal Justice Sciences.

Linz, D., & Penrod, S. (1982, March). A meta-analysis of the influence of research methodology on the outcomes of jury simulation studies. Annual Meeting, Academy of Criminal Justice Sciences.

Linz, D., Slack, A., Kaiser, K., & Penrod, S.  (1981, October).  Meta-analysis of defendant characteristics studies.  Biennial convention of the American Psychology and Law Society, Cambridge, MA.

Heberlein, T., Linz, D., & Ortiz, B.  (1980, September).  Satisfaction, knowledge and contentment of customers on a mandatory participation time-of-day electricity pricing experiment.  International Conference on Consumer Behavior and Energy Use, Banff, Canada.

Linz, D.  (1977, December).  Transportation problems of the elderly.  Meeting of the National Science Foundation, Washington, D.C.

<u>Invited Addresses</u>

Linz, D. (2010). Effects of Sexually Oriented Messages on Individuals and Communities: A History of Challenging Assumptions in the Courtroom. Annual Barnard College, John Jay, CUNY, joint psychology and law seminar.

Linz, D (2007). Increasing graduate student diversity: Views from the admission committee level.  The 2nd Social, Behavioral and Economic Sciences Alliances for Graduate Education and the Professoriate (SBES/AGEP) Meeting. University of California, Santa Barbara.

Linz D. (2004).  Can Justice be Served? An Analysis of Issues Surrounding the Kobe Bryant Sexual Assault Trial and Pretrial Publicity. UCSB Women's Center.

Linz, D. (June, 1998).  Undergraduate and graduate education in  law and society at UCSB . Workshop on Undergraduate and Graduate Education in Law and Society.  Law and Society annual meeting, Aspen CO.

Linz, D. (October, 1997).  Violence in the media. Summit '97: Celebrating Community, Pro-Youth Coalition of Santa Barbara County.

Linz, D. (September, 1996).  Plenary Speaker: The National Television Violence Study, USA.  Fourth Annual International Film Regulators Conference, London, England.

Linz, D. (September, 1996).  Plenary Speaker: Violence and the internet.  Fourth Annual International Film Regulators Conference, London, England.

Potter, J., Linz, D., Wilson, B.J., Kunkel, D., Donnerstein, E., Smith, S.L., Blumenthal, E. & Gray, T. (June, 1996).  Content analysis of entertainment television:  New methodological developments.  Duke Conference on Media Violence and Public Policy.

Wilson, B.J., Potter, J., Linz, D., Donnerstein, E., Kunkel, D., Smith, S.L., Blumenthal, E. & Gray, T. (June, 1996). Content analysis of entertainment television:  Results for 1994-5.  Duke Conference on Media Violence and Public Policy.

Wilson, B.J., Donnerstein, E., Linz, D.,, Kunkel, D.,  Potter, J., Smith, S.L., Blumenthal, E. & Gray, T. (June, 1996).  Content analysis of entertainment television:  The importance of context.  Duke Conference on Media Violence and Public Policy.

Kunkel, D., Wilson, B.J., Potter, J., Linz, D., Donnerstein, E., Smith, S.L., Blumenthal, E. & Gray, T. (June, 1996).  Content analysis of entertainment television:  Implications for public policy.  Duke Conference on Media Violence and Public Policy.

Linz, D. (August, 1993).  Presidential Mini Convention on Sex Love and Psychology. Invited Dialogue on Obscenity and Pornography.  American Psychological Association Annual Meeting, Toronto, Canada.

Linz, D. (March, 1992).  Plenary Speaker: Research report on the effects of exposure to sexually explicit and sexually violent materials on human behavior.  Third Annual International Film Regulators Conference, London, England.

Linz, D. (April, 1990).  Sexual Violence in the Mass Media and Social Policy.  Invited Address, Western Psychological Association Annual Meeting, Los Angeles CA.

Linz, D. (January, 1990). Expert Testimony in Obscenity Cases.  Invited Address, First Amendment Lawyers Association, Winter Meeting, San Diego, CA.

Linz, D.  (February, 1989). Panel Discussion:  Pornography and the Law. 16th Annual Conference of the Western Society of Criminology, Orange, CA.

Linz, D.  (1988, June).  The use and misuse of social science research in reports on pornography by the U.S. Attorney General and U.S. Surgeon General. Invited presentation.  Symposium on Pornography Social Science and the Common Law, International Congress of Law and Mental Health. Montreal, Canada.

Donnerstein, E., & Linz, D.  (1985, November).  Mass media effects on desensitization of sexual violence.  Invited symposium presentation.  American Society of Criminology, San Diego.

Donnerstein, E., & Linz, D.  (1985, September).  Desensitization to sexual mass media violence.  Invited symposium presentation, International Academy of Sex Research, Seattle, WA.

Linz, D.  (1985, May).  Pornography: New approaches and justifications for regulating. Presentation at the American Association for the Advancement of Science Annual Meeting, Los Angeles, CA.

Linz, D., & Donnerstein, E.  (1985, April 17).  Effects of sexual violence in the media: Recent research.  Seminar at the Department of Criminal Justice, Indiana University, Bloomington, IN.

Linz, D.  (1984, August).  Sexual violence and the constitution.  Paper presented at the Project '87 seminar "Individual Rights and the First Amendment."  University of Illinois-Chicago Circle.

Linz, D.  (1984, September).  Research report to the international conference of film regulators.  Presented at the International Conference of Film Regulators, Toronto, Canada.

Linz, D., & Donnerstein, E.  (1984, November).  Pornography and sexual violence in the media: Effects on attitudes and behavior.  Presented at the Annual Meetings of the American Society of Criminology, Cincinnati, OH.

PROFESSIONAL SERVICE

Editorial Board of *Media Psycholog*.

Special Issue Editor: Content analysis. Sex Roles: A Journal of Research (2009-2010)

Consulting Editor: 1991-93 Journal of Research in Personality, Academic Press.

Journal Refereeing

2001-pres. Media Psychology
1989-pres. Human Communication Research
1988-pres. Journal of Personality and Social  Psychology
1987-pres. Journal of Communication
1989-pres.  Communication Research
1986-pres.  Journal of Research in Personality
1988-pres.  Journal of Sex Research
1987-pres.  Journal of Experimental  Psychology
1988-pres.  Law and Human Behavior
1990-pres.  Journal of Broadcasting and Electronic Media
1990-pres.  Law and Society Review

Professional Memberships

International Communication Association (ICA)
Law and Society Association
American Psychology-Law Society (APA Division 41)
Society for the Psychological Study of Social Issues (APA Division 9)

UNIVERSITY AND PUBLIC SERVICE

Communication Department

| 1991-2 | Graduate Advisor/ Chair-Graduate Committee |
|--------|---------------------------------------------|
| 1990-4. | Member Graduate Committee |
| 2004 | Chair-Search Committee Media Communication Position |
| 2005-2008. | Graduate Advisor/Chair-Graduate Committee |
| 2001-pres. | QMSS Department representative |

Graduate Students Supervised
(Directed*/Committee Member)

| | | | | |
|---|---|---|---|---|
| 1. Ilene Arluk | M.A.* | 1988 | | |
| 2. Cynthia Felando | M.A. | 1989 | | |
| 3. Barbara Randall | M.A. | 1989 | | |
| 4. Diana Stroyls | M.A.* | 1990 | | |
| 5. Audrey Weiss | M.A. | 1990 | Ph.D. | 1994 |
| 6. Britt Andreata | M.A.* | 1991 | | |
| 7. Susan Fox | M.A. | 1991 | Ph.D. | 1994 |
| 8. Wangner Diaz | M.A. | 1991 | | |
| 9. James Harwood | M.A. | 1992 | Ph.D. | 1994 |
| 10. Jay Eskenazi | M.A.* | 1992 | | |
| 11. Dorothy Imrich | M.A.* | 1992 | Ph.D.* | 1998 |
| 12. Laura Jansma | M.A.* | 1992 | Ph.D. | 1996 |
| 13. Charles Mullin | M.A.* | 1992 | Ph.D.* | 1996 |
| 14. Laura Leets | M.A. | 1992 | Ph.D. | 1995 |
| 15. Denise Filotas | M.A. | 1993 | | |
| 16. Amy Tendrich | M.A. | 1993 | | |
| 17. Xixia Han | M.A. | 1993 | | |
| 18. Travis Dixon | M.A.* | 1994 | Ph.D.* | 1998 |
| 19. Timothy Gray | M.A. | 1996 | | |
| 20. Sunwolf | M.A. | 1997 | | |
| 21. Carrie Colvin | M.A. | 1999 | | |
| 22. Stacey Smith | | | Ph.D. | 1999 |
| 23. Laura Zwarun | | | Ph.D.* | 2002 |
| 24. Bryant Paul | | | Ph.D.* | 2003 |
| 25. Carolyn Shepard | | | Ph.D. | 2004 |
| 26. Joan O'Connor | | | Ph.D.* | 2005 |
| 27. Mike Yao | M.A. | 2003 | Ph.D.* | 2006 |
| 28. Chad Mahood | | | Ph.D.* | 2006 |
| 29. Sahara Byrne | M.A. | 2005 | Ph.D.* | 2007 |

(K. Kyoon Hur Dissertation Award – International
Communication Association, Mass Communication
Division. 2009, Chicago Illinois.) (Outstanding Dissertation
of the Year – International Communication Association.

|  |  |  |  |  |
|---|---|---|---|---|
|  | Instructional & Developmental Communication Division. Montreal, Quebec, 2008. ) |  |  |  |
| 30. Karyn Riddle | M.A. | 2005 | Ph.D. | 2007 |
| 31. Emily Moyer |  |  | Ph.D. | 2007 |
| 32. Rena Rudy | M.A.* | 2006 | Ph.D.* | In prog. |
| 44. Heidi Kane (Psychology) |  |  | Ph.D | 2009 |
| 38. Elisia Sim | M.A. | 2009 |  |  |
|  |  |  |  |  |
| 34. Lyudmila Popova | M.A.* | 2008 | Ph.D. | 2010 |
| 35. Paul Kang | M.A.* | 2008 |  |  |
| 38. Elisia Sim | M.A. | 2009 |  |  |
| 39. Rebecca Speer | M.A. | 2010 |  |  |
| 40. Mary Danis |  |  | Ph.D | 2010 |
| 41. Grace Anderson | M.A. | 2009 | Ph.D. | 2011 |
| 42. Abby Prestin | M.A. | 2009 | Ph.D. | 2012 |
| 43. Jiyeon So |  |  | Ph.D | 2013 |
| 44. Christopher Seaman | M.A.* | 2010 | Ph.D.* | 2014 |
| 45. Theresa De Los Santos | M.A. | 2010 | Ph.D. | 2014 |
| 46. Ryan Lingsweiler |  |  | Ph.D. | 2014 |
| 47. Ryan Medders |  |  | Ph.D | 2014 |
| 45. Douglas Bonilla | M.A. | 2011 |  |  |
| 46. Amber Westcott Baker |  |  | Ph.D | 2012 |
| 47. Cynthia Bates |  |  | Ph.D | 2012 |
| 49. Debra Bunyan (Psychology) |  |  | Ph.D. | 2012 |
| 50. K.K. Holland | M.A. | 2011 |  |  |
| 51. Rebekah Pure |  |  | Ph.D. | 2013 |
| 52. Andrew Zhang |  |  | Ph.D. | 2013 |
| 53. Lauren Keblusek | M.A. | 2014 |  |  |
| 54. Michael Mangus | M.A. | 2013 | PhD. | 2015 |
| 55. Richard Huskey | M.A. | 2014 | Ph.D. | 2016 |
| 56. Alex Sink | M.A. |  | PhD. | 2019. |
| 57. Benjamin K. Smith |  |  | PhD. | 2019. |
| 58. Nicole Neda Zamanzadeh | M.A. | 2016 |  |  |
| 59. Audrey N. Abeyta | M.A. | 2015 |  |  |
| 60. Jennifer Suh |  | M.A, | 2016 |  |
| 61. Charlotte A. Rushforth | M.A. | 2016 |  |  |
| 62. Chelsea Lonergan | M.A. | 2016 |  |  |
| 63. Stephenson Whitestone |  |  | PhD. in prog. |  |

Academic Senate Service

Member: UCSB Lancaster Dissertation Prize Committee, 2010.
Member: UCSB Graduate Council, 2009-pres.
Member: DIGSSS Fellowship Committee, 2006-pres.
Plous Award Committee, 2005, Chair, 2010.

Member: Human Subjects Review Board, 1990-pres.
Creation and Coordinating Committee Member: Quantitative Methods in Social Science, 1999-2001.
Advisory Board Member:  Social Sciences Survey Center, 1999-2002.

<u>Campus-wide Addresses</u>

Linz, D (2007). Increasing graduate student diversity: Views from the admission committee level.  The 2nd Social, Behavioral and Economic Sciences Alliances for Graduate Education and the Professoriate (SBES/AGEP) Meeting. University of California, Santa Barbara.

(March 2002). National Security vs. Personal Liberty,  Invited Address and Debate Moderator, panelists Nadine Strossen and William H. Webster, University of California, Santa Barbara.

(Oct. 1991).  Obscenity and pornography: Can the Social Scientist Evaluate Contemporary Community Standards.  Chancellor's Council Mini-Symposium Series 1991-92.

Faculty Address (Sept, 1991): Chancellor's Convocation for New Students.

Linz, D (June, 1991).  Free speech and sensitivity to ethnic diversity.  Commencement address, University of California, Santa Barbara.

COMMUNITY SERVICE

Public Testimony/Governmental and
Technical Reports

2010. Testimony before the Missouri General Assembly. SB 586, Regulation of Sexually Oriented Businesses Legislation Proposed by the State of Missouri Senate.

2009. Testimony before the Missouri General Assembly. HB 321, SB 226, Regulation of Sexually Oriented Businesses Legislation Proposed by the State of Missouri General Assembly.

2008. State of New Jersey 213th Legislature, Senate, no. 945 an act concerning the regulation of sexually oriented businesses.

2008. Testimony before the California State Assembly, AB 2014: Impose a tax on gross receipts, as defined, of an adult entertainment venue, as defined, in this state at a rate of 25%.

2007. Testimony before the Sarasota county commission, Florida ordinance no. 2007-100-a an ordinance of Sarasota county, Florida, relating to sexually oriented

businesses, with the provisions of this ordinance establishing licensing requirements and regulations for sexually oriented businesses.

Linz, D. (October 5, 2005).  Testimony before the Judiciary Committee on Criminal Justice, The Ohio State Senate, Columbus, OH.  Am. H.B. no. 23  "Would regulate adult entertainment establishments and permit townships to regulate such establishments."

Linz D., Yao, M. and Paul, B. (May 16, 2004).  Testing The Assumption That Adult Businesses Produce Adverse Secondary Effects in Ohio.  Testimony before the General Assembly of the State of Ohio, Sub. H.B. No. 426

Linz, D. and Paul, B. (2002).  Paper on the Applicability of the 1977 Los Angeles Secondary Effects Study as a Basis to Justify the Preclusion of "Multiple Use' Adult Businesses, and an Analysis of More recently Conducted "Secondary Effects" Sudies. Presented in support of the amicus curiae brief of the First Amendment Lawyers Association, in The City of Los Angeles v. Alameda Books, Inc. Supreme Court of the United States.

Participant in the Development of the Report (2001) "Violence in the Media and Its Effect on Youth Violence," in: Youth Violence: A report of the Surgeon General.  U.S. Department of Health and Human Services.

Linz, D. (1999).  Paper on the "Secondary effects studies" relied upon by government bodies when enacting legislation to regulate "adult " businesses.  Presented in support of the amicus curiae brief of the First Amendment Lawyers Association, in Erie PA v. Paps A.M. Supreme Court of the United States.

Wilson, B.J., Kunkel, D., Linz, D., Potter, W.J., Donnerstein, E., Smith, S.L., Blumenthal, E.Y., & Colvin (1997).  Implications of the National Television Violence Study's content-based findings for evaluating the industry's V-chip ratings.  Report to the Federal Communications Commission (CS Docket 97-55).

Wilson, B.J., Kunkel, D., Linz, D., Potter, W.J., Donnerstein, E., Smith, S.L., Blumenthal, E.Y., & Grey, T.E. (1996).  National Television Violence Study (1996). Violence in television programming overall: University of California, Santa Barbara.  Scientific Papers: National Television Violence Study.  Studio City, CA: Mediascope.

Wilson, B.J., Kunkel, D., Linz, D., Potter, W.J., Donnerstein, E., Smith, S.L., Blumenthal, E.Y., & Grey, T.E. (1996). Television violence and its context: A content analysis 1994-1995.  Executive Summary: National television violence study. Studio City, CA: Mediascope.

Linz, D. (1993).  The effects of exposure to sex and violence and the likely impact of a statewide law to allow victims of pornography to be compensated for injuries.  Testimony before the California Senate Judiciary Committee, Sacramento CA.

Linz, D. (1993).  The effects of exposure to sex and violence and the likely impact of a zoning ordinance for businesses selling sexually explicit material.  Testimony before the City Council, Santa Maria, CA.

Linz, D. (1991).  Recent research on sex and violence in the media.  Presentation, The Santa Barbara Rotary Club.

Linz, D. (1991).  Obscenity law and social science measurement of community standards. Presentation, Santa Barbara Women Lawyers, Santa Barbara, CA.

Donnerstein E. & Linz, D. (1990).  Evidence on the Causal Connection Between Exposure to Penthouse Magazine and Anti-social Conduct.  Testimony before the Indecent Publications Tribunal, Wellington, New Zealand.

Linz, D. (1990).  The effects of sexual violence in the mass media.  Testimony before the Senate Judiciary Committee on California Senate Joint Resolution No. 65--"Relative to television violence".

Donnerstein, E., Wilson, B., & Linz, D. (1990). Review of social science research on the effects of sexually indecent materials.  Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. § 1464, MM Docket No.89-494.

Linz, D.  (November, 1989). The effects of exposure to pornography on attitudes about rape and rape victims.  Testimony on proposed obscenity legislation before the Michigan House of Representatives and Senate.

Linz, D. (1988, November).  The effects of media violence on children. Testimony before the California Legislature Senate Select Committee on Children and Youth. Riverside California.

Donnerstein, E., & Linz, D.  (1986, June).  Techniques designed to mitigate the impact of mass media sexual violence on adolescents and adults.  Invited symposium presentation. Surgeon General's Workshop on Pornography and Public Health, Washington.  In The Report of the Surgeon General's Workshop on Pornography and Public Health. Washington, DC: US Public Health Service, 1986.

Donnerstein, E., & Linz, D.  (1985, Sept.).  Presentation to the US Attorney General's Commission on Pornography, Houston, TX.

Linz, D., Donnerstein, E., & Penrod, S.  (1985, January).  Pornography, sexual aggression and the law.  Presentation at Statewide Prosecutor Education and Training program, and meeting of the Wisconsin District Attorneys Association, Madison, WI.

Linz, D.  (1984, October 16).  Violent media imagery and violence against women.  Sensitive Crimes Seminar, City of Madison Police Department, Madison, WI.

Linz, D.  (1984, July).  The relationship between pornography and violence.  Testimony before the Illinois Commission on the Status of women on.  Chicago.

Linz, D.  (1984, February).  Civil litigation and victims of violent pornography.  Symposium on Media Violence and Pornography, Toronto, Canada.

Donnerstein, E., & Linz, D.  (1984, January).  New directions in research on violence in the media.  Paper presented at the Symposium on TV Violence, National Coalition on Televised Violence, American Medical Association, Washington D.C.

Linz, D.  (1982, April).  Applying psychological research to the courtroom.  State Bar of Wisconsin Annual Meeting, Madison, WI.

<u>List of Federal and State Court Cases in which Daniel Linz has Testified</u>

*Johnson v. County of Los Angeles Fire Dep't*, 865 F. Supp. 1430 (C.D. Cal. 1994).

*Deja Vu of Nashville, Inc. et al. v. Metropolitan Government of Nashville and Davidson County, et al.*, United States District Court for the Middle District of Tennessee, Nashville Division.

*Nite Moves Entertainment Inc. v. City of Boise*, United States District Court for the District of Idaho.

*State of Florida v. Calderon et al.,* County Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida.

*Nightlife Partners, LTD; et al. v. City of Beverly Hills*, United States District Court, Central District of California.

*Kentucky Restaurant Concepts, Inc. v. The City of Louisville,* Jefferson County Kentucky in the United States District Court, Western District of Kentucky at Louisville.

*Route 62 video and Books, Inc., v. City of Alliance*, in the United States District Court for the Northern District of Ohio Eastern Division.

*J.R's Kitty Kat Lounge, Inc. v. City of South Bend*, in the St Joseph Superior Court, St Joseph County Indiana.

*R.V.S., LLC v. City of Rockford*, United States District Court, Northern District of Illinois, Western Division.

*Kentucky Restaurant Concepts, Inc. v. Louisville Jefferson County Metro Government*, Jefferson County Circuit Court, Division Six.

*Atlantic Enterprises v. The Mayor and Borough of Carlstadt,* Superior Court of New Jersey, Bergen County Vicinage.

*Washington Retailment, Inc. v. City of Centralia*, U.S. District Court Case NO. C03-5137.

*J.L. Spoons Inc. et al., v. Kenneth Morckel et al.*, U.S. District Court, Northern District of Ohio.

*Annex Books, et al. v. City of Indianapolis*, Case No. 03 CV 00918, United States District Court. Southern District of Indiana.

*Pennsylvania Pride Inc. v. Township of Southampton*, Case No. 2000-3181, United States District Court.

*Giovani Carandola, Ltd., et al. v. Ann Scott Fulton, et al.*, Case No. 1:01CV115, United States District Court.

*New Albany DVD, LLC, Plaintiff, vs. City of New Albany, Indiana, Defendant.* United States District Court Southern District of Indiana New Albany Division. 4:04-cv-00052-SEB-WGH.

*Daytona Grand, inc. d/b/a Lollipop's Gentlemen's Club, a Florida corporation, Miles Weiss and John Doe, plaintiffs, -vs- City of Daytona Beach, Florida, a municipal corporation, defendant.* United States District Court Middle District of Florida Orlando Division. Case no. 6:02-cv-1469-orl-28krs

22ND AVENUE STATION, INC., a Minnesota corporation, Plaintiff, v. City of MINNEAPOLIS, a municipal corporation, Defendant. United States District Court, District of Minnesota: 06-cv-00495-MJD-AJB.

VIP OF BERLIN, LLC v. THE TOWN OF BERLIN, CONNECTICUT,    a Municipal Corporation; and HERMAN MIDDLEBROOKS, JR. in his official capacity as Town Manager for the Town of Berlin, Connecticut NO.: 3:06CV01811 (SRU) APRIL 17, 2007.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO EASTERN DIVISION. 84 VIDEO/NEWSSTAND, INC., *et al.*, Plaintiffs v. THOMAS SARTINI, *et al.*, Case No.: 1:07 CV 3190

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA ALAMEDA BOOKS, INC.; et al., Plaintiff v. CITY OF LOS ANGELES, Case No. CV 95-07771 DDP (CTx)

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK. FOR THE PEOPLE THEATRES OF N.Y., INC. d/b/a FAIR THEATRE and JGJ MERCHANDISE CORP., d/b/a VISHANS VIDEO a/k/a MIXED EMOTIONS, Plaintiffs, -against- THE CITY OF NEW YORK; HON. MICHAEL R. BLOOMBERG, as Mayor of the City of New York; AMANDA M. BURDEN, as Director of City Planning, Department of City Planning of the City of New York, and PATRICIA J. LANCASTER, as Commissioner of Buildings, Department of Buildings of the City of New York, Defendants. Index No: 121080/02.

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS. Abilene Retail # 30, Inc., Plaintiff, vs. Board of Commissioners of Dickinson County, Kansas, et al., Defendants. Case No. 2:04-CV-2330.

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA Richmond Division , IMAGINARY IMAGES, INC. dba PAPER MOON, *et al.*, Plaintiffs, v. Civil No.: 2:08cv398 PAMELA O'BERRY EVANS, *et al.*, Defendants.

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK. TEN'S CABARET, INC. f/k/a Stringfellow's of New York, Ltd. PUSSYCAT LOUNGE, INC., d/b/a' "Pussycat Lounge; CHURCH STREET CAFÉ INC., d/b/a "Baby Doll"; 69-20 QUEENS BLVD. INC., d/b/a "Nickels." Plaintiffs, Index No. 121197/02 vs. THE CITY OF NEW YORK; MAYOR MICHAEL BLOOMBERG, as Mayor, etc., et al.

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE WESTERN DIVISION, ENTERTAINMENT PRODUCTIONS, INC., a Tennessee Corporation, d/b/a Christie's Cabaret, et al., Plaintiffs, v. SHELBY COUNTY, TENNESSEE et al.  Defendants.

PERSONAL REFERENCES

Dr. Edward Donnerstein, Dean, Division of Social Sciences
University of Arizona.

Dr. Neil Malamuth, Chair
Department of Speech and Communication Studies Program, University of California,
Los Angeles, CA 90026

Dr. Steven Penrod, Distinguished Professor of Psychology,
John Jay School of Criminal Justice.  New York, New York.

EXHIBIT 2: Peer reviewed articles

# An Examination of the Assumption that Adult Businesses Are Associated with Crime in Surrounding Areas: A Secondary Effects Study in Charlotte, North Carolina

Daniel Linz                                         Bryant Paul
Kenneth C. Land                                Michael E. Ezell
Jay R. Williams

Recent Supreme Court decisions have signaled the need for sound empirical studies of the secondary effects of adult businesses on the surrounding areas for use in conjunction with local zoning restrictions. This study seeks to determine whether a relationship exists between adult erotic dance clubs and negative secondary effects in the form of increased numbers of crimes reported in the areas surrounding the adult businesses, in Charlotte, North Carolina. For each of 20 businesses, a control site (matched on the basis of demographic characteristics related to crime risk) is compared for crime events over the period of three years (1998–2000) using data on crime incidents reported to the police. We find that the presence of an adult nightclub does not increase the number of crime incidents reported in localized areas surrounding the club (defined by circular areas of 500- and 1,000-foot radii) as compared to the number of crime incidents reported in comparable localized areas that do not contain such an adult business. Indeed, the analyses imply the opposite, namely, that the nearby areas surrounding the adult business sites have smaller numbers of reported crime incidents than do corresponding areas surrounding the three control sites studied. These findings are interpreted in terms of the business mandates of profitability and continuity of existence of the businesses.

## Introduction

In a 1977 ABC News Special entitled *Sex for Sale: The Urban Battleground*, Howard K. Smith concluded a segment with the following:

We thank John Couchell, Assistant Director, Strategic Planning & Analysis, Charlotte-Mecklenburg Police Department for providing the data analyzed in this study and for helpful advice. Any inadequacies of analysis or errors of interpretation are, however, solely the responsibility of the authors of this article. Address all correspondence to Daniel Linz, Professor, Department of Communication and the Law and Society Program, University of California, Santa Barbara, CA 93106; e-mail: linz@comm.ucsb.edu.

*Law & Society Review*, Volume 38, Number 1 (2004)
© 2004 by The Law and Society Association. All rights reserved.

> Commercial sex is often called a victimless crime. We have shown that a glomeration of sex businesses, in fact, have many victims. Residents move out of the areas from fear, customers desert legitimate shops which have to sell out at a loss. City dwellers are victimized by having to pay more taxes to make up for the areas that are in arrears because of sex businesses. In the spreading decay, muggers, dope pushers move in. It's harder to spot their crimes in a general sea of rot. Police and courts tend to give up. Civilization living by rules moves out and we're all victims. Better solutions may emerge, but for now the Detroit plan is the best in sight. Leave aside individual arrests for obscenity, which the law seems to have an impossible time defining. Pass a zoning law allowing no sex-related establishment or service to exist within three blocks, say, of any other. Let none become the nucleus for a cancerous spread.

In the summer of 1976, the city of Detroit, Michigan introduced zoning laws designed to break up the concentrated areas containing sex-related "adult" businesses.[1] The assumption driving the dispersion of concentrated adult businesses was the presumed negative "secondary effects" of these businesses on the surrounding neighborhood. Enthusiasm for the Detroit zoning approach quickly spread to other cities.

This diffusion of the Detroit zoning approach throughout the nation over the last 25 years has produced a continuing history of constitutional litigation. Since 1976, the Supreme Court has decided a series of cases focusing on whether the free speech clause of the First Amendment allows cities and states to enact legislation controlling the location of adult businesses on the basis of presumed negative secondary effects.[2]

### The Court's Presumption of Adverse Secondary Effects

The rationale for the secondary effects doctrine was most completely laid out in *Renton v. Playtime Theatres, Inc.*, in 1986. In *Renton*, the Supreme Court considered the validity of a Renton municipal ordinance that prohibited any adult theater from locating within 1,000 feet of any residential zone, family dwelling, church, park, or school. The Court's analysis of the ordinance proceeded in three steps. First, the Court found that the Renton ordinance did not ban adult theaters altogether, but merely required that they be a certain distance from so-called "sensitive locations." The ordinance, the Court said, was properly considered

---

[1] "Adult" or "adult-oriented" or "sex-related" businesses may include pornography stores, massage parlors, and topless or nude dance nightclubs. In the present study, the adult businesses studied are topless nightclubs, also known as "gentlemen's clubs."

[2] See, e.g., *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976); *City of Renton v. Playtime Theatres Inc.*, 475 U.S. 41 (1986).

to be a time, place, and manner regulation. The Court next considered whether the ordinance was content neutral or content based. If the regulation were content based, it would be considered presumptively invalid and subject to the "strict scrutiny" standard. The Court held, however, that the ordinance was not aimed at the content of the films shown at adult theaters, but rather at the secondary effects of such theaters on the surrounding community, namely at crime rates, property values, and the quality of the city's neighborhoods. Given this finding, the Court stated that the ordinance would be upheld as long as the city of Renton showed that its ordinance was designed to serve a substantial government interest such as a reducing crime rates or maintaining property values.

Further, in *Renton* the Court stated, for the first time, that a city interested in restricting the operation of adult businesses was not required to show adverse impact from operation of adult theaters in its own community if no data on adverse impacts existed, but could instead rely on findings of impacts from other cities as a rationale for supporting passage of an ordinance. The Court ruled that Renton could rely on the experiences of and studies produced by the nearby city of Seattle as evidence of a relationship between adult uses and negative secondary effects. Thus, the Court ruled that the First Amendment does not require a city to conduct new studies or produce new evidence before enacting an ordinance, as long as the evidence relied upon is reasonably believed to be relevant to the problem the city faces.

Since *Renton*, a number of cities, counties, and states have undertaken investigations designed to establish the presence of such secondary effects and their connection to adult facilities. These studies have, in turn, been shared with other municipalities and generally serve as the basis for claims that adult entertainment establishments are causally related to harmful secondary side effects, such as increased crime and decreases in property values. Many local governments have relied on this body of information as evidence of the secondary effects of adult businesses. Further, in most cases, cities and other governmental agencies have used the findings of a core set of studies from other locales as a rationale for instituting regulation of such businesses in their own communities.

In more recent years, the Court has considered the constitutionality of anti-nudity ordinances passed by municipalities or states that have relied on negative secondary effects to justify the legislation.[3] In a fractured decision issued in 1991, the Court in *Barnes v. Glens Theatre Inc.* held that the state of Indiana could

---

[3] See e.g., *Barnes v. Glens Theatre Inc.*, 501 U.S. 560 (1991); *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000).

regulate public nudity.[4] Justice Souter in a concurring opinion ruled that the government could undertake such regulation on the basis of the *presumed* negative secondary effects on the surrounding community.[5]

In the 2000 decision *City of Erie v. Pap's A.M.*, the Court again held that municipalities have the right to pass anti-nudity ordinances on the assumption that nudity is associated with adverse secondary effects such as crime.[6] Again, the Court was fractured; however, three justices agreed with Justice O'Connor's opinion that in conformity with Justice Souter's concurrence in *Barnes*, combating negative secondary effects associated with adult businesses was a legitimate basis for the imposition of anti-nudity regulations.

Most notable for our purposes, however, was Justice Souter's partial concurrence and partial dissent in the *Pap's* decision. He significantly revised the position he took regarding the assumption of secondary effects in *Barnes*. In *Pap's*, Justice Souter said he was now of the opinion that the evidence of a relationship between adult businesses and negative secondary effects is at best inconclusive.[7] He called into question the reliability of past studies that purported to demonstrate these effects and suggested that municipalities wishing to ban nudity must show evidence of a relationship between adult businesses and negative effects.[8]

Most recently (2002) Justice O'Connor, joined by the Chief Justice, Justice Scalia, and Justice Thomas (with Justice Kennedy's concurrence) concluded that the city of Los Angeles may reasonably rely on its 1977 study to demonstrate that its present ban on multiple-use establishments serves the city's interest in reducing crime. In *City of Los Angeles v. Alameda Books, Inc., et al.*, the Court maintained that it was "reasonable for Los Angeles to suppose that a concentration of adult establishments is correlated with high crime rates because a concentration of operations in one locale draws, for example, a greater concentration of adult consumers to the neighborhood, and a high density of such consumers either attracts or generates criminal activity." Justice Kennedy, whose opinion may be the controlling one in the case, reiterated the assumption that adult businesses cause negative secondary effects. In his opinion in *Alameda* he asserts, "municipal governments know that high concentrations of adult businesses can damage the value and integrity of a neighborhood. The damage is measurable; it is

---

[4] *Barnes v. Glens Theatre Inc.*, 501 U.S. 560 (1991) (hereinafter *Barnes*).

[5] As will be discussed in depth below, restrictions on erotic dance have typically included requiring dancers to wear at least pasties and a G-string when performing.

[6] *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) (hereinafter *Pap's*).

[7] *Id.* at 6-7 (Souter, D. concurring in part dissenting in part).

[8] *Id.* at 5 n.3.

all too real." The Court held that a municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest.

However, the plurality added an important methodological caveat concerning the evidence necessary to validate the assumption that adult businesses cause secondary effects. The Court warned:

> "This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support its rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the *Renton* standard. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance."

### Empirically Testing the Assumption of Secondary Effects from Adult Businesses

Justice Souter, joined by Justice Ginsburg, Justice Breyer, and Justice Stevens, took the admonishment by the plurality in *Alameda* that municipalities cannot rely on methodologically frail demonstrations of secondary effects a step further. Justice Souter faulted the city of Los Angeles because the city did not demonstrate that its theory that regulation requiring adult establishments disburse and be operated as free standing businesses will reduce crime. Justice Souter asked the city to demonstrate, not merely by appeal to common sense *but also with empirical data*, that adult businesses are associated with crime and that its ordinance will successfully lower crime.

In fact, Justice Souter claims that the only way to avoid a zoning ordinance such as that passed in Los Angeles from being unconstitutional due to the lack of content neutrality, a requirement set out in *Renton*, is to conduct empirical evaluations of whether such effects, assumed in the past, actually exist. He notes in *Alameda*:

> "(the) risk of viewpoint discrimination is subject to a relatively simple safeguard, however. If combating secondary effects of property devaluation and crime is truly the reason for regulation, it is possible to show by empirical evidence that the effects exist, that they are caused by the expressive activity subject to zoning, and that the zoning can be expected either to ameliorate them or to enhance the capacity of the government to combat them . . . "

### The Present Study

The first purpose of the present study is to conduct the type of empirical study demanded by Justice Souter and noted to be relevant by Justice O'Connor and the other justices in *Pap's*. Also, it is designed to avoid the collection of "shoddy data" or the use of (shoddy) "reasoning" as demanded in *Alameda Books*, in order to determine if a relationship exists between adult businesses and negative secondary effects, or whether, as Justice Souter has contended, such a relationship must not be assumed. Further, this evidence is obtained in accordance with established methodological procedures so as to insure a high level of scientific reliability.

Past studies claim to have found crime but lack the essential methodological features necessary to validly make such a claim. Paul, Linz, and Shafer (2001) found numerous problems among the most frequently cited studies by communities across the United States. For example, the Indianapolis, Indiana study (1986) failed to properly match study and control areas on variables, the Phoenix, Arizona study (1979) relied on crime data collected for only a one-year period, and in the Los Angeles study (1977) authors admitted that the police stepped up surveillance of adult businesses during the study period. Each of these methodological problems severely limits the utility of these studies.[9]

---

[9] As we noted above, the Court in *Alameda* warned that a municipality cannot get away with shoddy data or reasoning. The municipality's evidence must fairly support its rationale for its ordinance. What methodological features of an inquiry may prevent the collection of reliable data and sound reasoning concerning secondary effects? Unfortunately, when municipalities have conducted studies of crime and adult businesses in the past, there has not been a set of methodological criteria or minimum scientific standards to which the cities were required to adhere. Paul, Linz, and Shafer (2001) have argued that, without such standards, most cities that have passed legislation are relying on methodologically flawed data and research.

The basic requirements for the acceptance of scientific evidence for legal decision making were prescribed by the Supreme Court in the 1993 case of *Daubert v. Merrell Dow*, 509 U.S. 579 (1993). In *Daubert*, Justice Blackmun, writing for the Court, held that there are certain limits on the admissibility of scientific evidence offered by "expert witnesses" in federal courts. In an attempt to prevent the proliferation in courtrooms of what Peter Huber has called "junk science" and what the Supreme Court is now calling "shoddy data or reasoning," the Supreme Court in *Daubert* opined that scientific knowledge must be grounded "in the methods and procedures of science," and must be based on more than "subjective belief or unsupported speculation." Thus, the Court said, "the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." The Court observed that "[i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity."

Offering "some general observations" as to how this connection can be made, the Court provided a list of factors that federal judges could consider in ruling on a proffer of expert scientific testimony: (1) the "key question" is whether the theory or technique under scrutiny is testable, borrowing Karl Popper's notion of falsifiability (Popper 1959); (2) although publication was not an absolute essential, the Court noted that peer review and publication increased "the likelihood that substantive flaws in methodology will be detected"; (3) an error rate or estimate of the probability that empirical relationships are due to chance should be calculated; (4) adherence to professional standards in using the

More recently, Linz and Paul (2002) have undertaken an examination of adult cabarets in the city of Fort Wayne, Indiana, that serve alcoholic beverages and that provide exotic entertainment wherein dancers are required to wear pasties and G-strings. Unlike previous studies conducted in other municipalities, specific

---

technique in question; and (5) finally, though not the sole or even the primary test, general acceptance could "have a bearing on the inquiry."

In the present study, we specifically consider the impact of adult dance clubs on the occurrence of crimes reported to the police. We will limit our discussion of acceptable scientific procedures to those necessary to insure the proper implementation of such a crime study. Three criteria are crucial in insuring that a scientifically valid study of secondary crime effects has been conducted, as follows. First, in order to insure accurate and fair comparisons, a control area must be selected that is truly "equivalent" to the area containing the adult dance entertainment business(es) (cf. Campbell & Stanley 1963: 34; Babbie 1999: 240). Because most analyses of secondary effects attempt to uncover increases in crime, professional standards dictate that the control (non-adult dance) site must be comparable (matched) with the study (adult dance) site on variables related to crime. Of particular importance are that the study and control areas are matched for ethnicity and socioeconomic status of individuals in both areas. A concerted effort should also be made to include only comparison areas with similar real estate market characteristics such as proportion of commercial and industrial space in either area. The study and control areas should also be approximately equal in total population. Finally, because of the effect of businesses that serve alcoholic beverages on neighborhood deterioration and crime (Roncek & Maier 1991), the study and control areas should be matched on the presence of alcohol-serving establishments. The reasons for these concerns are discussed later in this article. In summary, "quasi-experimental" studies employ a test group or area and a matched control group or area. The most important consideration in such a design is whether the comparison group or control group are well matched.

Second, a sufficient period of elapsed time following the establishment of an adult dance entertainment business is necessary when compiling crime data in order to ensure that the study is not merely detecting an erratic pattern of social activity. Generally, the longer the time period for observation of the events under consideration, the more stable (and more valid) the estimates of the event's effects tend to be (cf. Singleton, Straits, & Straits 1993: 213–41).

Third, the crime rate must be measured according to the same valid source for all areas considered (Campbell & Stanley 1963: 59). Studies of secondary effects typically focus on two general types of crime in relation to adult dance entertainment businesses. These two types of crime are "general criminal activity" (including, but not limited to, robbery, theft, assault, disorderly conduct, and breaking and entering) and "crimes of a sexual nature" (including, but not limited to, rape, prostitution, child molestation, and indecent public exposure). It is especially important that the measurement of these crimes is based on the same information source for both sites and throughout the entire study period. For example, if the study area measures crime by the number and type of calls made to the police department, the comparison area must also rely on such a measure when the two areas are compared.

In addition, the crime information source must be factually valid and reliable, such as a daily log kept by police, or a compilation of the number of calls for service made in a municipality recorded by street address or similar geographical locators. Any change in police surveillance techniques regarding adult dance entertainment businesses in a particular community must also be noted. Obviously, increased surveillance of an area simply because an adult dance club is located there will have an impact on the amount of crime detected by the police. If increased police surveillance and the presence of an adult dance club in a particular area are confounded in this way, it is impossible to tell whether crime has increased due to the presence of the club or simply because of the increased police activity. Finally, an error rate must be calculated. The error rate is the degree of chance a scientist will allow. In the social sciences, it is conventional to set the error rate at 5% or less (i.e., we will tolerate an error rate that says that up to 5 times out of 100 the results may be obtained by chance).

attention was given to developing an empirical approach that fulfilled the requirements set out by the Supreme Court for the proper conduct of a social scientific inquiry. A 1000-foot circumference surrounding each of eight exotic dance nightclubs in Fort Wayne was established. Comparison areas were selected in Fort Wayne and matched to the club areas on the basis of demographic features associated with crime and commercial property composition. The number of calls to the police from 1997 to 2000 in the areas surrounding the exotic dance nightclubs was compared to the number of calls found in the matched comparison areas. The analysis showed little difference, overall, between the total number of calls to the police reported in the areas containing the exotic dance nightclubs and the total number of offenses reported in the comparison areas.

The present study is also informed by two related bodies of thought about crime and place, social disorganization theory, and routine activity/crime opportunity theory. The second purpose of this study is to examine the impact of adult businesses in a local community in light of these perspectives. These approaches point to variables that predict the frequency and location of criminal activity in a community. This set of ideas is also especially relevant here, first, because they are the implicit theories employed by municipalities addressing the problem of adverse secondary effects, second, because they suggest a number of other variables, predictive of crime events, that must be considered as control variables in any study of the impact of adult businesses on crime, and finally, because these variables have been successful as predictors of crime events.

### Routine Activities/Crime Opportunity Theory

While perhaps not the ideal forum for the examination of criminological theory, investigating the secondary effects of adult bars as a stimulus for crime addresses a current and pressing legal policy issue. City planners and other representatives of local governmental bodies have explicitly claimed that adult businesses are associated with crime and disorder and have theorized that the presence of an adult business in a localized area increases the concurrence of offenders motivated to commit crimes together with suitable targets for the crimes.

In Phoenix, for example, the city adopted a zoning ordinance whose restriction of adult business to within 500 or 1000 feet of sensitive land uses such as churches, schools, and daycare centers is predicated on the idea that the presence of adult businesses attracts persons who will engage in crime. The Phoenix ordinance was based on the theory that there are direct impacts that uniquely

relate to this class of land use. In fact, the city planners in Phoenix asked: "are the crime impacts . . . directly related to the adult businesses being there, or to some other societal variables in the neighborhood?" Realizing that these other societal variables need to be controlled for, the Phoenix planners undertook an empirical study in which they considered adult land uses and negative secondary effects in light of other variables related to crime such as number of residents, median family income, percentage of non-white population, percentage of dwelling units built since 1950, and percentage of acreage used residentially and non-residentially (Planning Department of Phoenix 1979: 4).

More formal expressions of how certain societal factors that may be related to the commission of crime have come from criminologists propounding routine activities/crime opportunity theory (Cohen & Felson 1979; Cohen, Kluegel, & Land 1981). This approach begins by noting that, in order for a predatory crime (e.g., robbery) to occur, there must be a concurrence in space and time of (1) a motivated offender, (2) a suitable target, and (3) an absence of a guardian that is capable of preventing the crime. This theory then focuses on how changes in the time and space of how people order their lives can change the opportunity structure for crime and thus affect crime rates and rates of criminal victimization—even in the absence of an increase in the structural or psychological factors that produce increases in the number of motivated offenders.

Routine activities/crime opportunity theory has been quite successful in empirical tests (see, e.g., Miethe & Meier 1994). This theory also has been used to guide research by criminologists on so-called hot spots or locations in urban areas that attract large numbers of crime incidents (see, e.g., Roncek & Maier 1991; Smith, Frazee, & Davison 2000). Researchers have found that perpetrators of street crime such as robbery commit their crimes proximate to where they live, on face blocks with which they are familiar or which they traverse in their routine activities.

This approach suggests a number of variables that must be considered in any investigation of the relationship of crime events to adult businesses in a community. It is necessary to control for population size, because, all else being equal, blocks with many people may have more potential crime victims than do face blocks with few people. Somewhat surprisingly, however, the population control variable is often found to be negatively associated with the number of crimes such as street robberies, suggesting that robbers tend to target victims where fewer people reside, and perhaps where fewer witnesses are likely.

In addition, it is necessary to control for neighborhood business and housing characteristics such as multiple apartments, or even

multiple buildings at a given address under the assumption that, all else being equal, the more places, the more likely a robbery victimization will occur on a face block. Higher levels of crime tend to plague places with certain types of facilities and not others. In some cases, for example, crimes seem to be elevated by a target-rich environment—for example, thefts of 24-hour convenience stores, auto thefts from large parking lots, or robberies from shoppers in heavily frequented commercial areas (Engstad 1975; Duffala 1976). The presence of bars, restaurants, and gas stations identifies blocks that might be particularly attractive for potential offenders because of easy accessibility and the presence of people carrying cash, often under the influence of alcohol (Roncek & Maier 1991; Sherman et al. 1989; Stark 1987). The number of other commercial places, such as business offices, industrial buildings, and warehouse facilities on a block is also important in predicting crime events.

Specific land uses are not only important in themselves but also operate in interaction with variables indicative of social disorganization in determining the risk of crime. Variables that have been investigated and been found to be most important as predictors of crime activity include measures of racial composition (number of African Americans and racial heterogeneity), family structure (as measured by number of single-parent households), economic composition (as measured by family income), and the presence of motivated offenders including males between the ages of 18 and 25 (Miethe & McDowall 1993). These social disorganization variables have been examined on the basis of the assumption that a local area's population age structure (especially the presence of young adults) and its race/ethnic composition can affect both the size of the pool of motivated crime offenders and the presence of suitable targets for predatory crimes (see, e.g., Miethe & Meier 1994).

Similarly, the socioeconomic status of individuals in a local area can affect both the prevalence of motivated offenders and crime targets. For example, Cohen, Gorr, and Olligschlaeger (1993) found that crime hot spots tended to be in areas with higher levels of poverty or low income, and were likewise associated with low family cohesion—an indication of the prevalence of both motivated offenders and crime targets.

**Research Question**

Once variables known to be related to crime events suggested by social disorganization and routine activities theories have been taken into account we may ask: does the presence of an adult business in a localized area increase the concurrence in space and time of offenders motivated to commit crimes together with suitable targets for the crimes in the absence of guardians capable of preventing or deterring the crimes?

The site for the present study was Charlotte, North Carolina. For each adult topless dance club in that community, a control site (matched on the basis of demographic characteristics related to crime risk) is compared for crime events over the period of three years (1998–2000) using data on crime incidents reported to the police. This research is designed to address the questions of whether and to what extent the adult dance clubs contribute to community disorder—that is, increased crime in neighborhoods—compared to their control neighborhoods that do not have adult dance clubs.

## Data and Methods

### Establishing Matched Comparison Locations

Twenty topless adult nightclubs in Charlotte, North Carolina are the focal points of the present study. It was not possible to randomly assign units of analysis to an experimental group and a control group to perform a "true" experiment to test the hypothesis that adult nightclubs in Charlotte engender negative effects. Instead, a "quasi-experiment" was conducted in which matched "control" areas were found and compared to "test" areas containing the adult business. In order to insure accurate and fair comparisons, a control area must be selected that is as "equivalent" as possible to the area containing the adult entertainment business(es).

The main hypothesis to be tested in the present study is that the presence of an adult nightclub increases the number of crime incidents reported in localized areas surrounding the club as compared to the number of crime incidents reported in comparable localized areas that do not contain an adult nightclub. In order to test this hypothesis, suitable control (non-adult nightclub) sites must be chosen that are comparable (matched) to the test (adult nightclub) sites on key demographic and other variables that are generally regarded as being related to the incidence of crime.

In order to insure that the research reported here utilized appropriately "matched" adult nightclub (test) and non-club (control) areas, a crime-mapping approach was utilized. Two radii—500 feet and 1,000 feet—were used to identify circular perimeters surrounding each of 20 adult nightclubs in Charlotte. These distances were chosen because they represent the city's presumptions about negative secondary effects. The Charlotte city code, as is the case for hundreds of municipalities across the United States, mandates that adult establishments be no closer than 1000 feet from churches, schools, daycare centers, and other sensitive land uses. Other cities such as New York specify distances of 500 feet.

Comparison areas or control sites (census block groups) of physical size roughly comparable to the areas containing the adult nightclubs, each with 500 and 1000 feet in radius, were selected that matched the adult nightclub areas on the basis of several of the variables known to be related to the risk of crime victimization (on the basis of social disorganization and routine activities theory as reviewed above) and by further informally attempting to equate areas on the basis of commercial property composition. Additional variables were also taken into consideration in order to rule out alternative explanations but were not formally considered for matching purposes.

The following variables were used for the selection of control sites: total population size (1997), percentage of households that are female headed, percentage of the population that is African-American, percentage of the population aged 18–29, percentage of the adult population that is divorced, and median household income. Each of these variables was identified at the U.S. Census block group level. Properly "matching" the subject and control areas is critical in order to insure that the results we obtain can be ascribed to the presence or absence of (in this case) an adult nightclub, and not to some other irrelevant factor.

In addition, although not formally matched on these variables beforehand, measurements were taken of traffic patterns and number of businesses and commercial properties in the areas immediately surrounding the adult and control sites.[10] Traffic patterns may be important to consider because they are an indication of the number of people moving through an area both suitable as targets and as perpetrators of crime. Business composition is important because of the effect of the number of businesses on crime opportunity and neighborhood deterioration. These variables, while technically measured, are not included in the formal model testing. They will be examined to determine simply whether they covary with crime patterns. If it is found that they correspond to the pattern of crime in a particular area, we may have some indication that these features of the environment may be reasonable explanations for the findings we obtain.

The geographic information system computer program Maptitude (1999) was used to locate the census block group within which each club was located. For each census block group, a Maptitude data set provides counts for most of the demographic variables measured by the 1990 U.S. Census. In addition, 1997 supplements are provided for most variables. The values of each of the variables of interest were identified for the census block within

---

[10]  The figures showing the names and locations of business composition are available from the authors.

which the adult nightclub was located. When the 1000-foot area surrounding a club location touched more than one census block, the average value for each of the relevant demographic variables was calculated across the blocks that overlapped with the club perimeters. A comparable area, matched for values on the crime-related variables, was then selected via Maptitude. All control areas were selected before the crime data were obtained and thus before any analysis of the crime data was undertaken. Finally, it should be noted that two variables often associated with social disorganization and routine activity theory, social class and residential mobility, are not available in census block data, and thus they cannot be included in the analysis. To the extent that social disorganization variables included in the model correlate with these unavailable variables, the consequences for our conclusions may be minor.

Table 1 displays a comparison of the values for each of the demographic characteristics measured at the census block level both for the adult nightclub locations and the control sites to which they were matched. Table 1 contains a column for the population size variable, four columns for the four percentage variables, and a final column for the median household income variable. Rows for the 20 adult nightclub sites are ordered alphabetically from top to bottom in Table 1, with rows for the three control sites ordered alphabetically at the bottom of the table. For each of the demographic and income variables in the table, it can be seen that there is a substantial amount of variability among the club and control sites.

To determine which control site to match with which adult nightclub location, the frequency distributions of each of the six demographic variables given in Table 1 were divided into five equally distributed levels (quintiles). For each demographic variable, each of the quintiles was assigned a numerical value that could range from 1 to 5, where 1 indicates that level of the demographic variable that is least likely to be associated with the occurrence of crime events and 5 being equal to the value that is most likely to be related to crime risk. For all but one of the demographic variables in Table 1, this resulted in the assignment of high code numbers for variables that had high values and low code numbers for variables that had low values. The only exception was median household income, for which research suggests that higher levels of household income will be associated with lower crime risk.

Table 2A contains the resulting codes for each of the demographic variables for each of the adult nightclubs and control sites. The right-most column of the table gives the combined means of the quintile codes—ranked from highest (4.0) to lowest (1.67)—where a higher mean quintile code indicates a location with a higher crime risk and a lower mean code indicates a location

**Table 1.** Absolute Values for Demographic Variables Related to Crime in Areas Around Club and Control Sites

| Club | Population | Percentage of Households that Are Female Headed (%) | Percentage African American (%) | Percentage Age 18–29 (%) | Percentage Total Divorced (%) | Household Income ($) |
|---|---|---|---|---|---|---|
| Baby Dolls | 3881 | 0 | 21 | 72 | 2 | 38,624 |
| Club Champagne | 2480 | 19 | 59 | 23 | 11 | 32,222 |
| Crazy Horse | 1026 | 6 | 31 | 28 | 10 | 33,772 |
| Diamond Club | 1203 | 7 | 7 | 14 | 7 | 47,373 |
| Fancy Cat | 1483 | 18 | 53 | 22 | 11 | 32,486 |
| Gentlemen's Club | 45 | 67 | 58 | 13 | 16 | 32,188 |
| Just Because | 705 | 34 | 97 | 20 | 7 | 24,910 |
| Leather 'n Lace N | 3438 | 6 | 16 | 29 | 6 | 49,065 |
| Leather 'n Lace S | 525 | 17 | 13 | 20 | 10 | 35,854 |
| Men's Club | 5675 | 10 | 47 | 29 | 10 | 39,645 |
| Office Lounge | 4217 | 2 | 37 | 27 | 9 | 39,373 |
| Paper Doll Lounge | 761 | 30 | 18 | 16 | 11 | 35,298 |
| Platinum Club | 1204 | 7 | 07 | 14 | 7 | 47,373 |
| Player's Club | 1649 | 44 | 97 | 17 | 7 | 20,749 |
| Polo Club | 649 | 10 | 16 | 17 | 8 | 26,616 |
| Tattletales | 1008 | 13 | 15 | 19 | 12 | 28,746 |
| Temptations | 4028 | 10 | 38 | 26 | 9 | 41,254 |
| Twin Peeks | 4511 | 3 | 20 | 63 | 2 | 38,042 |
| Uptown Cabaret | 293 | 0 | 61 | 36 | 9 | 38,750 |
| VIP Showgirls | 1216 | 15 | 12 | 24 | 11 | 36,268 |
| Exxon Control | 1640 | 3 | 9 | 15 | 8 | 74,433 |
| KFC Control | 1084 | 14 | 95 | 18 | 8 | 32,172 |
| McDonald's Control | 3024 | 4 | 23 | 39 | 10 | 40,145 |

**Table 2A.** Quintile Scores for Demographic Variables in Areas Around Club and Control Sites[a]

| Club | Population Size Code | % Fem. Head of Household Code | % African American Code | % Age 18–29 Code | % Divorced Code | Income Level Code | Combined Mean of Codes—Ranked |
|---|---|---|---|---|---|---|---|
| Club Champagne | 4 | 4 | 5 | 3 | 4 | 4 | 4.00 |
| Fancy Cat | 3 | 4 | 4 | 3 | 5 | 4 | 3.83 |
| Just Because | 2 | 5 | 5 | 3 | 2 | 5 | 3.67 |
| Player's Club | 4 | 5 | 5 | 2 | 1 | 5 | 3.67 |
| Men's Club | 5 | 3 | 4 | 5 | 3 | 1 | 3.50 |
| Gentlemen's Club | 1 | 5 | 4 | 1 | 5 | 4 | 3.33 |
| Temptations | 5 | 3 | 4 | 4 | 3 | 1 | 3.33 |
| **McDonald's Control** | **4** | **2** | **4** | **5** | **3** | **2** | **3.33** |
| Crazy Horse | 2 | 2 | 3 | 4 | 4 | 4 | 3.17 |
| Tattletales | 2 | 3 | 2 | 2 | 5 | 4 | 3.17 |
| VIP Showgirls | 3 | 4 | 1 | 3 | 5 | 3 | 3.17 |
| Office Lounge | 5 | 1 | 3 | 4 | 3 | 2 | 3.00 |
| Twin Peeks | 5 | 1 | 3 | 5 | 1 | 3 | 3.00 |
| **KFC Control** | **2** | **3** | **5** | **2** | **2** | **4** | **3.00** |
| Uptown Cabaret | 2 | 5 | 2 | 5 | 3 | 3 | 2.83 |
| Paper Doll Lounge | 1 | 1 | 5 | 5 | 3 | 2 | 2.83 |
| Baby Dolls | 4 | 1 | 3 | 5 | | 2 | 2.67 |
| Polo Club | 1 | 4 | 1 | 2 | 4 | 3 | 2.50 |
| Leather 'n Lace S | 1 | 3 | 2 | 2 | 2 | 5 | 2.50 |
| Leather 'n Lace N | 4 | 2 | 2 | 4 | | 1 | 2.33 |
| Diamond Club | 3 | 2 | 1 | 1 | 2 | 1 | 1.67 |
| Platinum Club | 3 | 2 | 1 | 1 | 2 | 1 | 1.67 |
| **Exxon Control** | **4** | **1** | **1** | **1** | **2** | **1** | **1.67** |

[a]Values for each variable could fall within one of five equally distributed levels, and were assigned a value for this table that could range from 1 to 5, where 1 was equal to the level of that variable that was least likely to be associated with crime and 5 was equal to the value that was most likely to be related to crime. For all but one variable considered in this table, this resulted in high code numbers for variables that had high values and low code numbers for variables that had low values. The only exception was for income, where a higher value resulted in a lower code score and a lower value resulted in a higher code score, because higher levels of income were expected to be associated with lower levels of criminal activity.

with a lower crime risk. The adult nightclubs are reordered in Table 2A into three groups corresponding to the three control sites with which the various clubs are associated. The first group in the table identifies seven clubs located in relatively high-crime risk locations—Club Champagne, Fancy Cat, Just Because, Player's Club, Men's Club, Gentlemen's Club, and Temptations. The control site for these clubs is a McDonald's fast food establishment with a mean quintile social disorganization variable score of 3.33. A second group in Table 2A identifies five clubs of medium relative crime risk—Crazy Horse, Tattletales, VIP Showgirls, Office Lounge, and Twin Peaks. The control site for these clubs is a Kentucky Fried Chicken (KFC) fast food restaurant with a mean quintile social disorganization score of 3.0. A third group in Table 2A identifies eight clubs of low relative crime risk—Uptown Cabaret, Paper Doll Lounge, Baby Dolls, Polo Club, Leather 'n Lace South, Leather 'n Lace North, Diamond Club, and Platinum Club. The control site for these clubs is an Exxon gasoline service station with a mean quintile score of 1.67. Note that the average quintile score for each of the control sites is equal to the lowest mean quintile score of the clubs in the group to which it is matched. Because the mean quintile scores are indicative of the criminogenic potential in the areas surrounding the sites, this implies that most of the adult nightclubs to which the control sites are matched should be expected—solely on the basis of the demographics of the surrounding areas—to have higher numbers of crime events recorded.

Table 2B displays the vehicular traffic counts for club and control areas in recent years. As can be seen from the table, the relationship between the volume of vehicular traffic and relative crime risk is not straightforward. The high-crime risk control location has a much higher volume of vehicular traffic than the average of the adult nightclub study sites. This pattern does not hold for the medium- and low-crime risk locations, however. The medium-crime risk location has the lowest volume of traffic. The low-crime risk location has an intermediate level of traffic.

Land use, commercial establishments, and business patterns were also taken into consideration by a simple count of commercial establishments for each control location and the computation of average counts for the club locations. Table 2C displays these counts and averages. No particular pattern was observed here either. The high-crime risk control area has a large number of commercial sites compared to the test area. However, on average, the medium-crime risk area test sites have many more commercial businesses in the area than the medium-crime risk control area. Finally, the low-crime risk area has substantially more commercial establishments than the test sites.

**Table 2B.** Traffic Patterns at the Nearest Intersection to the Study or Control Sites Counted by the Charlotte-Mecklenburg Department of Transportation (all counts are taken at mid-block volume and are average weekday traffic patterns)

| | Volume of Motor Vehicle Traffic | Year Count Taken |
|---|---|---|
| **Relatively High Crime Risk Locations** | | |
| Club Champagne | No data for nearest intersection | |
| Fancy Cat | 26,400 | 2000 |
| Gentlemen's Club | 35,000 | 2000 |
| Just Because Sports | 16,000 | 2002 |
| Player's Club | 12,000 | 2000 |
| Men's Club | 31,400 | 2002 |
| Temptations | 43,900 | 2000 |
| Average | 22,217 | |
| Control Site McDonald's | 82,100 | 2000 |
| **Medium Relative Crime Risk Locations** | | |
| Twin Peeks | 34,200 | 2000 |
| Crazy Horse | No data for nearest intersection | |
| Tattletales | 32,100 | 2000 |
| VIP Showgirls | 32,000 | 2001 |
| Office Lounge | 40,600 | 2000 |
| Platinum Club 2000 | No data for nearest intersection | |
| Average | 34,725 | |
| Control Site Kentucky Fried Chicken | 20,700 | 2000 |
| **Relatively Low Crime Risk Locations** | | |
| Polo Club | 32,100 | 2000 |
| Baby Dolls | 24,000 | 2000 |
| Paper Doll Lounge | 37,800 | 2000 |
| Diamond Club | 35,000 | 2000 |
| Leather 'n Lace S | No data for nearest intersection | |
| Leather 'n Lace N | No data for nearest intersection | |
| Uptown Cabaret | 26,500 | 2002 |
| Average | 31,080 | |
| Control site Exxon | 45,900 | 2001 |

## Data on Crimes Reported

With support from the U.S. Department of Justice Office of Community Oriented Policing Services, the Charlotte-Mecklenburg Police Department maintains a computerized "reported incidents" information system for the city of Charlotte and Mecklenburg County, North Carolina. This system is capable of providing geo-coded information on all crime incidents reported at or near locations in the Charlotte area. Using this computerized database, brief descriptions of all crime incidents reported at or near each of the adult nightclubs and control sites identified above for the three years 1998–2000 were identified and provided to the authors by the Charlotte-Mecklenburg Police Department. The two perimeters identified above were employed, thus yielding records of incidents that occurred within a 500-foot radius and incidents that occurred within a 1,000-foot radius.

**Table 2C.** Counts of Number of Businesses at Control and Test Sites Within a 1,000-Foot Radius

|  | Number of Businesses/ Commercial Properties |
|---|---|
| **Relatively High-Crime Risk Locations** | |
| Club Champagne | 21 |
| Fancy Cat | 36 |
| Gentlemen's Club | 49 |
| Just Because Sports | 18 |
| Player's Club | 11 |
| Men's Club | 61 |
| Temptations | 21 |
| Average | 31 |
| Control Site | |
| McDonald's | 57 |
| Medium Relative Crime Risk Locations | |
| Twin Peeks | 50 |
| Crazy Horse | 48 |
| Tattletales | 33 |
| VIP Showgirls | 37 |
| Office Lounge | 80 |
| Platinum Club 2000 | 81 |
| Average | 55 |
| Control Site | 19 |
| Kentucky Fried Chicken | |
| Relatively Low Crime Risk Locations | |
| Polo Club | 84 |
| Baby Dolls | 0 |
| Paper Doll Lounge | 23 |
| Diamond Club | 67 |
| Leather 'n Lace S | 84 |
| Leather 'n Lace N | 34 |
| Uptown Cabaret | 31 |
| Average | 46 |
| Control Site | 89 |
| Exxon | |

There are no formal measurements of the accuracy with which the officers in the Mecklenburg Police Department or the dispatchers of the Computer Aided Dispatch (CAD) system locate a crime event. The dispatcher is at the mercy of the caller who relates an address. The police department does not keep an account of the discrepancy between the original address reported to the dispatcher and the address noted in any subsequent police report.

For crimes such as rape, robbery, and assault, the address of the actual offense may not be the address of the dispatch. Victims of these crimes sometimes go to other locations and call for service. The discrepancy between call address and actual address of the crime event may therefore be sizable, approximately 10%–20%, according to the Charlotte assistant crime analyst. But, these inaccuracies only occur for these crimes. The address of the crime location and the call location are highly consistent between the

CAD and the location of the crime for property crimes and serious assaults resulting in incapacitation and murder.

The database used for the present study contains only those crime incidents derived from the CAD database for which the police completed a report. This constitutes approximately 25%–30% of the entire CAD database. The accuracy of addresses listed in the report data file is not checked against the CAD, nor is it checked against a map of the city (although a procedure for verifying addresses has recently been implemented by the department). Accuracy is estimated by the crime analyst to be in the 94%–95% range.

For purposes of the present study, the authors grouped the reported crime incidents into six categories, ordered from the most to the least inclusive, as follows: total crimes (i.e., the total of all crime categories listed below), total Uniform Crime Reports (UCR) Index Crimes (i.e., the total of the UCR Violent and Property Crimes identified below), total Uniform Crime Reports Violent Crime Index Crimes (murder, rape, aggravated assault, and robbery), total Uniform Crime Reports Property Crime Index Crimes (burglary, larceny/theft, motor vehicle theft, and arson), sex crimes (the crime reports data had counts listed only as "sex offenses" to which were added rape/attempted rape counts, to define this variable), and all other crimes (minor incidents such as disorderly conduct, hit and run, non-aggravated assault, embezzlement, and forgery).

Counts of the number of incidents reported in each of these six categories for each of the three years of the study for each of the 23 adult nightclub and control sites for each perimeter constitute the dependent variables to be studied.

### Statistical Model

In addition to overall estimates of mean numbers of crime incidents surrounding the adult nightclub and control sites, we conducted a panel regression analysis of the data.[11] For this,

---

[11] The dependent variable is a positively skewed count variable. Therefore, we experimented with the estimation of either a Poisson or negative binomial regression model that more accurately accounts for such a dependent variable, using specifications identical to the OLS regression models presented in the article. However, due to the limited number of clubs/controls and the relatively large number of parameters in comparison (especially the club-specific fixed-effects that were included to account for unobserved heterogeneity at the club/neighborhood level), we routinely encountered convergence problems and were not able to reliably and robustly estimate these models. This was entirely expected by us given that the Poisson and binomial models are nonlinear models that are estimated via maximum likelihood methods. The maximum likelihood estimation (MLE) method requires, for convergence, a relatively well-defined likelihood surface. If we had access to either more years of crime data or more clubs/controls, these models would have been more feasible and more appropriate, as a larger number of observations would bring asymptotics into play more definitely and stabilize the likelihood surface. Therefore, we chose to work with the OLS estimates, which were statistically stable and substantively interpretable.

we use fixed-effects or least-squares dummy-variable regression models (see, e.g., Hannan & Young 1977; Hsiao 1986) to analyze the Charlotte crime events data arranged in a pooled time-series cross-section with site (club or control)-years as units of analysis. Effects are fixed for years and sites. Site-fixed-effect models eliminate bias created by the failure to include controls for unmeasured characteristics of the sites that have additive effects. Thus, fixed-effects models control for unmeasured characteristics of the sites that may affect the incidence of crime events at or near the adult nightclub and control sites. The regression model is:

$$Y_{it} = \beta_0 + \varepsilon_{it}, \tag{1}$$

where

$$\varepsilon_{it} = u_i + v_t + w_{it}$$

In this model, the regression parameter $\beta_0$ denotes an overall constant term for the model, which corresponds to the overall average number of crime incidents of a given type across all sites and years. This overall average number of crime incidents is adjusted up or down for each site $i$ and year $t$ by the overall error term $\varepsilon_{it}$. The overall error term $\varepsilon_{it}$ is composed of a cross-sectional (site) component $u_i$ plus a year component $v_t$ plus a purely random component $w_{it}$. The additive error term effects of the sites are estimated relative to a base nightclub that consistently has low numbers of crime incidents (Fancy Cat), so that most site-specific effects for most crime categories will be positive. Overall year effects on the numbers of reported crime incidents also are estimated for 1999 and 2000, with the year 1998 taken as the base year.

For all models, we used a heteroskedasticity-consistent covariance matrix to estimate the standard errors of the regression coefficients. This method of calculating the standard errors, often referred to in the statistical literature as the HC3 estimator, is a robust estimator similar to the one derived by White (1980), but adding a finite sample correction term to relax the asymptotic requirements of White's original formulation (Davidson & McKinnon 1993; Long & Ervin 2000; McKinnon & White 1985). The finite sample correction term produces a more conservative estimate of the variance of the parameter estimates by adding an adjustment term that accounts for the small sample size (Long & Ervin 2000). The HC3 estimator is an approximation of the jackknife variance estimator (Long & Ervin 2000; McKinnon & White 1985).

## Results

Table 3 reports overall results on mean numbers of crime incidents reported to the Charlotte Police Department for local areas (both 500- and 1,000-foot radii) surrounding both the 20 adult nightclubs and the three control sites.[12] The table includes the means for each of the three years 1998, 1999, and 2000, as well as for all three years combined. Means are given for each of the six categories of crime described earlier. For the adult nightclubs, two estimates of the means are given. This is due to the fact that one of the clubs, Baby Dolls, had no reported crimes within 1,000 feet during any of the three years. Therefore, in order to provide an estimate of the mean crimes reported that is not distorted by including a club in the denominators that did not contribute to the incidents in the numerators, two sets of mean estimates are reported—one that includes Baby Dolls and one that does not.

Several results in Table 3 merit comment. First, consider the overall means for our most comprehensive measure of crime incidents—the Total Crimes rows of Table 3. For this crime category, the mean number of incidents for all three years combined in the adult nightclub locations is between 59% and 62% of those reported for the control sites for the 500-foot perimeters and between 45% and 47% of those reported for the control sites for the 1,000-foot perimeters. Roughly similar bounds characterize the means for the combined years for all of the other crime categories in the table. Thus, with respect to all six categories of crime incidents under investigation, it is evident that the overall mean numbers of crime incidents for all three years combined are somewhat less in the areas surrounding the adult nightclubs than in the areas surrounding the control sites.

Next, consider the year-specific means of crime incidents reported in Table 3. For both the 500- and 1,000-foot perimeters and four of the crime categories in the table, namely Total Crimes, Total UCR Crimes, UCR Property Crimes, and Other Crimes, there is an evident difference between the adult nightclub and

---

[12]  Recall that the three control sites were chosen solely on the basis of demographic characteristics of their surrounding neighborhoods that research motivated by crime opportunity/routine activities theory has found to be associated with crime risk. On this basis, we identified the McDonald's control site as a "high-crime risk" control site, the KFC site as a "medium-crime risk" site, and the Exxon station as a "low-crime risk" site. These characterizations of the relative crime risk potential of the sites are, in fact, corroborated by the data on crimes reported to the Charlotte Police Department, as reported in Table 3. For instance, for Total UCR Crimes, the average numbers of crime incidents reported across the three years within the 500-foot (1,000-foot) perimeters are 86.33 (294.67) at the McDonald's site, 69 (156.33) at the KFC site, and 24 (56) at the Exxon site. The orderings of the three sites by numbers of crime incidents reported for all of the other crime categories studied in this article are similar.

**Table 3.** Mean Number of Crimes Reported to the Police by Crime Type and Radius

| Crime Type | Year | 500-Foot Radius | | | 1,000-Foot Radius | | |
| | | Clubs | | | Clubs | | |
| | | w/o B.D.[a] | w/ B.D.[b] | Controls | w/o B.D. | w/ B.D. | Controls |
|---|---|---|---|---|---|---|---|
| Total Crimes | 1998 | 62.6 | 59.5 | 124.0 | 130.2 | 123.7 | 297.3 |
| | 1999 | 67.7 | 64.3 | 101.0 | 134.5 | 127.8 | 282.3 |
| | 2000 | 60.9 | 57.9 | 84.0 | 121.5 | 115.4 | 237.3 |
| | All | 63.7 | 60.6 | 103.0 | 128.7 | 122.3 | 272.3 |
| Total UCR Crimes | 1998 | 38.2 | 36.3 | 65.7 | 78.5 | 74.6 | 177.0 |
| | 1999 | 44.4 | 42.2 | 63.3 | 84.7 | 80.5 | 181.7 |
| | 2000 | 38.8 | 36.9 | 50.3 | 73.9 | 70.2 | 148.3 |
| | All | 40.5 | 38.4 | 59.8 | 79.0 | 75.1 | 169.0 |
| UCR Violent Crimes | 1998 | 7.0 | 6.7 | 17.7 | 12.0 | 11.4 | 34.7 |
| | 1999 | 7.0 | 6.6 | 19.0 | 13.4 | 12.8 | 36.7 |
| | 2000 | 6.2 | 5.9 | 10.7 | 11.2 | 10.7 | 26.0 |
| | All | 6.7 | 6.4 | 15.8 | 12.2 | 11.6 | 32.4 |
| UCR Property Crimes | 1998 | 31.2 | 29.7 | 48.0 | 66.5 | 63.2 | 142.3 |
| | 1999 | 37.4 | 35.6 | 44.3 | 71.3 | 67.7 | 145.0 |
| | 2000 | 32.6 | 31.0 | 39.7 | 62.7 | 59.6 | 122.3 |
| | All | 33.8 | 32.1 | 44.0 | 66.8 | 63.5 | 136.6 |
| Sex Crimes | 1998 | 0.53 | 0.50 | 0.33 | 1.05 | 1.00 | 1.00 |
| | 1999 | 0.32 | 0.30 | 0.33 | 0.79 | 0.75 | 0.33 |
| | 2000 | 0.26 | 0.25 | 0.67 | 0.63 | 0.60 | 3.67 |
| | All | 0.37 | 0.35 | 0.44 | 0.82 | 0.78 | 1.67 |
| Other Crimes | 1998 | 24.2 | 23.0 | 58.3 | 51.2 | 48.7 | 119.7 |
| | 1999 | 23.2 | 22.0 | 37.3 | 49.3 | 46.9 | 100.3 |
| | 2000 | 22.0 | 20.9 | 33.3 | 47.1 | 44.8 | 87.3 |
| | All | 23.1 | 22.0 | 43.0 | 49.2 | 46.8 | 102.4 |

[a]This mean excludes the club Baby Dolls, which had no reported crimes within 1,000 feet during the years 1998, 1999, and 2000.

[b]This mean includes the club Baby Dolls (i.e., the denominator is increased by 3).

control sites. That is, the trend in the means across the three years for the control sites for all of these crime categories is down, whereas there is little, if any, trend across the years for the adult nightclub sites. It is as if the levels of crime incidents in the control site areas are declining toward the already lower levels near the club sites. Even so, however, for all four categories, the mean numbers of crime incidents reported in the last year available, the year 2000, in the nightclub areas remain below those in the control areas. This is especially true when the perimeter around these locations is expanded to 1,000 feet, which, of course, permits the inclusion in the crime counts of incidents further removed from the club and control site premises. For two other crime categories in Table 3, UCR Violent Crimes and Sex Crimes, the trends across the three years are more muted for both the club and the control sites. This is due, in part, to the fact that the numbers of these

crimes are lower, so that even a slight increase in incidents can be influential in the computation of the means.

For a more precise statistical analysis of the crime events data, the regression model described above in Equation 1 was estimated. Table 4 reports parameter estimates and summary statistics for the full version of this regression model wherein the dependent variable is the Total UCR Crimes reported in the 500- and 1,000-foot perimeters of the adult nightclub and control sites.[13] This model takes the number of crime events reported for 1998 as the omitted year and the number of events reported for the Fancy Cat Club as the omitted adult nightclub site.[14] The coefficients of determination (R-squared) reported in Table 4 show that the fixed-effects regression models succeed in explaining over 90% of the variance in numbers of Total UCR Crimes reported in the two perimeters.

It can be seen from Table 4 that the partial regression coefficients estimated for the year 1999 are 4.78 and 5.74 for events reported within a 500-foot and 1,000-foot radius of the clubs and control sites, respectively. This means that, on average, about five more crime events were reported within 500 feet of all locations in 1999 than in 1998 and about six more within the 1,000-foot radius. By comparison, in the year 2000, the regression coefficients indicate a decrease of one to two crime events from that in 1998 within 500 feet and seven to eight within 1,000 feet of all locations. However, none of these year-specific regression coefficients has an associated $p$-value less than the .05 level of statistical significance, that is, statistically significant from zero. Therefore, it can be inferred that these year-to-year variations from the 1998 base year are sufficiently small that they are statistically meaningless.

Examining next the estimated partial regression coefficients for the adult nightclub and control sites in Group 1, recall that these are in relatively high-crime risk locations. A key comparison is the size of the coefficient estimated for the control site for this group, a McDonald's fast food restaurant, with the coefficients for the club sites in this group. It can be seen that the estimated coefficients for

---

[13]  Full regression models were estimated for both the 500- and 1,000-foot perimeters and all six of the categories of crime incidents identified earlier in the text. We exhibit the regression model for Total UCR Crimes in Table 4, as this category consists of the most serious crimes reported to the police.

[14]  Fancy Cat was chosen as the omitted site, because it has relatively low numbers of crime events within the defined areas. This means that the regression coefficients estimated for the other club and control sites will be positive coefficients, thus indicating the increase in crime events expected for their defined areas relative to those for Fancy Cat. Similarly, the year 1998 was chosen as the omitted year category so that the average number of crime events across all sites reported for 1999 and 2000 can be interpreted as the average increase or decrease expected in those years relative to 1998.

**Table 4.** Parameter Estimates from Fixed-Effects Dummy Variable Regression Model of Total UCR Crimes

| Variable | 500-Foot Radius | | | 1,000-Foot Radius | | |
|---|---|---|---|---|---|---|
| | Robust | | | Robust | | |
| | b-Coeff. | HC3 S.E. | p-Value | b-Coeff. | HC3 S.E. | p-Value |
| Year 1999 | 4.78 | 4.61 | 0.305 | 5.74 | 6.07 | 0.350 |
| Year 2000 | −1.52 | 4.72 | 0.749 | −7.52 | 6.41 | 0.247 |
| **Group 1** | | | | | | |
| Club Champagne | 22.33 | 9.63 | 0.025 | 38.00 | 12.54 | 0.004 |
| Just Because | 26.67 | 13.14 | 0.048 | 69.33 | 21.93 | 0.003 |
| Player's Club | 45.00 | 8.59 | 0.000 | 85.33 | 11.00 | 0.000 |
| Men's Club | 63.00 | 21.18 | 0.005 | 64.67 | 23.01 | 0.007 |
| Gentlemen's Club | 101.33 | 8.47 | 0.000 | 94.33 | 10.42 | 0.000 |
| Temptations | 6.33 | 7.09 | 0.376 | 26.33 | 12.21 | 0.037 |
| McDonald's | 82.33 | 5.01 | 0.000 | 276.00 | 8.72 | 0.000 |
| **Group 2** | | | | | | |
| Crazy Horse | 91.00 | 9.41 | 0.000 | 113.67 | 16.12 | 0.000 |
| Tattletales | 47.67 | 7.84 | 0.000 | 59.33 | 8.06 | 0.000 |
| VIP Showgirls | 6.00 | 5.37 | 0.270 | 34.33 | 5.50 | 0.000 |
| Office Lounge | 34.67 | 9.88 | 0.001 | 97.33 | 12.05 | 0.000 |
| Twin Peeks | 19.33 | 7.15 | 0.010 | 20.33 | 8.66 | 0.024 |
| Kentucky Fried Chicken | 65.00 | 16.53 | 0.000 | 137.67 | 23.96 | 0.000 |
| **Group 3** | | | | | | |
| Uptown Cabaret | 93.00 | 19.65 | 0.000 | 109.00 | 13.62 | 0.000 |
| Paper Doll Lounge | 16.33 | 5.91 | 0.008 | 21.33 | 7.28 | 0.005 |
| Baby Dolls | −4.00 | 5.19 | 0.445 | −18.67 | 6.96 | 0.010 |
| Polo Club | 28.67 | 6.31 | 0.000 | 65.33 | 17.76 | 0.001 |
| Leather 'n Lace South | 31.00 | 6.09 | 0.000 | 79.00 | 11.86 | 0.000 |
| Leather 'n Lace North | 21.33 | 5.68 | 0.001 | 10.67 | 6.58 | 0.112 |
| Diamond Club | 8.67 | 5.86 | 0.146 | 90.33 | 14.36 | 0.000 |
| Platinum Club | 30.33 | 8.30 | 0.001 | 68.00 | 6.68 | 0.000 |
| Exxon | 20.00 | 5.60 | 0.001 | 37.33 | 11.70 | 0.003 |
| Constant | 2.91 | 5.20 | 0.578 | 19.26 | 5.93 | 0.002 |
| R-Squared | 0.91 | | | 0.95 | | |

NOTE: The reference site is the Fancy Cat Club.

McDonald's are 82.33 and 276 for the 500- and 1,000-foot radii, respectively. These coefficients can be interpreted as indicating that, net of the overall constant and year-specific terms for the regression equations, the McDonald's site is expected to have about 82 and 276 more crime events reported on average per year than the Fancy Cat Club, respectively, for the two perimeters. For the 500-foot perimeter, the coefficient for McDonald's is substantially larger than those for all of the adult nightclubs in Group 1 except for the Gentlemen's Club. In the case of the 1,000-foot perimeter, the McDonald's coefficient is much larger than the coefficients of all of the club sites, including the Gentlemen's Club.[15]

---

[15] The fact that the regression coefficient estimated for the Gentlemen's Club for the 1,000-foot perimeter (94.33) is smaller than that for this club for the 500-foot perimeter (101.33) is not an error. To calculate the unconditional expected value for the club and control site locations, one must add the regression coefficient for the site to the overall constant term for the regression equation. Making this calculation, it can be seen that the average expected number of events across the three years for the 1,000-foot perimeter for the Gentlemen's Club is about 114 as compared to 104 for the 500-foot perimeter.

Consider next the adult nightclub and control sites in Group 2. Recall that these are medium-crime risk locations. In this group, the control site is the Kentucky Fried Chicken restaurant, which has an estimated regression coefficient of 65 for the 500-foot perimeter and 137.67 for the 1,000-foot perimeter. For the 500-foot perimeter around the sites, the KFC regression coefficient is substantially larger than those of all of the club locations in this group except those for the Crazy Horse Club. The same is true for the coefficients for the 1,000-foot perimeter model.

The adult nightclub and control sites in Group 3, the low-crime risk locations, were then examined. In this group, the Exxon service station is the control site. It has an estimated regression coefficient of 20 crime events for the 500-foot perimeter and 37.33 for the 1,000-foot perimeter. For the 500-foot perimeter around the sites, this coefficient is larger than those estimated for three adult nightclubs (Paper Doll Lounge, Baby Dolls, and Diamond Club), about the same as one club (Leather 'n Lace North), somewhat smaller than those for three club sites (Polo Club, Leather 'n Lace South, and Platinum Club), and much smaller than that for one club (Uptown Cabaret). For the 1,000-foot perimeter, the estimated regression coefficient for Exxon is larger than those for three clubs (Paper Doll Lounge, Baby Dolls, and Leather 'n Lace North) and smaller than those for five clubs (Uptown Cabaret, Polo Club, Leather 'n Lace South, Diamond Club, and Platinum Club).

We next turn to an assessment of the statistical significance of the differences between the net effects (i.e., the estimated partial regression coefficients) of the three groups of adult nightclub sites as compared to the corresponding control sites. For this, we estimated a set of constrained regression models, as reported in Tables 5A and 5B. Table 5A reports the results for the 500-foot perimeters around the sites; Table 5B reports the corresponding results for the 1,000-foot perimeters.

Each of these constrained models commenced with a corresponding full model, like that displayed in Table 4 for Total UCR Crime incidents reported within the 500-foot perimeter. We then constrained all of the adult clubs in one of the groups, namely Group 1, to have a common partial regression coefficient. For Total UCR Crimes, this group coefficient, 29.14, is reported in the first column of coefficients in Table 5A. The constrained model also estimated a partial regression coefficient for the Group 1 control site, the McDonald's fast food restaurant. This coefficient, 73.14, is reported in the second column of coefficients of Table 5A. An F-ratio then was computed for the null hypothesis that the common regression coefficient for the Group 1 sites is equal to the coefficient for the corresponding control site. This statistic, 27.60, is given in the third column of coefficients of Table 5A. The fourth

**Table 5A.** Summary Results of F-Tests Comparing the Equivalence of the Club Group Dummy Variables and the Matched Control Site: 500-Foot Radius

| Model | Group | Group Coefficient | Control Coefficient | F-Value | $p$-Value | Model R-Squared |
|---|---|---|---|---|---|---|
| Total Crimes | | | | | | |
| | 1 | 47.05 | 128.33 | 13.40 | 0.0006 | 0.65 |
| | 2 | 65.33 | 106.00 | 1.70 | 0.1982 | 0.73 |
| | 3 | 43.67 | 44.33 | 0.00 | 0.9582 | 0.67 |
| Total UCR Crimes | | | | | | |
| | 1 | 29.14 | 73.67 | 27.60 | 0.0000 | 0.59 |
| | 2 | 39.73 | 65.00 | 1.96 | 0.1682 | 0.73 |
| | 3 | 28.17 | 20.00 | 1.36 | 0.2487 | 0.66 |
| UCR Violent Crimes | | | | | | |
| | 1 | 8.14 | 15.00 | 11.15 | 0.0016 | 0.61 |
| | 2 | 4.47 | 27.67 | 6.15 | 0.0167 | 0.78 |
| | 3 | 4.38 | 2.67 | 0.34 | 0.5623 | 0.51 |
| UCR Property Crimes | | | | | | |
| | 1 | 21.00 | 58.67 | 21.63 | 0.0000 | 0.53 |
| | 2 | 35.27 | 37.33 | 0.02 | 0.8790 | 0.69 |
| | 3 | 23.79 | 17.33 | 1.95 | 0.1682 | 0.73 |
| Sex Crimes | | | | | | |
| | 1 | 0.29 | 0.67 | 0.82 | 0.3689 | 0.30 |
| | 2 | 0.20 | 0.00 | 1.91 | 0.1738 | 0.40 |
| | 3 | 0.50 | 0.67 | 0.03 | 0.8572 | 0.17 |
| Other Crimes | | | | | | |
| | 1 | 17.71 | 54.33 | 4.16 | 0.0468 | 0.65 |
| | 2 | 25.47 | 41.00 | 1.31 | 0.2579 | 0.67 |
| | 3 | 15.33 | 24.00 | 1.52 | 0.2227 | 0.62 |

NOTE: For Group 1, the reference site is the Diamond Club. For Groups 2 and 3, the reference site is the Fancy Cat Club.

column of coefficients reports the statistical significance of the F-ratio. For Group 1 Total UCR Crimes, it can be seen in Table 5A that the estimated difference of the partial regression coefficients for Total UCR Crimes for the Group 1 adult clubs and the control site for this group is highly statistically significant, that is, has a $p$-value or estimated probability of occurrence that is equal to zero to four decimal places. In other words, the numerical difference of the estimated partial regression coefficients for the Group 1 sites and the control site for Group 1 is not likely to be due to chance variations. Furthermore, the estimated coefficients show that the adult club sites in Group 1 are highly likely to have a net number of Total UCR Crimes that is much smaller than the control site.

Examining all of the estimated coefficients, F-ratios, and $p$-values in Table 5A, it can be seen that a pattern is readily apparent: for four of the crime categories—Total Crimes, Total UCR Crimes, UCR Violent Crimes, and UCR Property Crimes—the numerical differences of the estimated partial regression coefficients for the Group 1 sites (the adult nightclubs located in relatively high-crime risk areas) and the coefficients for the control site (the McDonald's fast food restaurant) are highly statistically significant. That is, these numerical differences are not likely due to chance fluctuations in the

**Table 5B.** Summary Results of F-Tests Comparing the Equivalence of the Club Group Dummy Variables and the Matched Control Site: 500-Foot Radius

| Model | Group | Group Coefficient | Control Coefficient | F-ratio | $p$-value | Model R-squared |
|---|---|---|---|---|---|---|
| Total Crimes | | | | | | |
| | 1 | $-55.67$ | 257.67 | 151.77 | 0.0000 | 0.87 |
| | 2 | 104.67 | 239.00 | 8.17 | 0.0063 | 0.87 |
| | 3 | 78.33 | 74.33 | 0.03 | 0.8561 | 0.79 |
| Total UCR Crimes | | | | | | |
| | 1 | $-36.33$ | 185.67 | 408.27 | 0.0000 | 0.87 |
| | 2 | 65.00 | 137.67 | 7.97 | 0.0069 | 0.87 |
| | 3 | 53.13 | 37.33 | 1.24 | 0.2698 | 0.79 |
| UCR Violent Crimes | | | | | | |
| | 1 | 1.62 | 23.00 | 30.57 | 0.0000 | 0.67 |
| | 2 | 7.20 | 51.67 | 16.13 | 0.0002 | 0.89 |
| | 3 | 6.54 | 3.33 | 0.89 | 0.3508 | 0.76 |
| UCR Property Crimes | | | | | | |
| | 1 | $-37.95$ | 162.67 | 344.71 | 0.0000 | 0.87 |
| | 2 | 57.80 | 86.00 | 3.10 | 0.0849 | 0.86 |
| | 3 | 46.58 | 34.00 | 1.13 | 0.2936 | 0.79 |
| Sex Crimes | | | | | | |
| | 1 | 0.67 | 0.67 | 0.00 | 1.0000 | 0.18 |
| | 2 | 0.67 | 2.33 | 0.52 | 0.4734 | 0.49 |
| | 3 | 0.67 | 1.67 | 0.46 | 0.4992 | 0.43 |
| Other Crimes | | | | | | |
| | 1 | $-19.71$ | 71.67 | 31.32 | 0.0000 | 0.81 |
| | 2 | 39.27 | 100.33 | 7.75 | 0.0077 | 0.82 |
| | 3 | 24.92 | 36.00 | 1.11 | 0.2973 | 0.74 |

NOTE: For group 1, the reference site is the Diamond Club. For groups 2 and 3, the reference site is the Fancy Cat club.

data. In other words, the expected numbers of crime events for these four categories of crime reported within 500-foot perimeters of the Group 1 adult nightclub locations are much lower than those reported within this perimeter for the control site. And these differences are not likely to be due to random or chance fluctuations.

For these four categories of crime incidents, the numerical differences of the coefficients for the Group 2 (clubs located in medium-crime risk areas) and Group 3 (clubs located in low-crime risk areas) adult nightclub sites and their respective control sites are not nearly as large and tend not to reach statistical significance. An exception is the Group 2 constrained model for UCR Violent Crimes, which has an F-ratio of 6.15. This F-ratio has a $p$-value or probability of occurrence under the null hypothesis of no difference in the regression coefficients for the club and control sites of .0167, which is statistically significant at the .05 level. Generally, however, the main conclusion from Table 5A for these four crime categories is that, within the 500-foot perimeters, there are significantly lower numbers of crime incidents reported around the Group 1 adult nightclubs than around the corresponding control site. For the Group 2 and Group 3 club sites, the

differences in the partial regression coefficients tend not to be as large and not attain statistical significance.

For the other two crime categories in Table 5A—Sex Crimes and Other Crimes—there is less of a pattern to the group differences. Recall that the number of sex crimes reported per year at any of the adult nightclub or control sites is very small. It is therefore not surprising that none of the numerical differences of regression coefficients for the groups of club sites and their corresponding control sites attain statistical significance. For the Other Crimes category, the numerical differences of the estimated regression coefficients for both the Group 1 clubs and their control site attain statistical significance. Even for these crimes, however, the numerical values of the regression coefficients for the Group 2 club locations (25.47) and their control site (41) indicate a larger expected number of crime incidents—about 16 per year—within the 500-foot perimeters around the club locations than around the control site. But the variability within the Group 2 club locations is sufficiently large that this numerical difference is not statistically significant.

What is the effect on the club group versus control site comparisons of enlarging the perimeters for crimes reported to 1,000 feet around the sites? Recall that this allows for the inclusion of more crime incidents from the neighborhoods around the club and control locations. Table 5B provides the answers. For four of the six crime categories—Total Crimes, Total UCR Crimes, UCR Violent Crimes, and Other Crimes—the estimates in Table 5B show that the adult club sites have estimated partial regression coefficients that are much smaller than those of the corresponding control sites for the Group 1 and Group 2 clubs. And these numerical differences all are statistically significant at the .05 level. Indeed, most of the F-ratios have $p$-values much smaller than .05. The estimated partial regression coefficients for the UCR Property Crimes category show a similar pattern of differences of club and control sites for the Group 1 clubs. However, while the coefficient difference is in a similar direction for the Group 2 clubs and control site for this crime category for the Group 2 clubs, the corresponding F-ratio has a $p$-value of .08, which does not exceed the .05 level of statistical significance. For the fifth crime category, Sex Crimes, the numerical differences between expected numbers of incidents reported for the club and control sites again are small and statistically insignificant. In brief, the main effect of enlarging the perimeters around the adult nightclub and control site locations from 500 to 1,000 feet for most categories of reported crime incidents is that the gaps in the expected numbers of crime incidents become very large and highly statistically significant for both the high- and the medium-crime risk locations.

## Conclusion

On the basis of the findings reviewed above, it must be concluded that there is little evidence in the data to support the main hypothesis stated earlier. Recall that we asked: once variables known to be related to crime events suggested by social disorganization and routine activities theories have been taken into account, does the presence of an adult business in a localized area increase the concurrence in space and time of offenders motivated to commit crimes together with suitable targets for the crimes in the absence of guardians capable of preventing or deterring the crimes? We found that, at least in Charlotte, North Carolina, it is not the case that the presence of an adult nightclub increases the number of crime incidents reported in localized areas surrounding the club as compared to the number of crime incidents reported in comparable localized areas that do not contain an adult nightclub.

Indeed, the empirical data and analyses reported above imply the opposite, namely, that the nearby areas surrounding the adult nightclub sites have smaller numbers of reported crime incidents than do corresponding areas surrounding the three control sites studied. Furthermore, it must be emphasized again that the control sites were chosen solely by matching set demographic characteristics (which were chosen on the basis of crime opportunity/routine activities theory and research) of the census block or blocks containing the adult nightclubs and control sites. Thus, these findings could not have been biased by the choice of the control sites. Further, although not incorporated into the formal model, examination of the vehicular traffic patterns and number of commercial establishments surrounding the adult businesses yielded no consistent pattern of findings. There were not, for example, consistently more business targets for crime or greater numbers of human traffic passing through the control areas that would account for the greater numbers of crimes in these locations compared to the adult locations.

Our regression analyses help to identify more precisely exactly where the adult nightclubs with relatively low numbers of reported crime incidents are located. Specifically, for local areas around the adult nightclub and control sites defined by 500-foot radii, the regression analyses show that it is in the high-crime risk locations in which the numbers of reported crimes are significantly lower than in the corresponding control site. In the medium- and low-crime risk club and control site locations, the regression models estimate smaller effect coefficients for crime risk of the club locations than for the corresponding control sites. However, the numerical differences of the coefficients for these two more moderate-crime

risk groups versus their control sites generally do not reach standard levels of statistical significance. The regression analyses for the clubs and control sites defined by the 1,000-foot radii (which allow for the inclusion of more crime incidents from the neighborhoods around the sites) show similar results for the high-crime risk locations. In addition, the 1,000-foot perimeter regression analyses similarly show that the medium-crime risk locations generally have significantly lower numbers of crime incidents that those reported for the corresponding control site.

Our analyses of the overall mean numbers of crime incidents (for the adult nightclubs compared to the control sites) for the years 1998–2000 suggest that Charlotte, like many cities across the country and the United States as a whole (U.S. Department of Justice, Federal Bureau of Investigation 2000), was experiencing declining numbers of crime incidents during this period. These analyses show that the overall lower numbers of crime incidents reported in the local areas around the adult nightclubs than around the control sites declined across the three years. That is, the differences decreased, thus indicating that, as the overall level of crime in Charlotte declined from 1998 to 2000, the numbers of crime incidents reported in local areas around the control sites declined toward the lower levels already present in the local areas surrounding the adult club sites. In other words, the areas around the adult club sites already had relatively low levels of reported crime in 1998. Then, as the overall levels of crime in Charlotte declined in 1999 and 2000, the numbers of crime incidents reported around the club sites remained at these low levels. But, during 1999 and 2000, the numbers of crime incidents reported around the control sites declined along with crime levels in the city as a whole and toward the already low levels of the locations around the club sites.

**Implications for Crime Opportunity and Social Disorganization Perspectives**

What accounts for these findings? In contradiction to the hypothesis stated earlier in this article, why do the local areas surrounding the adult nightclubs in Charlotte have lower numbers of reported crime incidents than corresponding areas around the control sites? Why do we not find empirical evidence of the social disorganization/crime opportunity spillover of these adult establishments of the type cited at the outset of this article?

First, the adult nightclub business in the late-1990s in many respects may be quite unlike that of the 1960s and 1970s when these establishments were relatively new forums of entertainment in American society. As noted in the introduction to this article, adult nightclubs have been subjected to over two decades of

municipal zoning restrictions across the country, and they usually must comply with many other regulations as well. These clubs do not appear to be locations where potential offenders gather to prey on desirable targets in the absence of crime suppressors, such as employees whose role is to ensure the safety of customers and the maintenance of order within the clubs.

The establishments themselves have evolved more closely into legitimate businesses—establishments with management attention to profitability and continuity of existence. To meet these objectives, it is essential that the management and/or owners of the clubs provide their customers with some assurance of safety. Accordingly, adult nightclubs, including those in Charlotte, often appear to have better lighting in their parking lots and better security surveillance than is standard for non-nightclub business establishments. These may be factors producing fewer crime opportunities and lower numbers of reported crime incidents in the surrounding areas of the clubs.

The extensive management of the parking lots adjoining the exotic dance nightclubs, in many cases including guards in the parking lots, valet parking, and other control mechanisms, may be especially effective in reducing the possibility of violent disputes in the surrounding area. In addition, unlike other liquor-serving establishments (bars and taverns that do not offer adult entertainment) that may be present in the control areas, violent disputes in the areas surrounding exotic dance clubs between men over unwanted attention by other males to dates or partners are minimal due to the fact that the majority of patrons attend the clubs without female partners. Thus, the possibility of interpersonal aggression may be greatly reduced in the vicinity of adult dance clubs, compared to most other locations where adults congregate, such as bars or taverns that do not feature adult entertainment.

Findings from a qualitative, anthropological case study of several of the exotic dance clubs included in this study undertaken by Hanna (2001) are consistent with these speculations. Three adult clubs were chosen to reflect three different kinds of economically developed neighborhoods. Neighborhood residents had few complaints about the adult businesses and most neighboring business owners were quick to note that the reason they felt the adult clubs had few negative effects was because of very efficient management of the property and facilities.

A related, but alternative, explanation might also be considered. Perhaps victims of crime in areas surrounding adult clubs are not motivated to report crime incidents to the police. If this were the case, there may not be stable crime reporting across study and control sites. It could be that, compared to the control sites, more of the crime that occurs in the adult dance club zone goes

unreported. It seems plausible that many of the victims of crime in these areas might not want to draw attention to themselves. This may be a plausible alternative explanation for crimes such as personal assault and robbery; it would not be a reasonable explanation for burglary, serious property crimes in adjacent buildings, murder, or serious personal assault.

Finally, it is important to point out that imperfections in matching control and adult club areas may always be advanced to account for the findings here or for any other quasi-experimental study. While we attempted to match the sites on variables known to be related to crime as suggested by criminological theory and further examined business and traffic patterns and found no consistent pattern that could plausibly account for the results, it is never possible, logically, to rule out all alternative explanations based on some unobserved variable to match all possible variables. Indeed, we always fail to match on some unspecified variable. The challenge is to identify that variable before hand which may more reasonably account for the findings.

One specific difference between control and club sites may be worth noting, however, and could be the basis for further study. We chose specific business locations in the center of the control areas for our crime event counts, and this yielded two popular fast food restaurants and a gas station as control sites. There might be more appropriate control sites for comparison given the context of the secondary effects legal arguments.

Conceptually, it may be more appropriate to compare adult club sites with non-adult club sites so that one can determine whether the type of club activity affects the level of crime. This comparison may be implicit (if not explicit) in the minds of citizens and justices when considering whether an adult club should be allowed to locate in a particular area. Methodologically, using basic service type businesses such as fast food restaurants as control sites may confound the comparisons being made in the research, even if they are located in areas equivalent to those in which adult dance clubs are located.

There is an empirical study conducted in another locale, which may allay the concern that the control areas chosen in the present study would yield abnormally high crime rates relative to adult club locations. The Board of Commissioners of Fulton County, Georgia (Atlanta area) attempted to address the assumption that the consumption of alcoholic beverages in adult entertainment establishments may contribute to increased crime in the vicinity of such adult entertainment establishments. This study, conducted by the Fulton County Police Department, compared calls for service to the police that resulted in an arrest or a report in the vicinity of six liquor-serving establishments that featured adult entertainment

and six liquor-serving establishments that did not include adult entertainment (Fulton County Police 1997). The findings indicated substantially more calls for service to the police to liquor establishments that *did not* provide adult entertainment compared to liquor establishments featuring adult entertainment. These findings lend credibility to the outcome of the present study and suggest that the results are not a function of improperly matched control and test sites. Unfortunately, the Fulton County study did not match test and control areas on demographic variables known to be related to crime and is therefore methodologically limited.

The most informative approach would be to examine crime incidents surrounding adult businesses while simultaneously controlling for all other known or suspected causes of crime. This would include taking into account variables such as land use, social disorganization and crime opportunity, traffic patterns, and the presence or absence of alcohol-serving establishments. Future research should be devoted to the study of secondary effects of adult businesses with these methodological refinements.

## Legal and Policy Implications

It has been demonstrated through this study that there may be a sufficient basis for a serious challenge to the assumption made by municipalities and the courts that there is an empirical relationship between exotic dance businesses and at least one kind of negative secondary effect, specifically increases in crime. Further, this conclusion is based on research procedures that adhere more thoroughly to long-standing and well-accepted methodological procedures for insuring sound scientific conclusions than previous studies undertaken by municipalities across the country.

In *Pap's*, Justice O'Connor provides room for legal challenges, based on the collection of empirical evidence, to the assertions made by municipalities regarding a relationship between adverse secondary effects and nude dancing. In order to remain consistent with the Supreme Court's holding in *Pap's*, lower courts will be required to consider the methodological legitimacy of evidence of a relationship between negative secondary effects and the subject businesses collected both by governments and by those business owners who attempt to challenge government ordinances restricting their establishments.

Further, in *Alameda*, Justice O'Connor and others further refined her notions of how municipalities' assumptions about adult businesses and secondary effects may be challenged by admonishing cities that they cannot engage in shoddy data collection or reasoning in coming to the conclusion that adult businesses cause these effects. In evaluating the quality of the data collected and the

reasoning of municipalities, a standard such as that laid out in *Daubert* for the admissibility of scientific evidence may best serve the interests of justice.

The study presented here, we would argue, meets such standards for admissibility. The application of such standards, bolstered by the Court's opinion in *Alameda*, may force courts to reject studies that have been previously relied upon as evidence of negative secondary effects, and require new, more methodologically sound studies to demonstrate the necessity for regulations directed at the exotic dance industry.

### Challenging Common Sense Assumptions About Adverse Secondary Effects

This investigation suggests it may be best not to assume adverse secondary effects in the form of greater crime emanate from adult businesses in a community. Further tests of this assumption on a community-by-community basis are not tremendously difficult. Justice Souter noted in his opinion in *Alameda*:

> . . . stress should be placed on the point that requiring empirical justification of claims about property value or crime is not demanding anything Herculean. Increased crime, like prostitution and muggings, and declining property values in areas surrounding adult businesses, are all readily observable, often to the untrained eye and certainly to the police officer and urban planner. These harms can be shown by police reports, crime statistics, and studies of market value . . .

And precisely because this sort of evidence is readily available, Justice Souter noted:

> Reviewing courts need to be wary when the government appeals, not to evidence, but to uncritical common sense in an effort to justify such a zoning restriction. It is not that common sense is always illegitimate in First Amendment demonstration. The need for independent proof varies with the point that needs to be established, and zoning can be supported by common experience when there is no reason to question it. But we must be careful about substituting common assumptions for evidence, when the evidence is as readily available as public statistics and municipal property valuations, lest we find out when the evidence is gathered that assumptions are highly debatable.

In fact, in the *Alameda* case, Justice Souter has formulated a legal test based on empirical verification. He argues that the weaker the empirical evidence concerning secondary effects, the more likely the governmental action is not content neutral. He states:

. . . The lesson is that the lesser scrutiny applied to . . . zoning restrictions is no excuse for government failure to provide a factual demonstration for claims it makes about secondary effects; on the contrary, this is what demands the demonstration. And finally the weaker the demonstration of facts distinct from disapproval of the adult viewpoint, the greater the likelihood that nothing more than condemnation of the viewpoint drives the legislation. The danger is that without empirical verification the city has a right to experiment with a First Amendment restriction in response to a problem of increased crime that the city has never shown to be associated with adult businesses.

However welcome, this is an admittedly strong position in favor of empirical evidence to substantiate a legal assumption about human behavior. At the very least, however, a study like the one reported here could have the effect of shifting the burden of proof to municipalities to demonstrate that their theory of adverse secondary effects is correct.

## References

Babbie, E. (1999) *The Basics of Social Research*. Belmont, CA: Wadsworth.

Campbell, D. T., & J. C. Stanley (1963) *Experimental and Quasi-Experimental Designs for Research*. Chicago: Rand McNally.

Cohen, L. E., & M. Felson (1979) "Social Change and Crime Rate Trends: A Routine Activity Approach," 44 *American Sociological Rev.* 588–608.

Cohen, J., W. Gorr, & A. Olligschlaeger (1993) *Modeling Street-Level Illicit Drug Markets*, Working paper 93–64, The H. John Heinz III School of Public Policy and Management. Pittsburgh: Carnegie Mellon University.

Cohen, L. E., J. R. Kluegel, & K. C. Land (1981) "Social Inequality and Predatory Criminal Victimization: An Exposition and Test of a Formal Theory," 46 *American Sociological Rev.* 505–24.

Davidson, R., & J. G. McKinnon (1993) *Estimation and Inference in Econometrics*. New York: Oxford Univ. Press.

Duffala, D. C. (1976) "Convenience Stores, Armed Robbery, and Physical Environmental Features," 20 *American Behavioral Scientist* 227–46.

Engstad, P. A. (1975) "Environmental Opportunities and the Ecology of Crime," in R. A. Silverman & J. J. Teevan, eds., *Crime in Canadian Society*. Toronto: Butterworths.

Fulton County Police (1997) *Study of Calls for Service to Adult Entertainment Establishments Which Serve Alcoholic Beverages, January 1995–May 1997*. Report to the Board of Commissioners of Fulton County, Georgia.

Hanna, J. L. (2001) "Reality and Myth, What Neighbors Say About Exotic Dance Clubs: A Case Study in Charlotte, North Carolina," Unpublished manuscript, Univ. of Maryland.

Hannan, M. T., & A. A. Young (1977) "Estimation in Panel Models: Results on Pooling Cross-Sections and Time Series," 1977 *Sociological Methodology* 52–83.

Hsiao, C. (1986) *Analysis of Panel Data: Econometric Society Monographs*. New York: Cambridge.

Linz, D., & B. Paul (2002) "Testing Assumptions Made by the Supreme Court Concerning the Negative Secondary Effects of Adult Businesses: A Quasi-

Experimental Approach to a First Amendment Issue," Paper presented at the 2002 International Communication Association, Acapulco, Mexico.

Long, J. S., & H. Ervin (2000) "Correcting for Heteroskedasticity with Heteroskedasticity-Consistent Standard Errors in the Linear Regression Model: Small Sample Considerations," 54 *The American Statistician* 217–24.

McKinnon, J. G., & H. White (1985) "Some Heteroskedasticity-Consistent Covariance Matrix Estimators with Improved Finite Sample Properties," 29 *J. of Econometrics* 53–57.

Miethe, Terance D., & David McDowall (1993) "Contextual Effects in Models of Criminal Victimization," 71 *Social Forces* 741–59.

Miethe, T. D., & R. F. Meier (1994) *Crime and Its Social Context: Toward an Integrated Theory of Offenders, Victims, and Situations*. Albany, NY: State Univ. of New York Press.

Paul, B., D. G. Linz, & B. J. Shafer (2001) "Government Regulation of Adult Businesses Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects," 6 *Communications in Law & Policy* 355–92.

Planning Department, City of Phoenix, Arizona (1979) *Relation of Criminal Activity and Adult Businesses*.

Popper, K. (1959) *The Logic of Scientific Discovery*. New York: Basic Books.

Roncek, D. W., & P. A. Maier (1991) "Bars, Blocks, and Crimes Revisited: Linking the Theory of Routine Activities to the Empiricism of 'Hot Spots,'" 29 *Criminology* 725–53.

Sherman, Lawrence W., Patrick R. Gartin, & Michael E. Buerger (1989) "Hot Spots of Preditory Crime: Routine Activities and the Criminology of Place," 27 *Criminology* 27–55.

Singleton, R. A., Jr., B. C. Straits, & M. M. Straits (1993) *Approaches to Social Research*. London: Oxford Univ. Press.

Smith, W. R., S. G. Frazee, & E. L. Davison (2000) "Furthering the Integration of Routine Activity and Social Disorganization Theories: Small Units of Analysis and the Study of Street Robbery as a Diffusion Process," 38 *Criminology* 489–524.

Stark, Rodney (1987) "Deviant Places: A Theory of the Ecology of Crime," 25 *Criminology* 893–909.

U.S. Department of Justice, Federal Bureau of Investigation (2000) *Crime in the United States, 1999*. Washington, DC: U.S. Government Printing Office.

White, H. (1980) "A Heteroskedastic-Consistent Covariance Matrix and a Direct Test of Heteroskedasticity," 48 *Econometrica* 817–38.

# Peep Show Establishments, Police Activity, Public Place, and Time: A Study of Secondary Effects in San Diego, California

**Daniel Linz**
University of California, Santa Barbara

**Bryant Paul**
Indiana University

**Mike Z. Yao**
University of California, Santa Barbara

*An empirical study was undertaken in San Diego, California, to test assumptions made by the government and by conservative religious policy advocates that there is a greater incidence of crime in the vicinity of peep show establishments. We asked two questions: (a) Is criminal activity in San Diego particularly acute at peep show establishments compared to surrounding control locations? and (b) Is criminal activity in San Diego disproportionately greater at or near peep show establishments between the hours of 2 a.m. and 6 a.m. compared to other times of the day? The levels of crime activity and the expenditure of police resources were examined by measuring the number of calls-for-service (CFSs) to the police within a 1,000-ft. area on either side of the peep show establishments and comparably-sized control areas beyond the immediate 1,000-foot area. A more focused "late-night" (2 a.m. to 6 a.m.) analysis was also undertaken. The results showed no reliable evidence of differences in crime levels between the control and test areas, nor was there any evidence of disproportionately greater amounts of crime within the 2 a.m. to 6 a.m. time period in the areas surrounding the peep show establishments. We concluded that San Diego does not have a problem with crime at the peep show establishments generally, nor is there a heightened problem with crime during the 2 a.m. to 6 a.m. period. We discuss the implications of assuming that peep show establishments are associated with negative effects in the community and the possibility of viewpoint discrimination against sex communication.*

The members of the Community Defense Counsel of Scottsdale, Arizona, a politically conservative, religious-based organization devoted to the strict regulation or elimination of sex businesses, have a theory about sexual communication and place. They maintain that the neighborhoods or business districts surrounding sex businesses typically suffer declines in property values and increases in crime, especially sex crimes (Community Defense Counsel, 2004). On its webpage, the Community Defense Counsel offers the following in a section of the page entitled *Answers to frequently asked questions about sexually oriented businesses*: "Communities that have been the most effective in protecting their neighborhoods have been those that use a combination of aggressive enforcement of criminal obscenity laws and . . .stringent time, place, and manner regulations."

We examined the so-called "secondary effects" of adult peep show establishments in a community both during the day and after hours. The city of San Diego was chosen for study because of an ordinance passed in October 2000 that

made it unlawful for any person to operate a "peep show booth" or "peep show device" between the hours of 2:00 a.m. and 6:00 a.m. The city claimed—consistent with the sex communication, place, and time theory advanced above—that the ordinance was needed to further a substantial government interest in combating crime in the geographical locations surrounding these adult businesses, particularly during late-night hours. We obtained empirical evidence and used it to test the government's and religious conservatives' assumptions of the harms associated with sexually-oriented adult businesses. Specifically, we asked two questions: is criminal activity in San Diego particularly acute at peep show establishments compared to surrounding control locations, and is criminal activity in San Diego disproportionately greater at or near peep show establishments between the hours of 2 a.m. and 6 a.m. compared to other times of the day?

### Research on Sex Entertainment Establishments in the Community

The place of adult entertainment establishments in the community, the characteristics of those who patronize them, and their impact on the community have been investigated by sex researchers from several points of view. One perspective examines the sexual interests and behavior of the individual patrons of adult businesses. Here, researchers have not focused on peep shows, but have

*Note.* This manuscript is a revised version of a paper presented at the 2004 Society for the Scientific Study of Sexuality Western Region Conference in San Diego, California, and an earlier report prepared at the behest of the plaintiffs in the case *Mercury Books, Inc., Plaintiffs, vs. City of San Diego, Defendant,* in the United States District Court for the Southern District of California.

Address correspondence to Daniel Linz, Department of Communication and Law and Society Program, University of California, Santa Barbara, CA, 93106; e-mail: linz@comm.ucsb.edu.

examined men's objectification of women through the use of materials commonly found at these venues. For example, researchers have examined exposure to these materials as a possible inhibitor of intimacy with women (Brooks, 1995), and they have examined men's attitudes toward non-relational sex given patronage of adult businesses (Good & Sherrod, 1997).

The second approach might be termed the sociology of the adult peep show. For example, the social environment of the adult bookstore and video peep show in a large Midwestern city was examined using a dramaturgical perspective based on covert participant observation (Tewksbury, 1990). A similar approach was taken by Frank (2003), who investigated the appeal of modern strip clubs for certain groups of late 20th century, heterosexually-identified American men.

A third approach, the feminist perspective, has assumed men are motivated to use the sex industry, including adult peep shows, out of a desire to maintain sexual mastery and power over women (Bartky, 1990; Edwards, 1993). These researchers note that although they are euphemistically labeled "adult entertainment," most of these places in the community are sources of commoditized sex. In this view, strip clubs, pornographic bookstores, peep shows and erotic massage parlors are primarily aimed at male consumers and perpetuate male domination and female oppression.

A fourth approach, perhaps best described as the communication/message effects approach, has included empirical investigation of pornographic content of adult videos and magazines found in adult bookstores and peep show arcades (Yang & Linz, 1990) and addressed methodological issues in the content analysis of pornography (Linz & Donnerstein, 1988). Other research has investigated the effects of exposure to sexually explicit materials and attitudes toward rape and other forms of sexual violence (Linz, 1989; Linz & Malamuth 1993; Malamuth, Heavey, & Linz, 1993).

Finally, other scholars have examined the impact of businesses such as peep shows on the culture of a community. Mosco (in press), for example, examined the impact of closing Times Square peep shows in New York City, and the marginalization of sex entertainment venues in the community through the process of urban renewal.

In this study, we examined peep shows from a different perspective. We empirically tested assumptions made by religious conservatives and lawmakers regarding the effects of sex businesses on crime and disorder in the space surrounding them.

### Time, Place, and Manner Restrictions

The legal rationale for regulating peep show establishments was laid out most completely in *City of Renton v. Playtime Theatres, Inc.* (1986). The Supreme Court held that a Renton city ordinance could not be aimed at the content of the films shown at adult theaters. However, the Court stated that the ordinance would be upheld as long as the city of Renton showed that its ordinance was designed to serve a substantial government interest, such as reducing crime. Recently, in *City of Los Angeles v. Alameda Books, Inc., et al.* (2002), the Supreme Court endorsed the secondary effects justification laid out in *Renton* but cautioned that municipalities must find a way to address the alleged secondary effects without reducing the availability of sex-related messages through the elimination of adult businesses. Justice Kennedy asserted in *Alameda Books* that the government cannot reduce secondary effects by reducing speech.

The Supreme Court has also considered the legality of attempts to regulate the form or manner of sexual messages within adult businesses. Several anti-nudity ordinances have been passed by municipalities or states. In 1991, the Court in *Barnes v. Glens Theatre, Inc.* held that the state of Indiana could regulate public nudity by requiring that dancers wear pasties and g-strings. In 2000, in the decision *City of Erie v. Pap's A.M.*, the Court again held that municipalities have the right to pass anti-nudity ordinances on assumption that combating negative secondary effects associated with adult businesses was a legitimate basis for the imposition of such regulations.

Limitations on the times when adult businesses may operate represent another form of restriction. The California State Supreme Court addressed the constitutionality of time restrictions in *People v. Glaze* (1980). The *Glaze* case was concerned with violation of a municipal ordinance requiring picture arcades to remain closed between the hours of 2 a.m. and 9 a.m. The Court held that when an ordinance not uniformly applicable to all commercial enterprises involves restrictions on activities protected by the First Amendment, the government must bear the burden of showing that the regulation is narrowly and explicitly drawn and necessary to further a legitimate government interest. The Court noted that the record before it failed to show either that criminal activity is particularly acute at picture arcades, or that it is prevalent between the hours 2 a.m. and 9 a.m.

The Ninth Circuit Court of Appeals has taken a different position on time-based restrictions of sex speech (*Center for Fair Public Policy v. Maricopa County,* 2003). The Court ruled that the time regulation passed by Maricopa County, Arizona, was valid, despite the large and obvious reduction in expression resulting from the time restrictions. The Court disavowed Justice Kennedy's assertion in *Alameda Books* that the government cannot reduce secondary effects by reducing speech—an effect, it may be argued, that results from limiting the times during the day when adult businesses may operate. The Court opined that Justice Kennedy was not talking about hours of operation restrictions when he said the government cannot reduce secondary effects by reducing speech, since this would have the effect of overturning hundreds of limitations undertaken by communities across the nation, and this, according to the Court of Appeals, was not his intention.

### Empirical Study of Secondary Effects of Adult Businesses

According to the Community Defense Counsel, many land use studies, police investigations, and public health evalu-

ations conducted over the last 30 years document the negative secondary effects that sexually-oriented businesses bring to communities. These adverse impacts include decreased property values, the spread of sexually transmitted diseases (STDs), and increases in crimes ranging from indecent exposure to assault to rape.

Contrary to the assertions made by religious conservative organizations such as the Community Defense Counsel, Paul, Linz, and Shafer (2001) found that among the most frequently cited studies by communities across the United States, none had been subject to scientific peer review and most lacked essential methodological features that would ensure their reliability and validity. For example, the City of Indianapolis, Indiana study (1984) failed to match study and control areas on critical variables; the City of Phoenix, Arizona study (1979) relied on crime data collected for only a one-year period; and the City of Los Angeles study (1977) authors admitted that the police increased surveillance of adult businesses during the study period.

In contrast to the assertions of the Community Defense Counsel, Paul et al. (2001) concluded,

> With few exceptions, the methods used in the most frequently cited studies are seriously and often fatally flawed. These studies, relied on by other communities throughout the country, do not adhere to professional standards of scientific inquiry, and nearly all fail to meet the basic assumptions necessary to calculate an error rate—a test of the reliability of findings in science. Those studies that are scientifically credible demonstrate either no negative secondary effects associated with adult businesses or a reversal of the presumed negative effect (p. 1).

Paul et al.'s critique applied to many of the studies used by the city of San Diego as justification for its ordinance.

When municipalities have conducted studies of crime and adult businesses in the past, there has not been a set of methodological criteria or minimum scientific standards to which the cities were required to adhere. First, to ensure accurate and fair comparisons, a control area must be selected that is truly "equivalent" to the area containing the adult entertainment business(es). Since most analyses of secondary effects attempt to uncover increases in crime, professional standards dictate that the control (non-adult) areas must be comparable (matched) with the study (adult) areas on variables related to crime. Of particular importance are that the study and control areas are matched for ethnicity and socioeconomic status of individuals in both areas. Second, a sufficient period of elapsed time following the establishment of an adult entertainment business is necessary when compiling crime data in order to ensure that the study is not detecting an erratic pattern of social activity. Generally, the longer the time period for observation of the events under consideration, the more stable (and more valid) the estimates of the event's effects tend to be (Singleton, Straits, & Straits, 1999). Third, the crime rate must be measured according to the same valid source of data for all areas considered (Campbell & Stanley, 1963). It is especially important that the measurement of crime is based on the same information source for both areas and

throughout the entire study period. For example, if the study area measures crime by the number and type of calls made to the police department, the comparison area must also rely on such a measure when the two areas are compared.

In addition, the crime information source must be factually valid and reliable, such as a daily log kept by police or a compilation of the number of calls-for-service made in a municipality recorded by street address or similar geographical locators. Any change in police surveillance techniques regarding adult entertainment businesses in a particular community must also be noted. Obviously, increased surveillance of an area simply because an adult business is located there will have an impact on the amount of crime detected by the police. If increased police surveillance and the presence of an adult business in a particular area are confounded in this way, it is impossible to tell whether crime has increased due to the presence of the adult business or because of the increased police activity. Finally, an error rate must be calculated. The error rate is the degree of chance a scientist will allow. In the social sciences, it is conventional to set the error rate at 5% or less (i.e., 95 times out of 100 the results could not be obtained by chance).

Recent studies utilizing sound methodological procedures have not found adverse secondary effects associated with adult businesses in the community. For example, Linz, Land, Williams, Paul, and Ezell (2004) sought to determine whether a relationship exists between adult erotic dance clubs and negative secondary effects in the form of increased numbers of crimes reported in the areas surrounding the adult businesses in Charlotte, North Carolina. For each of 20 businesses, a control site, matched on the basis of demographic characteristics related to crime risk, was compared for crime events over a period of three years (1998–2000) using data on crime incidents reported to the police. The presence of an adult nightclub did not increase the number of crime incidents reported in localized areas surrounding the club (defined by circular areas of 500- and 1,000-foot radii) as compared to the number of crime incidents reported in comparable localized areas that did not contain an adult business. The analyses implied the opposite: that areas surrounding adult businesses sites have smaller numbers of reported crime incidents than do corresponding areas surrounding the three control sites studied.

Previous research specifically addressing the possibility of greater adverse effects after hours also did not find the effects alleged by the Community Defense Counsel and lawmakers in San Diego. The city of Phoenix conducted a study in 1994 that examined cabarets, arcades, and bookstores in that community (City of Phoenix Planning Department, 1994). Interviews with residents, police officer interviews, and on-site observations were undertaken to determine what type of activities were taking place outside adult businesses. Calls-for-service to the police were also analyzed by time of day. Additional data from the

police department's Organized Crime Bureau Vice unit about specific violations, such as prostitution and disorderly conduct, noise/disturbance, and loitering, per time of day were also obtained.

The findings of the Phoenix (1994) study directly contradicted the government's assertions that adult businesses cause problems in the community. According to business owners who were surveyed, more vandalism, more crime against customers and businesses, and more money was spent on security in the control areas. Only 2% of police surveyed said adult businesses presented "a lot of problems" requiring their attention, compared to 31% who said the control business areas had "a lot of problems" requiring police attention.

### Condemnation of Sex-Related Communication Establishments and Viewpoint Discrimination

It is important to study empirically the assumptions made by religious conservatives and government officials, because the lack of a quantifiable link between the presence of sexually-oriented businesses in the community and secondary crime effects may have serious consequences for social policy concerning sex communication. If the theory of negative secondary effects does not stand up to empirical scrutiny, the results of this study may point to an incidence of what Justice Souter in the *City of Los Angeles v. Alameda Books, Inc., et al.* (2002) has referred to as a weak demonstration of facts indicating "viewpoint discrimination." Justice Souter formulated a legal test based on the empirical verification of adverse secondary effects of adult businesses. He argued that because courts do not apply strict scrutiny to time, place, and manner regulations, municipalities need to be vigilant about restricting sex-related speech. In his view, sound empirical investigations of presumed adverse secondary effects are helpful in guarding against unconstitutional restrictions of freedom of sexual speech. Justice Souter noted that the weaker the demonstration of empirical facts as separate from disapproval of the viewpoints expressed in adult materials, the greater the likelihood that unconstitutional condemnation of the these viewpoints by the government is occurring.

This study may be considered an application of Justice Souter's viewpoint discrimination test. In this sense, the study is an attempt to determine if San Diego is engaging in disapproval of adult sex speech rather than attempting to regulate sex communication out of concern for empirically-verifiable, adverse secondary effects.

### Research Questions

For each peep show establishment in San Diego, we compared a control area for crime events over a period of five years using data on crime incidents reported to the police. The research was designed to measure the extent to which the peep show establishments contributed to community disorder (i.e., increased crime in the immediate vicinity) compared to the control vicinities beyond the peep show establishments. We asked two questions:

1. Is criminal activity in San Diego particularly acute at peep show establishments compared to surrounding control locations?
2. Is criminal activity in San Diego disproportionately greater at or near peep show establishments between the hours of 2 a.m. and 6 a.m. compared to other times of the day?

### Method

To ensure accurate and fair comparisons, control areas were selected that were equivalent to the areas containing the peep show establishments. A sufficient period of time (five years) was used when compiling crime data in order to ensure that the study was not merely detecting an erratic pattern of social activity. The crime information source was a compilation of the number of calls for police service made in the municipality recorded by street address or similar geographical locators. Error rates were calculated for the statistics to determine if any observed differences between control and comparison areas were reliable differences or were due to chance (Paul et al., 2001).

The study included several steps. Data on calls-for-service were requested from the San Diego Police Department. Test areas ("inner areas") were established and defined to constitute 1,000 feet on either side of the center point of each peep show establishment on both sides of the street in San Diego (spanning a contiguous distance of 2,000 feet). These areas were measured along the street on which each peep show establishment was located. The width of each test area was determined to ensure all calls-for-service occurring within the 2,000-foot test area, and associated specifically with the street on which the business in question operated, were included in our analysis. Control areas ("outer areas") were established along that same street in the 1,000-foot distance adjacent to these two immediate 1,000-foot inner areas. There were no adult entertainment businesses of any type included in any of the control areas used in this study. The calls-for-service to the police were then plotted using a computerized mapping program.

All calls were plotted based on the longitude and latitude coordinates provided by the city's crime analyst. Comparisons of the number of crime incidents were then made for the inner and outer areas. We also made comparisons for the number of crime incidents occurring between the hours of 2 a.m. to 6 a.m. and those occurring throughout the entire 24 hours of the day.

### Locating Peep Show Establishments

A "peep show establishment," for the purposes of this study, was defined as any place to which the public is permitted or invited where one or more "peep show devices" are maintained. According to the San Diego Municipal Code section 33.3302 a "peep show device" means any device which displays still or moving images that are distinguished or characterized by an emphasis on "specified sexual activities" or "specified anatomical areas." Although

the city of San Diego has 39 adult entertainment businesses, only 19 of those businesses are peep show establishments. Accordingly, for purposes of this study, only data tied to these 19 peep show locations were analyzed. Names and addresses of the 19 peep show establishments are available upon request.

### Compiling a Crime Incident Database

The neighborhoods surrounding the peep show establishments constituted the geographical area of the database for this study. A record of all calls-for-service for each police beat that included within it one or more of the city's 39 various adult entertainment businesses, or which included any areas within 2,000 feet of such businesses in the city of San Diego, was obtained from the City of San Diego. (A copy of the list of beats provided by the city may be obtained from the authors). This included a database with five years of Computer Aided Dispatch (CAD) data (January 1997 through December 2001), including (a) incident date and time, (b) incident type, (c) disposition, (d) incident addresses, and (e) XY coordinates for each of the beats.

To retrieve the data, the San Diego Police Department managing analyst researched the crime incident categories to make sure all applicable call types were included in the data retrieval. City analysts determined which of the Department's beats were associated with the requested locations (including the 2,000-foot area on either side of each establishment). We wrote a query to retrieve the data and then performed a download to place it into a database format. The Appendix lists the calls-for-service categories (CAD) used to compile data for the study by the San Diego Police Department data analyst.

### Spatial Placement of Police Calls

The Geographic Information System (GIS) expert within the San Diego Police Department suggested that the research on the requested locations should include geo-validation utilizing parcel data to ensure the points used for the radius were placed accurately. This proved to be impossible since the parcel data available through the city's GIS does not include the level of detail required for this type of validation. To overcome any problems associated with the inexact spatial placement of the points representing the addresses and the city's GIS base maps being accurate only to +/- 40 feet at a 95% confidence level, we placed a 1,040 foot radius (instead of a 1,000 foot radius) around locations to determine which beats needed to be included in the data set.

Additionally, since 1997, there have been several changes related to beat boundaries and numbering of beats. The data was extracted to include all appropriate calls, carefully taking into account changes in beat structure or beat boundaries over time.

The XY coordinates provided by the Department are in the Stateplane NAD 83 (California Zone VI) coordinate system. These coordinates provide a more precise location of the global position of the location of the call-for-service.

The resulting data extract included 607,903 calls-for-service records from the San Diego Police Department's CAD system. These records were used in our study.

### Establishing Test and Control Areas

The GIS mapping program *Maptitude* was used to establish the 1,000-foot strip on either side of the peep show location (inner area) and to establish an additional 1,000-foot area on each side beyond the inner area. Crime incidents occurring within the two inner 1,000-foot areas were then compared with the incidents in the two outer 1000-foot areas. An example of the placement of the two inner 1,000-foot and two outer 1,000-foot areas surrounding a peep show establishment address may be found in Figure 1.

This inner and outer 1000-foot measurement along city streets was employed because of the arrangement of commercial property in San Diego. As is common throughout California, the commercial zones routinely follow main streets or strips. The advantage to using such a measurement area as a control is that it also contains nearly identical neighborhood characteristics as the test area. This renders the two areas comparable on most dimensions aside from the presence of a peep show establishment.

### RESULTS

### Police Activity at Peep Shows vs. Control Locations

We made comparison of calls-for-service to the police for the inner and outer areas surrounding the peep show establishments to determine if criminal activity is high at or near San Diego peep shows compared to surrounding control locations. As shown in Table 1, the amount of crime within the inner and outer areas was nearly identical. For 10 of the peep show locations, crime incidents were higher in the inner 1,000-foot areas than in the outer areas. For nine of the locations, crime was lower in the inner areas compared to the outer areas. This result conforms to what would be expected by chance.

**Figure 1. An example of the placement of the two inner 1,000-ft. and two outer 1,000-ft. areas surrounding the peep show establishment addresses.**



Calls occurring on inner 1000ft section of street are marked with "x"s

**Table 1. Total Calls-for-Service for Inner and Outer 1000-ft. Areas Surrounding Peep Show Establishments in San Diego, CA**

| Peep Show | Total inner | Total outer | Inner/Outer* |
|---|---|---|---|
| Establishment A | 2551 | 2123 | 1.20 |
| Establishment B | 1421 | 1591 | 0.89 |
| Establishment C | 3444 | 1569 | 2.19 |
| Establishment D | 2552 | 2571 | 0.99 |
| Establishment E | 1930 | 1780 | 1.08 |
| Establishment F | 419 | 540 | 0.77 |
| Establishment G | 1182 | 941 | 1.25 |
| Establishment H | 2120 | 2099 | 1.01 |
| Establishment I | 5328 | 2304 | 2.31 |
| Establishment J | 1372 | 1907 | 0.71 |
| Establishment K | 726 | 558 | 1.30 |
| Establishment L | 306 | 451 | 0.67 |
| Establishment M | 1221 | 549 | 2.22 |
| Establishment N | 926 | 681 | 1.35 |
| Establishment O | 1068 | 1733 | 0.61 |
| Establishment P | 1424 | 2126 | 0.66 |
| Establishment Q | 423 | 605 | 0.69 |
| Establishment R | 332 | 216 | 1.53 |
| Establishment S | 755 | 1157 | 0.65 |
| Average | 1552.63 | 1342.15 | 1.16 |

*Ratios greater than 1 indicate more calls-for-service in the 1,000-foot areas immediately on either side of the peep show establishments than in the adjacent 1,000-foot areas. Ratios below 1 indicate more calls-for-service in the adjacent areas.

To probe this apparent null finding, we conducted a series of statistical tests, beginning with a Mann-Whitney $U$ Ranking Test. This is a non-parametric statistical procedure that tests the notion that two sample populations are equivalent in location or origin. The results were Mann-Whitney $U = 180.00$, mean rank inner $= 19.53$, mean rank outer $= 19.47$, $z = -.015$, $p = .988$. This test indicated a failure to reject the null hypothesis that there is no difference between the inner and outer areas around peep show establishments in calls-for-service frequency.

We computed a statistically more powerful two-sample $t$-test for the mean levels of calls-for-service for the inner ($M = 1,552.6$, $SD = 1,250.70$) and outer areas ($M = 1,342.2$, $SD = 750.36$), $t(36) = .629$, $p = .533$. This test indicated a failure to reject the null hypothesis at the conventional $\alpha$ level of .05.

To guard against a Type II error (i.e., falsely accepting the null hypothesis when there is in actuality an effect), we conducted a compromise power analysis using a MS-DOS version of the computerized power calculator "G*Power" (Erdfelder, Paul, & Buchner, 1996). The power of a statistical test is the probability of rejecting the null hypothesis given that the alternative hypothesis is true (Cohen, 1988; Kraemer & Thiemann, 1987; Lipsey, 1990). Power depends on the type of test, the alpha level, the sample size and variance, and the effect size. Generally speaking, bigger samples, larger effect size, larger α-level, and smaller sample variance will give more power to a statistical test.

In a typical controlled experiment, planned or *a priori* power analysis is often performed to ensure a study would have enough statistical power to reject the null hypothesis.

The goal is to make a decision about the sample size and alpha level that will be used in the study and the target effect size that will be "detectable" with the given level of statistical power. The sample size in this study is limited by the number of peep show establishments in the test area. Thus, an *a priori* power analysis often used to determine a minimum sample size is unsuitable.

Post-hoc or retrospective power analyses are often suggested to guard against a Type II error (i.e., falsely accepting a null hypothesis when there is a true effect) in situations where statistically non-significant results are found. In a post-hoc power analysis, the sample size and alpha-level are known, and the variance observed in the sample provides an estimate of the variance in the population. An inherent problem of a post-hoc power analysis is that when sample size is held constant, power is determined by the effect size. Specifically, the smaller effect size becomes, the weaker the power would be. Thus, a retrospective power calculation based on observed effect size is rarely useful when increasing sample size is not a viable option to increase power (Thomas & Krebs, 1997). Such inappropriate use of post-hoc power analysis have been documented and discussed in detail by many researchers (Goodman & Berlin, 1994; Lenth, 2001; Levine & Ensom, 2001; Thomas & Krebs, 1997). Based on this logic, a post-hoc power analysis would tell us no more than what can be inferred from the observed *p*-value in this study because our sample size is limited by the number of peep shows in San Diego.

Nevertheless, it has been suggested that it is important to guard against Type II error if a statistically non-significant finding is obtained. In this study, while a primary goal was to test the hypothesis that areas immediately surrounding a peep show establishment would require more police attention than other nearby areas, a more interesting and important question is, if we fail to reject the null hypothesis at alpha level of .05, can we then be confident enough to accept the null hypothesis? The answer would be *no*. The conventional wisdom of setting the alpha level at .05 is based on the assumption that it would be more important to guard against a Type I error (i.e., false positive) than to guard against a Type II error because in most empirical studies, researchers are looking to confirm a hypothesis rather than to disconfirm it. In fact, it would be four times more likely to commit a Type II error than to commit a Type I error at alpha = .05. Thus, to guard against Type II error, a compromise power analysis should be conducted.

Compromise power analyses are primarily used in two situations: (a) for reasons that are beyond a researcher's control (e.g., working with clinical populations), the sample size is too small to satisfy conventional levels of alpha level and power given the effect size; and (b) given conventional levels of significance, a sample is too large such that even negligible effects would force a rejection of the null hypothesis (Erdfelder et al., 1996). In a compromise power analysis, researchers would specify the relative seriousness of both Type I and Type II errors (Cohen, 1988)

with a beta/alpha ratio. An optimum critical value for the test statistic which satisfies this ration is then calculated. Given a sample size, this optimum critical value can be regarded as a rational compromise between the demands for a low alpha risk and a large power level, given a fixed sample size.

Our analysis assumed a fixed sample size and the observed effect size and was conducted under the assumption that the relative ratio between alpha and beta is 1 (i.e., an equal likelihood of committing a Type I or Type II error). A new optimum critical value was obtained, two-tailed $t$-critical (36) = .78, power = .56, alpha = beta = .44. This analysis indicated a failure to reject the null hypothesis at a new and more liberal critical value.

To account for possible spatial dependence between the inner and outer areas around each peep show location, an OLS regression analysis was also conducted. A challenge associated with geo-coded crime data is the issue of spatial dependency. Criminologists have noticed that crime occurrences in a neighborhood are not independent of each other (Morenoff, Sampson, & Raudenbush, 2001; Smith, Frazee, & Davison, 2000). Thus, statistical models often used in criminology research, such as an Ordinary Least Square (OLS) regression, with data that have geographic units of analysis may violate the assumption of independence. Statistical errors are likely to be correlated across locations because of systematic ordering across spatial units of analysis, such as street blocks or census tracts (Smith et al., 2000). In our study, spatial dependence can be understood as the fact that the crime events in the inner 1,000-foot areas on either side of the adult business are related and influenced by crime events in the adjacent outer areas for each of the peep show locations.

Several techniques have been developed to estimate spatial dependence (Morenoff et al., 2001). The two frequently used forms of spatial dependence models are the spatial lag model and the spatial error model (Anselin, 1988). In this study, we utilized the spatial lag model to control for the influence of spatial dependency. The spatial lag model can be expressed by the following equation:

$$y = \rho Wy + X\beta + \varepsilon$$

where y is an N x 1 vector of observations on a dependent variable taken at each of $\alpha$ locations, $\rho$ is the spatial dependence coefficient, Wy is an N x 1 vector composed of elements of the spatial lags for the dependent variable (i.e., the product of W and y, where W is a N x N covariance matrix of the spatial dependency among each locations), X is an N x k matrix of exogenous variables, $\beta$ is an k x 1 vector of parameters, and $\varepsilon$ is a vector of error.

Our regression model used calls-for-service to the police observed in the inner and outer zones surrounding peep show locations as the dependent variable. A spatial lag term was introduced to the regression model before the inner/outer condition variable was entered into the equation in order to control for spatial dependency. We made the assumption that the inner and outer 1,000-foot areas surrounding each peep show location were spatially interdependent on each other; we assigned an arbitrary weight of .50 to account for this dependence. We also assumed the entire 4,000-foot area around each peep show was independent of the 4,000-foot areas around other peep show locations.

The overall regression model was statistically significant, $F(2, 35) = 11.92$, $p < .001$. The spatial dependency term explained almost 36% of variance in the dependent variable ($R^2 = .359$). However, the variable representing the inner and outer areas did not add significant contribution to the overall predictive power of our model, $F(1, 35) = 1.684$, $p = .203$, once spatial dependence was controlled.

### Hotspot Analysis of Calls-for-Service

A "hotspot" analysis was also undertook. Although there is a voluminous literature on crime hotspots, we used the procedure employed in the Garden Grove study (McCleary & Meeker, 1991) as a precedent. The Garden Grove Study is frequently cited by municipalities across the country as justification for ordinances to limit adult businesses and sex communication.

The authors of the Garden Grove Study undertook a hotspot analysis by listing the relative rank of adult business addresses vs. other business addresses in the immediate surrounding area. This method involves comparing specific adult business addresses with the remaining neighborhood in terms of percentage of crime and the relative ranks of addresses. They reasoned that if the adult business accounted for 10-25% of crimes in a neighborhood, they constituted a significant source of crime events. They also computed the relative ranking of the adult business address among all addresses on Garden Grove Boulevard. They concluded that because three to five of the six adult businesses were found at the top 10 hotspots, this finding further bolstered their conclusion that these businesses were a significant source of crime. We employed the percentage and ranking method employed in the Garden Grove Study to crime events in San Diego.

Hotspot analyses pinpoint the exact source of the calls for service to the police. These results are summarized in Table 2. The analyses were conducted only for the 10 inner areas that had a greater number of calls than the control outer areas. Within each of the 10 inner areas we identified the 15 street addresses that had the greatest number of calls-for-service. These analyses indicated that in 6 of the 10 inner areas, the peep show was not among the top 15 addresses most frequently brought to the police's attention through calls-for-service.

For the four peep shows ranked 15th and below, we conducted further analysis. The number of calls-for-service to the police at these four peep show establishments accounted for no more than 4% of the total calls-for-service in their respective test area. In the one instance where a peep show establishment did appear at the number 3 rank among the top 15 street addresses, that peep show establishment had an average of less than one incident per year

**Table 2. Calls-for-Service Hotspot Analyses in Areas Surrounding Peep Show Establishments in San Diego, CA**

| Peep Shows | CFSs from Peep Shows | % of Total Rank | CFSs from top Inner | Hotspot |
|---|---|---|---|---|
| Establishment E | 73 | 5 | 3.7% | 316 |
| Establishment H | 34 | 12 | 1.7% | 98 |
| Establishment G | 20 | 14 | 1.7% | 104 |
| Establishment R | 4 | 3 | 1.2% | 46 |

at its address. Finally, in no instance did the number of calls-for-service at any of the peep show establishments approach the frequencies of the top hotspot street addresses within the inner areas.

### Police Activity Between 2 a.m. and 6 a.m. Compared to Other Times of Day

Three analyses were undertaken to answer the question of whether police activity in San Diego was disproportionately greater at or near peep show establishments between the hours of 2 a.m. and 6 a.m. compared to other times of day. We used the first analysis to determine if the number of calls-for-service was greater than would be expected given the number of hours comprising a day. Table 3 shows the results of analyses of the calls-for-service between the hours of 2 a.m. and 6 a.m. and a comparison of the frequency of these calls to the entire 24 hour period. If calls were distributed equally across the day, approximately 17% of those calls would be expected in the four-hour period between 2 a.m. to 6 a.m. If crime were a particularly acute problem at this time of day, it may be expected that more than 17% of the total criminal activity

would occur during that time. The results displayed in Table 3 show that 11% of calls-for-service occurred in the inner areas during the 2 a.m. to 6 a.m. period, contrary to the expectation of 17%.

Second, we compared this hours-based data to data from the control areas. Table 4 presents the results of these analyses. The percentage in the outer areas is on average 10.6, nearly identical to the 11% figure found for the inner areas immediately surrounding the peep show establishments.

The third step was to compare the inner areas and the outer areas using only those calls-for-service that occurred between 2 a.m. and 6 a.m; Table 5 shows the results of these analyses. There was a nearly identical percentage of crime occurring in the inner areas as compared to the outer areas, indicated by the average ratio of inner to outer areas, which is very close to 1.00. As further confirmation a statistical test was performed, Mann-Whitney $U = 176.00$, inner mean rank $= 19.74$, outer mean rank $= 19.26$, $z = -.131$. The results of this test indicate there was no difference between the inner and outer areas in their call-for-service frequencies between the hours of 2 a.m. and 6 a.m.

We also performed a more powerful statistical test on the mean ratio between calls-for-service frequencies between 2 a.m. and 6 a.m. and the entire day for the inner areas ($M = .11$, $SD = .02$) and outer areas ($M = .10$, $SD = .02$) surrounding peep show establishments. The result of this test, $t(36) = .77$, $p = .45$, indicated a failure to reject the null hypothesis at $\alpha = .05$.

We also conducted a compromise power analysis. Given fixed sample size and the observed effect size, a new optimum critical value was obtained under the assumption that the relative seriousness ratio between alpha and beta is 1 (two-tailed $t$-critical $(36) = 1.54$, power $= .70$). The results of

**Table 3. Calls-for-Service for Inner 1,000-ft. Areas Surrounding Peep Show Establishments in San Diego Between the Hours of 2 a.m. and 6 a.m. as a Proportion of the Entire 24-Hour Period**

| Peep show | Total inner | Inner 2-6 | Inner 2-6/ Total inner |
|---|---|---|---|
| Establishment A | 2551 | 249 | 0.09 |
| Establishment B | 1421 | 146 | 0.10 |
| Establishment C | 3444 | 463 | 0.13 |
| Establishment D | 2552 | 340 | 0.13 |
| Establishment E | 1930 | 247 | 0.12 |
| Establishment F | 419 | 44 | 0.10 |
| Establishment G | 1182 | 142 | 0.12 |
| Establishment H | 2120 | 201 | 0.09 |
| Establishment I | 5328 | 830 | 0.15 |
| Establishment J | 1372 | 140 | 0.10 |
| Establishment K | 726 | 89 | 0.12 |
| Establishment L | 306 | 27 | 0.08 |
| Establishment M | 1221 | 170 | 0.13 |
| Establishment N | 926 | 114 | 0.12 |
| Establishment O | 1068 | 135 | 0.12 |
| Establishment P | 1424 | 131 | 0.09 |
| Establishment Q | 423 | 39 | 0.09 |
| Establishment R | 332 | 21 | 0.06 |
| Establishment S | 755 | 76 | 0.10 |
| Average | 1552.63 | 189.68 | 0.11 |

**Table 4. Calls-for-Service for the Outer 1,000-ft. Areas Surrounding Peep Show Establishments in San Diego Between the Hours of 2 a.m. and 6 a.m. Compared to the Remaining Time of Day**

| Peep show | Total outer | Outer 2-6 | Outer 2-6/Total |
|---|---|---|---|
| Establishment A | 2123 | 282 | 0.13 |
| Establishment B | 1591 | 207 | 0.13 |
| Establishment C | 1569 | 152 | 0.09 |
| Establishment D | 2571 | 325 | 0.12 |
| Establishment E | 1780 | 172 | 0.09 |
| Establishment F | 540 | 51 | 0.09 |
| Establishment G | 941 | 129 | 0.13 |
| Establishment H | 2099 | 194 | 0.09 |
| Establishment I | 2304 | 237 | 0.10 |
| Establishment J | 1907 | 204 | 0.10 |
| Establishment K | 558 | 59 | 0.10 |
| Establishment L | 451 | 42 | 0.09 |
| Establishment M | 549 | 61 | 0.11 |
| Establishment N | 681 | 52 | 0.07 |
| Establishment O | 1733 | 244 | 0.14 |
| Establishment P | 2126 | 179 | 0.08 |
| Establishment Q | 605 | 69 | 0.11 |
| Establishment R | 216 | 16 | 0.07 |
| Establishment S | 1157 | 123 | 0.10 |
| Average | 1324.16 | 147.26 | 0.102 |

**Table 5. Calls-for-Service for Inner and Outer 1,000-ft. Areas Surrounding Peep Show Establishments in San Diego Between the Hours of 2 a.m. and 6 a.m. Compared to the Remaining Time of Day**

| Peep show | Inner area | Outer area | Outer/Inner |
|---|---|---|---|
| Establishment A | 249 | 282 | 1.13 |
| Establishment B | 146 | 207 | 1.41 |
| Establishment C | 463 | 152 | 0.32* |
| Establishment D | 340 | 325 | 0.95* |
| Establishment E | 247 | 172 | 0.69* |
| Establishment F | 44 | 51 | 1.15 |
| Establishment G | 142 | 129 | 0.90* |
| Establishment H | 201 | 194 | 0.96* |
| Establishment I | 830 | 237 | 0.28* |
| Establishment J | 140 | 204 | 1.45 |
| Establishment K | 89 | 59 | 0.66* |
| Establishment L | 27 | 42 | 1.55 |
| Establishment M | 170 | 61 | 0.35* |
| Establishment N | 114 | 52 | 0.45* |
| Establishment O | 135 | 244 | 1.80 |
| Establishment P | 131 | 179 | 1.36 |
| Establishment Q | 39 | 69 | 1.76 |
| Establishment R | 21 | 16 | 0.76* |
| Establishment S | 76 | 123 | 1.61 |
| Averages | 189.68 | 147.26 | 1.03 |

* Higher number of crime incidents in the areas immediately surrounding the peep show establishments than in outer areas.

this analysis indicated a failure to reject the null hypothesis at a much more liberal level of alpha = beta = .30.

### Hotspot Analysis of Calls-for-Service between 2 a.m. and 6 a.m.

A crime "hotspot" analysis was also undertaken. The 10 locations that had more crime in the inner than outer areas between the hours of 2 a.m and 6 a.m. were identified. Within each of these 10 inner areas, we identified the 15 street addresses that had the greatest number of calls-for-service. Eight peep show establishments ranked below 15. Table 6 displays the results of the hotspot analysis for these eight establishments. The number of calls-for-service at these eight businesses accounted for no more than 6.5% of the total calls-for-service in the 2,000-foot areas immediately adjacent to the peep show establishments. Additionally, the number of calls for service at any of the individual peep show establishments did not remotely

**Table 6. Calls-for-Service Hotspot Analyses in Areas Surrounding Peep Show Establishments in San Diego Between the Hours of 2 a.m. and 6 a.m.**

| Peep Shows | CFS from Peep shows | Rank | Percent of Total Inner | CFSs from top "Hotspot" |
|---|---|---|---|---|
| Establishment C | 13 | 10 | 2.8% | 190 |
| Establishment E | 16 | 4 | 6.5% | 60 |
| Establishment D | 10 | 5 | 2.9% | 51 |
| Establishment I | 10 | 10 | 1.2% | 120 |
| Establishment M | 9 | 5 | 5.3% | 16 |
| Establishment G | 7 | 3 | 4.9% | 22 |
| Establishment H | 5 | 6 | 2.5% | 17 |
| Establishment N | 3 | 9 | 2.6% | 34 |

approach the frequencies of the top hotspot street addresses within the inner areas.

## DISCUSSION

The city of San Diego claimed, consistent with the place and time theory about sex businesses advanced by religious conservatives, that regulation was needed to further a substantial interest in combating harmful crime effects in the geographical locations surrounding adult peep show establishments, particularly during late-night hours. In the study presented here, we obtained empirical evidence and used it to test the governmental and religious assumptions of harm to the community from these establishments.

Overall, the results of the analyses suggest police activity in a given geographical space is not significantly related to the presence of peep show establishments in San Diego. Not only were calls-for-service to the police not acute at or near peep show establishments compared to surrounding control locations, but the peep show addresses themselves appeared to be among the least frequent sites coming to police attention. Further, the data showed no indication of a disproportionately greater amount of criminal activity near peep shows in San Diego between the hours of 2 a.m. and 6 a.m. compared to other times of the day. In fact, there were substantially *fewer* crimes than would be expected by a random distribution model.

Two features of our analyses strengthen confidence in the findings of this study. First, in order to guard against a Type II error (i.e., falsely accepting the null hypothesis when it should be rejected), we conducted a power analysis. This analysis indicated the study design permitted a sufficient amount of statistical power to allow for confidence in the null results. Second, to account for the possible spatial dependence between calls-for-service in the inner and outer areas around each peep show location, we conducted analyses controlling for spatial dependence. Even after we controlled for the correlation of crime events between the areas surrounding the peep show and adjacent areas, there was no greater number of crime incidents in the peep show areas compared to the control areas than what would be expected by chance.

### Crime Measurement and Null Findings in This Study

The results of this investigation suggest it may be best not to assume adverse secondary effects in the form of greater police activity and crime emanating from adult businesses such as peep show establishments. However, the null findings do not obviate the need for future research. Although the study found no statistically significant effects with the measures and tests employed here, there is no guarantee that an alternate means of measurement might not yield an association between adult businesses such as peep shows and adverse secondary effects.

Criminologists use a variety of measures of crime; each measure has advantages and disadvantages. All measures have error associated with them and may be biased. One procedure that might have contributed to the null findings

in the present study is the use of calls-for-service to the police as a measure of crime and disorder. Using calls-for-service as the outcome variable may have introduced error in detecting crime events. This error may potentially decrease the probability of finding a negative effect for peep shows in the community and increase the probability of accepting the null hypothesis of no effects.

Many criminologists have employed citizens' telephone calls-for-service (CFSs) to police dispatch centers to measure crime at the address (Sherman, Garten, & Burger, 1989), neighborhood (Bursik, Grasmick & Chamlin, 1990; Warner & Pierce, 1993), and city (Bursik & Grasmick, 1993) levels. According to its proponents, the CFSs measure offers a more valid description of aggregate levels of crime than either police records collated in the FBI's Uniform Crime Reports (UCR) or victimization data collected in the National Crime Survey.

At least two factors contribute to measurement bias in UCR data: citizens' decisions about whether to notify the police about criminal activity and police decisions about whether to take reports when citizens inform them that crimes have occurred (e.g., Black, 1970). Sources of bias in victimization data include, but are not limited to, citizens' failure to report crimes to interviewers, as well as other problems that are common to survey research, such as errors associated with interviewer effects, interviewee memory problems, and other response biases (e.g., Bailey, Moore & Bailer, 1978; Biderman & Lynch, 1991).

The most serious source of bias in CFSs data is the process by which police discover crimes: many come to their attention via means other than phone calls to dispatch centers. For example, citizens sometimes report crimes directly to officers on patrol and at station houses. Further, officers often observe criminal activity while patrolling their beats (Reiss, 1971). Errors in CFSs crime counts also vary according to neighborhood. Dispatch data are more likely to undercount the total number of crimes that come to the attention of the police in neighborhoods where residents believe that officers respond more slowly to their calls, where residents are more fearful of crime, and where they experience more criminal victimization.

Calls-for-service to the police were used in this study because other studies have relied on this measure of police and crime activity. These studies are routinely used as a means of justifying legislation restricting adult businesses, or in the absence of negative effects, have been cited as evidence for a lack of secondary effects. The most important of these studies is the Fulton County Georgia police study. The 11th Circuit Court U.S. of Appeals has cited this study as one that is particularly applicable to the secondary effects debate. The statistical information included in that study was obtained through the Fulton County Police Department computerized incident and calls-for-service reporting program (*Flanigan's Enters. v. Fulton County*, 2002).

Further, it has been generally agreed upon by criminal justice researchers that CFSs are a valid measure of the uti-

lization of police resources. This is particularly true with regard to time utilization by police. Thus, the measure may be especially useful in an hours-of-operation study. Often police resources are limited late at night. This scarcity of police personnel has been used as a justification by governments for curtailing First Amendment-related sex communication businesses after hours. To the extent that the findings of this study are limited to police resource utilization, concerns about measurement error and null findings are probably unwarranted.

A suggestion for future secondary effects studies is that researchers also rely on incident data in addition to calls-for-service in order to reduce the possibility of mistakenly accepting a null finding due to crime measurement error. The U.S. Department of Justice is replacing its long-established Uniform Crime Reporting (UCR) system with the more comprehensive and potentially more valid National Incident-Based Reporting System (NIBRS). NIBRS collects a wide range of information on victims, offenders, and circumstances for a greatly increased variety of offenses. Moreover, NIBRS collects information on multiple victims, multiple offenders, and multiple crimes that may be part of the same episode. The use of these more rigorously collected and more comprehensive incident-based data may allow for more confidence to be placed in future null findings should they be obtained.

### Condemnation of Sex-Related Communication Establishments, Public Space, Time, and Viewpoint Discrimination

What does the lack of empirical evidence of a relationship between sexually-oriented businesses in the community and secondary crime effects, both during regular and late-night hours in San Diego, mean regarding the city's underlying rationale for regulating sex oriented businesses? Were the city to press ahead with legislation despite a lack of empirical evidence of adverse secondary effects, it may be an incidence of what Justice Souter in the *City of Los Angeles v. Alameda Books, Inc.* (2002) has referred to as a weak demonstration of facts indicating viewpoint discrimination.

In *Alameda*, Justice Souter said sound empirical investigations of presumed adverse secondary effects are helpful in guarding against unconstitutional restrictions of freedom of sexual speech. Lacking empirical proof of its own, the city of San Diego may be engaging in disapproval of adult speech rather than attempting to regulate sex communication out of concern for adverse secondary effects.

### REFERENCES

Anselin, L. (1988). *Spatial econometrics: Methods and models*. Dordrecht, Holland: Kluwer Academic.

Bailey, L., Moore T. F., & Bailer, B. A. (1978). An interviewer's variance study of the national crime study city sample. *Journal of the American Statistical Association*, 73, 16-23.

Barnes v. Glens Theatre Inc., 501 U.S. 560 (1991).

Bartky, S. L. (1990). *Femininity and domination: Studies in the phenomenology of oppression*. New York: Routledge.

Biderman, A. D., & Lynch, J. P. (1991). Understanding crime statistics:

Why the UCR diverges from the NCS. New York: Springer-Verlag.

Black, D. J. (1970). Production of crime rates. *American Sociological Review,* 35, 733-748.

Brooks, G. R. (1995). *The centerfold syndrome: How men can overcome objectification and achieve intimacy with women.* San Francisco, CA: Jossey-Bass.

Bursik, R. J. Jr., & Grasmick, H. G. (1993). The use of multiple indicators to estimate crime trends in American cities. *Journal of Criminal Justice, 29,* 509–516.

Bursik, R. J. Jr., Crasmick, H. G., & Chamlin, M. B. (1990). The effect of longitudinal arrest patterns on the development of robbery trends at the neighborhood level. *Criminology, 28,* 431–450.

Campbell, D. T., & Stanley, J. C. (1963). *Experimental and quasi-experimental designs for research.* Chicago: Rand McNally.

*Center For Fair Public Policy v. Maricopa County, Arizona,* 336 F.3d 1153 (9th Cir. 2003).

City of Erie v. Pap's A.M., 529 U.S. 277 (2000).

City of Indianapolis, Indiana. (1984). *Adult entertainment businesses in Indianapolis—An analysis.*

City of Los Angeles, California. (1977). *Study of the effects of the concentration of adult entertainment establishments in the city of Los Angeles.*

City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002).

City of Phoenix, Arizona. (1979). *Relation of criminal activity and adult businesses.*

City of Phoenix Planning Department. (1994, June). *Adult business study: Impacts in late evening/Early morning hours.*

City of Renton v. Playtime Theatres, Inc., 475 U.S. 41. (1986).

Cohen, J. (1988). *Statistical power analysis for the behavioral sciences* (2nd Ed.). Hillsdale, NJ: Lawrence Erlbaum Associates, Inc.

Community Defense Counsel. (2004). *Secondary effects* [Online]. Available http://www.communitydefense.org/seffects.cfm.

Edwards, S. S. M. (1993). Selling the body, keeping the soul: Sexuality, power, the theories and realities of prostitution. In S. Scott & D. Morgan (Eds.), *Body matters: Essays on the sociology of the body* (pp. 89-104). Washington, DC: Falmer Press.

Erdfelder, E., Paul, F., & Buchner, A. (1996). G*POWER: A general power analysis program. Behaviour. *Research Methods, Instruments, and Computers, 28,* 1-11.

Flanagan's Enterprises, Inc. v. Fulton County, Georgia. 242 F.3d 976. (11th Cir.2001).

Frank, K. (2003). "Just trying to relax": Masculinity, masculinizing practices, and strip club regulars. *The Journal of Sex Research.* 40, 61-75.

Fuller, R., & Miller, S. (1997, June). *Fulton County Police: Study of calls for service to adult entertainment establishments which serve alcohol beverages.*

Good, G. E., & Sherrod, N. B. (1997). Men's resolution of nonrelational sex across the lifespan. In R. F. Levant & G. R. Brooks (Eds.), *Men and sex: New psychological perspectives* (pp. 181-204). New York: Wiley.

Goodman, S. N., & Berlin, J. A. (1994). The use of predicted confidence intervals when planning experiments and the misuse of power when interpreting the results. *Annals of Internal Medicine, 121,* 200-206.

Kraemer, H. C., & Thiemann, S. (1987). *How many subjects?* London: Sage.

Lenth, R. V. (2001). Some practical guidelines for effective sample size determination. *The American Statistician, 55,* 187-193.

Levine, M., & Ensom, M. H. H. (2001). Post hoc power analysis: An idea whose time has passed. *Pharmacotherapy, 21,* 405-409.

Linz, D. (1989). Exposure to sexually explicit materials and attitudes toward rape: A comparison of study results. *The Journal of Sex Research, 26,* 50-84.

Linz, D., & Donnerstein, E. (1988). Methodological issues in the content analysis of pornography. *Journal of Law Reform, 21,* 47-53.

Linz, D., Land, K. C., Williams, J. R., Paul, B., & Ezell, M. (2004). An examination of the assumption that adult businesses are associated with crime in surrounding areas: A secondary effects study in Charlotte, North Carolina. *Law & Society Review, 38,* 69-104.

Linz, D., & Malamuth, N. M. (1993). Communication concepts 5: Pornography. In S. Chaffee (Ed.), *Communication concepts series.* Newbury Park. CA: Sage.

Lipsey, M. W. (1990). *Design sensitivity: Statistical power for experimental research.* Newbury Park, CA: Sage.

Malamuth, N. M., Heavey, C. L., & Linz, D. (1993). Predicting men's antisocial behavior against women: The interaction model of sexual aggression. In G. C. N. Hall, R. Hirschman, J. Graham, & M. Zaragoza (Eds.) *Sexual aggression: Issues in etiology, assessment and treatment* (pp. 63-97). Washington, DC: Hemisphere.

McLeary, R., & Meeker, J. W. (1991, October). *Final report to the city of Garden Grove: The relationship between crime and adult business operations on Garden Grove Boulevard.*

Morenoff, J. D., Sampson, R. J., & Raudenbush, S. W. (2001). Neighborhood inequality, collective efficacy, and the spatial dynamics of urban violence. *Criminology, 29,* 517-559.

Mosco, V. (in press). New York.com: A political economy of the "informational" city. *The Journal of Media Economics.*

Newport News, Virginia. (1996, March). *Newport News Department of Planning and Development.*

Paul, B., Linz, D., & Shafer, B. (2001). Governmental regulation of "adult" businesses through zoning and anti-nudity ordinances: Debunking the legal myth of negative secondary effects, *Communication Law & Policy, 6,* 255-391.

People v. Glaze, 27 Cal. 3d 841, 166 Cal. Rptr. 859. (1980).

Reiss, A. J. (1971). *The police and the public.* New Haven, CT: Yale University Press.

Schlosser, E. (1997, February 10). The business of pornography. *U.S. News & World Report, 122,* 43-52.

Sherman, L. W., Garten, P. R., & Burger, W. M. (1989). Hot spots of predatory crime: Routine activities and the criminology of place. *Criminology,* 27, 27-55.

Singleton, R. A., Straits, B. C., & Straits, M. M. (1999). *Approaches to social research.* London: Oxford University Press.

Smith, W. R., Frazee, S. G., & Davison, E. D. (2000). Furthering the integration of routine activity and social theories: Small units of analysis and the study of street robbery as a diffusion process. *Criminology, 38,* 483-523.

Tewksbury, R. (1990). Patrons of porn: Research notes on the clientele of adult bookstores. *Deviant Behavior, 11,* 259-271.

Thomas, L., & Krebs, C. J. (1997). A review of statistical power analysis software. *Bulletin of the Ecological Society of America, 78,* 126-139.

Warner, B. D., & Pierce, G. L. (1993). Reexamining social disorganization theory using calls for services as a measure of crime. *Criminology, 31,* 493-518.

Yang, N., & Linz, D. (1990). Movie ratings and the content of adult videos: The sex-violence ratio. *Journal of Communication, 40,* 28-42.

Manuscript accepted September 10, 2005

## Appendix

Calls-for-service categories (CAD) used to compile data for the peep show establishment study by the San Diego Police Department data analyst.*

| Description | Category | Description | Category |
|---|---|---|---|
| Arson in Progress | Arson | Disturbing Peace Noise Only | Disturbing the Peace |
| Arson Report | Arson | Disturbing Peace/Noise-Cost Rec | Disturbing the Peace |
| Battery | Arson | Preserve the Peace | Disturbing the Peace |
| Battery Report | Arson | Disturbing Peace w/Violence | Disturbing the Peace |
| ADW | Arson | Party Call | Disturbing the Peace |
| 245 Suspect There Now | Arson | Drunk-Drugs/Alcohol | Drunk in Public |
| ADW Report | Arson | DWI | DUI |
| ADW-All Units Information | Arson | DWI With Cost Recovery | DUI |
| Threatening w/Weapon | Arson | DWI-All Units Information | DUI |
| Threatening w/Weapon Report | Arson | Indecent Exposure | Indecent Exposure |
| Tampering w/Veh in Progress | Auto Burglary | Indecent Exposure Report | Indecent Exposure |
| Vehicle Alarm/Audible | Auto Burglary | Murder | Murder |
| Vehical Caser | Auto Burglary | 187 Suspect There Now | Murder |
| Tampering w/Veh Report | Auto Burglary | Murder-All Units Information | Murder |
| Auto Theft | Auto Theft | Ambulance Call, Overdose | Narcotics |
| Eval-Poss Unreported Car Theft | Auto Theft | Description | Category |
| Auto Theft (GPS Vehicle) | Auto Theft | Narcotics Activity | Narcotics |
| Car Theft Report | Auto Theft | Robbery | Robbery |
| Car Theft Recovery Report | Auto Theft | 211 Suspect There Now | Robbery |
| Auto Theft All Units Info | Auto Theft | Robbery Alarm | Robbery |
| Stolen Veh-Lojack | Auto Theft | Robbery Caser | Robbery |
| Varda Alarm | Auto Theft | Robbery Car Jacking | Robbery |
| Prowler | Burglary | Robbery-Pronet | Robbery |
| Burglary in Progress | Burglary | Robbery Report | Robbery |
| 459 Suspect There Now | Burglary | Robbery-All Units Information | Robbery |
| Burglary Alarm | Burglary | Assault-Sex Crime | Sexual Assault/Rape |
| Burglary Caser | Burglary | Assault-Sex Crime Report | Sexual Assault/Rape |
| Burglary Hot Prowl | Burglary | Rape | Sexual Assault/Rape |
| Burglary Report | Burglary | 261 Suspect There Now | Sexual Assault/Rape |
| Child Molest | Child Molest | Rape Caser | Sexual Assault/Rape |
| 288 Suspect There Now | Child Molest | Rape Report | Sexual Assault/Rape |
| Child Molest Caser | Child Molest | Discharging Firearms | Shooting at Home/Dwelling |
| Child Molest Report | Child Molest | Firing At Occupied Hse/Veh | Shooting at Home/Dwelling |
| Disturbing Peace | Disturbing the Peace | Firing At Occp'd Hse/Veh 1110 | Shooting at Home/Dwelling |
| Dist Peace-Capp House | Disturbing the Peace | Firing At Unoccupied Veh | Shooting at Home/Dwelling |
| Domestic Vio/Occurring Now | Disturbing the Peace | Firing At Unoccupied Veh/Hse 1110 | Shooting at Home/Dwelling |
| | | Vandalism, In Progress | Vandalism |
| | | Vandalism, Report | Vandalism |
| | | Tagger | Vandalism |

*There is no call type associated specifically with lewd conduct. These calls overlap with and are included in child molest or indecent exposure categories. Residential and commercial burglaries do not have separately defined call types in CAD. There is no call types associated with truancy in CAD.

Hindawi Publishing Corporation
Journal of Criminology
Volume 2014, Article ID 783461, 14 pages
http://dx.doi.org/10.1155/2014/783461

*Research Article*

# Are Adult Businesses Crime Hotspots? Comparing Adult Businesses to Other Locations in Three Cities

## Christopher Seaman and Daniel Linz

*University of California, Santa Barbara, CA 93106-4020, USA*

Correspondence should be addressed to Christopher Seaman; cseaman@umail.ucsb.edu

Received 9 September 2013; Revised 14 December 2013; Accepted 9 January 2014

Academic Editor: Paul B. Stretesky

Copyright © 2014 C. Seaman and D. Linz. This is an open access article distributed under the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

This study addresses three questions pertinent to the debate concerning the secondary crime effects of adult businesses. (1) Are adult businesses hotspots for crime? (2) How do adult businesses compare with controls with regard to crime? (3) What subclasses of adult business are most likely to be associated with crime? A study of three cities reveals that adult businesses tended to fall outside the heaviest concentrations of criminal activity. Further, adult bookstores were less related to crime than both cabarets and on-site liquor-serving establishments. While adult cabarets were associated with ambient crime, crime was generally equivalent to nonadult liquor-serving establishments. A weighted intensity value analyses revealed that crime generally was more "intense" around liquor-serving establishments than around adult cabarets across the municipalities. These findings suggest that the relationship between cabarets and crime is not due to the presence of adult entertainment per se but rather due to the presence of liquor service. This finding is consistent with central precept of routine activities theory that areas that contain public establishments that serve alcohol facilitate crime.

## 1. Are Adult Businesses Crime Hotspots? Comparing Adult Businesses to Other Locations in Three Cities

Historically, courts have allowed cities and municipalities to regulate adult businesses featuring sexual expression via time, place, and manner restrictions, such as zoning ordinances, that limit where these businesses may locate. These regulations are justified under the assumption that governmental bodies have a substantial interest in combating the alleged "adverse secondary effects," such as crime thought to be associated with these businesses [1]. Furthermore, in the case *City of Renton v. Playtime Theatres, Inc* [2], the U.S. Supreme Court has ruled that there need only be a "reasonable" belief that adult businesses are associated with secondary effects and that cities and municipalities need not rely upon studies from within their own community to establish that secondary effects occur but can instead draw upon evidence from other communities

The evidentiary standard to be used for the regulation of adult businesses was further refined by the court in the case *City of Los Angeles v. Alameda Books* [3]. While the plurality said that Los Angeles had met the reasonableness standards set forth in the earlier *Renton* decision, Justice O'Connor, delivering the opinion of the Court, wrote the following.

> *This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in Renton. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.*

However, much of the empirical evidence for the alleged secondary effects accumulated by cities and municipalities is,

TABLE 1: Person crimes intensity values across East Hartford, Milford, and Richmond.

| Point sources | East Hartford | | Milford | | Richmond | |
|---|---|---|---|---|---|---|
| | Average | Median | Average | Median | Average | Median |
| Cabaret | 49.51 | 49.51 | 8.98 | 8.98 | 14.18 | 14.18 |
| On-site liquor | 26.71 | 14.78 | 8.52 | 4.26 | 16.51 | 12.09 |
| Off-site liquor | 22.20 | 20.16 | 5.03 | 5.18 | N/A | N/A |
| Bookstores | 11.06 | 11.06 | 4.92 | 4.90 | 8.24 | 5.86 |
| Hotspots | 39.93 | 26.25 | 9.37 | 7.51 | 40.78 | 30.08 |

TABLE 2: Property crimes intensity values across East Hartford, Milford, and Richmond.

| Point sources | East Hartford | | Milford | | Richmond | |
|---|---|---|---|---|---|---|
| | Average | Median | Average | Median | Average | Median |
| Cabaret | 114.35 | 114.35 | 50.31 | 50.31 | 50.88 | 49.67 |
| On-site liquor | 61.63 | 48.31 | 256.61 | 83.42 | 54.21 | 43.69 |
| Off-site liquor | 79.06 | 64.47 | 94.98 | 61.74 | N/A | N/A |
| Bookstores | 34.94 | 34.94 | 53.12 | 48.45 | 40.78 | 35.77 |
| Hotspots | 94.13 | 79.50 | 183.16 | 108.09 | 83.99 | 74.40 |

TABLE 3: Vice/disorder crimes intensity value across East Hartford, Milford, and Richmond.

| Point sources | East Hartford | | Milford | | Richmond | |
|---|---|---|---|---|---|---|
| | Average | Median | Average | Median | Average | Median |
| Cabaret | 39.04 | 39.04 | 13.83 | 13.83 | 12.62 | 15.22 |
| On-site liquor | 12.87 | 9.50 | 24.37 | 15.91 | 14.29 | 7.35 |
| Off-site liquor | 8.19 | 6.95 | 18.99 | 15.24 | N/A | N/A |
| Bookstores | 4.23 | 4.23 | 18.69 | 17.35 | 8.06 | 4.59 |
| Hotspots | 21.52 | 11.37 | 39.08 | 30.98 | 46.2 | 41.84 |

TABLE 4: Sex crimes intensity values across East Hartford, Milford, and Richmond.

| Point sources | East Hartford | | Milford | | Richmond | |
|---|---|---|---|---|---|---|
| | Average | Median | Average | Median | Average | Median |
| Cabaret | 0.96 | 0.96 | 1.34 | 1.34 | 0.21 | 0.00 |
| On-site liquor | 1.66 | 1.00 | 1.80 | 0.92 | 0.19 | 0.00 |
| Off-site liquor | 1.52 | 1.45 | 0.87 | 0.32 | N/A | N/A |
| Bookstores | 1.00 | 1.00 | 0.80 | 0.83 | 0.06 | 0.00 |
| Hotspots | 4.93 | 3.57 | 3.51 | 2.65 | 1.20 | 1.00 |

at best, inconclusive and may not meet the *Alameda* evidentiary standard [4]. More recent empirical examinations of the potential public safety hazards posed by adult businesses in communities in which they are located, such as San Diego, several cities in Ohio, Charlotte North Carolina, and several other municipalities, have been undertaken by Linz and his associates [5–8], as well as other researchers examining adult business in San Antonio [9]. These investigations suggest that adult businesses do not pose the public safety hazards assumed by municipalities and the courts.

Although studies published in peer-reviewed journals with a contrary view are few in number, at least one other author has claimed to find secondary crime effects for adult businesses, in contrast to the null findings of the Linz et al. and Enriquez et al. investigations. McCleary [10] claims to have found empirical evidence of crime increases when an adult entertainment business opened on an interstate highway off-ramp to a small rural village. To explain these findings McCleary relies on a variation of the hotspot theory of routine activities. In addition, McCleary [11] asserts that subclasses of adult businesses do not differ in ambient crime risk, a finding later contradicted by Seaman and Linz [8].

The present study addresses four questions pertinent to the debate concerning secondary crime effects of adult businesses, in light of the criminological theory of hotspots and routine activities. First, we ask the following. Are businesses that feature adult entertainment located in several cities in the Eastern United States hotspots for crime? How do adult businesses compare with other businesses in the community as places that attract crime? What types or subclasses of adult business are most likely to be associated with crime?

## 2. Hotspot Theory of Routine Activities

Routine activities theory is derived from a rational choice perspective which maintains that committing a crime is a purposive behavior that the criminal believes will benefit him in some way [12] The theory states, in part, that crime activity is the result of a convergence in time and space of a likely offender, a suitable target, and the presence of capable guardians to prevent the crime. The more often that these three factors converge, the more often crime will occur. Further, the more valuable the target is perceived to be, or the easier it is to victimize the target, the more likely offenders will commit a predatory crime. Constructs from routine activities theory and environmental criminology have been used to explain crime trends in a variety of urban locations (see, e.g., [13]).

An empirical observation important to this theoretical perspective is the finding that the majority of crimes in any given city occur in a few geographic areas or "hotspots." Ratcliffe and McCullagh [14] define hotspots as "aggregations of the raw crime data, designed to identify the sites of highest incident concentrations" (page 385). For example, Sherman et al. [15] found that, in Minneapolis, 50 percent of all calls to the police regarding predatory crime resulting in a patrol car being dispatched went to only 3 percent of all the addresses or intersections in the entire city. Consistent with the theory, research has shown that these crime hotspots are, indeed, often the result of the convergence of offenders, targets, and guardians in space and time [15]. For example, Ratcliffe et al. [16] found that increasing police foot patrols in areas known to be hotspots for violent crime led to a significant decrease of

Journal of Criminology 3




Crimes in East Hartford, CT
▲ Adult bookstores
▲ Adult cabarets
◦ Mixed beverage locations

N

Miles
0.15
0.3
0.6

Figure 1: Crime kernel density estimation for East Hartford, CT.




Crimes in Milford, CT
▲ Adult bookstores
▲ Adult cabarets
◦ Mixed beverage locations

N

Miles
0.5
1
2

Figure 2: Crime kernel density estimation for Milford, CT.

violent crime rates compared to controls. Weisburd et al. [17] also found that higher concentrations of motivated offenders (in this case, juveniles at high risk for committing crimes) were associated with a higher likelihood of the area being a crime hotspot. In addition, Ratcliffe and McCullagh [14] have found evidence to suggest that hotspots can be categorized into one of two broad categories: hotpoints, which are single remote locations characterized by a high incidence of crime, and hotbeds, which are a grouping of discrete locations with high incidence of crime that are spatially proximal.

*2.1. Sexually Oriented Businesses as Crime "Hotspots".* McCleary [11] has modified the routine activities theory of hotspots and applied this modified theory to adult businesses. McCleary maintains that sexually oriented businesses draw potential targets (customers) to the area around the businesses that are attractive to criminals based on the "presumed" characteristics of these customers such as lack of residence in the neighborhood, being disproportionately male (and thus more likely to enter an adult business alone rather than with a group of friends), being open to vice overtures (i.e., offers of drugs, prostitution), carrying cash, and being reluctant to report their victimization to the police. McCleary proposes that because of the presence of so many attractive targets, presumably drawn there by the sexually oriented business, criminals are rationally motivated to seek out these areas and victimize these "soft" targets. McCleary surmises that because of these presumed features that sexually oriented businesses must be "hotspots" of crime.



Crimes in Richmond, VA
▲ Adult bookstores
▲ Adult cabarets
◦ Mixed beverage locations

N

Miles
0.25
1.25
2.5
5

Figure 3: Crime kernel density estimation for Richmond, VA.

However, we suggest that routine activities theory would actually predict the opposite of McCleary's theory, for several reasons. First, routine activities theory posits that offenders are attracted to areas and locations that bring them into proximity with suitable targets, such as shopping malls, large retail store parking lots, and fast food restaurants [18]. These locations are most likely to be both target rich and congruent with the lifestyle of people that are likely to commit crimes than are other locations. Most adult businesses do not present

4



Crimes in East Hartford, CT
Crime rate per 1000 ambient population

- 0.00–74.07
- 74.08–210.53
- 210.54–451.04
- 451.05–965.59
- 965.60–6545.45
- ▲ Adult bookstores
- ▲ Adult cabarets
- ○ Mixed beverage locations

FIGURE 4: LandScan map for crimes per 1000 ambient population in East Hartford, CT.



Crimes in Milford, CT
Crime rate per 1000 ambient population

- 0.00–111.11
- 111.12–250.64
- 250.65–494.21
- 494.22–1123.57
- 1123.58–4800.00
- ▲ Adult bookstores
- ▲ Adult cabarets
- ○ Mixed beverage locations

FIGURE 5: LandScan map for crimes per 1000 ambient population in Milford, CT.

an environment as target rich as several restaurants or grocery shopping locations. Particularly, locations such as adult cabarets may be too expensive, due to the expensive entry fees as well entertainment fees, and therefore incongruous with the lifestyles of the most likely offenders. Additionally, routine activities theory also implies that people and their property vary in suitability as targets for predatory crime and that these differences influence who is chosen by offenders or whether or not a crime even occurs at all [19]. While it might be the case that patrons of adult businesses would have high economic value that are theoretically attractive to offenders, a range of soft targets (or those who are easily victimized), such as elderly men and women and mothers with small children in tow carrying cash, would be considered theoretically the most valuable targets. These people are not frequent patrons of adult establishments. Moreover, the presence of people who are inattentive to their surroundings is far more likely at bars and restaurants, rather than adult business venues, because the former are controversial in the community and customers will be far more likely to be especially vigilant of potential danger. This should be especially true at bookstores, in which there is no alcohol being consumed on-site to lower the vigilance of customers. Further, adult cabarets, for example, are known for exceptionally high level of guardianship. These establishments often employ several male floor hosts and "bouncers." Security personnel often patrol the parking area and may even have security cameras that oversee entries and locations in the club. These guardianship practices would contribute to relatively low levels of criminal activity at adult business locations.

Empirical research has also not supported the notion that adult businesses are hotspots of crime. For example, Weisburd et al. [20] found that between four and five percent of street segments in the city accounted for 50 percent of crime incidents for each year over 14 years. As Cancino and McCluskey [21] have pointed out, these studies did *not* identify any adult businesses as hotspots.

### 2.2. 7th Circuit Court of Appeals and Adult Businesses as Hotspots.

This hybrid theory and these hypothesized effects have been directly and most thoroughly addressed by the 7th Circuit Court of Appeals in *New Albany DVD, L.L.C. v. City of New Albany*, 581 F.3d 556 (7th Cir. 2010), cert denied, 130 S.Ct. 3410 (June 14, 2010). This case involved a zoning ordinance prohibiting the opening of a video store. The 7th Circuit Court of Appeals was suspicious of the reasoning underlying McCleary's theory and questioned whether it was empirically supported. Referring to the McCleary theory as "the theft line of argument," the court said

> The "theft" line of argument starts with the premise that many customers of adult establishments pay in cash, which makes them a target for thieves. (Page 6).

The Court in *New Albany* further said the following.

> New Albany has not supplied evidence that fairly supports the idea that adult bookstores located near churches or residences attract thieves who then steal from the local denizens as well as the stores' customers. We don't say that the City will be unable to produce this evidence, but the lack



Crimes in Richmond, VA
Crime rate per 1000 ambient population

- 🟩 0.00–56.74
- 🟩 56.75–160.32
- 🟨 160.33–317.04
- 🟧 317.05–622.53
- 🟥 622.54–2000.00
- ▲ Adult bookstores
- ▲ Adult cabarets
- ○ Mixed beverage locations

N

Miles

0   1.25  2.5        5

FIGURE 6: LandScan map for person crimes per 1000 ambient population in Richmond, VA.

*of good evidence to this effect in the record—is enough to require an evidentiary hearing. (Page 7).*

Rather than using this two-step procedure employed by other researchers (e.g., [15, 22]), in which a point source is established as a hotspot before applying routine activities theory to understand the dynamics of crime at that location, McCleary's application of routine activities theory to adult businesses and secondary effects *begins and ends* with an adult address as a point source, never endeavoring to establish whether that point source is a crime hotspot in the context of the larger municipal, metropolitan, or other geographical areas. It can be argued that unless it can be established that there is an unusual amount or pattern of crime surrounding a particular geographical location, it would seem to be unnecessary to resort to a special theory such as routine activities to explain a crime pattern that is not anomalous.

The present study endeavors to answer the question: are adult businesses hotspots of crime activity?

*2.3. Comparing Adult Businesses to Other Locations.* Once the hotspot question has been addressed, subsequent questions involving the identifiable features of the adult businesses themselves and the features of other businesses and locales that may be associated with crime and the routine activities of who does what and where may be answered using a comparative analysis. Simply knowing that crime occurs in the vicinity of an adult business gives no indication of the relative frequency of crime compared to other locales. Here it is useful to understand the criminological impact of adult

businesses relative to other types of businesses and other locales in a community.

The 7th Circuit Court of Appeals in the case *Annex Books, Inc. v. City of Indianapolis, Ind.* [23] has said that crime in and around adult businesses must be compared to some control location in order to understand the relative criminological potency of an adult business. If such a comparative analysis is not undertaken, the court said the ordinance to regulate adult businesses in Indianapolis may be unconstitutional and a court hearing or court trial is necessary for the municipality and the adult businesses to determine whether or not the ordinance is fairly supported by the evidence collected in a scientifically valid manner.

The court, commenting on the comparative analysis issue further, went on to suggest that alcohol-serving businesses would constitute the most useful control or comparison points, as the court noted in *Annex Books*.

*Nor can we tell whether 41 arrests at one business over the course of 365 days is a large or a small number. How does it compare with arrests for drunkenness or public urination in or near taverns, which in Indianapolis can be open on Sunday and well after midnight? If there is more misconduct at a bar than at an adult emporium, how would that justify greater legal restrictions on the book-store—much of whose stock in trade is constitutionally protected in a way that beer and liquor are not. ([23, page 4])*

The 7th Circuit Court has stated that taverns and bars are appropriate comparison points for criminal activity in the vicinity of adult bookstores. In the present study we ask the following: how do adult bookstores compare with other businesses such as taverns and bars in the community as places that attract crime?

## 3. Are Subclasses of Adult Businesses Equal in Their Crime Impact?

In addition to the questions of whether adult businesses are hotspots of crime activity in the first place and how adult businesses compare to other businesses in the community, it is useful to know how *types* or *subclasses* of adult businesses compare to one another in terms of criminological impact. The courts have also weighed this question to some degree. The question for the courts has been how applicable is evidence of secondary effects associated with one type of business to conclusions about crime and public safety for other types of adult businesses. Specifically, the courts have been concerned with the question of whether "off-site" adult businesses (i.e., retail businesses in which adult entertainment is bought and then viewed at home) versus "on-site" adult businesses (i.e., businesses with adult entertainment on premises) are differentially associated with crime. Secondary effects studies have typically ignored salient differences among distinct adult business models.

Recall that, in *City of Los Angeles v. Alameda Books*, the court allowed adult businesses to challenge the relevance of

secondary effects evidence. If an adult business plaintiff could demonstrate that the government's evidence was *irrelevant* to the problem that its ordinance purported to address, the ordinance might be struck down. The Fifth, Seventh, and Tenth Circuit Courts of Appeal are "split" regarding the meaning of the *Alameda* of decision for the relevance of secondary effects evidence. The Fifth Circuit decision *Encore Videos v. City of San Antonio* struck down a San Antonio ordinance when the city failed to include secondary effects studies of "off-site" adult bookstores in the defense of the ordinance. The court said that the evidence used by the city did not distinguish between "on-site" and "off-site" sexually oriented businesses and that it is reasonable to assume that "off-site" sexually oriented businesses would be associated with less crime, due to the fact that the patrons are not present at and around the location of the business for as long as they would be at "on-site" businesses.

The Seventh Circuit Court of Appeals, in the two separate cases mentioned above, has also said that distinctions between "subclasses" of adult businesses are important. The court has said that in order to regulate "off-site" adult businesses, cities and municipalities must provide reliable evidence that this class of businesses is associated with negative secondary effects. In *Annex*, the court said that the crime data must be relevant to the type of business for which secondary effects are being alleged.

> *The City's only evidence about the four plaintiffs is that during 2002 the police made 41 arrests for public masturbation at Annex Books, the only plaintiff that offers private booths. (The masturbation was "public" in the sense that officers could see what customers were doing inside the booths.) The district court thought this datum enough, by itself, to support the 2003 amendments. Yet it is hard to grasp how misdemeanors committed in single-person booths justify the regulation of book and video retailers that lack such booths (Id. at 4.).*

In the companion decision in *New Albany DVD, LLC v. City of New Albany* [24], the city of Indianapolis and New Albany relied only upon studies that examined the impact of adult businesses with live entertainment or on-site viewing booths. The Seventh Circuit specifically required the city to provide evidence that off-site adult businesses are associated with negative secondary effects.

In contrast, the Tenth Circuit has not agreed with the Fifth and Seventh Circuit courts. In *Doctor John's, Inc. v. City of Roy* [25], the court upheld the constitutionality of an ordinance in Roy, Utah, writing that "*Alameda Books* reiterated that a city does not face a "high bar" in meeting its initial obligation to show an ordinance is narrowly tailored towards a significant interest; it need only show that its evidence "fairly support[s]" its rationale."

The question of adult business subclass differences may be extended beyond the possible differences between "off-site" (i.e., retail businesses in which adult entertainment is bought and then viewed at home) and "on-site" adult businesses (i.e., businesses with adult entertainment on premises) and whether secondary crime effects are similar for both. A potentially more important question concerns the difference between the two predominate business subtypes, the adult cabaret or nightclub that offers live entertainment such as exotic dancing and often serves alcohol and the book/video store where no such live entertainment is offered but where on-premise viewing of adult materials is possible. This differential crime potential of these businesses has not been addressed by the courts at all. However, there is good reason to believe that the two types will differ in terms of crime impact.

Compared to the adult book/video store, the adult cabaret may be a more frequent source of criminal activity simply because this business model nearly always includes alcohol service. A central precept of routine activities theory is that areas that contain public establishments that serve alcohol as an important part of their retail activity facilitate general crime [22, 26–31]. It has also been shown that higher levels of alcohol outlet density are geographically associated with higher rates of violence [32, 33]. Therefore, there may be significant differences in crime between adult businesses that serve alcohol and those that do not. Further, the amount of traffic and number of visitors at any business will affect the extent to which criminal activity occurs around that location [15, 34]. Adult businesses that offer live entertainment such as cabarets might be expected to have more traffic and patrons on-site than will bookstores.

In the present study we explore the question of what types or subclasses of adult business are most likely to be associated with crime. We wonder, on the basis of the forgoing, if cabarets will be more criminogenic than adult bookstores. We also wonder about the results of comparisons of adult cabarets and other alcohol serving businesses in the community and if cabarets are more or less criminogenic than bars and taverns.

## 4. Summary of Research Questions

In summary, relying upon the hotspot theory of routine activities as applied to sexually oriented businesses, the following research questions were investigated. RQ 1: are businesses that offer sexually oriented communication "hotspots" of criminal activity? RQ 2: is the geospatial relationship between crime and adult cabarets lower, equal to, or higher than the geospatial relationship between crime and adult bookstores? RQ 3: is the geospatial relationship between crime and adult cabarets lower or higher than the geospatial relationship between crime and nonadult establishments with liquor service? Is the geospatial relationship between crime and adult bookstores lower or higher than the geospatial relationship between crime and nonadult establishments with liquor service?

An empirical study of three cities, Richmond VA, Milford CT, and East Hartford CT, was undertaken to address these research questions.

## 5. Method

*5.1. Measuring Criminal Activity.* Criminal activity was measured using crime incident data gathered with Incident Based Reporting (IBR) rules, which was obtained from law

enforcement agencies. IBR systems, which are defined at the local and state levels, involve comprehensive data collection at the incident level on the various aspects of reported criminal incidents. Depending upon the design of the particular system, the information collected can include details about the incident location, offense(s), offender(s), victim(s), property, and arrestee(s). The crime data for Milford covered the years of 2000–2008, East Hartford covered the years of 2005–2008, and Richmond covered the years from March 2007 to September 2008.

These data were then aggregated into specific "types" of crime in order to get a sense of what kinds of crimes were most prevalent in specific areas of the cities. Crimes including robberies, murders, assaults, and the like were aggregated as "Person Crimes." Crimes including burglaries, criminal mischief, shoplifting, and autothefts were aggregated as "Property Crimes." Crimes that involve alcohol or drug intoxication, possession of narcotics, prostitution, and so forth were aggregated as "Vice and Disorder Crimes." Finally, crimes such as indecent exposure, sexual assaults, and lewd and lascivious behavior were listed as "Sex Offenses."

*5.2. Adult Businesses Locations.*  Both cabarets and bookstores were located using a combination of information provided by the liquor control boards and public directories. In East Hartford, CT, there are two cabarets, Kahoots and Venus Lounge, which are located at 639 Main Street and 1268 Main Street, respectively. There are also two adult bookstores, Aircraft Book and News and Video Lane, which are located at 349 Main Street and 775 Silver Lane, respectively. It should be noted, however, that Venus Lounge was not an adult business during the full period of crime observations in the study. In 2008 the Venus Lounge became the Main Street Café, which is currently a bar that does not feature adult entertainment.

In Milford, CT, there are five adult bookstores: Milford Book and Video, located at 784 Boston Post Road; Penthouse Books, located at 9 Banner Drive, Romantix, located at 120 Boston Post Road; Video Pleasures, located at 110 Bridgeport Ave.; Vinnys Adult Superstore, located at 753 Boston Post Road. There is also one cabaret, Keepers, which is located at 354 Woodmont Road.

In Richmond, VA, there are seven cabarets: two Paper Moon Gentleman's Clubs located at both 6710 Midlothian Turnpike and 3300 Norfolk Street; Daddy Rabbit's, located at 3206 Broad Rock Road; Pure Pleasure, located at 68 Labrook Concourse; Candy Bar, located at 3904 Hull Street Road; Velvet, located at 3S 15th Street; Richard's Restaurant, located at 1732 Altamont Ave. There are also four adult bookstores in Richmond, VA; Broadway Books, located at 5100 Midlothian Tpke number A; B&T Adult Books, located at 1203W Broad St.; Quality Books, located at 8S Crenshaw Ave.; Triangle Bookstore, located at 1001N Boulevard.

*5.3. Locating Liquor-Serving Businesses.*  Liquor-serving businesses that do not feature adult entertainment were located using records obtained through the alcohol control boards in Connecticut and Virginia. For both East Hartford and Milford, these records included businesses, like bars and restaurants, which served liquor on the premises. Also included were "off-site" businesses, like liquor stores, which sold packaged liquor that could be taken home. For Richmond, the records did not distinguish between "off-site" liquor-serving businesses and those that only sold beer and wine. In fact, it was not clear from the records that off-site stores that sold liquor were even included at all. No off-site businesses, such as a grocery, had any indication that liquor was being served there and there was no specific business types listed for liquor stores or other such establishments. Because these two very different types of businesses could not be distinguished and it could not be established that "off-site" liquor-serving businesses were represented at all, only on-site liquor-serving establishments were included in the Richmond analysis.

*5.4. Constructing Crime Maps Using ArcGIS.* The crime events were then assigned latitude and longitude coordinates through geocoding in the WGS1984 coordinate system and then plotted on to a map using ArcGIS. In order to have the corresponding maps of the cities in ArCGIS, TIGER Lines provided by the U.S. Census were downloaded and added to the data file. Because the TIGER Lines were provided in a different coordinate system (NAD83), crime events were reprojected into NAD83 coordinates in order to have all elements in the data file be in the same coordinate system.

*5.5. Overview of Analysis Strategy.*  In this study, three different types of analyses were performed across the three cities: (1) kernel estimation, (2) crime rate calculations using ambient population data provided by the Oak Ridge National Laboratory, and (3) buffer analysis examining crime hypothesized to emanate from a given point source using "intensity value analysis," which takes into account the element of spatial sensitivity. Each of these analyses gives a unique picture of the relationship between sexually oriented businesses and criminal activity.

*5.6. Kernel Density Estimation.*  Kernel estimation or kernel density is a procedure that maps the location and relative density of plotted points. Cancino and McCluskey [21] suggest that using a kernel density function is a better way to understand where the concentration and proximity of crime are in a given area. Concerning this method, Anselin et al. [35] explain the following.

> Kernel estimation or kernel smoothing is one method for examining large-scale global trends in point data. The goal of kernel estimation is to estimate how event levels vary continuously across a study area based on an observed point pattern for a sample of points. Kernel estimation creates a smooth map of values using spatial data. The smoothed map appears like a spatially based histogram, with the level at each location along the map reflecting the point pattern intensity for the surrounding area. (Page 227)

Kernel density estimations were performed using the function available in ArcGIS. Crime types were combined to create a map showing the incidence of all crimes in each city. Given that there is no steadfast rule in determining search radius or bandwidth [35], the defaults given in ArcGIS were used to determine the cell output and search radius. Square meters were used as the area units, due to being the measurement system utilized by NAD83. For ease of presentation and in order to make fine grain distinctions in crime concentrations, the range of data was broken into 32 intervals, separated by natural breaks in the data, with each interval being given a particular shade. It should be noted that the use of 32 intervals is mostly arbitrary; 32 intervals were enough to show subtle differences in crime frequency across the three cities, but slightly more or fewer intervals could potentially have been used. However, unless the number of intervals was drastically different, it is unlikely that this would significantly affect the interpretation of the analysis. Darker shades corresponded to heavier concentrations of crime.

The major advantage of using the kernel density technique is that it gives an intuitive visual representation of where the crime is concentrated in a given area. Cancino and McCluskey [21] analogize this technique to a "Doppler Radar," in which one can see on a map where the heaviest and most concentrated rainfall (or in this case, crime) is located. This allows for an excellent exploratory examination of crime. Further, for our purposes, if adult businesses really are crime hotspots, we should see them located within these heavily concentrated areas of criminal activity. This technique is useful because it allows for a "bird's eye view" of where the criminal activity is spatially clustering, and whether these "clusters" of crime are proximate to adult businesses.

*5.7. Crime Rates Using Ambient Population Data.* Next, we examined crime rates across the three cities using ambient population data provided by the Oak Ridge National Laboratory. This data provides an estimate of the number of people within a given area during a 24-hour period, using probability coefficients that take into consideration factors such as proximity to roads, slope and land cover of area, and presence of nighttime lights. This estimate of ambient population provides a better measure to calculate a rate than simply the number of residents within a given area, because commercial areas often have many potential victims (e.g. customers) but few to no residents living within those areas. Therefore, calculating a crime rate based only upon the number of residents will inflate the perceived "dangerousness" of commercial areas over residential areas and will lead to an inaccurate estimate of crime risk. The LandScan dataset provides a grid of blocks approximately one square kilometer in size which each contain an estimated 24-hour ambient population count. For the sake of brevity, crime rates were calculated for all crimes across the three cities for each of these blocks, providing a crime rate per 1000 people within each LandScan block. Adult businesses were then located within their respective LandScan block and compared to crime rates across the whole city to examine whether adult businesses tend to be located in areas with high crime rates,

relative to the rest of the city. This analysis will be used as a hotspot analysis, similar to the kernel density estimation, which accounts for the impact of ambient population in the calculation of a crime rate.

*5.8. Intensity Value Analysis.* In crime hotspot research, researchers conventionally have constructed a buffer of predetermined distance around a point source and then examined the frequency of crime events that fall within that buffer in order to establish the point source's relative contribution of crime. Further, all crime events are usually assigned the same value, regardless of their distance from the hypothesized point source [36]. This lack of "spatial sensitivity" prevents the researcher from drawing conclusions about the relative contribution of a point source to ambient criminal activity. Ideally, an intensity value analysis must be undertaken in order to include the element of spatial sensitivity in any buffer analysis examining crime hypothesized to emanate from a given point source [36].

An intensity value is a value (usually one) that is weighted by the distance from a spatial event to a point source within a buffer of a specified distance. Like conventional buffer analyses, the researcher must specify the length of the radius from the point source to the edge of the buffer. Unfortunately, there is little research available on what an appropriate buffer size is, and the choice is often arbitrary [36]. However, in the area of secondary effects, cities have often constructed their ordinances requiring adult businesses to be 1000 feet away from residential areas and/or other adult businesses. Given that cities and municipalities have often maintained that a 1,000-foot buffer was sufficient distance to keep ambient criminal activity from creeping into areas that needed to be protected, 1,000-foot buffers were used in the intensity value analysis due to their legal significance. Crime events were converted from latitude/longitude coordinates into Cartesian coordinates using ArcGIS and then analyzed using buffer intensity analysis software developed by Ratcliffe [37].

This intensity value analysis software utilizes an inverse weighting procedure in which each crime event within the buffer of a point source is given a weighted value depending on its distance from that point source. The exact algorithm used in order to weight particular crime events is too rather arbitrary, but results rarely vary as a result of the algorithm utilized [36]. For the purposes of this study, a nonlinear inverse weighting method based on an exponential value was used, such that crime events half the distance from the point source contribute a weighted value of 0.33 to the final intensity calculation.

Using this algorithm, each crime event within 1,000 feet of the adult businesses was weighted and added together to get a final intensity value for that particular business. This value is, of course, both descriptive and relative. In order to make meaningful comparisons, intensity values were also calculated for the approximately top 100 hotspots for each type of crime and also for liquor-serving establishments within the city. In addition, for Milford and East Hartford, both "off-site" (e.g., liquor stores) and "on-site" (bars and nightclubs) liquor-serving establishments were able to be

obtained. As mentioned above, in Richmond only "on-site" liquor-serving establishments were included.

Further, adult cabarets and bookstores were separately compared in order to test whether there were any noticeable differences between the two classes of business.

## 6. Results

*6.1. Kernel Density Estimation Analyses.* The kernel density estimation was used to investigate RQ 1: are businesses that offer sexually oriented communication "hotspots" of criminal activity? Kernel density estimations work best as simple visual examples and will be relied upon as such here.

*6.1.1. East Hartford.* The kernel density estimation map for East Hartford, CT, can be seen in Figure 1. All of the adult businesses, except for the Venus Lounge, are not located within the heaviest (or, in a visual sense, "darkest") clusters of crime. However, this cluster does not appear to be centered around Venus Lounge specifically. Rather, Venus Lounge appears to be located in a larger area in which crime is prevalent and which also contains at least two other nonadult alcohol-serving establishments. However, conservatively, it can be said that Venus Lounge is somewhat spatially related to high occurrences of person, property, and vice/disorder crime. Adult bookstores did not seem to have any sort of spatial relationship to crime.

*6.1.2. Milford, CT.* The kernel density estimation map for Milford, CT, can be seen in Figure 2. None of the adult businesses are wholly within any of the heaviest clusters of crime activity. In fact, the heaviest cluster of crime in the city seems to be centered on a nonadult liquor-serving establishment. Therefore, there does not seem to be any spatial relationship between adult businesses and heavy clusters of criminal activity in Milford, CT.

*6.1.3. Richmond, VA.* Kernel density estimation map for Richmond, VA, can be seen in Figure 3. Neither the adult bookstores nor the adult cabarets are completely located within any of the densest areas of crimes. Once again, there does not seem to be a clear spatial relationship between adult businesses and crime.

*6.2. Ambient Population Crime Analysis.* Ambient population crime analysis was also used to investigate RQ 1: are businesses that offer sexually oriented communication "hotspots" of criminal activity? Much like the kernel density estimation, this analysis is meant to provide an overall visual picture of areas of heavy crime within each city and is not meant to provide detailed quantitative information about specific differences between subclasses of adult businesses or between adult businesses and liquor-serving establishments. Thus, as with the prior analysis, the ambient crime analysis will be utilized to provide a general sense of where the "hotspots" of crime exist within each city.

*6.2.1. East Hartford.* The ambient population crime analysis map for East Hartford, CT, can be seen in Figure 4. While the two cabarets are present in areas with a relatively high rate of crime to ambient population, there does not appear to be a unique relationship between crime and the cabarets, and most criminogenic area in the city contains no adult businesses at all. Furthermore, the bookstores are located in areas that have relatively low incidence of crime.

*6.2.2. Milford, CT.* The ambient population crime analysis map for Milford, CT, can be seen in Figure 5. While adult businesses generally are located within relatively heavy areas of crime, no adult businesses are located in any of areas that are most strongly related to crime. This is especially significant considering the area containing two adult bookstores, is no more criminogenic than neighboring areas that contain no adult businesses at all. Given that there are two adult businesses in the same area, we should have expected this block to be particularly high in crime if McCleary's [11] version of routine activities were true. Therefore, there does not seem that adult businesses are "hotspots" of crime, when accounting for ambient population in Milford, CT.

*6.2.3. Richmond, VA.* The ambient population crime analysis map for Richmond, VA, can be seen in Figure 6. There were two cabarets that were located in the areas among the highest rate of crime in the city, while four other cabarets were not. Further, none of the adult bookstores were located in areas that had very high crime rates. Thus, in Richmond, there was some limited support that adult businesses may be located in hotspots of crime; though it was more common that they were not in these areas.

*6.3. Intensity Value Analysis.* This analysis specifically addresses the following research questions. RQ 1: is the geospatial relationship between crime and adult cabarets lower, equal to, or higher than the geospatial relationship between crime and adult bookstores? RQ 2: is the geospatial relationship between crime and adult cabarets lower or higher than the geospatial relationship between crime and nonadult establishments with liquor service? RQ 3: Is the geospatial relationship between crime and adult bookstores lower or higher than the geospatial relationship between crime and nonadult establishments with liquor service?

Hotspots were identified by examining the total number of crimes per address for each city. An address was considered to be a "hotspot" if it fell within the approximately top one hundred most criminogenic addresses in a given city. There were slight discrepancies in the number of addresses included as hotspots for each city, given that some addresses that fell below and above the cutoff for inclusion in the top one hundred had equal numbers of crimes. Therefore, the basic strategy taken was to include as close to 100 addresses as possible and stop where a natural break in the number of crimes per address occurred in the data. These addresses were then geocoded and analyzed using the intensity value analysis. An average intensity value for the hotspots was

calculated, in order to compare the criminogenic impact of an "average" hotspot to that of an adult business.

For the purposes of interpreting the results of the intensity value analyses, the mean will be given primary importance over the median. This choice was made because hotspots, which are outliers responsible for the majority of the crimes in a given city, are exactly what are of interest in this approach. So, given that means are sensitive to outliers, they are the better measure of what is and is not a "hotspot" in this case.

*6.3.1. Person Crimes.*  Results of the intensity value analysis for person crimes across the three cities can be seen in Table 1. There are considerable differences across the three cities in how "intense" criminal activity is around the cabarets as compared to the hotspots and the nonadult liquor-serving establishments.

In East Hartford, the cabarets have a higher mean intensity value than both the hotspots and on-site liquor-serving businesses controls. Looking at this more closely, this is almost entirely due to the Venus Lounge; the mean intensity value for Venus Lounge is 182.14, while it is only 46.55 at Kahoots. In Milford, the cabaret was a fraction more intense than the on-site liquor-serving establishments in terms of their mean person crime intensity and slightly less intense than the mean hotspot intensity value. In Richmond, the cabarets have lower mean intensity values for person crimes than do the on-site liquor-serving establishments and are almost half as intense as the mean hotspot value.

One clear finding, however, is that the bookstores have the lowest mean intensity value for person crimes, compared to liquor selling point sources and other hotspot point sources, and bookstores show considerable differences in mean intensity values compared to the adult cabarets and the on-site liquor-serving establishments.

*6.3.2. Property Crimes.*  Results of the intensity value analysis for property crimes across the three cities can be seen in Table 2. Once again, there are differences across the three cities. In East Hartford, the cabarets had higher mean intensity values for property crime than did the on-site liquor-serving establishments or hotspots. Again, this difference can almost entirely be attributed specifically to the Venus Lounge; the mean intensity value for Venus Lounge was 80.63, while it was 18.39 for Kahoots.

In Milford, the cabaret had a considerably lower mean intensity value than either the on-site liquor-serving establishments or the hotspots. Finally, in Richmond, the cabarets had a slightly lower mean intensity value than did the on-site liquor establishments and a noticeably lower mean intensity value compared to the hotspots. Once again, the bookstores had, across all three cities, the lowest mean intensity value for property crime.

*6.3.3. Vice Disorder Crimes.*  Table 3 displays the results of the intensity value analysis for vice/disorder crime. The cabarets showed a similar pattern as for the last two crime types. In East Hartford, the cabarets had higher mean intensity values than both the on-site liquor-serving establishments

and the hotspots. Once more, this was solely because of the Venus Lounge. The mean intensity value at the Venus Lounge was 46.55, while it was 18.39 at Kahoots. In Milford, the mean intensity value for cabarets was lower than both the on-site liquor-serving establishments and the hotspots. In Richmond, the cabarets had a slightly lower mean intensity value than the on-site liquor-serving establishments and a much lower mean intensity value than the hotspots.

In both East Hartford and Richmond, the bookstores once again had the lowest mean intensity value. However, in Milford, the mean intensity value for the bookstores was higher than that of the cabaret but still lower than any of the alcohol serving establishments or hotspots.

*6.3.4. Sex Crimes.*  Table 4 displays the results of the intensity value analysis for sex crimes. In East Hartford, the cabarets had the lowest mean intensity value out of all point sources included in the analysis. In Milford, the cabaret mean intensity value was lower than both the on-site liquor-serving establishments and the hotspots. Finally, in Richmond, the mean intensity value was just slightly higher for the cabarets than for the on-site liquor establishments but lower than the hotspots. In East Hartford, the bookstores had the second lowest mean intensity values, with the cabarets being a fraction lower. For both Milford and Richmond, the bookstores had the lowest mean intensity value of all point sources included in the study.

## 7. Discussion

The present study used crime data and adult business locations in East Hartford, Milford, and Richmond to answer several questions. Are adult businesses hotspots of crime? Are adult businesses more or less criminogenic than liquor-serving establishments? There are several conclusions that can be drawn from the analyses of these secondary effects.

*7.1. Adult Businesses as Hotspots of Crime?*  Are businesses that offer sexually oriented communication "hotspots" of criminal activity? Results of the kernel density estimation indicated that the adult businesses tended to fall outside the heaviest concentrations of criminal activity. In addition, results of the intensity value analysis indicated that the mean intensity value in the 1,000-foot area around the adult businesses was generally lower than the mean intensity value around the approximately top 100 hotspots in their respective cities. This was particularly salient for the adult bookstores. There was no city in the study and no type of crime for which the adult bookstores had a higher mean intensity value than the hotspots.

This finding was also true for the cabarets in Milford and Richmond. For no type of crime did the cabarets have a higher mean intensity value than the hotspots. This was not the case for East Hartford, however. One venue, the Venus Lounge, solely accounted for the higher cabaret mean intensity value for person, property, and vice/disorder crime. It should be further noted that the results for the Venus Lounge are partially confounded by the fact that at least two nonadult

alcohol-serving establishments are located adjacent to this business, and it is not known to what extent ambient crime activity is due to either of these two other businesses. Finally, while the ambient population analysis indicated that cabarets may be hotspots in Richmond, VA, this was contradicted by the results of the intensity value analysis. In summary, for the most part, with a few exceptions, adult businesses, either cabarets or bookstores, were not "hotspots" of crime in our study.

This finding suggests that the results of data analyses using the two-step procedure often employed by other researchers of first locating a crime hotspot and then applying routine activities theory to understand the dynamics of crime in the hotspot (e.g., [15, 22]) may yield a different account of crime patterns in a given municipality than an inquiry which begins and ends with the assumption that the adult business address is a point source of crime. The results of the present study suggest that since there is no unusual amount or pattern of crime surrounding the geographical location of adult businesses, it would seem to be unnecessary to resort to a special theory such as routine activities to explain a crime pattern that is not anomalous. McCleary's application of routine activities theory to adult businesses and secondary effects may be misapplied.

*7.2. Are There Differences between Bookstores and Cabarets?* Our findings consistently obtained across several different methods strongly suggest that there are critical crime differences between cabarets and adult bookstores in these cities. Compared to cabarets, adult bookstores, overwhelmingly, were unassociated with crime in virtually every analysis in the study. Consistently, adult bookstores were not located in areas shown to be regions of high criminal activity in kernel density estimations and had the lowest mean intensity values. Furthermore, the adult bookstores were even found to be less related to crime than both on-site and off-site liquor-serving establishments. In these particular cities, at least, there does not seem to be much evidence to support treating adult bookstores as a public safety hazard.

This finding is important for the secondary effects debate. McCleary [11] has argued that differences between subclasses of adult businesses (such as cabarets and bookstores) are trivial and should not affect theorizing about the crime impact of adult businesses. He writes the following.

> In lawsuits, SOB ("sexually oriented business") plaintiffs have argued that their narrowly-defined SOB subclass is exempt from criminological theory. But in fact, the relevant criminological theory applies to all subclasses. To the extent that two SOB subclasses draw similar patrons from similarly wide catchment areas, theory predicts similar ambient crime risks. Put simply, similar causes (the presence of many high-value targets and low levels of police presence) have similar effects (i.e., high ambient crime risk). [11, page 54]

However, McCleary's assertion that all subclasses will have equivalent effects on crime has not been well tested empirically. The present study is a strong empirical test of

McCleary's suppositions and suggests that there are substantial differences in the criminogenic impact of subtypes of adult businesses. The research results reported here suggest that municipalities should be far less concerned about the safety hazards posed by adult book/video stores compared to alcohol serving cabarets.

*7.3. Are Adult Businesses More or Less Criminogenic than Liquor-Serving Establishments?* In this study we asked is the geospatial relationship between crime and adult cabarets lower or higher than the geospatial relationship between crime and establishments with liquor service but no adult entertainment? We also asked is the geospatial relationship between crime and adult bookstores lower or higher than the geospatial relationship between crime and nonadult establishments with liquor service?

Examining the results of the three separate analyses, we found that the magnitude of the relationship between adult book/video stores and crime was far smaller than the relationship between liquor-serving establishments and crime. While adult cabarets were found to be associated with ambient crime, this level of crime was generally no greater than that found for liquor-serving establishments that did not have adult entertainment. In fact, the intensity value analyses revealed that, across the municipalities, crime generally was more "intense" around liquor-serving establishments than around adult cabarets. These findings suggest that the relationship between cabarets and crime is not due to the presence of adult entertainment per se but rather due to the presence of liquor service. This finding is consistent with a central precept of routine activities theory that areas that contain public establishments that serve alcohol facilitate general crime [22, 26–33]. This finding, while not technically inconsistent with the McCleary's [10] proposal that the presence of attractive targets, presumably drawn there by the sexually oriented business, brings in rationally motivated criminals that seek to victimize these "soft" targets, does suggest that this process is not one that is endemic to or unusually strongly associated with adult businesses. The present study demonstrates that it cannot be assumed that adult businesses must be "hotspots" of crime merely because of the presumed features of the geographic areas that contain such businesses.

*7.4. Study Limitations.* There are several limitations to the current study. The cities included in the study may not be representative of other locations across the country. The conclusions based on these data may not be easily generalized from these cities to cities in the United States at large. These venues were chosen on the basis of convenience, due to the quality of crime data available in a desirable format. However, given the difficulties associated with getting high quality, usable crime data for even one city, trying to do a representative random sample of cities to use for this analysis was beyond the scope of this study. A broader range of different cities and towns should be analyzed and compared in order to determine if there are any specific differences in secondary effects by national location. Ideally,

future research needs to be done in which cities are sampled representatively in order to maximize generalizability. This being unlikely, at the very least, a broader range of cities, towns, and municipalities needs to be analyzed and compared in order to determine if there are any specific differences in secondary effects across localities. While this study may not be broadly generalizable, it is still important to note that we observed the same pattern of relationships across three cities of varying population and geographic location. Therefore, this study suggests some evidence to suggest that these findings may hold generally and provides a strong impetus for future research in this regard.

Another limitation of the present study lies in the philosophical difficulties associated with trying to provide evidence for a null effect. Finding few differences between cabarets and bars in the present analyses used in this study, with the methods employed, is not technically a demonstration that no effects exist.

It is also important to note that we cannot necessarily establish that any crime that is spatially proximal to an adult business or nonadult alcohol-serving establishment is actually caused by that business. Future research would need to undertake a longitudinal quasiexperimental design to more soundly make such causal claims.

Another potential limitation of this study is that it did not measure the structural characteristics that would predict crime at both adult business locations as well as nonadult alcohol-serving establishments. It should be noted, however, that Seaman and Linz [8] mirrored the present results when controlling for such factors. Nonetheless, future research should integrate the structural characteristics of the urban environment in order to more precisely assess the spatial relationship between crime, subclasses of adult businesses, and nonadult alcohol-serving establishments.

In summary, there are observable differences in the crime activity between adult book/video store locations and adult cabaret locations, as well as between adult businesses in general and nonadult liquor-serving establishments. While it cannot be concluded that adult bookstores are not related to crime at all, it can be said that the adult bookstores in our convenience sample of municipalities are overall less strongly associated with crime than the adult cabarets. The same can be said concerning the strength of relationship between adult businesses and crime and the nonadult liquor-serving establishments and crime, the latter relationship showing evidence of greater strength.

*7.5. Legal and Policy Implications.* In this study we have conducted a series of comparative analyses. The Court of Appeals in *Annex Books* noted the usefulness of such a comparative analysis and suggested that this type of inquiry is undertaken so that crime in and around adult businesses could be put into some perspective relative to crime at other businesses in the community, particularly alcohol-serving businesses. The court recognized that this comparative process has First Amendment implications. Without such comparative analyses and a demonstration that adult businesses present some special problem to the community as hotspots of crime, any

legislation singling out adult businesses and the expression that occurs there for special regulation may therefore be based on the content of speech and not the secondary crime effects associated with adult businesses.

There has been a recent attempt to deliberately exclude such comparative analysis by various state legislatures who apparently fear that a finding of little difference in crime around adult businesses that compared other locations may appear to make state regulations less than content neutral. The Missouri State Legislature, for example, recently passed a law regulating adult businesses which deliberately excepts municipalities and other governmental bodies from undertaking comparisons of the secondary effects of adult businesses versus other businesses in the community R.S.Mo. § 573.525.2(3). The law incorporates the following language: "each of the foregoing negative secondary effects constitutes a harm which the state has a substantial interest in preventing or abating or both. Such substantial government interest in preventing secondary effects, which is the state's rationale for sections 573.525 to 573.537, exists independent of any comparative analysis between sexually oriented and non-sexually oriented businesses."

This language strongly suggests that the legislative purpose in adopting the legislation would likely subject the restrictions to "strict scrutiny" as content based. The language of the statute implies an intention to treat erotic expression differently from similarly situated nonerotic speech. The application of intermediate scrutiny to adult use regulations is only appropriate when "the "predominate concerns" motivating the ordinance were with the secondary effects of adult [speech] and not with the content of adult [speech]." Intermediate scrutiny, as a legal policy then, is reserved for restrictions on expression which are "justified without reference to the content of the regulated speech." The Missouri Legislature claimed to be doing so to ameliorate the adverse secondary effects alleged to be associated with that expression. But, in the next breath, the general assembly betrayed its concern with the content of the expression by stating that even if businesses offering books, magazines, videos, and live entertainment with a nonerotic theme produced the same or even greater secondary effects, SB 586 and 617 in a comparative analysis, the state would only regulate businesses offering adult content. Under Missouri law, a nightclub that presents comedy acts and a nightclub that presents adult dancers are treated differently, notwithstanding the fact that they might cause precisely the same sorts of adverse secondary effects.

Precluding comparative analyses may cause First Amendment problems for municipalities. Undertaking comparative analyses as in the present study in which an attempt is made to identify adult businesses as hotspots for crime relative to other locations and asking how adult businesses compare with other businesses in the community as places that attract crime may be one way to avoid creating content based legal restrictions.

## Conflict of Interests

The authors declare that there is no conflict of interests regarding the publication of this paper.

## References

[1] Young v. American Mini Theatres, 427 U.S. 50, 1976.

[2] City of Renton v. Playtime Theatres, Inc, 475 U.S. 41, 1986.

[3] City of Los Angeles v. Alameda Books, 535 U.S. 425, 2002.

[4] B. Paul, D. Linz, and B. Shafer, "Governmental regulation of "adult" businesses through zoning and anti-nudity ordinances: debunking the legal myth of negative secondary effects," *Communication Law & Policy*, vol. 6, pp. 255–391, 2001.

[5] D. Linz, K. C. Land, J. R. Williams, B. Paul, and M. E. Ezell, "An examination of the assumption that adult businesses are associated with crime in surrounding areas," *Law and Society Review*, vol. 38, no. 1, pp. 69–1, 2004.

[6] D. Linz, B. Paul, and M. Z. Yao, "A secondary effects study of peep show establishments in San Diego," *The Journal of Sex Research*, vol. 43, no. 2, pp. 182–193, 2006.

[7] D. Linz, M. Yao, and S. Byrne, "Testing supreme court assumptions in *California v. la Rue*: is there justification for prohibiting sexually explicit messages in establishments that sell liquor?" *Communication Law Review*, vol. 7, no. 1, pp. 23–53, 2007.

[8] C. Seaman and D. Linz, "The secondary effects doctrine since alameda: an empirical re-examination of the justifications for laws limiting first amendment protection," *Journal of Media Law and Ethics*, vol. 2, no. 4, pp. 192–214, 2010.

[9] R. Enriquez, J. M. Cancino, and S. P. Varano, "A legal and empirical perspective on crime and adult establishments: a secondary effects study in San Antonio," *Journal of Gender, Social Policy, and the Law*, vol. 15, no. 1, pp. 1–41, 2006.

[10] R. McCleary, "Rural hotspots: the case of adult businesses," *Criminal Justice Policy Review*, vol. 19, no. 2, pp. 153–163, 2008.

[11] R. McCleary, "Crime-related secondary effects: secondary effects of "off-site" sexually-oriented businesses," Report Commissioned by Texas City Attorneys Association, 2008.

[12] M. Felson and R. V. Clarke, *Opportunity Makes the Thief*, Police Research Series, Paper 98, Policing and Reducing Crime Unit, Research, Development and Statistics Directorate, London, UK, 1998.

[13] T. A. Danner, "Violent times: a case study of the Ybor City Historic District," *Criminal Justice Policy Review*, vol. 14, pp. 3–29, 2003.

[14] J. H. Ratcliffe and M. J. McCullagh, "Hotbeds of crime and the search for spatial accuracy," *Journal of Geographical Systems*, vol. 1, no. 4, pp. 385–398, 1999.

[15] L. W. Sherman, P. R. Gartin, and M. E. Buerger, "Hot spots of predatory crime: routine activities and the criminology of place," *Criminology*, vol. 27, no. 1, pp. 27–55, 1989.

[16] J. H. Ratcliffe, T. Taniguchi, E. R. Groff, and J. D. Wood, "The Philadelphia foot patrol experiment: a randomized controlled trial of police patrol effectiveness in violent crime hotspots," *Criminology*, vol. 49, no. 3, pp. 795–831, 2011.

[17] D. Weisburd, E. R. Groff, and S.-M. Yang, "Understanding and controlling hot spots of crime: the importance of formal and informal social controls," *Prevention Science*, 2013.

[18] L. E. Cohen and M. Felson, "Social change and crime rate trends: a routine activity approach," *American Sociological Review*, vol. 44, pp. 588–608, 1979.

[19] M. Felson and L. E. Cohen, "Human ecology and crime: a routine activity approach," *Human Ecology*, vol. 8, no. 4, pp. 389–406, 1980.

[20] D. Weisburd, S. Bushway, C. Lum, and S.-M. Yang, "Crime trajectories at places: a Longitudinal Study of Street Segments in the City of Seattle," *Criminology*, vol. 42, no. 2, pp. 283–322, 2004.

[21] J. Cancino and J. McCluskey, An empirical analysis of Dr. Richard McCleary's San Antonio SOB case study (Secondary Effects of "Off-Site" Sexually-oriented Businesses) commissioned by the Texas City Attorney's Assocation, *Unpublished Report*, 2009.

[22] D. Roncek and P. Maier, "Bars, blocks, and crime revisited: linking the theory of routine activities to the empiricism of 'hot spots'," *Criminology*, vol. 29, no. 4, pp. 725–753, 1991.

[23] Annex Books,v. City of Indianapolis, IN 2855813, 7th Cir. Sept. 3, 2009.

[24] New Albany DVD, LLC v. City of New Albany, No. 05-1286, 7th Cir. Sept. 10, 2009.

[25] Doctor John's, v. City of Roy, 465 F. 3d 1150, 1169, 10th Cir. 2006.

[26] R. Block and C. Block, "Space, place, and crime," in *Crime and Place: Crime Prevention Studies*, J. Eck and D. Weisburd, Eds., vol. 4, pp. 124–141, Criminal Justice Press, Massey, NJ, USA, 1995.

[27] "Minnesota Crime Commissionan analysis of the relationship between adult entertainment establishments, crime, and housing values," Tech. Rep., The Minneapolis City Council, Minneapolis, MN, USA, 1980.

[28] D. Roncek and R. Bell, "Bars, blocks and crimes," *Journal of Environmental Systems*, vol. 11, no. 1, pp. 35–46, 1981.

[29] D. Roncek and M. Pravatiner, "Additional evidence that taverns enhance nearby crime," *Sociology and Social Research*, vol. 73, no. 4, pp. 185–188, 1989.

[30] L. Shannon, "Ecological evidence of the hardening of the inner city," in *Metropolitan Crime Patterns*, R. Figlio, S. Homkin, and G. Rengert, Eds., pp. 92–128, Willow Tree, Monsey, NY, USA, 1986.

[31] L. Sherman, "Hot spots of crime and criminal careers of place," in *Crime and Place: Crime Prevention Studies*, J. Eck and D. Weisburd, Eds., vol. 4, pp. 27–55, Criminal Justice Press, Massey, NJ, USA, 1995.

[32] R. Scribner, D. Cohen, S. Kaplan, and S. H. Allen, "Alcohol availability and homicide in New Orleans: conceptual considerations for small area analysis of the effect of alcohol outlet density," *American Journal of Public Health*, vol. 98, pp. 243–251, 1999.

[33] R. A. Scribner, D. P. MacKinnon, and J. H. Dwyer, "The risk of assaultive violence and alcohol availability in Los Angeles county," *American Journal of Public Health*, vol. 85, no. 3, pp. 335–340, 1995.

[34] K. J. Rice and W. R. Smith, "Testing routine activity and social disorganization theory: socio-ecological models of automobile theft," *Journal of Research in Crime and Delinquency*, vol. 39, no. 3, pp. 304–336, 2002.

[35] L. Anselin, J. Cohen, D. Cook, W. Gorr, and G. Tita, "Spatial analysis of crime," in *Criminal Justice 2000*, D. Duffee, Ed., vol. 4 of *Measurement and Analysis of Crime and Justice*, pp. 213–262, National Institute of Justice, Washington, DC, USA, 2000.

[36] J. H. Ratcliffe and T. Taniguchi, "Is crime higher around drug-gang street corners? Two spatial approaches to the relationship between gang set spaces and local crime levels," *Crime Patterns and Analysis*, vol. 1, no. 1, pp. 23–46, 2008.

[37] J. H. Ratcliffe, *Buffer Intensity Calculator (Version 2. 3) [Computer Software]*, Temple University, Philadelphia, Pa, USA, 2007.

# A LEGAL AND EMPIRICAL PERSPECTIVE ON CRIME AND ADULT ESTABLISHMENTS: A SECONDARY EFFECTS STUDY IN SAN ANTONIO, TEXAS

ROGER ENRIQUEZ[a]

JEFFREY M. CANCINO[b]

SEAN P. VARANO[c]

Introduction ........................................................................................ 2
I. Adult Entertainment and the First Amendment ................................ 3
II. What Causes Crime? ........................................................................ 6
   A. Human Display Establishments and Crime ............................. 6
   B. Social Disorganization Theory and Crime .............................. 7
   C. Alcohol Outlet Institutions and Crime .................................. 9
III. San Antonio, TX–Rationale for Enactment ................................... 10
IV. Present Study ............................................................................... 12
   A. Research Objective ............................................................... 12

[a] Roger Enriquez received his J.D. from the University of Iowa and is an Assistant Professor of Criminal Justice at the University of Texas at San Antonio. His research agenda includes empirical testing of anecdotal legal theories with respect to jurors, false confessions, and secondary effects. Recent publications have appeared in the Journal of Gender, Race and Justice, and Policing: An International Journal of Police Strategies and Management.

[b] Jeffrey Michael Cancino is Assistant Professor of Criminal Justice at Texas State University-San Marcos. His research interests include police culture, social disorganization theory, homicide, and Latino studies. Recent publications have appeared in Policing: An International Journal of Police Strategies and Management, Homicide Studies, the Journal of Criminal Justice, and Criminal Justice Policy Review.

[c] Sean P. Varano is an Assistant Professor in the College of Criminal Justice at Northeastern University. His research interests include juvenile justice policy, intervention programs for serious juvenile offenders, homicide characteristics, and aspects of technology in the criminal justice system. His recent publications involve exploring changing characteristics of homicide events, the involvement of drugs in homicide, and police-led intervention strategies for serious juvenile offenders.

1

B. Data and Methods.............................................................. 13
    1. Defining Local Community by Block Groups........................ 13
    2. Community Characteristics.............................................. 15
    3. Texas Alcohol Beverage Commission (TABC) Data ............. 15
    4. Human Display Establishment Data .................................. 16
    5. Official Crime Data ....................................................... 16
    6. Geo-coding TABC Data, Human Display Establishments,
        and Crime................................................................. 17
    7. Dependent Variables..................................................... 18
    8. Independent Variables.................................................. 18
V. Findings............................................................................ 19
VI. Present Study Conclusions.................................................. 34
VII. Legal Implications............................................................ 34
Conclusion ........................................................................... 41

INTRODUCTION

When Oliver Wendell Holmes Jr. wrote his seminal work *The Path of Law* in 1897, he argued that "the man of the future is the man of statistics...."[1] Holmes was a philosophical pragmatist who thought judges should assess the consequences of a decision by using relevant statistical techniques and theories.   Roscoe Pound, the Dean of Harvard Law School, argued that judges had to take into consideration the sociological consequences of their decisions and advocated a broadening of legal training to include the social sciences, economics, sociology, and political science.[2]  Both Pound and Holmes embraced the notion that judges could play a creative role in rendering decisions when the case involved special or novel circumstances.

Nearly 110 years have passed since Holmes announced that the "path of law" might lead to the doorstep of the statistician.  Today, courts have shown an increasing willingness to use statistical evidence to bolster or undermine a plaintiff's claim.[3]  For example, in a case of

---

1. Oliver Wendell Holmes, *The Path of the Law*, 10 HARV. L. REV. 457, 469 (1897) (emphasizing the role that statistics would play in the practice of the law in the future).

2. *See generally* Roscoe Pound, *A Survey of Social Interests*, 57 HARV. L. REV. 1 (1943) (arguing that the training and practice of law remains overly rigid and that legal training should evolve to include varied disciplines).

3. *See* J. Mitchell Pickerill, Book Review, 24 JUST. SYS. J. 242 (2003) (reviewing JOSEPH L. GASTWIRTH ED., STATISTICAL SCIENCE IN THE COURTROOM (2000)) (explaining that statistical evidence has been used in cases involving DNA evidence,

recent vintage, the Supreme Court ruled that a municipality may regulate adult-entertainment establishments because they are concerned with the adverse "secondary effects" those establishments create.[4] Part I of this article discusses the development of the so-called secondary effects doctrine and the First Amendment.

## I. ADULT ENTERTAINMENT AND THE FIRST AMENDMENT

The Supreme Court has long recognized that adult establishments have a constitutionally protected right to free expression.[5] In *Schad v. Borough of Mount Ephraim*, the Court ruled that municipalities could promulgate zoning restrictions that affect time, place, and manner of expression of adult businesses but could not ban them out of existence.[6] In *Barnes v. Glen Theatre, Inc.*, the Supreme Court upheld a public nudity law, but eight of nine justices agreed that nude dancing was a form of expressive conduct worthy of First Amendment protection.[7] The *Barnes* case generated four separate opinions. However, the concurrence written by Justice Souter provides the most lucid explanation of the secondary effects rationale. Souter argued that secondary effects are "correlated with the existence of establishments offering [nude] dancing."[8] Whether nude dancing caused the secondary effects was not the issue, the mere presence of the correlation was sufficient to permit a municipality to regulate.[9] While correlation is a statistical term, the Court failed to articulate a threshold for intervention. Judges and lawyers were left without any

environmental and toxic torts litigation, product liability, discrimination, monetary damages, warranty contracts, tobacco litigation, jury selection methods, the death penalty and deterrence, sentencing issues, pornography, fraud, and drug trafficking).

4. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 429-30 (2002) (reversing and remanding because the City of Los Angeles could rely on a study, even one conducted years ago, of the secondary effects of adult establishments in promulgating regulations on adult establishments).

5. *See, e.g.*, Schad v. Borough of Mount Ephraim, 452 U.S. 61, 66 (1981) ("[N]ude dancing is not without its First Amendment protections from official regulation.").

6. *Id.* at 76 (demonstrating that while some of the activities involved in adult establishments may fall under the aegis of free expression, municipalities are not powerless to govern when and where that expression occurs).

7. 501 U.S. 560, 565-66 (1991) (indicating, however, that nude dancing of this variety was at the outermost bounds of constitutionally protected free expression).

8. *Id.* at 585 (Souter, J. concurring) (hinting that a secondary effects argument would be viewed more harshly if applied to a more traditionally accepted form of expression like the theatre).

9. *See id.* at 585-86 (Souter, J. concurring) ("To say that pernicious secondary effects are associated with nude dancing establishments is not necessarily to say that such effects result from the persuasive effect of the expression inherent in nude dancing. It is to say, rather, only that the effects are correlated with the existence of establishments offering such dancing, without deciding what the precise causes of the correlation actually are.").

indication as to how strong or weak the correlation must be; however, the Court did hold that a study relied on by a municipality need not be local. "[L]egislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects."[10] Again, while the *Barnes* Court did not explicitly call for empirical evidence, it does not seem plausible that a litigant could establish the presence (or absence) of secondary effects without the use of statistical data. Ironically, Justice Souter may have come to the same conclusion too late for the litigants in *Barnes* when the Court decided *City of Erie v. Pap's A.M.*[11] There, Souter acknowledged that he had made an error in his *Barnes* concurrence when he said that a governmental entity did not need localized proof of secondary effects. He commented, "[A]fter many subsequent occasions to think further about the needs of the First Amendment, I have come to believe that a government must toe the mark more carefully than I first insisted. I hope it is enlightenment on my part, and acceptable even if a little late."[12]

In *City of Los Angeles v. Alameda Books, Inc.*, Justice O'Connor, in a plurality opinion, permitted municipalities to "rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection" between adult businesses and harmful secondary effects.[13] It appears that the evidence adduced by the municipality provided the rationale for the adoption of the ordinance. Although O'Connor did not specifically state that *statistical* evidence was necessary to justify an ordinance that restrains adult businesses, it is clearly implied. After all, the word *connection* is nearly synonymous with the statistical term *correlation*. Moreover, O'Connor was quick to point out that a municipality could not get away with "shoddy data."[14] In so doing, she provided additional evidence that the Court at least contemplated a municipality's use of statistics to substantiate its rationale in adopting an ordinance. It is clear that the most

---

10. *Id.* at 584 (Souter, J., concurring) (explaining that municipalities may rely on studies conducted by other localities on the secondary effects of similar establishments in determining what regulations to place on adult establishments).

11. *See* City of Erie v. Pap's A.M., 529 U.S. 277, 310-11 (2000) (Souter, J., concurring in part and dissenting in part) (finding that the City of Erie's regulation was content-neutral and consistent with the First Amendment).

12. *Id.* at 317 (Souter, J., concurring in part and dissenting in part) (explaining that he should have required the state to have produced better evidence of their motivation for regulating in *Barnes*).

13. 535 U.S. 425, 438 (2002) (plurality opinion) (quoting City of Renton v. Playtime Theatres Inc., 475 U.S. 41, 51-52 (1986)) (pointing out that the Court had specifically refused to set a high bar for municipalities).

14. *Id.* at 438-39 ("The municipality's evidence must fairly support the municipality's rationale for its ordinance.").

prudent course for a municipality that wishes to regulate adult businesses should be to procure good statistical evidence that adult businesses and harmful secondary effects are correlated prior to the adoption of an ordinance regulating those activities.

Conversely, adult establishments that are adversely affected by an ordinance and wish to challenge its constitutionality must "cast direct doubt" on the rationale (or evidence) used to support the adoption of the ordinance.[15]  Therefore, the Supreme Court has clearly placed the burden of proof on the plaintiff.  The plaintiffs can shift the burden back on the municipality by (1) "demonstrating that the municipality's evidence does not support its rationale;" or (2) "by furnishing evidence that disputes the municipality's factual findings."[16]  Under either regime, it does not appear plausible that a plaintiff could succeed in shifting the burden of proof to the municipality without the use of an expert trained in research methods or statistics to scrutinize the municipalities study or by commissioning a study of their own with findings that differ from the municipality's findings.[17]   Once the burden is shifted, the municipality must "supplement the record with evidence renewing support for a theory that justifies its ordinance."[18]  In the instant case, the Court found that that plaintiff failed to "offer a competing theory, let alone data" to undermine the municipality's rationale for the ordinance.[19]  Ultimately, the Court ruled that the ordinance at issue was constitutional.[20]

At first blush, *Alameda* appears to merely affirm a line of cases where the Supreme Court has consistently upheld the constitutionality of zoning, nudity, and indecency ordinances that target adult businesses.[21]  However, because of the way the plurality opinion was written, the practical effect on parties that wish to prevail in similar cases is that they should probably enlist the assistance of a

---

15.  *See id.* (holding that the statistical evidence is subject to judicial scrutiny for accuracy and relevance).

16.  *Id.* (describing the burden-shifting mechanism).

17.  When a plaintiff commissions a separate study, he does so at his own peril because the commissioned study may corroborate the municipality's findings.

18.  *See id.* at 439 (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 298 (2000)).

19.  *Id.* at 437 ("While the city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects, it does not bear the burden of providing evidence that rules out every theory for the link between concentrations of adult establishments that is inconsistent with its own.").

20.  *Id.* at 442-43 (holding that the municipality could regulate adult businesses).

21.  *See, e.g., Pap's A.M.*, 529 U.S. 277; Barnes v. Glen Theater, Inc., 501 U.S. 560 (1991); Renton v. Playtime Theatres, 475 U.S. 41 (1986); Young v. American Mini Theatres, 427 U.S. 50 (1976).

6      JOURNAL OF GENDER, SOCIAL POLICY & THE LAW   [Vol. 15:1

statistician as soon as feasible.

## II. WHAT CAUSES CRIME?

### A. Human Display Establishments and Crime

Few studies have attempted to study the interaction between adult businesses and crime. In an unpublished study, Linz and Paul[22] used San Diego Police Department calls for service within a 1000-foot area to determine whether there was a greater incidence of crime in a 1000-foot vicinity of peep show establishments compared to 1000-foot control sites (based on census socioeconomic and demographic characteristics). The findings revealed no significant relationship between San Diego peep shows within the 1000-foot perimeter and crime. In a related study conducted in Daytona Beach, Florida, Linz, Fisher, and Yao[23] estimated the effects of social disorganization variables, alcohol sites, and adult cabarets on police calls for service at the census block level. The authors also matched 1000-foot perimeter control sites with those of the adult cabaret perimeters to help isolate the sources of crime. The regression analysis showed no association between adult cabarets and crime at the census block level. Rather, the results indicated that social disorganization and alcohol establishments were better predictors of crime. Using a similar methodological design and data, Linz et al.[24] found that adult businesses were not associated with crime in Charlotte, North Carolina. This study is the first peer-reviewed article to be published on the topic of adult establishments.

While the Linz studies are promising, they are far from dispositive. One question remains open: Does the presence of adult businesses in a particular area increase crime? If the answer is negative, then might there be other area characteristics or institutions that are responsible for increases in crime?

For well over seven decades, criminologists[25] have relied upon

---

22. Daniel Linz & Bryant Paul, A Secondary Effects Study Relating to Hours of Operation of Peep Show Establishments in San Diego, California (2002) (unpublished study) (on file with author).

23. Daniel Linz et al., Evaluating Potential Secondary Effects of Adult Cabarets in Daytona Beach, Florida: A Study of Calls for Service to the Police (Aug. 30, 2003) (unpublished study) (on file with author).

24. Daniel Linz et al., An Examination of the Assumption That Adult Businesses are Associated with Crime in Surrounding Areas: A Secondary Effects Study in Charlotte, North Carolina, 38 L. & SOC'Y REV. 69 (2004) (finding that the incidents of crime in areas containing adult establishments are in fact lower than similar areas without adult establishments).

25. For purposes of this paper, a criminologist is a researcher who studies the causes and correlates of crime.

social disorganization theory to understand the causes of crime rates across urban neighborhoods.[26]  The body of research based upon this theory consistently shows that the local community context matters.

### B. Social Disorganization Theory and Crime

Social disorganization theory specifies that economically impoverished local communities characterized by residential instability and ethnically diverse populations are more likely to lack social organization than more affluent, homogenous neighborhoods with stable populations.[27]  In short, social disorganization theory is primarily concerned with community mechanisms of social control that enable residents to realize collective norms and regulate behavior in order to improve the quality of life.  Three structural characteristics are most closely associated with social disorganization theory: (1) economic status, (2) residential mobility, and (3) population composition.[28]  Each concept merits a brief description.  First, socially disorganized communities characterized by low economic status lack the necessary financial resources to effectively establish informal social control (e.g., neighborhood watch groups) over community social problems (e.g., crime).[29]  Second, residential mobility[30] impedes the development of social ties among neighbors.[31]  The inability to establish social relations promotes crime by undercutting communal prevention and problem solving.  Third, researchers conceptualize population composition as recent arrivals, foreign-born persons, and those who have migrated from other parts of the country.[32]  The connection between population composition and crime is based on the premise that a mix of racial and ethnic groups disrupts the equilibrium of neighborhood social control, which in turn leads to increased crime and delinquency.[33]

Based on these three concepts, most scholars hypothesized that crime rates would be higher in socially disorganized neighborhoods.[34]

---

26. *See* C.R. SHAW & H.D. MCKAY, JUVENILE DELINQUENCY AND URBAN AREAS: A STUDY OF RATES OF DELINQUENCY IN RELATION TO DIFFERENTIAL CHARACTERISTICS OF LOCAL COMMUNITIES IN AMERICAN CITIES (UNIVERSITY OF CHICAGO PRESS 1969) (1942) (establishing the history or legacy of social disorganization theory).

27. *See id.*

28. *See id.*

29. *See id.* at 147-52.

30. Residential mobility is a community characteristic whereby residents are continuously moving, leaving the neighborhood in a constant state of transition.

31. *See* SHAW, *supra* note 26, at 147-49.

32. *See id.* at 152.

33. *See id* at 155.

34. *See id.*

Empirical evidence showed that crime was due to weakened community social organization, which resulted from structural constraints (e.g., low-economic status, high residential instability, and population composition) endemic in the environment. Ultimately, researchers concluded that community attributes explain crime patterns better than individual characteristics (e.g., an individual's race) do.[35] Thus, social disorganization is a theory about places, not persons, so the root causes of crime can be traced back to the characteristics of the community and not the individual.[36]

Recent research has gathered considerable evidence in support of social disorganization theory. Along the way, scholars have reformulated and refined the classic social disorganization model[37] and have applied the principles of social disorganization to explain the link between local institutions (e.g., bars and families–or lack thereof) and crime.[38] For example, scholars have reported that rates of family disruption (measured as divorced families), low socio-economic status, residential stability, and heterogeneity accounted for

---

35. *See id.* at 320.

36. *See id; see also* R. J. Sampson & W. J. Wilson, *Toward a Theory of Race, Crime, and Urban Inequality, in* CRIME AND INEQUALITY 37, 37-54 (J. Hagan & R.D. Peterson eds., 1995) (using community characteristics like poverty and residential instability to bolster the argument that social disorganization theory is about places not persons).

37. *See* Robert J. Bursik, *Social Disorganization and Theories of Crime and Delinquency: Problems and Prospects,* 25 CRIMINOLOGY 519 (1988) (recognizing the work of many researchers who have made methodological departures from Shaw's original social disorganization model when performing related research); D. Wayne Osgood & Jeff M. Chambers, *Social Disorganization Outside the Metropolis: An Analysis of Rural Youth Violence,* 38 CRIMINOLOGY 81, 81-82 (2000) (arguing the importance of performing social disorganization research outside of its traditional urban setting); RUTH ROSNER KORNHAUSER, SOCIAL SOURCES OF DELINQUENCY: AN APPRAISAL OF ANALYTIC MODELS 1-20 (1978) (explaining how different views on the concept of culture lead sociologists and anthropologists to formulate many theories on the best way to link social conditions and crime); Robert J. Sampson & W. Byron Grove, *Community Structure and Crime: Testing Social Disorganization Theory,* 94 AM. J. OF SOC. 774, 782 (1989) [hereinafter Sampson & Grove, *Community Structure and Crime*] (choosing as a superior research model an updated version of the classic research model that is also influenced by social-network theory, systemic theory, and macrosocial conceptualization); Sampson et al., *Neighborhood and Violent Crime: a Multilevel Study of Collective Efficacy,* 277 SCIENCE 918, 918-19 (1997) [hereinafter Sampson et al., *Neighborhood and Violent Crime*] (incorporating the measure of "collective efficacy" into social disorganization research); Robert J. Sampson & Stephen W. Raudenbush, *Systemic Social Observation of Public Spaces: A New Look at Disorder in Urban Neighborhoods,* 105 AM. J. OF SOC. 603, 605-08 (1999) [hereinafter Sampson & Raudenbush, *Disorder*] (considering the importance of using direct observation for research concerning social disorganization).

38. *See* Ruth D. Peterson et al., *Disadvantage and Neighborhood Violent Crime: Do Local Institutions Matter?,* 37 J. RES. CRIME & DELINQ. 31, 32 (2000) (lamenting many researchers' failure to fully evaluate the importance of local institutions while investigating social correlates to crime rates); *see also* Maria Luisa Alaniz et al., *Immigrants and Violence: The Importance of Neighborhood Context,* 20 HISP. J. BEHAV. SCI. 155 (1998).

much of the effect on rates of burglary.[39]  In addition, studies show that burglary is influenced by other community characteristics, such as single parent households.[40]

The most robust tests of social disorganization theory examined the effects of three social disorganization concepts (concentrated disadvantage, immigrant population, and residential instability) on violent crime.[41]  Results from their analysis showed that concentrated disadvantage (i.e., poor racially segregated residents) and residential instability were significantly related to homicide rates.  In a separate study focused on non-violent crime, researchers reported that concentrated disadvantage and mixed land use were strongly associated with less serious crimes, such as physical and social disorder.[42]  While most scholars have focused on community, social, and economic predictors associated with social disorganization, other researchers also have examined the relationship between various types of institutions (i.e., banks, libraries, recreation center, and bars) within the community that may also influence crime.

### C. Alcohol Outlet Institutions and Crime

The rationale for linking the impact of local institutions with crime can be found in the tenets of social disorganization theory.[43]  The logic behind the connection lies in the assumption that socially disorganized communities are less likely to attract and sustain so-called conventional institutions such as banks, libraries, and recreation centers that help control crime.[44]  Conversely, bars (so-

---

39. *See* Sampson & Grove, *Community Structure and Crime, supra* note 37, at 798.

40. *See* James P. Lynch & David Cantor, *Ecological and Behavioral Influences on Property Victimization at Home: Implications for Opportunity Theory,* 29 J. RES. CRIME & DELINQ 335, 339 (1992) (arguing that examining the "ecological context" of crime, along with the more traditional variables of social disorganization, will provide more accurate and reliable results); Douglas A. Smith & G. Roger, *Household Characteristics, Neighborhood Composition, and Victimization Risk,* 68 SOCIAL FORCES 621, 625-28 (1989) (contending that multi-level analysis, which combines both individual and aggregate statistics, paints the most accurate picture of crime's correlates); Pamela Wilcox Rountree, Kenneth C. Land & Terance D. Miethe, *Macro-Micro Integration In the Study of Victimization: A Hierarchical Logistic Model Analysis Across Seattle Neighborhoods,* 32 CRIMINOLOGY 387, 396 (1994) (measuring correlation between crime and characteristics, such as the number of residents that live alone).

41. *See* Sampson et al., *Neighborhood and Violent Crime, supra* note 37, at 923 (proffering that these three variables combine to create an important construct called "collective efficacy" that can be reliably linked to rates of violence in neighborhoods).

42. *See* Sampson & Raudenbush, *Disorder, supra* note 37, at 624, Table 2.

43. *See* SHAW, *supra* note 26.

44. *See* Peterson et al., *supra* note 38, at 33 (positing that social disorganization leads to economic divestment in the area, which in turn hurts positive institutions' chances of prospering).

called weak institutions), which are more prevalent in disorganized neighborhoods, tend to thwart crime control efforts.[45]    Thus, researchers have characterized the presence of bars as an indirect indicator of social disorganization[46] and more recently as "crime generators."[47]  In fact, scholars have found a higher concentration of alcohol outlets in 213 socially disorganized California cities than in those cities not characterized as socially disorganized.[48]  Therefore, the combination of weak institutions like bars and social disorganization attributes are likely to foster crime.[49]

### III. SAN ANTONIO, TX–RATIONALE FOR ENACTMENT

Clearly influenced by recent Supreme Court jurisprudence,[50] the city of San Antonio passed several ordinances aimed at curtailing

---

45. *See generally id.* at 35 (noting that bars may encourage criminal behavior by serving as a gathering place for idle individuals whose collective judgment may suffer due to inebriation).

46. *See id.* (arguing that a large number of bars in a particular area is a sign of that neighborhood's inability to control the proliferation of "weak" and potentially crime-inducing institutions).

47. *See* Marc Quimet, *Aggregation Bias in Ecological Research: How Social Disorganization and Criminal Opportunities Shape the Spatial Distribution of Juvenile Delinquency in Montreal,* 42 CAN J. OF CRIMINOLOGY 135, 140-41 (1992) (pointing out that areas such as bars, malls, and subways may breed crime because they tend to place likely victims and likely offenders in the same space).

48. *See* R. K. Watts & J. Rabow, *Alcohol Availability and Alcohol Related Problems in 213 California Cities,* 7(1) ALCOHOLISM: CLINICAL AND EXPERIMENTAL RESEARCH 47-58 (Winter 1983).

49. *See* ROBERT NASH PARKER & LINDA-ANNE REBHUN, ALCOHOL AND HOMICIDE: A DEADLY COMBINATION OF TWO AMERICAN TRADITIONS 77-101 (David Luckenbill ed., 1995); Richard A. Scribner, David P. MacKinnon & James H. Dwyer, *The Risk of Assaultive Violence and Alcohol Availability in Los Angeles County,* 85 AM. J. PUB. HEALTH 335, 338-39 (1995) (finding a significant association between the density of alcohol outlets and assaultive violence); JAMES F. SHORT, POVERTY, ETHNICITY, AND VIOLENT CRIME 54-56 (1997) (citing over a dozen researchers whose work all demonstrate the ill effects resulting from a lack of strong local institutions); Mercer L. Sullivan, *Puerto Ricans in Sunset Park, Brooklyn: Poverty Amidst Ethnic and Economic Diversity, in* IN THE BARRIOS: LATINOS AND THE UNDERCLASS DEBATE 1, 16, 22 (Joan Moore & Raquel Pinderhughes eds., 1993) (observing crime's prevalence in Sunset Park, Brooklyn, an area with few employment opportunities and many non-traditional families); WILLIAM JULIUS WILSON, THE TRULY DISADVANTAGED: THE INNER CITY, THE UNKNOWN, AND PUBLIC POLICY 25 (1987) (finding that housing projects in Chicago, which had high rates of single parent households and poverty, as well as an abundance of minors, became hotbeds of criminal activity within the city).

50. *See* SAN ANTONIO, TEX., CODE OF ORDINANCES ch. 21, art. 9, § 101002 (2006) ("WHEREAS, the City Council finds that similar adverse secondary effects have impacted the City of Jackson, Mississippi as described at J&B Entertainment, Inc. v. City of Jackson, Mississippi, 152 F.3d 362 (5th Cir. 1998); the City of Erie, Pennsylvania as described at City of Erie v. Pap's A.M., 120 S. Ct. 1382 (2000); and other cities as described in City of Renton v. Playtime Theaters, Inc., 475 U.S. 41 (1986), Young v. American Mini Theatres, 426 U.S. 50 (1976), Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), and City of Los Angeles v. Alameda Books, Inc., 121 S. Ct. 1223 (2001).").

perceived problems with area strip clubs.[51]   The municipality's ordinances prohibit, *inter alia*, nude dancing, lap dancing, and VIP rooms; require topless dancers to maintain a distance of three feet from patrons at all times; and require dancers, bouncers, and managers to apply for and wear photo ID badges while on duty.[52] Among the reasons for the enactment of the ordinance the "City Council [found] that there are adverse secondary effects resulting from public places where a state of nudity, semi-nudity, or specified sexual acts occur or exist."[53]   Moreover, the "City Council [found] that prostitution, violent crimes, and crimes against persons, promotion of prostitution, indecent exposure, lewd conduct, illegal drug possession, and illegal drug dealing occur with greater frequency at or near the aforementioned public places."[54]  The City Council also found that the "unrestricted operation of certain sexually oriented businesses may be detrimental to the public health, safety, and welfare by contributing to the decline of residential and business neighborhoods and the growth of criminal activity."[55]  Clearly, one of the aims of the ordinance was to combat a perceived increase in crime.[56]

The findings presented by the City Council were the result of statistical analysis in addition to findings from other cities and counties outside the jurisdiction of San Antonio indicating that similar adverse secondary effects were linked to adult businesses.[57] While the City relied upon in-house statistical analysis and findings

---

51.  *See* Laura Jesse, *Badge Will be Item Dancers Can't Shed—Council Toughens Strip Club Rules—Clubs Will go to Court*, SAN ANTONIO EXPRESS-NEWS, Dec. 18, 2004, at 1B.

52.  *See* SAN ANTONIO, TEX., CODE OF ORDINANCES ch. 21, art. 9, §§ 100190, 101002 (2006) (prohibiting nude dancing, lap dancing, and VIP rooms, as well as requiring dancers, bouncers, and managers to wear photo badges).

53.  *Id.* (defining adverse secondary effects as violations of the law "caused by the existence of or geographic proximity to a human display establishment").

54.  *Id.* (listing other perceived negative effects such as reduction in surrounding property value and the threat of infection and disease from unsanitary conditions caused by bodily fluids).

55.  *Id.* (quoting § 243.001 TEX. LOC. GOV'T CODE § 243.001 (2006)).

56.  *See id.* (citing studies showing increases in crime associated with human display establishments).   Additionally, the city was concerned with declines in property values.  While the present study does not take diminution of real property values into account, the authors performed an unpublished study that shows no correlation between adult cabarets and decreases in property value.  *See also* Jeffrey Cancino, Assessing the Effects of Human Display Establishments on Property Values: An Empirical Study in San Antonio, Texas (Feb. 27, 2004) (unpublished study) (on file with author) (assessing whether proximity to human display establishments affects property values).

57.  *See* §§ 100190, 101002 (relying upon the findings set forth in the legal opinions of the cities of Jackson, Miss. and Erie, Pa. as providing additional support for enacting the regulations).

presented by other local governments to support its position, both approaches are controversial and have been criticized. An examination of previous city-studies showed severe methodological limitations that raise concerns and may warrant further investigation.[58]  For example, scholars report that the Indiana study (1986) failed to properly match (based on key variables) study site with control site, the Phoenix study (1979) used only one year of crime data, and the Los Angeles (1977) results were biased due to a direct increase in enforcement during the evaluation period.[59]  In short, the reliability of previous city-studies is dubious at best and most likely fatally flawed.

Moreover, the in-house studies relied upon by the City Council were just as problematic. In fact, the police department's chief statistician admitted, "crime can't be definitely linked to activity in the clubs."[60]

## IV. PRESENT STUDY

### A. Research Objective

In order to ascertain the rationality of the municipality's ordinance, a study was undertaken. The primary research objective of the study was to determine the effect of human display establishments on crime after controlling for social disorganization characteristics and alcohol outlets. To accomplish this objective, multiple sources of data were used to measure social disorganization characteristics in the community, identify the unit of analysis, and identify local institutions of interest. In terms of analysis, four analytical strategies were employed.

The first strategy is more descriptive in nature. Consistent with previous adult establishment research, 500-and 1000-foot concentric zone perimeters were constructed around human display establishments and control sites. The human display establishments

---

58. *See* Bryant Paul et al., *Government Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects*, 6 COMM. L. & POL'Y 355, 367, 372-76, 385 (2001) (emphasizing that the methodology used in the most frequently cited studies is often flawed by poor selection of control areas, insufficient time periods, change in police presence, and segmented surveys preventing a study from being reliable).

59. *See, e.g., id.* at 379-81 (proffering that the authors of the study failed to find controls sufficiently similar in zoning mix, population, and age of housing, asserting that by only using data from one year the study could not demonstrate reliability or predictability and adding that an increase in police presence of the studied area makes the study's findings suspect).

60. *See* Jesse, *supra* note 51, at B1 (interviewing the police department's chief statistician).

Case 3:22-cv-00177-M   Document 47   Filed 05/24/22   Page 370 of 399   PageID 1495

were matched with a control site based on similar socioeconomic and demographic census characteristics. Once the concentric zones were fitted with the census data, crime incidents occurring within the 500- and 1000-foot perimeters were mapped for analysis. Note that such preliminary analysis provides a frequency distribution of incidents per year and the averages for several crime outcomes. This rather cursory analysis is followed by a bivariate analysis. Next, an analysis of variance is conducted to help determine whether statistical differences in crime rate means among three types of block groups exist. Finally, a more rigorous multivariate stepwise regression analysis is performed. Before proceeding with the various types of analysis, a thorough review of the data and methods are provided. For the sake of brevity, only the more rigorous multivariate stepwise regression analysis will be published in this paper.[61]

### B. Data and Methods

Four independent data sources—2000 Census data, Texas Alcohol Beverage Commission (TABC) data, adult human display establishment data, and official San Antonio Police Department crime records—were used to assess the effects of human display establishments on crime, net of social disorganization predictors, and alcohol outlets. The following subsections highlight the collection procedures for these data.

### 1. Defining Local Community by Block Groups

Urban sociological research is replete with controversies about the proper operationalization regarding what constitutes a "neighborhood" or "community."[62]   For example, when studying crime rates and crime-related outcomes, the criminological literature shows that scholars normally select pre-constructed units from the census bureau ranging from geographically large tracts,[63] to small

---

61. *See* Cancino, *supra* note 56.

62. Since the early ecological studies of the Chicago School, researchers have struggled to adequately define the term "community." For the most part, the term has been defined rather loosely. For example, researchers have defined community in three different ways: (1) social aspects, such as group solidarity, cohesion, and social interaction; (2) geographic features, such as census tracts, block groups, roads, and businesses; and (3) socio-geographic characteristics where researchers attempt to identify both social and geographic components.  *See generally* TERANCE D. MIETHE & ROBERT F. MEIER, CRIME AND ITS SOCIAL CONTEXT 3, 21-22 (1994) (emphasizing the influences that the social or geographic characteristics of a community can influence crime rates).

63. *See, e.g.*, Sampson et al., *Neighborhood and Violent Crime, supra* note 37, at 919 (combining census tracts in Chicago spatially to create clusters approximately the size of local neighborhoods); Pamela Wilcox Rountree & Kenneth C. Land, *Burglary Victimization Perceptions of Crime Risk and Routine Activities: A Multilevel Analysis*

14      JOURNAL OF GENDER, SOCIAL POLICY & THE LAW   [Vol. 15:1

block groups,[64] and smaller face blocks.[65]   There appears to be a
methodological trade-off with respect to the type of aggregate chosen.
When researchers do not have access to a high number of crime
incidents, using a larger unit of analysis (e.g., census tract) helps to
compensate for such deficiency by increasing the reliability and
minimizing measurement error.[66]   Choosing among these aggregates
is convenient, but the reality is that determining the appropriate
aggregate usually is dictated by characteristics of the study, data
availability, and variables used.[67]

In the present study, there exist a relatively large number of crime
incidents.   Therefore, it was decided to use block groups as the unit of
analysis.   There is sufficient justification for using census block groups
over larger tracts and smaller face blocks.[68]   Moreover, alcohol outlets

---

*Across Seattle Neighborhoods and Census Tracts*, 33 J. RES. CRIME & DELINQ. 147, 147
(1996) (classifying individuals within larger units according to census tracts in the city
of Seattle).

64.  *See* Denise C. Gottfredson et al., *Social Area Influences on Delinquency: A
Multilevel Analysis*, 28 J. RES. CRIME & DELINQ. 197, 206 (1991) (studying data
according to block groups consisting of about 10 city blocks and having a population
between 1,000 and 1,200 persons and using enumeration districts of about 500 to 600
persons where Census Bureau data did not contain such blocks); *see also* Alaniz et al.,
*supra* note 38, at 155-174; Ora Simcha-Fagan & Joseph E. Schwartz, *Neighborhood
and Delinquency: An Assessment of Contextual Effects*, 24 CRIMINOLOGY 667, 673-74
(1986) (studying neighborhoods consisting of geographically contiguous study areas
that included block groups with similar demographics).

65.  *Compare* MEITHE & MEIER, *supra* note 62, at 81 (studying the effect of
proximity to high crime areas on increased victimization rates by averaging the
indications of social and economic deterioration occurring within three blocks of an
individual's residence), *with* William R. Smith et al., *Furthering the Integration of
Routine Activity and Social Disorganization Theories: Small Units of Analysis and the
Study of Street Robbery as a Diffusion Process*, 38 CRIMINOLOGY 489, 494-95 (2000)
(finding face blocks the preferable method of analysis, but elaborating that its small
size may result in higher statistical rates of interaction because they are more likely to
share similar characteristics), *and* Ralph B. Taylor & Jeanette Covington, *Community
Structural Change and Fear of Crime*, 40 SOC. PROBS. 374, 379-80 (1993) (selecting
one side of each census block randomly and choosing another side where that side
did not meet the necessary criteria but refraining from using both sides of one
block).

66.  *See, e.g.*, Quimet, *supra* note 47, at 150 (advising the use of larger areas of
study where crime or delinquency rates are low to increase reliability).

67.  *See id.* at 151 (explaining that a researcher must tailor the study to the type of
analysis most suited to the information available, and finding neighborhoods most
suitable for social disorganization models and census tracts best for variables from
opportunity models).

68.  Prior social disorganization research has used block groups: *see, e.g.*, Michael
D. Reisig & Jeffrey Michael Cancino, *Incivilities in Nonmetropolitan Communities:
The Effects of Structural Constraints, Social Conditions, and Crime*, 32 J. CRIM. JUST.
15, 19-20 (2004) (constructing units of analysis based on those used for
"neighborhood clusters," in conjunction with block groups); Jeffrey Michael Cancino,
*Breaking from Orthodoxy: The Effects of Social Disorganization on Perceived
Burglary in Nonmetropolitan Communities*, 28 AM. J. CRIM. JUST. 1 (2003). Moreover,
census face blocks are too small given San Antonio's relatively large population and
are more reflective of residential areas.

and human display establishments are not situated in the face block residential fashion; instead, such establishments are represented more accurately by a block group combination of business and residential locales.    Overall, block groups are the most appropriate unit of analysis for the current research objectives and are thus used as the defining feature of the local community.

Census 2000 data was used to identify the unit of analysis—block groups (BGs) and to identify an array of socioeconomic and demographic items at the BG-level, such as total population, number of whites, number of Latinos, and the like.  Note that census items are not direct indicators of social disorganization; rather, they reflect key structural conditions suggested by a long line of theorists as causes of social disorganization.[69]  Overall, 1,016 BGs were used.  Population sizes for the BGs ranged from 4 to 9,922 individuals, with a mean population of approximately 1,400.

### 2. Community Characteristics

The community characteristics were also derived from 2000 Census data.[70]    The specific community characteristics include absolute values for median household income in dollars, African-Americans, Latinos, males age 15 to 29, divorced adult residents, female-headed households, vacant housing units, and renter-occupied housing units. In an effort to be consistent with scholarship in the field, these specific community characteristics were selected because research indicates that these characteristics tend to increase the relative level of crime and disorder.  If social disorganization controls are not taken into account, then it is possible that any apparent effects of human display establishments on crime might be overestimated.

### 3. Texas Alcohol Beverage Commission (TABC) Data

Consistent with prior research that collected alcohol outlet data,[71] the current study obtained a list of all "on-site" alcohol serving institutions from the TABC.  This entity makes such information publicly available via the Internet in a downloadable version.[72]  The

---

69. *See* Eric Silver, *Extending Social Disorganization Theory: A Multilevel Approach to the Study of Violence Among Persons with Mental Illness*, 38 CRIMINOLOGY 1043, 1056-67 (2000) (indicating that census tract measures do not directly demonstrate "neighborhood social disorganization processes," but instead reveal structural conditions that theorists consider to cause social disorganization).

70. *See* U.S. Census Bureau, Census 2000 Gateway, http://www.census.gov/main /www/cen2000.html (last visited July 22, 2006).

71. *See* Alaniz et al., *supra* note 38, at 155-74; Peterson et al., *supra* note 38, at 39-41 (studying the apparent "crime-producing influence" bars have on their surrounding neighborhoods).

72. *See* Texas Alcoholic Beverage Commission Homepage, http://www.tabc.state.

information includes, for example, the physical street address, type of
license, name of business, and length of operation.    Alcohol
establishments were limited to locations that allow for the
consumption of alcohol on-site, thereby excluding those businesses
that are mere retailers of alcohol, deemed more appropriately as "off-
site." The use of on-site outlets makes intuitive sense because the
types of alcohol establishments specified in this analysis are
conceptually similar to human display establishments.    That is,
businesses providing the consumption of alcohol on-site and human
display establishments attract people who spend a considerable
amount of time in one location.

### 4. Human Display Establishment Data

The physical street addresses of seven human display establishments
(P.T.'s, Sugar's, Allstars, Tiffany's, Wild Zebra, Palace, and Babes)
were collected. The exact addresses were verified by referencing the
2003 telephone directory, followed by calling the establishments.

### 5. Official Crime Data

The San Antonio Police Department (SAPD) provided official
crime incident (e.g., assault, robbery, and the like) records for three
calendar years, 2000-2002. This data was obtained via the Freedom of
Information Act/Texas Open Records Act. The data included several
attributes of the criminal event including date, time, location
(address), type of criminal incident, and the police district in which
the event occurred. Using the location where the crime occurred is
informative in that it provides researchers with proximal causes of
crime.[73] At least three years of crime data is considered sufficient to
avoid annual fluctuations and increases the likelihood of having
sufficient incidents to calculate reliable rates.[74]

---

cx.us/ (last visited Oct. 11, 2006).

[73]. *See, e.g.*, MEITHE & MEIER, *supra* note 62, at 47 (asserting that physical
nearness to high-crime areas increases the likelihood of becoming a victim of crime
because living in these areas increases one's risk of coming into contact with
offenders); Smith et al., *supra* note 65, at 503 (linking the presence of criminal
activities with the residential area of offenders, who go about their activities around
their residence and move along nearby and often used streets); Taylor & Covington,
*supra* note 65, at 375 (highlighting other studies demonstrating that, when
individuals and particularly youths see crime rates increase in an area, they assume
that residents can no longer supervise that area, leading to more frequent problems
with teen groups).

[74]. *See* Peterson et al., *supra* note 38, at 39 (restating that researchers often use
three-year average rates in order to have a sufficient number of total rates to obtain
reliable results); Robert J. Sampson, *Urban Black Violence: The Effect of Male
Joblessness and Family Disruption*, 93 AM. J. OF SOC. 348, 360 (1987) (noting the
practice of previous researchers to use a three-year average rate for robbery and
homicide arrests that is employed for the purposes of reducing both the influence of

### 6. Geo-coding TABC Data, Human Display Establishments, and Crime

To perform the proposed analysis, it was necessary to import addresses from the human display establishments, alcohol outlets, and SAPD's crime incidents into the proper format for geocoding. To carry out this task, two procedures were required. First, the 2000 census block group information was downloaded from the United States Department of Census web site.[75]  Second, each of the data sets was subsequently geocoded using Geographic Information Systems (GIS) software (ArcView 8.1). This process entails assigning the address of each crime incident, on-site alcohol outlet, and human display establishment to their respective location on a computer-generated map. The ArcView software was used to create the 500- and 1000-foot concentric zone perimeters around the human display establishment and control site.

Approximately seventy percent of crime data across the three years was successfully geocoded. Computer matching is performed using mathematical computations and indices. In some cases the GIS software could not find the exact location of crime incidents with a sufficient level of precision on the computer-generated map. There are several explanations for this problem. First, a sizable number of the incidents did not have valid addresses. For example, a visual review of the unmatched addresses reveals only the street name without a numerical identifier (e.g., Main Street, San Antonio, TX). Another possible source is errors made during the entry process by SAPD, yet there is no way to verify this. Despite these minor problems, approximately 45,000 crime incidents were successfully geocoded per year on average. Although these numbers may under represent the actual level of crime in any given geographical location, underestimation is expected to be equally distributed across geographical locations thereby not misrepresenting the results of this analysis. Overall, the geocoding process is consistent with prior research.[76]

---

random changes and any missing data); Robert J. Sampson et al., *Race and Criminal Violence: A Demographically Disaggregated Analysis of Urban Homicide*, 31 CRIME & DELINQ. 47, 54 (1985) (employing "a three-year average rate" of arrests for homicides in order to reduce the influence of random changes). *But see* Steven F. Messner & Reid M. Golden, *Racial Inequality and Racially Disaggregated Homicide Rates: An Assessment of Alternative Theoretical Explanations*, 30 CRIMINOLOGY 421, 430 (1992) (deciding to use a five year period of study because the events studied occur infrequently in some cities).

75. *See* U.S. Census Bureau Homepage, http://www.census.gov/ (last visited Oct. 11, 2006).

76. *See* Peterson et al., *supra* note 38, at 38-39 (using violent crime data reported by the police and broken down by census tracts to investigate the influence of local institutions on crime rates); Alaniz et al., *supra* note 38, at 155-74 (using census tracts as an aggregate unit of analysis).

One additional methodological procedure is worth mentioning—the selection of control sites. After obtaining relevant socioeconomic and demographic census characteristics, the researcher drove to each human display establishment to gain some familiarity with the general surroundings. Selecting a control site that matched the human display establishment based on census data was not the only particular interest; instead, the goal was to ensure that the control site was similar in terms of broader environmental features. While the census data reflected a comparable match for the human display and control sites, discrepancies were apparent in the broader environment (e.g., apartment complex, heavy business area, large grocery stores, and a high volume of traffic in terms of people) on two occasions and therefore were not used.

### 7. Dependent Variables

The dependent variables (i.e., outcome of interest) were the rate (per 1,000) of crimes for several different types of criminal incidents. Some scholars argue that crime rates should be used when estimating the effects of environmental predictors.[77] Thus, six types of crime rates (public order, drug offenses, sex offenses, assault, robbery, and firearm offenses) and the total crime rate are specified as the dependent variables (seven variables total). Calculating crime rates involved a two-step process. The first step required computing the three year crime average (2000-2002) for each crime type across all block groups (i.e., 1,016). Once calculated, rates were determined for each census block group by dividing the total number of events by the BG population and then multiplying the result by 1,000. The computations are represented in the following formula where $X$ refers to the specific crime group (e.g., drug offenses):

$$Rate_x = \left( \frac{3YearAverageTotalEvents}{Pop2000} \right) x1,000$$

### 8. Independent Variables

To capture sources of social disorganization, the 2000 census data was used to measure eight variables: (1) renter (percent BG housing units that are renter occupied), (2) Latino (percent BG population that is Latino), (3) Black (percent BG population that is Black), (4) divorced (percent BG population that is divorced), (5) median

---

77. *See, e.g.,* Quimet, *supra* note 47, at 135 (including crime rates in an analysis of how social disorganization variables predict crime).

household income (BG median household income in dollars), (6) vacant (percent BG housing units that are vacant), (7) male 15-29 years of age (percent BG male population in crime prone 15-29 age category), and (8) female headed householder (percent BG household population that is female headed). Note that only a few social disorganization variables were selected in order to achieve conceptual clarity and parsimonious statistical modeling. Moreover, scholars have used similar social disorganization predictors.[78]

Researchers have operationalized alcohol outlets in various ways, such as on-site, off-site, and total. Consistent with other research, alcohol density outlets are measured as the number of on-site alcohol outlets in each BG per 1000 population.[79] Human display establishments were dummy coded and measured as the presence and non-presence of such establishments within a BG (1 = human display establishment in the BG, 0 = no human display establishment in the BG). Only seven human display establishments were included in the present research.

## V. FINDINGS

As mentioned earlier, four analytical strategies were selected. First, crime incidents occurring within the 500- and 1000-foot concentric zone perimeters for human display and control sites were assessed. Second, bivariate analysis (the analysis of two variables simultaneously for the purposes of determining a relationship between them) was conducted among the variables to obtain a preliminary understanding of the bivariate relationships. Next, an analysis of variance was conducted to help determine whether statistical differences in crime rate means among three types of block groups exist. The final stage of analysis included a procedure known as ordinary least squares ("OLS") stepwise regression. This analytical technique helps determine which variable(s) makes a significant contribution in predicting crime. Significantly, explained variance fluctuations in the dependent variable(s) could be detected.[80] Stated differently,

---

78. *See, e.g.*, Alaniz et al., *supra* note 38, at 155; Kwabena Gyimah-Brempong, *Alcohol Availability and Crime: Evidence from Census Tract Data*, 68 S. ECON. J. 2, 2-21 (2001) (employing census tract data and a reduced-form crime equation to find that, in Detroit, alcohol availability positively and significantly relates to occurrences of crime).

79. *See, e.g.*, Alaniz et al., *supra* note 38, at 167; Gyimah-Brempong, *supra* note 78, at 10 (evaluating the relationship between crime and alcohol availability by calculating "the total number of alcohol licenses of all types granted per 1000 people in a census tract").

80. *See* ALAN AGRESTI & BARBARA FINLAY, STATISTICAL METHODS FOR THE SOCIAL SCIENCES 530-31 (Prentice-Hall, Inc. 1997) (1986) (explaining forward selection and stepwise regression procedures).

stepwise regression allows researchers to observe any significant change among variables and specified models in a systematic fashion. The central research question is: do human display establishments influence crime after controlling for social disorganization predictors and alcohol outlets, which are known to be associated with crime? Therefore, the authors will focus exclusively on the Stepwise Regression and Multivariate Models.[81]

To address the central research question, three models are estimated.   Model 1 specifies variables associated with social disorganization.  Model 2 reflects the social disorganization variables in addition to alcohol density outlets.  Model 3 (the full model) includes social disorganization predictors, alcohol density outlets, and human display establishments.

Table 1 presents all models for the crime rate of public order.  In Model 1, the significant F-statistic ($F = 4.888$) indicates that the independent variables are sufficient in explaining the variation in the dependent variable (public order).  The $R^2$ value is .037, meaning that the proportion of variation in public order explained by Model 1 is approximately 3%.  Upon closer examination, four of the eight social disorganization predictors (Latino, Black, median household income, males 15-29 years of age) are significantly correlated with public order.  Moreover, the magnitude of such relationships is strong, but in the opposite direction.

Table 1. Stepwise Regression Analysis for Public Order

| Variable | Model 1 β | Model 2 β | Model 3 β |
|---|---|---|---|
| Renter | -.00 | -.06 | -.06 |
|  | (1.50) | (1.48) | (1.48) |
|  | [-9.79] | [-2.21] | [-2.15] |
| Latino | -.16** | -.15** | -.15** |
|  | (1.24) | (1.20) | (1.21) |
|  | [-4.64] | [-4.28] | [-4.32] |
| Black | -.08** | -.05 | -.05 |
|  | (2.43) | (2.37) | (2.37) |
|  | [-5.71] | [-3.75] | [-3.71] |

81.  Other tables and models are available upon request.

| | | | |
|---|---|---|---|
| Divorced | -.05 | -.06 | -.06 |
| | (5.11) | (4.96) | (4.96) |
| | [-7.20] | [-9.27] | [-9.14] |
| Median household income | -.18** | -.15** | -.15** |
| | (.00) | (.00) | (.00) |
| | [-8.35] | [-7.03] | [-7.00] |
| Vacant | .08** | .06 | .06 |
| | (3.57) | (3.47) | (3.47) |
| | [9.34] | [6.76] | [6.60] |
| Males 15-29 years of age | -.08** | -.08** | -.08** |
| | (5.95) | (5.77) | (5.77) |
| | [-14.12] | [-13.63] | [-13.39] |
| Female-headed households | -.06 | -.03 | -.03 |
| | (1.63) | (1.59) | (1.59) |
| | [-2.80] | [-1.56] | [-1.54] |
| Alcohol density outlets | ----- | .30** | .26** |
| | | (.10) | (.10) |
| | | [.85] | [.86] |
| Human display est. | ----- | ----- | -.03 |
| | | | (3.40) |
| | | | [-3.55] |
| Constant | 9.683** | 8.545** | 8.508** |
| F Statistic | 4.888** | 12.128** | 11.025** |
| $R^2$ | .037 | .098 | .099 |

Note: Standard errors in parentheses and unstandardized coefficients in brackets.

- $p < .05$, ** $p < .01$

In Model 2, the results are similar; however, after controlling for alcohol density outlets, the F-statistic (F = 12.128) increased tremendously. More interesting is the observed $R^2$ value (.098) when compared to the $R^2$ (.037) for Model 1. By adding the alcohol density outlet variable to the regression equation, the proportion of explained variance in public order increased 6%. This increase is reflected in the magnitude and positively significant correlation (.30) between alcohol density outlets and the crime of public order. As expected and consistent with prior research, as alcohol density outlets increase, so does the crime of public order. In Model 3 (full model), the addition of human display establishments revealed an insignificant yet inverse relationship with the dependent variable. Stated differently, the observed inverse relationship suggests that as human display establishments decrease, crime increases. The F-statistic (11.025) decreased, but the alcohol density outlet variable remained significant. In terms of $R^2$ (.099), there was no significant increase in explained variance. Thus, Model 2 is the superior model. Overall, human display establishments are not significantly related to public order crimes. Instead, it appears that based on the full model comparison in strength of correlations and significance, alcohol density outlets (.26) are stronger determinants of crime.

Table 2 presents all models for the crime rate of drug offenses. The findings in Model 1 indicate a weak and insignificant model. For example, the F-statistic (1.370) is insignificant and the $R^2$ value (.011) is small (i.e., 1% of the explained variance). Here, only two of the social disorganization predictors are significant (Latino and median household income). In Model 2, by adding alcohol density outlets, the model improved significantly. The F-statistic (F = 4.088) reached significance and the $R^2$ value (.035) increased 2%. The observed relationship between alcohol density outlet and the rate of drug offenses (.17) was significant and apparently caused the significance of Latino and median household income in Model 1 to disappear. Model 3 showed no improvement in the explained variance, nor did it yield any significant variables besides alcohol density outlets. More importantly, the results showed a weak and insignificant relationship (.02) between human display establishments and drug offenses. Hence, when specified, the alcohol density outlets variable produced a strong and positive association with drug offenses across all models. The empirical evidence indicates that human display establishments do not cause drug crimes.

Table 2.  Stepwise Regression Analysis for Drug Offenses

| Variable | Model 1 β | Model 2 β | Model 3 β |
|---|---|---|---|
| Renter | .01 | -.03 | -.03 |
| | (8.94) | (8.97) | (8.98) |
| | [1.30] | [-6.59] | [-6.80] |
| Latino | -.09* | -.08 | -.08 |
| | (7.41) | (7.32) | (7.33) |
| | [-14.90] | [-13.55] | [-13.38] |
| Black | -.02 | -.00 | -.00 |
| | (14.50) | (14.39) | (14.40) |
| | [-8.08] | [-.74] | [-.88] |
| Divorced | -.05 | -.06 | -.06 |
| | (30.42) | (30.10) | (30.11) |
| | [-45.68] | [-53.42] | [-53.92] |
| Median household income | -.10* | -.09 | -.09 |
| | (.00) | (.00) | (.00) |
| | [-2.79] | [-2.30] | [-2.31] |
| Vacant | .03 | .01 | .01 |
| | (21.26) | (21.09) | (21.12) |
| | [16.78] | [7.16] | [7.84] |
| Males 15-29 years of age | -.06 | -.05 | -.06 |
| | (35.44) | (35.02) | (35.06) |
| | [-56.97] | [-55.14] | [-56.10] |
| Female-headed households | -.01 | .01 | .01 |
| | (9.72) | (9.64) | (9.65) |
| | [-2.79] | [1.84] | [1.79] |
| Alcohol density outlets | ----- | .17** | .16** |
| | | (.63) | (.63) |
| | | [3.16] | [3.10] |

| | | | |
|---|---|---|---|
| Human display est. | ----- | ----- | .02 (20.67) [14.03] |
| Constant | 45.496** | 41.244** | 3.868** |
| F Statistic | 1.370 | 4.088** | 3.724** |
| $R^2$ | .011 | .035 | .036 |

Note: Standard errors in parentheses and unstandardized coefficients in brackets.

* $p < .05$, ** $p < .01$

Table 3 presents all models for the crime rate of sex offenses (e.g., rape). In Model 1, the findings indicated that four of the eight social disorganization variables were significantly related to rape. For example, a significant positive association (.09) was observed between the percentage of vacant housing units and rape. With respect to the overall model, the F-statistic (F = 4.212) shows that the independent variables explain the variation in the dependent variable. The R2 value (.032) reveals a 3% portion of the explained variance according to the current model. In Model 2, the four social disorganization variables remain significant, but the inclusion of alcohol density outlets trumps these variables in terms of magnitude of correlation. A significantly strong positive relationship (.15) is observed between alcohol density outlet and rape. The current model also shows a significant increase in the F-statistic (6.069). The R2 has also increased by 2%. In the final full model, the significance and relationship for alcohol density outlets has remained the same, and the coefficient for human display establishment is .00. Although significant, the F-statistic decreased (5.458) and the R2 value (.052) was unchanged. Once again, Model 2 is superior and human display establishments do not appear to influence sex offenses, such as rape.

Table 3.  Stepwise Regression Analysis for Sex Offenses (Rape)

| Variable | Model 1 β | Model 2 β | Model 3 β |
|---|---|---|---|
| Renter | -.03 (.79) [-.58] | -.06 (.80) [-1.21] | -.06 (.80) [-1.21] |
| Latino | -.11** (.66) [-1.75] | -.11** (.65) [-1.64] | -.11** (.65) [-1.64] |
| Black | -.04 (1.29) [-1.38] | -.02 (1.28) [-.80] | -.02 (1.28) [-.80] |
| Divorced | -.03 (2.70) [-2.55] | -.04 (2.68) [-3.17] | -.04 (2.68) [-3.17] |
| Median household income | -.20** (.00) [-4.69] | -.18** (.00) [-4.30] | -.18** (.00) [-4.30] |
| Vacant | .09** (1.89) [5.29] | .08** (1.88) [4.53] | .08** (1.88) [4.54] |
| Males 15-29 years of age | -.08* (3.15) [-6.98] | -.07* (3.12) [-6.83] | -.07* (3.12) [-6.84] |
| Female-headed households | -.02 (.86) [-.41] | -.00 (.86) [-3.75] | .00 (.86) [-3.84] |
| Alcohol density outlets | ----- | .15** (.06) [.25] | .15** (.06) [.25] |

| | | | |
|---|---|---|---|
| Human display est. | ----- | ----- | .00<br>(1.84)<br>[.20] |
| Constant | 5.683** | 5.346** | 5.348** |
| F Statistic | 4.212** | 6.069** | 5.458** |
| $R^2$ | .032 | .052 | .052 |

Note: Standard errors in parentheses and unstandardized coefficients in brackets.
* $p < .05$, ** $p < .01$

Table 4 presents all models for the crime rate of assault. In Model 1, two social disorganization variables (i.e., Latino and median household income) are significantly related to assault. The F-statistic (F = 7.439) is significant, and the R2 value (.056) reveals a 5% portion of the explained variance for assault according to the current model. Model 2 indicates a relatively significant and strong positive association (.22) between alcohol density outlets and assaults. Here, the F-statistic (F = 12.395) almost doubled in value when compared to Model 1. More importantly, the explained variance (R2 = .100) for assault showed a 5% increase over Model 1. In other words, 10% of the explained variance in assault is attributed to Model 2. After controlling for human display establishments, Model 3 findings showed a weak (.01) and insignificant relationship with assault. As the model indicates, the only significant variables were Latino, median household income, divorced, female-headed household, and alcohol density outlets. Similar to the tables previously presented, the F-statistic (F = 11.148) decreases and the R2 value (.100) remains unchanged compared to Model 2 when human display establishments are added to the regression model. Overall, Model 2 is more parsimonious.

Table 4.  Stepwise Regression Analysis for Assault

| Variable | Model 1 β | Model 2 β | Model 3 β |
|---|---|---|---|
| Renter | -.04 | -.08* | -.08* |
|  | (6.85) | (6.79) | (6.80) |
|  | [-6.18] | [-14.47] | [-14.51] |
| Latino | -.15** | -.14** | -.14** |
|  | (.68) | (5.55) | (5.55) |
|  | [-20.34] | [-18.92] | [-18.89] |
| Black | -.05 | -.02 | -.02 |
|  | (11.10) | (10.90) | (10.91) |
|  | [-14.08] | [-6.36] | [-6.39] |
| Divorced | -.05 | -.06* | -.06* |
|  | (23.31) | (22.80) | (22.82) |
|  | [-36.44] | [-44.57] | [-44.66] |
| Median household income | -.30** | -.27** | -.27** |
|  | (.00) | (.00) | (.00) |
|  | [-6.09] | [-5.57] | [-5.58] |
| Vacant | .06 | .04 | .04 |
|  | (16.29) | (15.98) | (16.01) |
|  | [31.38] | [21.28] | [21.41] |
| Males 15-29 years of age | -.03 | -.02 | -.03 |
|  | (27.16) | (26.53) | (26.56) |
|  | [-21.50] | [-19.58] | [-19.76] |
| Female-headed households | -.05 | -.07* | .07* |
|  | (7.44) | (7.31) | (7.31) |
|  | [10.06] | [14.94] | [14.92] |
| Alcohol density outlets | ----- | .22** | .22** |
|  |  | (.47) | (.48) |
|  |  | [3.32] | [3.31] |

| | | | |
|---|---|---|---|
| Human display est. | ----- | ----- | .01 (15.66) [2.71] |
| Constant | 62.559** | 58.091** | 58.119** |
| F Statistic | 7.439** | 12.395** | 11.148** |
| $R^2$ | .056 | .100 | .100 |

Note: Standard errors in parentheses and unstandardized coefficients in brackets.
* $p < .05$, ** $p < .01$

Table 5 presents all models for the crime rate of robbery. In Model 1, several of the social disorganization predictors are significantly related to robbery. The F-statistic ($F = 6.893$) is significant, meaning that the independent variables sufficiently explain the variation in robbery. The $R2$ value (.052) suggests that 5% of the variation in robbery is explained by this regression model. In Model 2, many of the same social disorganization predictors remained significant (with the exception of median household income) and alcohol density outlet was significantly and positively correlated (.23) with robbery. The magnitude in correlation for alcohol density outlets surpassed those variables associated with social disorganization. The F-statistic ($F = 12.195$) doubled, and Model 2 accounted for a 4% (observed $R2 = .098$) increase in explained variance. In Model 3, the inclusion of human display establishments produced a weak (.02) and insignificant relationship with robbery. Alcohol density outlets, however, remained statistically significant. Model 3 showed a decrease in the F-statistic (11.012) and an unchanged $R2$ value (.099). Thus, controlling for human display establishments does not produce any additional explained variance in robbery. Model 2 remains the superior model.

Table 5. Stepwise Regression Analysis for Robbery

| Variable | Model 1 β | Model 2 β | Model 3 β |
|---|---|---|---|
| Renter | -.00 | -.05 | -.05 |
| | (.73) | (.72) | (.72) |
| | [-5.28] | [-.96] | [-.97] |
| Latino | -.15** | -.14** | -.14** |
| | (.61) | (.59) | (.59) |
| | [-2.12] | [-1.96] | [-1.95] |
| Black | -.10** | -.07* | -.07* |
| | (1.18) | (1.16) | (1.16) |
| | [-3.24] | [-2.40] | [-2.41] |
| Divorced | -.03 | -.05 | -.05 |
| | (2.48) | (2.43) | (2.43) |
| | [-2.54] | [-3.43] | [-3.47] |
| Median household income | -.10* | -.07 | -.07 |
| | (.00) | (.00) | (.00) |
| | [-2.17] | [-1.61] | [-1.62] |
| Vacant | .11** | .09** | .09** |
| | (1.74) | (1.70) | (1.70) |
| | [5.61] | [4.51] | [4.56] |
| Males 15-29 years of age | -.09** | -.09** | -.09** |
| | (2.89) | (2.82) | (2.83) |
| | [-8.03] | [-7.82] | [-7.90] |
| Female-headed households | -.19** | -.21** | .21** |
| | (.79) | (.78) | (.78) |
| | [4.31] | [4.84] | [4.84] |
| Alcohol density outlets | ----- | .23** | .22** |
| | | (.05) | (.05) |
| | | [.36] | [.36] |

| | | | |
|---|---|---|---|
| Human display est. | ----- | ----- | .02 (1.67) [1.08] |
| Constant | 3.573** | 3.085** | 3.097** |
| F Statistic | 6.893** | 12.195** | 11.012** |
| $R^2$ | .052 | .098 | .099 |

Note: Standard errors in parentheses and unstandardized coefficients in brackets.
* $p < .05$, ** $p < .01$

Table 6 presents all models for the crime rate of firearm offenses. In Model 1, four of the eight social disorganization predictors (i.e., Latino, divorced, median household income, males 15-29 years of age) were significantly related to firearm offenses. The F-statistic (F = 4.004) was significant, and 3% (R2 = .031) of the variation in firearm offenses is explained by Model 1. After controlling for alcohol density outlets, Model 2 indicates a somewhat surprising result. In particular, the observed relationship between this variable and firearm offenses is weak (.02) and insignificant (the aforementioned social disorganization variables remain significant). Given such relationship, it is important to notice that the F-statistic (3.583) has remained significant but has decreased. Likewise, the R2 value (.031) is unchanged. In previous tables, Model 2 findings showed an increase in the F-statistic and R2; however, in this case it appears that including alcohol density outlets does not improve the model. The findings for Model 3 also show a weak and insignificant coefficient for alcohol density outlets (.02) and human display establishments (.00). The full model F-statistic (3.222) has decreased but has remained significant, while the R2 value (.001) is consistent with the previous models. Among the estimated models regarding firearm related offenses, Model 1 is the superior model.

Table 6. Stepwise Regression Analysis for Firearms

| Variable | Model 1 β | Model 2 β | Model 3 β |
|---|---|---|---|
| Renter | -.05 (1.31) [-1.69] | -.06 (1.33) [-1.81] | -.06 (1.33) [-1.81] |
| Latino | -.14** (1.08) [-3.64] | -.14** (1.09) [-3.62] | -.14** (1.09) [-3.62] |
| Black | -.02 (2.12) [-1.06] | -.02 (2.13) [-.95] | -.02 (2.13) [-.95] |
| Divorced | -.08* (4.45) [-10.20] | -.08* (4.46) [-10.31] | -.08* (4.46) [-10.31] |
| Median household income | -.21** (.00) [-8.14] | -.20** (.00) [-8.07] | -.20** (.00) [-8.07] |
| Vacant | .01 (3.11) [.51] | .00 (3.13) [.37] | .00 (3.13) [.38] |
| Males 15-29 years of age | -.07* (5.17) [-10.76] | -.07* (5.19) [-10.73] | -.07* (5.20) [-10.74] |
| Female-headed households | -.02 (1.42) [-.78] | -.02 (1.43) [-.72] | .02 (1.43) [-.72] |
| Alcohol density outlets | ----- | .02 (.09) [4.57] | .02 (.09) [4.51] |

| | | |
|---|---|---|
| Human display est. | ----- | ----- | .00 (3.06) [.14] |
| Constant | 9.756** | 9.69 | 9.696** |
| F Statistic | 4.004** | 3.583** | 3.222** |
| $R^2$ | .031 | .031 | .031 |

Note: Standard errors in parentheses and unstandardized coefficients in brackets.
* $p < .05$, ** $p < .01$

Table 7 presents all models for total crime rate. The results in Model 1 show that four (Latino, divorced, median household income, and males 15-29 years of age) out of eight social disorganization predictors are significant. Model 1 also reveals a significant F-statistic (F = 5.708), meaning that the independent variables are sufficient in explaining the variation in total crime. In addition, Model 1 accounted for 4% of the explained variance. After controlling for alcohol density outlets, the F-statistic (F = 8.513) was significant and increased in size compared to Model 1. An increase of 2% (R2 = .071) in explained variance by Model 2 also was observed. With regard to the predictors in Model 2, five of the eight social disorganization variables are significantly related to total crime. Moreover, the relationship between alcohol density outlets and total crime is significant and shows a positive association (.17). In Model 3, controlling for human display establishments does not account for any increase in explained variance (R2 = .071). The F-statistic (F = 7.720) shows a slight decrease, but remains significant. More importantly, the alcohol density outlet coefficient (.17) is still significant, while the human display establishment coefficient (.02) is weak and insignificantly related to total crime. Overall, Model 2 regains supremacy.

Table 7. Stepwise Regression Analysis for Total Crime

| Variable | Model 1 β | Model 2 β | Model 3 β |
|---|---|---|---|
| Renter | -.04 | -.08* | -.08* |
| | (40.72) | (40.77) | (40.81) |
| | [-41.62] | [-80.22] | [-81.33] |
| Latino | -.18** | -.17** | -.17** |
| | (33.75) | (33.30) | (33.33) |
| | [-142.44] | [-135.83] | [-134.93] |
| Black | -.04 | -.02 | -.02 |
| | (66.03) | (65.44) | (65.46) |
| | [-76.22] | [-40.25] | [-40.98] |
| Divorced | -.09** | -.10** | -.10** |
| | (138.60) | (136.85) | (136.91) |
| | [-375.47] | [-413.36] | [-415.99] |
| Median household income | -.24** | -.22** | -.22** |
| | (.00) | (.00) | (.00) |
| | [-.00] | [-2.72] | [-2.73] |
| Vacant | .05 | .03 | .03 |
| | (96.88) | (95.92) | (96.04) |
| | [130.04] | [82.95] | [86.47] |
| Males 15-29 years of age | -.09** | -.09** | -.09** |
| | (161.49) | (159.25) | (159.41) |
| | [-432.06] | [-423.11] | [-428.12] |
| Female-headed households | -.03 | -.05 | .05 |
| | (44.27) | (43.85) | (43.86) |
| | [39.62] | [62.33] | [62.01] |
| Alcohol density outlets | ----- | .17** | .17** |
| | | (2.84) | (2.87) |
| | | [15.48] | [15.18] |

| | | |
|---|---|---|
| Human display est. | ----- | ----- | .02 (93.98) [73.51] |
| Constant | 381.526** | 360.703** | 361.469** |
| F Statistic | 5.708** | 8.513** | 7.720** |
| $R^2$ | .043 | .071 | .071 |

Note: Standard errors in parentheses and unstandardized coefficients in brackets.
* $p < .05$, ** $p < .01$

## VI. PRESENT STUDY CONCLUSIONS

After controlling for socioeconomic and demographic community characteristics associated with social disorganization, weak institutional dimensions such as alcohol outlets, and the presence of human display establishments, three general findings emerged. First, several of the social disorganization predictors were significant throughout the models. Second, according to the F-statistics and R2 values, Model 2 was superior for six out of the seven crime dependent variables, and the seventh variable was best analyzed under Model 1. With this said, Model 3 (which controlled for human display establishments) was inferior for each of the seven crime outcomes. Third, when alcohol density outlet was specified in fourteen models, its coefficient was significant and the magnitude trumped other predictor coefficients, whereas the coefficient for human display establishments was consistently weak and insignificant in each of the seven models. In short, the empirical evidence tempers the San Antonio City Council's contention that the presence of human display establishments produces crime. Instead, the results point to weak institutions, namely alcohol outlets and community characteristics associated with social disorganization theory as causes and correlates of crime.

## VII. LEGAL IMPLICATIONS

According to the plurality test in *Alameda*,[82] the present study would certainly cast "direct doubt" on the rationale or evidence used

---

82. *See* City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 438-39 (2002) (holding that the municipality's statistical evidence, which is subject to judicial scrutiny, must support its rationale for the ordinance).

to support the adoption of the San Antonio ordinance.[83] This would then shift the burden back to the municipality. However, it is not clear what evidence a court would require from a municipality to justify the ordinance. In *Alameda*, the Court ruled that the municipality must "supplement the record with evidence renewing support for a theory that justifies its ordinance."[84] Unfortunately, the Court failed to address the issue of quality and quantum of evidence necessary to renew support. Despite the Supreme Court's failure, a number of cases have percolated through various federal courts and may prove helpful to adult establishments and municipalities alike.

In *R.V.S., L.L.C. v. City of Rockford*,[85] the Seventh Circuit Court of Appeals applied the *Alameda* standard and ruled that the municipality failed to carry its burden, stating that "Rockford has produced little evidence of harmful secondary effects connected to Exotic Dancing Nightclubs beyond the assumption that such effects exist."[86] Further, the court was willing to give a great deal of deference to a municipality's experience; however, they were not willing to accept a connection *ipse dixit*.[87] At trial, Dr. Daniel Linz, who has principally conducted many studies in the field of negative secondary effects,[88] provided expert testimony that found no adverse secondary effects associated with nude or semi-nude dancing.[89] Ultimately, the court ruled that Rockford had not adequately engaged in an empirical assessment and therefore failed to meet the burden as prescribed in *Alameda*.[90]

In *Encore Videos, Inc. v. City of San Antonio*,[91] the court ruled that the municipality failed to carry its burden to justify a regulatory

---

83. *See* SAN ANTONIO, TEX., CODE OF ORDINANCES ch. 21, art. 9, §§ 100190, 101002 (2006) (asserting that restrictions on adult businesses were justified because such business caused many negative effects, including a rise in crime in the area surrounding the establishments)

84. *Id.* at 439.

85. 361 F.3d 402, 411 (7th Cir. 2004) (striking down ordinance that prohibited the existence of "exotic dancing nightclubs" within 1,000 feet of churches, schools, residences, or other "exotic dancing nightclubs").

86. *Id.* at 411.

87. *See id.* ("Rockford does not identify any studies, judicial opinions, or experience-based testimony that it considered in adopting the Ordinance.").

88. *See generally supra* notes 22-24.

89. *R.V.S.*, 361 F.3d at 406-07 ("Linz found no studies concerning the secondary effects of establishments where performers wear clothing.").

90. *Id.* at 415-16 ("Without further direction from the Supreme Court, we cannot constitutionally lower the already modest evidentiary hurdle for justifying regulations of sexually explicit but non-obscene speech on secondary effects grounds, especially in a case where mainstream speech is affected.").

91. 330 F.3d 288, 294-95 (5th Cir. 2003) (striking down an ordinance that banned the establishment of "sexually oriented businesses" within 1,000 feet of residences).

ordinance because the studies it relied upon either excluded establishments that provide only take-home videos or failed to differentiate between on-site and off-site adult establishments. The court cited *Alameda* as support for the proposition that a "municipality's evidence must fairly support the municipality's rationale for its ordinance."[92] It ruled that "given the expansive reach of the ordinance in the instant case, we must require at least some substantial evidence of secondary effects."[93]   Finding no such evidence in the record, the court struck down the ordinance.[94]

In *G.M. Enterprises, Inc. v. Town of St. Joseph, Wisconsin*,[95] the court ruled that the presentation of a report that found the majority of the studies relied upon by the municipality to be "fundamentally unsound" and methodologically flawed did not do enough to call into question the town's findings.   The plaintiffs submitted an affidavit from Dr. Daniel Linz that critiqued the town's studies and tended to show that nude dancing at the Club did not create secondary effects.[96]   It is clear that the plaintiff in *G.M. Enterprises* proffered at least as much evidence as the plaintiffs in *Encore Videos* and *R.V.S.*; however, this Court ruled differently than the others.[97]   The *G.M. Enterprises* Court held that the:

> [p]laintiff submitted some evidence that might arguably undermine the Town's inference of the correlation of adult entertainment and adverse secondary effects, including a study that questions the methodology employed in the numerous studies relied upon by the Board; evidence of an increase of property values near the Club; and evidence that the majority of police calls in regards to the Club originated during periods of time when no semi-nude dancing

---

92.  *Id.* at 295 (citing City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 438 (2002)).

93.  *Id.*

94.  *Id.* at 295 (requiring the city to provide "at least some substantial evidence of secondary effects specific to adult business that sell books or videos").

95.  350 F.3d 631, 636 (7th Cir. 2003) (upholding an ordinance that prohibited "sexually oriented businesses" from allowing its employees, entertainers, and/or performers to make physical contact with, or come within a certain distance of, the business's patrons).

96.  *Id.* at 636 (noting that plaintiff presented evidence showing that property values near the Club had increased over time to argue that the Club had not created negative secondary effects, particularly increasing crime or diminishing the viability of the neighborhood).

97.  *Compare id.* (upholding a town ordinance based on simple deference to the local legislature's judgment, ignoring the empirical data presented against the ordinance), *with* Encore Videos, Inc. v. City of San Antonio, 330 F.3d 288 (5th Cir. 2003) (rejecting a town ordinance because the local legislature failed to persuasively establish an evidentiary connection between the regulated activity and crime), *and* R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402 (7th Cir. 2004) (rejecting a town ordinance because the local legislature failed to empirically demonstrate the existence of the claimed secondary effects).

occurred. Although this evidence shows that the Board might have reached a different and equally reasonable conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the Board's legislative process.[98]

In essence, the court ruled that the "quality and quantum of evidence" produced by the municipality was enough to renew support for the ordinance and was therefore constitutional.[99]

In *Annex Books, Inc. v. City of Indianapolis*, the court found sufficient evidence to support the municipality's rationale of combating secondary effects to uphold the validity of an ordinance aimed at regulating adult businesses that rent and display adult oriented videos, magazines, and other materials.[100] Again, Dr. Daniel Linz provided expert testimony on behalf of the plaintiffs to show that the studies relied upon by the municipality used shoddy data and unsound methodology.[101] In this case, what seemed to hold sway over the court was not the evidence of secondary effects, but rather what the court dubbed "actual effects."[102] "Specifically, the data revealed that the police made forty one (41) arrests at Annex Books for public masturbation between December 5, 2001 and November 5, 2002."[103] Ultimately, the court found the number of actual arrests at Annex Books "compelling" and ruled to find sufficient evidence of adverse secondary effects to uphold the ordinances.[104]

In *Giovanni Carandola, Ltd. v. Fox*, an adult entertainment liquor regulation was challenged because it allegedly violated the First Amendment.[105] The court concluded that the legislature's stated purpose was reduction of secondary effects.[106] Therefore, the court

---

98. *G.M. Enter.*, 350 F.3d at 636.

99. *See id.* at 638-39 (resolving a discrepancy between evidence presented by plaintiffs and evidence presented by the local government through deference to the local legislature's judgment).

100. 333 F. Supp. 2d 773, 788-89 (S.D. Ind. 2004).

101. *Id.* at 786-87 ("Dr. Linz cites in his finding that the authors themselves often admit that they do not find evidence of adverse secondary effects associated with adult businesses.").

102. *See id.* at 787 (referring to data that police made forty-one public masturbation arrests as evidence of "actual effects" in the court's decision-making calculus).

103. *Id.*

104. *Id.* at 788-89 (employing the *Alameda* standard to determine that the city presented "a reasonable basis" for its ordinance).

105. 396 F. Supp. 2d 630, 633 (M.D.N.C. 2005).

106. *Id.* at 639 ("The preamble to the statute . . . affirms that its intent is 'to address the harmful secondary effects of such entertainment, including higher crime rates, public sexual conduct, sexual assault, prostitution, and other secondary effects.'").

utilized the *Alameda* framework to analyze the connection between regulation of liquor at adult establishments and secondary effects.[107]

In an effort to cast doubt on the state's rationale, plaintiffs used the expert testimony of Dr. Daniel Linz, who critiqued the studies relied upon by the legislature.[108]  He pointed out that most of the studies could be found on a web site created by the National Law Center for Children and Families, whose stated purpose is to protect children and families from the harmful effects of illegal pornography.[109]  The court provided, in painstaking detail, Linz's critiques of the studies specifically referred to in the preamble to the North Carolina statute at issue.[110]  Moreover, Linz provided two studies from North Carolina to further his contention that adult businesses do not increase crime or decrease property value.[111]  The Charlotte and Greensboro studies used similar methodologies as the present study and ultimately concluded that adult cabarets do not produce harmful secondary effects.[112]  The court ruled that "considering the evidence presented, the Plaintiffs carried their initial *Alameda Books* burden by casting direct doubt on the state's evidence of secondary effects."[113]

Under *Alameda*, once the burden is shifted from the plaintiff, the state may "supplement the record with evidence renewing support for a theory that justifies the ordinance."[114]  The State of North Carolina employed expert testimony from Dr. Richard McCleary, a professor of Criminology at University of California – Irvine, which "tended to rehabilitate the evidence relied upon by the General Assembly" in

107. *See id.* ("[T]he legislature's stated purpose is in accord with *Alameda Books*. . . .").

108. *Id.* at 641-42 (noting that Dr. Linz presented five methodological questions to guide an analysis of the legislature's studies and summarily rejected the studies based on the answers to those questions).

109. *Id.* at 641-43 ("The NLC provides these 'canned' summaries to governments across the United States to foster more regulation of sexually oriented businesses.").

110. *Id.* at 643-45 (devoting a full paragraph of description to Linz's assessment of each study referred to in the North Carolina Statute's preamble) (reviewing N.C. GEN. STAT § 18B-1005.1 (2005)) (stating that the Legislature has "reviewed studies of the secondary effects of sexually oriented businesses that have been conducted in locations across the United States" which "fairly support" its reasonable belief that the statute will reduce the negative secondary effects of adult entertainment).

111. *Id.* at 645-47 (summarizing that Dr. Linz testified about studies that he conducted and found no correlation between increased crime rates and the location of sexually oriented businesses, and which he argued were "more methodologically sound than the studies relied upon by the [North Carolina] General Assembly").

112. *Id.* at 645-47 (describing the Charlotte study as examining twenty adult cabarets' effects on crime in surrounding 100- and 500-foot areas, and describing the Greensboro study as employing regression analysis instead of control groups to examine every adult cabaret in the city).

113. *Id.* at 647.

114. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 441 (2002).

favor of finding association between negative secondary effects and adult businesses.[115]   Moreover, Dr. Cleary specifically called into question the validity and reliability of the two North Carolina studies that Dr. Linz conducted.[116]  His most salient criticism centered on the use of too many research methods—Dr. Linz used "different measurements of crime, different methods of choosing control areas, and different statistical analysis."[117]   Left with conflicting expert opinions, the court held that "the evidence does not provide a substantial basis of fact to support an inference that sexually oriented businesses negatively impact property values or create urban instability."[118]  However, the court found that it was reasonable to infer that sexually oriented business are associated with higher incidents of crime and concluded that the statute was therefore constitutional.[119]

The post-*Alameda* jurisprudence makes it clear that courts are struggling with the issue of "quantum and quality" of evidence necessary to establish an association or link between sexually oriented businesses and negative secondary effects.  Although the Supreme Court has ruled that empirical studies or localized studies are unnecessary to support the rationale behind adoption of those ordinances, the likelihood of either side prevailing without them is not very good, as courts have ruled ordinances unconstitutional in cases where the municipality provides little or no empirical or local support for the rationale of ameliorating negative secondary effects.[120]  However, it is important to note that the *Alameda* decision clearly placed the burden on the plaintiff to cast "direct doubt" on the municipality's rationale.   In other words, all nudity or zoning ordinances that affect adult businesses should be presumed constitutional.  However, cases like *R.V.S.* and *Encore Videos* illustrate

---

115. *Giovani Carandola*, 396 F. Supp. 2d at 647 (characterizing Dr. McCleary's evidence as attempting to associate negative secondary effects and adult businesses).

116. *Id.* (contending that the variables Dr. Linz used in his Charlotte study "include too many false alarms . . . and leave out many crimes that are discovered by patrolling or means other than a 911 call to the police," and criticizing Dr. Linz's use of regression analysis as distorting the results in his Greensboro study).

117. *Id.* at 650.

118. *Id.* at 651.

119. *Id.* at 652 (declining to determine whether the evidence presented by plaintiffs or defendants had more credibility, and instead finding that the competing studies indicated that both sides had a reasonable basis for their findings and upholding the legislature's judgment).

120. *See, e.g.,* R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402 (7th Cir. 2004) (rejecting a town ordinance based on lack of demonstrated secondary effects); Encore Videos, Inc. v. City of San Antonio, 330 F.3d 288 (5th Cir. 2003) (rejecting a town ordinance for lack of evidentiary connection between the regulated activity and crime).

the willingness of courts to rule in favor of adult businesses when municipalities fail to provide empirical or localized proof of secondary effects.

By contrast, in cases such as *Giovanni Carandola*, where both parties offered expert testimony to assist the court in ascertaining the validity of empirical studies relied upon by the legislature and localized studies conducted by one of the parties, a court likely will not substitute its opinion for the opinion of the legislature as to which expert is most correct.[121] Therefore, it is reasonable to believe that courts will rule in favor of the municipality where both parties provide empirical data or localized proof of the existence, or lack thereof, of negative secondary effects,.

*Annex Books* provides a good illustration of where a court will look at so-called actual effects to bolster the rationale for passage of restrictive ordinances. In *Annex Books*, the court noted that police made 41 arrests for public masturbation at the Annex Books location.[122] Clearly, this factor was important to the court in reaching the decision that passage of the ordinance was justified. In cases where actual effects exist it is not likely that courts will give great weight to evidence that shows a lack of negative secondary effects.

Lastly, *G.M. Enterprises* is a good illustration of an adult business that failed to provide sufficient localized studies or empirical data to cast direct doubt on the municipality's rationale for enactment of an ordinance.[123] There, the evidence only tended to "undermine" the correlation and did not cast "direct doubt," which apparently meant to "vitiate" the municipality's rationale and not "undermine" the rationale.[124] It is a valuable lesson to adult businesses that want to challenge the constitutionality of this type of ordinance. While municipalities are not required to provide empirical studies or localized studies finding negative secondary effects, good analysis of recent case law seems to suggest that adult businesses should proffer

---

121. *See Giovani Carandola*, 396 F. Supp. 2d at 663 (deferring to the judgment of the legislature with respect to an ordinance regulating adult entertainment establishments).

122. Annex Books, Inc. v. City of Indianapolis, 333 F. Supp. 2d 773, 787 (S.D. Ind. 2004) (accepting the number of actual arrests at Annex Books as enough evidence to motivate the ordinance).

123. *See* G.M. Enter., Inc. v. Town of Saint Joseph, Wis., 350 F.3d 631, 636-37 (7th Cir. 2003) (deferring to the local legislature's decision to restrict adult business despite empirical data presented against the ordinance).

124. *See id.* at 639-640 ("*Alameda Books* does not require a court to re-weigh the evidence considered by a legislative body, nor does it empower a court to substitute its judgment in regards to whether a regulation will best serve a community, so long as the regulatory body has . . . consider[ed] evidence 'reasonably believed to be relevant to the problem' addressed.").

both types of studies.

## CONCLUSION

Increasingly, courts are using statistical data to either bolster or undermine a plaintiff's claim.    When a plaintiff attacks the constitutionality of an ordinance that targets adult businesses in an attempt to combat the secondary effects they create, courts likely will look to experts to assist in determining the existence of those secondary effects. Plaintiffs and municipalities should be aware that the likelihood of prevailing increases when good research methods are employed to produce sound empirical data and/or localized studies. However, establishments with incidents of so-called actual effects are cautioned because a court likely will weigh evidence of actual effects quite heavily against adult establishments.[125]  As the present study demonstrates, the causes and correlates of crime are many.  Social disorganization theory suggests that crime flourishes in communities that have weakened community social organization due to structural constraints like low-economic status, high residential instability, and diverse population composition.  Moreover, socially disorganized communities are more likely to attract weak institutions such as bars.    The combination of weak institutions and social disorganization attributes are likely to foster crime.      Clearly, determining which establishments do or do not affect crime is a delicate matter. Both municipalities and adult businesses should take into consideration all of the factors before rushing to judgment. After all, as Justice Holmes said over one-hundred years ago: "the man of the future is the man of statistics."[126]

---

125. *See, e.g., Annex Books*, 333 F. Supp. 2d at 787 (responding to empirical data presented against a city ordinance by noting that "the City has rebutted Plaintiffs' evidence to the contrary on adverse secondary effects [by presenting actual effects]").

126. Holmes, *supra* note 1, at 457.

HeinOnline -- 15 Am. U. J. Gender Soc. Pol'y & L. 42 2006-2007