# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| ASSOCIATION OF CLUB EXECUTIVES OF DALLAS, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| | § | Civil Action No. 3:22-cv-00177-M |
| v. | § § | |
| CITY OF DALLAS, TEXAS, | § § | |
| Defendant. | § § | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

TAMMY L. PALOMINO
City Attorney for the City of Dallas
STACY JORDAN RODRIGUEZ
Texas State Bar No. 11016750
Stacy.Rodriguez@dallas.gov
Executive Assistant City Attorney
ELIZABETH CHANDLER
Texas State Bar No. 24097484
Elizabeth.Chandler@dallas.gov
Assistant City Attorney

Dallas City Attorney's Office
1500 Marilla Street, Room 7DN
Dallas, TX 75201
Phone: (214) 670-3519
Fax:    (214) 670-0622

SCOTT D. BERGTHOLD
Tennessee State Bar No. 023186
sbergthold@sdblawfirm.com
Law Office of Scott D. Bergthold, PLLC
2290 Ogletree Avenue, Suite 106
Chattanooga, TN 37421
Phone: (423) 899-3025

# Contents

Table of Authorities ..................................................................................iii

Summary............................................................................................ 1

Preliminary Statement ......................................................................... 1

Statement of the Facts and of the Case ...................................................... 4

Standard of Review.............................................................................. 14

Argument .......................................................................................... 16

I.     Plaintiffs' First Amendment claim fails as a matter of law. ...................... 17

    A.     Plaintiffs' plea for strict scrutiny is foreclosed. ............................. 17

    B.     Under governing law, the Ordinance's modest hours regulation is valid because it is designed to serve a substantial government interest and allows for reasonable alternative avenues of communication. .................. 17

        1.     The beginning and end of substantial government interest analysis is *Renton*'s "any evidence reasonably believed to be relevant" standard—a broad, deferential standard that the hours rule easily satisfies. ................................................................... 18

            a.     The Fifth Circuit held that the City's ample pre-enactment secondary effects evidence from various sources satisfies *Renton*. ........................................................ 21

            b.     Plaintiffs' post-remand evidence assumes a standard for legislative evidence that the Fifth Circuit rejected, and fails to cast "direct doubt" on the City's legislative rationale. ................. 23

                i.     Plaintiffs' experts ignore much of the legislative record, which stands as "evidence reasonably believed to be relevant." ........................................... 24

                ii.     Plaintiffs' experts presume their own regulatory rationale without refuting the City's................................. 27

                iii.     Plaintiffs' experts also fail to cast "direct doubt" for the independent reason that their study is flawed. .................... 30

            c.     Even if Plaintiffs had cast direct doubt, the City's post-remand evidence shows that the City "meets the standard set forth in

*Renton.*" ................................................................................ 32

      2.   The Ordinance allows for reasonable alternative avenues of communication. ................................................................ 34

   C.   Plaintiffs lack standing to challenge the Ordinance's age restriction, a regulation that satisfies intermediate scrutiny ............................ 36

      1.   Plaintiffs lack standing because they allege no injury in fact and a favorable decision would not redress any claimed injury ................... 36

      2.   The SOB employee age requirement satisfies intermediate scrutiny. ............................................................... 37

   D.   Plaintiffs' other First Amendment claims fail. ........................... 39

II.   Plaintiffs' remaining claims are makeweight. .................................... 41

Conclusion ........................................................................... 42

Certificate of Service ................................................................. 43

# TABLE OF AUTHORITIES

## Cases

*84 Video/Newsstand, Inc. v. Sartini,*
    455 Fed. Appx. 541 (6th Cir. Sept. 7, 2011) ..................................................... 3, 34

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................................... 14

*Andy's Rest. & Lounge, Inc. v. City of Gary,*
    466 F.3d 550 (7th Cir. 2006) ................................................................................. 3

*Annex Books, Inc. v. City of Indianapolis,*
    740 F.3d 1136 (7th Cir. 2014) .............................................................................. 13

*Ass'n of Club Executives of Dallas, Inc. v. City of Dallas,*
    83 F.4th 958 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 1064 (2024) ...............*passim*

*Baby Dolls Topless Saloons, Inc. v. City of Dallas,*
    295 F.3d 471 (5th Cir. 2002) .......................................................................... 22, 40

*Barnes v. Glen Theatre, Inc.,*
    501 U.S. 560 (1991) ...................................................................................... 18, 21

*BGHA, LLC v. City of Universal City,*
    340 F.3d 295 (5th Cir. 2003) ............................................................................... 25

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ............................................................................................ 40

*City of Austin v. Reagan Nat'l. Adver. of Austin, LLC,*
    596 U.S. 61 (2022) ............................................................................................... 5

*City of Erie v. Pap's A.M.,*
    529 U.S. 277 (2000) ...................................................................................... 19, 20

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) ......................................................................................*passim*

*Ctr. for Fair Pub. Policy v. Maricopa Cnty.,*
    336 F.3d 1153 (9th Cir. 2003) ................................................................... 3, 30, 35

*Daytona Grand, Inc. v. City of Daytona Beach,*
    490 F.3d 860 (11th Cir. 2007) ........................................................... 15, 23, 25, 26

iii

*DC Operating, L.L.C. v. Paxton,*
  100 F.4th 657 (5th Cir. 2024) ........................................................... 36

*Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd of Trustees,*
  411 F.3d 777 (6th Cir. 2005) (*en banc*) ..................................... 3, 30, 35

*Doctor John's v. Wahlen,*
  542 F.3d 787 (10th Cir. 2008) ............................................................ 15

*Doe I v. Landry,*
  909 F.3d 99 (5th Cir. 2018) ............................................... 37, 38, 39, 40

*Energy Reserve Grp., Inc. v. Kan. Power & Light Co.,*
  459 U.S. 400 (1983) .......................................................................... 42

*Fantasy Ranch, Inc. v. City of Arlington,*
  459 F.3d 546 (5th Cir. 2006) ......................................................... 2, 14

*Fed. Sav. & Loan Ins. Corp. v. Griffin,*
  935 F.2d 691 (5th Cir. 1991) ............................................................. 42

*Flanigan's Enters. of Ga., Inc. v. Fulton County,*
  596 F.3d 1265 (11th Cir. 2010) ................................................ 24, 27, 28

*G.M. Enters., Inc. v. Town of St. Joseph,*
  350 F.3d 631 (7th Cir. 2003) ....................................................... 15, 16

*Gammoh v. City of La Habra,*
  395 F.3d 1114 (9th Cir. 2005) ........................................................... 15

*Heideman v. South Salt Lake City,*
  165 Fed. Appx. 627 (10th Cir. 2006) ................................................... 25

*Imaginary Images, Inc. v. Evans,*
  612 F.3d 736 (4th Cir. 2010) .................................................. 15, 30, 32

*J&B Entm't, Inc. v. City of Jackson,*
  152 F.3d 362 (5th Cir. 1998) ............................................................. 38

*Lady J. Lingerie, Inc. v. City of Jacksonville,*
  176 F.3d 1358 (11th Cir. 1999) ..................................................... 3, 29

*Lindquist v. City of Pasadena, Tex.,*
  525 F.3d 383 (5th Cir. 2008) ............................................................. 41

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................. 36, 41

*Mitchell v. Comm'n on Adult Ent. Establishments,*
    10 F.3d 123 (3rd Cir. 1993) ................................................................ 3, 29

*Mote v. Walthall,*
    902 F.3d 500 (5th Cir. 2018) ................................................................ 41

*Nixon v. Shrink Mo. Gov't PAC,*
    528 U.S. 377 (2000) ................................................................ 20

*Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty.,*
    No. 8:05-CV-1707, 2009 WL 4349319 (M.D. Fla. Nov. 25, 2009) ........................ 28

*Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County,*
    630 F.3d 1346 (11th Cir. 2011) ................................................................ 15, 23, 25

*Reagan Nat'l Adver. of Austin, Inc. v. City of Austin,*
    972 F.3d 696 (5th Cir. 2020), *rev'd and* ................................................................ 5

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
    --- F.4th ---, No. 23-30033, 2025 WL 340799 (5th Cir. Jan. 30, 2025) ................ 37

*Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41 (1986) ................................................................ *passim*

*Richland Bookmart, Inc. v. Knox County,*
    555 F.3d 512 (6th Cir. 2009) ................................................................ 3

*Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.,*
    3 F.3d 877 (5th Cir. 1993) ................................................................ 2

*Schultz v. City of Cumberland,*
    228 F.3d 831 (7th Cir. 2000) ................................................................ 3

*SOB, Inc. v. County of Benton,*
    317 F.3d 856 (8th Cir. 2003) ................................................................ 15, 25

*Star Satellite, Inc. v. City of Biloxi,*
    779 F.2d 1074 (5th Cir. 1986) ................................................................ 3

*Texas Entertainment Association, Inc. v. Paxton,*
    732 F. Supp. 3d 684 (W.D. Tex. 2024) ................................................................ 37, 38, 39

*Texas State LULAC v. Elfant,*
    52 F.4th 248 (5th Cir. 2022) ................................................................ 37

*Turner Broadcasting System, Inc. v. FCC,*
    520 U.S. 180 (1997) ................................................................ 15

*United States v. O'Brien*,
    391 U.S. 367 (1968) ............................................................... 20, 37, 38, 39

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ........................................................................ 40

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ........................................................................ 39

*Woodall v. City of El Paso*,
    49 F.3d 1120 (5th Cir. 1995) ........................................................... 35

## SUMMARY

Count I of Plaintiffs' Second Amended Complaint asserts that Ordinance No. 32125's regulation of sexually oriented businesses (SOBs) violates the First and Fourteenth Amendments. Count II seeks an injunction against the Ordinance, and Count III seeks damages from its enforcement. Plaintiffs also seek attorneys' fees.

Plaintiffs' claims are all brought under 42 U.S.C. § 1983. To prevail, they must show that the City acted under color of state law and that its actions deprived Plaintiffs of their rights under the Constitution or federal law. Plaintiffs have not made this showing, so the City is entitled to judgment as a matter of law.

## PRELIMINARY STATEMENT

After remand, this Court aptly observed that "the Fifth Circuit expressly held that '[t]he City's evidence here meets the *Renton* standard.'" (ECF No. 86 at 1 (quoting *Ass'n of Club Executives ("ACE") of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 967 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 1064 (2024)). The Court asked why, "[g]iven the Fifth Circuit's unambiguous holding that the Ordinance satisfies" the *Renton* test, the Court should not enter judgment on the existing record. (*Id*. at 2.)

Despite Plaintiffs' protestations (ECF No. 87), the Court's read is right—the Fifth Circuit's opinion is fatal to Plaintiffs' case at any stage.

On remand, Plaintiffs fail to carry their heavy burden to show that the Ordinance is unsupported by "any" evidence even "reasonably believed to be relevant" to secondary effects. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986).

Of course, the Fifth Circuit's holding that the City's pre-enactment record meets this deferential standard took into account Plaintiffs' expert testimony at the injunction hearing. That holding—made under a *de novo* review standard, *ACE* of *Dallas*, 83 F.4th at 966—that the City's record was not "shoddy" is law of the case. *Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 881 (5th Cir. 1993).

Plaintiffs' post-remand expert reports (Appx. 179) wholly ignore much of that record—including the City's "boots-on-the-ground experience," studies from "other comparable cities," and "academic research" about secondary effects. *ACE of Dallas*, 83 F.4th at 961, 967. That evidence, standing alone, justifies summary judgment.

Nor does Plaintiffs' new study cast direct doubt on the City's rationale that closing SOBs during certain hours may reduce secondary effects during those hours.

Instead, Plaintiffs double down on what the Fifth Circuit rejected: secondary effects must be proven through a local, methodologically sound study (comparing SOBs to non-SOBs as to the exact activity being regulated). (Appx. 221, 236 (claiming their local, scientific study found no evidence of secondary effects, i.e., evidence that SOBs "have more crime around them than" non-SOBs, "particularly between the hours of 2am and 6am"). This fails. *Ace of Dallas*, 83 F.4th at 965-68 (holding *Renton* satisfied by non-local evidence that did not study hours, and rejecting comparison requirement).

But even crediting their study, the City is entitled summary judgment under governing law.[1] *Fantasy Ranch, Inc. v. City of Arlington*, 459 F.3d 546, 561 (5th Cir.

---

[1] The City hereby incorporates its filed appendix supporting summary judgment.

2006) (affirming summary judgment despite plaintiffs' experts' opinions and lack of

local secondary effects, and concluding that courts should not submit legislative

judgments "to a jury for re-weighing"). Both before and after *Alameda Books*,

federal appellate courts have repeatedly upheld more restrictive SOB hours of

operation laws. *See, e.g.*, *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074 (5th Cir.

1986) (upholding ordinance requiring SOBs to close between midnight and 10 a.m.

Monday through Saturday and all day Sunday); *Adult Ent. Establishments*, 10 F.3d

123 (3rd Cir. 1993) (upholding law requiring SOBs to be closed from 10 p.m. to 10

a.m. Monday through Saturday and all day Sunday); *Lady J. Lingerie, Inc. v. City of

Jacksonville*, 176 F.3d 1358 (11th Cir. 1999); *Schultz v. City of Cumberland*, 228

F.3d 831 (7th Cir. 2000) (upholding ordinance requiring closure from midnight to 10

a.m. six days a week and all day Sunday); *Ctr. for Fair Pub. Policy v. Maricopa

Cnty.*, 336 F.3d 1153 (9th Cir. 2003) (requiring closure from 1 a.m. to 8:00 a.m.

Monday through Saturday and 1 a.m. to noon on Sundays); *Deja Vu of Cincinnati,

L.L.C. v. Union Twp. Bd of Trustees*, 411 F.3d 777 (6th Cir. 2005) (*en banc*)

(upholding law requiring closure from 12 a.m. to 12 p.m. Monday through Saturday

and all day Sunday); *Andy's Rest. & Lounge, Inc. v. City of Gary*, 466 F.3d 550 (7th

Cir. 2006) (upholding ordinance requiring closure from 11 p.m. to 10 a.m. each day);

*Richland Bookmart, Inc. v. Knox County*, 555 F.3d 512 (6th Cir. 2009) (requiring

closure between midnight and 8 a.m.); *84 Video/Newsstand, Inc. v. Sartini*, 455

Fed. Appx. 541 (6th Cir. Sept. 7, 2011) (affirming summary judgment, despite Dr.

Linz's testimony, for law requiring closure from midnight to 6 a.m. every day).

## STATEMENT OF THE FACTS AND OF THE CASE

In late 2020 and early 2021, there was an influx of fatal shootings in Dallas in the early morning at or near SOBs. *ACE of Dallas*, 83 F.4th at 962. Dallas police formed a task force to patrol near SOBs after midnight. *Id.* Over eight months, police "responded to 134 calls for service, issued over 1,100 citations, and made more than 350 drug and weapon seizures." *Id.*

Major Stephen Bishopp, Ph.D., of the Dallas Police Department, collected 2019-2021 data about arrests, crimes reported, and 911 calls within 500 feet of SOBs, evaluating nighttime hours including the 10 p.m. to 2 a.m. and 2 a.m. to 6 a.m. windows. *Id.* In the arrest data, he "focused on aggravated assaults, robberies, prostitution, and gun- and drug-related arrests." (ECF No. 45 at 19.)

While a greater number of property crimes "occurred from 10:00 p.m. to 2:00 a.m., the opposite was true for violent crime: roughly 67% of all aggravated assaults, rapes, robberies, and murders occurred from 2:00 a.m. to 6:00 a.m." *ACE of Dallas*, 84 F.4th at 962. "In 2021, that percentage jumped to 76%." *Id.* Similarly, a majority of nighttime 911 calls—and a majority of the calls needing an emergency response—"came between 2:00 a.m. and 6:00 a.m." *Id.*

On three occasions, the police department submitted its findings to members of the Dallas City Council. *Id.* They also provided the Council with summaries of "three academic studies linking SOBs to increased crime and rates," *id.*, as well as two studies from other cities, Beaumont and Amarillo, "finding a correlation between SOBs' hours of operation and increased crime." *Id.* The police urged the City Council to require SOBs to close between 2 a.m. and 6 a.m. *Id.*

The City Council unanimously adopted the Ordinance in January 2022. In addition to the hours regulation, the Ordinance followed a recent state law in prohibiting SOBs from employing persons under 21 years old. (Appx. 1, 4.)

Plaintiffs sued, seeking a TRO and preliminary injunction against the hours rule. The City agreed to not enforce the Ordinance until a ruling on Plaintiffs' preliminary injunction motion. The Court held a hearing over three non-consecutive days, between which discovery was had and certain depositions were taken. The Court heard testimony from several witnesses and received numerous exhibits, including Dallas police officials and the Plaintiffs' expert report (Pl. Ex. 6) and the corresponding testimony of Dr. Daniel Linz. On May 24, 2022, the Court preliminarily enjoined the Ordinance. (ECF No. 45.)

The Court first expressed uncertainty as to the level of scrutiny—strict or intermediate—that should apply. (*Id.* at 8-15) (discussing *Reagan Nat'l Adver. of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020), *rev'd and rem'd, City of Austin v. Reagan Nat'l. Adver. of Austin, LLC*, 596 U.S. 61 (2022)).

Without deciding that question, the Court concluded that the Ordinance "does not survive strict or intermediate scrutiny, and is thus unconstitutional." (*Id.* at 16.)

The Court found that the Ordinance failed strict scrutiny because the City had not considered less restrictive regulations, e.g., closing SOBs only between 2 a.m. and 4 a.m. (*Id.* at 16.)

Applying intermediate scrutiny, the Court found that the City's legislative record did not fairly support its rationale: "to reduce crime and conserve police and

5

fire-rescue resources." (*Id.* at 18 (quoting Ordinance at 2).) The Court critiqued the City's 2019-2021 crime data, contained in the January 5, 2022 SOB Briefing and January 14, 2022 Task Force Report, on these grounds:

> (1) including crime data at or near non-operational SOBs;
> (2) counting all crimes within 500 feet of SOBs, even though not all stem from the SOBs;
> (3) not ensuring that the SOB was open when the crime occurred; and
> (4) inflating crime reports through increased police patrols.

(ECF No. 45 at 25-29.)

The Court concluded that the "Plaintiffs have successfully cast doubt on the City's evidence, and by extension, the City's rationale for the Ordinance." (*Id.* at 29.)

Next, the Court concluded that "the evidence does not clearly establish that there are more adverse secondary effects at SOBs from 2 a.m. to 6 a.m.," so as to justify what the Court repeatedly characterized as "a complete restriction" on speech. (*Id.* at 30.) The Court faulted the City, for example, for not analyzing whether the difference in arrests between the 10 p.m. to 2 a.m. period and the 2 a.m. to 6 a.m. period was "statistically significant." (*Id.*)

On this point, the Court also criticized the Ordinance's regulation of adult bookstores and adult arcades because, in the Court's view, the local crime data did not show greater secondary effects in the later period than in the earlier period. Although reported offenses and police calls were slightly higher in the later period, the Court held the difference was not a "sufficient" adverse effect, so the City could not rely on the police calls justification without comparing SOBs to non-SOBs. (*Id.* at 31 n. 27.) Citing *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009), the Court held that the Ordinance is not narrowly tailored. (*Id.* at 31.)

The Court also found that the Ordinance is not narrowly tailored "for an additional significant reason," namely that "[t]he failure to include information about non-SOBs renders the City's reliance on this [local police data] evidence unreasonable." (*Id.* at 32.) The City had not "consider[ed] crime statistics associated with non-SOB businesses open during the deep hours of the night," such as "all-night eateries" (i.e., diners) or "motels and hotels." (*Id.*)  The Court found that the lack of data about non-SOBs left it unknown how many of the crimes and calls for service were attributable to SOBs rather than other businesses. (*Id.* at 33-36.)

Seemingly merging the substantial government interest inquiry with that of whether a content-neutral rationale exists to justify applying intermediate scrutiny, the Court held that "the lack of evidence regarding non-SOBs dooms [the City's] stated rationale because it is impossible to tell whether reducing calls for service at SOBs would actually conserve resources in a way so as to meaningfully target the alleged side effect of the speech, as opposed to the speech itself." (*Id.* at 35 (citing *Alameda Books*, 535 U.S. at 446-47 (Kennedy, J., concurring); *see also id.* at 36 ("Because the City provided no non-SOB comparison data indicating that the problems of which the City complains are particularly associated with SOBs, the Ordinance amounts to a targeted and unjustified restriction on speech.").

After concluding that the crime data is insufficient to show that the Ordinance is narrowly tailored to serve a substantial government interest, the Court held that "the Ordinance is clearly overbroad as to bookstores" because it limits speech during hours "where the evidence shows no secondary effects" are occurring. *Id.*

The Court moved on to "the research studies cited by the City" and found that they "do not reasonably justify the Ordinance" because they are not sufficiently tailored to the City's circumstances. (*Id.* at 37.) One article "examines rural areas, not urban cities like Dallas," and while it "shows that crime rates tend to increase around SOBs," "does not show increasing crime rates associated with the late-night hours." (*Id.* at 37.) Likewise, the others show similar increases "in overall crime," but "without addressing any particular time of day," so the City could not rely on them to justify "curtailing particular hours of operation." (*Id.*)

Based on these critiques, this Court held that "the Ordinance does not pass strict or intermediate scrutiny," and issued a preliminary injunction. (*Id.* at 38-39.)

The Fifth Circuit reversed. *ACE of Dallas*, 83 F.4th 958 (5th Cir. 2023).

To start, the court held that the Supreme Court's sign cases do not compel strict scrutiny for secondary effects laws, and "[a]ny shadow cast on the secondary effects doctrine by our *Reagan I* opinion" had been dispelled by its later reversal. *Id.* at 964. Because "*Renton* and its longstanding secondary effects doctrine has direct application" in this case, the Fifth Circuit applied it to the Ordinance. *Id.* at 965.

"Under *Renton*, the Ordinance must be upheld if it 'is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.'" *Id.* at 965 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50 (1986) (cleaned up)).

The panel disagreed with this Court's conclusion that the Ordinance failed *Renton*'s substantial government interest prong "because of flaws in the City's

supporting evidence," and explained that the Court "held the City's evidence to a standard of exactitude not required by the Supreme Court's precedents." *Id.*

The court explained that "[t]he pertinent inquiry here, then, is whether the City could reasonably believe that its evidence linked SOBs' operation between 2:00 a.m.—6:00 a.m. and the secondary effects targeted by the Ordinance." *Id.* at 966.

Noting that this Court answered the question in the negative "after closely scrutinizing the City's evidence," the Fifth Circuit observed that it reviews a district court's findings as to the existence of a city's evidence for clear error, "but we review *de novo* whether that evidence is shoddy or unreliable within the meaning of *Alameda Books." Id.* (internal quotation marks and citation omitted).

The appellate court began by summarizing this Court's four critiques of the City's police data and its critique of the three academic studies cited in the Ordinance. *Id.* at 966; *see also supra* at 4-7 and ECF No. 45 at 17-37.

The panel then observed that this Court "applied *Renton's* reasonable belief standard too strictly" and "demanded the City link SOBs to secondary effects with a degree of certainty that outstrips what *Renton* envisioned." *Id.* at 967. Contrary to the Court's close scrutiny of evidence for the City's legislative policy judgment, "all *Renton* demands is evidence reasonably believed to be relevant to the problem." *Id.*

This deferential standard applies because legislators "cannot be required to act only on judicial standards of proof," and cities "must have latitude to experiment in addressing secondary effects"; thus, "very little evidence is required." *Id.* (citations omitted). The panel cautioned against "second-guessing" fact-bound assessments of

9

city planners "because they know the streets of their cities better than we do." *Id.* (quoting *Alameda Books*, 535 U.S. at 451-52 (cleaned up)).

It observed that *Renton*'s deferential standard "does not require a city to forge an ironclad connection between SOBs and secondary effects or to produce studies examining precisely the same conditions at issue." *Id.*

Properly framed, "[t]he City's evidence here meets the *Renton* standard." *Id.*

The Fifth Circuit gave significant weight to the non-scientific genesis of the Ordinance: "multiple shootings at Dallas SOBs in the late hours of the night" that led to the creation of the task force and increased police presence around SOBs, resulting in over 100 felony arrests, over 100 911 calls, and over 350 drugs and weapons seizures. *Id.* Even though "not *every* arrest was related to an SOB," the "City was still entitled to rely on this type of boots-on-the-ground experience." *Id.*

Under *Renton*'s deferential "reasonably believed to be relevant" standard, "[t]he City could reasonably infer from the lengthy experiences of its police department . . . that SOBs were responsible in significant part for the noxious secondary effects targeted by the Ordinance" and "are 'powder kegs' for violent crime in the late hours" of the night. *Id.*

The panel also credited the City's reliance on "five other Texas cities' hours-of-operation restrictions on SOBs, including those of Fort Worth, San Antonio, and El Paso." *Id.* at 967-68. So, too, was the City entitled to rely on the Amarillo and Beaumont reports "showing a positive correlation between the hours of operation of SOBs and higher crime rates." *Id.* at 968 (cleaned up).

The Fifth Circuit also found *Renton* satisfied by the "three studies that, in the district court's words, 'suggest that SOBs are associated with an increase in overall crime.'" *Id*. Reliance on these was reasonable, even though they did not study hours.

Noting that "[b]oth the Supreme Court and this court have found the reasonable belief standard satisfied on records much more tenuous than this one," the appellate court held that "the City was hardly pushing the envelope." *Id*.

The panel also specifically rejected this Court's criticism of the City's data "for failing to include crime data associated with non-SOBs," and its corollary conclusion that "a comparison was necessary to 'conclude that the secondary effects are linked to the SOBs, as opposed to some other, unrelated factor.'" *Id*. On the contrary, comparative analysis is not necessary because *Alameda Books* settled that the City was "entitled to make reasonable inferences from the information it had without needing to rule out other" explanations for adverse effects at or near SOBs. *Id*.

The Fifth Circuit then addressed this Court's "concern[] with whether the Ordinance would be *successful* in reducing secondary effects." *Id*. This is "the wrong focus," the panel explained, since cities are given latitude to experiment and "need not show that their ordinances *will successfully* lower" crime. *Id.* (quoting *Alameda Books*, 535 U.S. at 439 (cleaned up)). "Once again, the district court demanded evidentiary precision from the City that *Renton* does not require." *Id*. at 968.

In footnote 13, the Fifth Circuit addressed adult bookstores. While noting that Plaintiffs could continue to press the issue, it further emphasized that comparative analysis and evidentiary precision are not required. "Although the overall incidence

of violent crime at adult bookstores appears low, the data reflects that these locations still generated over 500 911 calls and over 150 arrests between 2:00 a.m. and 6:00 a.m." *Id.* at 969 n.13.

The City could reasonably rely on this evidence to believe that its Ordinance could reduce secondary effects during these regulated hours, even without a comparison to the other nighttime window. "Courts should not second-guess legislative judgments about the significance of these problems." *Id.*

"Additionally, there is evidence that some of the adult bookstores provide" on-site viewing facilities (e.g., booths), which "precedents recognize as posing a greater threat" of certain secondary effects than those without such facilities. *Id.* at 969.

Under *Renton*, the "Ordinance was backed by ample data—from the City's own police task force, other comparable cities, and academic research—supporting a link between SOBs' late-night operation and increased crime." *Id.* at 961.

On *Renton*'s second prong, the panel held that Justice Kennedy's *Alameda Books* concurrence dovetails with *Renton*'s requirement that ordinances must leave open adequate alternative avenues of communication. *Id.* at 969 (citing *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186, 1195 (9th Cir. 2004)).

While this Court found that the Ordinance failed that requirement because it would cost SOBs significant revenue while depriving patrons of access to protected speech "during those hours," the Fifth Circuit disagreed. *Id.* at 969. "A regulation need not be costless to be valid," and Plaintiffs still have a reasonable opportunity to operate their businesses "for twenty hours a day, seven days" a week. *Id.* The

panel cited post-*Alameda Books* Sixth and Ninth Circuit decisions that upheld more restrictive SOB hours regulations, and rejected Plaintiffs' reliance on *Annex Books, Inc. v. City of Indianapolis*, 740 F.3d 1136 (7th Cir. 2014). *Id.* at 969-70 & n.14.

The Fifth Circuit vacated the preliminary injunction and remanded for further proceedings consistent with its opinion. *Id.* at 970.

On remand, the Court asked Plaintiffs to explain, in light of the Fifth Circuit's ruling, "what issues, if any, remain live" in the case. (ECF No. 86 at 2.) The Court also queried why it should not enter judgment on the substantial record already developed in discovery and the multi-day injunction hearing. (*Id.*)

Plaintiffs responded that they were entitled to conduct their own study to dispute the City's legislative rationale. (ECF No. 87 at 3-4.) But they did not explain how their secondary effects theory—requiring comparative analysis between SOBs and non-SOBs as to the exact activity regulated—would differ from what they previously argued so as to survive the Fifth Circuit's holdings.

On December 13, 2024, Plaintiffs served the expert report of Dr. Linz and Dr. Anna Vaynman, who helped Linz in studying Dallas crime data from January 2019 to November 30, 2023. (Appx. 179.) These will be called the Second Linz Report.[2]

As detailed below, the Second Linz Report does *not* dispute that crimes and 911 calls occur around SOBs between 2 a.m. and 6 a.m.—nor that closing SOBs then may reduce these events. Rather, it contends only that SOBs do not have more crime near them than non-SOBs, and have more crime between 10 p.m. and 2 a.m.

---

[2] Dr. Linz's first report was Plaintiffs' Exhibit 6 at the preliminary injunction stage.

## STANDARD OF REVIEW

Summary judgment is required if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "Only disputes over facts that might affect the outcome of the suit *under the governing law* will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added). Merely colorable evidence is not sufficient to preclude summary judgment. *Id.* at 249-50.

In secondary effects cases, courts "are not empowered by *Alameda* to second-guess the empirical assessments of a legislative body, nor are we expected to submit such assessments to a jury for re-weighing" at trial. *Fantasy Ranch*, 459 F.3d at 561 (affirming summary judgment despite plaintiffs' experts' opinions and *no* "arrests, citations, or police calls for prostitution, solicitation, assault or narcotics at any" adult cabarets in the city the prior year).

The on-point cases "requir[e] deference to the 'legislative process' even if the evidence" from plaintiffs' experts "allows a 'different and equally reasonable conclusion'" about secondary effects. *Ass'n of Club Executives of Dallas*, 83 F.4th 958, 967 (5th Cir. 2023) (quoting *Fantasy Ranch*, 459 F.3d at 561).

Thus, "the relevant 'material fact' that" an SOB must "place[] at issue is whether the ordinance is supported" by *any* evidence "that can be '*reasonably* believed to be relevant to the problem.'" *Fantasy Ranch*, 459 F.3d at 861 (quoting *Renton,* 475 U.S. at 51-52 (emphasis by Fifth Circuit)). If the deferential standard applicable to a legislative judgment is satisfied, "summary judgment is

14

appropriate," even in a First Amendment case, "regardless of whether the evidence is in conflict." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 211 (1997).

Thus, summary judgment has been repeatedly affirmed in cases where SOBs challenged the government's secondary effects rationale—often through the testimony of the Dr. Linz, Plaintiffs' expert here. *G.M. Enters., Inc. v. Town of St. Joseph*, 350 F.3d 631, 639-40 (7th Cir. 2003) (affirming summary judgment, despite Dr. Linz's expert opinions, which were "not sufficient to vitiate the result reached in the Board's legislative process"); *SOB, Inc. v. County of Benton*, 317 F.3d 856, 862-63 (8th Cir. 2003) (same); *Gammoh v. City of La Habra*, 395 F.3d 1114, 1126-27 (9th Cir. 2005) (same); *Doctor John's v. Wahlen*, 542 F.3d 787, 791-93 (10th Cir. 2008) (same); *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County*, 630 F.3d 1346 (11th Cir. 2011) (affirming summary judgment upholding SOB ordinance despite plaintiffs' three experts' opinions and local counter-studies); *see also Daytona Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860, 882-82 & n.33 (11th Cir. 2007) ("Daniel Linz, one of the experts hired by Lollipop's, also co-authored the studies found to be insufficient in two of these cases"); *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 748-49 (4th Cir. 2010) (following *Renton* and *Alameda Books* and concluding that "while the Linz study and others may well be of interest to legislatures or those formulating policy," it does not cast direct doubt on the legislative judgment; courts "risk violence, then, to democratic principles and to prudent and innovative governance when we make the validity of legislation turn on wars of competing studies").

## ARGUMENT

This Court should grant summary judgment in light of the Fifth Circuit's unambiguous holding that the Ordinance satisfies *Renton*. (ECF No. 86 at 2.) While an appellate decision on a preliminary injunction is not a final judgment, it is beyond cavil that in First Amendment cases, that decision regularly foreshadows the final judgment. It does so here as well.

The Fifth Circuit had before it Plaintiffs' (and their expert's) theory of what a City must do to show reasonable reliance on secondary effects. But the appellate court rejected that theory, as many others have done before.

This is because "the purpose of the evidentiary requirement" stated in *Renton* and reiterated in *Alameda Books* is only "to require municipalities to demonstrate reliance on some evidence in reaching a reasonable conclusion about the secondary effects." *G.M. Enters.*, 350 F.3d at 640. Its purpose is not to impose "[a] requirement of *Daubert*-quality evidence" on the legislative process. *Id.*; *see also ACE of Dallas*, 83 F.4th at 969 n.13 (citing this part of *G.M. Enterprises* for the proposition that "[c]ourts should not second-guess legislative judgments about the significance of these problems").

On remand, Plaintiffs' experts again urge that secondary effects, *by definition*, exist only when SOBs are shown to have greater problems than non-SOBs, and only when they have more problems during the regulated hours than during other hours. But that definition is foreclosed by the Fifth Circuit's decision in this case.

Summary judgment is therefore warranted.

## I.    Plaintiffs' First Amendment claim fails as a matter of law.

The Fifth Circuit's opinion in this case succinctly summarized the governing

law:

> For over three decades, the Supreme Court has analyzed such regulations
> under a two-step test adopted in *City of Renton v. Playtime Theatres*, 475
> U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The first step asks whether
> the measure "ban[s]" SOBs or regulates only the "time, place, and manner"
> of their operation. *Id*. at 46, 106 S.Ct. 925. If the latter, the second step
> asks whether the regulation is "designed to combat the undesirable
> secondary effects" of "businesses that purvey sexually explicit materials"
> rather than to restrict their "free expression." *Id*. at 48–49, 106 S.Ct. 925.
> A regulation satisfying both steps is "reviewed under the standards
> applicable to 'content-neutral' time, place, and manner regulations,"
> namely intermediate scrutiny. *Id*. at 50, 106 S.Ct. 925. Accordingly, the
> regulation will be upheld if it "is designed to serve a substantial
> governmental interest and allows for reasonable alternative avenues of
> communication." *Ibid*.

*ACE of Dallas*, 83 F.4th at 963-64 (5th Cir. 2023).

### A.    Plaintiffs' plea for strict scrutiny is foreclosed.

The "Plaintiffs argue that *Renton* is no longer good law. And even if it is, they

contend that the Ordinance is content-based under recent Supreme Court precedent

and thus subject to strict scrutiny." *Id*. at 964. The Fifth Circuit "reject[ed] both

arguments," *id*., holding that *Renton* applies to the Dallas Ordinance. *Id*. at 965.

Because the Ordinance does not ban SOBs, but only regulates the time, place,

and manner of their operation, strict scrutiny is inappropriate. *Id*.

### B.    Under governing law, the Ordinance's modest hours regulation is valid because it is designed to serve a substantial government interest and allows for reasonable alternative avenues of communication.

Federal appellate courts, both before and after *Alameda Books*, have upheld

SOB hours laws. The Ordinance—less restrictive than many of these laws—is valid.

1.   **The beginning and end of substantial government interest analysis is**
      ***Renton*'s "any evidence reasonably believed to be relevant" standard—**
      **a broad, deferential standard that the hours rule easily satisfies.**

The Fifth Circuit held that the City's evidence "meets the *Renton* standard."

*ACE of Dallas*, 83 F.4th at 967. Yet Plaintiffs continue to press that it does not,

relying on the burden-shifting procedure in *Alameda Books*. But the sole purpose of

that procedure is to ensure only that the City "meets the standard set forth in

*Renton*." 535 U.S. at 439. So discussion of that standard's provenance is in order.

Whether a law satisfies the "any evidence reasonably believed to be relevant"

standard is a question answered by legal authority, *i.e.*, by the judicial decisions

determining that standard's contours. Thus, cases applying the standard—i.e.,

identifying the types of legislative evidence that satisfy it—are determinative.

In *Renton* itself, the City of Renton relied on only a single judicial opinion—

involving Seattle, which chose the opposite SOB zoning rule (dispersal) from what

Renton chose (concentration). But that was enough. 475 U.S. at 51-52 (holding that

validity of Renton's reliance on Seattle's experience was not "affected by the fact

that Seattle ultimately chose to adopt a different method of adult theater zoning

than that chosen by Renton, since Seattle's choice . . . does not call into question

either Seattle's identification of those secondary effects or the relevance of Seattle's

experience to Renton").

Five years later, in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), the

Supreme Court examined a statewide nudity law challenged by a strip club under

the First Amendment. Although the state kept no legislative record, *Barnes* upheld

the law on secondary effects grounds based on prior judicial decisions. *Id*. at 584

("The type of entertainment . . . is plainly of the same character as that at issue in *Renton, American Mini Theatres*, and *LaRue*. It therefore is no leap to say that live nude dancing . . . is likely to produce the same pernicious secondary effects . . . .").

Then in *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), the city was again entitled to rely on secondary effects discussed in prior judicial opinions: "Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theatres* to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood." *Id*. at 297.

The Supreme Court emphasized that the City Council had "*at various times over more than a century, expressed its findings* that" lewd conduct in public places are "highly detrimental to the public health, safety, and welfare," and promote "violence, public intoxication, prostitution and other serious criminal activity." *Id*. (emphasis added by Supreme Court). *City of Erie* treated these findings by city council members concerning establishments in their community as "particularized, expert judgments about the resulting harmful secondary effects." *Id*. at 297-98.

The Supreme Court explained that "[e]ven in cases addressing regulations that strike closer to the core of First Amendment values, we have accepted a state or local government's reasonable belief that the experience of other jurisdictions is relevant to the problem it is addressing." *Id*. (citing *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000) (upholding campaign finance law based on state's reliance on evidence—mainly newspaper articles—discussing perception that large donations could buy votes)).

19

Especially relevant here is *City of Erie*'s rejection of the dissent's reliance on a study by Dr. Daniel Linz, Plaintiffs' expert. *Id.* at 300. Refusing to require "an empirical analysis" to justify secondary effects laws, the court explained that *Nixon* "flatly rejected that idea. 528 U.S. at 394 (noting that the 'invocation of academic studies said to indicate' that the threatened harms are not real is insufficient to cast doubt on the experience of the local government)." *Id.*; *cf. id.* at 301 ("*O'Brien*, of course, required no evidentiary showing at all that the threatened harm was real").

Two years later, the Supreme Court issued its *Alameda Books* decision reaffirming *Renton*'s deferential standard. 535 U.S. 425 (2002). Although the city relied on a study that it *admitted* did not evaluate the precise problem its regulation sought to address, the Court held that the city could rely on an inference from the study and did "not bear the burden of providing evidence that rules out every theory for the link between concentrations of adult establishments [and asserted secondary effects] that is inconsistent with its own." *Id.* at 437 (plurality). Nor must a "city provide evidence that not only supports the claim that its ordinance serves an important government interest, but also does not provide for any other approach to serve that interest." *Id.* at 438. The plurality explained:

> In *Renton*, we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between speech and a substantial, independent government interest. 475 U.S. at 51-52; *see also, e.g., Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 584, 115 L. Ed. 2d 504, 111 S. Ct. 2456 (1991) (SOUTER, J., concurring in judgment) (permitting municipality to use evidence that adult theaters are correlated with harmful secondary effects to support its claim that nude dancing is likely to produce the same effects).

20

*Id.* at 438. Note that when *Alameda Books* explicated the *Renton* standard, it cited pages 51-52 of the *Renton* decision and page 584 of the *Barnes* decision—the pages of those decisions that credit the government's reliance on prior judicial decisions as evidence supporting the legislative judgment regarding secondary effects.

The City does not run through this history of the case law to argue that the Court should uphold the Ordinance based solely on a judicial opinion—although the City's substantial legislative record does include journal articles discussing these cases and their recognition of SOBs' negative secondary effects. Rather, the City highlights this history to show (a) the breadth of *Renton-Alameda Books* deference, which allows reliance on many kinds of evidence that do not lend themselves to scientific challenge, and (b) that nothing in the cases suggests that a plaintiff will always be able to successfully cast direct doubt on a city's legislative rationale.

### a. The Fifth Circuit held that the City's ample pre-enactment secondary effects evidence from various sources satisfies *Renton*.

As noted above, the Fifth Circuit's decision establishes that the City's pre-enactment legislative record meets the *Renton* standard. But it is important to note that the Ordinance has a "pre-, pre-enactment" record also supporting its validity.

Dallas has litigated regulation of SOBs throughout the history discussed above.

In *Dumas v. City of Dallas*, the Fifth Circuit upheld the City's SOB ordinance after a police study found that SOB areas had much higher crime rates, that SOBs "are frequently used for unlawful sexual activities," and that SOBs are associated with urban blight. 837 F.2d 1298, 1301 (5th Cir. 1986), *aff'd in part, rev'd in part*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) (invalidating licensing scheme).

Over the next decade, the City litigated the secondary effects issue often and commissioned studies by the Malin Group. (Appx. 590-612.) Malin reviewed secondary effects studies conducted in cities around the country, and also "studied the *secondary effects of SOBs in Dallas.*" *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 476 (5th Cir. 2002) (emphasis in original). Malin "compared a study area containing seven SOBs to two control areas, the first containing no SOBs and the second containing two SOBs located a half-mile apart but within 1000 feet of residential uses." *Id*. The Fifth Circuit summarized the results:

> In short, sex crime arrests were three to five times more frequent in the study area. While the Malin Study is careful not to attribute this disparity entirely to SOBs, it did find a correlation between SOBs—*specifically, their "hours of operation* and the type of people which SOBs attract"—and higher crime rates.

*Id*. at 481 (emphasis added).

Hence, the City has long observed the relationship between SOBs' hours of operation and secondary effects. But while an hours regulation was not the fighting issue in *Baby Dolls*, the holding of that case has direct application to this one.

The plaintiffs there challenged the City's requirement that to escape regulation as an SOB, a business's dancers would have to don a full bikini (as opposed to just opaque pasties and a bikini bottom). Malin, they argued, did not study the covering issue, nor did any of the studies on which the City relied. *Id*. at 482.

The Fifth Circuit granted this premise, but rejected the SOBs' conclusion: "[I]t was not necessary to make that connection." *Id*. Instead, "it was reasonable for the City to conclude that establishments featuring performers in attire more revealing than bikini tops pose the same types of problems associated with other SOBs." *Id*.

22

In other words, *Renton*'s deferential standard has never required precision in legislative evidence—a holding that directly refutes Plaintiffs' claim here that they "cast direct doubt" on whether the City's evidence supports its regulatory rationale.

**b.    Plaintiffs' post-remand evidence assumes a standard for legislative evidence that the Fifth Circuit rejected, and fails to cast "direct doubt" on the City's legislative rationale.**

There are two critical aspects to burden-shifting under *Alameda Books*: the relevant evidentiary standard and the relevant rationale. Plaintiffs seek to invoke this burden-shifting, but the Second Linz Report does not speak to either of these.

As to *Renton*'s evidentiary standard, the above shows that "any evidence 'reasonably believed to be relevant'" includes a city's "own findings, evidence gathered by other localities, or evidence described in a judicial opinion—may form an adequate predicate to the adoption of a secondary effects ordinance . . . ." *Peek-A-Boo Lounge*, 630 F.3d at 1357 (cleaned up); *id.* at 1359 (rejecting "the argument that a municipality may only rely on studies employing the scientific method"); *Daytona Grand*, 490 F.3d at 882-82 (reversing judgment that relied on Dr. Linz's theory, noting "the City's 'anecdotal' evidence may be a more accurate assessment of such crimes [*e.g.*, lewdness, prostitution, sexual assaults] because it is not based on a data set that undercounts the incidents of such 'victimless' crimes").

In sum, a city need not show that it regulates all sources of secondary effects, concentrates on the biggest sources of secondary effects, regulates secondary effects in the most effective manner, or that sexually oriented businesses have more secondary effects than non-sexually oriented businesses (*i.e.*, regular bars). *ACE of Dallas*, 83 F.4th at 968 (rejecting argument that comparison to non-SOBs was

23

required to establish secondary effects interest); *Flanigan's Enters. of Ga., Inc. v. Fulton County*, 596 F.3d 1265, 1281 (11th Cir. 2010) ("Even if we were to accept that crime is greater in and around the non-adult establishments—and the record is hotly disputed on this point—a municipality would still be empowered to act in order to check a class of crime it found to be particularly troublesome.").

As to rationale, it is *the City's rationale* that matters under *Renton*:

> The municipality's evidence must fairly support the *municipality's rationale* for its ordinance. If plaintiffs fail to cast direct doubt on *this rationale*, either by demonstrating that the municipality's evidence does not support *its rationale* or by furnishing evidence that disputes the municipality's factual findings, the municipality meets *the standard set forth in Renton*. If plaintiffs succeed in casting doubt on a *municipality's rationale* in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance. *See, e.g., Erie v. Pap's A. M.*, 529 U.S. 277, 298, 146 L. Ed. 2d 265, 120 S. Ct. 1382 (2000) (plurality opinion).

*Alameda Books*, 535 U.S. at 438-39 (emphasis added).

The Fifth Circuit quoted the City's straightforward finding—that "the operation of [SOBs] between 2:00 a.m. and 6:00 a.m. is detrimental to the public health, safety, and welfare"—and rationale for the Ordinance: to "reduce crime and conserve police and fire-rescue resources." *ACE of Dallas*, 83 F.4th at 962.

### i.   Plaintiffs' experts ignore much of the legislative record, which stands as "evidence reasonably believed to be relevant."

The Second Linz Report—even if accepted as true—fails to cast direct doubt on the City's evidence for its Ordinance. It involves data (2022-2023) that was not before the City Council in an attempt to cast direct doubt on the Council's judgment based on the evidence that was before it. And it does not dispute the veracity of any of that evidence, only the inferences to be drawn from it. Moreover, it wholly fails to

24

address much of the legislative record, and the untouched evidence easily satisfies the "any evidence reasonably believed to be relevant" standard.

A party challenging an SOB regulation bears the burden of disproving *each* secondary effect interest that a regulation may serve. Thus, in *Alameda Books*, the Supreme Court concluded that the city could rely on an inference from its study of crime, even though its study concerning property values was inconclusive. 535 U.S. at 435-36. Likewise, in *Daytona Grand*, the Court observed that the plaintiffs' experts, including Dr. Linz, "failed to cast direct doubt on *all* of the evidence that the City reasonably relied on when enacting the challenged ordinances." 490 F.3d at 884 (emphasis supplied); *accord SOB, Inc. v. County of Benton*, 317 F.3d 856, 864 (8th Cir. 2003); *Heideman v. South Salt Lake City*, 165 Fed. Appx. 627, 631 (10th Cir. 2006); *Peek-A-Boo Lounge*, 630 F.3d at 1358-59 (affirming summary judgment where plaintiffs' experts did not "say anything about" three studies, the "judicial opinions relied upon," or affidavits submitted by investigator and police); *BGHA, LLC v. City of Universal City*, 340 F.3d 295, 299 (5th Cir. 2003) ("Camelot never challenged the actual substance of the [secondary effects] affidavits.").

A city need not disprove a challenger's theories of secondary effects, *Alameda Books*, 535 U.S. at 437; rather, the challenger must address the city's rationale for its regulations. *Id.* at 437. A plaintiff must cast direct doubt on the rationale the city actually adopted in support of its ordinance, not some other rationale that a plaintiff believes would have been more appropriate. *Id.* (holding that a challenger cannot "simply replace the city's theory" with its own).

25

Plaintiffs' evidence fails to "cast direct doubt" on the City's legislative evidence on multiple levels. Any one of these failures justifies summary judgment.

First, the Second Linz Report fails to "cast direct doubt on all of the evidence that the City reasonably relied on." *Daytona Grand*, 490 F.3d at 884.

The Fifth Circuit held that Dallas reasonably relied upon the secondary effects studies from Amarillo and Beaumont. *ACE of Dallas*, 83 F.4th at 968 (noting that these "suggest that SOBs are associated with an increase in overall crime"); *see also id.* at 963 (noting the studies found "a correlation between SOBs' hours of operation and increased crime"). The Second Linz Report says nothing about this evidence that meets the *Renton* standard, so despite Plaintiffs' burden-shifting attempt, the City "meets the standard set forth in *Renton*." *Alameda Books*, 535 U.S. at 439.

Likewise, the City reasonably relied upon the "three academic studies linking SOBs to increased crime rates." *ACE of Dallas*, 83 F.4th at 962. The Second Linz Report is also silent on these studies published in peer-reviewed journal articles. This evidence, standing alone, is much more than the single judicial opinion that the *Renton* court held was sufficient.

Nor does the Second Linz Report challenge the anecdotal data—the rash of shootings (including five murders at SOBs), felony arrests, and weapons and drug seizures—documented by the Dallas Police Department's Task Force. *Cf. Daytona Grand*, 490 F.3d at 882-82 (noting that city's anecdotal evidence supported its secondary effects interest). Again, this satisfies the "any evidence that is reasonably believed to be relevant" standard. *Alameda Books*, 535 U.S. at 438 (cleaned up).

And nothing in the Second Linz Report challenges the City Council's decision to give the greatest weight to violent crimes, which were higher during the 2 a.m. to 6 a.m. period. In fact, the Second Linz Report confirms the prevalence of violent crimes around adult cabarets during that time period. (Appx. 236 (showing that 29% of crimes around adult cabarets were violent, whereas only 8% - 13% around control areas were violent, between 2 a.m. and 6 a.m.).)

Summary judgment is appropriate, then, because "[e]ven if we were to accept that crime is greater in and around the non-adult establishments—and the record is hotly disputed on this point—a municipality would still be empowered to act in order to check a class of crime it found to be particularly troublesome." *Flanigan's Enters.*, 596 F.3d at 1281.

### ii. Plaintiffs' experts presume their own regulatory rationale without refuting the City's.

The Second Linz Report fails to refute the City's straightforward regulatory rationale, but instead imposes its own (straw man) rationale that it then defeats.

The *City's rationale* is that closing SOBs from 2 a.m. to 6 a.m. may reduce the costs of adverse secondary effects, including crime and the depletion of police and fire-rescue resources. *ACE of Dallas*, 83 F.4th at 962.

The Second Linz Report simply replaces the City's rationale with what the Plaintiffs and Linz thinks should be the required legislative rationale: that SOBs must "have more crime around them than other locations in Dallas" (Appx. 221.) in order for a city to demonstrate that it has a valid interest in reducing crime around SOBs.

27

But Plaintiffs' premise—a *non sequitur*—was specifically rejected by the Fifth Circuit. *ACE of Dallas*, 83 F.4th at 968 ("The district court also faulted the City for failing to include crime data associated with non-SOBs. Because crime could also occur at 'other late-night establishments,' the court reasoned, a comparison was necessary to 'conclude that the secondary effects are linked to the SOBs, as opposed to some other, unrelated factor.' We disagree."); *accord Flanigan's Enters.*, 596 F.3d at 1281 (crediting non-comparative anecdotal evidence and holding that greater calls for service around non-SOBs did not undermine secondary effects interest in regulating SOBs); *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty.*, No. 8:05-CV-1707, 2009 WL 4349319, at *6 (M.D. Fla. Nov. 25, 2009) ("The County may regulate secondary effects in sexually oriented businesses, including Plaintiffs', notwithstanding the existence of secondary effects in other types of businesses."), *aff'd*, 630 F.3d 1346 (11th Cir. 2011).

The corollary premise of the Second Linz Report—that the City must show greater overall crime from 2 a.m. to 6 a.m. than from 10 p.m. to 2 a.m. (Appx. 233)—is also not required. The City does not have to prove that *more* crime happens between 2 a.m. and 6 a.m. than any other period. It need only have a reasonable belief that requiring SOBs to close during those hours may reduce their secondary effects while allowing adequate alternative avenues of communication.

The Second Linz Report ignores other obvious points.

The first is that by studying only recent Dallas police data, it presumes that the City must prove local secondary effects before regulating SOBs' hours. But that

runs headlong into *Renton*'s central holding that cities need not prove local secondary effects. 475 U.S. at 51-52.

The second is that even if crime and calls for service are overall higher between 10 p.m. and 2 a.m. (because many more people are on the streets then), the City's regulation still targets crime and calls for service burdens at a time (2 a.m. to 6 a.m.) when less police are on patrol and strain on law enforcement is greater.

The third is that the City's Ordinance is justified by the higher incidence of violence—a class of crime the City found particularly troublesome—in the 2 a.m. to 6 a.m. period, regardless of overall crime counts in the 10 p.m. to 2 a.m. period. Dr. Linz's argument does not negate the City's basis for regulating the 2 a.m. to 6 a.m. period, but only invites the Court to engage in the sort of line-drawing repeatedly rejected in these cases. *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999) (upholding ordinance requiring SOBs to close from 10 a.m. to noon and rejecting the plaintiffs' argument to scrutinize "the City's reasons for this rule on an hour by hour basis").

Finally, the Second Linz Report, even if true, proves too much. It would support closing SOBs for eight hours a day (from 10 p.m. through 6 a.m.) to achieve greater reductions in secondary effects—both in the overall crime in the first four hours and the violent crime more prevalent in the last four hours. Federal appellate courts have upheld much more restrictive hours regulations than the Ordinance under both *Renton* and *Alameda Books*. To *Lady J. Lingerie* add *Mitchell v. Comm'n on Adult Ent. Establishments*, 10 F.3d 123 (3rd Cir. 1993) (upholding law requiring

SOBs to be closed from 10 p.m. to 10 a.m. Monday through Saturday and all day
Sunday); *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd of Trustees*, 411 F.3d 777
(6th Cir. 2005) (*en banc*) (upholding law requiring closure from 12 a.m. to 12 p.m.
Monday through Saturday and all day Sunday); *Ctr. for Fair Pub. Policy v.
Maricopa Cnty.*, 336 F.3d 1153 (9th Cir. 2003) (requiring closure from 1 a.m. to 8:00
a.m. Monday through Saturday and 1 a.m. to noon on Sundays).

In this sense, the Second Linz Report critique of the Ordinance for being *more*
permissive than it has to be is no basis for saying that the Ordinance is not
designed to serve a substantial government interest in preventing secondary effects
from 2 a.m. to 6 a.m. *Cf. Imaginary Images*, 612 F.3d at 747-49 (rejecting plaintiffs'
reliance on Dr. Linz's opinions and stating: "It bears repeating that more severe
policies . . . have been repeatedly upheld in the face of constitutional challenge.").

Under governing law, the Second Linz report fails to cast direct doubt on the
City's substantial legislative evidence or on the City's rationale. The Court should
therefore grant the City summary judgment.

### iii. Plaintiffs' experts also fail to cast "direct doubt" for the independent reason that their study is flawed.

Because the premises underlying the Second Linz Report run counter to
governing law as to the necessary secondary effects evidence and rationale, it fails
to cast direct doubt as required under *Alameda Books*. But the study fails to cast
direct doubt for an additional, independent reason: it is fatally flawed.

As explained in the City's expert report by Dr. Richard McCleary, Ph.D. (Appx.
426-431), the Second Linz Report suffers from numerous defects, the first of which

is that it ignores an abundance of empirical evidence documenting the secondary effects of SOBs and supporting restrictions on their hours of operation. (*See e.g.*, Appx. 395-96 (citing study from Greensboro, North Carolina); Appx. 416 (discussing crime during nighttime hours in Sioux City, Iowa and Montrose, Illinois); Appx. 646 (Austin, Texas studying finding that "the late operating hours of most adult businesses created special problems to the surrounding neighborhood in the form of noise, glare, and traffic"); Appx. 831 (Garden Grove, California report observing that SOB public safety hazards can be mitigated by limiting hours of operation).)

As to Linz's study of Dallas police data, McCleary observes that the non-SOB control sites Linz chose are not adequately matched to the SOB control sites in terms of ambient crime risk. So the static group comparison Linz employed cannot be adequately interpreted. (Appx. 429.)

The study is also flawed because Linz presents no basis for throwing out the "outliers," i.e., three SOBs in Dallas that the data show have extreme crime risk. Discarding outliers is never acceptable, and Linz's choice to ignore the SOBs that are hotspots for crime obscures the secondary effects of SOBs in Dallas. (Appx. 430.)

Third, some of the non-SOB controls are in "geographic clusters," while others are long distances away (as much as 22 miles) from the SOBs that they purportedly are "matched" to. Both problems—clusters that can contain confounding variables, and unreasonable distances between allegedly "comparable" sites—can distort ambient crime counts and make Linz's comparisons between SOBs and non-SOB controls meaningless. (Appx. 431.)

31

The Second Linz Report shows aggregate totals, but does not show the dispersion measures (standard deviations) that would be required to assess the significance of the comparisons between SOBs and non-SOB controls. (Appx. 431.)

Dr. McCleary concludes that the defects in the design and execution of their study means that Drs. Linz and Vaynman do not cast "any meaningful doubt" on the City's reliance on its own crime data or the Ordinance's overall factual predicate. (*Id.*)

Of course, *Renton* and *Alameda Books* do not require trial courts to endure "argumentative rounds and elusive requirements of statistical validation." *Imaginary Images*, 612 at F.3d at 748. Rather, a city need only rely on "some" evidence reasonably believed to be relevant. *Id.* at 747 (holding that, under *Renton* standard, "Linz's study hardly undermined the government's case") (cleaned up). As the City has met that standard, the Court should grant the present motion.

### c. Even if Plaintiffs had cast direct doubt, the City's post-remand evidence shows that the City "meets the standard set forth in *Renton*."

Just as Plaintiffs did not cast direct doubt on the City's legislative evidence at the preliminary injunction, they fail to do so at summary judgment. But even if Plaintiffs argue that they have cast direct doubt, the City is still entitled to prevail. That is because the City has "supplement[ed] the record with evidence renewing support for a theory that justifies its ordinance" under the "standard set forth in *Renton*." *Alameda Books*, 535 U.S. at 439.

First, the City has submitted the affidavit of Stephen Bishopp, Ph.D., who analyzed data from before and after the City began enforcing the Ordinance on

November 30, 2023. (Appx. 175-178.) The data shows a "strong correlation between enforcement of the Ordinance and a reduction in crime." (Appx. 176 ¶ 8.) Between the Pre-Enforcement Period and the Enforcement Period, "[t]otal offenses and calls within 500 feet of an SOB dropped by 19% and 14%, respectively." (Appx. 176 ¶ 8.)

Offenses within 500 feet of an SOB between 2 a.m. and 6 a.m. dropped by 42%, and police calls within the same 500 feet radius during that same time window dropped by 34%. (Appx. 176 ¶ 8.) Thus, the preliminary data shows that the Ordinance is having its intended effect, even though such a showing is not required. *ACE of Dallas*, 83 F.4th at 968.

Second, the City has submitted the expert report of Dr. McCleary, along with a host of studies and documents referenced and incorporated therein that show the strong, empirical support for regulations like those at issue here. (Appx. 381-1500.)

Dr. McCleary has been qualified as a witness on the secondary effects issue in many courts, and has sat on the editorial boards of several major criminology journals. (Appx. 441.) Based on his own research in the field—much of it peer-reviewed and published—he concludes that the Ordinance is well supported.

"Given that secondary effects are predicted by a strong criminological theory, and given that the prediction is corroborated consistently by a diverse empirical literature, it is a scientific *fact* that SOBs pose ambient crime risks." (Appx. 385.)

More specifically, he explains that the contention "that closing SOBs during this overnight shift [2 a.m. to 6 a.m.] will mitigate the secondary effects" of SOBs is "consistent with theory and research." (Appx. 385.)

33

Dr. McCleary's report incorporates his work in other cities and shows that
"routine policing is more difficult and less effective in darkness." (Appx. 396.)
Limiting the operation of high-risk sites like SOBs will mitigate ambient crime risk;
"this theoretical prediction is confirmed by the empirical evidence." (Appx. 396.)

Even if one assumes—contrary to the relevant case law—that Dr. Linz's
opinion could shift the evidentiary burden under the *Renton*-Alameda *Books*
standard, the City has adduced additional evidence in support of its regulatory
rationale. Thus, the Court should grant the City's motion for summary judgment.
*84 Video/Newsstand, Inc. v. Sartini*, 455 Fed. Appx. 541, 550-52 (6th Cir. 2011)
(affirming summary judgment upholding SOB hours of operation regulation,
holding that Dr. Linz failed to cast direct doubt, and that even if he had,
"McCleary's testimony renews support for Ohio's theory of secondary effects").

## 2. The Ordinance allows for reasonable alternative avenues of communication.

The Fifth Circuit properly held that the hours rule—much less restrictive than
many others that have been upheld—leaves open reasonable alternative avenues of
communication. *ACE of Dallas*, 86 F.4th at 969.

Succinctly put, the Ordinance "leaves SOBs free to open for twenty hours a day,
seven days a week, while also, in the City's reasonable view, curtailing the violent
crime and 911 calls with which the City was concerned." *Id*. The City's four-hour
rule does not impermissibly restrict speech, so summary judgment is proper.

Plaintiffs' economic losses do not forestall that result. *Renton* itself emphasized
that "[t]he inquiry for First Amendment purposes is not concerned with economic

34

impact." 475 U.S. at 54; *see also ACE of Dallas*, 83 F.4th at 969 ("A regulation need

not be costless to be valid."); *Woodall v. City of El Paso*, 49 F.3d 1120, 1124 (5th Cir.

1995) ("It is not relevant that a relocation site will result in lost profits, higher

overhead costs, or even prove commercially unfeasible for an adult business.")

Nor did Justice Kennedy's *Alameda Books* concurrence overrule, *sub silencio*,

this holding from *Renton. Ctr. for Fair Pub. Policy*, 336 F.3d at 1162 (upholding

more restrictive SOB hours rule, stating: "Given his emphatic reaffirmation of

*Renton*, we are not persuaded that Justice Kennedy meant to precipitate a sea

change in this particular corner of First Amendment law."); *see also Deja Vu of

Cincinnati, L.L.C.*, 411 F.3d 777, 791 (6th Cir. 2005) (*en banc*) (upholding more

restrictive hours rule as narrowly tailored under *Alameda Books*).

Plaintiffs' theory is that the hours rule is unconstitutional because it SOBs will

lose profits and patrons will lose access to speech "during those hours." *ACE of

Dallas*, 83 F.4th at 969. But the Fifth Circuit "disagree[d]" with that theory. *Id.*

In doing so, it cited *Entertainment Productions, Inc. v. Shelby County*, where

the Sixth Circuit explained that under the SOBs' theory, "it is hard to see how any

government action that alters the economic calculus of adult-oriented businesses

would not potentially violate the First Amendment. . . . [This] legal theory would

expand Justice Kennedy's concurrence beyond any recognizable limiting principle,

and we accordingly reject it." 721 F.3d 729, 742 (6th Cir. 2013)

Thus, the Fifth Circuit's conclusion on preliminary injunction should become

this Court's conclusion on summary judgment.

**C. Plaintiffs lack standing to challenge the Ordinance's age restriction, a regulation that satisfies intermediate scrutiny.**

Plaintiffs' challenge to the age restriction is not justiciable for multiple reasons. But even if it were, it would fail.

**1. Plaintiffs lack standing because they allege no injury in fact and a favorable decision would not redress any claimed injury.**

Plaintiffs lack standing to challenge the Ordinance's age restriction because they do not allege any injury from that provision. Likewise, they lack standing because Texas statutes—not challenged in this case—impose the same restriction; therefore, any ruling against the Ordinance provision would not redress any injury.

It is settled that Article III standing requires each plaintiff to show it has an injury in fact that is concrete and particularized, and actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs have not alleged, much less shown, an injury in fact caused by the age requirement. Paragraphs 27 and 55 of the second amended complaint mention the age requirement. (ECF No. 90 at 14.) But neither paragraph alleges that the Plaintiffs employ, or seek to employ, minors under no harm to the Plaintiffs. Plaintiffs' failure to assert any Article III injury in fact to themselves bars their claims against the age requirement. *DC Operating, L.L.C. v. Paxton*, 100 F.4th 657, 659 (5th Cir. 2024) (dismissing strip club's challenge to the state SOB age statute for lack of standing).

Plaintiffs also lack standing because a favorable ruling against the Ordinance's age provision would not redress their injury (if they had alleged any) as Article III requires. *Lujan*, 504 U.S. at 561. SOBs in Dallas are barred from having workers

under 21 years of age by multiple provisions of state law. *See Texas Entertainment Association, Inc. v. Paxton*, 732 F. Supp. 3d 684, 688 (W.D. Tex. 2024) (upholding state code provisions that prohibit those under 21 from working in SOBs). Plaintiffs do not challenge those state laws here.

So a ruling against the Ordinance's employee age requirement would not redress any injury because state law would still bar Plaintiffs from having workers under 21 years old. *See Texas State LULAC v. Elfant*, 52 F.4th 248, 255-256 (5th Cir. 2022). This lack of redressability means that Plaintiffs lack standing to challenge the Ordinance's age rule.

Thus, the Court should dismiss Plaintiffs' challenge to the age requirement.

## 2.    The SOB employee age requirement satisfies intermediate scrutiny.

Even if Plaintiffs had standing, the age requirement is constitutional for the reasons explained in *Doe I v. Landry*, 909 F.3d 99 (5th Cir. 2018), and in the case upholding the Texas statute on which the Ordinance provision was based. *Texas Entertainment Association, Inc. v. Paxton*, 732 F. Supp. 3d 684 (W.D. Tex. 2024).[3]

The regulation is content-neutral because it is a manner regulation of SOB operations that aims to prevent negative secondary effects. *Doe I*, 909 F.3d at 107; *Texas Ent. Ass'n*, 732 F. Supp. 3d at 695; (Appx. 1-2, Ord. No. 32125 at 1-2); (Appx. 383-439, McCleary Report). Therefore, intermediate scrutiny standard under *United States v. O'Brien*, 391 U.S. 367 (1968), applies. *Doe I*, 909 F.3d at 109.

---

[3] The Fifth Circuit recently decided *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, --- F.4th ---, 2025 WL 340799, No. 23-30033 (5th Cir. Jan. 30, 2025) (striking 21-year-old age requirement for buying handguns). That case does not mention the First Amendment or relevant cases like *Doe*, and thus does not apply.

Under *O'Brien*, a law is justified if it is:

[1] within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest.

*Id.* at 377.

The first *O'Brien* factor is satisfied because the City has constitutional authority to regulate SOB operations.

The second factor is also satisfied because the Ordinance is intended to regulate secondary effects, "which is a substantial government interest." *Doe I*, 909 F.3d at 109.

Here, the City relies on reports showing a connection between SOBs and trafficking of 18 to 20 year-olds, like those that the Fifth Circuit and the Western District of Texas considered when upholding Louisiana and Texas SOB laws imposing similar age rules. (Appx. at 1022-1500, various reports; Appx. 503-512, *Correlates of Current Transactional Sex Among a Sample of Female Exotic Dancers in Baltimore, MD*, Journal of Urban Health (2011); Appx. 983-999, Holsopple Report); *Doe I*, 909 F.3d at 109-110;[4] *Texas Entm't Ass'n*, 732 F. Supp. 3d at 691.

"It is reasonable for [the City] to believe that if young adults are vulnerable to sex trafficking, a regulation that prohibits them from working at places with high rates of such trafficking" will reduce "trafficking overall." *Texas Entm't Ass'n*, 732 F. Supp. 3d at 696. This evidence is "sufficient to show a reasonable belief that there is

---

[4] Secondary effects evidence can be adduced prior to enactment of a law *and* during litigation. *Doe I*, 909 F.3d at 110; *J&B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 371-372 (5th Cir. 1998).

a link between the [age regulation] and curbing the identified secondary effects of human trafficking and prostitution." *Doe I*, 909 F.3d at 110.

The age regulation satisfies the third *O'Brien* factor because the governmental interest in reducing the risk of sex trafficking of persons under 21 through SOBs is unrelated to the suppression of free expression. *Doe I*, 909 F.3d at 110; *Texas Entm't Ass'n*, 732 F. Supp. 3d at 695. SOBs may still present erotic materials and shows, and those under 21 may still engage in expression, even if not at SOBs. *Id*.

The regulation also satisfies the fourth *O'Brien* factor because, as the Fifth Circuit held in *Doe I*, requiring SOB employees to be at least 21 is narrowly tailored because it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation." 909 F.3d at 112-113; *id*. at 110-111 (following *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989), and explaining that time, place, and manner regulations must be narrowly tailored to serve governmental interests but "need not be the least restrictive or least intrusive means of doing so").

Preventing those under 21 from working in SOBs serves the City's substantial interest in reducing the risk of trafficking that can occur through such venues. That the regulation applies to all SOB workers under age 21, not just performers, is no First Amendment defect because the other roles (clerks, bartenders, etc.) are not inherently expressive. *Texas Entm't Ass'n*, 732 F. Supp. 3d at 698.

The Court should grant summary judgment on the Ordinance's age rule.

## D.  Plaintiffs' other First Amendment claims fail.

Plaintiffs' First Amendment overbreadth claim is underdeveloped and meritless.

To sustain a First Amendment overbreadth claim, Plaintiffs must show that a law "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep' . . . ." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003); *Doe v. Landry*, 909 F.3d 99 (5th Cir. 2018). The facial overbreadth doctrine is an exception to standing principles and is "strong medicine" to be employed "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973); *Baby Dolls Topless Saloons, Inc. v. City of Dallas, Tex.*, 295 F.3d 471, 482 (5th Cir. 2002).

"The overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Baby Dolls*, 295 F.3d at 482. The claimant must make the substantial overbreadth demonstration "from the 'text of [the law] and from actual fact." *Hicks*, 539 at 122.

Plaintiffs do not explain the basis for their overbreadth claim. While the Court's preliminary injunction order stated that the Ordinance was "overbroad as to bookstores" (ECF No. 45 at 36), this statement appears in the Court's discussion of secondary effects evidence under the *Renton* standard and the Court's conclusion that the Ordinance was not narrowly tailored to serve the secondary effects interest. The Fifth Circuit reversed on this issue and vacated the injunction order without a separate discussion of third-party standing and overbreadth principles.

In any event, Plaintiffs present no grounds for this Court to employ the "strong medicine" of facial overbreadth, as they have failed to show substantial overbreadth "from the text of [the law] and from actual fact" concerning any provision in the Ordinance.

## II.  Plaintiffs' remaining claims are makeweight.

Plaintiffs' remaining claims—that the Ordinance deprives their patrons of First and Fourteenth Amendment "rights to receive protected expression," violate rights of free association, deprives Plaintiffs of equal protection, etc.—are without merit.

First, no patron is a party to this action, and Plaintiffs have not shown any injury in fact to a patron. Thus, the undeveloped claim(s) on behalf of patrons should be dismissed for want of standing. *Lujan*, 504 U.S. at 560.

But even if Plaintiffs' could show standing to assert claims on behalf of unnamed patrons, those claims would fail for the reasons that Plaintiffs' own First Amendment claims fail. And where a Fourteenth Amendment claim (such as a substantive due process liberty claim) wholly overlaps with a claim under an "explicit textual source of constitutional protection," the Fourteenth Amendment claim cannot proceed. *Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383, 387 (5th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)).

Second, Plaintiffs have not stated a "right to associate" claim. (*See* ECF No. 90 at 16, ¶60(i).) There is no constitutionally-protected general "right of 'social association.'" *Mote v. Walthall*, 902 F.3d 500, 506 (5th Cir. 2018) (quoting *Dallas v. Stanglin*, 490 U.S. 19 (1989)). Plaintiffs do not allege facts to show that any "expressive association" or "intimate association" is at issue, *id.*, or that the Ordinance does anything to injure any protected association. The City is therefore entitled to summary judgment on Plaintiffs' right to associate claim.

Plaintiffs' Contracts Clause claim (ECF No. 90 at 16, ¶60(i)) has no merit. The Contracts Clause applies only to substantial impairment of existing contracts and

not prospective interference with a generalized right to enter into future contracts. *See Energy Reserve Grp., Inc. v. Kan. Power & Light Co.,* 459 U.S. 400, 410 (1983); *see also Fed. Sav. & Loan Ins. Corp. v. Griffin,* 935 F.2d 691, 698 (5th Cir. 1991) ("The Contract Clause focuses on *retroactive state legislation.*"). Because Plaintiffs have not shown how the Ordinance substantially impairs a preexisting contractual relationship, the claim fails at the threshold. *Energy Reserves Grp.*, 459 U.S. at 411. And because the Ordinance serves substantial governmental interests, the exercise of the police power would justify an impairment if any occurred. *Id.* at 412.

## CONCLUSION

For the foregoing reasons, the Court should grant the City summary judgment on all of Plaintiffs' claims.

Dated: <u>February 4, 2025</u>   Respectfully submitted,

          Tammy L. Palomino
          City Attorney for the City of Dallas

          <u>/s/*Stacy Rodriguez*    </u>
          Stacy Jordan Rodriguez
          Texas State Bar No. 11016750
          Stacy.Rodriguez@dallas.gov
          Executive Assistant City Attorney

          Elizabeth Chandler
          Texas State Bar No. 24097484
          Elizabeth.Chandler@dallas.gov
          Assistant City Attorney

          Dallas City Attorney's Office
          1500 Marilla St., Room 7DN
          Dallas, Texas 75201
          Phone: (214) 670-3519
          Fax:  (214) 670-0622

/s/*Scott D. Bergthold*
Scott D. Bergthold
Tennessee State Bar No. 023186
sbergthold@sdblawfirm.com
Law Office of Scott D. Bergthold, P.L.L.C.
2290 Ogletree Avenue, Suite 106
Chattanooga, TN 37421
Phone:  (423) 899-3025

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I certify that on February 4, 2025, I filed the foregoing document with the United States District Court for the Northern District of Texas via the Court's CM/ECF system, thereby serving all parties of record by operation of the CM/ECF system.

*s/ Scott D. Bergthold*
Scott D. Bergthold