# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| ASSOCIATION OF CLUB EXECUTIVES OF DALLAS, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| | § | Civil Action No. 3:22-cv-00177-M |
| v. | § § | |
| CITY OF DALLAS, TEXAS, | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

On April 28, 2025, the Court heard oral argument on (1) the Motion for Summary Judgment (ECF No. 116), filed by Defendant City of Dallas (the "City") which is directed to the Plaintiffs' Second Amended Complaint ("SAC"), (2) the Motion for Partial Summary Judgment (ECF No. 113) and (3) the Motion for Leave to File Corrective and Supplemental Report (ECF No. 134), filed by Plaintiffs, sexually oriented businesses ("SOBs"), comprised of seven adult cabarets[1], one adult bookstore[2], and a non-profit trade association[3]. At the hearing, the Court held that intermediate scrutiny applies to Plaintiffs' First Amendment challenge.[4]

---

[1] Nick's Mainstage, Inc.–Dallas PT's, d/b/a PT's Men's Club; Fine Dining Club, Inc., d/b/a Silver City; 11000 Reeder, LLC, d/b/a Bucks Wild; TMCD Corporation, d/b/a The Dallas Men's Club; Dallas Food & Beverage LLC, d/b/a Bucks Cabaret; High Expectations Hospitality, LLC d/b/a Spearmint Rhino Gentlemen's Club; and Elevated Hospitality Services, LLC d/b/a Spearmint Rhino Gentlemen's Club.

[2] AVM-AUS, Ltd. d/b/a New Fine Arts Shiloh.

[3] Association of Club Executives of Dallas, Inc.

[4] Plaintiffs move for partial summary judgment, arguing that Ordinance No. 32125 is subject to strict scrutiny because it defines adult cabarets based on the intended effect of the expression on the audience. However, the argument that strict scrutiny applies is foreclosed by *Ass'n of Club Exec. of Dall., Inc. v. City of Dallas*, 83 F.4th 958, 970 (5th Cir. 2023) [hereinafter referred to as "*ACE v. Dallas*"].

For the reasons stated below, the City's Motion for Summary Judgment is **GRANTED**, the Plaintiffs' Partial Motion for Summary Judgment is **DENIED,** and Plaintiffs' Motion for Leave is **DENIED**, except to the extent correcting typographical errors.

### I.    BACKGROUND

On January 26, 2022, the Dallas City Council ("the Council") adopted Ordinance No. 32125 (the "Ordinance"), which amended Chapter 41A of the Dallas ordinances. The Ordinance prohibits SOBs from operating between 2:00 a.m. and 6:00 a.m. The Council restricted the hours of operation for SOBs to minimize the adverse secondary effects associated with SOBs, including crime and calls for emergency resources. Dall. City Code § 41A-14.3(b), Ord. 32125 at 1.

The Ordinance states that the Council determined that the operations of SOBs from 2:00 a.m. – 6:00 a.m. are "detrimental to public health, safety, and general welfare," citing crime data showing an increase in violent crimes and gun and drug-related arrests near SOBs between 2:00 a.m. and 6:00 a.m.; the report of the 2021 Dallas Police Department ("DPD") Task Force[5], which had been created in response to multiple shootings and violent crimes occurring near SOBs; data from the Dallas Fire-Rescue Department relating to calls for service[6] at or near SOBs between 2 a.m. and 6 a.m.; three academic studies[7] purporting to link SOB locations to higher rates of crime; and reports from Beaumont and Amarillo, showing a positive correlation between the

---

[5] In March of 2021, DPD created a Task Force that consisted of eight officers who patrolled areas near SOBs Thursday–Saturday nights. Based in part on the firsthand observations of the Task Force officers, DPD presented findings to the Council with a recommendation to restrict early morning hours of operation of SOBs. Def's Mot. Summ. J., Ex. 2 (ECF No. 118, at COD-7–COD-37) ("SOB Briefing").

[6] Calls for service relate to calls to 911 for emergency assistance. They are ranked by priority, with "Priority 1" calls being the most urgent, requiring an immediate response. ECF No. 66, Tr. Vol. 2, at 133:1–21.

[7] Richard McCleary, *Rural Hotspots: The Case of Adult Businesses*, 19 Crim. Just. Pol'y Rev. 153 (2008); Erin S. McCord & R. Tewksbury, *Does the Presence of Sexually Oriented Businesses Relate to Increased Levels of Crime? Examination Using Spatial Analyses*, 59 Crime & Delinquency 1108–25 (2012); Alan C. Weinstein & Richard McCleary, *The Association of Adult Businesses with Secondary Effects: Legal Doctrine, Social Theory, and Empirical Evidence*, 29 Cardozo Arts & Ent. L.J. 565 (2011). SOB Briefing, COD-34.

hours of operation of SOBs and higher crime rates.  *Id*. 1–2.  The evidence cited in the Ordinance was presented to the Council by DPD in several briefings before the Ordinance was adopted. *See* SOB Briefing, at COD-7–COD-50.

Plaintiffs filed this action under 42 U.S.C. § 1983 on January 26, 2022, the same date the Ordinance was enacted, asserting that the Ordinance violates the First and Fourteenth Amendments.  On February 18, 2022, the City moved to dismiss Plaintiffs' claims under Rule 12(b)(6).  In March and April 2022, the Court conducted a multiday evidentiary hearing on Plaintiffs' request for a preliminary injunction.  On May 24, 2022, the Court granted a preliminary injunction and denied the City's Motion to Dismiss.  The City appealed, and on October 12, 2023, the Fifth Circuit, in *ACE v. Dallas*, vacated the preliminary injunction and remanded the case for further proceedings, after which the three motions addressed herein were filed.

Both parties submitted additional materials after the summary judgment deadline. Plaintiffs filed a motion for leave to supplement the record, and Defendants submitted additional exhibits with their reply brief.  (ECF Nos. 134–36).  At oral argument, the Court stated that it would consider the untimely submissions from both parties only to the extent they corrected typographical errors.  Plaintiffs' Motion for Leave is otherwise **DENIED** as untimely, and the additional reply exhibits are not considered.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings, discovery, disclosure materials, and affidavits show that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law.  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  All evidence must be viewed in the light most favorable to the party opposing the summary judgment motion.  *Id.*

### III.    ANALYSIS

The SAC asserts various claims against the City under the First and Fourteenth Amendments.[8]  Plaintiffs acknowledged that they were waiving their claims based on equal protection, prior restraint, and the rights of association and contract.  ECF No. 90 at 15–16 ¶¶ (a)–(j); ECF No. 117 at 41.  Accordingly, summary judgment for the City is granted with respect to those claims.  The City moves for summary judgment on Plaintiffs' facial challenge to the Ordinance, brought under the First and Fourteenth Amendments, and on the overbreadth challenge under the First and Fourteenth Amendments brought by Plaintiff AVM-AUS, Ltd. d/b/a New Fine Arts Shiloh, an adult bookstore.[9]

The Court concludes that summary judgment for the City is appropriate because Plaintiffs fail to demonstrate a genuine issue of material fact.  The City's evidence supports its rationale for the Ordinance, and the Ordinance is not violative of the First or Fourteenth Amendments.

### A.    Application of Intermediate Scrutiny

The City argues that the Ordinance is supported by evidence reasonably related to its rationale—reducing crime and conserving emergency resources.  Because the Ordinance does not ban SOBs and only eliminates their right to operate for four hours per day, it is subject to intermediate scrutiny as a "time, place, and manner" regulation.  *City of Renton v. Playtime*

---

[8] Count I of the SAC asserts both facial and as-applied challenges to the Ordinance.  Plaintiffs' summary judgment briefing does not distinguish between the two or present any separate argument or analysis for an as-applied challenge.  The Court evaluates the First Amendment claim as a facial challenge under intermediate scrutiny.
[9] To the extent Plaintiffs reference the Fourteenth Amendment, the Court construes it as incorporating the First Amendment claim against the City through the Due Process Clause.  Plaintiffs do not assert a stand-alone due process claim under the Fourteenth Amendment.

*Theatres*, 475 U.S. 41, 46 (1986); *ACE v. Dallas*, 83 F.4th at 965.  Plaintiffs' Motion for Partial Summary Judgment is incorrectly based on the application of strict scrutiny.

To survive intermediate scrutiny, the City must show that the Ordinance is "designed to serve a substantial governmental interest and allow[] for reasonable alternative avenues of communication."  *ACE v. Dallas*, 83 F.4th at 963–64 (citing *Renton*, 475 U.S. at 50 (quotations omitted)).  This evidentiary burden is light: the City may rely on reasonably relevant evidence and common sense inferences.  *ACE v. Dallas*, at 966–67 (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437 (2002) (internal quotation marks and citations omitted).  Plaintiffs may "cast direct doubt" on that rationale by either demonstrating that the City's evidence does not support its rationale or by furnishing evidence that disputes the City's findings.  *Alameda Books*, 535 U.S. at 437; *see also ACE v. Dallas,* 83 F.4th at 966 n.9 (citing Justice Kennedy's concurrence in *Alameda Books* as controlling).  If Plaintiffs cast direct doubt on the City's rationale, the burden shifts back to the City "to supplement the record with evidence renewing support" for the Ordinance.  *Alameda Books*, 535 U.S. at 439.

1.  **The City relied on reasonably relevant evidence**.

Under *Renton*, to satisfy the requirement that the Ordinance be "designed to serve a substantial governmental interest," the City must demonstrate that it relied on evidence reasonably believed to be relevant to its rationale in adopting the Ordinance—namely, reducing crime and conserving emergency resources.  475 U.S. at 51–52.  This is not "an unduly rigorous evidentiary burden."  *Alameda Books*, 535 U.S. at 439.  The City is not required to produce empirical certainty or direct proof of causation.  *Id*.  It may rely on common sense inferences

drawn from local data, studies from other cities, or academic research.  *See ACE v. Dallas*, 83 F.4th at 966.

In support of the Ordinance, the City relied on four categories of evidence: (i) statistical crime data, (ii) data collected by the Task Force, (iii) studies from other cities, and (iv) academic research on secondary effects.

The crime data collected by DPD and summarized in the SOB Briefing to the Council focused on arrests, violent crimes[10], and calls for service within 500 feet of SOBs during the hours of 10:00 p.m. – 2:00 a.m. and 2:00 a.m. – 6:00 a.m.  SOB Briefing, COD-19–COD-31. The arrest data focused on arrests for aggravated assaults, robberies, prostitution, and gun and drug-related crimes, indicating that more arrests occurred between 2:00 a.m. and 6:00 a.m. than between 10:00 p.m. and 2:00 a.m.  *Id*. at COD-19.  For example, the data showed that gun and drug-related arrests steadily increased from 2019–21, accounting for 58% of total arrests between 10:00 p.m. and 2:00 a.m., and 63% of arrests between 2:00 a.m. and 6:00 a.m.  In 2021, the data showed more total arrests between 2:00 a.m. and 6:00 a.m. than between 10:00 p.m. and 2:00 a.m.  *Id*.

The data presented to the Council indicated a higher concentration of violent offenses between 2:00 a.m. and 6:00 a.m. than between 10:00 p.m. and 2:00 a.m.  For example, from 2019–21, 67.16% of reported violent crimes near SOBs occurred between 2:00 a.m. and 6:00 a.m., and in 2021 alone, 76% of reported violent crimes were near SOBs.  *Id*. at COD-20.  Over the same period, reports of violent crime decreased by 29% between 10:00 p.m. and 2:00 a.m. but increased by 80% between 2:00 a.m. and 6:00 a.m.  Calls for service followed a similar trend.  *Id*. at COD-28.  From 2019–21, there were 11,999 calls for service to locations within 500

---

[10] "Violent crimes include aggravated assault, rape, robbery, and murder."  SOB Briefing, COD-20.

feet of SOBs.  *Id*.  2,171 of those occurred between 10:00 p.m. and 2:00 a.m., including 165

Priority 1 calls.[11]  2,396 occurred between 2:00 a.m. and 6:00 a.m., including 215 Priority 1

calls.[12]  *Id*.

The Council was also briefed on the observations of members of the Task Force—

"multiple shootings, violent crimes, and [crimes] increasing after midnight."  *Id*. at COD-15.

The findings of the Task Force reinforced the crime statistics data, showing that from May to

December 2021, there were 549 aggravated assaults in the Task Force patrol zone, with 110

occurring between 10:00 p.m. and 2:00 a.m., compared to 130 between 2:00 a.m. and 6:00 a.m.

*Id*. at COD-16.

The Council also considered reports from Beaumont and Amarillo, which had

implemented restrictions on SOB operating hours in response to increased rates of crime and

reduction in property values.[13]  *Id*. at COD-33.  These reports found a "positive correlation

between SOB[s], specifically their hours of operation, people attracted, and higher crime rates."

*Id*.  Finally, the Council considered three academic writings examining the relationship between

SOBs and crime, public safety, and other secondary effects.  *Id*. at COD-33.  Although the

academic papers were not time or location-specific, the three articles generally concluded that

there is a correlation between SOBs and higher crime rates.  *Id*. at COD-34.  The studies

emphasize the importance of public policy responses, recommending that city officials and law

enforcement consider the adverse secondary effects of SOBs when making policy decisions.  The

---

[11] *Supra* n.7.

[12] Calls for service to fire-rescue showed similar patterns.  From 2019–21, 1,317 calls for service occurred, with 270 between 10:00 p.m. and 2:00 a.m., and 405 between 2:00 a.m. and 6:00 a.m.  *Id*. at COD-31.

[13] Although not referenced in the Ordinance, the SOB briefing to the Council mentioned El Paso, Fort Worth, San Antonio, Plano, and Grand Prairie, all of which have restricted hours of operation for SOBs.  *Id*. at COD-14.

research suggests increased patrols, surveillance, and environmental design strategies to deter or minimize crime near SOBs.

Under *Renton*, the Council was not required to conduct new studies or prove a direct causal link between SOBs and crime. *Renton*, 475 U.S. at 51–52. Instead, it could rely on evidence it reasonably believed to be relevant to addressing the increase in late-night crime and the strain on emergency services. *Id*. The Council was not limited to relying on its own experience and local data, but could also rely on the findings of other cities facing similar issues. *See Id.* (upholding Renton's zoning ordinance based on studies conducted in Seattle).

*Alameda Books* clarifies the evidentiary burden on municipalities. 535 U.S. at 437. Justice Kennedy's concurrence explains that a city may rely on evidence it reasonably believes is relevant to the problem, including crime data, local experience, and studies from other jurisdictions. *Id*. at 452. Justice Kennedy emphasizes that a city needs only to demonstrate a reasonable belief that the evidence shows a correlation between SOBs and adverse secondary effects, from which it may infer that regulating SOBs may reduce those effects.

In *ACE v. Dallas*, the Fifth Circuit clarified that under *Renton* and *Alameda Books*, "[t]he pertinent inquiry . . . is whether the City could reasonably believe that its evidence linked SOBs' operation between 2:00 a.m.– 6:00 a.m. and the secondary effects targeted by the Ordinance." 83 F.4th at 966. The Fifth Circuit emphasized that deference is to be given to local lawmakers, who are not evaluating evidence in a vacuum, but instead bring contextual knowledge to resolving adverse secondary effects. *Id.* at 966. As such, legislatures "cannot be required to act only on judicial standards of proof," and municipalities "must have latitude to experiment in addressing secondary effects"—a standard under which "very little evidence is required."[14] *Id.*

---

[14] Municipalities are entitled to make predictive judgments when addressing local conditions. *ACE v. Dallas*, 83 F.4th at 966.

at 965–66 (quoting *Alameda Books*, 535 U.S. at 451) (internal quotation marks and citations omitted). Cities are given wide latitude in determining the kind of evidence necessary to satisfy the reasonably relevant standard. *Id.* at 965.

The Council relied on statistical crime data, firsthand observations of the Task Force officers, academic studies, and reports from other cities in making its decision to limit SOB operations between 2:00 a.m. and 6:00 a.m. in order to reduce adverse secondary effects. This evidence satisfies the City's burden under *Renton* and *Alameda Books* to show that restricting SOB operations during these hours would likely reduce crime and the drain on emergency resources.[15]

### 2. **Plaintiffs fail to cast direct doubt on the City's rationale**.

Plaintiffs emphasize that under *Alameda Books*, once the City meets its initial burden of showing a reasonable belief that its actions would reduce adverse secondary effects, Plaintiffs may "cast direct doubt" on the City's rationale by showing that the City's evidence does not support its stated rationale, or by furnishing evidence that disputes the City's findings. 535 U.S. at 438–39. Here, Plaintiffs pursue the second approach, by presenting evidence they contend disproves the City's claimed adverse secondary effects, making summary judgment for the City inappropriate.

To support their challenge, Plaintiffs submit expert reports analyzing the same components as did the Council: crime incidents, arrests, and calls for service within 500 feet of SOBs, and then comparing that data to such events at selected non-SOB locations ("control sites") between 10:00 p.m. and 2:00 a.m. and between 2:00 a.m. and 6:00 a.m. Plaintiffs' reports

---

[15] Even if the City had relied solely on one category of this evidence—such as local crime data or studies from other municipalities—that alone would likely have been sufficient to satisfy its evidentiary burden. *See Renton*, 475 U.S. at 51–52 (1986) (permitting reliance on studies conducted by other cities); *ACE v. Dallas*, 83 F.4th at 966 (5th Cir. 2023) ("[V]ery little evidence is required.").

conclude that SOBs are not associated with adverse secondary effects during operating hours, based on their finding that crime incidents, calls for service, and arrests near SOBs during those hours are comparable to or lower than those near the selected control sites.[16]  Pls' App. in Supp. of Resp. to Def's Mot. for Summ. J. at App. 44 – App. 45 (ECF No. 127).  Plaintiffs argue that this data undermines the City's findings.

As an initial matter, Plaintiffs mischaracterize what their evidence demonstrates.  Their study does not demonstrate that the City's evidence is wrong or unreliable.  Instead, it offers a different interpretation of similar data, shifting the focus from whether crime increased near SOBs from 2 a.m. – 6 a.m. to a comparison of arrests and calls for service near SOBs to those at the control sites.  When this Court granted a preliminary injunction against the enforcement of the Ordinance, this Court found fault with the City's failure to compare statistics for crime and calls around SOBs from 2 a.m. – 6 a.m. to those around non-SOBs from 2 a.m. – 6 a.m. However, the Fifth Circuit disagreed, finding that "[t]he City was entitled to make reasonable inferences from the information it had without needing to rule out other possibilities."  *ACE v. Dallas*, 83 F.4th at 968.  Plaintiffs treat the existence of comparable crime rates at control sites as proof that there are no adverse secondary effects near SOBs.  This approach does not disprove the City's conclusions that SOBs provoke crime and emergency calls from 10 p.m. – 2 a.m. Whether there is also crime at non-SOB sites does not prove otherwise.

The City is not required to prove its rationale to be correct.  It needs only to show the Council relied on evidence that it reasonably believed relevant to minimizing the adverse secondary effects it sought to address.  *See Renton*, 475 U.S. 51–52.  To cast doubt on this rationale, Plaintiffs must demonstrate that the Council did not have a reasonable belief that SOBs

---

[16] The report concludes, "The 2am-6am time block is less criminogenic around adult businesses than around control locations, and is less criminogenic than the 10pm-2am time block."  ECF No. 127 at 44–45.

contribute to adverse secondary effects between 2:00 a.m. and 6:00 a.m.  Stated differently, Plaintiffs must do more than offer a plausible alternative interpretation of evidence; they must disprove the reasonable relevant belief of the Council that there was a link between SOBs and adverse secondary effects from 2 a.m. – 6 a.m.

Plaintiffs fail to make this showing.  As the Fifth Circuit has made clear, the City is not required to provide comparative data to support its rationale.  *ACE v. Dallas*, 83 F.4th at 963–64.  Moreover, there are additional flaws in the Plaintiffs' expert reports—namely, the exclusion of relevant data from "outliers" and the failure to consider whether the control sites are appropriate comparators.[17]  *See Id*. at 966 n.12 (noting that deference to municipalities is appropriate even where the crime data is not "perfectly tailored," particularly when supported by hands-on experience).  These omissions further undermine Plaintiffs' evidence and do not cast direct doubt on the City's rationale.

Even if Plaintiffs' evidence were sufficient to discredit the City's statistical crime data, the City's rationale for the Ordinance is supported by other evidence, including Task Force officers' firsthand observations, academic studies, and findings from other cities.  *See Renton*, 475 U.S. at 51–52 (upholding ordinance based on reasonably believed relevant evidence, including studies from other cities).  Plaintiffs do not address these categories of evidence and thus do not disprove the City's rationale for the Ordinance.

3.  **The Ordinance provides a reasonable alternate avenue of communication**.

A regulation that targets the secondary effects of protected expression must still leave open adequate alternative avenues for communication.  *Id*. at 54.  This fact-specific inquiry turns

---

[17] For example, the City contends that several high crime SOB locations were excluded from Plaintiffs' analysis as statistical "outliers," even though they represent critical data points for assessing late-night crime trends.  The City argues that omitting those sites distorts the overall picture and undermines the reliability of the conclusions drawn about the relationship between SOBs and adverse secondary effects.  This Court agrees.

on whether the regulation meaningfully forecloses expressive activity. The law does not require that the alternatives be ideal or unrestricted—only that they provide speakers with a reasonable opportunity to disseminate their message. *See Id.*; *Alameda Books*, 535 U.S. at 437.

The Ordinance leaves SOBs free to operate twenty hours per day, restricting only the 2:00 a.m. – 6:00 a.m. time window. The record contains no evidence suggesting that a twenty-hour window, rather than a twenty-four-hour window, is essential to the expressive nature of the performances, or that twenty hours is an inadequate amount of time for protected expression. The Court finds the Ordinance leaves open ample alternative channels of communication and satisfies the second step of the *Renton* test. *See ACE v. Dallas*, 83 F.4th at 963–64. Because the City has met its burden under *Renton* and *Alameda Books*, and Plaintiffs fail to raise a genuine dispute of material fact, the Court concludes that the Ordinance does not violate the First Amendment. Summary judgment is therefore appropriate for the City.

B. Overbreadth

Plaintiffs also assert that the Ordinance is facially invalid due to overbreadth, clarifying that it sweeps too broadly by applying to adult bookstores, which feature adult films, and opportunities to review them and to engage in sexual conduct while doing so. ECF No. 127 at App. 56 – App. 69. They contend there is insufficient evidence linking adult bookstores to the adverse secondary effects the City seeks to mitigate, particularly during the restricted hours of 2:00 a.m. – 6:00 a.m. Plaintiffs provide only a cursory argument in support of this claim.

To prevail on their facial overbreadth challenge, Plaintiffs must show that the Ordinance prohibits a substantial amount of protected speech relative to its plainly legitimate sweep. *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003); *Doe v. Landry*, 909 F.3d 99, 114 (5th Cir. 2018). This doctrine is "strong medicine" to be applied "only as a last resort." *Broadrick v.*

12

*Oklahoma*, 413 U.S. 601, 613 (1973); *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 482 (5th Cir. 2002). To succeed, Plaintiffs must show that the Ordinance's overbreadth is both "real" and "substantial," based on the text of the law being challenged and the facts. *Baby Dolls*, 295 F.3d at 482; *Hicks*, 539 U.S. at 122.

Plaintiffs reference a footnote in *ACE v. Dallas*, observing that incidents of violent crime at adult bookstores "appear[] low". *See* 83 F.4th at 969 n.13. However, the Fifth Circuit also noted that more than 500 911 calls and 150 arrests occurred between 2:00 a.m. and 6:00 a.m. around adult bookstores and emphasized that "[c]ourts should not second-guess legislative judgments about the significance of these problems." *Id*. The Fifth Circuit noted that such evidence may reasonably support regulation, even if adverse secondary effects are less pronounced at adult bookstores than at adult cabarets.

Plaintiffs rely on their expert report, which concludes that there is "not more crime around adult bookstores than control locations," and that the 2:00 a.m. – 6:00 a.m. time block is "less criminogenic" than the earlier hours. ECF No. 127 at App. 58. According to that report, "the 2:00 a.m. to 6:00 a.m. period was associated with fewer crime incidents than the 10:00 p.m. to 2:00 a.m. period." *Id*. However, this evidence does not demonstrate that the Ordinance burdens a substantial amount of protected expression as it relates to adult bookstores. Nor does it show that the Ordinance burdens a substantial amount of protected speech relative to its legitimate aim of mitigating late night adverse secondary effects. Although the evidence linking adult bookstores to secondary effects is weaker than the evidence for cabarets, it still concerns the category of SOBs and is sufficient to support the City's rationale.

The overbreadth doctrine does not require the City to produce perfect data nor to justify the regulation's application to every type of SOB with equal precision. *Renton*, 475 U.S. at 51–

52; *Alameda Books*, 535 U.S. at 439–40.  The standard is objective and substantially defers to legislative judgment, particularly where the City relies on evidence it reasonably believes to be relevant.  Plaintiffs' own experts acknowledge there is late night criminal activity at or near adult bookstores.  Bookstores, while in some respects different from cabarets, are not categorically exempt from the adverse secondary effects the Ordinance seeks to address, nor is the City prohibited from grouping them with other SOBs.  If crime is occurring around SOBs, it is within the purview of the City to provide limited regulation of them, as it has done here.  The Ordinance does not restrict a substantial amount of protected speech in relation to its legitimate scope.  The failure to show that the Ordinance's overbreadth is both real and substantial warrants summary judgment on Plaintiffs' overbreadth challenge.

## IV.    CONCLUSION

Plaintiffs' Motion for Partial Summary Judgment is **DENIED**, the Motion for Leave is **DENIED**, and the City's Motion for Summary Judgment is **GRANTED**.

**SO ORDERED**.

June 12, 2025.

BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE